Michael W. Sobol (State Bar No. 194857)
(msobol@lchb.com)
Allison S. Elgart (State Bar No. 241901)
(aelgart@lchb.com)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Michael A. Caddell (admitted *pro hac vice*)
(mac@caddellchapman.com)
George Y. Niño (State Bar No. 146623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, TX 77010
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI N. WHITE, ROBERT RADCLIFFE, CHESTER CARTER, ARNOLD LOVELL, Jr., CLIFTON C. SEALE, III and ALEX GIDI, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendant. | Case No. 05-cv-01070-DOC/MLG<br><br>**DECLARATION OF JOHN ULZHEIMER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| JOSE HERNANDEZ, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendant. | Case No. 06-cv-03924-DOC/MLG<br><br>**DECLARATION OF JOHN ULZHEIMER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, John Ulzheimer, declare that:

1. I have been retained to provide an opinion in connection with plaintiffs' motion for class certification in the above-referenced action. I make the following representations on the basis of my own personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

## I. My Professional Background

2. All that I state will be based on my 15 years of experience in the consumer credit reporting and consumer credit scoring industries.

3. I spent seven (7) years with Equifax Credit Information Services and spent several of those years as an Assistant Manager of a team of consumer service agents, which handled thousands of consumer contacts (both telephone and mail) on a daily basis.

4. The majority of the consumer contacts were challenges (disputes) to what they believed to be inaccurate information residing on their credit files. My role and that of my subordinates was to interview the consumer and capture the specifics regarding their dispute, enter that information into Equifax's computer systems, generate verification forms which were sent to the furnishers of the challenged credit report information, manually input the responses we received back from the data furnishers specific to the challenged credit report information, update the consumer's credit file based on the direction of the data furnisher and then mail the consumer an updated current copy of their credit report.

5. I also spent 6 years and 11 months at the Fair Isaac Corporation. Fair Isaac is best known for their work in credit risk score development. Their core product, the "FICO" Credit Score, is widely known in the consumer credit and lending environment and is by far the dominant credit risk score used in those industries.

6. My role at Fair Isaac included consulting with their credit reporting agency partners, lenders and consumers on all aspects of credit scores. I

1  also spent time developing credit bureau scorecards, which are the heart of the
2  credit scoring models.  I am well versed on credit model design, development as
3  well as the use of these models in the financial service and insurance industries.  I
4  understand exactly what causes credit scores to be good, bad or average.  Because
5  of my experience with both credit reports and credit scores, my level of expertise in
6  the consumer credit arena can best be described as unique.  It's because of the
7  unique blending of these two disciplines (credit reporting and credit scoring) that I
8  was tapped as one of the very few people at Fair Isaac who was allowed to speak to
9  the media as a quotable source of information as a representative of the company.  I
10 was also one of less than a dozen people in a company of 2400 who were allowed
11 to speak on behalf of the company to trade groups, members of government,
12 consumer groups, partners and clients as an educational speaker on the topic of
13 credit scoring.
14         7.    I have made no less than 500 credit reporting and credit scoring
15 presentations during the past 15 years.  These presentations were of varying levels
16 of complexity and were delivered to consumers and consumer groups, credit
17 counselors, credit reporting agencies, nationally recognized lenders, members of the
18 press, financial planners, members of Congress and banking authorities.
19         8.    I am currently the President of Credit.com Educational Services,
20 a credit education company.  My responsibilities are to hold educational forums
21 where we teach credit challenged consumers how to re-enter the consumer credit
22 environment with a better understanding of what lenders and insurance companies
23 expect from them from a credit risk perspective.  I also contribute to our sister
24 company's credit related blog at www.creditbloggers.com.
25         9.    I teach an ongoing class on credit reporting and credit scoring at
26 Emory University in Atlanta, Georgia and have been a guest lecturer on the same
27 topics at the University of Georgia, LaGrange College and the Westminster School,
28 which is also located in Atlanta, Georgia.

10. I also volunteer my time to teach credit reporting and credit scoring basics on behalf of the Georgia Consortium For Personal Financial Literacy and others who they try and reach through their non-profit efforts.

11. In addition to the above, I also have appeared on CNN to discuss credit reporting and credit scoring, have written and ghost written books and product manuals on the same and am frequently interviewed and quoted by both the print and online credit and finance media.

12. I have served as an expert witness in two other cases as an expert for the credit industry. This is my first time as an expert serving a plaintiff. One of the two cases was settled before being tried and the other is still pending.

## II. Opinion

13. My review of countless examples of credit files that have Chapter 7 bankruptcy filings noted in the Public Records section indicates that a great many of them contain dischargeable credit accounts (commonly referred to as "trade lines"), collections and other pre-bankruptcy debts as still due and owing. It is my understanding that plaintiffs' counsel have reviewed more than 2,800 such credit reports and have discovered that the error rates in reporting the status of pre-bankruptcy debts is comparable for all three of the major credit reporting agencies. Assuming that is correct and based on my first-hand experience with this problem while at Equifax, it is my belief that Experian likely receives many thousands of consumer disputes each year that are specifically targeted at having incorrectly reported pre-bankruptcy debts reported as due and owing in one manner or another, rather than as being discharged or included in the bankruptcy.

14. Based on my experience in the consumer credit industry and my familiarity with the vast capabilities of the computer systems used by the major credit reporting agencies, it is my opinion that Experian likely has the ability to identify those individuals: (a) who have obtained Chapter 7 discharge orders since

1  1995; and (b) whose dischargeable debts have been reported as due and owing in
2  one or more credit reports issued since March 2002.
3          15.     Experian has sophisticated computer systems that I believe are
4  capable of being programmed to systemically fix misreporting of pre-bankruptcy
5  dischargeable debts, that this could be done at a reasonable cost, and that much, if
6  not all, of this cost would be recaptured over time by reducing reinvestigation costs
7  and improving consumer sentiment toward the company.
8          16.     Experian has the ability to program its computer systems to
9  identify which debts pre-date a bankruptcy filing. I believe that it also has the
10  ability to program its computer systems to identify which of these pre-bankruptcy
11  debts are non-dischargeable in the large majority of cases and to sort those non-
12  dischargeable debts out from the dischargeable ones.
13          17.     I have reviewed METRO 2 format for credit reporting and would
14  note that using that format Experian codes debts by category, including categories
15  that correspond to the vast majority of debts that are non-dischargeable by nature
16  (*e.g.*, student loans, child support payments, tax liens, *etc.*). It is my opinion,
17  therefore, that Experian is able to identify these debts through computer search
18  programs and to separate them from debts that are dischargeable.
19          18.     It is also my understanding that information relating to whether
20  debts have been reaffirmed in a reaffirmation agreement or successfully challenged
21  in an adversary proceeding is available from PACER (where it is in computer
22  readable form). It is my further understanding that Experian, either directly or
23  through a third party vendor, obtains information relating to the existence of
24  bankruptcy filings and discharge orders from PACER. It is my opinion, therefore,
25  that Experian could easily retrieve information relating to the existence of debts that
26  have been reaffirmed or successful challenged through PACER and could program
27  their computers to separate these non-dischargeable from those that are
28  dischargeable.

595485.1                                  - 4 -                    DECLARATION OF JOHN ULZHEIMER
                                                                  05-CV-01070-DOC/MLG; 06-CV-03924-DOC/MGL

19. As an alternative or supplemental way of solving any misreporting problems, Experian can implement a policy that mandates that it reverse its default handling in regard to the reporting of discharged debts. It is my understanding that Experian relies on information obtained from data furnishers to update the status of accounts that have been "included in bankruptcy".

20. It is my opinion that reversing the default would result in far greater accuracy than the present system because the number of debts that are discharged by a Chapter 7 bankruptcy discharge order vastly exceeds the number of debts that are non-dischargeable. Under this revised reporting procedure, Experian would update its consumer credit files accordingly and maintain that information until its data furnishers inform it that the debt has been reaffirmed or was successfully challenged as part of the bankruptcy or was otherwise non-dischargeable as a matter of law, thus shifting the burden to the furnishers to provide information showing that a particular debt has not been discharged.

21. The improper reporting of discharged debts as due and owing has an adverse affect on any credit bureau based risk score, making it much more difficult for consumers to rebuild and re-establish their credit. The adverse impact could result from the misreporting of even one tradeline. This adverse impact will vary from consumer to consumer. For one person the adverse impact under FICO could be ten (10) credit score points, for another it could be twenty (20) credit score points, and for others it could be still more.

22. The impact to a consumer's bottom line even with a minor improvement in their credit score can be significant. In 2005, the Consumer Federation of America and Providian Financial commissioned a study whereby they concluded "if consumers were to raise their credit scores by 30 points, on average, they would save $16 billion on lower credit card finance charges alone." Assuming that the study even remotely reflects the reality of finance savings for consumers if they can raise their credit scores by "an average" of 30 points, then even consumers

1  who are able to improve their scores by 5, 10 or 15 points will likely realize true
2  financial savings. This is true in many cases but especially so for higher risk
3  borrowers, like those who have filed for bankruptcy, since all lenders and insurance
4  companies use a tiered based method of assigning interest rates, loan terms or
5  premiums.
6       I state the above opinions with a significant degree of confidence and
7  certainty.
8       Signed and sworn to under the penalties of perjury under the laws of
9  the United States this the 14th day of February, 2007, in Atlanta, Georgia.

_____
John Ulzheimer