Michael W. Sobol (State Bar No. 194857)
(msobol@lchb.com)
Allison S. Elgart (State Bar No. 241901)
(aelgart@lchb.com)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Michael A. Caddell (admitted *pro hac vice*)
(mac@caddellchapman.com)
George Y. Niño (State Bar No. 146623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, TX 77010
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TERRI N. WHITE, ROBERT RADCLIFFE, CHESTER CARTER, ARNOLD LOVELL, Jr., CLIFTON C. SEALE, III and ALEX GIDI,** *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.,**<br><br>**Defendant.** | **Case No. 05-cv-01070-DOC/MLG**<br>**LEAD CASE**<br><br>**DECLARATION OF JOHN ULZHEIMER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO EXPERIAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I, John Ulzheimer, declare that:

1.    I have been retained to provide an opinion in connection with Plaintiff's opposition to Experian's motion for partial summary judgment in the above-referenced action. I make the following representations on the basis of my

DECLARATION OF JOHN ULZHEIMER

1   own personal knowledge.  If called as a witness, I could and would competently

2   testify to the matters stated herein.

3   **I.     My Professional Background**

4          2.     All that I state will be based on my 16 years of experience in the

5   consumer credit reporting and consumer credit scoring industries.

6          3.     I spent six (6) years with Equifax Credit Information Services

7   and spent several of those years as an Assistant Manager of a team of consumer

8   service agents, which handled thousands of consumer contacts (both telephone and

9   mail) on a daily basis.

10          4.     The majority of the consumer contacts were challenges (disputes)

11   to what they believed to be inaccurate information residing on their credit files.  My

12   role and that of my subordinates was to interview the consumer and capture the

13   specifics regarding their dispute, enter that information into Equifax's computer

14   systems, generate verification forms which were sent to the furnishers of the

15   challenged credit report information, manually input the responses we received

16   back from the data furnishers specific to the challenged credit report information,

17   update the consumer's credit file based on the direction of the data furnisher and

18   then mail the consumer an updated current copy of their credit report.

19          5.     I also spent 6 years and 11 months at the Fair Isaac Corporation.

20   Fair Isaac is best known for their work in credit risk score development.  Their core

21   product, the "FICO" Credit Score, is widely known in the consumer credit and

22   lending environment and is by far the dominant credit risk score used in those

23   industries.

24          6.     My role at Fair Isaac included consulting with their credit

25   reporting agency partners, lenders and consumers on all aspects of credit scores.  I

26   also spent time developing credit bureau scorecards, which are the heart of the

27   credit scoring models.  I am well versed on credit model design, development as

28   well as the use of these models in the financial service and insurance industries.  I

DECLARATION OF JOHN ULZHEIMER

understand exactly what causes credit scores to be good, bad or average.  Because of my experience with both credit reports and credit scores, my level of expertise in the consumer credit arena can best be described as unique.  It's because of the unique blending of these two disciplines (credit reporting and credit scoring) that I was tapped as one of the very few people at Fair Isaac who was allowed to speak to the media as a quotable source of information as a representative of the company.  I was also one of less than a dozen people in a company of 2400 who were allowed to speak on behalf of the company to trade groups, members of government, consumer groups, partners and clients as an educational speaker on the topic of credit scoring.

7.   I have made no less than 500 credit reporting and credit scoring presentations during the past 16 years.  These presentations were of varying levels of complexity and were delivered to consumers and consumer groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, financial planners, members of Congress and banking authorities.

8.   I am currently the President of Credit.com Educational Services, a credit education company.  My responsibilities are to hold educational forums where we teach credit challenged consumers how to re-enter the consumer credit environment with a better understanding of what lenders and insurance companies expect from them from a credit risk perspective.  I also contribute to our sister company's credit related blog at www.creditbloggers.com.

9.   I teach an ongoing class on credit reporting and credit scoring at Emory University in Atlanta, Georgia and have been a guest lecturer on the same topics at the University of Georgia, LaGrange College and the Westminster School, which is also located in Atlanta, Georgia.

10.   I also volunteer my time to teach credit reporting and credit scoring basics on behalf of the Georgia Consortium For Personal Financial Literacy and others who they try and reach through their non-profit efforts.

11.    In addition to the above, I also have appeared on CNN multiple times to discuss credit reporting and credit scoring, have written and ghost written books and product manuals on the same and am frequently interviewed and quoted by both the print and online credit and finance media.

12.    I have served as an expert witness in two other cases as an expert for the credit industry.  This is my first time as an expert serving a plaintiff.  Both previous cases have now been settled.

## II.   Opinion

13.    The primary function of any credit-scoring model is to be predictive of some future outcome.  In the case of credit risk scores, they are meant to be predictive of future consumer credit risk.  The only way to maintain the highest level of predictive performance would be to continuously redesign and redevelop the credit-scoring model.  Another value of continuous redevelopment is that the model is built on a newer sample of consumer credit files.  This allows the model developer an opportunity to study any new trends in consumer behavior as well as any new trends in how the credit reporting agencies gather and maintain credit data.   Once these trends are identified they can be studied to determine if they have any predictive value as a possible new characteristic set or variable classing.  If they do, in fact, have value then the developer is obligated through dedication to his trade and responsibility to his clients to consider them for inclusion in the final scorecard/s of the newly redeveloped credit-scoring model.  If lenders and credit reporting agencies changed how they reported or noted certain types of accounts and that process became an industry standard (a very realistic expectation considering all three credit bureaus ask lender data furnishers to use the universal METRO 2 reporting format) then subsequent development samples would likely capture the idiosyncrasies of any new reporting practices and allow the model developer to take them into account when the new model is finalized.

DECLARATION OF JOHN ULZHEIMER

14.   All credit bureau based scoring models depend on data from credit reports to generate scores.  As such, incorrect or incomplete credit information on any given consumer will lead to a score being calculated that is not truly indicative of that consumer's credit risk.  If that score is too high, then it's not fair for the lenders, insurance companies, or their respective investors.  If that score is too low, then it's not fair for the consumer or their family.  A component of this case that keeps resurfacing is the various credit score comparisons produced by Experian and TransUnion.  These comparisons use a "pre/post" structure whereby they show the consumer's scores as they stand status quo and then as they stand if, in fact, the credit bureaus made certain modifications correcting erroneous credit data.  Notwithstanding the numerous unanswered questions about these comparisons, in some cases the consumer's scores appear to increase and in some cases the consumer's scores appear to decrease.  These results validate my opinion that this is not a credit scoring issue, it's a data accuracy issue.  In each instance'. where the score changed it identifies a situation where the consumer's credit file contained errors.  As such, a lender, insurance company, employer or a consumer was being misled by a credit score generated by, in part, erroneous credit information and made a lending decision on a unrepresentative credit score and credit file data.  The goal of everyone involved with the credit industry should be to work, without rest, until credit reports are 100% correct 100% of the time.  Anything less is a disservice to consumers whose financial fortunes are largely controlled by their credit files and to lenders and insurance companies who spend collectively billions of dollars each year on credit reports and credit scores as part of their underwriting, prospecting and account management practices.  It is most accurate to show any debt as discharged if it is, in fact, discharged and not discharged if it is, in fact, not discharged.  And, in the case of a ride through (a debt that is discharged but still being paid voluntarily) then it is most accurate to show the debt as being discharged but still being voluntarily paid.  In fact, there is a

DECLARATION OF JOHN ULZHEIMER

1   narrative "Making Payments" as well as "Voluntary" that can be included with a

2   tradeline.  These narratives, or narrative codes, can be included on an account by

3   the data furnisher or by the credit-reporting agency.  As such, Experian's proposal

4   to simply report these debts as discharged without noting voluntary payments

5   misrepresents the true status of the account and unfairly punishes consumers.

6   Moreover, voluntary payment is predictive of future credit behavior and therefore it

7   would diminish the predictive value of credit reporting to omit this important

8   information.

9        15.   If there is a tradeline that has a status date that precedes a

10  discharge date of a Chapter 7 bankruptcy, then this implies that there is not more

11  recent information specific to that account that the credit-reporting agency has or

12  has access to, about the account.   Sometimes there can be conflicting information

13  between the public records section of the credit file and the trade section, which can

14  be easily identified and corrected.  For example, if a credit card account is showing

15  as "charged off" in June of 2006 with a past due balance of $5,000 and there is a

16  Chapter 7 bankruptcy showing as discharged in November of 2006 then the credit

17  reporting agencies can reasonably report that the debt on the credit card was, in

18  fact, discharged as part of the bankruptcy because of it being a statutorily

19  dischargeable debt under our current bankruptcy laws.

20       16.   An account that has been discharged as part of a Chapter 7

21  bankruptcy that still is being reported as being charged off, in collection, having a

22  record of previous late payments (referred to as PHR's or Previous High Rates) or

23  as being past due with a balance owing is inaccurate credit reporting.

24       17.   By incorrectly reporting erroneous information on a credit file

25  the credit reporting agencies not only risk producing an inaccurate credit score but

26  they also can cause harm to the consumer by reporting information that could cause

27  the consumer to fail underwriting standards due to policy failures.  All lenders and

28  insurance companies use non-scoring criteria as a "complimentary" underwriting

- 5 -

DECLARATION OF JOHN ULZHEIMER

1    variable.  For example, Lender A may require a minimum FICO credit score of 580
2    and no past due balances in order to approve a consumer for a personal loan.  If the
3    consumer's credit file scores higher than 580 yet shows a past due debt that was, in
4    fact, discharged as part of a Chapter 7 bankruptcy then the consumer will be denied
5    credit because of the erroneous credit reporting.  They passed the lender's minimum
6    score requirements but failed their non-scoring criteria.  This non-scoring criteria is
7    common in all types of lending but most common in the mortgage environment.
8    Mortgage lenders who use Fannie Mae and Freddie Mac's Loan Prospector and
9    Desktop Underwriter application processing systems are fully dependant on criteria
10   hard coded within those systems.  The applicant's credit scores are a variable within
11   these decision engines but are just one variable among literally dozens of non-score
12   related variables.  Information taken directly from a consumer's credit files is fed
13   into these systems and "graded" as part of the decision making progress.  Any past
14   due debt is flagged and can cause a consumer to be denied a loan or countered back
15   with less attractive terms.

16          18.    Most consumers are not engaged with the credit reporting
17   agencies to the degree necessary to realize that they've been damaged somehow
18   because of the errors in credit reporting.  I submit that this is irrelevant and that
19   consumers are potentially harmed each and every day that their credit reports
20   contain errors.  The credit reporting agencies make it, at the very least, extremely
21   inconvenient for consumers to always have to act as the guardian of their own
22   credit file data.  In fact, I submit that most consumers would rather engage in
23   almost any other activity than to spend time trying to reach a live person at the
24   credit reporting agencies who is not on a "talk time" clock and is empowered to
25   make a common sense decision about the accuracy of pre-bankrupt debt
26   information.  The risk to consumers of not having a completely accurate credit file,
27   especially when it would be so easy to eliminate one costly category of errors, is
28   harm to their credit risk and insurance risk scores, harm in the eyes of lender

DECLARATION OF JOHN ULZHEIMER

1   policies outside of credit scoring, harm in the eyes of insurance company policies

2   outside of credit scoring, risk of credit denials, higher interest rates, less attractive

3   terms, loss of employment and loss of insurance.  These are real life consequences.

4        19.   As a credit file delinquency ages a consumer's score will

5   organically improve, even if nothing else on the credit file changes.  This is due to a

6   common component of all credit scoring models that gives less weight to

7   delinquencies as they age.   As such, it is a certainty that consumers who have

8   incorrectly reported pre-bankruptcy debts appearing on their credit reports will see

9   their scores improve over time despite still having a past due balance on their credit

10  files.  Their improvement is somewhat limited given the fact that the past due

11  balance is still preventing them from scoring as well as they deserve.  A solution to

12  this problem would be to correct the tradeline, collection or judgment to show a

13  zero dollar balance as of the date discharged.  This updating of a status date can

14  lower a consumer's scores in some cases because the model now sees a more recent

15  delinquency.  I submit that in the cases where the scores went down because of the

16  correction that they were actually corrected to reflect the consumer's true credit

17  risk.  And, now as the account begins to age, the consumer will see their score

18  improve not only because of the aging of the delinquency but also because there is

19  no longer an incorrectly reported balance due.  As the consumer's score improves it

20  will be a true and accurate reflection of his/her credit risk, which is what lenders

21  depend on when making their decisions.

22       20.   I believe that the credit-reporting agencies have an obligation to

23  report information about an account (trade line, collection) or judgment if they have

24  more accurate or up to date information.  I do not believe that the bureaus do or

25  should have a preference to not update an account simply as a matter or

26  inconvenience, preference or belief that their update will lower a consumer's credit

27  scores.  The reporting agencies should focus their efforts on making sure consumer

28

- 7 -

DECLARATION OF JOHN ULZHEIMER

1  credit files are completely accurate, not cherry pick certain instances where an error

2  in reporting is acceptable.

3      21.   It is my understanding that the Fair Credit Reporting Act

4  obligated a data furnisher to report whether or not an account has been reaffirmed

5  or has been successful in challenging the discharge of their debt.

6      22.   Since courthouses do not send information to the credit bureaus

7  as a data furnisher would, the bureaus must rely, in part, on public record vendors

8  such as ChoicePoint and Lexis Nexis for some of their updates.  These companies

9  routinely include bankruptcy petitions, discharge orders, dismissals, reaffirmations,

10  and successful challenges to discharge.

11      23.   Public record vendors also provide reactive updates to

12  information already on file through the process of reinvestigation by the credit

13  reporting agencies (e.g. satisfaction of judgment, release of lien, dismissal of

14  bankruptcy).  The credit reporting agencies make adjustments to the credit files'

15  based on this information even if the consumer never challenged the item in

16  question.  So, it's reasonable to expect the credit reporting agencies could also

17  update a tradeline or collection based on more recent public record vendor updates.

18

19  I state the above opinions with a significant degree of confidence and certainty.

20

21      Signed and sworn to under the penalties of perjury under the laws of

22  the United States this the _18th_ day of July, 2007, in Atlanta, Georgia.

23

24

25  
   John Ulzheimer

26

27

28

- 8 -

DECLARATION OF JOHN ULZHEIMER