1   Michael W. Sobol (State Bar No. 194857)
    (msobol@lchb.com)
2   Rebecca Bedwell-Coll (State Bar No. 184468)
    (rbcoll@lchb.com)
3   Allison Elgart (State Bar No. 241901)
    (aelgart@lchb.com)
4   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
5   San Francisco, CA 94111-3339
    Telephone: (415) 956-1000
6   Facsimile: (415) 956-1008

7   Michael A. Caddell (admitted *pro hac vice*)
    (mac@caddellchapman.com)
8   Cynthia B. Chapman (State Bar No. 164471)
    (cbc@caddellchapman.com)
9   George Y. Niño (State Bar No. 146623)
    (gyn@caddellchapman.com)
10  CADDELL & CHAPMAN
    1331 Lamar, Suite 1070
11  Houston, TX 77010
    Telephone: (713) 751-0400
12  Facsimile: (713) 751-0906

13  *Attorneys for Plaintiffs*

14

15

         UNITED STATES DISTRICT COURT

         CENTRAL DISTRICT OF CALIFORNIA

16  TERRI N. WHITE, *et al.*,        Case No. 05-cv-01070-DOC/MLG
                          (LEAD CASE)
17          Plaintiffs,

18     v.                   **PLAINTIFFS' STATEMENT**
                          **OF GENUINE ISSUES IN**
19  EXPERIAN INFORMATION     **OPPOSITION TO DEFENDANT**
    SOLUTIONS, INC.,           **EXPERIAN INFORMATION**
20                          **SOLUTIONS, INC.'S MOTION**
           Defendant.      **FOR PARTIAL SUMMARY**
21                          **JUDGMENT**

22

23                    **Date:**  **August 13, 2007**
                     **Time:**  **8:30 a.m.**
24                    **Place:**  **Courtroom 9B**
                     **Judge:** **Hon. David O. Carter**
25

26

27

28

    720454.2

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUL 2 0 2007

CENTRAL DISTRICT OF CALIFORNIA
BY         DEPUTY

RECEIVED BUT NOT FILED

JUL 17 2007

CLERK, U.S. DISTRICT OF CENTRAL DISTRICT OF SOUTHERN DIVISION

DOCKETED ON CM

JUL - 1 2007

BY

157

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| OVERVIEW | | 1 |
| EXPERIAN'S STATEMENT OF UNCONTROVERTED FACTS | | 1 |
| PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS | | 6 |
| I. | Experian's Present Reporting Procedures | 6 |
| II. | Experian's Notice Of The Unreliability Of Creditors In This Unique Context | 9 |
| III. | Experian's Reporting is Grossly Inaccurate | 12 |
| | A. Experian's Analysis of Its Error Rate | 12 |
| | B. Plaintiffs' Analysis of Experian's Error Rate | 12 |
| IV. | Legal and Practical Effect Of Chapter 7 Discharge Order | 14 |
| V. | Experian's Ability to Lower Its Error Rate at Reasonable Cost | 15 |
| VI. | Reinvestigation Issues | 17 |
| VII. | Evidence of Experian's Reckless Disregard of Its Legal Obligations | 18 |
| VIII. | Harmful Consequences Of Inaccurate Bankruptcy Reporting | 19 |

Pursuant to Local Rule 56-2, Plaintiffs hereby submit this Statement of Genuine Issues In Opposition to Defendant Experian Information Solutions, Inc.'s ("Experian") Motion for Partial Summary Judgment.

**OVERVIEW**

On July 5, 2007, Experian served its Motion for Partial Summary Judgment together with a 980 page "Joint Compendium of Evidence in Support of Defendants' Oppositions to Plaintiffs' Motion for Class certification and Experian's Motion for Partial Summary Judgment." All told, the Compendium lists 14 Declarations and 47 Exhibits and references Experian's self-serving "Chapter 7 Tradelines Analysis" of 180 million tradelines contained in the credit files of over 8.8 million consumers.

By separate pleading in conformity with Local Rule 56-1, Experian narrowed this universe of evidence to a smaller set that it contends is relevant to its summary judgment motion in its Statement of Uncontroverted Facts and Conclusions of Law ("Def. Statement of Facts"). Plaintiffs thus fairly conclude that Experian suggests and offers no other evidence necessary for Plaintiffs to rebut beyond that in its Statement of Facts. To the extent it asserts additional evidence in its opening or reply briefs, Plaintiffs do object to same as non-compliant with Local Rule 56.[1]

Plaintiffs offer in this Statement of Genuine Issues a response to the evidence Defendant identifies in its Statement of Fact and also allege additional Disputed Material Facts necessary to rebut the unlisted facts upon which Experian bases its argument.

**EXPERIAN'S STATEMENT OF UNCONTROVERTED FACTS**

1. Under its policies, Experian updates a tradeline on a consumer's Experian credit file to reflect a discharge in a Chapter 7 bankruptcy when the creditor reports to Experian that the debt has been discharged.

---

[1] *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988)(Central District of California local rule governing motions for summary judgment served as adequate notice that Court would not assist "to sift through record.")

1       Plaintiffs' Response:  Plaintiffs lack knowledge or information sufficient to
2 know whether Experian consistently and accurately updates tradelines in this
3 fashion.  However, Experian's statement is incomplete and misleading in that,
4 though it may update tradelines to reflect a bankruptcy when the creditor reports a
5 debt has been discharged, it frequently fails to update inconsistent and inaccurate
6 information showing the same account as having acquired a delinquent status soon
7 after the discharge date.  (Bennett Decl. at ¶ 18(e)).

8       2.    Experian understands that Section 1681e(b) of the Fair Credit
9 Reporting Act and Section 1785.14(b) of the California Consumer Credit Reporting
10 Agencies Act require that it update tradelines on Experian credit files to reflect a
11 discharge in a Chapter 7 bankruptcy when the creditor reports to Experian that the
12 debt has been discharged.

13       Plaintiffs' Response: Denied.

14       a.    Experian offers no supporting evidence for its conclusion.
15 While Plaintiffs agree that Experian may update a credit account tradeline when a
16 creditor reports that the debt has been discharged, there is nothing in the record to
17 suggest that Experian has any particular "understanding" of the requirements of the
18 Fair Credit Reporting Act (FCRA), Section 1681e(b), or the California Consumer
19 Credit Reporting Agencies Act (CCRAA), Section 1785.14(b) (collectively
20 hereafter considered as FCRA "Section 1681e(b)").  The supporting evidence
21 suggested by Experian, Browne Declaration ¶18, states nothing of the kind.

22       b.    Experian's witness, Browne, testified in another case that
23 Section 1681e(b) imposed a higher standard and duty to review and evaluate its
24 procedures than Experian acknowledges here, stating that Experian's procedures
25 should reach a level of accuracy such that "if they try to go higher than that would
26 be either impossible or flat out not feasible[.]"  (Browne Dep., p. 89, lines 12-20,
27 Bennett Decl. Exhibit 14).   He also admitted that to comply with Section 1681e(b),
28 Experian would have to "take a look at the procedure, take a look at the results and

1  the outcome of the procedure and, if I felt that the outcome of that procedure was

2  not as good as it could be in terms of accuracy, then I would look to see if there

3  were changes that could be made to that procedure that would increase accuracy."

4  (*Id.*, p. 90, lines 2-16).

5         3.     Experian does not interpret Section 168e(b) or

6  Section 1785.14(b) as requiring it to adopt a discharge presumption based on

7  statistics about the percentage of debts discharged in a typical bankruptcy or to

8  independently review bankruptcy court dockets in an attempt to identify particular

9  debts that were reaffirmed or subject to adversary proceedings.

10      Plaintiffs' Response: Denied.

11          a.     Experian offers no supporting evidence for its conclusion.

12  Plaintiffs have separately objected to the statement of Browne's "opinion", the sole

13  citation offered for this proposition. Further, Browne's statement does not offer

14  any interpretation of Section 1681e(b) or any other specific provision of law.

15          b.     Experian has long had a policy that presumes a tradeline

16  as discharged, but follows that policy only when the consumer initiates a dispute.

17  Experian's "Consumer Investigation Procedures" effective as early as 2002 provide

18  the steps used "when the consumer claims an account was included in his/her

19  bankruptcy." (Experian Investigation Procedures, 2002, Bennett Decl. Exhibit 21,

20  p. EXP 1533). When a consumer contacts Experian and complains that it has not

21  updated a tradeline as discharged, Experian's long held policy is to:

22          i.     Locate the bankruptcy on the consumer's credit

23  report and make a note of the bankruptcy status, file date and status date;

24          ii.     Compare the date the account was opened to the

25  date the bankruptcy was filed to determine if the account was opened before the

26  bankruptcy was filed; and

27

28

1               iii.    If the account was opened before the bankruptcy

2 was filed, enter the appropriate bankruptcy chapter and the current status of the

3 bankruptcy that appears on the consumer's credit report.

4 (*Id.*). (See also Def. Declaration of Kimberly Hughes, ¶8).

5      When a bankruptcy tradeline is disputed, Experian applies this discharge

6 presumption to all pre-bankruptcy accounts — not just those that are disputed:

7 "Upon receiving a dispute that a tradeline should be reported as discharged, it is

8 Experian's policy to determine whether additional tradelines should be similarly

9 updated. For example, [for Plaintiff Carter's dispute], Experian was only asked to

10 update one account, but updated eleven." (Def. Declaration of Kimberly Hughes,

11 ¶12).

12         4.    A bankruptcy indicator appearing on a consumer's Experian

13  credit file is a derogatory status.

14     **Plaintiffs' Response:** Admitted, except that the proposition is not relevant to

15 the issue of whether the alleged inaccuracies in Experian's credit reports violate its

16 statutory duty.

17        5.    Experian received a letter from Named Plaintiff Arnold Lovell,

18 Jr., dated March 25, 2005, stating that certain of his accounts should have included

19 a notation that the accounts were discharged in bankruptcy.

20     **Plaintiffs' Response:** Admitted. Arnold Lovell's unredacted dispute letter is

21 attached as Bennett Declaration, Exhibit 10 (filed under seal).

22        6.    Lovell's March 25, 2005 letter made no reference to when and

23 where his bankruptcy was filed.

24     **Plaintiffs' Response:** Admitted, except to the extent it implies that Lovell's

25 letter did not provide Experian sufficient information to easily determine when and

26 where his bankruptcy was filed. (*See* response 7 below.)

27

28

7.     Lovell's March 25, 2005 letter did not include a copy of Lovell's bankruptcy petition or his discharge order, only his Schedule F which did not describe when or in which court he filed his bankruptcy petition.

Plaintiffs' Response:  Admitted, except to the extent it implies that Lovell's letter did not provide Experian sufficient information to easily determine when and where his bankruptcy was filed.

a.     Experian's dispute letter provided his New York address and his Schedule F, containing a bankruptcy case number, which should have enabled Experian to locate his bankruptcy records and to conclude that the subject tradelines were discharged in bankruptcy.  (Bennett Decl., ¶¶15-16).

b.     Mr. Lovell provided Experian sufficient information to locate his credit file, which contained other comparable tradelines that were reported with a Chapter 7 bankruptcy discharge as of October 2004.  (Arnold Lovell Experian Credit Reports, Bennett Decl. Exhibit 8, p. EXP 00144 ).

8.     At the time Experian received the March 25, 2005 letter, Experian's records did not contain a public record item reflecting that Lovell had been discharged in bankruptcy.

Plaintiffs' Response:  Admitted.

9.     Experian requested that Lovell provide additional documentation regarding his filing for bankruptcy and discharge, but Lovell never responded.

Plaintiffs' Response:  Denied.

Contrary to Experian's claim, Mr. Lovell did thereafter telephone Experian and again disputed the inaccuracies in his credit file.  (Declaration of Arnold Lovell, Jr.).

10.     Experian received a letter from Named Plaintiff Clifton C. Seale III on or about May 19, 2005, in which he asked Experian to update five of

- 5 -

1   his accounts to reflect that each was discharged in bankruptcy and that he no longer

2   owed money on these accounts due to his Chapter 7 bankruptcy discharge.

3        Plaintiffs' Response:  Admitted.

4        Clifton Seale's unredacted dispute letter is attached as Bennett Declaration,

5   Exhibit 11 (filed under seal).

6              11.   After confirming the fact of Seale's discharge, Experian

7   proceeded to update four of the referenced accounts, but inadvertently failed to

8   update the fifth.

9        Plaintiffs' Response:  Plaintiffs admit that Experian never corrected Mr.

10  Seale's credit file.  However, Plaintiffs deny that this failure was merely inadvertent.

11       As addressed more fully in Plaintiffs' Statement of Additional Material Facts,

12  Experian knows and in fact intends that its employees move hurriedly from one

13  dispute to the next and provides no incentive for substantive accuracy.

14  **PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

15  **I.    Experian's Present Reporting Procedures**

16             12.   Experian receives credit data from multiple sources including

17  public records furnishers and tradeline furnishers.  (Def. Declaration of Patricia

18  Finneran ¶¶ 8, 15, 23 and 25.  Declaration of David Browne, *Dennis v. BEH-1,*

19  *LLC, et al*, Appeal No. 04-56230 (9th Cir.), Bennett Decl. Exhibit 18, ¶ 3).

20             13.   After it receives data from public record and tradeline

21  furnishers, Experian organizes and sells it to its subscribers in the form of a credit

22  report.  That report includes two primary sections for credit data – Public Records

23  and Tradelines.  ((How to Read) Experian Credit Profile, Bennett Decl. Exhibit 1).

24             14.   Experian gathers its Public Records data from Public Records

25  Vendors that Experian has hired to obtain Judgments and Liens and Bankruptcy

26  filings directly from Court dockets.  (Finneran Decl. ¶¶ 15-18; ███████████

27  ████████████████████████████████████████████████

28

15.     Experian uses Lexis-Nexis to obtain its public record bankruptcy information.  (Finneran Decl. ¶ 15).

16.     Through Lexis-Nexis, Experian has access to all discharge orders issued by U.S. bankruptcy courts and it instructs its vendor as to what information it wants from the Bankruptcy court or docket.  (Finneran Decl. ¶ 16).

17.     Experian gathers significant information about each bankruptcy filing, including without limitation date of filing, date of discharge, type of bankruptcy, and assets versus liabilities in the bankruptcy.  (Finneran Decl. ¶¶ 9-10; (How to Read) Experian Credit Profile, Bennett Decl. Exh. 1, p. EXP 04639).

18.     Experian records the information from the bankruptcy docket in the public records section of its credit reports (Experian's Answer to Second Amended Consolidated Class Action Complaint ("Answer") ¶ 14; Finneran Decl. ¶ 9).

19.     Under its existing initial reporting procedures, Experian will not report a pre-bankruptcy debt as discharged unless one of Experian's furnishers affirmatively informs it of that fact.  (Answer ¶ 17; Def. Statement of Fact, ¶1).

20.     Experian receives its tradeline data (credit accounts and collections) in a uniform industry format, Metro 2.  This format, developed by Experian, Equifax and Trans Union, through their trade organization, the Consumer Data Industry Association (CDIA), requires credit data to be furnished and reported to the CRAs in a specific manner.  (Declaration of Evan Hendricks, ¶¶8-10).  (See also Credit Reporting Resource Guide (METRO 2 Manual), Consumer Data Industry Association (CDIA), Bennett Decl. Exhibit 22).

21.     When Experian's credit furnishers report to it in Metro 2 format, they have to identify their industry and the nature of the debt by inputting an "Account Type Code."  (Def. Declaration of Angela Granger ¶ 53; Hendricks Decl., ¶13; Metro 2 Manual, Bennett Decl. Exhibit 22, pp. 5-9).

22.   Experian knows if a tradeline is of an account type that would not be dischargeable in bankruptcy, because the Metro 2 codes correspond to all significant categories of statutorily non-dischargeable debts, such as Child Support (code 93), Government Fine (code 71) or Student Loans (code 12). (Metro 2 Manual, Bennett Decl. Exhibit 22, pp. 5-9).

23.   Through the industry standard Metro 2 format, a bankruptcy is reported to a credit tradeline in a field titled, "Consumer Information Indicator." "The critical piece of displayable information for the bankrupt borrower is the Consumer Information Indicator." (*Id.* at 6-13) (Hendricks Decl., ¶11).

24.   Through the industry standard Metro 2 format, a debt that is "Reaffirmed" in bankruptcy must be reported by the creditor to Experian with a "Reaffirmation" (code R) in the Consumer Information Indicator field. (*Id.*, p. 5-29) (Hendricks Decl., ¶12).

25.   Experian understands that "[t]he term 'reaffirmed' means a consumer entered into an agreement with a creditor to continue to make payments on an account rather than include it in the bankruptcy. Creditors are required by law to submit reaffirmation agreements to the bankruptcy court for approval." (Experian Investigation Procedures, 2002, Bennett Decl. Exhibit 21, p. EXP 1537).

26.   Under the industry standard Metro 2 format, a "ride through" or any rights to collateral are irrelevant to the credit reporting for the underlying discharged debt. (Metro 2 Manual, Bennett Decl. Exhibit 22, p. 6-15) ("Even though the creditor can pursue the collection of collateral, the account is still included in bankruptcy. The reporting of the Consumer Information Indicator has no impact on the creditor's ability to collect.").

27.   Experian's credit reports include a section that lists historical information about accounts preceding the date of the report and is labeled "Account History." Experian's reports also include a section that lists the last reported status

720454.2

- 8 -

*WHITE/HERNANDEZ PLTFS' STATEMENT OF GENUINE ISSUES IN OPP. TO DFDT'S MTN FOR PARTIAL SJ Case Nos. 06-CV-01070 DOC/MLG, 06-CV-0392-DOC/MLG*

1    of an account and is titled "Status." (Arnold Lovell Experian Credit Reports,

2    Bennett Decl. Exhibit 8, p. EXP 00145).

3

4    

5

6

7          29.    The credit industry understands and interprets the Status section

8    of Experian's reports to reflect the current status and balance of an account.

9    (Hendricks Decl., ¶20).

10         30.    The reporting of information about an account as of a status date

11   constitutes an implicit representation that Experian is not in possession of more

12   recent information concerning the status of that account. (Ulzheimer Decl. II, ¶

13   15).

14   **II.    Experian's Notice Of The Unreliability Of Creditors In This Unique**
**Context.**

15

16         31.    Experian's credit reports put it on notice of recurring errors in its

17   reporting of pre-bankruptcy debts because those reports contain information that

18   appears implausible and inconsistent.  For example, in the credit file of Clifton

19   Seale, Experian was informed by its public records furnisher and certain other

20   creditor furnishers that the Plaintiff had obtained a bankruptcy discharge.  However,

21   it also received information from several other creditor furnishers by their

22   continued status reporting or omissions that he had not obtained a discharge.

23   (Clifton Seale Experian Credit Reports, Bennett Decl. Exhibit 9).

24         32.    Experian has complete contractual control over what bankruptcy

25   and other public records data its vendor collects and provides.

26

27

28

33.     Experian believes that its Public Records furnishers are the most reliable of its sourced data. (Experian's Appellee Brief, *Dennis v. BEH-1, LLC, et al*, Appeal No. 04-56230 (9th Cir.), Bennett Decl. Exh. 17; Experian's Memorandum of Law in Support of Motion to Dismiss, *Gonzalez v. Experian Information Solutions, Inc., et al.*, No. 2:04cv912 (D. Utah), Bennett Decl. Exh. 19; Declaration of David Browne, *Dennis v. BEH-1, LLC, et al*, Appeal No. 04-56230 (9th Cir.), Bennett Decl. Exh. 18, ¶¶ 3-4).

34.     Experian knows or should know that its credit tradeline furnishers are uniquely unreliable in the context of post-bankruptcy reporting. (Hendricks Decl. ¶¶22-23).

a.     Experian acknowledges that many creditors do not receive complete or timely notice of the Chapter 7 discharge or may not be able to identify or match the account numbers in the bankruptcy schedules. (Def. Declaration of Lisa H. Fenning, ¶¶ 28-32).



        d.     Experian is well aware that its creditor/furnishers frequently cease reporting on certain types of accounts, including, in particular, accounts that have been charged off and placed in collection. (Finneran Decl. ¶ 24). Consequently, Experian is aware that these creditor/furnishers are failing to report to Experian when those debts have been included in bankruptcy. (*Id.*)

- 11 -

## III.   Experian's Reporting is Grossly Inaccurate

### A.   Experian's Analysis of Its Error Rate[2]

35.   Experian's data found that of 8.5 million consumers who had obtained a complete Chapter 7 discharge, there were 43.6 Million open, pre-bankruptcy tradelines that were not reported as discharged. Removing the 4.9 million tradelines that Experian was able to determine were statutorily non-dischargeable and 10.8 million tradelines showing a zero balance on the date of discharge, leaves as many as *27.9 million* total tradelines (or 3.25 per discharged consumer) with outstanding balances that were not corrected to show they were discharged in bankruptcy.  (Granger Decl. ¶¶ 49-58).

### B.   Plaintiffs' Analysis of Experian's Error Rate

36.   Although Plaintiffs have actually produced the credit reports considered in their pre-filing analysis, Experian has not done any re-analysis of these reports.  (Bennett Decl., ¶ 19).

37.   The results of the Juntikka document review showed that, of approximately 985 credit reports issued by Experian, about 76 percent erroneously reported the status of tradelines post-bankruptcy. The Juntikka review also showed that, of 340 credit reports Experian issued upon a re-investigation request, 24 percent still erroneously reported the status of tradelines post-bankruptcy. (Second Amended Consolidated Class Action Complaint ("Complaint") at ¶¶ 18, 22.)

38.   Independent of Mr. Juntikka, the 765 Experian reports Plaintiffs' counsel believed to be inaccurate were copied and delivered to the office

---

[2] As Plaintiffs have addressed by separate Rule 37(c)(1) Objection and pursuant to Rule 56(f), Experian served its tradeline and scoring analysis in the Granger Declaration, July 5, 2007, and by separate production on July 10, 2007.  Plaintiffs had themselves served discovery long before these dates requesting (a) a complete and objective measure and analysis, and (b) the data and model information to examine the underlying assumptions and inputs of any later Experian analysis. Defendant has expressly stated that it will not produce this information. (Bennett Decl. ¶21).

1  of Leonard Bennett, which conducted its own count. (Bennett Decl. ¶17). The

2  results of that mathematical tally is as follows:  Of those 765 credit reports,

3  Plaintiffs counted a total of 2,824 tradelines that were being reported inaccurately

4  by Experian, an average of almost 4 inaccurate tradelines per file.  The tallied

5  inaccuracies were as follows:

6      (a)    195 of the 765 reports, 25.5%, still contained a dischargeable judgment

7  that was not reported as "included in bankruptcy".

8      (b)    339 of the 765 reports, 44.3%, still contained at least one pre-

9  bankruptcy tradeline that was being reported as a "charge-off" *after the date of*

10  *bankruptcy*.

11      (c)    333 of the 765 reports, 43.5%, still contained at least one pre-

12  bankruptcy credit card tradeline that was being reported in a derogatory status less

13  than chargeoff or collection.

14      (d)    290 of the 765 reports, 38%, still contained at least one pre-bankruptcy

15  collection account showing outstanding.

16      (e)    Of the 765 credit reports, there were 447 credit reports, 58.4%, that

17  still contained three or more of the above inaccuracies.  (*Id.* ¶ 18).

18      39.    Of the 765 Experian reports reviewed, 282, or 37% contained at

19  least one tradeline reported in which the Experian reports contained both a Chapter

20  7 bankruptcy discharge and a post-discharge dated derogatory status, *i.e.*, charge-

21  off, late payments, etc. after date of bankruptcy. (*Id.*)

22      40.    This reporting error has the significant potential to mislead the

23  reader and appears to report that the consumer again defaulted on the tradeline after

24  having already completed bankruptcy. (*Id.*)

25      41.    The differences between the Bennett count and the Juntikka

26  count were minor. (*Id.* ¶20). The Juntikka tally counted pre-bankruptcy accounts

27  containing derogatory information, but listing a zero balance as errors.  This was

28  not true in the Bennett tally.  However, even when those errors are removed, there

1  are still just about the same number of inaccurate reports, because almost all the

2  reports contain other errors.   (*Id.*).

3  **IV.   Legal and Practical Effect Of Chapter 7 Discharge Order**

4           42.   The effect of a Chapter 7 discharge order in a no asset case is to

5  fully and completely discharge the vast majority of a debtor's pre-bankruptcy debts.

6  (Declaration of Jay L. Westbrook in opposition to Experian's Summary Judgment

7  Motion, hereinafter Westbrook Decl., ¶¶ 9-10).

8           43.   A discharge order in a Chapter 7 no asset case has the effect of

9  discharging all pre-bankruptcy debts except for those falling in one of the following

10  three categories: (1) debts that are statutorily non-dischargeable by nature

11  (principally, student loans, domestic support obligations and recent tax liens);

12  (2) debts that are reaffirmed in a reaffirmation agreement; and (3) debts that are the

13  subject of a successful adversary proceeding.  (*Id.* ¶¶ 5-6).

14           44.   Nearly all Chapter 7 Bankruptcy cases are No Asset cases.   In

15  fact, in the opinion of Experian's expert, there are positive dividends or assets in

16  less than 2% of all cases.  (Fenning Decl. ¶17).

17           45.   A bankruptcy discharge reaches both secured and unsecured

18  debts that are "ridden through" bankruptcy.  (Westbrook Decl. ¶ 12).

19           46.   Defendant's expert witness believes that "ride through" is no

20  longer a viable or common place legal occurrence. (Fenning Decl. ¶¶ 23-24).

21           47.   In a Chapter 7 no asset bankruptcy, it is immaterial whether or

22  not a debt is listed on the consumer's Schedule F.  The debt is still discharged

23  unless otherwise excluded by adversary proceeding, reaffirmation agreement or by

24  virtue of it being statutorily non-dischargeable by nature. (Westbrook Decl. ¶¶ 7,

25  10-12).

26           48.   Adversary proceedings in Chapter 7 cases are extremely rare,

27  occurring in less than 2% of cases and succeeding in fewer.   (*Id.* ¶ 9).

28

49.     Post discharge legal proceedings seeking to declare a debt that was not listed on the F schedule as non-dischargeable are almost unheard of.  (*Id.* ¶ 7).

## V.     Experian's Ability to Lower Its Error Rate at Reasonable Cost

50.     Because a discharge order discharges all pre-bankruptcy debts that are statutorily non-dischargeable, Experian could dramatically reduce its error rate by identifying those statutorily non-dischargeable debts and treating all others as having been discharged.  (Bennett Decl., Ex. 28).

51.     Experian has the present ability to separate dischargeable tradelines from those that are non-dischargeable.  (Def. Declaration of Kimberly Hughes, ¶¶ 8-9; Bennett Decl., Ex. 28).

52.     The determination whether a Chapter 7 bankruptcy is a "no asset" bankruptcy is easily determinable from court records and is readily apparent from the docket sheet. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

53.     Experian is already able to identify whether a given debt was incurred pre or post bankruptcy and to sort those debts out from debts that were incurred post-bankruptcy by comparing the date the account was opened to the date of the bankruptcy.  (*Supra,* ¶¶ 15-17; Experian Investigation Procedures, 2002, Bennett Decl. Exhibit 21, p. EXP 1533 & Ex. 28).

54.     Experian already can identify pre-bankruptcy debts that are statutorily non-dischargeable by nature because: (a) its furnishers routinely provide Experian with the information that enables it to identify those debts; and (b) it can and does code statutorily non-dischargeable debts by type in its database.  (*Supra,* ¶ 22).

55.     Experian already can identify which pre-bankruptcy debts are non-dischargeable on the basis of having been reaffirmed or successfully challenged because Experian's furnishers are contractually obligated to provide it that information and routinely do so. (*Supra*, ¶ 24).

56.     Experian already can identify which pre-bankruptcy debts are non-dischargeable on the basis of having been reaffirmed because reaffirmations are listed on the bankruptcy docket sheet and are, hence, readily available to Experian's public records vendors. (Westbrook Decl. ¶ 11).

57.     Experian already can identify which pre-bankruptcy debts are non-dischargeable on the basis of having been successfully challenged because those challenges are listed on the bankruptcy docket sheet and are otherwise easily accessible to Experian's public records vendors.  (*Id.*).

58.     "e-Oscar is a web-based, Metro 2 compliant, automated system that enables Data Furnishers and Credit Reporting Agencies to create and respond to consumer credit history disputes. [. . .] e-Oscar also provides for data furnishers to send 'out-of-cycle' credit history updates to CRAs." (Emails between Equifax, Experian, Trans Union and the CDIA produced in *Faile v. Equifax Information Services, LLC, et al*, 3:06cv717 (E.D. Va.), Bennett Decl. Exh. 23, p. EIS-Faile 013842).

59.     "e-Oscar is an electronic and online interface between the national CRAs and their creditor furnishers that is the most common means used by creditors to change their account specific credit reporting." (Hendricks Decl. ¶ 15).

60.     The e-Oscar system is now almost the exclusive means that the national CRAs use to convey disputes about credit tradelines to the respective creditors. (*Id.*).

61.     e-Oscar is a revenue generating system owned by the CRAs through a separate, jointly controlled limited liability company, Online Data Exchange, LLC.  (Deposition of Kent Mast (Equifax General Counsel), June 12,

1   2007. *Faile v. Equifax Information Services, LLC, et al,* 3:06cv717 (E.D. Va.),

2   Bennett Decl. Exh. 24, p. 52, line 6 – p. 53, line 12). Currently, the CRAs charge

3   their creditor furnishers $.25 for each dispute communication sent from the CRA to

4   the creditor through the e-Oscar electronic interface. (Emails between Equifax,

5   Experian, Trans Union and the CDIA produced in *Faile v. Equifax Information*

6   *Services, LLC, et al,* 3:06cv717 (E.D. Va.), Bennett Decl. Exh. 23, p. EIS-Faile 83).

7          62.    The CRAs have established a monthly capacity to permit as

8   many as 15 million disputes per month without any further need to upgrade.

9   (Emails between Equifax, Experian, Trans Union and the CDIA produced in *Faile*

10  *v. Equifax Information Services, LLC, et al,* 3:06cv717 (E.D. Va.), Bennett Decl.

11  Exh. 23, p. EIS-Faile 13-128, 14659-14768).

12         63.    The e-Oscar system could be upgraded to accommodate one

13  million requests for bankruptcy information at a very modest cost. (*Id.,* p. EIS-

14  Faile 83-84).

15         64.    Each ACDV dispute sent by the CRA to its creditor customer is

16  less than a penny or minimal, even assuming the CRA does not charge the creditor

17  the $.25 it now imposes for each dispute. Accordingly, at minimal or no cost,

18  Experian can use the e-OSCAR system to notify a consumer's furnishers whenever

19  it learns of a Chapter 7 discharge order and provide the creditor an opportunity to

20  respond. (Hendricks Decl. ¶ 18).

21  **VI.   Reinvestigation Issues**

22         65.    Experian uses a "Productivity" quota system that requires and

23  incentivizes its employees and their supervisors to process consumer disputes as

24  rapidly as possible, entitled National Consumer Assistance Center "(NCAC)

25  Individual Contributor Incentive Plan" ("the NCAC Plan"). (Experian Employee

26  Incentive Documents, Bennett Decl. Exh. 5; EXP 4485).

27         66.    Under the NCAC Plan, the "average minimum productivity

28  level" is 13.10 "converted units" per hour and 98.25 converted units per 8 hour

1   work day, which translates into a minimum quota of 15 standard disputes per hour,

2   or one dispute every 4 minutes. (*Id.*). (Deposition of Kimberly Hughes, June 30,

3   2005. *Beck v. Equifax Information Services, LLC, et al,* No. 1-05cv347 (E.D. Va.),

4   Bennett Decl. Exh. 16, p. 183, line 11 – p. 184, line 10).

5        67.   Under the NCAC Plan, Experian gives its employees incentives

6   to meet higher productivity quotas reaching up to 24.49 converted units, which

7   translates into 28 standard disputes per hour. (Experian Employee Incentive

8   Documents, Bennett Decl. Exh. 5, EXP 04450-04451).

9        68.   Experian's reinvestigation practices frequently fail to correct the

10  inaccuracies in its reporting of pre-bankruptcy debts. Of 340 dispute letters,

11  comparable to those of Lovell and Seale, Experian investigated and fully corrected

12  only 24% consumer files. (Declaration of Charles Juntikka In Support Of

13  Plaintiffs' Motion For Class Certification, ¶¶ 18, 22).

14  **VII.   Evidence of Experian's Reckless Disregard of Its Legal Obligations**

15       69.   Complaints about discharged debts as due and owing are one of

16  the eight most common types of disputes, accounting for about 4% of the total.

17  FTC Report, Bennett Decl., Exh. 25 at 12; GAO Report, Bennett Decl., Exh. 26 at

18  31, 67.

19       70.   The CRAs receive approximately 500,000 disputes per year

20  concerning incorrect bankruptcy information. FTC Report, Bennett Decl., Exh. 25

21  at 12; GAO Report, Bennett Decl., Exh. 26 at 30-31, 67.

22       71.   Since all three CRAs use the same reporting practices, it is a

23  logical assumption about one-third of all bankruptcy disputes are directed to

24  Experian. Thus, it is a reasonable inference that Experian receives about 150,000

25  disputes per year complaining of discharged debts as having been reported as due

26  and owing. Regardless of the exact percentage variance, the number of Experian

27  disputes will be significant.

28

72.     Experian has admitted that since February 4, 2005, 67 consumers have filed individual complaints in federal court against Experian complaining about the erroneous bankruptcy-related information in their credit reports.  (Experian's List of its Prior Similar FCRA Lawsuits, Bennett Decl. Exh. 12).

73.     The CRAs, including Experian, have never taken the legal position that they have no legal obligation to report material information about an account that is in their possession or that they are free to simply disregard that information because it is their preference to do so.

74.     Experian offers no evidence that it has ever done anything to enforce the contractual provision obligating its furnishers to update the status of accounts containing debts discharged in bankruptcy.

75.     Prior to this lawsuit, Experian had never made any effort to determine whether its reporting procedures for reporting the status of pre-bankruptcy debts violated its obligations under the FCRA or the CCRAA based on statistical evidence of its inaccuracy.  (Browne Decl., ¶ 18).

## VIII.  Harmful Consequences Of Inaccurate Bankruptcy Reporting

76.     Inaccurately reporting discharged debts as due and owing can have severe non-scoring related consequences on all consumers who have emerged from Chapter 7 bankruptcy, including disqualify consumers from obtaining mortgages, auto loans and other forms of credit, as well as denial of apartment leases or employment opportunities.  (Declaration of John Ulzheimer in Opposition to Experian Summary Judgment Motion, hereinafter Ulzheimer Decl. II, ¶17).

77.     Any adverse scoring effect from accurately reporting discharged debt as due and owing is likely to disappear with time, because the delinquency will become increasingly less consequential, but the unpaid balance will remain. (Ulzheimer Decl. II).

78.   The elimination of post-discharge voluntary payment history is neither a likely nor necessary effect of accurately reporting discharged debts as due and owing because that information is predictive of future credit behavior (Ulzheimer Decl. II, ¶ 14) and because FTC regulations require Experian to report such voluntary payments. 16 C.F.R. 600 App., sec. 607 (b)(3)(F)(2).

79.   If Experian had not eliminated post-discharge voluntary payment history from its scoring analysis, there would have been a substantial rise in the number of scores that would have been gone up and a substantial fall in the number that would have gone down. (Ulzheimer Decl. II, ¶ 14).

Date: July 20, 2007                              Respectfully submitted,


Michael W. Sobol (State Bar No. 194857)
(msobol@lchb.com)
Allison S. Elgart (State Bar No. 241901)
(aelgart@lchb.com)
LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008


Michael A. Caddell (Admitted *Pro hac vice*)
(mac@caddellchapman.com)
Cynthia B. Chapman (State Bar No. 164471)
cbc@caddellchapman.com)
George Y. Niño (State Bar No. 144623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston TX 77010-3027
Telephone:  (713) 751-0400
Facsimile:  (713) 751-0906

Daniel Wolf
(dan@danielwolflaw.com)
1220 N Street, N.W., Suite PH 2
Washington D.C. 20005
Telephone:  (202) 772-1154

Stuart Rossman
(srossman@nclc.org)
Charles Delbaum
(cdelbaum@nclc.org)
NATIONAL CONSUMER LAW CENTER
77 Summer Street, 10th Floor
Boston MA 02110
Telephone: (617) 542-8010
Facsimile: (617) 542-8028

Leonard A. Bennett (VSB No. 37523)
(lenbennett@cavtel.net)
Matthew Erausquin (VSB No. 65434)
(matt@clalegal.com)
CONSUMER LITIGATION
ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 201
Newport News VA 23606
Telephone: (757) 930 3660
Facsimile: (757) 930-3662

Mitchell A. Toups (TSB No. 20151600)
(matoups@wgttlaw.com)
WELLER, GREEN, TOUPS
& TERRELL, L.L.P.
Bank of America Tower
2615 Calder St., Suite 400
Beaumont TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 832-8577

Charles W. Juntikka (cj4689)
(charles@cjalaw.com)
CHARLES JUNTIKKA & ASSOCIATES
11 W. 42nd Street, 12th Floor
New York NY 10036
Telephone: (212) 315-3755

Attorneys for Plaintiffs

720454.2

- 21 -

*WHITE/HERNANDEZ* PLTFS' STATEMENT OF GENUINE
ISSUES IN OPP. TO DFDT'S MTN FOR PARTIAL SJ
Case Nos. 06-CV-01070 DOC/MLG, 06-CV-0392-DOC/MLG