Michael W. Sobol (State Bar No. 194857)
(msobol@lchb.com)
Allison Elgart (State Bar No. 241901)
(aelgart@lchb.com)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Michael A. Caddell (State Bar No. 249469)
(mac@caddellchapman.com)
Cynthia B. Chapman (State Bar No. 164471)
(cbc@caddellchapman.com)
George Y. Niño (State Bar No. 146623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, TX 77010
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, ROBERT RADCLIFFE, CHESTER CARTER, ARNOLD LOVELL, Jr., CLIFTON C. SEALE, III and ALEX GIDI, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXPERIAN INFORMATION SOLUTIONS, INC., <br><br> Defendant. | Case No. 05-cv-01070-DOC (MLGx) LEAD CASE <br><br> AND RELATED CASES: 05-cv-01073-DOC (MLGx); 05-cv-7821-DOC (MLGx); AND 06-cv-0392-DOC (MLGx) <br><br> Date: September 10, 2007 <br> Time: 8:30 a.m. <br> Place: Courtroom 9B <br> Judge: Hon. David O. Carter |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST EXPERIAN, EQUIFAX, AND TRANS UNION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

I.    PLAINTIFFS' CLAIMS SATISFY THE THRESHOLD CRITERIA FOR CLASS CERTIFICATION UNDER RULE 23(A) .................................................................................... 2

    A.    The Classes Are Ascertainable. .......................................... 2

    B.    The Typicality And Adequacy Requirements Are Met. ............. 5

        1.    There is no intra-class conflict that would preclude named Plaintiffs from representing the interests of the entire class. ........................................................... 5

            a.    As to the proposed damages class, Defendants have failed to demonstrate the existence of any intra-class conflict. ...................... 6

            b.    As to the proposed injunctive relief class, the speculative conflict Defendants identify does not defeat class certification. ............................. 7

        2.    The Conduct Of Both Plaintiffs And Their Counsel Demonstrates That They Are More Than Capable Of Adequately Representing The Interests Of The Classes. ...................................................................... 13

        3.    Plaintiffs Have Standing To Represent The Classes ...... 16

II.    PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(B)(2) .............. 17

    A.    Plaintiffs Are Entitled To Injunctive And Declaratory Relief Under The FCRA, The CCRAA And The N.Y. FCRA. ...................................................................... 17

    B.    Plaintiffs Have Standing To Seek Injunctive And Declaratory Relief Under The CCRAA ......................... 21

    C.    Certification Of Rule 23(b)(2) Classes Is Appropriate Because Plaintiffs Are Not Seeking To Certify Any Monetary Relief Claims Under That Rule And Because Each Defendant Has Acted On Grounds Generally Applicable To The Classes. ......................................... 22

III.    PLAINTIFFS' CLAIMS SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(B)(3) .............. 24

    A.    Common Questions Of Law Or Fact Predominate Over Individual Ones. ............................................................ 24

        1.    Plaintiffs' inaccurate reporting claims. ...................... 24

        2.    Plaintiffs' reinvestigation claims. .............................. 31

    B.    The Class Action Device Is Superior To Other Available Methods For Adjudicating These Controversies. ................. 32

1

## TABLE OF CONTENTS
### (continued)

| | Page |
|---|---|
| 1. Class-wide adjudication of these claims is manageable. | 32 |
| 2. Individual adjudication of these claims is unrealistic. | 32 |
| 3. Class-wide adjudication of these claims would not violate defendants' due process rights. | 33 |
| CONCLUSION | 36 |

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acosta v. Trans Union, LLC*,
   240 F.R.D. 564 (C.D. Cal. 2007) ...................................................... 7, 32

*Aiello v. First Alliance Mortgage Co.*,
   280 B.R. 246 (C.D. Cal. 2002) ............................................................ 19

*Akselrod v. Chex, Systems, Inc.*,
   205 WL 142390 (C.D. Cal. June 6, 2005) ........................................... 28

*Allarcom Pay Television, Ltd. v. General Instrument Corp.*,
   69 F.3d 381 (9th Cir. 1995) ................................................................. 19

*Alweis v. Evans*,
   505 N.E.2d 605 (N.Y. 1987) ............................................................... 21

*Ashby v. Farmers Ins. Co.*,
   2004 U.S. Dist. LEXIS 21053 (D. Ore. Oct. 18, 2004) ...................... 33

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ........................................................... 5, 13

*Bonner v. Home123 Corp.*,
   2006 U.S. Dist. LEXIS 54418 (N.D. Ind. Aug. 4, 2006) ..................... 34

*Braxton v. Farmer's Ins. Group*,
   209 F.R.D. 654 (N.D. Ala. 2002) ........................................................ 33

*California v. ARC Am. Corp.*,
   490 U.S. 93 (1989) .............................................................................. 18

*Cameron v. Ti-Line, Inc.*,
   547 F.2d 473 (9th Cir. 1976) ............................................................... 31

*Campion v. Credit Bureau Servs.*,
   206 F.R.D. 663 (E.D. Wash. 2001) ..................................................... 25

*Chamberlan v. Ford Motor Co.*,
   314 F. Supp.2d 952 (N.D. Cal. 2004) ....................................... 18, 19, 21

*Cole v. Am. Family Mut. Ins. Co.*,
   410 F. Supp. 2d 1020 (D. Kan. 2006) ................................................. 29

*Coleman v. Cannon Oil Co.*,
   141 F.R.D. 516 (M.D. Ala. 1991) .................................................... 6, 12

*Credit Data of Arizona, Inc. v. Arizona*,
   602 F.2d 195 (9th Cir. 1979) ............................................................... 19

*Cummings v. Connell*,
   313 F.3d 886 (9th Cir. 2003) ................................................................. 8

*Dale v. Daimler Chrysler Corp.*,
   204 S.W.2d 151 (Mo. App. 2006) ......................................................... 4

*Davenport v. Farmers Ins. Group*,
   378 F.3d 839 (8th Cir. 2004) ......................................................... 17, 19

*Davoll v. Webb*,
   194 F.3d 1116 (10th Cir. 1999) ............................................................. 3

NO. 05-CV-01070-DOC (MLGX)
REPLY MEM. ISO MOT. FOR CLASS CERT. AGAINST
EXPERIAN, EQUIFAX, AND TRANS UNION

# TABLE OF AUTHORITIES
## (continued)

Page

*DeMando v. Morris,*
206 F.3d 1300 (9th Cir. 2000) ............................................................. 16

*Dierks v. Thompson,*
414 F.2d 453 (1st Cir. 1969) ................................................................ 8

*Dunnigan v. Metro Life Ins.,*
214 F.R.D. 125 (S.D.N.Y. 2003) ........................................................ 3

*Ehrheart v. Lifetime Brands, Inc.,*
498 F. Supp.2d 753 (E.D. Pa. 2007) .................................................. 16

*Elliott v. ITT Corp,*
150 F.R.D. 569 (N.D. Ill. 1992) ..................................................... 2, 3

*English v. Gen. Elec. Co.,*
496 U.S. 72 (1990) ............................................................................. 18

*Eubanks v. Billington,*
110 F.3d 87 (D.C. Cir. 1997) ............................................................ 22

*Florida Lime and Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) .......................................................................... 18

*Golden Door, Inc. v. Odisho,*
646 F.2 346 (9th Cir. 1980) .............................................................. 19

*Gunnells v. Healthplan Servs.,*
348 F.3d 417 (4th Cir. 2003) .............................................................. 9

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) .......................................................... 24

*Hanrahan v. Britt,*
174 F.R.D. 356 (E.D. Pa. 1997) ......................................................... 9

*Hillis v. Equifax Consumer Servs.,*
237 F.R.D. 491 (N.D. Ga. 2006) ........................................................ 6

*Hnot v. Willis Group Holdings Ltd.,*
228 F.R.D. 476 (S.D.N.Y. 2005) ........................................................ 2

*Holloway v. Full Spectrum Lending,*
2007 U.S. Dist. LEXIS 59934 (C.D. Cal. June 26, 2007) .............. 14, 24, 35

*Horton v. Goose Greek Independent School Dist.,*
690 F.2d 470 (5th Cir. 1982) ......................................................... 8, 13

*I.M.A.G.E. v. Bailar,*
78 F.R.D. 549 (N.D. Cal. 1978) ........................................................ 13

*In re Beezley,*
994 F.2d 1433 (9th Cir. 1993) ........................................................... 29

*In re Bulk [Extruded] Graphite Antitrust Litig.,*
2006 U.S. Dist. LEXIS 16619 (D.N.J. Apr. 4, 2006) ......................... 5

*In re CBS Companies, Inc. Collection Letter Litig.,*
181 F.R.D. 380 (N.D. Ill. 1998) ........................................................ 14

*In re Farmers,*
2006 U.S. Dist. LEXIS 27290 [needs full cite] .................................. 34

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Hanson,*
104 B.R. 261 (Bankr. Ct. 1989) 4 Collier on Bankruptcy § 523.03
(15th ed. 2004)..................................................................................27

*In re Helmes,*
336 B.R. 105 (Bankr. E.D. Va. 2005) ...........................................10

*In re Inchinose,*
946 F.2d 1169 (5th Cir. 1991)........................................................27

*In re Linerboard Antitrust Litig.,*
305 F.3d 145 (3d Cir. 2002)...........................................................31

In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,
*209 F.R.D. 323 (S.D.N.Y. 2002)*.....................................................3

*In re Napster Copyright Litig.,*
2005 U.S. Dist. LEXIS 11498 (N.D. Cal. May 31, 2005) ..........34, 35

*In re Nielsen,*
383 F.3d 922 (9th Cir. 2004)..........................................................29

*In re THQ, Inc. Securs. Litig.,*
2002 WL 1832145 (C.D. Cal. 2002) ..............................................14

*In re Torres,*
2007 Bankr. LEXIS 1478 (S.D.N.Y. May 3, 2007)....................10, 29

*Irwin v. Mascott,*
112 F. Supp. 2d 937 (N.D. Cal. 2000) ...........................................19

*Ishikawa v. Delta Airlines, Inc.,*
343 F.3d 1129 (9th Cir. 2003).......................................................18

*Kagan v. Gibraltar Savings and Loan Association,*
35 Cal. 3d 582 (1984)....................................................................31

*Karnette v. Wolpoff & Abramson,*
2007 U.S. Dist. LEXIS 20794 (E.D. Va. Mar. 23, 2007) ...............15

*Kline v. Coldwell, Banker & Co.,*
508 F.2d 226 (9th Cir. 1974)..........................................................33

*Korman v. Walking Co.,*
2007 U.S. Dist. LEXIS 63732 (E.D. Pa. Aug. 28, 2007)................16

*Lau v. Arrow Fin. Servs., LLC,*
245 F.R.D. 620 (N.D. Ill. 2007) ...............................................1, 3, 27

*Lerwill v. Inflight Motion Pictures, Inc.,*
582 F.2d 507 (9th Cir. 1978)........................................................6, 7

*Lewis v. Curtis,*
671 F.2d 779 (3d Cir. 1982)...........................................................14

*Macarz v. TransWorld Systems, Inc.,*
194 F.R.D. 46 (D. Conn. 2000) ........................................................4

*Marshall v. Holiday Magic, Inc.,*
550 F.2d 1173 (9th Cir. 1977)....................................................5, 6, 7

# TABLE OF AUTHORITIES
## (continued)

Page

*McCall v. Drive Fin. Servs., L.P.,*
236 F.R.D. 246 (E.D. Pa. 2006) .................................................... 16

*McDonald v. Washington Mutual Bank, FA,*
2000 U.S. Dist. LEXIS 11496 (N.D. Ill. June 22, 2000) .................. 3, 25

*Molski v. Gleich,*
318 F.3d 937 (9th Cir. 2003) ........................................................ 22

*Morris v. Transouth Fin. Corp.,*
175 F.R.D. 694 (M.D. Ala. 1997) .................................................. 14

*Murray v. GMAC Mortgage,*
434 F.3d 948 (7th Cir. 2006) ........................................ 32, 34, 35, 36

*Murray v. New Cingular Wireless Servs.,*
232 F.R.D. 295 (N.D. Ill. 2005) .................................................... 14

*Nat'l Federation of the Blind v. Target Corp.,*
2007 U.S. Dist. LEXIS 30513 (N.D. Cal. Apr. 25, 2007) ................... 3

*Nielsen v. Dickerson,*
1999 U.S. Dist. LEXIS 8334 (N.D. Ill. May, 19, 1990) .................... 14

*Parker v. Time Warner Entertainment Co., L.P.,*
331 F.3d 13 (2d Cir. 2003) ........................................................... 35

*Pickett v. IBP, Inc.,*
2001 U.S. Dist. LEXIS 22453 (Dec. 21, 2001) ............................... 13

*Pirian v. In-N-Out Burgers,*
2007 U.S. Dist. LEXIS 25384 (C.D. Cal. 2007) .............................. 35

*Pitts v City of Portsmouth,*
221 F.R.D. 438 (E.D. Va. 2004) .................................................... 25

*Radici v. Associated Ins. Cos.,*
217 F.3d 737 (9th Cir. 2000) ........................................................ 19

*Ratner v. Chemical Bank N.Y. Trust Co.,*
54 F.R.D. 412 (S.D.N.Y. 1972) ..................................................... 33

*Red Rock v. Henry,*
106 U.S. 596 (1883) .................................................................... 21

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979) .................................................................... 35

*Robidoux v. Celani,*
987 F.2d 931 (2d Cir. 1993) ........................................................... 3

*Schwartz v. Upper Deck Co.,*
183 F.R.D. 672 (S.D. Cal. 1999) ..................................................... 2

*Sepulveda v. Wal-Mart Stores, Inc.,*
237 F.R.D. 229 (C.D. Cal. 2006) ................................................... 23

*Serna v. Big A Drug Stores, Inc.,*
2007 U.S. Dist. LEXIS 82023 (C.D. Cal. Oct. 9, 2007) ................... 33

*Silkwood v. Kerr-McGee Corp.,*
464 U.S. 238 (1984) .................................................................... 19

# TABLE OF AUTHORITIES
## (continued)

Page

*Social Servs. Union v. County of Santa Clara,*
  609 F.2d 944 (9th Cir. 1979)...............................................9, 13

*St. Paul Guardian Ins. Co. v. Johnson,*
  884 F.2d 881 (5th Cir. 1989)......................................................29

*Sturdevant v. Deer,*
  73 F.R.D. 375 (E.D.Wisc. 1976).................................................8

*Surowitz v. Hilton Hotels Corp.,*
  383 U.S. 363 (1966)...................................................................14

*Torrisi v. Tuscon Elec. Power Co.,*
  8 F.3d 1370 (9th Cir. 1993).........................................................7

*Trujillo v. First American Registry, Inc.,*
  157 Cal. App. 4th 628 (2007)....................................................30

*United States v. Hansen,*
  772 F.2d 940 (D.C. Cir. 1985)...................................................21

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,*
  350 F.3d 1181 (11th Cir. 2003)..................................................13

*Warth v. Seldin,*
  422 U.S. 490 (1975)...................................................................16

*Washington v. CSC Credit Services, Inc.,*
  199 F.3d 263 (5th Cir. 2000)......................................................17

*Wells v. McDonough,*
  188 F.R.D. 277 (N.D. Ill. 1999) ................................................25

*White v. E-Loan, Inc.,*
  2006 U.S. Dist. LEXIS 62654 (N.D. Cal. Aug. 18, 2006).....................33, 34, 35

*White v. Imperial Adjustment Corp.,*
  2002 U.S. Dist. LEXIS 26610 (E.D. La. Aug. 6, 2002) .........................3, 24, 25

*Wilder v. Bernstein,*
  499 F. Supp. 980 (S.D.N.Y. 1980)...............................................7

*Wood v. Capital One Auto Fin., Inc.,*
  2006 U.S. Dist. LEXIS 67513 (E.D. Wisc. Sept. 19, 2006) ..............15

## STATUTES

15 U.S.C. § 1681i ...............................................................23, 31

15 U.S.C. § 1681(n)(1)(A).................................................30, 31

15 U.S.C. § 1681e(b)......................................................24, 25, 33

15 U.S.C. § 1681h(e)......................................................18, 20

15 U.S.C. § 1681n(a)(1) ...........................................................34

15 U.S.C. § 1681n(a)(1)(A)........................................................30

15 U.S.C. § 1681s(c )(1)(A)(iii)..................................................30

15 U.S.C. § 1681s(c)(1)(A)........................................................20

15 U.S.C. § 1681t .........................................................18, 20

# TABLE OF AUTHORITIES
## (continued)

Page

15 U.S.C. § 1681t(a)............................................................17, 19

15 U.S.C. § 1681t(b)..................................................................18

15 U.S.C. § 1780(a)...................................................................31

15 U.S.C. § 1785.31(a)..............................................................30

## OTHER AUTHORITIES

140 Cong. Rec. H9797, H9810 (1994) (Statement of Rep. Kennedy)....................20

R. Berner & B. Grow, *Prisoners of Debt*, Business Week, Nov. 1, 2007 ................................................................................10

S. Rep., 91-517, 91st Cong., 1st Sess. 8 (1969) .........................................19

## RULES

Federal Rules of Civil Procedure

    Rule 23(a) ...................................................................... 8

    Rule 23(b)(2) ...........................................................22, 23

    Rule 23(b)(3) ...........................................................22, 23

    Rule 23(c) ...................................................................... 7

## TREATISES

1 Herbert Newberg & Alba Conte, Newberg On Class Actions § 4.14, at 4-51 to 4-52 (3d ed. 1992)..............................................23

15 James Wm. Moore, et al., MOORE'S FEDERAL PRACTICE §101.32 (3d ed. 2003)...................................................................21

## REGULATIONS

16 C.F.R., pt. 600, app. § 622 (1995) ..........................................19

55 Fed. Reg. 18804, 18808........................................................19

# **INTRODUCTION**

At the heart of Defendants' assault on Plaintiffs' class certification motion is their contention that they have complied with their statutory obligations to employ reporting practices that meet the maximum possible accuracy standard. Defendants, therefore, spill much ink arguing that Plaintiffs' evidence fails to establish either: (1) that those practices generate credit reports that are systemically inaccurate; or (2) that alternative procedures are available that could greatly improve the accuracy of their reporting. All of that is, of course, beside the point.

This motion is not about whether Plaintiffs will succeed or are likely to succeed on the merits. It is about whether the classes should be certified. To the extent this Court may delve into the merits at all in resolving that question, its focus must be entirely "on whether the path that will need to be taken to decide the merits renders the case suitable for class treatment"—not on "the substantive strength or weakness of the plaintiffs' claims." *Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 623 (N.D. Ill. 2007).

Unable or unwilling to accept that reality, Defendants have sought to turn this motion into a debate about the merits. Yet, Defendants' own litigation-generated studies show that their error rate equals or exceeds the error rate suggested by Plaintiffs' pre-filing investigation.[1] Discovery has yielded additional evidence showing that millions of these errors have been brought to Defendants'

---

[1] So impressed are Defendants with the substance and scope of Plaintiffs' pre-filing investigation that they have confused it with the evidence Plaintiffs will offer at trial. At this stage, however, Plaintiffs offer that investigation only to give their allegations regarding Defendants' woeful reporting practices more specificity and this Court comfort that they are both credible and well founded. There is, thus, neither need nor occasion to consider the multitude of attacks Defendants level on Mr. Juntikka's review of their credit reports—all of which are addressed in detail in Plaintiffs' response to Defendants' evidentiary objections to his declaration. Suffice to say here that Plaintiffs have provided Defendants all of the reports Mr. Juntikka reviewed and that Defendants' failure to provide their own tabulations based on their own examination of those reports is compelling evidence that his were not far off the mark—though not quite as compelling as Defendants' own studies, which are perfectly consistent with Mr. Juntikka's tabulations.

1   attention and that they have employed automated procedures to correct them that

2   are very similar to those Plaintiffs have proposed.

3          Nevertheless, no assessment of the evidence is needed or permitted to

4   determine whether *the inquiry* into whether Defendants' *admittedly uniform*

5   reporting practices comply with their statutory obligations is common to the class.

6   As the claims of each and every class member arise out of those standardized

7   practices, that issue is, by its very nature, a common one and those claims could not

8   be better suited for class treatment.

9   **I.    PLAINTIFFS' CLAIMS SATISFY THE THRESHOLD CRITERIA
        FOR CLASS CERTIFICATION UNDER RULE 23(A)**

10

11         **A.    The Classes Are Ascertainable.**

12         "An identifiable class exists if its members can be ascertained by reference

13   to objective criteria." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679 (S.D. Cal.

14   1999); *see also Elliott v. ITT Corp*, 150 F.R.D. 569, 573-74 (N.D. Ill. 1992); *Hnot*

15   *v. Willis Group Holdings Ltd.*, 228 F.R.D. 476, 482 n.2 (S.D.N.Y. 2005). In this

16   case, a person qualifies for membership in the classes if: (a) he was the beneficiary

17   of a discharge order in a Chapter 7 no asset bankruptcy case; (b) a credit report

18   relating to him was issued after March 15, 2002; and (c) that report listed at least

19   one of his discharged debts as due and owing. As Defendants do not—and, indeed,

20   cannot—maintain that any of these criteria involve a subjective inquiry, these

21   classes are plainly ascertainable.

22         Defendants contend that identifying class members requires, in Experian's

23   words (at 15-16), an "unmanageable" and "administratively [in]feasible"

24   examination of millions of bankruptcy files to determine whether any of the pre-

25   bankruptcy debts listed in their reports were, in fact, discharged. Such burdens are

26

27

28

1    not, however, sufficient to render a class unascertainable when its members can be

2    identified using objective criteria.[2]

3        As is apparent from Experian's own prose, Defendants' "administrative

4    burden" argument goes to manageability—not ascertainability.[3]  However, it is

5    beyond dispute that any manageability problems that may arise in connection with

6    the need to identify class members cannot defeat class certification when that

7    identification "is a matter capable of ministerial determination from the defendants'

8    files" or other readily obtainable records.[4]  As set forth in Point III.A.1 below, the

9    determination which of a consumer's pre-bankruptcy debts have been discharged

10   and which have not can be accomplished systematically through automated cross-

11   referencing of information that is already in Defendants' files or that is readily

12   obtainable by them.

13       Regardless, any significant administrative burdens associated with

14   identifying class members could be removed simply by tweaking the class

15   definition.[5]  Specifically, the class could be redefined to consist of: all individuals

16   who, since March 15, 2002, have had a credit report relating to them issued by a

17   Defendant indicating: (a) that they had obtained a Chapter 7 discharge order; and

18   (b) that at least one of their pre-bankruptcy debts was listed as due and owing,

19

---

20   [2]  *See, e.g., Dunnigan,* 214 F.R.D. at 135 (holding that even if "examination of the
     individual files of each of the participants" was required to identify them and even
21   if "this manual process may be slow and burdensome," that fact "cannot defeat the
     ascertainability requirement"); *Elliot,* 150 F.R.D. at 575.
22   [3]  *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 209 F.R.D. 323, 337
     n.20 (S.D.N.Y. 2002) ("administrative[] burden[]" of identifying class members is a
23   "problem [that] is primarily one of manageability, and not ascertainability");
     *Dunnigan v. Metro Life Ins.,* 214 F.R.D. 125, 135 (S.D.N.Y. 2003).
24   [4]  *White v. Imperial Adjustment Corp.,* 2002 U.S. Dist. LEXIS 26610, at *57 (E.D.
     La. Aug. 6, 2002) (holding that burden of identifying consumers affected by CRA's
25   failure to maintain reasonable procedures was no barrier to class certification); *see
     also Lau,* 245 F.R.D. at 624; *McDonald v. Washington Mutual Bank, FA,* 2000 U.S.
26   Dist. LEXIS 11496, at *14-15 (N.D. Ill. June 22, 2000).
     [5]  "If the court finds that the proposed definition is not sufficiently definite, it may
27   modify the definition." *Davoll v. Webb,* 194 F.3d 1116, 1146 (10th Cir. 1999); *see
     also Robidoux v. Celani,* 987 F.2d 931, 937 (2d Cir. 1993) ("[a] court is not bound
28   by the class definition proposed in the complaint"); *Nat'l Federation of the Blind v.
     Target Corp.,* 2007 U.S. Dist. LEXIS 30513, at *11 (N.D. Cal. Apr. 25, 2007).

1   despite the fact that nothing in the Defendant's files indicated that such debt was

2   excluded from discharge. Inasmuch as membership would be determined solely by

3   reference to information in Defendants' files, redefining the class in this manner

4   obliterates their ascertainability argument based on administrative burden.[6]

5        Defendants next argue that Plaintiffs have defined an improper "fail-safe"

6   class, that is, a class that can be ascertained only by reference to "the paramount

7   liability question," which, Defendants assert, is whether they "issue inaccurate

8   credit reports." TU Opp. at 14-15. Membership in the redefined class is, however,

9   not determined by reference to that issue. Moreover, even with regard to Plaintiffs'

10  original class definition, Defendants' "fail-safe" argument is wrong.

11       "[T]o determine whether a class definition improperly includes a merits

12  determination, a court must ask itself, will the class exist even if the defendant of

13  the class action lawsuit wins at trial?" *Dale v. Daimler Chrysler Corp.*, 204 S.W.2d

14  151, 180 (Mo. App. 2006). "If a reviewing court determines that a victory by the

15  defendants at trial means that no class ever really existed, then the class definition

16  improperly includes a merits determination." *Id.* That is not this case.

17       The "ultimate issue of liability" here is not whether Defendants credit reports

18  are inaccurate, but rather, whether Defendants employ reasonable procedures to

19  assure maximum possible accuracy in their reporting in accordance with the

20  requirements of the FCRA. Identifying which individuals have had their

21  discharged debts listed as due and owing in Defendants' credit reports will not

22  determine this key liability question. Conversely, if Defendants prevail on that

23

---

24  [6] Defendants contend that they are unable to recover any of the credit reports that
    they "generated for a particular consumer at some point in the past." Experian Opp.

25  at 15. ~~Sub~~ (references to "Ex. " are to the exhibits

26  attached to the Declaration of Michael W. Sobol [Exhibits A through T]; or the
    Supplemental Declaration of Michael W. Sobol [Exhibits U through FF]).

27  Furthermore, any failure of Defendants to retain their records—and particularly any
    failure to do so since having been given notice of this litigation—cannot be allowed

28  to serve as the basis for avoiding class action liability. *Macarz v. TransWorld
    Systems, Inc.*, 194 F.R.D. 46, 57 (D. Conn. 2000).

1  issue, there will still be a class of individuals whose discharged debts were

2  inaccurately reported, but because the procedures were found to be reasonable, will

3  nonetheless be bound by the Court's judgment.

4  **B.    The Typicality And Adequacy Requirements Are Met.**

5      Defendants maintain that a supposed intra-class conflict precludes the named

6  Plaintiffs from satisfying the adequacy and typicality prerequisites for class

7  certification.  In addition, TU argues that named Plaintiffs are inadequate class

8  representatives because both they lack standing and have shirked their

9  responsibilities to the classes.  Defendants are wrong on all counts.

10      **1.    There is no intra-class conflict that would preclude named Plaintiffs from representing the interests of the entire class.**

11

12      Purported conflicts among class members, "particularly as they regard

13  damages," are not "sufficient to defeat class action status at the outset unless the

14  conflict is apparent, imminent, and on an issue at the very heart of the suit."

15  *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975); *see also Marshall v. Holiday*

16  *Magic, Inc.*, 550 F.2d 1173, 1177 (9th Cir. 1977).  "Such arguments are unavailing

17  except in the rarest of cases where a conflict is 'so palpable as to outweigh the

18  substantial interest of every class member in proceeding with the litigation.'"  *In re*

19  *Bulk [Extruded] Graphite Antitrust Litig.*, 2006 U.S. Dist. LEXIS 16619, at *24-25

20  (D.N.J. Apr. 4, 2006).

21      Ignoring these principles, Defendants assert a supposed conflict between the

22  economic interests of Plaintiffs and those of certain other class members based

23  upon their own internal scoring analyses, which, they say, conclusively demonstrate

24  that improved accuracy in their reporting of pre-bankruptcy debts would cause the

25  credit scores of a portion of class members to go down.  Defendants' argument is

26  ridden with legal and factual flaws.

27

28

**a.   As to the proposed damages class, Defendants have failed to demonstrate the existence of any intra-class conflict.**

At the outset, the supposed conflict Defendants have asserted relates only to the relief sought, but ignores the fact that Plaintiffs have asserted two separate claims—one for injunctive relief and the other for monetary damages. Even if any form of injunctive relief this Court might fashion would conflict with the economic interests of some class members, which it would not, Defendants have shown no potential for conflict whatever in regard to Plaintiffs' claims for monetary relief.

Where, as here, the complaint seeks class-wide claims for money damages, the inclusion of individuals who may have profited from a defendant's unlawful conduct in the class does not give rise to any intra-class conflict—much less one that will automatically defeat class certification. In *Marshall v. Holiday Magic*, for instance, plaintiffs filed class-wide claims for money damages under the federal securities and anti-trust laws. Despite the fact that the class included all distributors who had participated in an allegedly unlawful pyramid scheme, including some who had "profited from the scheme," the Ninth Circuit found no intra-class conflict. 550 F.2d at 1177-79.[7] Similarly, in this case, the interests of class members who may have experienced a beneficial scoring effect as a result of Defendants' inaccurate reporting practices will in no way be compromised by an award of damages to other class members who did not benefit from those practices.

---

[7] *See also Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) (finding no intra-class conflict in action seeking money damages, despite fact defendant's wrongful refusal to pay extra for overtime was against economic interest of some class members); *Hillis v. Equifax Consumer Servs.*, 237 F.R.D. 491, 500 (N.D. Ga. 2006) (holding that fact that some members of the proposed class "may have experienced an increase in their FICO score" as a result of defendant's violations of Credit Repair Organizations Act was "insufficient to rise to the level of a fundamental conflict"); *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 523 (M.D. Ala. 1991) (certifying damages class, despite "fact that some antitrust plaintiffs may actually have benefited from defendants' illegal activity" since that fact was only "relevant to calculating damages, not to determining that these plaintiffs had interests antagonistic to those of the general class").

1      Moreover, Defendants' argument overlooks the fact that, under the FCRA,

2 class members would "not be required to prove . . . actual damages in order to

3 prevail" on their claims for statutory damages. *Acosta v. Trans Union, LLC*, 240

4 F.R.D. 564, 579 (C.D. Cal. 2007). Inasmuch as, all class members will be entitled

5 to statutory damages if Plaintiffs prevail on their willful violation claims, they all

6 have an equal interest in establishing the existence of such a violation. However, to

7 the extent any residual concerns about conflicting interests may exist, the Ninth

8 Circuit has repeatedly recognized that such concerns are effectively addressed by

9 Rule 23(c)(2), which ensures that all class members will be provided notice of this

10 action and an opportunity to be excluded if they believe it is contrary to their

11 interests. *See, e.g., Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir.

12 1993) ("the opportunity to opt out can alleviate our concern about potential class

13 conflict"); *Lerwill*, 582 F.2d at 512; *Marshall*, 550 F.2d at 1177.

14              **b.**    **As to the proposed injunctive relief class, the**

15                    **speculative conflict Defendants identify does not defeat class certification.**

16      Insofar as it relates to Plaintiffs' claims for class-wide injunctive relief,

17 Defendants' argument that certification must be denied on the basis of intra-class

18 conflict is likewise flawed. At the outset, that argument presupposes that certain

19 consumers—those whose scores have allegedly been artificially inflated by

20 Defendants' inaccurate reporting practices—have a cognizable legal interest in

21 keeping *inaccurate* information in their credit reports. That is an assumption that

22 turns the FCRA on it head. In enacting that statute, Congress sought to protect

23 consumers only from the transmission of *inaccurate* information about them. "The

24 fact that some members of the class may be personally satisfied with the existing

25 system and may prefer to leave the violation of their rights" to accurate information

26 "unremedied is simply not dispositive of a determination [of adequacy] under Rule

27 23(a)." *Wilder v. Bernstein*, 499 F. Supp. 980, 983 (S.D.N.Y. 1980); *see also*

28 *Lerwill*, 582 F.2d at 512 (noting that "there is a substantial question whether" for

1  purposes of finding a class conflict absent class members "can be deemed to oppose

2  rights which are . . . mandated by statute").[8]

3      To the extent, however, that any interests absent class members may assert in

4  having inaccurate information reported about them could properly be considered in

5  determining whether a class conflict exists, the critical question under Rule 23(a) is

6  whether those interests can be adequately protected in the absence of their active

7  participation in the suit.  The answer to that question is most certainly yes, because

8  Defendants themselves can be counted on to "energetically and forcefully" assert

9  the position that they are privileged to report inaccurate information and that their

10  existing reporting practices comply with the requirements of the FCRA.[9]

11      Apart from these conceptual problems with their class conflict argument,

12  Defendants have failed to provide any evidence that even a single class member

13  opposes named Plaintiffs' view that greater accuracy in the reporting of pre-

14  bankruptcy debts is in the interest of everyone.  Such failure is itself sufficient

15  reason to reject Defendants' argument that Plaintiffs cannot adequately represent

16  the classes.  *See, e.g., Cummings v. Connell*, 313 F.3d 886, 896 (9th Cir. 2003)

17  (holding that in absence of any "evidence that class members actually possess[ed]

18  opposing views regarding the pursuit of the punitive remedy," there was no

19  evidence of any "actual conflict" that would justify denying class certification).

20  _____

21  [8] Many forms of inaccurate reporting hurt some consumers and help others.  For instance, a reporting procedure that resulted in the systemic mixing of one

22  consumer's files with another will benefit those whose files were mixed with more creditworthy consumers at the same time that it harms others whose files were

23  mixed with less creditworthy ones.  Under the logic of Defendants' argument, however, the fact that certain class members may attain such an undeserved benefit

24  would foreclose the possibility of class certification in such a case.  That cannot be and is not the law.

[9] *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470, 487 (5th Cir.

25  1982) (holding that interests of class members who supported school district's use of sniff searches to combat drug problem were adequately protected by defendant,

26  who could be relied upon "to present to the court the arguments supporting the contention of any dissident absentees that the sniffing is not an unconstitutional

27  search"); *see also Dierks v. Thompson*, 414 F.2d 453, 457 (1st Cir. 1969) (finding requirements of Rule 23(a) and due process satisfied where defendants were

28  asserting the same position as certain absent class members and, hence could represent their interests); *Sturdevant v. Deer*, 73 F.R.D. 375 (E.D.Wisc. 1976).

1       Unable to identify any class members who oppose Plaintiffs' pursuit of an

2  injunctive remedy, Defendants simply assume that many would because they would

3  supposedly suffer a net financial loss if this Court were to issue an injunction

4  compelling them to employ more accurate reporting practices.  Why?  Because

5  Defendants' untested, self-serving and litigation generated credit scoring analyses

6  show that the scores of many class members would go down if such an injunction

7  were to issue.  Under the law of this Circuit, however, "[m]ere speculation as to

8  conflicts that may develop at the remedy stage is insufficient to support denial of

9  initial class certification."[10]  Here, Defendants' argument that a subset of the class

10  has interests opposed to the rest is based on at least three different levels of rank

11  speculation and biased scoring analyses that are deeply flawed.[11]

12       The first level of speculation concerns Defendants' bald assertion that the

13  supposed scoring benefits from inaccurately reporting discharged debts as due and

14  owing outweighs the non-scoring consequences of such reporting.   Defendants

15  present no evidence quantifying those supposed scoring benefits in economic terms.

16  And their assumption that their reporting of discharged debts in a delinquent status

17  has no disadvantageous non-scoring consequences is demonstrably false.  For

18  instance, such unresolved debts can by themselves disqualify consumers from

19  obtaining mortgages, auto loans and other forms of credit, and may result in others

20  being denied apartment leases or employment opportunities.  As the courts have

21  recognized, the pressure on consumers in these circumstances can become so great

22  that they end up paying their discharged debts.  *See, e.g.*, *In re Torres*, 2007 Bankr.

23

_____

24  [10]  *Social Servs. Union v. County of Santa Clara*, 609 F.2d 944, 948 (9th Cir.

25  1979); *see also Gunnells v. Healthplan Servs.*, 348 F.3d 417, 431, n.7 (4th Cir.
  2003) ("potential conflicts relating to relief issues which would arise only if the
  plaintiffs succeed on common claims of liability on behalf of the class will not bar a

26  finding of adequacy"); *Hanrahan v. Britt*, 174 F.R.D. 356, 364 (E.D. Pa. 1997)

27

28

1  LEXIS 1478, at *19-20 (S.D.N.Y. May 3, 2007); *In re Helmes*, 336 B.R. 105, 108

2  (Bankr. E.D. Va. 2005). Indeed, this phenomenon is so widespread that it has

3  created an entire market for discharged debt.[12]

4        Second, not only have Defendants failed to demonstrate a net *economic*

5  benefit to any class members from inaccurate reporting of discharged debts, they

6  have failed even to demonstrate that anyone ultimately realizes a net *scoring*

7  benefit from such reporting. According to Defendants' own experts, one of the two

8  reasons why a consumer may benefit from the failure to report that a delinquent

9  account has been discharged in bankruptcy is the so-called "recency effect."

10  Declaration of Angela Granger, dated July, 3, 2007, ¶ 23. In other words, because

11  the adverse scoring impact of derogatory information decreases with age, the

12  replacement of an older derogatory notation with a newer bankruptcy notation will

13  start the clock ticking anew, thereby, deflating the consumer's credit score. The

14  problem with this thinking is that, after a couple of years, neither the newer

15  bankruptcy notation nor the older derogatory notation it replaced will be "recent"

16  and, hence, any negative scoring impact arising out of the "recency effect" will

17  disappear over that period. Ulzheimer 7/07 Decl. ¶ 19, Ex. FF.[13] At the same time,

18  however, the unpaid balances will remain on the credit report for the entire 7-year

19  period during which a delinquency may be reported. *Id.* Thus, long after the

20  "recency effect" has run its course, the reporting of discharged debts as due and

21  owing will continue to have an adverse impact on the consumer's credit score.

22        Defendants' have presented no evidence, beyond their own speculation, that,

23  *over time*, the cumulative impact on credit scores from inaccurately reporting

24

---

25  [12] *See* R. Berner & B. Grow, *Prisoners of Debt*, Business Week, Nov. 1, 2007

26  (http://www.businessweek.com/bwdaily/dnflash/content/oct2007/db20071031_039
775.htm).
[13] As the standard bearer in the credit industry is the FICO scoring model and as

27  virtually no one in that industry relies on the Vantage scoring model to make their
credit decisions, the Equifax scoring analysis, which is based entirely on that

28  model, is meaningless. Ulzheimer 12/06 Decl. ¶ 19, Ex. B.

1  discharged debts is positive for any significant segment of the class.  Indeed, their

2  evidence shows that the more time that elapses, the greater the adverse impact of

3  reporting discharged debts on credit scores.  Supplemental Declaration of Angela

4  Granger, dated Dec. 28, 2007, ¶ 4; ███████████████████████████████

5  ███████  Moreover, as Experian itself admits (at 8-9), any short-term positive

6  *scoring* impact a consumer may enjoy as a result of the failure to update the status

7  of his or her pre-bankruptcy accounts is likely to have little or no *economic* impact

8  because during the first couple of years after the discharge "the bankruptcy

9  reference itself factors so heavily into a credit grantor's decision-making process

10  that it tends to overshadow everything else in a debtor's credit report."

11      Third, in conducting their scoring analyses, Defendants assumed that any

12  injunction this Court may issue compelling them to revise their reporting methods

13  would mimic the methods they used in conducting those analyses.  That assumption

14  is entirely unjustified. ████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  The exclusion of such positive payment history, however, is not part of any remedy

19  Plaintiffs must or would seek.

20      By their deliberate decision to employ a reporting system that reports

21  discharged debts as due and owing, Defendants have created a perverse incentive

22  for consumers to pay debts they do not owe—thereby causing them ***to lose real***

23  ***dollars*** at the same time they may have been improving their credit scores.  If,

24  instead, Defendants had acted in accordance with their legal obligations by

25  reporting discharged debts as discharged, consumers would have had little incentive

26  to continue paying them and would, instead, have adjusted their behavior by

27  rebuilding their credit through the establishment of new accounts.  Only minds as

28  cynical as those belonging to Defendants would think of fashioning an injunction

1    that would punish consumers who they wrongfully encouraged to make payments

2    *they did not owe* by wiping out all history of them.  Yet, when those same minds

3    were not employing the kind of intimidation tactics that they are resorting to here,

4    they found it possible to cobble together a non-cash settlement under which a

5    consumer's positive payment history would have remained untouched.  Inasmuch

6    as the real world prospect of such an inequitable injunction being issued is zero, the

7    scoring analyses upon which Defendants' conflict argument rests should be

8    accorded no weight.[14]

9         In this connection, it is worth noting that among those whom Defendants

10   allege would experience a decrease in their credit scores if they adopted more

11   accurate reporting practices are certain named Plaintiffs.  Yet, Defendants have not

12   shown that any of them "received any [economic] benefit from the[ir] illegal

13   activity" and, in fact, "the evidence as well as their willingness to sue on behalf of

14   the class indicates that the opposite is true."  *Coleman*, 141 F.R.D. at 523.[15]  Indeed,

15   because these Plaintiffs are members of the same subset of the class that Defendants

16

17   [14]



18

19

20

21

22   [15] As part of their effort to show that neither Plaintiffs nor any of the putative class
     members are actually harmed by their unlawful reporting practices, Defendants
23   characterize "this as a classic lawyer-driven case" that came into being only after
     Mr. Juntikka made "unsolicited communications" to "over a thousand Chapter 7
24   debtors in [his] search for potential plaintiffs."  Experian Opp. at 9.  This accusation
     is as false as it is offensive.  For years, several of Mr. Juntikka's clients came into
25   his office each week complaining that their discharged debts were being reported as
     due and owing on their credit reports.  Juntikka Decl. ¶¶ 5-6, Ex. D.  Upon learning
26   of the magnitude of the problem at a conference, he became mortified that his
     clients were not getting the "fresh start" he had promised them and so he sent out a
27   mass mailing in which he offered to help clear up the errors in their reports *free of
     charge*.  *Id.*  In other words, this case was "lawyer-driven" only in the sense that it
28   arose out of Mr. Juntikka's commendable *pro bono* efforts to protect the interests of
     his clients.

1  say have interests antagonistic to the rest, they can be counted on to represent those

2  interests—a fact, which is, in and of itself, sufficient grounds to reject Defendants'

3  attempt to defeat certification on the basis of an alleged intra-class conflict.

4      Even if that conflict were real, however, Defendants are wrong in assuming

5  that protecting the interests of those who may have benefited from the denial of

6  their statutory rights requires depriving the majority who did not of their only

7  opportunity for a viable remedy. *See, e.g., Horton*, 690 F.2d at 487. Rather, the

8  correct solution is to employ appropriate procedural safeguards by, for example,

9  establishing subclasses so as to ensure that the interests of all class members are

10 adequately represented (*Blackie*, 524 F.2d at 909; *I.M.A.G.E. v. Bailar*, 78 F.R.D.

11 549, 558 (N.D. Cal. 1978)), or, if necessary, by redefining the class so as to remove

12 the conflict altogether. *Social Servs.*, 609 F.2d at 948-49. Indeed, in one of the two

13 cases Defendants principally rely upon, the Eleventh Circuit made clear those class

14 members who "did not experience a net benefit from the defendants' allegedly

15 illegal conduct [were] free to pursue a class action on behalf of all similarly situated

16 parties," *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1194

17 (11th Cir. 2003), and, in the other, the trial court certified a similarly restricted class

18 on remand. *Pickett v. IBP, Inc.*, 2001 U.S. Dist. LEXIS 22453 (Dec. 21, 2001).[16]

19          **2.    The Conduct Of Both Plaintiffs And Their Counsel**
                    **Demonstrates That They Are More Than Capable Of**
20                  **Adequately Representing The Interests Of The Classes.**

21     TU asserts (at 27-28) that none of the named Plaintiffs are adequate

22 representatives of the class because they "lack basic knowledge about the case" and

23 have "failed to take an active role in managing the litigation." It is, however, "not a

24 ────────────────────────

25 [16] Equifax goes so far as to argue (at 25) that class certification would violate the
    due process rights of those class members whose credit scores may have been
    artificially inflated by Defendants' unlawful reporting practices, because no form of
26  notice could be fashioned that would enable them to make "informed, intelligent
    decisions about whether to remain in the class." Leaving aside that class members
27  have no right to opt out of a Rule 23(b)(2) class, Equifax's due process argument is
    premised on the assumption that the interests of some class members are
28  irreconcilably in conflict with those of others—an assumption which, for the
    reasons set forth above, is patently false.

745560.1                        - 13 -

1     requirement that representative plaintiffs . . . play a personal role in the direction

2     and management of the action," *Morris v. Transouth Fin. Corp.*, 175 F.R.D. 694,

3     698 (M.D. Ala. 1997), or even that they are "personally . . . able to assist [their]

4     counsel." *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982). As this Court has

5     itself recognized, a named Plaintiff can serve as a class representative even if he has

6     only "marginal familiarity with the fact of the case" and lacks any understanding of

7     legal theories. *Holloway v. Full Spectrum Lending*, 2007 U.S. Dist. LEXIS 59934,

8     at *20 (C.D. Cal. June 26, 2007) (citing *Murray v. New Cingular Wireless Servs.*,

9     232 F.R.D. 295, 300 (N.D. Ill. 2005)). Indeed, only in the most "flagrant cases,"

10     where they have displayed "an alarming unfamiliarity with the suit," have named

11     plaintiffs been found unfit to represent a class. *In re THQ, Inc. Securs. Litig.*, 2002

12     WL 1832145, at *6 (C.D. Cal. 2002).[17] In short, so long as "the putative class

13     representative[s] demonstrates some involvement in and understanding of the

14     proceedings, [they] can adequately represent the class." *Nielsen v. Dickerson*, 1999

15     U.S. Dist. LEXIS 8334, at *23 (N.D. Ill. May, 19, 1990).

16        The named Plaintiffs easily satisfy these less than demanding standards. As

17     their testimony reveals, they all have a basic understanding of the nature of their

18     claims, have kept abreast of major developments in their case, and have actively

19     participated in it through the discovery process and otherwise.[18]

20        TU nonetheless insists that named Plaintiffs are unfit to represent the class

21     because they did not know of the proposed *Acosta* settlement and that their counsel

22

---

[17] *See, e.g., Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966) (finding
23     class certification appropriate, despite fact that named plaintiff did not understand
her complaint, had little knowledge of what the lawsuit was about, and did not
24     know the defendants by name, nor even the nature of their misconduct); *In re CBS
Companies, Inc. Collection Letter Litig.*, 181 F.R.D. 380, 383-84 (N.D. Ill. 1998)
25     (finding adequacy prerequisite met, despite fact class representative had been out of
contact with her lawyers for eight months, did not know what a "defendant" was
26     and could not identify them by name).
[18] *See, e.g.*, Hernandez Depo. 138:1-23 (testifying that he has been communicating
27     with counsel every two to three weeks), Ex. Y; Radcliffe Depo. at 351:5-22,
377:16-17 (testifying that he has had communications with counsel and that he has
28     "received a ton of papers to go over"), Ex. Z; Carter Depo. at 33:21-34:15; 36:10-
39:2 (testifying that he has met with counsel and reviewed pleadings), Ex. AA.

1  should be disqualified because they did not tell them about it.  Leaving aside that

2  the *Acosta* settlement was negotiated in a separate case without any involvement of

3  counsel for the *White/Hernandez* plaintiffs and leaving aside that it would have

4  allowed TU to continue reporting inaccurate information about the

5  *White/Hernandez* plaintiffs without paying any of them a dime, TU's argument is

6  unsupported by the facts.  Plaintiffs have testified they were aware of the settlement

7  and understood it was contrary to the interests of the class.[19]

8      TU next asserts (at 9) that named Plaintiffs are unfit to represent the class

9  because they testified that they "did not care" whether the proposed relief would

10  impair the credit scores of class members.  TU grossly mischaracterizes named

11  Plaintiffs' testimony.  In fact, they disputed the premise that removing inaccurate

12  bankruptcy information would adversely affect anyone's credit worthiness,

13  expressed their view that more accurate reporting could only benefit class members,

14  and reaffirmed their intention to act in the best interest of the entire class.[20]

15      Finally, TU seeks to disqualify Plaintiff Falcon on the basis of a single

16  decade-old drug conviction.  As numerous courts have held, however, the mere fact

17  of a felony conviction, without more, does not render a person unfit to represent a

18  class.  *See, e.g., Wood v. Capital One Auto Fin., Inc.*, 2006 U.S. Dist. LEXIS

19  67513, at *9 (E.D. Wisc. Sept. 19, 2006) (citing cases); *Karnette v. Wolpoff &*

20  *Abramson*, 2007 U.S. Dist. LEXIS 20794, at *30 (E.D. Va. Mar. 23, 2007) (holding

21  that "single, decade-old conviction for possession of cocaine" did not make plaintiff

---

22  [19] Carter Depo. at 245:14-21; 247:13-21 (stating he was aware of the settlement and
23  that he had objected to it), Ex. AA; Hernandez Depo. 289:8-292:2; 509:4-16;
   510:5-13 (stating he was aware of the settlement and that he understood that it
24  "would not have been in the best interest for everybody in the class" because "it
   wouldn't have affected everybody involved in the class action suit"), Ex. Y; Seale
25  Depo. 338:20-339:21, 349:2-12, 342:1-5, 343:1-344:2 (stating he was aware of the
   settlement, did not believe that it was in the best interest of the class and authorized
26  objections to it), Ex. CC.
   [20] Carter Depo. at 536:9-15; 538:19-539:5, Ex. AA; Hernandez Depo. at 119:25-
27  121:3, Ex. Y; Radcliffe Depo. at 241:4-13, Ex. Z; Falcon Depo. at 152:23-153:15,
   Ex. BB.  For example, Mr. Hernandez simply testified (Depo. at 148:18-21, Ex. Y):
28  "I'm here to just do whatever's right, and I'll leave it upon the courts to really make
   that decision as to . . . how the consumers are going to be affected."

1   an inadequate class representative).  As Plaintiff Falcon's conviction was not for a

2   crime of dishonesty and as there is no "relationship between [that conviction] and

3   the subject matter" of her lawsuit, it is "irrelevant to [her] ability to represent the

4   class vigorously and responsibly." *McCall v. Drive Fin. Servs., L.P.*, 236 F.R.D.

5   246, 251-52 (E.D. Pa. 2006) (holding that plaintiff's "fifteen year old robbery is not

6   relevant to a class action under the FDCPA" and did not render him inadequate).

7           **3.**     **Plaintiffs Have Standing To Represent The Classes.**

8         Asserting that Plaintiffs have failed to demonstrate that inaccuracies in their

9   credit reports caused them any economic hardship, TU leaps to the conclusion that

10   plaintiffs have suffered no injury and, hence, have no standing to represent the

11   class.  TU Opp. at 10.  This argument confuses the "injury-in-fact" prerequisite for

12   standing with compensable harm. *Korman v. Walking Co.*, 2007 U.S. Dist. LEXIS

13   63732, at *8 (E.D. Pa. Aug. 28, 2007).  A person suffers injury-in-fact for standing

14   purposes whenever they suffer a denial of their legally protected rights, including

15   rights created by statute.[21]  As all named Plaintiffs have suffered a denial of their

16   statutory right to be protected from the publication of inaccurate financial

17   information about them, they have standing to pursue their FCRA claims and to

18   represent the class.[22]

19

20

21   [21] *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also DeMando v. Morris*, 206

22   F.3d 1300, 1303 (9th Cir. 2000) (holding that by virtue of his having "suffered the loss of a statutory right to disclosure [under TILA]," plaintiff had "therefore

23   suffered injury in fact for purposes of Article III standing"); *Korman*, 2007 U.S. Dist. LEXIS 63732, at *7-8 (holding that denial of statutory right to receipt that

24   omits certain credit card information is sufficient to confer standing under FCRA); *Ehrheart v. Lifetime Brands, Inc.*, 498 F. Supp.2d 753 (E.D. Pa. 2007) (same).

25   [22] Defendants' representations notwithstanding, it is also worth noting that Plaintiffs testified to, in fact, having suffered denials of credit and associated

26   hardships. *See, e.g.*, Falcon Depo. at 35:22-36:22; 37:25-38:12; 120:16-121:5; 132:20-25(denial of car loan and inability to obtain a cell phone or credit cards);

27   Ex. BB; Carter Depo. at 343:3-15; 345: 7-11; 346:7-8; 347:25-348:14; 340:1-5 (limited to high interest rate credit cards), Ex. AA; Radcliffe Depo. at 31:3 (same),

28   Ex. Z; Hernandez Depo. at 70:2-72:4 (denial of car loan due to "unresolved delinquent accounts"), Ex. Y.

II.    **PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(B)(2)**

A.    **Plaintiffs Are Entitled To Injunctive And Declaratory Relief Under The FCRA, The CCRAA And The N.Y. FCRA.**

*1. Availability Of Injunctive Relief Under The FCRA.* Citing *Washington v. CSC Credit Services, Inc.*, 199 F.3d 263 (5th Cir. 2000) and its progeny, Equifax (at 20) and Experian (at 18) assert that injunctive relief is unavailable to private plaintiffs under the FCRA. In so doing, they completely ignore Plaintiffs' opening brief, which explains (at 13-17) that all of these cases are based on the mistaken assumption that the FCRA expressly grants the FTC, but not private parties, the authority to seek injunctive relief in federal court. As the FCRA does no such thing, it cannot be reasonably—much less "necessarily" and "inescapably"—inferred that the FCRA strips the district courts of their inherent equitable powers.

*2. Availability Of Injunctive Relief Under The CCRAA And The N.Y. FCRA.* Citing several district court decisions, Equifax (at 20) and Experian (at 18) argue that the injunctive remedies that are provided for in the CCRAA and the N.Y. FCRA are preempted by the federal statute. In summarily reaching this conclusion, neither Defendants nor any of the cases they rely upon say anything about preemption principles or engage in even the most cursory analysis of how they should be applied in this context. Such an analysis points to one inescapable conclusion: the FCRA does not preempt injunctive remedies under State law.

Nothing in the FCRA expressly preempts those remedies. Moreover, insofar as it expressly contemplates the continuation of state regulation, 15 U.S.C. § 1681t(a), the "FCRA makes clear that it is not intended to occupy the entire regulatory field with regard to consumer reports." *Davenport v. Farmers Ins. Group*, 378 F.3d 839, 842-43 (8th Cir. 2004). Thus, Defendants' argument depends on the proposition that the FCRA impliedly preempts state law injunctive remedies

1    because the latter frustrates "the full purposes and objectives of Congress." *English*
2    *v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). That argument does not hold water.

3        It is well settled that when "addressing the question of preemption in a field
4    traditionally occupied by the States, a court must 'start with the assumption that the
5    historic police powers of the States were not to be superseded by the Federal Act
6    unless that was the clear and manifest purpose of Congress.'" *California v. ARC*
7    *Am. Corp.*, 490 U.S. 93, 101 (1989). Prior to passage of the FCRA in 1968,
8    regulation of the credit reporting industry was the province of the States. *See, e.g.*,
9    *Chamberlan v. Ford Motor Co.*, 314 F. Supp.2d 952, 959 (N.D. Cal. 2004) ("unfair
10   business practices [is an] area[] traditionally regulated by the States.").
11   Accordingly, to prevail on their argument that the FCRA ousts State injunctive
12   remedies, Defendants must show "an unambiguous congressional mandate to that
13   effect." *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146-47
14   (1963). This they cannot do for two reasons.

15       First, Congress defined the preemptive reach of the FCRA in § 1681t(a) of
16   that statute, which expressly preserves state laws that are consistent with the FCRA
17   and identifies the inconsistent ones that are not. 15 U.S.C. §§ 1681h(e) & 1681t(b).
18   As the Ninth Circuit has instructed where, as here, "'Congress has considered the
19   issue of preemption and has included in the enacted legislation a provision
20   explicitly addressing that issue . . . , there is no need to infer congressional intent to
21   preempt state laws from the substantive provisions of the legislation.'" *Ishikawa v.*
22   *Delta Airlines, Inc.*, 343 F.3d 1129, 1133 (9th Cir. 2003). In other words, the
23   "'express provisions for preemption of some state laws,' the inconsistent ones,
24   'imply that Congress intentionally did not preempt state law generally.'" *Id.*

25       Second, even if the FCRA were silent on preemption, state law injunctive
26   remedies simply do not frustrate the congressional purpose in enacting that statute.
27   To the contrary, allowing consumers to pursue injunctive remedies to enforce state
28   laws that provide protections identical to those set forth in the FCRA would

1    advance the federal interests in accurate, fair and responsible reporting.  Indeed, the

2    Supreme Court, the Ninth Circuit and this Court have consistently affirmed the

3    common sense principle that "[f]ederal regulation of a subject—even

4    thoroughgoing federal regulation—does not prevent states from adding remedies to

5    the arsenal established by federal law." *Radici v. Associated Ins. Cos.*, 217 F.3d

6    737, 742 (9th Cir. 2000).[23]  Applying this principle, the Ninth Circuit and at least

7    two district courts within it have held that the absence of injunctive remedies in

8    federal statutes does not foreclose the States from including them in theirs.[24]

9         Defendants' implied preemption argument also overlooks the FTC

10   commentary, which construes § 1681t(a) of the FCRA to limit federal preemption

11   to situations in which "compliance with inconsistent State law would result in

12   *violation of the FCRA.*" 16 C.F.R., pt. 600, app. § 622, P 1 (1995) (emphasis

13   added).  The FTC's interpretation is firmly "based on an unequivocal statement in

14   the principal report in the FCRA's legislative history . . . that, under the pre-

15   emption provision, 'no State law would be preempted unless compliance would

16   involve a violation of Federal law.'" 55 Fed. Reg. 18804, 18808 (quoting S. Rep.,

17   91-517, 91st Cong., 1st Sess. 8 (1969)).  There should, therefore, be no doubt that

18   the FCRA does not preclude states from "enacting greater protections for

19   consumers injured by the activities of reporting agencies" than does the FCRA.

20   *Cisneros v. U.D. Registry, Inc.*, 39 Cal.App.4th 548, 577 (1995).[25]

21   _____

22   [23] *See also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255-56 (1984); *Aiello v. First Alliance Mortgage Co.*, 280 B.R. 246, 251 (C.D. Cal. 2002) ("Additional penalties [under California's Unfair Competition Law] are not inconsistent with

23   TILA, but merely provide greater protection to consumers.").
     [24] *See, e.g., Golden Door, Inc. v. Odisho*, 646 F.2 346, 351-52 (9th Cir. 1980)

24   (Lanham Act "cannot be said to preempt this plaintiff's rights under California law" to injunctive relief for "innocent pre-registration use of a federal mark" since all

25   such relief does is "extend[] . . . greater protection" to federal registrants); *Irwin v. Mascott*, 112 F. Supp. 2d 937, 964 (N.D. Cal. 2000) ( "injunctive relief offered by"

26   California statute "is exactly the type of greater protection afforded to consumers which is not preempted by the FDCPA"); *Chamberlan*, 314 F. Supp.2d at 963-64.

27   [25] *See also Davenport*, 378 F.3d at 842-43 ("declin[ing] to interpret Congress's silence" with regard to "a matter not addressed by the FCRA" as "signify[ing] its

28   intent to prohibit states from enacting their own regulations"); *Credit Data of Arizona, Inc. v. Arizona*, 602 F.2d 195, 198 (9th Cir. 1979) (holding Arizona

1   Absent any explanation from Defendants, Plaintiffs can only assume that the

2   reason why they believe the FCRA displaces State law injunctive remedies is a

3   view that such remedies are inconsistent with an implied congressional intent to

4   make the FTC the sole authority for enforcing the FCRA and, thereby, to encourage

5   uniformity.  That view is flawed on several counts.

6   First, nowhere in the language of the FCRA or its legislative history is there

7   any indication that Congress intended to create such a uniform enforcement regime.

8   To the contrary, the Congress expressly gave state agencies the authority to seek

9   injunctive relief for FCRA violations.  15 U.S.C. § 1681s(c)(1)(A).

10   Second, the FCRA's legislative history reveals that, in crafting its carefully

11   calibrated preemption provisions, Congress struck a delicate balance between the

12   interest in uniformity and that of enabling states to serve as laboratories of

13   innovation.  *See* 15 U.S.C. § 1681h(e) and § 1681t.  As Congressman Kennedy

14   remarked, this balance was reached after "contentious" debate and was "the product

15   of a careful effort to balance industry's desire for nationwide uniformity with

16   States' vital interest in protecting their citizens."  140 Cong. Rec. H9797, H9810

17   (1994).  This Court should not accept Defendants' invitation to tilt that balance on

18   the side of uniformity by writing a new preemption provision into the FCRA.

19   Finally, insofar as encouraging more uniformity than the statute expressly

20   provides could be considered a goal of the FCRA, which it cannot, that goal would

21   still pale in comparison to its overriding purpose of protecting consumers from

22   inaccurate and irresponsible credit reporting.  Where, as here, the availability of

23   state law remedies could only advance the primary goal of a corresponding federal

24   statute, any "negative effect" on the "secondary goal" of "uniformity" can hardly be

25

26

27

28   statute, which granted consumers rights to obtain certain credit information without
    charge, not preempted by FCRA "since it merely adds an additional protection to
    the consumer for whose protection both statutes were enacted").

1  considered tantamount to a "'clear and manifest' [congressional] intent to preempt

2  State law." *Chamberlan*, 314 F. Supp. 2d at 963.

3      In addition to asserting that all State law injunctive remedies are preempted,

4  Equifax argues (at 18) that the New York legislature impliedly abolished that

5  remedy when it amended its version of the FCRA in 2006 to give New York's

6  attorney general the power to seek injunctive relief to enforce its terms. That

7  argument ignores the long-standing principle that repeals by implication cannot be

8  found except where the "intent to repeal is 'clear and manifest,'" that is, where

9  there is an "'irreconcilable conflict'" between the old statute and the newly enacted

10  one. *United States v. Hansen*, 772 F.2d 940, 944-45 (D.C. Cir. 1985) (Scalia, J.)

11  (quoting *Red Rock v. Henry*, 106 U.S. 596, 601-02 (1883)); *see also Alweis v.*

12  *Evans*, 505 N.E.2d 605, 607 (N.Y. 1987). As no such conflict exists here, TU's

13  argument that private parties can no longer seek injunctive relief to enforce

14  compliance with the NYFCRA has no merit.

15      3. *Availability Of Declaratory Relief.* For the reasons set forth in Plaintiffs'

16  opening brief—none of which Defendants dispute—any bar that the FCRA might

17  be construed as imposing on injunctive relief in private lawsuits would not prevent

18  a court from awarding declaratory relief. Accordingly, at a minimum, this Court

19  should certify Plaintiffs' declaratory relief claims under Rule 23(b)(2).

20  **B.   Plaintiffs Have Standing To Seek Injunctive And Declaratory**
      **Relief Under The CCRAA**

21

22  TU asserts that Plaintiffs have no standing to seek injunctive relief under the

23  CCRAA because none of those who are serving as class representatives are

    *currently* residents of California. Plaintiff Hernandez was, however, a California

24  resident at the time his injury occurred and, hence, he plainly has a claim under the

25  CCRAA. Furthermore, it is well settled that standing is determined by the status of

26  a plaintiff at the time he filed his case. 15 James Wm. Moore, et al., MOORE'S

27  FEDERAL PRACTICE §101.32 (3d ed. 2003). It is undisputed that Plaintiff Hernandez

28

1    was a resident of California at that time as well. Accordingly, he has standing to

2    assert injunctive relief claims under the CCRAA and to pursue those claims on

3    behalf of the class.

4        Furthermore, even if none of the *White/Hernandez* Plaintiffs had standing to

5    pursue claims under the CCRAA, TU forgets that their suit has been consolidated

6    with *Acosta*. Inasmuch as they are all California residents, the *Acosta* Plaintiffs

7    unquestionably have standing to pursue CCRAA claims. And, even if they did not,

8    this Court should afford the *White/Hernandez* Plaintiffs an opportunity to amend

9    their complaints to add someone who does.

10    **C.    Certification Of Rule 23(b)(2) Classes Is Appropriate Because
      Plaintiffs Are Not Seeking To Certify Any Monetary Relief Claims
11    Under That Rule And Because Each Defendant Has Acted On
      Grounds Generally Applicable To The Classes.**

12        Citing *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003), Defendants argue that

13    class certification under Rule 23(b)(2) is not appropriate here because, in their

14    view, "monetary damages are the primary form of relief sought by the proposed

15    class." Experian Opp. at 17; Equifax Opp. at 21. That argument is pure sophistry.

16        It is well settled that plaintiffs may obtain certification of claims for

17    monetary damages under Fed. R. Civ. P. 23(b)(2), but only if those claims are

18    "secondary to the primary claim for injunctive or declaratory relief." *Molski*, 318

19    F.3d at 947. In this case, Plaintiffs are ***not*** seeking to have any claims for money

20    damages certified under Rule 23(b)(2). In other words, Plaintiffs' claims for

21    injunctive and declaratory relief are not merely the primary form of relief Plaintiffs

22    seek; they are the ***only*** form of relief they seek. Defendants insistence that those

23    claims cannot be certified under Rule 23(b)(2) because Plaintiffs also seek to certify

24    claims for money damages under Rule 23(b)(3) is both contrary to common sense

25    and a long line of authority in which courts have certified hybrid classes seeking

26    injunctive relief under Rule 23(b)(2) and monetary relief under Rule 23(b)(3).[26]

27

28    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
      [26] *See, e.g.*, *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997); *Holmes v.
      Continental Can Co.*, 706 F.2d 1144, 1154-60 (11th Cir. 1983); 1 Herbert Newberg

1    Defendants reliance on *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229

2  (C.D. Cal. 2006), is misplaced for precisely this reason. In that case, plaintiff

3  sought to certify claims for monetary relief under Rule 23(b)(2), despite the fact

4  that most class members would not benefit from an injunction. The court cited this

5  fact in support of its conclusion that monetary relief was "incidental to injunctive

6  relief" and, hence, that class certification under Rule 23(b)(2) was improper. *Id.* at

7  245. Leaving aside that an injunction in this case will inure to the benefit of all or

8  almost all class members, *Sepulveda* has no relevance here because Plaintiffs are

9  not seeking to certify any claims for monetary damages under Rule 23(b)(2).

10    Finally, Defendants argue that injunctive relief is improper as to the

11  reinvestigation subclass because the reason why they may have refused to act "will

12  vary from case to case" and, hence, "no single form of injunctive relief would be

13  appropriate with respect to the class as a whole." Experian Opp. at 18; *see also*

14  Equifax Opp. at 22. Defendants are wrong. Plaintiffs' allegations that each

15  Defendant has violated its § 1681i duties by failing to devote sufficient resources to

16  the reinvestigation of consumer disputes and by creating a perverse incentive

17  system are, by their nature, "generally applicable to the class." Fed. R. Civ. P.

18  23(b)(3). Further, if Plaintiffs prove these allegations, this Court can issue

19  injunctive relief that would "be appropriate with respect to the class as a whole,"

20  namely, an injunction compelling Defendants to modify their incentive systems and

21  to commit additional resources to the reinvestigation process.

22

23  & Alba Conte, Newberg On Class Actions § 4.14, at 4-51 to 4-52 (3d ed. 1992).
    Defendants are, at any rate, wrong in asserting that monetary, rather than injunctive,
24  relief is the primary form of relief being sought in this case. In resolving that issue,
    the Ninth Circuit requires that the inquiry focus "predominantly on the plaintiffs'
25  intent in bringing the suit." *Dukes v. Wal-Mart, Inc.*, 2007 U.S. App. LEXIS 28558,
    at *38 (9th Cir. Dec. 11, 2007); *see also Molski*, 318 F.3d at 950. The paramount
26  motivation of named Plaintiffs, who after all are entitled to a maximum statutory
    damages award of just $1,000, is to compel Defendants to cease violating their
27  rights and those of other consumers to be protected from the publication of
    inaccurate financial information about them. *See* Radcliffe Decl. ¶ 9; Carter Decl. ¶
28  9; Lovell Decl. ¶ 12; Seale Decl. ¶ 11; and Hernandez Decl. ¶ 10, all previously
    filed with the Court.

III.  **PLAINTIFFS' CLAIMS SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(B)(3)**

A.  **Common Questions Of Law Or Fact Predominate Over Individual Ones.**

1.  **Plaintiffs' inaccurate reporting claims.**

The single most important fact bearing on the class certification determination, which Defendants nowhere dispute in their *80 pages* of opposition briefing, is that Defendants maintain standardized procedures for reporting the status of pre-bankruptcy debts that are universally applicable to each and every member of the putative class. Therefore, any finding a jury or court makes regarding whether or not those procedures are reasonable to assure maximum possible accuracy will apply equally to all class members across-the-board. And, likewise, a finding of whether or not Defendants acted willfully in failing to employ such reasonable procedures, would apply to every class member.

The determinations of these issues are unquestionably common ones; answer them for one class member, and they are answered for all class members. Moreover, these issues *predominate* because the determination of them will establish both the liability of the Defendants and the entitlement to relief for each and every consumer meeting the class definition. *White v. Imperial Adjustment Corp.*, 2002 U.S. Dist. LEXIS 26610 (E.D. La. 2002), aff'd, 2003 U.S. App. LEXIS 20162 (5th Cir. Oct. 2, 2003) (the predominance "standard is met . . . where there exists generalized evidence that proves or disproves an element of the class member's claim on a simultaneous, class-wide basis.") Indeed, under the law of this Circuit, the predominance requirement is satisfied "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ; *see also Holloway*, 2007 U.S. Dist. LEXIS 59934, at *8.

Defendants do not contest these elemental truths, but instead maintain that predominance cannot be satisfied because *if and when* the issue of class-wide

1  liability is resolved in Plaintiffs' favor, the determination of whether class members

2  are eligible for statutory damages entails numerous individual inquiries regarding

3  the accuracy of their credit reports, causation and damages. Defendants are

4  incorrect that such collateral issues can defeat a predominance finding because even

5  if Defendants are correct in identifying them as individualized,[27] they are the kind

6  of simple and straightforward issues that cannot defeat predominance. *See, e.g.,*

7  *Pitts v City of Portsmouth*, 221 F.R.D. 438, 447 (E.D. Va. 2004) (noting that

8  predominance determination turns on a "qualitative," rather than a "quantitative,"

9  comparison between the common and individual issues).

10          a. *Accuracy*. Defendants argue that predominance cannot be found because

11  determining whether errors exist on a class member's credit reports requires an

12  individualized review of millions of bankruptcy files. *See* TU Opp. at 18-19;

13  Experian Opp. at 20; Equifax Opp. at 10-13. Defendants' argument runs afoul of

14  the common sense principle that "individual questions that are ministerial in nature

15  or otherwise easy to resolve do[] not defeat a certification petition."[28] The process

16  of identifying errors in a credit report is quintessentially ministerial in nature.

17          As set forth in Plaintiffs' opening brief, a discharge order in a no asset

18  Chapter 7 proceeding discharges all pre-bankruptcy debts, including those that are

19  not listed on a bankruptcy schedule, except those that: (a) are statutorily non-

20  dischargeable by nature; and (b) have been reaffirmed by agreement or successfully

21  challenged in an adversary proceeding.

22          By accessing information in their own files, Defendants are able to, and in

23  fact do, systematically determine which consumers have been the beneficiaries of

---

[27] Plaintiffs disagree that these issues are truly individualized. With respect to most of the supposedly fact-intensive individualized inquiries they identify, Defendants have either: (1) confused the issue of commonality with the underlying merits of Plaintiffs' claims; or (2) mischaracterized a common issue as an individual one, as explained below.

[28] *Wells v. McDonough*, 188 F.R.D. 277, 279 (N.D. Ill. 1999); *see also White*, 2002 U.S. Dist. LEXIS 26610, at *57; *Campion v. Credit Bureau Servs.*, 206 F.R.D. 663, 676 (E.D. Wash. 2001); *McDonald*, 2000 U.S. Dist. LEXIS 11496, at *14-15.

1    Chapter 7 discharge orders.[29]  Defendants also know which debts pre-dated the

2    filing of their bankruptcy petitions and, for the great majority of those debts, which

3    were excluded from discharge.  Ulzheimer 2/07 Decl. ¶¶ 14-17, Ex. C.  Likewise,

4    the determination whether a discharge order relates to a "no asset" case can be

5    made through an automated review of bankruptcy court docket sheets.[30]  And,

6    finally, to the extent Defendants' creditor-furnishers may have failed to inform

7    them that a debt had been reaffirmed or successfully challenged, that information is

8    also easily discoverable from those docket sheets.  Fenning Dep. at 93:18-94:22,

9    100:8-101:1; Westbrook Decl. ¶¶ 8, 14, Ex. T to Sobol Decl.[31]

10        Thus, contrary to Defendants' representations, the determination whether any

11   given class member's credit report inaccurately records pre-bankruptcy debts as due

12   and owing is a mechanical task that can be achieved on a systematic basis without

13   the need to "mine" millions of individual bankruptcy records.  As one court

14   recently held when confronted with this precise issue, "determining whether a class

15

16

17   [29] Defendants' assertion that they are unable to match bankruptcy records with the
     consumers in their databases is nonsensical because the class definition presupposes

18   that they have already done that.
     [30] Defendants' argument that the determination whether a Chapter 7 discharge order

19   was issued in a "no asset" case involves a "severe factual challenge" (TU Opp. at
     16) is a severe exaggeration.  As their own expert admits, the vast majority of

20   Chapter 7 cases are of the "no asset" variety and that status is stated on the face of
     bankruptcy court docket sheets. Fenning Depo. at 24:17-25:16, 68:4-69:4, Ex. DD.

21   [31] Defendants' representation to the contrary notwithstanding, Plaintiffs' theory of
     the case does not rely on their ability to use PACER to determine whether or not a

22   debt has been discharged.  Rather, Plaintiffs' theory relies on their contention that a
     discharge order reaches the vast majority of pre-bankruptcy debts and that

23   Defendants can easily determine which of those debts are not reached from
     information provided by their creditor furnishers *or* by reviewing bankruptcy court

24   *docket sheets*.  Given Defendants' admission that those creditors furnishers "know
     if [an] account . . . was not discharged" (Equifax Opp. at 3-4), Defendants should

25   be able to make a reliable accuracy determination in all or almost all cases through
     an internal file review.  To the extent, however, that a review of docket sheets does

26   become necessary, Defendants can easily obtain them from their public records
     vendors and/or off of PACER, where they have been available in computer readable

27   form for over a decade. Fenning Depo. at 24:17-25:16, 68:4-69:4, Ex. DD.  Thus,
     Defendants' observations that most bankruptcy courts did not have electronically

28   accessible CM/ECF systems until recently and that there are still variances in their
     electronic filing practices are irrelevant.

1    member's debt was discharged in bankruptcy" is not "so daunting" an obstacle as to

2    defeat class certification. *Lau*, 245 F.R.D. at 624.

3        Defendants' argument that millions of fact-intensive mini-trials are needed to

4    determine whether debts have been discharged in bankruptcy is pure sophistry. In a

5    seemingly transparent effort to confuse the Court, Defendants equate the status that

6    a pre-bankruptcy debt might theoretically obtain *at some point in the future,*

7    should it be challenged by a creditor in a hypothetical future legal proceeding, with

8    the actual status of that debt at the time the credit report was published. In other

9    words, Defendants argue that because some debts may be challenged in the future,

10   even though the available records show that there is currently no such challenge, no

11   one can ever determine with respect any and all debts ever existing whether they

12   have been discharged. But the fact is that until such time as a bankruptcy court has

13   *entered* an order (*i.e.*, a publicly available and automatically retrievable order )

14   *sustaining* such a challenge, in a Chapter 7, no-asset bankruptcy, all debts (other

15   than those that are statutorily dischargeable by nature, like student loans) are

16   discharged. *See, e.g., In re Inchinose*, 946 F.2d 1169, 1175 n.4 (5th Cir. 1991), *In*

17   *re Hanson*, 104 B.R. 261, 262 (Bankr. Ct. 1989) 4 Collier on Bankruptcy § 523.03

18   (15th ed. 2004); Fenning Depo. at 20:24-22:20, 133:8-135:18, Ex. DD; Westbrook

19   Decl. ¶¶ 6-7, Ex. T.

20       A *future* proceeding could involve a fact-intensive inquiry, but that takes

21   place in the bankruptcy court and if the outcome revives a debt whose previous

22   status was discharged, a creditor will simply report that fact, or the resulting public

23   record bankruptcy order may be retrieved. Such a subsequent change in status does

24   not render inaccurate the prior reporting of that debt as discharged. In fact, it was

25   accurate. The point is that credit reporting has to be accurate at the time of the

26   reporting. Accordingly, in the context of *an FCRA proceeding, a CRA* cannot

27   argue that its reporting of a debt as due and owing was accurate on grounds of an

28   exception to dischargeability that a *creditor* could theoretically assert, but has not

1    yet asserted, *in a bankruptcy proceeding*. Absent a public record that such debt

2    was, in fact, excluded from discharge *at the time* the Defendant reported it as

3    delinquent, the only accurate reporting of that debt would be to characterize it as a

4    discharged debt.

5        In short, the issue whether a pre-bankruptcy debt has been excluded from

6    discharge is determinable from public records—records that are already in each

7    Defendant's files or are readily obtainable by them. The inescapable conclusion is

8    that, far from being "fact-intensive," the accuracy determination is the kind of

9    simple and mechanical task that the courts have repeatedly found insufficient to

10    defeat class certification.

11        Defendants also argue that individualized inquiries are required to determine

12    whether their reporting of their pre-bankruptcy debts as due and owing was

13    accurate by virtue of the fact that: (a) those debts were reported with a status date

14    pre-dating the bankruptcy and, hence, merely contain "accurate historical"

15    information (Experian Opp. at 20); (b) they were not listed on any bankruptcy

16    schedules (*id.* at 4 & 20); or (c) such reporting had a positive impact on the

17    consumer's credit score. *Id.* at 20. The problem with Defendants' argument is that

18    it assumes the accuracy determination hinges on facts that are irrelevant to that

19    determination. And in each case Defendants are wrong.

20        The reporting of a discharged debt as due and owing is inaccurate, regardless

21    of whether such reporting increases, decreases or has no effect on a consumer's

22    credit score.[32] Likewise, in a no asset case, a consumer's pre-bankruptcy debts are

23

---

24    [32] Experian's argument to the contrary is based on its bastardized reading of

25    *Akselrod v. Chex, Systems, Inc.*, 205 WL 142390 (C.D. Cal. June 6, 2005). In that
      case, plaintiff contended that a CRA violated the FCRA by issuing a credit report,

26    which *accurately* stated that his bank closed his account because of transactions
      involving "Checks Returned as Uncollectable," but failed to mention the bank
      suspected him of having engaged in fraud. *Id.* at *3. The court rejected that

27    argument ruling that misleading, but "factually correct information," is not
      inaccurate for FCRA purposes if "*the only manner*" in which the report could

28    mislead would be to the benefit of the consumer. *Id.* at *4 (emphasis added). That
      ruling is irrelevant here because: (1) the reporting of a discharged debt as due and

1   discharged, regardless of whether they are listed on any bankruptcy schedule. *See,*

2   *e.g., In re Nielsen,* 383 F.3d 922, 926 (9th Cir. 2004); *In re Beezley,* 994 F.2d 1433,

3   1434 (9th Cir. 1993); Fenning Depo. at 89:14-92:11, Ex. DD; Westbrook Decl. ¶¶

4   6-7, Ex. T. And, finally, it is inaccurate for a CRA, which knows of a debtor's

5   discharge, to report his discharged debts as due and owing in the "current" section

6   of its credit reports, regardless of whether they are given a pre-bankruptcy "status

7   date." *In re Torres,* 2007 Bankr. LEXIS 1478, at *28 (a "once-accurate credit

8   report" can "become inaccurate in light of changed circumstances, such as the

9   debtor's discharge").[33] Far from presenting individual issues that would defeat

10  predominance, each of these legal questions relating to what is and what is not

11  inaccurate reporting is common to the entirety of the class.

12        b. *Causation.* Experian argues (at 21) that resolution of Plaintiffs' claims

13  requires an individual inquiry into each discharged debt it inaccurately reports as

14  due and owing to determine whether such inaccuracy was the result of a class

15  member's failure to list that debt in a bankruptcy schedule. That argument ignores

16  Plaintiffs' allegations concerning the existence of cost-effective procedures that

17  would enable Defendants to accurately report the status of a consumer's pre-

18  bankruptcy debts, whether he listed them on a schedule or not. If Plaintiffs prove

19  those allegations, they will have succeeded in showing that but for the Defendant's

20  defective procedures, those unlisted debts would have been accurately reported.

21        At bottom, Experian's "causation" argument is really an argument that a

22  CRA can avoid liability under the FCRA by establishing that a consumer was

23

24

25

26

27  owing is factually incorrect; and (2) even if it is not, by Defendants'. own
    admission, such reporting is frequently detrimental to the consumer.

28  [33] Even if Defendants were correct on this point, which they are not, any tradelines
    that "merely" record the "historical status" of an account as of a pre-bankruptcy
    status date could be identified though an automated file search.

1    contributorily negligent or has "unclean hands." Experian fails to cite any authority

2    for that proposition and, in fact, no such defenses are available under the FCRA.[34]

3        c. *Damages.* Defendants also assert that the need to determine whether each

4    class member suffered damages defeats predominance. That assertion flies in the

5    face of a uniform body of case law, which holds that proof of actual damage is not a

6    prerequisite for statutory damages.

7        Undeterred, Experian argues that Plaintiffs must nonetheless show they

8    suffered something it calls "non-actual" damage in order to recover statutory

9    damages. Experian fails to cite a single case in support of this proposition or even

10   to explain what it means by non-actual damages. Instead, it relies on its assertion

11   that to construe § 1681n(a)(1)(A) as not requiring proof of such non-actual damages

12   would be to render the word "damages," as it is used in the phrase "damages of not

13   less than $100," superfluous. But, as is apparent from the context, the term

14   "damages" in that phrase refers not to any loss or harm to a consumer. Rather,

15   Congress meant the word "damages" in § 1681n(a)(1)(A) to have precisely the

16   same meaning as it does when it is combined with the word "punitive", namely an

17   *award* that a defendant may be required to pay when its conduct is found

18   unlawful.[35]

19       Citing *Trujillo v. First American Registry, Inc.*, 157 Cal. App. 4th 628

20   (2007), TU also argues (at 25) that a showing of "actual damage" is a prerequisite

21   to obtaining a punitive damages award under the CCRAA. The *Trujillo* court's

---

[34] *See, e.g., St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir. 1989) ("there is no indication . . .that the protection provisions of the FCRA are reserved for only those who have done no wrong"); *Cole v. Am. Family Mut. Ins. Co.*, 410 F. Supp. 2d 1020, 1025 (D. Kan. 2006) (holding that "the unclean hands doctrine" does not "appl[y] to claims under the FCRA").

[35] Experian attempts to divine Congressional intent out of the fact that Congress neglected to use the term "damage" to describe the $1000 amount that may be awarded as an alternative to "actual damages" in subsection 1681(n)(1)(A). Experian reads far too much in what should be seen as nothing more than a harmless omission, as is apparent from the fact that elsewhere in the FCRA, Congress used the term "damages" to describe the maximum statutory damages award that *a State* may recover on behalf of its residents "for each willful or negligent violation" of that statute. 15 U.S.C. § 1681s(c )(1)(A)(iii).

1    decision, however, was based on its interpretation of the language of § 1785.31(a)

2    of the CCRAA, which authorizes consumers "who suffer[ed] damages as a result of

3    a violation" of that statute to bring actions seeking punitive damages. 157 Cal.

4    App. 4th at 636. That interpretation conflicts with the California Supreme Court's

5    decision in *Kagan v. Gibraltar Savings and Loan Association*, 35 Cal. 3d 582

6    (1984), wherein it" interpret[ed] broadly" an identical requirement that "a consumer

7    suffer[] any damage" in § 1780(a) of the Consumer Legal Remedies Act "to include

8    the infringement of any legal right as defined by section 1770." *Id.* at 593. At any

9    rate, whatever the proper interpretation of the CCRAA, there is no parallel

10   requirement in § 1681n(a)(1)(A) of the FCRA and, hence, *Trujillo* sheds no light

11   on the meaning of that provision.

12       d. *Statute of limitations.* Noting that the claims of any class member who

13   failed to bring suit within two years of having learned of inaccuracies in his credit

14   reports would be time barred, Equifax argues (at 18) that this determination is an

15   individualized one that precludes certification of any claims based on credit reports

16   issued prior to October 2003. Individual issues relating to the applicability of the

17   statute of limitations, however, are rarely sufficient to defeat predominance. *See,*

18   *e.g., Cameron v. Ti-Line, Inc.*, 547 F.2d 473, 478 (9th Cir. 1976); *In re Linerboard*

19   *Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002). This case is no exception, given

20   that such an issue can be resolved systematically through an automated review of

21   Defendants' files to determine which class members asserted reinvestigation claims

22   and were sent copies of their reports.

23              **2.    Plaintiffs' reinvestigation claims.**

24       Defendants also assert that Plaintiffs' § 1681i claims cannot be certified

25   because the issue whether they followed reasonable reinvestigation practices is

26   individualized. That argument fairs no better than the parallel arguments they have

27   made to defeat certification of Plaintiffs' inaccurate reporting claims.

28

1    Plaintiffs' § 1681i  claims are based on their allegations that: (1) Defendants

2    have ready access to all the information they need to identify which pre-bankruptcy

3    debts were excluded from discharge; (2) they can, thus, easily determine whether

4    any given pre-bankruptcy debt has been discharged any time a consumer complains

5    that it has been inaccurately listed on his report as due and owing; and (3) despite

6    that ability, each Defendant frequently fails to correct such inaccurately reported

7    debts because they have failed to commit sufficient resources to the reinvestigation

8    process and have created perverse incentives that sacrifice quality for quantity.

9        If Plaintiffs prove these allegations, Defendants will be liable to any class

10   member whose credit report they failed to correct after having been notified that

11   they incorrectly reported one or more of his or her discharged debts as due and

12   owing.  Accordingly, the issue whether Defendants have violated the FCRA by

13   employing unreasonable reinvestigation practices is common to all class members.

14   **B.    The Class Action Device Is Superior To Other Available Methods For Adjudicating These Controversies.**

15       **1.    Class-wide adjudication of these claims is manageable.**

16       Defendants argue that the classes are unmanageable for the same reason that

17   they argue that the class is unascertainable and that the predominance requirement

18   cannot be met: the supposed need to conduct millions of mini-trials.  *See* Equifax

19   Opp. at 24; Experian Opp. at 23-24; TU Opp. at 25-26.  And for the same reasons

20   Defendants are wrong.  *See* Points I.A, III.A.1, *supra*.

21       **2.    Individual adjudication of these claims is unrealistic.**

22       Experian also asserts (at 24) that the availability of attorneys' fees, in

23   addition to statutory and punitive damages, gives class members "sufficient

24   economic incentive to prosecute their claims individually."  *See also* Equifax Opp.

25   at 24; TU Opp. at 22-23.  As set forth in Plaintiffs' opening brief (at 23-26), that

26   argument has been roundly rejected by this Court in *Acosta*, 240 F.R.D. at 573, by

27   the Seventh Circuit in *Murray v. GMAC Mortgage*, 434 F.3d 948 (7th Cir. 2006),

28

1    and by numerous other courts—all of which have agreed that these incentives are

2    "too slight to support individual suits." *Id.* at 953. Thus, the harsh reality is that

3    only a minute fraction of those aggrieved by Defendants' unlawful practices have

4    filed suits and, absent class certification, there is no realistic prospect of Defendants

5    ever being held accountable for them.

### 3.    Class-wide adjudication of these claims would not violate defendants' due process rights.

7    Defendants argue that class treatment is not superior to individual suits

8    because their potential exposure "would be enormous and completely out of

9    proportion to any harm suffered by the plaintiff." Equifax Opp. at 25; *see also*

10   Experian Opp. at 22; TU Opp. at 23. That argument is flawed on several counts.

11   At the outset, all of the cases upon which Defendants rely involve inadvertent

12   violations of the technical requirements of the statutes at issue, including a number

13   of discredited decisions from the 1970s and several recent ones involving the

14   failure to properly truncate customer account numbers.[36] In this case, by contrast,

15   Defendants are alleged to have violated their core reporting duty under § 1681e(b)

16   by employing practices that result in the inaccurate reporting of discharged debts as

17   due and owing on a massive scale. Such a violation is anything but technical.

18   Furthermore, under the FCRA, Plaintiffs will be entitled to statutory damages

19   only if they are able to establish that Defendants' violation of their § 1681e(b)

20   duties was willful. As the court have repeatedly recognized, "a willful violation of

21   the statute is more than a 'technical' one," *Ashby v. Farmers Ins. Co.*, 2004 U.S.

22   Dist. LEXIS 21053, at *24 (D. Ore. Oct. 18, 2004), and an award of statutory

---

[36] *See, e.g., Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 234-35 (9th Cir. 1974) (denying certification of *defendant class* where it would expose individual realtors to joint and several liability for up to $750 million on 800,000 transactions based solely on their adherence to realty board's suggestion as to proper commissions); *Serna v. Big A Drug Stores, Inc.*, 2007 U.S. Dist. LEXIS 82023, at *15-16 (C.D. Cal. Oct. 9, 2007) (distinguishing technical failure to truncate customer account number with cases involving a "substantive violation of consumers' rights"); *Ratner v. Chemical Bank N.Y. Trust Co.*, 54 F.R.D. 412, 416 (S.D.N.Y. 1972) (conduct at issue was "at most a technical and debatable violation" of TILA).

1    damages to the victims of such a willful violation would not result in a "horrendous

2    . . . punishment," no matter how many such victims there might be. *Braxton v.*

3    *Farmer's Ins. Group*, 209 F.R.D. 654, 662 (N.D. Ala. 2002); *see also White v. E-*

4    *Loan, Inc.*, 2006 U.S. Dist. LEXIS 62654, at *25 (N.D. Cal. Aug. 18, 2006).

5       In additon, Defendants' argument that "class action treatment might

6    somehow influence the proportionality of a statutory damages award is logically

7    flawed." *In re Napster Copyright Litig.*, 2005 U.S. Dist. LEXIS 11498, at *39

8    (N.D. Cal. May 31, 2005). "[T]he sum of the actual damages suffered by a class of

9    plaintiffs will be the same regardless of whether their claims are prosecuted as a

10   single class action or as a myriad of individual suits." *Id.* Accordingly, the

11   argument that class treatment exposes them to excessive damages awards is based

12   on the irrational "assumption that defendants who injure large number of

13   individuals are less culpable than those who spread the effects of their unlawful

14   conduct less widely." *Id.* To deny class treatment on grounds that it is unfair to

15   make a defendant compensate all those it has hurt "is clearly incompatible with the

16   purpose of Rule 23, which is in part intended to serve as a vehicle for redressing

17   widely dispersed harm that might otherwise go uncompensated." *Id.* at *40.

18       In short, Defendants invite this Court to embrace a twisted view of Rule 23

19   under which "the greater the number of violations of the FCRA, the less likely a

20   company can be held fully accountable," *White*, 2006 U.S. Dist. LEXIS 62654, at

21   *25 (N.D. Cal. Aug. 18, 2006), and that would, therefore, encourage them "to

22   violate the law on a grand scale." *In re Farmers*, 2006 U.S. Dist. LEXIS 27290, at

23   *45-46 [needs full cite]; *see also Bonner v. Home123 Corp.*, 2006 U.S. Dist.

24   LEXIS 54418, at *22-23 (N.D. Ind. Aug. 4, 2006). This Court should reject that

25   invitation.

26       Defendants face exposure to a large statutory damages award because when

27   Congress enacted § 1681n(a)(1), it made a policy decision to provide for a

28   minimum statutory damage award of $100 per person. *See, e.g., Murray*, 434 F.3d

1    at 953. This Court has noted that Congress chose not "to limit the aggregate award

2    to a FCRA class as it has in other contexts" such as the Truth In Lending Act and

3    the Fair Debt Collection Practices Act, but not under the FCRA. *Pirian v. In-N-Out*

4    *Burgers*, 2007 U.S. Dist. LEXIS 25384, at *14-15 (C.D. Cal. 2007); *see also*

5    *Murray*, 434 F.3d at 953; *White*, 2006 U.S. Dist. LEXIS 62654, at *26-27. In

6    essence, Defendants ask this Court to manipulate Rule 23 to undermine a

7    congressional policy choice of which they disapprove. As the Seventh Circuit held

8    in *Murray*, "it is not appropriate to use procedural devices" in that manner. 434

9    F.3d at 954. "Maybe suits such as this will lead Congress to amend the [FCRA];

10   maybe not. While a statute remains on the books, however, it must be enforced

11   rather than subverted." *Id.*[37]

12       Concerns about the possibility of an excessive statutory damages award are

13   "premature" at this time. *Pirian*, 2007 U.S. Dist. LEXIS 25384, at *14.[38] Such

14   concerns cannot be evaluated "in the abstract without any ability to determine the

15   size of the class or to judge [defendants'] overall conduct." *Id.*, 2007 U.S. Dist.

16   LEXIS 25384, at *14. "At this stage of the proceedings, there is simply nothing in

17   the record that would permit the court to" determine whether a damages award

18   exceeds constitutional limits "in an informed manner." *In re Napster*, 2005 U.S.

19   Dist. LEXIS 11498, at *42; *see also Parker*, 331 F.3d at 22. As Judge Easterbrook

20   has properly observed, the alternative approach of "[r]educing recoveries by forcing

21   everyone to litigate independently—so that constitutional bounds are not tested,

22   because the statute cannot be enforced by more than a handful of victims—has little

23   to recommend it." *Murray*, 434 F.3d at 954.

24

25   [37] *See also Reiter v. Sonotone Corp.*, 442 U.S. 330, 344-345 (1979) (argument that
     class treatment of Clayton Act claims should be denied because cost of defending

26   them could be "potentially ruinous" to small businesses is "more properly
     addressed to Congress than to this Court"); *Holloway*, 2007 U.S. Dist. LEXIS

27   59934, at *29-30; *White*, 2006 U.S. Dist. LEXIS 62654, at *27.
     [38] *See also Murray*, 434 F.3d at 954; *Parker v. Time Warner Entertainment Co.*,

28   *L.P.*, 331 F.3d 13, 22 (2d Cir. 2003); *Holloway*, 2007 U.S. Dist. LEXIS 59934, at
     *27; *White*, 2006 U.S. Dist. LEXIS 62654, at *24-25.

## CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully submit that the Court should grant their Motions for Class Certification.

Dated: January 18, 2008          Respectfully submitted,


By: _____
          Michael W. Sobol

Michael W. Sobol
(msobol@lchb.com)
Allison S. Elgart
(aelgart@lchb.com)
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

Daniel Wolf
(dan@danielwolflaw.com)
LAW OFFICE OF DANIEL WOLF
1220 N Street, N.W., Suite PH 2
Washington, D.C. 20005
Telephone: (202) 842-2170

Charles W. Juntikka (cj4689)
(charles@cjalaw.com)
CHARLES JUNTIKKA & ASSOCIATES
11 W. 42nd Street, 12th Floor
New York, NY 10036
Telephone: (212) 315-3755

Stuart Rossman
(srossman@nclc.org)
Charles Delbaum
(cdelbaum@nclc.org)
NATIONAL CONSUMER LAW CENTER
77 Summer Street, 10th Floor
Boston, MA 02110
Telephone: (617) 542-8010
Facsimile: (617) 542-8028

Michael A. Caddell (State Bar No. 249469)
(mac@caddellchapman.com)
Cynthia B. Chapman (State Bar No. 164471)
(cbc@caddellchapman.com)
George Y. Niño (State Bar No. 146623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, TX 77010
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

Leonard A. Bennett (VSB No. 37523)
(lenbennett@cavtel.net)
Matthew Erausquin (VSB No. 65434)
(matt@clalegal.com)
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 201
Newport News, Virginia 23606
Telephone: (757) 930 3660
Facsimile: (757) 930-3662

Mitchell A. Toups (TSB No. 20151600)
(matoups@wgttlaw.com)
WELLER, GREEN, TOUPS & TERRELL, L.L.P.
Bank of America Tower
2615 Calder St., Suite 400
Beaumont Texas 77702
Telephone: (409) 838-0101
Facsimile: (409) 832-8577

745560.1

NO. 05-CV-01070-DOC (MLGX)
REPLY MEM. ISO MOT. FOR CLASS CERT. AGAINST
EXPERIAN, EQUIFAX, AND TRANS UNION