BOIES, SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY 10504
Telephone:   914.749.8200
Facsimile:   914.749.8300
Email:   dboies@bsfllp.com
(pending *pro hac vice* admission)

George F. Carpinello
Adam R. Shaw
10 North Pearl Street
Albany, NY 12207
Telephone:  518.434.0600
Facsimile:  518.434.0665
Email:   gcarpinello@bsfllp.com
   ashaw@bsfllp.com
(admitted *pro hac vice*)

BROWNE WOODS GEORGE LLP
David L. Zifkin (SBN 232845)
2121 Avenue of the Stars, 24th Floor
Los Angeles, CA  90067
Telephone:  310.274.7100
Facsimile:  310.275.5697
Email:   dzifkin@bwgfirm.com

CHARLES JUNTIKKA &
ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone:  212.315.3755
Facsimile:  212.315.9032
Email:   charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone:  202.842.2170
Email:   dan@danielwolflaw.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., et al.,<br><br>                    Defendants.<br><br>And Related Actions. | CASE NO. SA 05-CV-1070 DOC (MLGx) (Lead Case)<br>Assigned to the Hon. David O. Carter<br><br>NOTICE OF MOTION AND MOTION FOR RECONSIDERATION AND TO VACATE ORDER GRANTING PRELIMINARY APPROVAL TO PROPOSED CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT HEREOF<br>_____<br>Date:    June 15, 2009<br>Time:    8:30 a.m.<br>Place:    9D<br>Judge:   Hon. David O. Carter |

229587_1.DOC

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III and Arnold E. Lovell (the "*White* Plaintiffs") will and hereby do move for reconsideration and to vacate the Court's order granting preliminary approval to proposed class action settlement.

This motion is brought pursuant to Federal Rules of Civil Procedures, 23(c) and (d), Local Rule 7.18 and the Court's inherent power.  It is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the declarations filed concurrently in support of this Motion, all documents and records on file in this action, and such additional evidence or argument as may be presented at the Hearing.

The Motion is made following the conference of counsel pursuant to L.R. 7-3.  The *White* Plaintiffs' counsel and the Settling Parties' counsel originally scheduled the meet and confer more than five days prior to the filing of this motion for reconsideration, which must be timely filed in order to preserve appellate rights under the Federal Rules.  At the request of the Settling Parties' counsel, the meet and confer was postponed until May 18, 2009.

DATED:  May 21, 2009

BOIES, SCHILLER & FLEXNER LLP
David Boies
George F. Carpinello
Adam R. Shaw

CHARLES JUNTIKKA & ASSOCIATES LLP
Charles Juntikka

DANIEL WOLF LAW OFFICES
Daniel Wolf

BROWNE WOODS GEORGE LLP
David L. Zifkin (SBN 232845)

By /s/ David L. Zifkin
David L. Zifkin

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

- 1 -

MOTION FOR RECONSIDERATION

1

## TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION ................................................................................. 1

4

ARGUMENT ....................................................................................... 2

5

I.   Reconsideration Is Warranted By Considerations Of Fundamental
     Fairness ....................................................................................... 2

6

7

II.  The Order Granting Preliminary Approval Should Be Vacated .................... 3

8

    A.  The Settlement Amount Falls Far Outside The Range of Possible
        Approval ................................................................................. 3

9

        1.  Defendants' Litigation Exposure In These Cases Remains
            Enormous ........................................................................... 5

10

11

        2.  There Is No Basis For Discounting Defendants' Litigation
            Exposure By Approximately 99 Percent ................................. 5

12

            a.  The Risk Of Failing To Establish Liability Does Not Justify
                Discounting Defendants' Litigation Exposure By More Than
                An Order Of Magnitude ................................................... 5

13

14

            b.  The Risk Of Failing To Secure Class Certification Does Not
                Justify A Significant Discount ........................................... 8

15

16

                i.  The risk that Plaintiffs will be unable to satisfy Rule 23(b)
                    (3)'s predominance requirement does not justify *any* discount ... 9

17

                ii. The risk that Plaintiffs will be unable to satisfy Rule 23(b)
                    (3)'s superiority requirements owing to trial manageability
                    Concerns does not justify a significant discount ...................... 10

18

19

        3.  The Amount Of The Settlement Pales In Comparison To The
            Litigation Value of These Cases ........................................... 14

20

        4.  Other Relevant Considerations Do Not Justify Settling These
            Cases  For A Tiny Fraction Of Their Litigation Value ................... 15

21

22

    B.  The Settlement Is Fatally Defective Because It Sacrifices The
        Claims Of The Unfortunate Many For The Favored Few .................... 18

23

        1.  The Settlement Abandons The Claims Of The Reinvestigation
            Subclass For Zero Compensation .......................................... 18

24

25

        2.  The Settlement Irrationally Favors Class Members With
            Claims Against One Defendant Over Those With Claims
            Against Two or  Three .......................................................... 19

26

27

        3.  The Settlement Sacrifices The Claims Of The Large Majority
            Of Class Members Who Are Unaware Of The Errors On Their

28

# TABLE OF CONTENTS
### (continued)

**Page**

   Credit Reports For The Small Minority Who Are ........................... 19

  4. The Settlement Sacrifices The Claims Of Class Members Who
   Are Unable To Affirm They Suffered Damages In Order To
   Enrich A Tiny Minority Who Are ....................................................... 21

  5. The Settlement Does Nothing To Account For The Claims of
   Class Members Who Fall Into Subclasses That Present No
   Manageability Or Due Process Concerns ........................................... 22

III. The Settlement Is Procedurally Defective .................................................... 23

 A. The Class Notice Form Does Not Provide Class Members
   Information Sufficient To Determine Whether It Is In Their
   Interest To Participate ........................................................................ 23

 B. The Settlement Poses Unreasonable Restrictions On Opt Out Rights
   That Are Designed To Deflate The Number Of Opt Outs ................... 25

CONCLUSION ..................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## FEDERAL CASES

*Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007) ...................... passim

*Albertson v. Commonwealth*, 247 F.R.D. 469 (E.D. Pa. 2008) .............................. 12

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) .............................. 8, 9, 10

*Ashby v. Farmers' Ins. Co.*, 2008 U.S. Dist. LEXIS 105612 (D. Ore. Dec. 12, 2008) ................................................................................................. 21

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) .................................................. 12

*Camp v. Progressive Corp.*, 2004 U.S. Dist. LEXIS 19172 (E.D. La. Sept. 23, 2004) ................................................................................................. 18

*Campbell v. Pricewaterhouse-coopers, LLP*, 253 F.R.D. 586 (E.D. Cal. 2008) ........................................................................................................ 11

*Carnegie v. Household Int'l, Inc.*, 371 F. Supp. 2d 954 (N.D. Ill. 2005) .................. 4

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ............... 11, 12, 13

*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir. 1981) ................................................................................................... 15, 16

*In re Elec. Data Sys. Corp. "ERISA" Litig*, 2005 U.S. Dist. LEXIS 17457. (E.D. Tex. 2005) ............................................................................................ 4, 15

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007) ............................................................................................................ 5

*Fleury v. Richemont North America, Inc.*, 2008 U.S. Dist. LEXIS 64521 (N.D. Cal July 3, 2008) ...................................................................................... 9

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979) ................................................................................................... 24

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 806c (3d Cir. 1995) ............................................ 3, 8, 18, 23

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................. 8, 9, 23

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Hilao v. Estate of Marcos*, 103 F.3d 762 (9th Cir. 1996)........................................13

*Holden v. Burlington N., Inc.*, 665 F. Supp. 1398 (D. Minn. 1987).................17, 24

*Holloway v. Full Spectrum Lending*, 2007 U.S. Dist. LEXIS 59934
   (C.D. Cal. June 26, 2007) ...................................................................................10

*Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 47515 (N.D.
   Cal. June 19, 2007) ...........................................................................................20

*Klay v. Humana, Inc.*, 382 F.3d 1241 (7th Cir. 2004).....................................10, 11

*Kessler v. Amer. Resorts International's Holiday Network, Ltd.,* 2007
   U.S. Dist. LEXIS 84450 (N.D.Ill., Nov. 14, 2007) ...........................................2

*Kirkpatrick v. Ironwood Communications, Inc.*, 2006 U.S. Dist. LEXIS
   79708 (W.D. Wash. Nov. 1, 2006) .....................................................................13

*Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283 (3d Cir. 1998)............................9

*Lau v. Arrow Financial Services*, LLC, 245 F.R.D. 620 (N.D. Ill.
   2007) ...................................................................................................................12

*Levell v. Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000)...............8, 9

*Malchman v. Davis*, 706 F.2d 426 (2d Cir. 1983) ...................................................3

*Mandujano v. Basic Vegetable Prods, Inc.*, 541 F.2d 832 (9th Cir.
   1976) ...................................................................................................................17

*Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977) ..........................23

*Martin v. Fedex Ground Package Sys.,* 2008 U.S. Dist. LEXIS 106524
   (N.D. Cal. Dec. 31, 2008)...................................................................................24

*Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494
   (S.D.N.Y. 1994)..................................................................................................17

*Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551 (D. Md.
   2006) ...................................................................................................................12

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. Cal.  2003) ........................................3, 24

*Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cit. 2006)...................10, 15

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Nasdaq Market-Makers Antitrust Litig*, 169 F.R.D. 493 (S.D.N.Y. 1996)..................................................................................13

*National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981) ...........................................................18, 19

*In re Nissan Motor Corp. Antitrust Litig*, 552 F.2d 1088 (5th Cir. 1977)...................................................................................23

*Odon USA Meats v. Ford Motor Credit Corp.*, 1994 U.S. Dist. LEXIS 13723 (N.D. Ill. Sept. 27, 1994)......................................3

*Olden v. Gardner*, 294 Fed. Appx. 210 (6th Cir. 2008)..........................17

*Petrovic v. AMOCO Oil Co.*, 200 F.3d 1140 (8th Cir. 1999)....................5

*Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292 (W.D. Pa. 1995)..........................................................................20

*Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978)..................17, 24

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980) ..........................18, 19

*Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002)....................16

*Rodriguez v. West Publishing Corp.,* 2009 U.S. App. LEXIS 8680 (9th Cir. Apr. 23, 2009) ...........................................................3

*Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 S. Ct. 2201 (2007)...................................................................................6

*Saylor v. Lindsley*, 456 F.2d 896 (2d Cir. 1972) .........................................24

*Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232 (W.D. Pa. 2008) ..................12

*Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005) ...............................20

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006)..................................................................................5

*In re Thermagenics Secs. Litig.*, 205 F.R.D. 687 (N.D. Ga. 2002) .........................12

*Thompson v. Clear Channel Communications., Inc.*, 247 F.R.D. 98

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3
(C.D. Cal. 2007) .......................................................................... 11

4
*Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008) ...................... 13

5

6
*Tierno v. Rite Aid Corp.*, 2007 U.S. Dist. LEXIS 89582 (N.D. Cal. Nov. 19, 2007) .......................................................................... 25

7
*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) .................... 13, 14

8
*Vaughter v. Eastern Airlines, Inc.*, 817 F.2d 685 (11th Cir. 1987) ........................ 25

9

10

STATE CASES

11
*Kullar v. Foot Locker Retail, Inc.*, 168 Cal.App.4th 116 (2008) ........................... 17

12

13
*State ex rel. Byrd v. Chadwick*, 956 S.W.2d 369 (Mo. Ct. App. 1997) ................. 24

14

OTHER AUTHORITIES

15

16
Fed. R. Civ. Proc. Rule 23(b) ................................................................. 10

17
Fed. R. Civ.Proc. Rule 23(c)(1), (c)(2) and (d) ........................................... 2

Central Dist. Of Cal. Local Rule 7-18 ...................................................... 3

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR RECONSIDERATION

## **INTRODUCTION**

The *White* Plaintiffs respectfully request that this Court reconsider and vacate its Order of May 7, 2009, granting preliminary approval to proposed class action settlement ("May 7 Order") because the relief it provides is patently inadequate. In rejecting an earlier settlement in this matter, this Court pointed out that, even at the minimum statutory damages level, Defendants face potential liability of $1 billion each. The present Settlement affords the class a net recovery, after deduction for attorneys' fees and notice costs, of just $28 million. The Settling Plaintiffs provide no substantive justification why the members of this class should take one cent on the dollar, in a case where evidence of willfulness is clear and Defendants' own records can be mined to determine who were aggrieved by their willful violations and who were not. The *White* Plaintiffs' expert has opined that the class has suffered actual losses of approximately $3 billion on the conservative side. In the context of such massive damages and willful misconduct, a settlement of $28 million (or $9.3 million per Defendant) should shock the conscience of this Court.

The *White* Plaintiffs are mindful of this Court's view that the broad classes Plaintiffs have sought to certify in these cases might be unmanageable and its repeated advice that they define narrower, more targeted classes that may avoid that concern. The Settling Parties' counsel, however, refused to do so and, instead, have now entered into a settlement, which, at Defendants' insistence, would cover three overlapping classes of some 10 million members each -- all of whom would forever release their claims in exchange for a share of the $28 million common fund.

As distributing this amount among all class members would require each Defendant to write a *de minimus* 93 cent check to each, the Settling Plaintiffs have, instead, taken it upon themselves to pick winners and losers amongst various subsets of the class. In so doing, they have manufactured a settlement which would sacrifice the claims of some 90% or more of the class, who will receive nothing, and of another 10% or less of the class who will receive almost nothing, in order to

MOTION FOR RECONSIDERATION

enrich a tiny minority of about 1%.  Without a doubt the two biggest losers will be the members of two subgroups who will not even be given an opportunity to obtain relief, namely: (1) some 150,000 consumers who fall within the reinvestigation subclass and whose claims are jettisoned in exchange for nothing; and (2) millions of other class members who are unaware of any errors on their credit reports and who will, therefore, be disenfranchised by the Settlement's requirement that anyone submitting a claim affirm their belief that their credit reports were inaccurate.  For these and other reasons, the Settlement must be rejected on the independent ground that it is structurally defective.

**ARGUMENT**

**I.  RECONSIDERATION IS WARRANTED BY CONSIDERATIONS OF FUNDAMENTAL FAIRNESS.**

As is more fully set forth in the *White* Plaintiffs' Memorandum in Support of Their Motion to Reconsider the Order Certifying a Settlement Class at 2-3) ("Cert. Recon. Br."), the usual criteria for reconsideration set forth in Local Rule 7-18 are not applicable in the context of class certification orders because of this Court's "gate-keeping" duty under F.R.Civ.Proc. Rule 23(c)(1) and (d) to ensure that the certification criteria are met at every phase of the litigation.  As this Court's authority under that rule "encompasses the preliminary approval of proposed settlements," as well as "preliminary certification of classes for settlement purposes," the requirements of Local Rule 7-18(a) should be no more applicable to this motion than they are to the *White* Plaintiffs' motion seeking reconsideration of this Court's certification order.  *Kessler v. American Resorts,* 2007 U.S. Dist. Lexis 84450, at *23 (N.D. Ill., Nov. 14, 2007).  Furthermore, the propriety (or lack thereof) of the Settlement is so intertwined with the adequacy of representation issues that lie at the heart of the *White* Plaintiffs' motion to reconsider this Court's class certification decision that it makes little sense to revisit the one without revisiting the other.

At any rate, even if the normal standards for reconsideration are applicable

MOTION FOR RECONSIDERATION

1  here, they are met for the reasons spelled out in the *White* Plaintiffs' memorandum

2  seeking reconsideration of the Court's order certifying a settlement class.  "Cert.

3  Recon. Br. at 3-6.

4  **II. THE ORDER GRANTING PRELIMINARY APPROVAL SHOULD BE VACATED.**

5
6      **A.  The Settlement Amount Falls Far Outside The Range Of Possible Approval.**

7         In determining whether a class settlement falls within a reasonable range, this

8  Court's task is to balance the amount offered therein against "the present value of

9  the damages plaintiffs would likely recover if successful, appropriately discounted

10  for the risk of not prevailing."  *In re General Motors Corp. Pick-Up Truck Fuel*

11  *Tank Products Liab. Litig. ["In re GMC Pick-Up"]*, 55 F.3d 768, 806c (3d Cir.

12  1995); *see also Rodriguez v. West Publishing Corp.*, 2009 U.S. App. LEXIS 8680,

13  at *36 (9th Cir. Apr. 23, 2009).  In fulfilling this responsibility at the preliminary

14  approval stage in a matter not yet certified as a class action, the courts are

15  "compelled to subject the proposed settlement to more careful scrutiny than [they]

16  otherwise would."  *Odon USA Meats v. Ford Motor Credit Corp.*, 1994 U.S. Dist.

17  LEXIS 13723, at *21 (N.D. Ill. Sept. 27, 1994).  Indeed, the circuit courts have

18  consistently cautioned the lower courts to "be doubly careful in evaluating the

19  fairness" of such pre-certification settlements.  *Malchman v. Davis*, 706 F.2d 426,

20  432 (2d Cir. 1983); *see also Molski v. Gleich,* 318 F.3d 937, 953 (9th Cir. Cal.

21  2003).  The Settlement cannot withstand such scrutiny.

22         Two years ago, when they were balancing the value of the *Acosta* settlement

23  against the litigation value of these cases, ***the proponents of this Settlement***

24  represented that there was "simply no basis for concluding that plaintiffs' chances

25  of prevailing" on their statutory damage claims were ***"less than 50 percent***" and

26  assessed the value of those claims for settlement purposes at not "less than ***two or***

27  ***three hundred million dollars***."  *White/Hernandez* Plaintiffs' Memorandum in

28  Support of Opposition to Motion for Preliminary Approval at  43 and 51 (Case No.

06-CV-05060, Docket # 42) ("*Acosta* Br."). On the basis of the evidence and argument supporting that assessment, this Court rejected the *Acosta* settlement, finding that: (1) the basic criteria for certification of a settlement class were all met and that certification of a litigation class was very likely; (2) the questions of liability and willfulness were both for the trier of fact; and (3) there was "a colossal discrepancy" between Defendants' minimum litigation exposure and the value of the settlement -- a discrepancy that could be acceptable only if Plaintiffs' claims were "grounded in such a tenuous basis that they were hopelessly doomed to fail in court," which was "not true here." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007).

By its May 7 Order, this Court, at the behest of the Settling Plaintiffs, has preliminary approved a Settlement that also contains a "colossal discrepancy" between litigation exposure and settlement award that would likewise be justified only if Plaintiffs' claims were "hopelessly doomed." If the Settling Plaintiffs really believed this to be so, it was incumbent upon them to explain to this Court what has happened in the past two years to so radically alter their assessment of their litigation risk.[1] Far from doing so, they instead offered this Court nothing but the barest conclusions -- stating, without any elaboration, that "they would face significant legal, factual, and procedural obstacles to recovering damages." Settling Plaintiffs' Memorandum in Support of Preliminary Approval at 21. As that justification is patently inadequate, this Court's decision to preliminarily approve the Settlement was clearly erroneous.

---

[1] *See, e.g., In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *20 (E.D. Tex, 2005) (denying preliminary approval of highly discounted settlement where "legal risk ha[d] been present from the very first day this case was filed" and where "[n]othing ha[d] since] been presented to the Court indicating that facts developed during discovery ha[d] weakened Plaintiffs' initial factual evaluation of this case"); *Carnegie v. Household Int'l, Inc.*, 371 F. Supp. 2d 954, 957 (N.D. Ill. 2005) (denying preliminary approval of class settlement where its supporters cited nothing to enable court "to make a reasonable assessment of the . . . evidence supporting and rebutting plaintiffs' claims").

### 1. <u>Defendants' Litigation Exposure In These Cases Remains Enormous.</u>

As this Court found in its decision rejecting the *Acosta* settlement, "[t]he litigation value of the plaintiffs' claims is tremendous." 243 F.R.D. at 389.  This is a matter of simple math.  Defendants have estimated the size of the class at more than 10 million individuals—all of whom will be entitled to a minimum $100 statutory damages award if Plaintiffs succeed in establishing that Defendants willfully violated the requirements of the FCRA.  *Id.* at 388.   Thus, Defendants "each face approximately $ 1 billion in civil liability."  *Id.*  While this is a significant amount by any measure, it is far less than the estimated $3 to 5 billion in actual losses that the class has suffered as a direct result of Defendants' unlawful reporting practices.[2]

### 2. <u>There Is No Basis For Discounting Defendants' Litigation Exposure By Approximately 99 Percent.</u>

In evaluating the adequacy of a class action settlement, the likelihood that plaintiffs will succeed in establishing their right to relief is "'by far the most important factor.'"[3] On any fair assessment, consideration of this factor militates overwhelmingly against approval of the settlement.

#### a. <u>The Risk Of Failing To Establish Liability Does Not Justify Discounting Defendants' Litigation Exposure By More Than An Order Of Magnitude.</u>

In order to establish Defendants' liability for negligence, Plaintiffs must show only that they failed to employ reporting procedures that were reasonable to assure maximum possible accuracy of their credit reports.  Plaintiffs prevail on their

---

[2]  Plaintiffs never sought the data that would have enabled them to conduct their own study of the credit scoring impact of Defendants' reporting practices. Declaration of Daniel Wolf, sworn to on May 21, 2009, ¶ 5.  However, based on Equifax's own flawed analysis of that impact, which showed that *64% of all class members' credit scores increased after the injunctive relief settlement was implemented*, the *White* plaintiffs' expert has conservatively estimated that the class lost $3-5 billion in higher interest payments on their mortgages, auto loans and credit cards during the 5 year period covered by this litigation.  Declaration of Stan C. Smith, PhD. ("Smith Decl."), sworn to on May 21, 2009, ¶5.

[3]  *Figueroa v. Sharper Image Corp.* 517 F. Supp. 2d 1292, 1323 (S.D. Fla. 2007); *see also Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006); *Petrovic v. AMOCO Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999).

statutory damage claims by showing that this failure was in reckless disregard of Defendants' statutory obligation to do so.  In their opposition to the *Acosta* settlement, counsel for Plaintiff *Hernandez* properly assessed their prospects of establishing the first of these elements as "extremely high" and the second as "not less than 50%."  *Acosta* Br. at 46 and 51.  Since that time, those prospects have risen even higher.

**First**, at the time of the *Acosta* decision, the Supreme Court had not yet issued its decision in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), wherein it held that a defendant is liable for a willful violation of the FCRA whenever it acts in reckless disregard of the requirements of that act (*i.e.*, runs an "unjustifiably high risk" of contravening them).  *Id.* at 70.

**Second**, Defendants' have produced a number of internal reporting analyses for this litigation (including a recent one they performed to determine the class size), which confirm that about **two-thirds** of the credit reports that they issued for consumers with Chapter 7 discharge orders were inaccurate in that they reported their pre-bankruptcy debts as still delinquent.  Declaration of Qiyong Zhou, sworn to July 31, 2008 at Ex. 72, p. 7 (Docket # 306) ("Zhou Decl.").

**Third**, on August 13, 2007, this Court issued a Tentative Order in which it ruled, based on what was a very incomplete record, that "it remains for the trier of fact to ultimately resolve whether Experian's 'statistical guess' ran an unjustifiably high risk of violating the FCRA." *Id.* at 10 (Docket # 169).

**Fourth**, a year and one half after the *Acosta* decision, Defendants entered into a settlement of Plaintiffs' injunctive relief claims that requires Defendants to treat all pre-bankruptcy debts in a Chapter 7 case as discharged, except when their creditor-furnishers have affirmatively provided them with information showing that a given debt has been excluded from discharge or such exclusion is otherwise apparent from information in their files.  At the urging of all the parties, this Court has found that these revised procedures are "a reasonable procedure to assure the

maximum possible accuracy."  Aug. 19, 2008 Order, ¶ 5.3, at 28 (Docket # 338). Thus, in order for a jury to find in Defendants' favor, it will have to find that Defendants' former procedures, which were based on the diametric opposite assumption, were nonetheless also "reasonable to assure maximum possible accuracy."  As it is hard to imagine how a reasonable person could hold both of those views simultaneously, the chances that Plaintiffs will be able to establish liability have plainly improved since the *Acosta* decision.

*Fifth*, despite the fact that the record is not nearly complete, post-*Acosta* discovery confirms Defendants' knowledge that their reporting procedures were, in fact, producing systemic errors, including:

- Public documents showing that each Defendant receives about 150,000 consumer disputes each year complaining about this problem.  *See* Plaintiffs' Statement of Genuine Issues of July 20, 2007 ¶¶ 69-71 (Docket No. # 166).

- Internal Experian documents showing that, as a result of such disputes, they fix over one million entries in their credit files every year.  Declaration of Michael Sobol, sworn to on Dec. 21, 2007, Exs. J-M (Docket # 195).

- Deposition testimony from each Defendant's officials acknowledging their awareness of the problem and the failure of their respective companies to do anything to address it.  *See, e.g.*, Deposition of William R. Stockdale, dated April 30, 2008; and

- Documents from each Defendant showing that when reinvestigating consumer disputes about pre-bankruptcy debts, they have long presumed that all such debts are reached by the discharge order unless their file information shows otherwise.  *See* Plaintiffs' Statement of Genuine Issues ¶ 3 of July 20, 2007 (Docket # 166).

*Last*, but certainly not least, the *White* Plaintiffs have obtained a declaration from the executive director of the National Credit Reporting Association ("NCRA"), stating that that he attended annual tape-recorded trade conferences at which the problem of reporting discharged debts as delinquent has been discussed with Defendants "as a serious issue that needed correction," and that they all "acknowledged the existence of this problem in their reporting of pre-bankruptcy

debts, but laid the blame for the problem on their credit furnishers."  Declaration of Terry W. Clemans ("Clemans Decl."), sworn to on May 14, 2009, ¶¶ 6-7.

In other words, despite their knowledge of the existence of a systemic problem that resulted in millions of errors in their credit reports, Defendants stuck their collective heads in the sand and did absolutely nothing to address it until mid-2008—nearly **three years** after the filing of these class actions.  In short, on the existing record, the case that Defendants failed to employ reasonable reporting procedures in violation of the FCRA is overwhelming and the case they ran an "unjustifiably high risk" of doing so is compelling.

### b. <u>The Risk Of Failing To Secure Class Certification Does Not Justify A Significant Discount.</u>

In its May 7 Order (at 22), this Court accepted the Settling Plaintiffs assertion that its tentative ruling denying Plaintiffs' motion for class certification shows that "certifying a class could present some difficulties."  To the extent that the tentative decision played a role in this Court's decision to preliminarily approve the settlement, that decision is clearly erroneous.

Under *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), this Court could not have conditionally certified the settlement class without finding that "all of the Rule 23 standards [had been] met without regard to the presence or terms of [the] pending settlement agreement."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Inasmuch as this Court's order does, in fact, find those standards to have been met, it has abandoned all of the reasoning in its tentative order denying class certification and has thus rendered that order irrelevant to any assessment of Plaintiffs' litigation risk.[4]  Furthermore, it is worth noting in this

---

[4]  *See, e.g., In re GMC Pick-Up*, 55 F.3d at 818 ("if the district court correctly concluded that there were insurmountable barriers to class treatment, it could not certify the class for settlement purposes"); *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 549 (S.D. Ohio 2000) (rejecting class counsel's argument that uncertainty in satisfying Rule 23 requirements supported approval of settlement because it "fail[ed] to recognize . . .that if class certification is not appropriate under Rule 23(a) and (b), then the Court cannot approve the proposed Agreement").

MOTION FOR RECONSIDERATION

1  connection that, in addition to being inconsistent with its May 7 Order, this Court's

2  tentative order denying class certification is inconsistent with: (1) its *Acosta*

3  decision, which found that all of the Rule 23 requirements (other than adequacy of

4  the *Acosta* plaintiffs and their counsel) are met in these cases, 243 F.R.D. at 387;

5  and (2) its injunctive relief order, which found that all of the Rule 23(a)

6  requirements (including adequacy) were met as to substantially overlapping classes.

7  Aug. 19, 2008 Order, at ¶¶ 8.1 – 8.2, 9.2 (Docket # 338).

8          **i.   The risk that Plaintiffs will be unable to satisfy Rule 23(b)(3)'s
            predominance requirement does not justify *any* discount.**

9          In its May 7 Order, this Court properly found that the predominance

10  requirement poses no barrier to certification of a settlement class in these cases, but,

11  at the behest of the Settling Plaintiffs, suggested that this did not mean that that a

12  litigation class could satisfy that requirement. Id. at 17 ("***as the Settlement is***

13  ***structured***, common questions . . . overwhelm individual issues") (emphasis added).

14  This suggestion that Rule 23 authorizes a relaxed standard when evaluating

15  predominance at the settlement stage is wrong.  Under *Amchem*, the predominance

16  showing for a settlement class is no less demanding than it is for a litigation class.

17  521 U.S. at 620.[5]  Thus, if the settlement class satisfies the predominance test, then

18  a litigation class must satisfy that test as well.

19          There is no question that it does.  Under the law of this Circuit, common

20  questions predominate when they "present a significant aspect of the case and they

21  can be resolved for all members of the class in a single adjudication." *Hanlon*, 150

22  F.3d at 1022.  As this Court correctly stated in *Acosta*, "[t]here is no dispute that the

23  question of Defendants' liability for having [willfully] violated the obligation to

24  employ reasonable reporting procedures ***is common to the class and is the central***

---

[5]  *See also Hanlon*, 150 F.3d at 1022 ("[s]ettlement benefits cannot form part of a
Rule 23(b)(3) analysis"); *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 314 (3d
Cir. 1998) ("*Amchem* rejected the idea that the potential benefits of settlement are
relevant to the predominance inquiry"); *Fleury v. Richemont North America, Inc.*,
2008 U.S. Dist. LEXIS 64521(N.D. Cal. July 3, 2008).

*issue in this case*."  243 F.R.D. at 393 (emphasis added).  At the same time, as this Court also observed in *Acosta*, Plaintiffs' claims for statutory damages raise no individual questions because they are not "required to prove causation or actual damages in order" to obtain them.  *Id.* at 579.[6]  Accordingly, this Court's finding in *Acosta* (*id.* at 387) and in its May 7 Order (at 17) that these cases satisfy Rule 23(b)(3)'s predominance requirement was clearly correct.

### ii.  The risk that Plaintiffs will be unable to satisfy Rule 23(b)(3)'s superiority requirement owing to trial manageability concerns does not justify a significant discount.

Under *Amchem*, the one Rule 23 factor that relates purely to the propriety of certifying a litigation class, as opposed to a settlement class, is the trial manageability element of Rule 23(b)(3)'s superiority requirement.  This factor was, however, not even mentioned in this Court's tentative order denying class certification—and with good reason.

By its terms, Rule 23(b)(3) does not allow the issue whether class-wide adjudication is manageable to be evaluated in the abstract, but rather commands the courts to determine whether it is "superior to other available methods."  As the Seventh Circuit put it in *Klay v. Humana, Inc.*, 382 F.3d 1241 (7th Cir. 2004), "we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members)."  *Id.* at 1273; *see also Hanlon*, 150 F.3d at 1023 (superiority "determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution").

Applying this standard in its *Acosta* decision, this Court has already found that "the most economical and efficient way" to resolve these matters is through a

---

[6]  *See also Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cit. 2006); *Holloway v. Full Spectrum Lending*, 2007 U.S. Dist. LEXIS 59934, at *15 (C.D. Cal. June 26, 2007) ("statutory damages . . . need not be determined on an individual basis, but rather can be determined based upon Defendant's conduct in the aggregate").

MOTION FOR RECONSIDERATION

class action because the alternative would be "litigating millions of individual claims." 240 F.R.D. at 573.  That ruling is consistent with those of other courts, which have likewise held that "it would be better to handle" cases involving the systemic denial of consumer rights through a class action than "to clog[] the federal courts with innumerable individual suits litigating the same issues repeatedly." *Klay*, 382 F.3d at 1273; *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30."). Recognizing as much, the courts have "rarely, if ever," found manageability concerns to "be in [themselves] sufficient to prevent certification of a class." *Klay*, 382 F.3d at 1272.[7]  Thus, even if these cases presented "potentially severe management issues" that would "be insufficient to defeat class certification." *Id.*

But they do not.  The only manageability concern that has ever been raised here relates to the supposed need "to adjudicate" whether the internally inconsistent bankruptcy-related information that was contained in each class member's credit file was, in fact, inaccurate.  This concern, however, is entirely overblown because, under the class definition, a consumer is eligible for class membership only when: (1) a Defendant has issued a credit report about him at a time when his credit file showed one or more of his pre-bankruptcy debts in a derogatory status; and then (2) only if, at that same time, there was nothing in his credit file indicating that all such debts fell within one of the statutorily specified categories that would exclude them from the discharge order.  As all pre-bankruptcy debts that do not fall within one of these categories are automatically discharged, the only scenario in which the credit report of a consumer who meets the class definition might be accurate would be the exceedingly rare one in which, for example, the ***only*** pre-bankruptcy debt with a derogatory notation in his credit file is a reaffirmed car loan or a student

---

[7]  *See also Campbell v. Pricewaterhouse-Coopers, LLP*, 253 F.R.D. 586, 605 (E.D. Cal. 2008); *Thompson v. Clear Channel Communications., Inc.*, 247 F.R.D. 98,148 (C.D. Cal. 2007).

1   loan, which was not coded as such by the creditor (nor, in the case of the student

2   loan, determinable as such by the identity of that creditor -- *e.g.*, Sally Mae).  Thus,

3   the manageability argument in these cases reduces to the notion that countless

4   individual file reviews would be needed to find a few needles in the hay stack.

5           Even if that were the case, which it is not, determining the accuracy of a class

6   member's credit report -- *e.g.*, determining whether a pre-bankruptcy debt listed on

7   that report in a derogatory status was reaffirmed or was a student loan -- is a

8   ministerial task that would never require an adversarial hearing to resolve.[8]  In the

9   only case that has ever addressed this specific issue -- *Lau v. Arrow Financial*

10  *Services., LLC*, 245 F.R.D. 620 (N.D. Ill. 2007) -- the district court held that this

11  task of "determining whether a class member's debt was discharged in bankruptcy"

12  is not "so daunting" as to defeat class certification.  *Id.* at 624.  While this case

13  involves a much larger class than the one in *Lau*, that is no argument against trial

14  manageability; "[t]he more claimants there are, the more likely a class action is to

15  yield substantial economies in litigation."[9]  Applying that principle, the courts have

16  consistently held that where, as here, eligibility for damages can be determined

17  through an essentially mechanical process, the burdens of doing so cannot defeat

18  class certification, regardless of how many such determinations must be made.[10]

19          Even if it were otherwise, this Court has procedural devices at its disposal

20  that would enable it to short-circuit this process.  *See, e.g.*, *Blackie v. Barrack*, 524

---

21  [8] Indeed, in the case of two categories of statutorily non-dischargeable debt (debts
22  that have been reaffirmed or that were successfully challenged in an adversary
    proceeding), this determination could be made for all class members though an
23  automated PACER search of Chapter 7 docket sheets.  Declaration of Michael
    Sobol, sworn to Jan. 18, 2008, Ex. DD (Docket No. 243).

24  [9]  *Carnegie*, 376 F.3d at 660-61 (rejecting argument that class is unmanageable
    because there were "millions of class members" as "no argument at all"); *see also In*
25  *re Thermagenics Secs. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002).

    [10]  *See, e.g.*, *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 250 (W.D. Pa.
26  2008) (holding class action was manageable where determining accuracy of rates
    charged to insured class members, while requiring a time-consuming "individual
27  review of each [of 530,000 title insurance] files," would be "a virtually automatic
    process"); *Albertson v. Commonwealth*, 247 F.R.D. 469, 827 (E.D. Pa. 2008)
28  (same); *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 560 (D. Md.
    2006).

1 F.2d 891, 906 (9th Cir. 1975); *Carnegie*, 376 F.3d at 661.  One such device would

2 be to use statistical sampling methods under which each defendant's aggregate

3 class-wide liability would be determined by randomly selecting a statistically

4 significant number of claims, determining how many of those claims are invalid in

5 that they involve accurate credit reports, and multiplying the number of the

6 remaining valid claims by a uniform statutory damages award.  *Hilao v. Estate of*

7 *Marcos*, 103 F.3d 762, 782-87 (9th Cir. 1996).[11]  Likewise, as it is now clear that

8 Defendants can identify all class members who have sought auto and mortgage

9 loans, it appears that it is now possible for an expert to calculate the aggregate

10 actual losses that have been suffered by the class as a whole as a result of having to

11 pay higher interest rates on such loans with reasonable precision.  *See* cases cited in

12 note 11 *supra*.  Thus, even if Plaintiffs are unable to prove recklessness, Defendants

13 face a serious risk of subclass-wide liability on Plaintiffs' negligence claims.

14     Alternatively, this Court would always have the option to "decertify[] the

15 [global] class after the liability trial" and then create subclasses consisting of class

16 members whose eligibility for damages are obvious from the face of their credit

17 reports (*see* Point II.B.5 *infra*).  *Carnegie*, 376 F.3d at 661; *see also Valentino v.*

18 *Carter-Wallace, Inc.,* 97 F.3d 1227 (9th Cir. 1996).  The ability of this Court to do

19 so should lay to rest any concerns it may have regarding the manageability of these

20 cases through the class action device.

21     In its Tentative Order denying class certification, this Court expressed

22 concern that class certification could expose Defendants to inordinate liability for

23 statutory damages to persons who suffered no actual damages.  Aug.- 13, 2007

24 Order, at 10 (Docket # 169).  From a purely legal perspective,  this concern

25 furnishes no basis for denying class certification on superiority grounds for the

26

27 [11] *See also Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2008); *Kirkpatrick v. Ironwood Communications., Inc.*, 2006 U.S. Dist. LEXIS 79708

28 (W.D. Wash. Nov. 1, 2006); *In re Nasdaq Market-Makers Antitrust Litig,* 169 F.R.D. 493, 524-27 (S.D.N.Y. 1996) (citing numerous cases).

229586_1.DOC                          - 13 -           MOTION FOR RECONSIDERATION

reasons set forth in Plaintiffs' Reply Memorandum in Support of Class Certification at 33-35 (Docket # 241).  Moreover, from a factual perspective, this Court's concern is unfounded for two reasons.  First, Defendants' overall exposure is not disproportionate to the actual losses that have been suffered by the class as a whole, which, as set forth above, are conservatively estimated to be $3 billion.  Second, through the same automated processes that Defendants have used to perform their scoring studies and identify class members, it is possible: (1) to identify the instances in which class members applied for auto loans, mortgages and other forms of credit; and (2) to determine whether their credit scores were adversely affected by Defendants' inaccurate reporting practices at the time they did so.  Thus, to the extent certain consumers did not suffer scoring consequences as a result of those practices, they can be identified and screened out. [12]

### 3.  The Amount Of The Settlement Pales In Comparison To The Litigation Value Of These Cases.

As set forth above, each Defendant faces exposure of $1 billion in damages for claims upon which there is a likelihood—or at least a very strong possibility— they will be found liable.  Yet, under the Settlement, the classes would forever release all three Defendants of this liability in exchange for just $28 million.  Or, to put it another way, each Defendant would pay an award averaging less than 1% of the $100 statutory minimum to release the claims of ten million absent class members, while each of the Settling Plaintiffs would be paid five times the $1,000

---

[12] The proposition that certain class members were not harmed by Defendants' inaccurate scoring practices is based entirely on their own litigation-instigated and deeply flawed scoring studies.  The most recent such study (and the only one that matters) is one done by Equifax, which showed that the credit scores of 18% of the class went down following Equifax's implementation of the injunctive relief settlement.  Zhou Decl. and Exh. 72 thereto. (Docket # 306).  Even if these numbers are accurate, any such beneficial scoring effect would be purely temporary, as over time the net impact of having discharged debts reported in a delinquent status will always be averse.  *See* Plaintiffs' Statement of Genuine Issues, ¶ 77 (Docket # 166).  Further, the presence of certain kinds of errors (*e.g.*, judgment errors) can by themselves disqualify class members' from obtaining mortgage and auto loans and can result in other non-scoring injuries.  *Id.* ¶ 76.  Defendants cannot dispute their ability to identify class members whose files contains such errors as the Settlement requires that they do so.

MOTION FOR RECONSIDERATION

statutory maximum.  As the Seventh Circuit explained when faced with an FCRA class settlement, presenting a virtually identical situation:

> Such a settlement is untenable. . . . [I]f the reason other class members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could [the named plaintiff] accept 300% of the statutory maximum?  And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny?  If, however, the chance of success is materially greater than 1%, as the proposed payment to [the named plaintiff] implies, then the failure to afford effectual relief to any other class member *makes the deal look like a sellout*.

*Murray*, 434 F.3d at 952 (emphasis added).

In sum, this Settlement does not come close to the range of possible approval.  It is a great deal for Defendants who will each wipe out $1 billion in potential liability, a very good deal for Settling Plaintiffs' counsel who will reap $17.25 million in fees, and a fine deal also for the Settling Plaintiffs themselves who will be awarded $5,000 each, but it is a lousy deal for class members who will receive an average of less than one cent on the dollar for their claims.[13]

### 4.  Other Relevant Considerations Do Not Justify Settling These Cases For A Tiny Fraction Of Their Litigation Value.

None of the less significant factors relating to the adequacy determination militate in favor of approving the Settlement.

*The cost, complexity and duration of the proceedings:*  Since "virtually all class actions will result in long, complex and expensive trials," the key question in evaluating this factor "is whether the likelihood of an especially long and complex trial is enough in a particular case to warrant a substantial reduction in what the class might otherwise receive in settlement."  *In re Corrugated Container Antitrust*

---

[13] *See, e.g., In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *23 (E.D. Tex. June 30, 2005) (finding that "issuing a [class] notice and holding a final fairness hearing would be an expensive and unjustifiable effort" and, hence, rejecting preliminary approval of settlement under which class' counsel "would recoup 100% of their $5.0 million in attorneys' fees and expenses," while the plaintiff class "would only be receiving a few pennies on the dollar").

MOTION FOR RECONSIDERATION

*Litigation*, 643 F.2d 195, 217 (5th Cir. 1981). Whatever reduction might be justified here, it would not come close to bridging the huge gap between Defendants' litigation exposure and the paltry amount the classes would receive under the Settlement. Further, it does not matter much whether those class members who might bother to submit claim forms "[receive] $ 15 to $ 30 now or in the future, since it is such a trivial amount of money even to a person who is usually strapped for funds." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 285 (7th Cir. 2002). At any rate, this case can be trial ready within one year.

**The amount of discovery:** While the Settling Plaintiffs tout the supposedly extensive discovery they have taken, the truth is that they have barely scratched the surface on the critical issue of willfulness. For instance, to this date, counsel for the *White* Plaintiffs are unaware of a single memorandum or email that Defendants have produced discussing the bankruptcy reporting problem that lies at the heart of this litigation. Wolf Decl. ¶ 5. Given the fact that Defendants have reported to their trade association that they receive 500,000 consumer disputes relating to this problem each year and that they attended tape recorded trade conferences at which it was discussed, any claim that there are no such documents is highly implausible. Yet, since defeating the *Acosta* settlement, counsel for the Settling Plaintiffs have failed to file a single motion to compel.

Further, though the Settling Plaintiffs tout the 40 depositions in these cases, just 20 of these were of defendants' officials, 10 of which concerned their post-litigation scoring studies. Nor have they deposed anyone who might candidly discuss this problem -- that is, they have deposed none of Defendants' lower or mid-level employees from their reinvestigation division, none of their former officers and no third parties.[14] Wolf Decl. ¶ 6. As a result of this failure to take important

---

[14] For instance, the Settling Plaintiffs needed to, but did not, depose anyone like John Ulzheimer, a former mid-level official in Equifax's reinvestigation division, who has testified that Equifax knew as far back as the early 1990s that inaccurate reporting of bankruptcy information was an "extremely frequent and reoccurring problem," which Equifax chose to address by revising its consumer dispute

MOTION FOR RECONSIDERATION

discovery or to reveal "what information they reviewed on which they based their assessment of the strength of their claims," the Settling Plaintiffs have left this Court with no ability "to intelligently evaluate" those claims and, hence, no basis to approve the settlement. *Kullar v. Foot Locker Retail, Inc.,* 168 Cal.App.4th 116, 129 (2008); *see also Olden v. Gardner,* 294 Fed. Appx. 210, 217 (6th Cir. 2008).

***The views of the original named Plaintiffs and their counsel:*** The views of class counsel in these cases do not favor settlement.   First, two of Plaintiffs' counsel are fiercely opposed to the Settlement, including both the attorney who is most familiar with the harmful effects of Defendants' unlawful practices and the attorney who authored all of the major briefs and argued the two major contested motions in this matter.  Wolf Decl. ¶ 4.  *See, e.g., Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1420  (D. Minn. 1987) (giving careful consideration to views of named plaintiffs' counsel who opposed settlement).  Second, inasmuch as counsel for the Settling plaintiffs took "virtually no discovery related to the crucial issues" of willfulness or class-wide damages, "their arguments are entitled to little deference."  *Olden,* 294 Fed. Appx. at 219.

Furthermore, the fact that a majority of the nine original named Plaintiffs are opposing the settlement, despite the fact that they were each offered $5,000 to support it, is a factor that should "weigh heavily" against approval.[15]  By contrast, no weight should be afforded the views of the four named Plaintiffs who support the settlement—all of whose interests are in conflict with the class and three of whom have previously supported a defective settlement that would have sold out the class.  *See* Cert. Recon. Br. at 19-20.

---

procedures, rather than by making systemic revisions to its initial reporting procedures.  Ulzheimer Declaration of Feb. 15, 2007, at ¶ 15 (Docket # 67).
[15] *Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494, 497 (S.D.N.Y. 1994)*; see also Mandujano v. Basic Vegetable Prods, Inc.*, 541 F.2d 832, 837 (9th Cir. 1976) (noting that opposition of 5 of 9 named plaintiffs was "significant" and required trial court to give "seasoned responses" to their objections); *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216-17 (5th Cir. 1978) (giving "great weight" to fact that named plaintiffs who had "provided exceptional representation" and showed no signs of "any conflict of interest" all opposed class settlement).

MOTION FOR RECONSIDERATION

1

**B. The Settlement Is Fatally Defective Because It Sacrifices The Claims Of The Unfortunate Many For The Favored Few.**

In assessing the adequacy of a class settlement, "a judge must focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class." *In re GMC Pick-Up,* 55 F.3d at 797.  A settlement that premises "the gain of one segment of a class . . . on the sacrifices of the other" is fatally defective. *Camp v. Progressive Corp.*, 2004 U.S. Dist. LEXIS 19172 (E.D. La., Sept. 23, 2004).[16]  Here, faced with the Herculean task of dividing a fund of $28 million among some 10 million class members, the Settling Plaintiffs have done just that.

**1.  The Settlement Abandons The Claims Of The Reinvestigation Subclass For Zero Compensation.**

In these actions, Plaintiffs have pursued two distinct types of claims—a section 1681e(b) claim based on Defendants' unreasonable reporting procedures on behalf of the classes, and a section 1681i claim based on Defendants' unreasonable reinvestigation practices on behalf of subclasses, consisting of consumers whose discharged debts continued to be erroneously reported after they submitted disputes complaining of those errors.  Plaintiffs' have submitted evidence indicating that each Defendant's woeful reinvestigation practices fails to correct inaccuracies in about 20% of the cases.  Juntikka Decl. sworn to Dec. 16, 2006 ¶¶ 18-19 (Docket # 51); Juntikka Decl. sworn to Feb. 15, 2007, ¶ 17 (Docket # 73).  If it can be established that Defendants employed these practices in reckless disregard of their obligations under section 1681i of the FCRA, subclass members will be entitled to a statutory damages award, separate and distinct from any such award they might obtain on their section 1681e(b) claim.  Furthermore, members of the reinvestigation subclass class all had problems that they believed were significant

---

[16]  *See also In re GMC Pick-Up,* 55 F.3d at 797 & 816; *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 16 (2d Cir. 1981); *Piambino v. Bailey*, 610 F.2d 1306, 1329 (5th Cir. 1980) (holding that vacatur of order approving settlement "is demanded by the failure to assess the interests of the categories of plaintiffs and whether the settlement was fair . . . as to each").

MOTION FOR RECONSIDERATION

enough to warrant the expenditure of their time and energy to fix -- time that the *White* Plaintiffs' expert values at approximately $60 per dispute.  Smith Decl. ¶ 42.

Without any explanation at all, however, the Settlement would release the claims of these subclass members in exchange for *zero* additional compensation. This failure to "provide for any additional payment" to an entire subclass "in return for the release of [their] claims" is a fatal defect that compels this Court to reject the Settlement.  *National Super Spuds,* , 660 F.2d at 18; *see also Piambino*, 610 F.2d at 1329 (disapproving settlement that required significant segment of class that placed judgment creditors, who had distinct claims of their own, on the same footing as other class members).

### 2.  The Settlement Irrationally Favors Class Members With Claims Against One Defendant Over Those With Claims Against Two Or Three.

This matter involves not one class action suit, but three, each against a different Defendant.  Many class members have claims against one Defendant, while many others have claims against just two or three.  Naturally, if each Defendant is found liable for willfully violating the FCRA, those class members who have claims against multiple Defendants will be entitled to a statutory damage award from each one.  Yet, under the Settlement, all class members are entitled to the same award, regardless of whether they have claims against one, two or all three Defendants.  The result is that the rights of those class members who have claims against multiple Defendants are traded off in favor of those who have claims against just one.  As such a distribution formula is patently irrational on its face, the Settlement is fatally defective.  *National Super Spuds,* 660 F.2d at 18.

### 3.  The Settlement Sacrifices The Claims Of The Large Majority Of Class Members Who Are Unaware Of The Errors On Their Credit Reports For The Small Minority Who Are.

In order to obtain an award under the Settlement, class members are required to submit a claims form, affirming that they "believe that there have been one or more errors in my credit reports regarding debt discharged in bankruptcy" or that

MOTION FOR RECONSIDERATION

they "have been damaged by [such] an error." Settlement Agreement, at 31. As this Court has correctly observed, however, "a considerable number of class members" (actually, a large majority) "are likely, through no fault of their own, unaware that they have valid claims" because they have never received" copies of their credit reports and, even if they did, they would be unlikely to have "the uncommon legal sophistication" that is needed to "identify discharged debts showing inaccurately." *Acosta*, 243 F.R.D. at 389.

In rejecting the *Acosta* settlement, this Court referred to its claims made component as "present[ing] an unforgiving whipsaw, causing [class members] to release [Defendants] from all conceivable claims while granting nothing of monetary value in return." *Id.* at 394. Inasmuch as the *Acosta* claims form did not require anyone to affirm the presence of errors in credit reports they had never seen, this Settlement is worse. In order to benefit the few who saw their credit reports during the liability period and had the sagacity to identify the inaccuracies within them, the Settlement would sacrifice the claims of the many who did not know of those errors and have no way to discover them. While not even affording these unfortunate class members even the opportunity to get a single dime, the Settlement will force them to relinquish "all conceivable claims," including actual damages claims, which the Settling Plaintiffs have never argued are amenable to class treatment in the first place.

At any rate, even if all class members were aware of the errors on their reports, it is a fact that "'claims made' settlements regularly yield response rates of 10 percent or less." *Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005). For the large majority who do not respond and who "will receive nothing in exchange for their claims being extinguished . . . , the probability of success would need to be zero percent in order to justify finding that the settlement was fair." *Id.* at 51, n.23 (rejecting preliminary approval).[17]

---

[17] *See also Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 47515, at *15-16 (N.D.

MOTION FOR RECONSIDERATION

### 4. **The Settlement Sacrifices The Claims Of Class Members Who Are Unable To Affirm They Suffered Damages In Order To Enrich A Tiny Minority Who Are.**

As the Settlement is structured, the lion's share of the common fund is set aside for a tiny minority of the class who can affirm that they have suffered actual damages as a result of errors on their credit reports.  Furthermore, the claims of these "actual damages" claimants, whose awards (depending on the number of claims filed) would range from $150 to $750,  are given priority over all others, except for a residual pool of $10 million that is reserved for the claims of everyone else.  In other words if, for example, just 0.9% of the class of 10 million claimants file "actual damage" claims worth $150 and 0.1% file claims worth $500, the payout to the "actual damage" group would be $18.5 million of an estimated awards pool of $28.75 million—leaving just $10.25 million for the rest of the class or an average of about *$1 per person*.  If just 10% of that class filed claims, they would each get an award of $10 and, if 20% filed, they would each get $5 (or $1.67 per defendant).   Everyone else, of course, would get nothing.

This trading off of the claims of rank-and-file class members for the benefit of a handful of "actual damage" claimants is without legal justification.  Under the FCRA, all class members are equally entitled to a statutory damages award of between $100 and $1,000, whether they suffered any actual damages or not.  *See Acosta*, 240 F.R.D. at 579 and cases cited in note 6 *supra*.  Furthermore, it is not at all clear that the FCRA permits one consumer to be awarded more statutory damages than another based on his ability to show that he suffered greater actual harm.  *Ashby v. Farmers' Ins. Co.*, 2008 U.S. Dist. LEXIS 105612, at *27 (D. Ore. Dec. 12, 2008) (rejecting "the proposition that actual harm is a relevant factor when determining the amount of statutory damages under FCRA").  What is clear, however, is that, to the extent that the FCRA does authorize such disparate awards,

---

Cal. June 19, 2007) (a settlement "cannot pass even the threshold of plausibility required for even preliminary approval" when rights of "those absent class members who wind up not submitting a timely claim . . . would be erased totally"),

MOTION FOR RECONSIDERATION

the disparity can never be greater than 10 to 1.  Thus, in setting up a system that would award some claimants as much as 50 or 100 times more than others, the Settlement picks winners and losers—sacrificing the claims of the many for the claims of the few without any basis in law.

### 5.  The Settlement Does Nothing To Account For The Claims Of Class Members Who Fall Into Subclasses That Present No Manageability Or Due Process Concerns.

As set forth above, the *White* Plaintiffs strongly believe that the broader classes are manageable.  However, if, as appears to be the case, any manageability-related litigation risk played a significant role in the Settling Plaintiffs' valuation of these claims, they should have heeded this Court's instruction and explored whether it was possible to identify any segments of the putative classes for which that risk is less substantial.  In fact, there are two such ultra-manageable segments.

The first consists of all consumers who meet the criteria for inclusion in the class by virtue of their having an outstanding pre-bankruptcy civil judgment in their credit files, which was not obtained by a governmental agency or taxing authority.  As such judgments are always reached by the discharge order, there would never be any need "to adjudicate" whether a credit report showing them as outstanding is accurate or inaccurate and, hence, their identification presents no manageability problems.  Juntikka Decl. ¶ 52.  Furthermore, such outstanding judgments are black marks of the worst kind.  Their presence on a credit report can only have a deflationary effect on credit scores and is, at any rate, an automatic disqualifier for both mortgages and auto loans.  *Id.* ¶ 51, and Exh. O thereto.  Accordingly, certification of a judgment class, which would consist of approximately 800,000 consumers, also raises no prospect of an aggregate statutory damage award that might exceed constitutional limits.

The second subset of the broader class that would present no manageability concerns is one that would consist of class members whose credit reports were corrected following their submission of a consumer dispute.  At a minimum, the

existence of such a correction would create at least a *prima facie* case of inaccuracy—obviating any need for individual accuracy determinations. Furthermore, the fact that members of this "corrected error" class felt it necessary to go through the trouble of submitting a dispute strongly suggests that they were experiencing problems with their credit. And, in fact, all of them have suffered at least some actual damage associated with the time and expense required to go through the dispute process. Smith Decl. ¶ 42. Thus, the potential that this class, which would consist of approximately 600,000 consumers, might obtain an aggregate statutory damages award also raises no due process concerns.

In short, while the Settling Plaintiffs cite class certification risk as a key factor in valuing the strength of their claims, they have done nothing in their Settlement to distinguish between the claims of the broader class that arguably present that risk and the claims of at least two subsets of that class, which do not. Their failure to do so is a fatal defect that by itself defeats the Settlement.[18]

## III.   THE SETTLEMENT IS PROCEDURALLY DEFECTIVE.

### A. The Class Notice Form Does Not Provide Class Members Information Sufficient To Determine Whether It Is In Their Interest To Participate.

In order to meet the requirements of Rule 23(c)(2), a class notice must "adequately describe" the substantive claims and "contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class." *In re Nissan Motor Corp. Antitrust Litig*, 552 F.2d 1088, 1104-05 (5th Cir. 1977); *see also Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1177 (9th Cir. 1977). Here the notice is fatally defective in that it:

- does not describe the substantive claims alleged in the complaint—that is, it

---

[18] *See, e.g.*, *Hanlon*, 150 F.3d at 1020 ("*Amchem* instructs us to give heightened scrutiny to cases in which class members may have claims of different strength."); *In re GMC Pick-Up*, 55 F.3d at 816 (holding that "failure to distinguish between groups of plaintiffs that did and those that did not confront difficult . . . defenses constitutes an abuse of discretion").

does not say that these are claims predicated on Defendants' alleged violations of their statutory obligations to employ reporting procedures reasonably designed "to assure maximum possible accuracy" and to employ reasonable reinvestigation practices;

- says nothing about Plaintiffs' rights under the FCRA to actual damages, statutory damages and/or attorneys' fees, *Martin v. Fedex Ground Package Sys.*, 2008 U.S. Dis. LEXIS 106524, at *21 (N.D. Cal. Dec. 31, 2008);

- does not state the class size or describe the formula for distributing funds;[19]

- fails to mention that class members with reinvestigation claims will be waiving those claims for no additional compensation, *see, e.g.*, *Molski v. Gleich,* 318 F.3d 937, 951-52 (9th Cir. 2003) (finding notice inadequate where it failed to convey what damage remedies were being released);

- fails to mention that a majority of the named Plaintiffs and two of their counsel believe the settlement is unfair and inadequate, *see Saylor v. Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972); *Holden* 665 F. Supp. at 1421;

- fails to mention that and that the Settlement made incentive awards available only to those named Plaintiffs who were willing to support it; and

- provides no information that would enable class members to tell whether the information on their credit reports was erroneous.

Finally, the notice is defective because it requires class members to submit a claim form before the settlement has been finally approved.  By requiring class members to make that election before giving them an opportunity to challenge it in this Court or on appeal, this procedure "unfairly burden[s]" their rights to object and "thereby significantly undermine[s] one of the most important procedural protections associated with the approval of a settlement."  *Pettway*, 576 F.2d at 1221.  On this basis alone, the Settlement is fatally infirm.  *Id.* ("the ability of subclass members to opt into a back pay settlement may not be terminated before a

---

[19] *See, e.g., Marshall,* 550 F.2d at 1178; *State ex rel. Byrd v. Chadwick*, 956 S.W.2d 369, 386 (Mo. Ct. App. 1997) (rejecting notice where it failed to estimate "the number of persons in the class, the total potential number of claims, the number of claims which it was estimated would be filed, the formula for determining each class member's recovery, or any other information by which the absent class members could determine their potential amount or range of recovery").

1  final determination of [its] propriety . . . is made"); *see also In re General Motors*

2  *Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1121 (7th Cir. 1979).

3       **B.  <u>The Settlement Poses Unreasonable Restrictions On Opt Out Rights</u>**
           **<u>That Are Designed To Deflate The Number Of Opt Outs.</u>**

4       Disregarding the spirit, if not the letter, of Rule 23(c)(2), the Settlement

5  imposes gratuitous obstacles on opt out rights that are designed to protect

6  Defendants by ensuring that the number of opt outs is as low as possible.

7       First, though the notice includes a postage prepaid claim form, that form

8  contains no check box that would enable class members to opt out.  Instead, class

9  members are needlessly required to send in their own letter requesting they be

10  excluded from the class—a requirement that courts have rejected.  *See also*

11  *Vaughter v. Eastern Airlines, Inc.,* 817 F.2d 685, 690-91 (11th Cir. 1987); *Tierno v.*

12  *Rite Aid Corp.*, 2007 U.S. Dist. LEXIS 89582 (N.D. Cal. Nov. 19, 2007).

13       Second, the Settlement requires that each person seeking exclusion from the

14  class personally sign his letter requesting exclusion, without even allowing for a

15  power or attorney as a substitute, and that he provide his phone number and last

16  four digits of his social security number, when the same information is not required

17  of those submitting a claim for benefits.  As these needless requirements are clearly

18  designed to limit the number of opt outs, this Court should reject them.

19  **<u>CONCLUSION</u>**

20       For the reasons set forth herein, the *White* Plaintiffs respectfully submit that

21  the Court should reconsider and vacate its orders granting preliminary approval of

22  the Settlement.

23  DATED:  May 21, 2009        BOIES, SCHILLER & FLEXNER LLP
                          David Boies

24                            George F. Carpinello
                          Adam R. Shaw

25                           BROWNE WOODS GEORGE LLP
                          David L. Zifkin (SBN 232845)

26

27                          <u>By /s/ David L. Zifkin</u>
                          David L. Zifkin

28                        Attorneys for *White* Plaintiffs