BOIES, SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY 10504
Telephone:   914.749.8200
Facsimile:   914.749.8300
Email:     dboies@bsfllp.com
(admitted *pro hac vice*)

George F. Carpinello
Adam R. Shaw
10 North Pearl Street
Albany, NY 12207
Telephone:  518.434.0600
Facsimile:   518.434.0665
Email:     gcarpinello@bsfllp.com
           ashaw@bsfllp.com
(admitted *pro hac vice*)

David L. Zifkin (SBN 232845)
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA   90401
Telephone:  310-395-5800
Facsimile:  510-874-1460
Email:  dzifkin@bsfllp.com

CHARLES JUNTIKKA &
ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone:   212.315.3755
Facsimile:   212.315.9032
Email:     charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone:   202.842.2170
Email:     dan@danielwolflaw.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., et al.,<br><br>                    Defendants.<br><br>and Related actions. | **CASE NO. 05-CV-1070 DOC (MLGx) (Lead Case)**<br><br>**THE *WHITE* PLAINTIFFS' OBJECTIONS TO CLASS ACTION SETTLEMENT**<br><br>**[REDACTED]\*** |

\* This is a redacted version of the *White* Plaintiffs' Objections to Class Action Settlement which will be filed under seal upon the Court's approval of the Stipulation, Supplemental Application, and Proposed Order to File Documents Under Seal, filed on December 14, 2009.

# <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

PART ONE:  OBJECTIONS TO APPOINTMENT OF CLASS
COUNSEL AND CLASS CERTIFICATION .......................................................... 8

I.    Counsel For The Settling Plaintiffs Are Unfit To Represent the Class ..... 10

   A. Counsel For The Settling Plaintiffs' Unethical Conduct In Regard
      To Incentive Awards Renders Them Unfit To Represent The Class ... 11

   B. Counsel For The Settling Plaintiffs' Unethical Conduct
      Regarding The Award Of Attorneys' Fees Renders Them
      Unfit To Represent The Class ................................................................ 14

   C. The Lieff/Caddell Team's Breach Of Their Duty Of Undivided
      Loyalty Renders Them Unfit To Represent The Class ........................ 16

      1. The Lieff/Caddell Team Has Violated The Ethical Rule
         Barring The Simultaneous Representation Of Clients
         With Adverse Interests ................................................................... 16

      2. The Lieff/Caddell Team's Violation Of The Ban On
         Simultaneous Representation Automatically
         Disqualifies It From Representing The Class ................................. 21

      3. The Lieff/Caddell Team's Argument That The Proscription On
         Simultaneous Representation Is Inapplicable Because Lieff
         And NCLC Withdrew Promptly After Learning Of The
         Conflict Has No Factual Basis ....................................................... 23

   D. The Lieff/Caddell Team's Complete Failure To Consult With The
      *White* Plaintiffs Shows That They Are Unfit To Represent The
      Class ...................................................................................................... 25

   E. Counsel For the *Acosta/Pike* Plaintiffs Are Unable To Adequately
      Represent The Class .............................................................................. 28

i

1. Counsel For The *Acosta/Pike* Plaintiffs Have Agreed To A Fee Sharing Agreement That Creates A Disabling Conflict Of Interest Between Them And The Class............................................. 28

2. Counsel For The *Acosta/Pike* Plaintiffs' Support For The Grossly Inadequate *Acosta* Settlement Demonstrates That They Are Unfit To Represent The Class By Themselves................. 29

II.  None Of The Named Plaintiffs Supporting The Settlement Can Adequately Represent The Class...................................................... 29

A.  The Settlement's Provision Regarding Incentive Awards Creates A Disabling Conflict Of Interest Between The Named Plaintiffs And The Rest Of The Class.............................................................. 29

B.  The *Acosta/Pike* Plaintiffs Cannot Represent The Class Because They Have Not Asserted Claims Against Experian And Because They Supported The Grossly Inadequate *Acosta/Pike* Settlement .................. 31

C.  The Settling Plaintiffs Cannot Represent Subclasses In Which They Do Not Belong And Whose Interests They Have Sacrificed .................. 32

1.  The Named Plaintiffs Cannot Represent The Subclass Of Consumers Who Are Unaware Of The Information In Their Credit Reports.............................................................................. 32

2.  The Named Plaintiffs Cannot Represent Members Of The Reinvestigation Subclass ........................................................... 33

3.  The Named Plaintiffs Cannot Represent Members Of The Subclass Of Consumers Whose Credit Reports Listed Their Pre-Bankruptcy Judgments As Still Outstanding........................................ 33

III. Certification of Plaintiffs' Actual Damage Claims Is Improper Because Settling Plaintiffs Have Failed To Satisfy Rule 23(b)(3)'s Predominance Requirement With Respect To Those Claims ................................ 34

PART TWO:  OBJECTIONS TO THE FAIRNESS AND ADEQUACY OF THE SETTLEMENT................................................................. 35

I.  The Settlement Amount Falls Far Outside The Range Of

ii

Reasonableness......................................................................................................38

   A.  Defendants' Litigation Exposure Remains Enormous ...........................39

   B.  There Is No Basis For Discounting Defendants' Litigation Exposure By Approximately 99 Percent.................................................40

       1.  The Risk of Failing To Establish Liability Does Not Justify Discounting Defendants' Litigation Exposure By More Than An Order Of Magnitude ......................................................40

       2.  The Risk Of Failing To Secure Class Certification Does Not Justify A Significant Discount ..........................................46

          a.  The risk that Plaintiffs will be unable to satisfy Rule 23(b)(3)'s predominance requirement does not justify *any* discount ..........47

          b.  The risk that Plaintiffs will be unable to satisfy Rule 23(b)(3)'s superiority requirement owing to trial manageability concerns does not justify a significant discount.........................................49

          c.  The risk that due process concerns will preclude satisfaction of Rule 23(b)(3)'s superiority requirement does not justify a significant discount.................................................55

   C.  The Amount Of The Settlement Pales In Comparison To The Litigation Value Of These Cases...........................................................59

   D.  Other Relevant Considerations Do Not Justify Settling These Cases For A Tiny Fraction Of Their Litigation Value ....................................59

II.  The Settlement Is Fatally Defective Because It Sacrifices The Claims Of The Unfortunate Many For The Favored Few ..................................................63

   A.  The Settlement Sacrifices The Claims Of The Large Majority Of Class Members Who Are Unaware Of The Information In Their Credit Reports For The Small Minority Who Are .................................64

   B.  The Settlement Abandons The Claims Of The Reinvestigation Subclass For Zero Compensation.........................................................67

iii

C.  The Settlement Irrationally Favors Class Members With Claims Against One Defendant Over Those With Claims Against Two Or Three ..................................................................................... 68

D.  The Settlement Sacrifices The Claims Of Class Members Who Are Unable To Affirm Their Belief They Have Suffered Damages To Enrich A Tiny Minority Who Are ..................................................... 68

E.  The Settlement Does Nothing To Account For The Claims Of Class Members Who Fall Into Subclasses That Present No Manageability Or Due Process Concerns ............................................... 71

III.   The Settlement Is Procedurally Defective ..................................... 73

A.  The Class Notice Does Not Provide Class Members Information Sufficient To Determine Whether It Is In Their Interest To Participate ............................................................................. 73

B.  The Settlement Poses Unreasonable Restrictions On Opt-Out Rights That Are Designed To Deflate The Number Of Opt-Outs .................... 75

CONCLUSION .................................................................................. 76

iv

# TABLE OF AUTHORITIES

Page

Federal Cases

*Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971) ............... 15

*Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007) ...................... passim

*Alberto v. GMRI, Inc.*, 252 F.R.D. 652 (E.D. Cal. 2008) ........................................ 31

*Alberton v. Commonwealth Land title Ins. Co.*, 247 F.R.D. 469 (E.D. Pa. 2008) ........................................................................................................ 53

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ................................ passim

*Andrews v. TRW, Inc.*, 225 F.3d 1063 (9th Cir. 2000), *rev'd on other grounds*, 534 U.S. 19 (2001) ............................................................................. 46

*Apparicio v. Radioshack Corp.*, 2009 U.S. Dist. LEXIS 49316 (C. D. Cal. May 21, 2009) ........................................................................................................ 30

*Ashby v. Farmers' Ins. Co.*, 2008 U.S. Dist. LEXIS 105612 (D. Ore. Dec. 12, 2008) ..................................................................................... 56, 57, 69-70

*Bateman v. Am. Multi-Cinema, Inc,*, 252 F.R.D. 647 (C.D. Cal 2008) ................. 57

*Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702 (6th Cir. 2009) ......................... 48

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ........................................ 53, 54

*Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421 (E.D. La. 1997) ......................................................................................................... 27

*Cal. Serv. Employees Health & Welfare Trust Fund v. Advance Bldg. Maint.*, 2009 U.S. Dist. LEXIS 21858 (N.D. Cal. Mar. 4, 2009) ........................ 25

*In re Calif. Canners and Growers*, 74 B.R. 336 (Bankr. N.D. Cal. 1987) ......................................................................................................... 22

*In re Calif. Micro Devices Secs. Litig.*, 168 F.R.D. 257 (N.D. Cal. 1996) ................................................................................................. 13, 28

*California ex rel. Barakat Consulting, Inc. v. Los Angeles Dep't of Water & Power*, 2004 Cal. App. Unpub. LEXIS 7305 (Aug. 5, 2004) ........................ 18

v

*Camp v. Progressive Corp.*, 2004 U.S. Dist. LEXIS 19172 (E.D. La. Sept. 23, 2004)................................................................................. 14

*Campbell v. Experian Info. Solutions, Inc.*, 2009 U.S. Dist. LEXIS 106045 (W.D. Mo. Nov. 13, 2009) ................................................. 46

*Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586 (E.D. Cal. 2008)........................................................................................ 51

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) .................... passim

*Cassara v. DAC Servs., Inc.*, 276 F.3d 1210 (10th Cir. 2002) ................................ 40

*Castaneda v. Burger King Corp.*, 2009 U.S. Dist. LEXIS 69592 (N.D. Cal. July 31, 2009)................................................................. 21

*Castillo v. General Motors Corp.*, 2008 U.S. Dist. LEXIS 82337 (E.D. Cal. Sept. 8, 2008) ..................................................... 30, 31

*Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 545 F. Supp. 2d 768 (N.D. Ill. 2008) ................................................. 56

*Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F.Supp. 2d 914 (N.D. Cal. 2003) ................................................. 21

*In re Chiron Corp. Secs. Litig.*, 2007 U.S. Dist. LEXIS 91140 (N.D. Cal. Nov. 30, 2007)........................................................ 13

*In re Community Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2003) ............................ 35

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981)................................................................................ 60

*Day v. NLO, Inc.*, 1995 U.S. Dist. LEXIS 22316 (S.D. Ohio May 19, 1995) ........ 14

*Deadwyler v. Volkswagen of America, Inc.*, 134 F.R.D. 128 (W.D.N.C. 1991), *aff'd,* 966 F.2d 1443 1992)................................................. passim

*In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457 (E.D. Tex. June 30, 2005)........................................... 39, 59

*Elliot v. Sperry Rand Corp.*, 680 F.2d 1225 (8th Cir. 1982).................................... 15

*Essex Chemical Corp. v. Hartford Accident and Indem. Co.*, 993 F.Supp. 241 (D.N.J. 1998) ................................................. 18

*Fahey v. Experian Info. Solutions, Inc.*, 571 F. Supp. 2d 1082 (E.D. Mo. 2008) ........................................................ 46

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007)............ 40

*Fleury v. Richemont North America, Inc.*, 2008 U.S. Dist. LEXIS 64521

vi

(N.D. Cal. July 3, 2008)...................................................................35, 48

*Flying J Inc. v. TA Operating Corp.*, 2008 U.S. Dist. LEXIS 18459 (D. Utah Mar. 10, 2008) ........................................................................................24

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977)..................................................................................................22

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979) ...................................................................................17, 63

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.* 55 F.3d 768 (3d Cir. 1995) ...................................................................passim

*Gillespie v. Equifax Info. Servs., LLC*, 2008 U.S. Dist. LEXIS 85150 (N.D. Ill. Sept. 15, 2008) ...................................................................................46

*Gorman v. Experian Info. Solutions, Inc.*, 2008 U.S. Dist. LEXIS 94083 (S.D.N.Y. Nov. 18, 2008)..............................................................................46

*Hadix v. Johnson*, 322 F.3d 895 (6th Cir. 2003) ......................................11

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)............................passim

*Harris v. Experian Info. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 46824 (D.S.C. June 26, 2007) ...............................................................................46

*Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301 (11th. Cir. 2009).................................................................................................48

*Heit v. Van Ochten*, 126 F. Supp. 2d 487 (W.D. Mich. 2001) ...............................17

*Hilao v. Estate of Marcos*, 103 F.3d 762 (9th Cir. 1996)......................................54

*Holden v. Burlington N., Inc.*, 665 F. Supp. 1398 (D. Minn. 1987).......................62

*Holloway v. Full Spectrum Lending*, 2007 U.S. Dist. Lexis 59934 (C.D. Cal. June 26, 2007) .......................................................................48, 55, 57

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983)..........................30

*Holmes v. Telecheck Int'l, Inc.*, 556 F. Supp. 2d 819 (M.D. Tenn. 2008)..................................................................................................46

*Hughes v. Microsoft Corp.*, 2001 U.S. Dist. LEXIS 5976 (W.D. Wash. Mar. 26, 2001) ....................................................................................14

*Huston v. Imperial Credit Commercial Mortgage Invest. Corp.*, 179 F. Supp. 2d 1157 (C.D. Cal. 2001) ..........................................................10

*Image Technical Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354 (9th
   Cir. 1998)................................................................................................21

*Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir.1997) ..................49

*Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 47515 (N.D. Cal.
   June 19, 2007)........................................................................................67

*Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642 (W.D. Wash. 2007) ......................56

*Kesler v. Ikea U.S., Inc.*, 2008 U.S. Dist. LEXIS 97555 (C.D. Cal.
   Feb. 4, 2008)......................................................................................55, 57

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004)..................................passim

*Kirkpatrick v. Ironwood Communications, Inc.*, 2006 U.S. Dist. LEXIS 79708
   (W.D. Wash. Nov. 1, 2006)....................................................................54

*Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283 (3d Cir. 1998).....................35, 48

*Lau v. Arrow Financial Servs., LLC*, 245 F.R.D. 620 (N.D. Ill. 2007)..................53

*Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581 (3d Cir. 1999) ..................................17

*Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290 (W.D. Pa. 1997) .......................14

*Levell v. Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000)................47

*In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007) ....................51

*Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320 (N.D. Ill 1991) ................54

*Malchman v. Davis*, 706 F.2d 426 (2d Cir. 1983)...................................................35

*Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832 (9th Cir.
   1976)................................................................................................21, 63

*Martin v. Foster Wheeler Energy Corp.*, 2008 U.S. Dist. LEXIS 25712 (M.D.
   Pa. Mar. 31, 2008) ................................................................................14

*Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977) ....................73, 74

*Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494
   (S.D.N.Y. 1994)......................................................................................63

*Medearis v. Oregon Teamster Employers Trust*, 2009 U.S. Dist. LEXIS
   53453 (D. Ore. June 19, 2009) ..............................................................75

*Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir. 2004) .................... 10, 35

*Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551 (D. Md. 2006) ................................................................................................. 53

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. Cal.  2003) ................................. 25, 29, 35

*Moreno v. AutoZone, Inc.*, 2007 U.S. Dist. LEXIS 98250 (N.D. Cal. Dec. 5, 2007) ..................................................................................... passim

*Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006) ................. passim

*In re Napster Copyright Litig.*, 2005 U.S. Dist. Lexis 11498 (N.D. Cal. May 31, 2005) ............................................................................ 56

*In re Nasdaq Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................................ 54

*National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981) ..................................................................... 33, 63, 68

*Nilsen v. York County*, 382 F. Supp. 2d 206 (D. Me. 2005) .................................. 14

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977) ............................................................................................ 73

*O'Brien v. Equifax Info. Servs., LLC*, 382 F. Supp. 2d 733 (E.D. Pa. 2005) ................................................................................................ 40, 46

*In re Ocean Bank*, 2007 U.S. Dist. LEXIS 29443 (N.D. Ill. Apr. 9. 2007) ............................................................................................. 27

*Olden v. Gardner*, 294 Fed. Appx. 210 (6th Cir. 2008) ........................................ 62

*Olden v. Gardner*, 2008 U.S. App. LEXIS 20092 (6th Cir. Sept. 18, 2008) .......... 13

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .................................................... 32

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ................................... 40

*Petruzzi's, Inc. v. Darling-Delaware Co.,Inc.*, 880 F. Supp. 292 (M.D. Pa. 1995) ................................................................................................. 63

*Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978) ...................... 63

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980) ............................................... 68

*Picker Int'l Inc. v. Varian Assocs., Inc.*, 869 F.2d 578 (Fed. Cir. 1989) ............... 24

ix

*Pirian v. In-N-Out Burgers*, 2007 U.S. Dist. LEXIS 25384 (C.D. Cal. Apr. 5, 2007) ........................................................................ 55, 57

*Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y. 1981) ................................. 30

*Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108 (S.D.N.Y. 1999) ............... 25

*Pope v. Rice*, 2005 U.S. Dist. LEXIS 4011 (S.D.N.Y. Mar. 14, 2005) ................. 18

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ...................................................... 55

*Reynolds v. Beneficial Nat'l. Bank*, 288 F.3d 277 (7th Cir. 2002) .................... 35, 60

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ....................... passim

*Rodriguez v. West Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74767 (C.D. Cal. Sept. 10, 2007) ....................................................................... 12, 30

*Romero v. Producers Dairy Foods, Inc.*, 2007 U.S. Dist. LEXIS 86270 (E.D. Cal. Nov. 13, 2007) ................................................................ 14

*Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007) ............................ 40, 41, 46

*Saindon v. Equifax Info. Servs.*, 2009 U.S. Dist. LEXIS 33060 (N.D. Cal. Apr. 17, 2009) ........................................................................ 46

*Sanchez & Daniels v. Koresko & Assocs.*, 2006 U.S. Dist. LEXIS 84232 (N.D. Ill. Spet. 14, 2006) ........................................................ passim

*Schick v. Berg*, 2004 U.S. Dist. LEXIS 6842 (S.D.N.Y. Apr. 20, 2004), *aff'd*, 2005 U.S. App. LEXIS 24671 (2d Cir. Nov. 17, 2005) ........................... 21

*Singh v. Mukasey*, 533 F.3d 1103 (9th Cir. 2008) ................................................. 25

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ................................................................................. 54

*Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232 (W.D. Pa. 2008) .................. 53

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ......................................... 11, 25

*St. Louis, Iron Mountain & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919) ................ 56

*Summerfield v. Equifax Info. Servs., LLC*, 2009 U.S. Dist. LEXIS 91316 (D.N.J. Sept. 30, 2009) ................................................................ 72

*Sutton v. Bernard*, 2002 U.S. Dist. LEXIS 14357 (N.D. Ill. Aug. 5, 2002) ........... 39

*Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005) .............................. 67

x

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006).................................................................................40

*In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 1029 (S.D. Ohio 2001).................................................................................14

*In re Theragenics Corp. Secs. Litig.*, 205 F.R.D. 687 (N.D. Ga. 2002).................53

*Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008).......................54

*Tierno v. Rite Aid Corp.*, 2007 U.S. Dist. LEXIS 89582 (N.D. Cal. Nov. 19, 2007).................................................................................75

*Trulis v. Barton*, 107 F.3d 685 (9th Cir. 1995)........................................................27

*Unified Sewerage Agency v. Jelco, Inc.,* 646 F.2d 1339 (9th Cir. 1981) ...............21

*United States v. Stepney*, 246 F. Supp. 2d 1069 (N.D. Cal. 2003)..........................18

*United States v. Sumner*, 226 F.3d 1005 (9th Cir. 2000) ........................................25

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ..............35, 73, 74

*Vaughter v. Eastern Air Lines, Inc.,* 817 F.2d 685 (11th Cir. 1987).......................75

*In re Warren*, 568 F.3d 1113 (9th Cir. 2009) .........................................................25

*White v. E-Loan, Inc.*, 2006 U.S. Dist. LEXIS 62654 (N.D. Cal. Aug. 18, 2006).................................................................................35, 57

*Williams v. Boeing Co.*, 225 F.R.D. 626 (W.D. Wash 2005).................................49

*Ybarrondo v. NCO Fin. Sys., Inc.*, 2008 U.S. Dist. LEXIS 4353 (S.D. Cal. Jan. 18, 2008).................................................................................31

State Cases

*7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135 (2000) .................................................................................19

*Alberts v. Franklin*, 2004 Cal. App. LEXIS 8309 (Sept. 1, 2004) ....................19, 20

*Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253 (2005).................................................................................13

*Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th 715 (2004) ..............................54

xi

*Clark v. American Residential Servs., LLC*, 175 Cal. App. 4th 785, (2009)........................................................................................................ 31

*Flatt v. Superior Court*, 9 Cal. 4th 275 (1994) ............................................. 16, 21, 22

*Forrest v. Baeza*, 58 Cal. App. 4th 65 (1997) ........................................... 22

*Johnson v. Haberman & Kassoy*, 201 Cal. App. 3d 1468 (1988) .......................... 24

*Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116 (2008) ........................ 62

*State ex rel. Byrd v. Chadwick*, 956 S.W.2d 369 (Mo. Ct. App. 1997) .............24-25


Federal Statutes

15 U.S.C. § 1601..................................................................................................... 2

15 U.S.C. § 1681a................................................................................................. 56

15 U.S.C. § 1681e................................................................................................. 46

15 U.S.C. § 1681i ................................................................................................... 2


Federal Rules

16 C.F.R. Part 600 app. § 607.3 .............................................................. 40


State Rules

C.D. Cal. L.R. 83-3.1.2.......................................................................................... 11

C.D. Cal. L.R. 83-2.9.2.1..................................................................... 8, 17, 24

Conduct Rule 1-120.............................................................................................. 20

Conduct Rule 1-320.............................................................................................. 30

Conduct Rule 3-310 (C)(3) .................................................................................. 16

Conduct Rule 3-500.............................................................................................. 27

Conduct Rule 3-510A............................................................................................ 27

xii

Conduct Rule 3-700 ................................................................................ 8

Model R. Prof. Conduct 1.2 .................................................................. 27

1 Witkin Cal. Procedure, Attorneys, § 128 (4th ed. 1996) ....................... 24

xiii

The objecting Plaintiffs, Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III and Arnold Lovell (the "*White* Plaintiffs"), submit these Objections to the proposed class action Settlement.

## PRELIMINARY STATEMENT

This Court should reject the Settlement for four principal reasons.

First, were it distributed equally among the three, 10 million-person classes, the Settlement would result in each Defendant paying each class member about ***90 cents*** for the relinquishment of his or her $100 minimum statutory damage claim.

Second, rather than paying each class member 90 cents and laying bare the utter inadequacy of the recovery, the Settlement is designed to pay two-thirds of the recovery to less than 1% of the class – thereby sacrificing the claims of more than 99% of the class.

Third, unwilling to risk opposition from the *White* Plaintiffs at the preliminary approval stage, the *White* Plaintiffs' former counsel ignored the repeated instructions to suspend their support for the Settlement or withdraw from representing them – thereby violating the ethical rule barring simultaneous representation of clients with adverse interests.

Finally, counsel for Plaintiffs, Jose Hernandez, Robert Randall, Bertram Robison and Kathryn Pike (the "Settling Plaintiffs"), again violated the ethical rules and created a disabling conflict between themselves and the class representatives, on the one hand, and the class at large, on the other, by writing provisions into the Settlement that denied attorneys' fees and $5,000 incentive awards to plaintiffs or counsel who might oppose the Settlement.

## STATEMENT OF FACTS

The *White* Plaintiffs are five individuals whose debts were discharged through Chapter 7 bankruptcy proceedings, but whose credit reports still showed one or more of those debts as delinquent following the discharge.  On November 2, 2005, the *White* Plaintiffs filed separate class action lawsuits against Defendants Experian

1

Information Solutions, Inc., Trans Union L.L.C. and Equifax Information Services, LLC alleging that: (1) the Defendants' procedures for reporting the status of pre-bankruptcy debts were not reasonably designed "to assure maximum possible accuracy," in willful violation of their obligations under section 1681e(b) of the Fair Credit Reporting Act, 15 U.S.C. §§ 1601 *et seq.* (the "FCRA"); and (2) the Defendants' practices for reinvestigating those debts were unreasonable in willful violation of their duties under 15 U.S.C. § 1681i.  Plaintiffs sought injunctive relief and statutory damages.

*1. The Formation Of The Lieff/Caddell Team:*  The *White* Plaintiffs are the original clients of Charles Juntikka, a New York City bankruptcy attorney who, together with his colleague, Daniel Wolf, enlisted Lieff Cabraser Heimann & Bernstein, LLP ("Lieff") to prosecute these actions on behalf of the *White* Plaintiffs in October 2005.  That same month, another legal team – led by Caddell & Chapman, P.C. ("the Caddell team") – filed a parallel class action against all three Defendants on behalf of Jose Hernandez in the Northern District of California. After learning of each other's filings, the two legal teams, together with the National Consumer Law Center (collectively, "the Lieff/Caddell team"), agreed to consolidate and jointly prosecute their cases in this District.  In their Joint Prosecution Agreement, the Lieff and Caddell teams agreed that NCLC would be authorized to appear on behalf of both the *White* Plaintiffs and plaintiff Hernandez. (Declaration of Adam R. Shaw, sworn to on Dec. 14, 2009, ¶ 2) ("Shaw Decl."). The Agreement, however, expressly disavows any intention to make the Lieff team co-counsel to plaintiff Hernandez or the Caddell team co-counsel to the *White* Plaintiffs.  (*Id.*).

*2.   The Defeat Of The Acosta/Pike Settlement And The Approval Of The Injunctive Relief Settlement:*  One year after the filing of the *White* and *Hernandez* lawsuits, in November 2006, counsel for plaintiffs in two related class actions lawsuits – *Acosta v. Trans Union, L.L.C.*, No. 06-5060 (C.D. Cal.) and *Pike v.*

2

*Equifax Information Services, LLC*, No. 05-1172 (C.D. Cal.) – sought to settle their cases and release the claims of all the members of the Trans Union and Equifax classes.  The *White/Hernandez* Plaintiffs opposed the *Acosta/Pike* settlement and, in March 2007, this Court issued a decision that: (1) denied class certification on the ground that the *Acosta/Pike* Plaintiffs were inadequate class representatives; and (2) denied preliminary approval of the settlement on grounds, among others, that it contained "serious structural defects" and "deliver[ed] grossly insufficient relief." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386, 400 (C.D. Cal. 2007).

Subsequently, Experian sought summary judgment on the issue of willfulness. On August 13, 2007, this Court issued a Tentative Order, finding that willfulness was "for the trier of fact to ultimately resolve."  (Tentative Order Granting In Part and Denying In Part Defendant's Motion for Partial Summary Judgment at 10, Aug. 13, 2007, Dkt. # 169) ("Summary Judgment Tentative Order").  At this Court's suggestion, Experian withdrew its motion and the parties began settlement negotiations.

On April 3, 2008, following limited discovery and lengthy negotiations, all parties in these related actions agreed to an injunctive relief settlement that requires Defendants to treat all delinquent pre-bankruptcy debts in a Chapter 7 case as discharged, except when it is apparent from information in their files that a particular debt has been excluded from discharge.  On August 19, 2008, this Court approved that settlement, finding that its revised procedures were reasonable "to assure the maximum possible accuracy" of Defendants' credit reports and, hence, complied with the FCRA.  (Approval Order Regarding Settlement Agreement and Release ¶ 5.4, Aug. 19, 2008, Dkt. # 338) ("Approval Order").

For the next five months, the parties continued their settlement efforts in regard to monetary relief.  In an apparent effort to help the parties break the impasse, this Court issued a Tentative Order in January 2009, denying class certification for lack of commonality, adequacy, typicality, predominance and superiority.  (Tentative

3

Order Denying Pls.' Mot. For Class Cert. at 7-10, Jan. 26, 2009, Dkt. # 369-1).

***3. The White Plaintiffs' Demand That Their Counsel Oppose The Proposed Settlement:*** On February 5, 2009, following another lengthy period of negotiation, counsel for the Settling Plaintiffs reached an agreement with Defendants on the overall amount of a proposed monetary relief settlement – $15 million per Defendant (or a cumulative total of $45 million), resulting in a net payment to the combined classes of about $27.75 million, after deductions of $11.25 million for attorneys' fees and an estimated $6 million for notice and administrative costs. (Order Granting Prelim. Approval to Proposed Settlement at 5, 11, May 7, 2009, Dkt. # 423).[1] Messrs. Wolf and Juntikka immediately opposed that settlement on the ground that it would release the claims of each member of three separate ten million-member classes for an award averaging less than 1% of the $100 statutory minimum to which they are entitled.   (Declaration of Charles Juntikka, sworn to on Dec. 14, 2009, ¶ 3)  ("Juntikka Decl.").

Several days later, without consulting the *White* Plaintiffs and despite their knowledge that Messrs. Wolf and Juntikka would be advising the *White* Plaintiffs to oppose the Settlement, the Lieff/Caddell team proposed a schedule to Defendants under which settlement papers would be filed on April 24 and a preliminary approval hearing would be held on April 27 – just one business day later.   (Shaw Decl. ¶ 3).   Tellingly, when counsel for Equifax asked that the hearing date be moved back, Lieff's lead attorney, Michael Sobol, replied that he had "good reason" to leave it where it was, but would "rather not go into [it]." (*Id.* ¶ 5).

On March 9, 2009, the Settling Parties filed their proposed schedule with the preliminary approval hearing moved to May 4 – six business days after the filing of the Settlement.  Upon learning of the filing of that schedule later that day, Messrs.

---

[1] As part of the Settlement, Defendants agreed to pay an additional $6 million in attorneys' fees for services rendered in connection with injunctive relief, which is the subject of a separate settlement. (Settlement Agreement and Release at 9, Apr. 24, 2009, Dkt. # 388, Ex. 1) ("Settlement Agreement").  Thus, if the proposed Settlement is approved, the total fee will be $17.25 million.

4

Wolf and Juntikka wrote Lieff and NCLC, informing them that the *White* Plaintiffs unanimously opposed the Settlement and had instructed their attorneys to reject it. (Juntikka Decl. ¶ 10, Ex. C). Ten days later, Mr. Wolf e-mailed Lieff and NCLC, expressing his "trust that, consistent with the ethical rules, you have taken no actions during this period that are supportive of the proposed settlement that your clients oppose and will not take any such actions so long as you continue to represent them." (*Id.* ¶ 13, Ex. E).

**4. Lieff's And NCLC's Refusal To Comply With Their Clients' Instructions:** On March 23, 2009, the Lieff/Caddell team sent a letter to Messrs. Wolf and Juntikka in which they (1) refused either to cease supporting the Settlement or withdraw from representing the *White* Plaintiffs, and (2) chastised Messrs. Wolf and Juntikka for sharing their views regarding the Settlement with the *White* Plaintiffs before its tentative terms had been "memorialized" in a final agreement. The same letter instructed the *White* Plaintiffs to take no action opposing the Settlement until (1) they had reviewed that written agreement, and (2) the Lieff/Caddell team had been given a chance to change their minds. Finally, the letter warned Messrs. Wolf and Juntikka that if the *White* Plaintiffs failed to heed this instruction, it would call into question their ability to serve as class representatives. (*Id.* ¶¶ 14-16, Ex. F).

Over the next ten days, Messrs. Wolf and Juntikka twice wrote the Lieff/Caddell team, assuring them that they "have been and remain free to communicate their views about the proposed settlement to the *White* Plaintiffs" and cautioning them not "to take actions in support of the proposed settlement . . . until such time as you withdraw from representing" the *White* Plaintiffs or persuade them to change their minds. (*Id.* ¶¶ 17-21, Exs. G, H).

On April 8, 2009, in response to a Lieff/Caddell team letter professing doubt about their true position, four out of five of the *White* Plaintiffs responded by confirming in writing that they were, in fact, opposed to the Settlement, with the fifth confirming the same one week later. (*Id.* ¶ 22, Exs. I, J, K). Despite having

5

received this letter and four earlier communications informing them of the *White* Plaintiffs' opposition to the Settlement, the Lieff/Caddell team said nothing to counsel for Defendants about that opposition and continued to negotiate the terms of the Settlement, thus implicitly representing that they were acting with the *White* Plaintiffs' authority.  (*Id.* ¶ 34).[2]

***5.   The Lieff/Caddell Team's Unsuccessful Efforts To Persuade The White Plaintiffs To Change Their Minds:***  On April 16, 2009 – a full 38 days after they had learned of the *White* Plaintiffs' opposition to the Settlement – the Lieff/Caddell team met with two of the five *White* Plaintiffs (plaintiffs Clifton Seale and Arnold Lovell) to discuss its terms.  (*Id.* ¶ 24).  For the very first time, the Lieff/Caddell team revealed a draft of the Settlement and took turns trying to convince plaintiffs Seale and Lovell that it was a good deal.  (*Id.* ¶¶ 24-25).

Upon reviewing the Settlement, the *White* Plaintiffs learned that: (1) to be eligible for payments, class members must submit a claim form, affirming their "belie[f] that there have been one or more errors in my credit reports regarding debts discharged in bankruptcy" or that they have been damaged by such errors (Notice of Final Forms of Notice of Class Action Settlement, Ex. A at 2, Aug. 18, 2009, Dkt. # 458) ("Final Forms of Notice"); (2) the reinvestigation subclass would receive no consideration for the release of their separate reinvestigation claims (Final Forms of Notice, Ex. C at 3-6); and (3) payment of $5,000 incentive awards and attorneys' fees would be made only to named Plaintiffs and their attorneys who support the Settlement.  (*Id.*, Ex. C at 4).[3]

---

[2]   Given the absence of any other plausible explanation, the inference is virtually inescapable that the reason for the Lieff/Caddell team's silence was their calculation that the negotiations might be derailed if defense counsel found out about the *White* Plaintiffs' opposition before the settlement terms were all locked in.  In other words, it appears that the Lieff/Caddell team leveraged the *White* Plaintiffs' supposed support for an agreement they unanimously opposed as a means of securing that deal.

[3]   The Settling Parties estimate that the awards for those who can affirm that they suffered damages will range from $150 to $750 (depending on the number of claims filed).  (Final Forms of Notice, Ex. C at 5; Settlement Agreement ¶ 7.7).  The Settlement gives these "actual damage" claims priority over all other claims,

At the conclusion of the April 16 meeting, plaintiff Seale told both Mr. Sobol and Mr. Stuart Rossman of NCLC that he was not convinced by their arguments and that he continued to oppose the proposed Settlement. (Juntikka Decl. ¶ 25; Declaration of Clifton C. Seale, III, sworn to on May 3, 2009, ¶ 14, attached to Shaw Decl. as Ex. Y). Plaintiff Lovell communicated the same message in a letter he sent to Messrs. Sobol and Rossman the next day. (*Id.*; Declaration of Arnold E. Lovell, sworn to on May 8, 2009, ¶ 13, attached to Shaw Decl. as Ex. E) ("Lovell Decl.").

On April 21, 2009, the Lieff/Caddell team's lead counsel informed Mr. Wolf that they still intended "to reach out" to some of the *White* Plaintiffs before filing the Settlement. (Declaration of Daniel Wolf, sworn to on May 21, 2009, ¶ 10, attached to Shaw Decl. as Ex. F) ("Wolf Decl."). Two days later, on April 23, Mitchell Toups of the Caddell team called plaintiff Lovell in a last ditch effort to change his mind, informing plaintiff Lovell that he would "jeopardize" his $5,000 incentive award if he did not come on board and support the Settlement. (Lovell Decl. ¶ 14).

**6. *Lieff's And NCLC's Filing Of The Settlement And Resistance Of Their Clients' Efforts To Oppose It:*** On April 24, 2009, despite having failed to persuade plaintiffs Lovell and Seale to change their minds about the Settlement and despite having **never** discussed its terms with the three other *White* Plaintiffs, Lieff and NCLC filed the Settlement with the Court. (Juntikka Decl. ¶¶ 26-31).

On that same day, the *White* Plaintiffs wrote this Court requesting that it set a

---

except that it reserves a residual pool of at least $10 million for the payment of "convenience" awards to those who are unable to attest that they suffered such actual damages. (Settlement Agreement ¶ 7.7). That pool is likely to be greater than $10 million because even if only 1% of the aggregate class of 15 million claimants were to file "actual damage" claims at only the $150 level, that would amount to $22.5 million of the $27.75 million available for distribution. Thus, the Settling Parties' estimate that the convenience award will come to $20 per person (Final Forms of Notice, Ex. C at 5) appears to be based on a calculation that no more than 500,000 individuals, or 3.75% of the 15 million member aggregate class, will seek "convenience" awards out of the $10 million residual fund.

7

briefing schedule that would allow for the filing of their opposition papers. Ignoring the fact that they still represented the *White* Plaintiffs, Lieff and NCLC filed a declaration (*see* Dkt. # 389) in opposition to their own clients' request for time to file an opposition – falsely stating that the *White* Plaintiffs had known all of the key settlement terms since February 5.  (Juntikka Decl. ¶ 36).[4]  Five days **later**, on April 29 and 30, Lieff and NCLC filed "notices" purporting to withdraw as counsel for the *White* Plaintiffs, but did not file any motion seeking leave to withdraw as required by C.D. Cal. L.R. 83-2.9.2.1 and Rule 3-700 of the Rules of Professional Conduct of the State Bar of California ("Conduct Rules").

*7.  **This Court's May 7, June 9 and July 29 Orders:***  On May 7, 2009, this Court issued orders denying the *White* Plaintiffs' application for time to file their opposition papers and granting the Settling Plaintiffs' motions for preliminary approval of the Settlement, class certification and appointment of class counsel.  On June 9, 2009, this Court issued an order denying the *White* Plaintiffs' motions to reconsider that order.

On July 27, 2009 – ***110 days after*** the White Plaintiffs' first instructed them to suspend their support for the Settlement or withdraw – Lieff and NCLC finally filed a motion seeking leave to withdraw.  On July 29, 2009, this Court issued an order granting that motion *nunc pro tunc* to April 29, 2009.

## PART ONE: OBJECTIONS TO APPOINTMENT OF CLASS COUNSEL AND CLASS CERTIFICATION

In their haste to obtain judicial approval of a settlement that would pay them up to $17.25 million in legal fees, but would leave class members with a penny on the dollar for the relinquishment of their statutory damage claims, counsel for the

---

[4]   The White Plaintiffs could not have known all of the material terms of the Settlement by February 5 because it was not until April 16, 2009 that the Settling Parties had even agreed to: (1) the class definition; (2) the criteria for making a claim; (3) the formula for distributing payments; (4) the treatment of the subclasses; (5) the scope of the release (*e.g.*, whether it would encompass actual damage claims); (6) the criteria for any incentive awards; (7) the elements of the notice; and (8) the mechanism for opting out.  (Juntikka Decl. ¶¶ 2, 25).

Settling Plaintiffs lost their ethical bearings. As a result they have engaged in a course of conduct that renders both themselves and their clients unfit to represent the interests of the class.

First, the *White* Plaintiffs' former counsel violated the ethical rules prohibiting simultaneous representation of clients with adverse interests by aggressively supporting the proposed settlement in defiance of the *White* Plaintiffs' repeated instructions to oppose that settlement or withdraw from representing them.

Second, the *White* Plaintiffs' former counsel compounded that violation by conducting a calculated campaign to deny their own clients an opportunity to oppose the Settlement before preliminary approval by: (1) admonishing the *White* Plaintiffs not to take any action in opposition to the Settlement until the final terms had been agreed upon and discussed with them; (2) refusing to share those terms or to start talking to the *White* Plaintiffs about them until one week before the filing date (and never consulting three of them at all); and (3) successfully opposing their own clients' request for time to file their objections to preliminary approval on the manifestly false ground that they had known all the key terms for months.

Third, counsel for all of the Settling Plaintiffs created a disabling conflict of interest between themselves and the other named Plaintiffs, on the one hand, and the rest of the class, on the other, by putting provisions in the Settlement that made Plaintiffs' counsel's eligibility for fees and their clients' eligibility for $5,000 incentive awards contingent on their "support" for the Settlement. Compounding this violation, they told one of the *White* Plaintiffs that he would "jeopardize" his $5,000 award if he did not provide such support.

In short, counsel for the Settling Plaintiffs did everything in their power to secure their fees and prevent opposition to the Settlement, going so far as to attempt strong-arming their own clients into supporting that settlement and to affirmatively oppose their own clients' efforts to obtain a meaningful opportunity to present their objections at the preliminary approval stage. They did all of this knowing that if

9

they could push their Settlement past that hurdle, the momentum favoring the Settlement at the final approval hearing – by which time some $6 million would have been spent to notify 15 million class members – could be insurmountable. The ethical violations that counsel for the Settling Plaintiffs have perpetrated to achieve this result should result in their automatic disqualification and prevents both themselves and their clients from representing the class.

## I.    Counsel For The Settling Plaintiffs Are Unfit To Represent The Class.

As fiduciaries for absent class members, class counsel are, in a very literal sense, a "fiduciary's fiduciary" who "assume[] a particularly heavy responsibility even beyond that owed by a lawyer to an individual client." *Deadwyler v. Volkswagen of America, Inc.,* 134 F.R.D. 128, 139 (W.D.N.C. 1991), *aff'd*, 966 F.2d 1443 (4th Cir. 1992). Class counsel's obligation to honor this responsibility faces its greatest test in the settlement context, where the temptation to maximize or secure substantial fees may cause counsel to subordinate the interests of the class to their own. *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) ("class actions are rife with potential conflicts of interest between class counsel and class members").

Given this combination of heightened risk and responsibility, the California courts, in particular, have adopted a "stringent approach to conflicts involving representation of absent class members," *Moreno v. AutoZone, Inc.*, 2007 U.S. Dist. LEXIS 98250, at *20 (N.D. Cal. Dec. 5, 2007), and, hence, are "more likely" to disqualify counsel in class action settings when their conduct runs afoul of the ethical rules. *Id.* at *20-21; *see also Huston v. Imperial Credit Commercial Mortgage Invest. Corp.*, 179 F. Supp. 2d 1157, 1167 (C.D. Cal. 2001). Applying these standards, counsel for the Settling Plaintiffs are clearly unfit to represent the class.[5]

---

[5]  In determining whether counsel have committed ethical violations that would disqualify them from representing an individual or a class, the rules of this Court require it to apply California's ethical standards. *Rodriguez v. West Publ'g Corp.*,

10

**A. Counsel For The Settling Plaintiffs' Unethical Conduct In Regard To Incentive Awards Renders Them Unfit To Represent The Class.**

By its terms, the Settlement provides that counsel for the Settling Plaintiffs shall seek $5,000 incentive awards only for each of the Named Plaintiffs who "support" the Settlement.  (Settlement Agreement ¶ 7.5).  The Settlement makes no provision for the payment of incentive awards for the Named Plaintiffs who oppose it.  In creating this unnecessary distinction, counsel for the Settling Plaintiffs have compromised the independence of all the class representatives who supported the Settlement and, thereby, have disqualified themselves from representing the class.

Under the law of this Circuit, a court may award incentive fees to named plaintiffs in order "to compensate [them] for work done on behalf of the class".  *Rodriguez*, 563 F.3d at 958.  Even under ordinary circumstances, such incentive awards carry with them an inherent potential for putting "the class representative[s] in a conflict with the class," *id.* at 960, for when they are offered such awards, "they may be more concerned with maximizing those incentives than with judging the adequacy of the settlement as it applies to class members at large."  *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).  As a result, "applications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs . . . to compromise the interest of the class for personal gain."  *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003).

In tethering incentive fees to each Named Plaintiffs' willingness to back their settlement position, counsel for the Settling Plaintiffs have elevated this inherent, but generally manageable, conflict into a disabling one.  Indeed, exploiting that conflict, one of the attorneys for the Settling Plaintiffs called plaintiff Lovell the day before the Settlement was filed, saying that he hoped plaintiff Lovell would change his mind because he did not want him to "jeopardize" his last chance to get that award.  (Lovell Decl. ¶ 14).

563 F.3d 948, 967 (9th Cir. 2009); C.D. Cal. L.R. 83-3.1.2.

11

Such threats by class counsel "to not request incentive payments" for named plaintiffs "if they did not agree to [a] Settlement" have been aptly characterized as "an actual manifestation of conflicting interest."  *Rodriguez v. West Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74767, at *79 (C.D. Cal. Sept. 10, 2007).  As unseemly and improper as they would be in any context, counsel for the Settling Plaintiffs' threats are particularly dangerous in this one where $5,000 incentives were dangled in front of named plaintiffs of limited financial means and were an estimated 250 times higher than the amounts they would have received had they been treated like most other class members.

As the Ninth Circuit's recent opinion in *Rodriguez* makes clear, any attorney who would participate in such an improper incentive fee arrangement is unfit to serve as class counsel.  In that case, named plaintiffs entered into retainer agreements in which their counsel promised to seek incentive awards that would tie their "compensation – in advance – to a sliding scale based on the amount recovered" until that compensation capped out at $75,000. *Rodriquez*, 563 F.3d at 959.  In so doing, "the incentive agreements disjoined the contingency financial interests of the contracting representatives from the class" because, once the threshold for the cap was reached, the named plaintiffs would have had no incentive to take the case to trial.  *Id.*  Thus, the incentive agreements created unacceptable "conflicts among [the named plaintiffs] (later certified as class representatives), their counsel (later certified as class counsel), and the rest of the class," which implicated the ethical rules prohibiting "'[s]imultaneous representation of clients with conflicting interests'" and rendered class counsel unfit to represent the class.  *Id.* at 967-68.

Like the incentive agreements in *Rodriguez*, the conditioning of incentive awards on the Named Plaintiffs' endorsement of the proposed settlement in this case "created an unacceptable disconnect between the interests of the [endorsing] representatives and class counsel, on the one hand, and members of the class on the other."  563 F.3d at 960.  And, as in the case of the *Rodriguez* incentive contracts,

"the conflict of interest inhering" in the conditioning of incentive awards on the Named Plaintiffs' support for the Settlement was neither one that "just happen[ed]" nor "that developed beyond the control or perception of class counsel."  *Id.* at 968. To the contrary, it was a direct byproduct of their own self-serving decision to turn an incentive award that is supposed to compensate named plaintiffs for their time into an incentive to rubber-stamp their counsels' decisions regarding settlement.

In this respect, the improprieties of counsel for the Settling Plaintiffs in regard to named plaintiff incentive awards are far more egregious than those that were at issue in *Rodriguez*.  By holding their clients' entitlement to a $5,000 incentive award hostage to their support for a settlement that would pay settling counsel up to $17.25 million in legal fees (*see* note 1 *supra*), counsel for the Settling Plaintiffs robbed the Named Plaintiffs of the independence they needed to effectively monitor the conduct of class counsel when such monitoring was needed most.[6]  In short, by turning their clients into little more than hired help whose pay is contingent on their willingness to serve as their "yes men" and who can be discarded at their whim, counsel for the Settling Plaintiffs have "effectively made [themselves] the class representative" and, thereby, rendered themselves unfit to serve as class counsel.[7]

Counsel for the Settling Plaintiffs have defended their decision to offer incentive payments only to those Named Plaintiffs who supported the Settlement on the

---

[6]   *See, e.g.*, *Olden v. Gardner*, 2008 U.S. App. LEXIS 20092, at *30-31 (6th Cir. Sept. 18, 2008) ("[o]versight from the class representatives is particularly important in the context of settlements"); *Deadwyler*, 134 F.R.D. at 139; *In re Calif. Micro Devices Secs. Litig.*, 168 F.R.D. 257, 268 (N.D. Cal. 1996) ("'[f]air and adequate' representation requires that the class representative be both willing and able to monitor closely the conduct of class counsel during settlement negotiations").

[7]   *Calif. Micro Devices*, 168 F.R.D. at 262, 274 (noting that if one attorney could play both role of class counsel and class representative, "he would be sorely tempted to sacrifice the interests of his fellow class members in favor of maximizing his own fees" and citing a "long line of cases" that "expressly forbid[]" this situation); *see also In re Chiron Corp. Secs. Litig.*, 2007 U.S. Dist. LEXIS 91140, at *46 (N.D. Cal. Nov. 30, 2007) ("When class counsel are not effectively monitored by the class representative, the result is indistinguishable from the situation in which an attorney serves as both class counsel and class representative."); *Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253, 1267 (2005) (citing numerous cases for proposition that "disqualification is required where class counsel serves as the class representative").

13

ground that they were aware of no authority to support the proposition that such payments can be made to persons who are not appointed class representatives. That explanation is not credible. First, there was nothing to prevent counsel for the Settling Plaintiffs from asking this Court to make the *White* Plaintiffs class representatives. Second, the courts have routinely awarded incentive payments to named plaintiffs who were not appointed class representatives.[8] Furthermore, the courts have awarded such payments to named plaintiffs without regard to whether they supported or opposed a proposed class action settlement.[9]

## B. **Counsel For The Settling Plaintiffs' Unethical Conduct Regarding The Award Of Attorneys' Fees Renders Them Unfit To Represent The Class.**

Consistent with its provision denying any compensation to the *White* Plaintiffs for their services on behalf of the class, the Settlement also provides that only counsel for the Settling Plaintiffs shall be eligible for an award of attorneys' fees if the Settlement is approved. (Settlement Agreement ¶ 1.24) (defining "Monetary Relief Fees" as "attorneys' fees and expenses . . . incurred by Proposed 23(b)(3) Settlement Class Counsel"). In other words, just as they would punish the *White* Plaintiffs for their refusal to support the Settlement, counsel for the Settling

---

[8] *See, e.g., Romero v. Producers Dairy Foods, Inc.*, 2007 U.S. Dist. LEXIS 86270, at *11 (E.D. Cal. Nov. 13, 2007) (awarding incentive payments to non-class representatives who sat for depositions); *Nilsen v. York County*, 382 F. Supp. 2d 206, 215 (D. Me. 2005) (awarding incentive payments to each class member who was deposed); *Camp v. Progressive Corp.*, 2004 U.S. Dist. LEXIS 19172 at *23 (E.D. La. Sept. 23, 2004) ("[t]he Class Representatives and some other plaintiffs will receive incentive payments for their participation in this litigation"); *Hughes v. Microsoft Corp.*, 2001 U.S. Dist. LEXIS 5976, at *36-38 (W.D. Wash. Mar. 26, 2001) (granting incentive awards to 10 named plaintiffs in an uncertified class action that was subsumed in another class action that settled); *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 1029, 1034-37 (S.D. Ohio 2001) (ordering incentive awards for class representatives and other named plaintiffs who "assisted in the prosecution of this litigation"); *Day v. NLO, Inc.*, 1995 U.S. Dist. LEXIS 22316, at *9 (S.D. Ohio May 19, 1995) (same).

[9] *See, e.g., Lazy Oil Co. v. Witco Corp.,* 95 F. Supp. 2d 290, 324-25 (W.D. Pa. 1997) (granting incentive awards to class representatives who ended up objecting to settlement); *Martin v. Foster Wheeler Energy Corp.*, 2008 U.S. Dist. LEXIS 25712, at *23-24 (M.D. Pa. Mar. 31, 2008) (same). Likewise, named plaintiffs who become objectors to a settlement are no less entitled to an award of attorneys' fees for the pre-objection services their counsel rendered to the class than are named plaintiffs who support the settlement.

14

Plaintiffs would punish any of the Named Plaintiffs' attorneys who might support their decision to oppose the Settlement.  Indeed, when Mr. Wolf told Mr. Sobol that his objections to the Settlement were based on principle, Mr. Sobol replied that he agreed because, by making them, Mr. Wolf would be forfeiting his claim for attorneys' fees.  (Juntikka Decl. ¶ 3).

Counsel who object to a class action settlement are, of course, every bit as much entitled to compensation for their pre-objection services on behalf of a class or putative class as are counsel who support it.[10]  Yet, ignoring this basic principle, counsel for the Settling Plaintiffs have agreed to a provision under which any attorney who supports the Settlement will be rewarded not only by being compensated for their own time but also for the labor of the attorneys opposing the Settlement, who will get nothing.  In their haste to maximize their own fees, counsel for the Settling Plaintiffs have thereby created a conflict of interest between themselves and the classes they seek to represent.

That conflict is disabling.  Once counsel for the Settling Plaintiffs determined that only those attorneys who supported the Settlement would be eligible for attorneys' fees, they placed enormous and intolerable pressure on each individual attorney within their group to continue supporting the Settlement, for if any of them chose to join the *White* Plaintiffs in opposing it, they would automatically lose their share of an anticipated $11.25 million fee award and thousands of hours of their work would go uncompensated.  *See Ace Heating*, 453 F.2d at 35 ("[i]t would chill challenges to the fairness" of class settlements if bringing such challenges were to "result[] in forfeiture of the right to be reimbursed for compensable legal services").  In other words, the disconnect that counsel for the Settling Plaintiffs have created between their own interests and those of the class by denying reimbursement to

---

[10]   *See, e.g., Elliot v. Sperry Rand Corp.*, 680 F.2d 1225, 1227 (8th Cir. 1982) (holding that named plaintiffs who became dissenters were entitled to "an appropriate award of attorneys' fees . . . [for] services in proceedings leading to approval of the settlement"); *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 35 (3d Cir. 1971) (same).

15

attorneys opposing the Settlement is even greater than the one they created between the Settling Plaintiffs and the class when they made their eligibility for incentive awards contingent on their supporting the Settlement.

There is a relationship between this conflict regarding eligibility for attorneys' fees and the conflict regarding eligibility for incentive awards that serves to underscore both conflicts – and counsel for the Settling Plaintiffs' inability to serve the interests of the class.  Settling Plaintiffs' counsel could not, on the one hand, take the position that named plaintiffs who oppose a settlement are entitled to be reimbursed for their services on behalf of the class, while, on the other hand, argue that their counsel are entitled to nothing for theirs.  It takes little imagination to understand that in taking the position that the *White* Plaintiffs are ineligible for incentive awards, their former counsel were thinking more about how they could maximize their own fees, than how to protect the interests of their clients.

### C.  The Lieff/Caddell Team's Breach Of Their Duty Of Undivided Loyalty Renders Them Unfit To Represent The Class.

#### 1.  The Lieff/Caddell Team Has Violated The Ethical Rule Barring The Simultaneous Representation Of Clients With Adverse Interests.

Under the ethical rules that govern Settling Plaintiffs' counsel, an attorney may not represent clients whose interests are adverse to each other without their "informed written consent."  Conduct Rule 3-310(C)(3).  "The paradigmatic instance of such prohibited dual representation . . . occurs where the attorney represents clients whose interests are ***directly*** adverse ***in the same litigation***." *Flatt v. Superior Court,* 9 Cal. 4th 275, 285 n.3 (1994) (emphasis in original).  That is precisely the violation that has occurred here.

On five separate occasions between March 9 and April 8, the *White* Plaintiffs wrote Lieff and NCLC, informing them of their unanimous opposition to the settlement and instructing them to suspend their support for it or withdraw. (Juntikka Decl. ¶¶ 10, 12-13, 17-22, Exs. C, D, E, G, H, J).  Yet, despite being

16

advised of their ethical obligations, Lieff and NCLC refused to withdraw and, instead, continued to take measures to advance the Settlement the *White* Plaintiffs opposed, culminating with: (a) their filing that settlement on April 24 – five days **before** their hollow efforts to withdraw on April 29 and 30; (b) their filing of a declaration on April 24 resisting their own clients' motions for time to file their objections (*see* Dkt. # 389); and (c) their subsequent opposition to their clients' motions for reconsideration (*see* Dkt. # 432) and applications for appellate review. Indeed, because they were not granted leave to withdraw in accordance with C.D. Cal. L.R. 83-2.9.2.1 until July 29, Lieff and NCLC continued to represent the *White* Plaintiffs as counsel of record in this matter and, hence, continued to violate their ethical obligations until that day.

The Lieff/Caddell team does not and cannot dispute that, once the *White* Plaintiffs decided to oppose the Settlement, their interests became adverse to those of plaintiff Hernandez and any other of the Named Plaintiffs who may have supported it.[11]   Thus, the conduct of NCLC, which represented both the *White* Plaintiffs and plaintiff Hernandez, ran directly afoul of the ethical proscription against simultaneous representation of clients with adverse interests.   The conduct of the Lieff firm, which expressly disavowed having formed any attorney-client relationship with plaintiff Hernandez when it executed the Joint Prosecution Agreement, was even more egregious.   (Shaw Decl, ¶ 2).   Inasmuch as the *White* Plaintiffs were Lieff's **only clients** during the period between March 9, 2009 when it began supporting the Settlement over their objections and July 29, 2009 when this Court granted its motion to withdraw, the only interests Lieff could have been

---

[11]   *See. e.g., Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 589 (3d Cir. 1999) (recognizing that class representatives who object to settlement "become adverse parties to the remaining class representatives"); *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1125 n.28 (7th Cir. 1979) (stating that an objector is "in an adversary relationship with both plaintiffs and defendants"); *Moreno*, 2007 U.S. Dist. LEXIS 98250, at *12; *Heit v. Van Ochten*, 126 F. Supp. 2d 487, 494 (W.D. Mich. 2001).

17

1   representing were **its own**.  *See* cases cited in note 7 *supra*.[12]

2       Citing a series of cases that recognize the right of class counsel to support a

3   settlement over the objections of the representative plaintiffs, the Lieff/Caddell team

4   has argued that the ethical rules prohibiting simultaneous representation of clients

5   with adverse interests do not apply here.   (Proposed Order Granting Prelim.

6   Approval at 24-25, Apr. 24, 2009, Dkt. # 388).   These cases are inapposite.

7       In *Moreno v. AutoZone*, the district court addressed the same authorities on

8   which the Lieff/Caddell team relies – all of which involved counsel who took acts

9   supportive of a class settlement on behalf of endorsing class representatives only

10  ***after*** counsel no longer represented the objecting class representatives.  The *Moreno*

11  court had little difficulty distinguishing those cases from a case like this one, in

12  which counsel "***simultaneously represent[ed]*** two different sets of clients that

13  actively have adverse interests."   2007 U.S. Dist. LEXIS 98250, at *20 (emphasis

14  added).   As the *Moreno* court correctly observed, "[t]he cases cited . . . do not

15  intimate, let alone hold, that such concurrent representation of adverse interests

16  could be appropriate." *Id.* at *19-20.

17      The four reported opinions that address this issue – three from California courts

18  – all hold that the ethical rules prohibit class and/or putative class counsel from

19  simultaneously representing clients who are both proponents and opponents of a

---

20  [12]   In its July 29 order, this Court found that the Caddell team had an ongoing

21  attorney-client relationship with the *White* Plaintiffs largely because the Lieff and

22  Caddell teams submitted a consolidated complaint and otherwise jointly pursued
    this litigation.  As the California Court of Appeal has made clear, however, the fact
    that two sets of attorneys may "cooperate . . . to pursue, a common objective" under

23  a joint defense agreement is insufficient to create "some ersatz attorney-client
    relationship."   *California ex rel. Barakat Consulting, Inc. v. Los Angeles Dep't of*

24  *Water & Power*, 2004 Cal. App. Unpub. LEXIS 7305, a *8-9 (Aug. 5, 2004); *see
    also Pope v. Rice*, 2005 U.S. Dist. LEXIS 4011, at *24-26 (S.D.N.Y. Mar. 14,

25  2005); *United States v. Stepney*, 246 F. Supp. 2d 1069, 1079-83 (N.D. Cal. 2003);
    *Essex Chemical Corp. v. Hartford Accident and Indem. Co.*, 993 F.Supp. 241, 253

26  (D.N.J. 1998).   Nor is the fact that the Lieff and Caddell teams described
    themselves as "Plaintiffs' counsel" in court filings and appearances sufficient to

27  "allege a bona fide, consensual co-counsel relationship, because such a relationship
    depends on, among other things, [each] plaintiff having consented" to each group's

28  representation of him or her as co-counsel.  *Pope*, 2005 U.S. Dist. LEXIS 4011, at
    *24.

class settlement and, in particular, from championing the cause of one of these two sets of clients over the other.

In *Moreno*, for example, a law firm represented five named plaintiffs, three of whom that firm was also representing as objectors to a settlement in another case against the same defendant and the other two of whom had submitted claims pursuant to that settlement. 2007 U.S. Dist. LEXIS 98250, at *8-9, 19-20. Noting that these two sets of clients had adverse interests, the court held that "Rule 3-310(C)(3) required [counsel] to obtain informed written consent to proceed with such concurrent representation" and that their failure to do so disqualified them from further involvement in the matter. *Id.* at *14-15.[13]

Likewise, in *7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135 (2000), the California Court of Appeal ruled that "the governing rule" is that withdrawal is "the appropriate course for counsel to take" where, as here, a majority of named plaintiffs oppose a proposed pre-certification settlement and instruct their counsel to cease negotiations. *Id.* at 1158-59.

Third, in *Alberts v. Franklin*, 2004 Cal. App. Unpub. LEXIS 5698 (June 16, 2004), the California Court of Appeal addressed a situation in which counsel failed to follow this governing rule. In that case, Franklin argued that, as class counsel, he had a duty to challenge as inadequate and collusive a class settlement that his client had supported over his objection. *Id.* at *65. While agreeing that, "as a general rule," such a duty exists, the Court of Appeal nonetheless ruled that Franklin could not fulfill it "at the expense" of one of his current clients. The Court explained that

---

[13] In their opposition to the *White* Plaintiffs' motions for reconsideration (Opp. to Obj. Pls.' Mot. for Reconsideration at 7 n.6, Dkt. # 432), Settling Plaintiffs tried to argue that *Moreno* is somehow inapposite because the court in that case distinguished the situation before it from one in which counsel "first represented the class, and *then* had sought to represent only a portion of the class, once various class members newly took adverse positions." 2007 U.S. Dist. LEXIS 98250, at *20 (emphasis added). The operative word is "then". As the next sentence in the *Moreno* opinion makes clear, that was "not the situation [t]here" (or here), where counsel "*simultaneously* represents two different sets of clients that actively have adverse interests" in the same case. *Id.* (emphasis added).

19

that:

> because [Franklin] simultaneously represented both the class and the
> [named plaintiff] individually and owed equal duties to both, he could
> not properly oppose the proposed settlement in [the class action] by
> taking an adversarial position to [his individual client]. *Id.* at *65-66.

The same result was reached in *Sanchez & Daniels v. Koresko & Assocs*, 2006 U.S. Dist. LEXIS 84232 (N.D. Ill. Sept. 14, 2006), a case in which counsel also took the position that "an attorney who represents both named plaintiffs and a class may labor under an inherent conflict of interest, particularly when the named plaintiff desires to settle his own claim." 2006 U.S. Dist. LEXIS 84232, at *72. While acknowledging that this may be so, the court nonetheless held that counsel:

> could not, consistent with his duty of loyalty, champion the class at
> [his client's] expense so long as he represented both of them, which he
> did at all relevant times. To do that, [counsel] would have had to
> withdraw from one representation or the other, which required leave of
> Court. *Id.* at *73-74.

Likewise, in the present case, by advancing a settlement contrary to the express wishes of the *White* Plaintiffs while still representing them as counsel of record in this matter, Lieff and NCLC have acted in a manner "inconsistent with [their] obligation of loyalty and faithfulness to [those] client[s]" and, hence, have "committed egregious misconduct." *Id.* at *78. Furthermore, inasmuch as the Caddell team knowingly assisted Lieff and NCLC in breaching their duties of undivided loyalty, they have committed no less serious a transgression. Conduct Rule 1-120 ("[a] member shall not knowingly assist in, solicit, or induce any violation of these rules"); *see also* cases cited in note 15 *infra*.

In arguing that they were free to ignore their own clients' instruction, Lieff and NCLC also overlook the fact that each of the cases they cite to justify their having done so involves the responsibilities of ***class counsel*** to a ***certified class***. Here, by contrast, Lieff and NCLC chose to subordinate their obligations to their actual clients to what they claim were the interests of a class that had not yet been

20

certified.  As the Ninth Circuit has made clear, however, "*a proposed class* . . . is not a legal entity to which any individual plaintiff's legal rights are to be sacrificed." *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 834 (9th Cir. 1976) (emphasis added); *see also Castaneda v. Burger King Corp.*, 2009 U.S. Dist. LEXIS 69592, at *13 (N.D. Cal. July 31, 2009) ("The case law is unambiguous that potential class members are unrepresented prior to class certification").  Thus, even assuming (incorrectly) that class counsels' broader fiduciary duties to the class would exempt them from the ethical rule prohibiting simultaneous representation of adverse interests, that exemption would be inapplicable here.[14]

### 2. The Lieff/Caddell Team's Violation Of The Ban On Simultaneous Representation Automatically Disqualifies It From Representing The Class.

Where, as here, an attorney simultaneously represents clients who oppose and support a class settlement without having obtained their "informed written consent," the result under the controlling California case law is "'*per se* or automatic' disqualification." *Moreno*, 2007 U.S. Dist. LEXIS 98250, at *15-16 (quoting *Flatt*, 9 Cal. 4th at 284); *see also Image Technical Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1358 (9th Cir. 1998).  In other words, and as the Ninth Circuit has itself made clear, disqualification of counsel who have violated the proscription against simultaneous representation does not depend on any "showing of specific 'adverse effect' resulting from such representation." *Certain Underwriters at Lloyd's of London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 919 (N.D. Cal. 2003) (citing *Unified Sewerage Agency v. Jelco, Inc.*, 646 F.2d 1339, 1345 (9th Cir. 1981)).  A showing of prejudice is not required because, in contrast to cases of successive representation in which the main interest is the preservation of confidential

---

[14]  This is not to say that counsel do not assume certain fiduciary duties to the uncertified class at the moment they file a class action.  They do.  But "the scope of those duties is limited to protecting the substantive legal rights of putative class members . . . from prejudice . . . resulting from the actions of [putative] class counsel." *Schick v. Berg*, 2004 U.S. Dist. LEXIS 6842, at *19 (S.D.N.Y. Apr. 20, 2004), *aff'd*, 2005 U.S. App. LEXIS 24671 (2d Cir. Nov. 17, 2005).

21

communications, "[t]he primary value at stake in cases of simultaneous or dual representation is the attorney's duty – and the client's legitimate expectation – of **loyalty**." *Flatt,* 9 Cal. 4th at 284 (emphasis in original); *see also Forrest v. Baeza*, 58 Cal. App. 4th 65, 74 (1997); *Moreno*, 2007 U.S. Dist. LEXIS 98250, at *17.

Thus, Lieff's and NCLC's dual representation of parties with adverse interests leaves this Court with no choice. Regardless of whether their disloyal conduct caused the *White* Plaintiffs any prejudice, it is "required to disqualify [them] from further representation in this matter." *Moreno*, 2007 U.S. Dist. LEXIS 98250, at *17; *see also Flatt*, 9 Cal. 4th at 286. Likewise, the Caddell team, which has all along known of the *White* Plaintiffs' opposition to the settlement and acted in concert with Lieff and NCLC, is also automatically disqualified from further involvement in this matter. [15]

Even if automatic disqualification were not the rule, the Lieff/Caddell team's disqualification would be warranted because their conduct clearly **did** cause prejudice to the *White* Plaintiffs – and by design. **First**, they tried to schedule the preliminary approval hearing just **one business day** after the filing date for their Settlement papers. (Shaw Decl. ¶ 3). **Second**, clouded by their conflicting loyalties, Lieff and NCLC, in concert with the Caddell team, made support for the Settlement an indispensable condition for incentive awards, thereby, denying any opportunity for compensation to **their own clients**. **Third**, the Lieff/Caddell team admonished the *White* Plaintiffs not to take any action to oppose the Settlement until after the Lieff/Caddell team had presented them with the final terms and discussed the Settlement with them in person. (Juntikka Decl. ¶¶ 14-16). **Fourth**, the Lieff/Caddell team then delayed providing those terms or meeting with any of the

---

[15] *See, e.g., In re Calif. Canners and Growers*, 74 B.R. 336, 348 (Bankr. N.D. Cal. 1987) (finding that law firm that "participated substantially and knowingly in" another's breach of duty of loyalty "must be disqualified as a result"); *see also Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 233 (2d Cir. 1977) (disqualifying law firm for having "aided and abetted [another firm's] breach of its duty of undivided loyalty").

22

*White* Plaintiffs until April 16 – just one week before the filing date – and never met with three of them. (*Id.* ¶¶ 23-30). **Fifth**, the Lieff/Caddell team then successfully opposed the *White* Plaintiffs request for time to respond to the Settlement – falsely telling the Court they deserved no time because they had known the key terms for months. (Juntikka Decl. ¶ 36; Sobol Decl. ¶ 5, Dkt. # 389).

By engaging in such machinations, rather than promptly withdrawing after learning of the *White* Plaintiffs' opposition to the Settlement, the Lieff/Caddell team deprived the *White* Plaintiffs of the opportunity to file an orderly and noticed motion with the Court asking it to set a briefing schedule and move the hearing date for preliminary approval. Given that the Settling Parties' stipulated scheduling order did not contemplate the filing of any opposition papers, this Court undoubtedly would have granted such a motion. In other words, the Lieff/Caddell team's calculated and disloyal maneuverings prejudiced the *White* Plaintiffs by denying them the right to have their positions advanced and heard at the preliminary approval stage.

### 3. The Lieff/Caddell Team's Argument That The Proscription On Simultaneous Representation Is Inapplicable Because Lieff And NCLC Withdrew Promptly After Learning Of The Conflict Has No Factual Basis.

The Lieff/Caddell team has dismissed as a "gotcha" argument their serious ethical improprieties – noting that withdrawals of representation "do not happen in an instant" and contending that Lieff and NCLC withdrew in this case as soon as it was reasonably practical. (Opp. to Obj. Pls.' Mot. for Reconsideration at 5-8, n.5, Dkt. # 432). That argument flies in the face of the chronology.

**First**, Lieff and NCLC did not even purport to withdraw until April 29 and 30, 2009 – more than **seven weeks** after Messrs. Wolf and Juntikka first told them of the *White* Plaintiffs' unanimous opposition to the Settlement on March 9, 2009, and **three** weeks after they had received letters from the *White* Plaintiffs themselves

23

confirming that opposition.  (Juntikka Decl. ¶¶ 10, 22, 37).[16]

**Second**, during that three week period, the Lieff/Caddell team continued to take acts directly adverse to the interests and instructions of the *White* Plaintiffs, including: (a) continuing to negotiate a settlement that the *White* Plaintiffs opposed; (b) inserting a provision in that settlement that denied them their right to incentive payments; and (c) filing papers supporting the Settlement on April 24th and then opposing the *White* Plaintiffs' request for a reasonable period of time in which to respond to those papers – five days **before** Lieff's and NCLC's purported withdrawal.  Whether Lieff and NCLC had waited one day or 100 to withdraw, they could not subvert their clients' interests while they were still representing them.[17]

**Third**, Lieff and NCLC did not file a motion requesting leave to withdraw from representing the *White* Plaintiffs until July 27, 2009 – more than **four months** after learning of their opposition to the Settlement.  Under Local Rule 83-2.9.2.1, Lieff and NCLC were "still counsel of record" for the *White* Plaintiffs and were "not relieved of [their] obligation to represent [them] loyally and faithfully" until that motion was granted on July 29, 2009.  *Sanchez*, 2006 U.S. Dist. LEXIS 84232, at *73.[18]

---

[16]   The Lieff/Caddell team pretend that they did not believe Messrs. Wolf and Juntikka, but they had no basis to doubt their veracity or integrity.  Indeed, this fiction is contradicted by Mr. Sobol's February 6, 2009 letter to the *White* Plaintiffs, in which he stated that Mr. Juntikka was an "attorney of great integrity."  (Juntikka Decl., ¶ 4, Ex. A).  At any rate, Lieff and NCLC were on notice of the *White* Plaintiffs' opposition from March 9 forward.  If they had any doubts about whether Messrs. Wolf's and Juntikka's characterization of the *White* Plaintiffs' position was accurate, Lieff and NCLC could have picked up the phone and called their clients.  It takes little imagination to surmise that the reason that no such call occurred was that they did not want to hear what their clients had to say.

[17]   *See, e.g., Johnson v. Haberman & Kassoy*, 201 Cal. App. 3d 1468, 1475 (1988) ("[t]he fiduciary relationship makes it improper for an attorney to act contrary to . . . the interests of his present . . . client); *Flying J Inc. v. TA Operating Corp.*, 2008 U.S. Dist. LEXIS 18459, at *20 (D. Utah Mar. 10, 2008) (holding that simultaneous representation rules applied when law firm was representing two clients "at the time it drafted and filed [a] complaint" on behalf of one of them containing "allegations adverse to" the other); 1 Witkin, Cal. Procedure, Attorneys, § 128 (4th ed. 1996).

[18]   *See also Picker Int'l Inc. v. Varian Assocs., Inc.*, 869 F.2d 578, 582-83 (Fed. Cir. 1989) (holding that counsel who had never "sought permission from nor [been] granted permission by the District Court . . .  to withdraw" were acting in violation

24

The *White* Plaintiffs are, of course, aware that this Court granted Lieff's and NCLC's motion to withdraw *nunc pro tunc* to April 29, 2009.  (Order Granting Application to Withdraw, July 29, 2009, Dkt. # 453).  The power to issue an order *nunc pro tunc* is, however, is "a limited one and may be used only where necessary to correct a clear mistake [in the record] and prevent injustice."  *In re Warren*, 568 F.3d 1113, 1116 n.1 (9th Cir. 2009) (quoting *United States v. Sumner*, 226 F.3d 1005, 1009-10 (9th Cir. 2000)).  This power cannot be used to rewrite history by "alter[ing] the substance of that which actually transpired" or by "backdat[ing] events to serve some other purpose."  *Id.*; *see also Singh v. Mukasey*, 533 F.3d 1103, 1110 (9th Cir. 2008.  In short, this Court's July 29 order granting Lieff's and NCLC's motion to withdraw can neither erase the fact that they made a deliberate tactical choice not to withdraw nor the ethical consequences of that choice.[19]

### D.  The Lieff/Caddell Team's Complete Failure To Consult With The *White* Plaintiffs Shows That They Are Unfit To Represent The Class.

Owing to both the dearth of formal discovery and lack of judicial supervision, pre-certification settlements, such as the one at issue here, "create especially lucrative opportunities for putative class attorneys to generate fees for themselves."[20]  As a result, courts have long been very wary of pre-certification

---

of the ethical prohibition on "simultaneous representation of clients with inconsistent interests"); *Cal. Serv. Employees Health & Welfare Trust Fund v. Advance Bldg. Maint.*, 2009 U.S. Dist. LEXIS 21858, at *11 (N.D. Cal. Mar. 4, 2009) (holding that law firm remained counsel for plaintiff where court had "not entered an order for the withdrawal" of that firm as contemplated by the local rule).

[19]  At the time they made their decision to file a notice of withdrawal, rather than a motion seeking leave to withdraw, Lieff and NCLC were in the process of rushing through the preliminary approval process under a compressed schedule that gave the *White* Plaintiffs just a few business days in which to prepare their objections. (*See* Shaw Decl. ¶ 3).  The filing of a properly noticed motion would have disrupted that effort because it would have required counsel for the Settling Plaintiffs to wait at least 41 days for a hearing on that motion and would have afforded the *White* Plaintiffs an opportunity to argue that, under the ethical rules, such withdrawal should be conditioned on giving their new counsel a reasonable opportunity to acquaint themselves with the case and prepare for the preliminary approval hearing.

[20]  *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.* [GMC Pick-Up], 55 F.3d 768, 788 (3d Cir. 1995); *see also Staton*, 327 F.3d at 952; *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *Polar Int'l. Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 113 (S.D.N.Y. 1999).

25

settlements and, indeed, prior to the Supreme Court's decision in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), they were sharply divided on whether such settlements could ever be proper. *See GMC Pick-Up*, 55 F.3d at 786-800.

Given the absence of any other meaningful check on abuses by counsel who may be more concerned about securing an easy fee than in serving the interests of the putative class, the need for named plaintiffs to exercise their paramount duty to monitor their counsel is greater at the pre-certification stage than it is at any other. *See* cases cites in note 6 *supra*. Whatever the prerogatives of counsel after they have been vetted by the court and duly appointed to represent a ***certified*** class, attorneys cannot be given unfettered discretion to disregard their clients' instructions regarding settlement prior to class certification – at least where, as here, those clients are fighting to protect the interests of the putative class, rather than their own. *See* cases cites at pp. 19-20 *supra*. And, lest named plaintiffs be deemed an irrelevant appendage, their attorneys cannot be permitted to negotiate and conclude a pre-certification settlement without even consulting their clients at all.

Yet, acting at all times in concert with the Caddell team, that is precisely what Lieff and NCLC have done here. ***First***, Lieff and NCLC agreed to the core money terms of the Settlement without ever having discussed them with any of the *White* plaintiffs. ***Second***, after learning of their opposition, Lieff and NCLC ignored the *White* Plaintiffs' instructions and refused to discuss the terms of the Settlement with any of them until they had been memorialized and finalized. ***Third***, even then, Lieff and NCLC consulted with just two of their five *White* Plaintiff clients. (Declaration of Robert Radcliffe, sworn to on May 8, 2009, attached to Shaw Decl. as Ex. Z; Declaration of Maria Falcon, sworn to on May 7 2009, attached to Shaw Decl. as Ex. AA; Declaration Chester Carter, sworn to on May 7, 2009, attached to Shaw Decl. as Ex. BB). ***Fourth***, unable to persuade any of the *White* Plaintiffs to change their minds, Lieff and NCLC went ahead and filed the Settlement on behalf of plaintiff Hernandez – someone with whom Lieff had no retainer agreement and who

26

it had disavowed any intention of representing.

Lieff's and NCLC's failure to consult with their clients in this case would be justified only if the views of the named plaintiffs don't matter.  But that cannot possibly be right, for "if the class representative requirement is to have any meaning at all – which it must absent action to the contrary by the courts or Congress – a class representative may not completely cede all control over settlement to class counsel." *In re Ocean Bank*, 2007 U.S. Dist. LEXIS 29443, at *20 (N.D. Ill. Apr. 9, 2007).  And, conversely, that requirement can have no meaning if an attorney can make it impossible for his clients to discharge their oversight responsibilities by refusing to consult with them concerning settlement negotiations and by making no "attempt to secure [their] authority to make settlement proposals."  *Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421, 428 (E.D. La. 1997); *see also Deadwyler,* 134 F.R.D. at 139.  Indeed, such conduct contravenes the ethical rules themselves, which obligate counsel to keep their clients informed of settlement offers and other "significant developments" regarding settlement,[21] and to secure their clients' authority in connection with settlement offers and demands.[22]

Where, as here, putative class counsel seek to exclude their clients from the settlement process, their conduct "lend[s] credence to the often heard charge from critics of the class action device that the real parties in interest on the plaintiffs' side are the lawyers." *Deadwyler,* 134 F.R.D. at 140-41.  In short, by usurping the role of the Named Plaintiffs and arrogating to themselves the unfettered right to settle on

---

[21]  *See* Conduct Rules 3-500 & 3-510A; *Deadwyler,* 134 F.R.D. at 140 ("No type of misbehavior by an attorney is more universally and categorically condemned, and is therefore more inherently in 'bad faith,' than the failure to communicate offers of settlement.").

[22]  *See* Model R. Prof. Conduct 1.2 ("A lawyer shall abide by a client's decisions concerning the objectives of representation."); *Trulis v. Barton,* 107 F.3d 685, 693 (9th Cir. 1995) ("It is axiomatic that an attorney cannot continue to represent a client in a lawsuit in contravention of that client's explicit instruction to the contrary."); *Sanchez,* 2006 U.S. Dist. LEXIS 84232, at *64-65 (characterizing as "inescapable" the conclusion that putative class counsel "violated his professional responsibility to his client" where, in disobedience to his clients instructions, he tried to derail settlement discussions).

whatever terms they see fit, Lieff and NCLC have, in effect, appointed themselves as class representatives.  In so doing, Lieff and NCLC have committed unethical conduct, *see id.*, and disqualified themselves from serving as class counsel.  *See* cases cited in note 7 *supra*.[23]

### E.  Counsel For The *Acosta/Pike* Plaintiffs Are Unable To Adequately Represent The Class.

#### 1.  Counsel For The *Acosta/Pike* Plaintiffs Have Agreed To A Fee Sharing Agreement That Creates A Disabling Conflict Of Interest Between Them And The Class.

Following this Court's order rejecting preliminary approval of the *Acosta/Pike* Settlement, counsel for the *Acosta/Pike* Plaintiffs entered into a fee sharing agreement with the Lieff/Caddell team under which their fee award was capped at "20% of the first $16 million in aggregate fees covered collectively from Equifax, Trans Union and/or Experian in the *White/Hernandez* and *Acosta/Pike* cases." (Juntikka Decl., ¶ 54, Ex. Q).   This fee agreement prevents counsel for the *Acosta/Pike* Plaintiffs from independently representing the class because it eliminates any financial incentive for them to take this case to trial or otherwise to seek a recovery in excess of one that would yield $16 million in aggregate fees – an amount that is not far below the $17.25 million in fees that Defendants have agreed to pay under the Settlement.

As set forth above, the Ninth Circuit has held that a similar agreement tying named plaintiffs' incentive awards to the amount of the overall recovery up to a cap of $75,000 rendered those plaintiffs and their counsel unfit to represent the class, because it "disjoined the contingency financial interests of the contracting representatives from the class." *Rodriguez*, 563 F.3d at 959.  *A fortiori*, a fee sharing agreement that capped counsel for the *Acosta/Pike* Plaintiffs' fee at an

---

[23] This is not the first time Lieff has engaged in such conduct.  In *California Micro Devices*, the district court found that Lieff had "operat[ed] with little or no monitoring from the putative class representatives and ha[d], therefore, effectively made itself the class representative."  168 F.R.D. at 274.

amount that was reached by a settlement that paid class members less than a penny on the dollar created a disabling conflict of interest that precludes such counsel from representing the class.

## 2. Counsel For The *Acosta/Pike* Plaintiffs' Support For The Grossly Inadequate *Acosta* Settlement Demonstrates That They Are Unfit To Represent The Class By Themselves.

Counsel for the *Acosta/Pike* Plaintiffs earlier negotiated settlement terms in the Equifax and Trans Union cases that this Court found to contain "serious structural defects" and to "deliver[] grossly insufficient relief," *Acosta*, 243 F.R.D. at 400, that "pales in comparison to Plaintiffs' potential recovery through litigation." *Id.* at 393. In addition, this Court found that those terms were the outcome of discovery efforts that were "deficient" in "myriad areas" and a process that was infected by the simultaneous negotiation of attorneys' fees and class relief. *Id.* at 397. In other words, the *Acosta/Pike* Plaintiffs' counsel, who have filed no case against Experian, have also proven themselves unqualified to represent the interests of the putative classes in the cases against Trans Union and Equifax.[24]

## II. None Of The Named Plaintiffs Supporting The Settlement Can Adequately Represent The Class.

### A. The Settlement's Provision Regarding Incentive Awards Creates A Disabling Conflict Of Interest Between The Named Plaintiffs And The Rest Of The Class.

For the reasons set forth in Point I.A above, the Settlement's provision conditioning the Named Plaintiffs' entitlement to incentive awards on their support for the Settlement creates a disabling conflict of interest between them and the rest of the class.

Compounding this already disabling conflict of interest is that $5,000 incentive

---

[24] *See, e.g., Molski,* 318 F.3d at 956 (ruling that district court abused its discretion in finding that class counsel "fairly and adequately protect[ed] the interests of the class" where they agreed to settlement that "waived practically all of the class members' claims without compensation" and "allowed the defendants to escape with little penalty").

awards are grossly disproportionate to the paltry amounts awarded to the absent class members.[25]   To make matters worse, the $5,000 award for each Settling Plaintiff is on top of the $2,500 incentive award that is payable to them under the injunctive relief settlement.[26]   Settling Plaintiffs have not documented their hours or otherwise put anything in the record that might explain what they have done to earn these amounts.   *See, e.g., Apparicio v. Radioshack Corp.*, 2009 U.S. Dist. LEXIS 49316, at *5-6 (C.D. Cal. May 21, 2009) (expressing "deep[] skeptic[ism]" over request for incentive award where plaintiffs "provided no detail on the amount of time and effort expended by the named plaintiffs").

The $7,500 incentive awards are a staggering ***375*** times more than the estimated $20 payment that a class member would receive if he or she submitted a claim for a "convenience" award and are about ***3,750*** times the amount that the average class member would receive if they all submitted claims.   The conflict of interest that arises from this disparity is itself sufficient to render the Settling Plaintiffs incapable of serving as "good champion[s]" for the class.   *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (rejecting as "untenable" settlement in which "class members get relief worth about 1% of the minimum statutory award," while the named plaintiff "accept[s] 300% of the statutory maximum").[27]   *A fortiori*, the Settling Plaintiffs are unable to do so when,

---

[25]   *See, e.g., Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983) ("where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class"); *Plummer v. Chemical Bank*, 91 F.R.D. 434, 442 (S.D.N.Y. 1981) ("such disparities [in the awards to class representatives and the class at large] must be regarded as *prima facie* evidence that the settlement is unfair to the class, . . . and a heavy burden falls on those who seek approval of such a settlement"), *aff'd*, 668 F.2d 654 (2d Cir.1982).

[26]   In providing for payment of this $2,500 award out of their attorneys' fees in their injunctive relief fee agreement, counsel for the Settling Plaintiffs violated yet another California ethical rule – the ban on fee splitting codified in Conduct Rule 1-320.   *Rodriguez*, 2007 U.S. Dist. LEXIS 74767, at *68; s*ee also Campbell v. Fireside Thrift Co.*, 2004 Cal. App. Unpub. LEXIS 216, at *36-38 (2004).

[27]   While some courts have approved incentive awards in the $5,000 range, such awards are generally justified only when they are proportionate to the awards given absent class members or "when the class representatives expend considerable time and effort on the case."   *Castillo v. General Motors Corp.*, 2008 U.S. Dist. LEXIS

30

as here, their counsel have made their eligibility for these disproportionate awards contingent on their supporting the Settlement.

**B. The *Acosta/Pike* Plaintiffs Cannot Represent The Class Because They Have Not Asserted Claims Against Experian And Because They Supported The Grossly Inadequate *Acosta/Pike* Settlement.**

None of the *Acosta/Pike* Plaintiffs have ever asserted a claim against Experian. As a result, they are plainly unable to represent the interests of any of the 10.8 million consumers who are members of the Experian class.

In its decision rejecting the *Acosta/Pike* settlement, this Court held that the *Acosta/Pike* Plaintiffs were also unable to adequately represent the TransUnion and Equifax classes owing to their having supported a settlement, which: (1) denied even the opportunity for any relief to a huge subclass in which the *Acosta/Pike* plaintiffs did not belong; (2) insulated Trans Union and Equifax from past and future liability for certain reporting errors that appeared on the credit reports of millions of their fellow class members, but not their own; and (3) memorialized their intention to abandon the claims of all class members other than those who, like themselves, resided in California in the event the settlement was not approved. *Acosta*, 243 F.R.D. at 385-86, 400.   This Court's ruling that the *Acosta/Pike* Plaintiffs cannot satisfy the adequacy of representation requirement constitutes the law of the case and, hence, controls the resolution of that issue here.

---

82337, at *39 n. 11 (E.D. Cal. Sept. 8, 2008); *see also Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008) (noting that "[i]f every member of the class opted into the settlement, each claimant would receive an average of only $ 24.17 while the named plaintiff would receive more than $ 5,000" and expressing "reticence" to approve settlement "[g]iven this explicit disparity and the utter lack of evidence demonstrating the quality of plaintiff's representative service"); *Ybarrondo v. NCO Fin. Sys., Inc.*, 2008 U.S. Dist. LEXIS 4353, at *7 (S.D. Cal. Jan. 18, 2008) (refusing to approve class settlement until parties "address the issue of the named Plaintiff's proposed $2,000 cash award, which appears disproportionately large in comparison to the class members' $23 cash award" by showing "how the incentive payment was earned"); *Clark v. American Residential Servs. LLC*, 175 Cal. App. 4th 785, 805-06 (2009) (rejecting incentive award that gave "named plaintiffs at least 44 times the average payout to a class member" where "the evidence in the record [was] entirely insufficient to support an enhancement of th[at] magnitude").

31

1

2

**C. The Settling Plaintiffs Cannot Represent Subclasses In Which They Do Not Belong And Whose Interests They Have Sacrificed.**

3

4

5

6

7

8

9

10

11

12

13

Where, as here, the parties have entered into a settlement agreement before a ruling on class certification, the district courts "must pay 'undiluted, even heightened, attention' to class certification requirements." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting *Amchem*, 521 U.S. at 620); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999). That is because certification of a settlement class operates to deprive the courts of "the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem*, 521 U.S. at 620. In the absence of that opportunity, there is a very real danger that, in their haste to strike a deal, those purporting to represent the entire class may end up sacrificing the interests of one distinct subclass for another.

14

15

16

17

18

To guard against that risk, the Supreme Court has instructed that no settlement class may be certified unless one or more of the class representatives belongs to each "distinct subgroup." *Id.* at 627-28. In this case, there are at least three distinct subclasses in which none of the class representatives belong. Thus, this Court cannot certify the settlement class.

19

20

**1. The Named Plaintiffs Cannot Represent The Subclass Of Consumers Who Are Unaware Of The Information In Their Credit Reports.**

21

22

23

24

25

26

27

28

As set forth in more detail in Point II.A of Part Two below, the Settlement draws a distinction between class members who are aware of the information in their credit reports, including, in particular, their pre-bankruptcy debts that Defendants have reported in a delinquent status, and those who are not. Under the Settlement, class members who have such knowledge are eligible for awards if they have a "belief" that such information was inaccurate. (*See* Final Forms of Notice, Exs. A-C). Those class members who have no knowledge of the information in their credit reports can have no basis to form even a belief that any of that

32

information is inaccurate and, hence, are eligible for nothing.

None of the Named Plaintiffs belong in the group of individuals who are unaware of the information in their credit reports relating to the reporting of their pre-bankruptcy debts. Accordingly, they are unable to represent the interests of this distinct subclass of individuals and, in fact, have sacrificed those interests by conditioning any relief on their ability to attest to a belief they cannot honestly hold. *See, e.g.*, *Amchem*, 521 U.S. at 627 (holding that named plaintiffs could not adequately represent interests of future claimants who had no way of knowing whether they had been injured). Indeed, it is as if Judge Friendly was writing about this very case when he condemned class representatives who were "willing to throw to the winds [other class members' claims] in order to settle their own." *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 17 n.6 (2d Cir. 1981).

### 2. __The Named Plaintiffs Cannot Represent Members Of The Reinvestigation Subclass.__

The Settling Plaintiffs brought their complaint both on behalf of: (1) a class of consumers victimized by Defendants' inaccurate reporting practices; and (2) a distinct subclass of consumers victimized by Defendants' unreasonable reinvestigation practices. Under the Settlement, all members of this distinct subclass are required to waive their reinvestigation claims in exchange for ***zero*** additional compensation. *See* Part Two, Point II.B *infra*.

As Plaintiff Hernandez does not have a reinvestigation claim against any of the Defendants, he does not belong to this distinct subclass and cannot represent its interests under *Amchem*. Nor can the *Acosta/Pike* Plaintiffs because they have never filed any claims of any kind against Experian.

### 3. __The Named Plaintiffs Cannot Represent Members Of The Subclass Of Consumers Whose Credit Reports Listed Their Pre-Bankruptcy Judgments As Still Outstanding.__

33

The interests of the four Settling Plaintiffs' are also not aligned with those of class members who, during the liability period, were issued credit reports that showed one or more of their pre-bankruptcy judgments as still outstanding.  As set forth in Point II.D. of Part Two below, this subclass presents none of the supposed manageability or due process problems that the Settling Plaintiffs cite as substantial justification for their decision to settle these actions for less than a penny on the dollar.  If such manageability and due process problems really do exist, then by definition, the claims of these subclass members are worth considerably more than those of other class members.

Yet, as none of the Settling Plaintiffs fall within the subclass of consumers whose credit reports show one or more of their pre-bankruptcy judgments as still outstanding, the members of this subclass have had no one to champion their cause. (Juntikka Decl. ¶ 55).    Thus, under *Amchem*, this subclass lacks adequate representation and, hence the Settlement cannot stand.

### III.  Certification Of Plaintiffs' Actual Damage Claims Is Improper Because Settling Plaintiffs Have Failed To Satisfy Rule 23(b)(3)'s Predominance Requirement With Respect To Those Claims.

Settling Plaintiffs seek an order certifying not only claims for statutory damages, but also claims for actual damages.  (*See* Proposed Order Granting Prelim. Approval at 8, Dkt. # 388).  As the Seventh Circuit stated in *Murray*, such actual damages claims raise individual issues of causation and damages, which, absent a viable theory of class-wide causation and damages, would ordinarily predominate over the common questions associated with those claims.  434 F.3d at 952-53.

Settling Plaintiffs have, however, presented no theory of class-wide causation and damages – much less any evidence in support of such a theory.  Their argument that individual issues do not defeat predominance with regard to the actual damage claims rests entirely on the proposition that the "Settlement is structured" in such a

1   way as to eliminate those issues.   (Pls.' Mem. in Support of Mots. For Prelim.

2   Approval of Settlement at 32, Apr. 24, 2009, Dkt. # 383).   That argument, however,

3   is foreclosed by *Amchem*, which bars the "[s]ettlement benefits" themselves from

4   "form[ing] part of a Rule 23(b)(3) analysis."   *Hanlon*, 150 F.3d at 1022 (citing

5   *Amchem*, 521 U.S. at 620); *see also Krell v. Prudential Ins. Co. of Am.*, 148 F.3d

6   283, 314 (3d Cir, 1998); *Fleury v. Richemont North America, Inc.*, 2008 U.S. Dist.

7   LEXIS 64521(N.D. Cal. July 3, 2008).   Thus, Plaintiffs' actual damage claims are

8   not amenable to class treatment and, inasmuch as the Settlement is predicated on

9   the certification of an actual damages class the members of which it affords greater

10  compensation, it cannot be approved by this Court.

11  
12  ### PART TWO:  OBJECTIONS TO THE FAIRNESS AND ADEQUACY OF THE SETTLEMENT

13      In assessing the adequacy and fairness of class settlements, the district courts

14  are "expected to give careful scrutiny to the[ir] terms . . . in order to make sure that

15  class counsel are behaving as honest fiduciaries for the class as a whole."   *Mirfasihi*

16  *v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004).   As noted above, the

17  temptation for class counsel to "place their pecuniary self-interest ahead of that of

18  the class" is never greater than it is when they are presented with an opportunity to

19  reach a settlement prior to class certification.   *See, e.g.,  In re Community Bank of*

20  *N. Va.*, 418 F.3d 277, 318 (3d Cir. 2003) (quoting *Reynolds v. Beneficial Nat'l*

21  *Bank*, 288 F.3d 277, 279 (7th Cir. 2002)).   Thus, the circuit courts have consistently

22  cautioned the lower courts to "be doubly careful in evaluating the fairness" of such

23  pre-certification settlements.   *Malchman v. Davis*, 706 F.2d 426, 432 (2d Cir.

24  1983); *see also Molski v. Gleich,* 318 F.3d 937, 953 (9th Cir. 2003); *Acosta v.*

25  *Trans Union LLC*, 243 F.R.D. 377, 383 (C.D. Cal. 2007).   These cases exemplify

26  the need for such care.

27      In rejecting an earlier settlement, this Court pointed out that, even at the

28  minimum $100 per person statutory damages level, each Defendant faces potential

liability of $1 billion (or $3 billion in the aggregate).  *Acosta*, 243 F.R.D. at 389. The present Settlement affords each of the three 10 million-member classes a net recovery of about $9.3 million (or under $28 million in the aggregate), after deduction for attorneys' fees and notice costs.  Or, to put it another way, each Defendant would pay an award averaging less than 1% of the $100 statutory minimum to which they are liable to each absent class member, while each Settling Plaintiff would be paid seven and one half times the $1,000 statutory maximum. As the Seventh Circuit explained when faced with an FCRA class settlement, presenting a virtually identical situation:

> Such a settlement is untenable. . . . [I]f the reason other class members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could [the named plaintiff] accept 300% of the statutory maximum?  And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny?  If, however, the chance of success is materially greater than 1%, as the proposed payment to [the named plaintiff] implies, then the failure to afford effectual relief to any other class member ***makes the deal look like a sellout***.

*Murray v. GMAC Mortgage Corp., 434 F.3d 948, 952 (7th Cir. 2006)* (emphasis added).[28]

The Settling Plaintiffs provide no substantive justification why class members should take one cent on the dollar, in a case where evidence of willfulness is clear, where Defendants' own records can be mined to determine which class members were aggrieved by their willful violations, and where the actual losses to the classes are estimated at $3 billion on the conservative side.  In the context of such massive

---

[28] In their opposition to the *White* Plaintiffs' motion for reconsideration (Opp. to Obj. Pls.' Mot. for Reconsideration at 9, Dkt. # 432), the Settling Plaintiffs argued that the settlement in *Murray* is nothing like the present Settlement because, in that case, 1.2 million absent class members would have been left to share $950,000 between them, or an average of about ***80 cents*** each on their $100 minimum statutory damage claims.  The Settling Plaintiffs need to check their math.  In each of these cases, more than 10 million class members will be left to share about $9.5 million between them, or an average of about ***90 cents*** each.  Accordingly, on a proportionate basis, this Settlement is every bit as bad as the one the Seventh Circuit rejected in *Murray*.

36

damages and willful misconduct, a settlement of under $10 million per Defendant should shock the conscience of this Court.

If this recovery were divided among all class members, they would receive about 90 cents from each Defendant – hardly worth the postage to mail the check. Recognizing the pittance of a recovery that the Settlement would provide if it were so distributed, the Settling Parties have structured the Settlement to disenfranchise 95% of the classes. *See* note 3 *supra*. They have done this by creating a claims-made procedure in which all class members are required to certify their belief that the Defendants issued credit reports about them that inaccurately described the status of their pre-bankruptcy debts when, as the Settling Parties know full well, that is a fact that the vast majority of class members could not possibly know.

This procedure is all the more egregious because there is no reason for such a certification since Defendants themselves have this information in their own files. Indeed, all the persons to whom notice is being sent are persons about whom Defendants issued credit reports containing pre-bankruptcy debts that they listed as still delinquent. The requirement that class members certify their belief that Defendants published an erroneous credit report about them is designed solely to winnow the number who will receive a portion of the recovery. And the conflict that requirement creates between the few who have the knowledge to make that certification and the many who do not is fatal.

This disabling conflict is, however, just one of several that have arisen from the Settling Parties effort to pick winners and losers from an aggregate class of 15 million consumers.[29] Other segments of the class whose claims would be sacrificed by the Settlement include: (1) the reinvestigation subclass, the members of which are provided zero compensation for the release of their separate claims; (2) anyone

---

[29] While there are an estimated 10 to 11 million class members as to each Defendant, the three classes do not completely overlap and, hence, the size of the aggregate class is over 15 million. *See* Defendants' Response To *White* Plaintiffs' Urgent Motion To Ninth Circuit For Stay Pending Appeal, Dec. 3, 2009, at 17.

37

who is not fortunate enough to be able to assert an "actual damage" claim under the arbitrary criteria that the Settlement creates for such claims; and (3) a subclass consisting of consumers whose pre-bankruptcy judgments were not reported as discharged, which is given no additional compensation, despite the fact that none of the defenses that have been raised in these cases are applicable to that subclass.

## I.   The Settlement Amount Is Far Outside The Range Of Reasonableness.

In determining whether a class settlement falls within a reasonable range, this Court's task is to balance the amount offered therein against "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing." *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig. ["GMC Pick-Up"]*, 55 F.3d 768, 806 (3d Cir. 1995); *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009). The Settlement does not come remotely close to that value.

Three years ago, when they were balancing the value of the *Acosta/Pike* settlement against the litigation value of these cases, *the same attorneys who are supporting this Settlement* represented that there was "simply no basis for concluding that plaintiffs' chances of prevailing" on their statutory damage claims were *"less than 50 percent"* and assessed the value of those claims for settlement purposes at not "less than *two or three hundred million dollars*" *per case*. (Pls.' Mem. in Support of Opp. to Mot. for Prelim. Approval at 43, 51, No. 06-CV-05060, Dkt. # 42) ("*Acosta* Br."). On the basis of the evidence and argument supporting that assessment, this Court rejected the *Acosta/Pike* settlement, finding that: (1) the basic criteria for certification of a settlement class were all met and that certification of a litigation class as to Plaintiffs' statutory damage claims was "a very real possibility", *Acosta*, 243 F.R.D. at 384-86, 393; (2) the questions of liability and willfulness were both for the trier of fact, *Id.* at 391-92; and (3) there was "a colossal discrepancy" between Defendants' minimum litigation exposure and the value of the settlement – a discrepancy that could be acceptable only if Plaintiffs'

38

claims were "grounded in such a tenuous basis that they were hopelessly doomed to fail in court," which was "not true here."  *Id.* at 391.

This Settlement contains the same "colossal discrepancy" between litigation exposure and settlement award that could be justified only if Plaintiffs' claims were "hopelessly doomed."  If the Settling Plaintiffs really believe this to be so, it is incumbent on them to explain to this Court what has happened in the past three years to so radically alter their assessment of their litigation risk.[30]  Far from doing so, they have instead offered this Court nothing but the barest conclusions – stating, without any elaboration, that "they would face significant legal, factual, and procedural obstacles to recovering damages."  (Pls.' Mem. in Support of Mots. For Prelim. Approval at 21, Dkt. # 383).  That justification is patently inadequate.

## A. Defendants' Litigation Exposure Remains Enormous.

As this Court found in its decision rejecting the *Acosta/Pike* settlement, "[t]he litigation value of the plaintiffs' claims is tremendous."  243 F.R.D. at 389.  This is a matter of simple math.  The size of each of the three classes is estimated to be at least 10 million individuals – all of whom will be entitled to a minimum $100 statutory damages award if Plaintiffs succeed in establishing that Defendants willfully violated the FCRA.  *Id.* at 388.  Thus, Defendants "each face approximately $ 1 billion in civil liability."  *Id.* at 389.  Although this amount is plainly significant, it is far less than the estimated $3 to $5 billion in actual losses that the class has suffered as a direct result of Defendants' unlawful reporting practices.[31]

---

[30] *See, e.g., In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *20 (E.D. Tex. June 30, 2005) (denying preliminary approval of highly discounted settlement where "legal risk ha[d] been present from the very first day this case was filed" and where "[n]othing ha[d since] been presented to the Court indicating that facts developed during discovery ha[d] weakened Plaintiffs' initial factual evaluation of this case"); *Sutton v. Bernard*, 2002 U.S. Dist. LEXIS 14357, at *5-6 (N.D. Ill. Aug. 5, 2002) (denying preliminary approval of class settlement where its supporters cited nothing to enable court "to make a reasonable assessment of the . . . evidence supporting and rebutting plaintiffs' claims").

[31] Plaintiffs never pressed for the data that would have enabled them to conduct their own study of the credit scoring impact of Defendants' reporting practices.

## B. There Is No Basis For Discounting Defendants' Litigation Exposure By Approximately 99 Percent.

In evaluating the adequacy of a class action settlement, the likelihood that plaintiffs will succeed in establishing their right to relief is "'by far the most important factor.'"[32]   On any fair assessment, consideration of this factor militates overwhelmingly against approval of the Settlement.

### 1. The Risk Of Failing To Establish Liability Does Not Justify Discounting Defendants' Litigation Exposure By More Than An Order Of Magnitude.

When a credit reporting agency "learns or should reasonably be aware of errors in its reports that may indicate systematic problems", the FCRA's "maximum possible accuracy" standard dictates that it: (1) " review its procedures for assuring accuracy"; and (2) take any available "steps to improve the accuracy of its reports" if such review shows that they can be implemented at a "reasonable cost." 16 C.F.R. Part 600 app. § 607.3 (2000).[33]   Under the FCRA, any credit reporting agency that acts in reckless disregard of these obligations is liable for statutory damages. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007).

In their opposition to the *Acosta/Pike* settlement, counsel for Plaintiff *Hernandez* properly assessed their prospects of establishing that Defendants violated their core reporting obligations under the FCRA as "extremely high" and

(Wolf Decl. ¶ 5).  However, based on Equifax's own flawed analysis of that impact, which showed that *64% of all class members' credit scores increased after the injunctive relief settlement was implemented*, the *White* plaintiffs' expert has conservatively estimated that the class lost $3-5 billion in higher interest payments on their mortgages, auto loans and credit cards during the 5 year period covered by this litigation.  (Declaration of Stan V. Smith, Ph.D., sworn to on May 21, 2009, ¶ 5, attached to Shaw Decl. as Ex. G.) ("Smith Decl.").

[32]   *Figueroa v. Sharper Image Corp.* 517 F. Supp. 2d 1292, 1323 (S.D. Fla. 2007); *see also Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999).

[33]   *See also Cassara v. DAC Servs., Inc.*, 276 F.3d 1210, 1217 (10th Cir. 2002) (same); *O'Brien v. Equifax Info. Servs., LLC*, 382 F. Supp. 2d 733, 738 n.10, 739 (E.D. Pa. 2005) (finding that a reporting agency violates § 1681e(b) if it "simply repeat[s] information from reputable sources . . . even if there is easily available a procedure that would greatly improve accuracy at a minimal cost").

40

their prospect of establishing that they did so recklessly as "not less than 50%." (*Acosta* Br. at 46, 51). Since that time, those prospects have risen even higher.

**First**, at the time of the *Acosta* decision, the Supreme Court had not yet decided *Safeco*, wherein it rejected the argument that a defendant is liable for a willful violation of the FCRA only if it purposefully violated that act. Instead, the Supreme Court held that the willfulness requirement is met whenever a defendant acts in reckless disregard of the requirements of the FCRA (*i.e.*, runs an "unjustifiably high risk" of contravening them). 551 U.S. at 70.

**Second**, Defendants have produced a number of internal reporting analyses for this litigation, which confirm that about **two-thirds** of the credit reports that Defendants issued for consumers with Chapter 7 discharge orders were inaccurate in that they reported their pre-bankruptcy debts as still delinquent. (Declaration of Qiying Zhou, sworn to on July 31, 2008, Ex. 72 at 7, Dkt. # 306) ("Zhou Decl.").[34]

**Third**, on August 13, 2007, this Court issued a Tentative Order denying Experian's motion for summary judgment on the issue of willfulness. On the basis of a very incomplete record, this Court found that "it remains for the trier of fact to ultimately resolve whether Experian's 'statistical guess' ran an unjustifiably high risk of violating the FCRA." (Summary Judgment Tentative Order at 10, Dkt. # 169).

**Fourth**, a year and one half after the *Acosta* decision, Defendants entered into a settlement of Plaintiffs' injunctive relief claims that requires Defendants to treat all pre-bankruptcy debts in a Chapter 7 case as discharged, except when their creditor-furnishers have affirmatively provided them with information showing that a given

---

[34] These numbers have recently been confirmed by Experian's estimate of the class size in the case against it. During the liability period, the maximum number of consumers for whom Experian could have issued inaccurate credit reports showing Chapter 7 bankruptcy discharge orders was 17.1 million. (Juntikka Decl. ¶ 53). According to Experian's latest analysis, in the case of 10.8 million of these consumers or 63% of the total, it issued credit reports that were inaccurate in that they reported one or more of their pre-bankruptcy debts as still delinquent, despite the absence of any information in Experian's files suggesting that those debts were excluded from discharge. (Shaw Decl., Ex. H).

41

debt has been excluded from discharge or such exclusion is otherwise apparent from information in their files.  At the urging of all the parties, this Court has found that these revised procedures are "a reasonable procedure to assure the maximum possible accuracy."  (Approval Order ¶ 5.3, Dkt. # 338).  Thus, in order for a jury to find in Defendants' favor, it will have to find that Defendants' former procedures, which were based on the exact opposite assumption, were nonetheless also "reasonable to assure maximum possible accuracy."  As it is hard to imagine how a reasonable person could hold both of those views simultaneously, the chances that Plaintiffs will be able to establish liability have improved since the *Acosta* decision.

*Fifth*, even though the record is not nearly complete, post-*Acosta* discovery confirms Defendants' knowledge that their reporting procedures were, in fact, producing systemic errors.  For instance, Plaintiffs' research has revealed data made public by Defendants' trade association (the 'CDIA') showing that disputes regarding bankruptcy information are among the five most common categories of consumer disputes – accounting for 4% of the 12.5 million consumer disputes Defendants receive each year (or a total of 500,000).  (*See* Declaration of Dean Binder, sworn to on Dec. 11, 2009, ¶ 64 ("Binder Decl."); Shaw Decl. Exs. CC, DD, EE).  This public data has been confirmed by internal Experian documents showing that, Redacted- Filed Under Seal

While these numbers are eye-opening by any measure, their magnitude cannot truly be appreciated until one realizes that of the 210 million or so consumers about whom Defendants maintain credit files at any given time, only about 10 million are potentially susceptible to inaccurate bankruptcy reporting – that is, only about 10 million have Chapter 7 discharge orders that are less than 7 years old in their files.

In other words, on a per capita basis, disputes about the failure to report accounts as "included in bankruptcy" were not only the most common kind of dispute; they were **almost as common as all other kinds of disputes combined**. (Binder Decl. ¶ 65). Even more astonishing is the fact that, on a per capita basis, bankruptcy-related corrections were **eight times more common than all other types of corrections combined**. (*Id.* ¶ 67).

Given the staggering number of disputes they receive and corrections they make, it is not surprising that Defendants' officials have admitted their awareness of the problem in their post-*Acosta* depositions. For example,

Redacted- Filed Under Seal

Redacted- Filed Under Seal

Redacted- Filed Under Seal

[35]

---

[35]  Incredibly, the Settling Plaintiffs did not depose any knowledgeable Equifax officials about their awareness of the frequency of bankruptcy-related consumer disputes. However, the record does include a declaration from a former Equifax official who served in its reinvestigation division and who testified that Equifax knew as far back as the early 1990s that inaccurate reporting of bankruptcy information was an "extremely frequent and reoccurring problem," which Equifax chose to address by revising its consumer dispute procedures, rather than by making systemic revisions to its initial reporting procedures. (*See* Declaration of

43

**Sixth**, the *White* Plaintiffs have obtained a declaration from the director of the National Credit Reporting Association ("NCRA"), stating that he attended annual tape-recorded trade conferences at which the problem of reporting discharged debts as delinquent has been discussed with Defendants "as a serious issue that needed correction," and that they all "acknowledged the existence of this problem in their reporting of pre-bankruptcy debts, but laid the blame for the problem on their credit furnishers." (Declaration of Terry W. Clemans, sworn to on May 14, 2009, ¶¶ 6-7, attached to Shaw Decl. as Ex. I; *see also* Declaration of Evan Hendricks, sworn to on July 19, 2007, ¶ 20, attached to Shaw Decl. as Ex. FF ("Hendricks Decl.")).

**Seventh**, post-*Acosta* discovery has confirmed that, despite their knowledge that their bankruptcy reporting procedures were producing systemic errors in their credit reports, Defendants never reviewed those procedures or considered any steps for improving them. For instance, when asked whether it was correct that Experian had "never considered a different approach other than relying exclusively on the furnishers for the status of post-discharge debts," a senior Experian official stated, "that is correct." (Deposition of Patricia Finneran, Jan. 19, 2007, attached to Shaw Decl. as Ex. P at 143:21-144:05; *see also* Redacted- Filed Under Seal

And, finally, in response to a similarly inquiry, a senior Equifax official admitted that "that particular issue was never kind of raised . . . as a high-priority given the fact that we are accurately reporting that an individual is in bankruptcy." (Deposition of John Carter, Jan. 17, 2008, attached to Shaw Decl. as Ex. R at 46:19-22).

---

John Ulzheimer, sworn to on Dec. 13, 2006, ¶ 15, attached to Shaw Decl. as Ex. GG) ("Ulzheimer I Decl.").

44

1    This failure of Defendants to even consider a change in their business rule for

2    reporting the status of pre-bankruptcy debts is particularly inexcusable given that,

3    Redacted- Filed Under Seal

4

5

6

7

8

9    In other words, despite their knowledge of the existence of a systemic problem

10   that resulted in millions of errors in their credit reports and their knowledge of a

11   way to fix that problem, Defendants did the exact opposite of what the FCRA

12   requires.  Instead of reviewing their procedures to determine whether any cost-

13   effective steps could be taken to improve the accuracy of their reports, they stuck

14   their collective heads in the sand and did absolutely nothing until mid-2008 –

15   nearly ***three years*** after the filing of these class actions.  Indeed, despite this Court's

16   warning to Defendants that "it would be absolutely inane . . . with this kind of input

17   . . . to go back and continue on a practice [that] could set up willfulness," that is

18   exactly what they did for the next year and one half.  (Transcript of Hearing,

19   Jan. 23, 2007, Vol. II at 26, No. 06-CV-05060, Dkt. # 115).  In short, on the

20   existing record, the case that Defendants failed to employ reasonable reporting

21   procedures in violation of the FCRA is overwhelming and the case they ran an

22   "unjustifiably high risk" of doing so is compelling.

23   Defendants have asserted, however, that Plaintiffs cannot meet the

24   "unjustifiably high risk" standard because post-*Safeco* jurisprudence has confirmed

25   that a defendant is not liable for willfully disregarding the requirements of the

26   FCRA when its conduct is based on an "objectively reasonable" interpretation of

27   those requirements. (Dfs.' Prelim. Response to *White* Pfs.' Mot. for Reconsideration

28   at 4, June 1, 2009, Dkt. # 436).  As this Court recognized in its Tentative Order

45

denying summary judgment (Summary Judgment Tentative Order at 7-9, Aug. 13, 2007, Dkt. # 169) that rule, however, does nothing to help Defendants because, unlike in *Safeco*, which involved contextual ambiguity surrounding the meaning of the term "increase," Defendants' liability in these cases does not turn on the correct interpretation of a "less-than-pellucid" statutory provision.   *Gillespie v. Equifax Info. Servs., LLC*, 2008 U.S. Dist. LEXIS 85150, at *17 (N.D. Ill. Sept. 15, 2008).

To the contrary, as the Ninth Circuit itself has held, Section 1681e(b)'s "statutory command is clear" and self-explanatory: a credit reporting agency "'shall follow reasonable procedures to assure maximum possible accuracy of the information'" contained in its credit reports. *Andrews v. TRW, Inc.*, 225 F.3d 1063, 1068 (9th Cir. 2000), *rev'd on other grounds*, 534 U.S. 19 (2001).   There is no ambiguity in these words that leaves room for a reporting agency to argue that it can fulfill its "maximum possibly accuracy" obligation by "simply repeating information from reputable sources . . . even if there is easily available a procedure that would greatly improve accuracy at a minimal cost."   *O'Brien*, 382 F. Supp. 2d at 738n.10, 739.   Thus, consistent with the rulings of numerous courts in the post-*Safeco* era, the issue of Defendants' liability for having willfully violated Section 1681e(b) will turn solely upon whether Plaintiffs are able to show that Defendants were on notice that their reporting procedures were generating systemic inaccuracies and did nothing to try and correct them.[36]

## 2. **The Risk Of Failing To Secure Class Certification Does Not Justify A Significant Discount.**

The Settling Plaintiffs seek to justify their penny on the dollar settlement

---

[36] *See, e.g., Campbell v. Experian Info. Solutions, Inc.*, 2009 U.S. Dist. LEXIS 106045, at *26 (W.D. Mo. Nov. 13, 2009); *Saindon v. Equifax Info. Servs.*, 2009 U.S. Dist. LEXIS 33060, at *12-13 (N.D. Cal. Apr. 17, 2009); *Fahey v. Experian Info. Solutions, Inc.*, 571 F. Supp. 2d 1082, 1092-93 (E.D. Mo. 2008); *Holmes v. Telecheck Int'l, Inc.*, 556 F. Supp. 2d 819, 846-47 (M.D. Tenn. 2008); *Gorman v. Experian Info. Solutions, Inc.*, 2008 U.S. Dist. LEXIS 94083, at *24-25 (S.D.N.Y. Nov. 18, 2008); *Harris v. Experian Info. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 46824 at *5-7 (D.S.C. June 26, 2007).

46

largely on the basis of this Court's tentative Order denying class certification, which, according to Settling Plaintiffs, shows that "certifying a class could present some difficulties." (Pls.' Mem. in Support of Prelim. Approval at 21, Dkt. # 383). In fact, that tentative decision provides no basis for discounting the value of Plaintiffs' claims – much less the massive discount embodied in the Settlement.

Under *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), this Court could not have conditionally certified the settlement class without finding that "all of the Rule 23 standards [had been] met without regard to the presence or terms of [the] pending settlement agreement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Inasmuch as this Court's order conditionally certifying the class does, in fact, find those standards to have been met, it has abandoned all of the reasoning in its tentative order denying class certification and has thus rendered that order irrelevant to any assessment of Plaintiffs' litigation risk.[37] Furthermore, it is worth noting in this connection that, in addition to being inconsistent with its May 7, 2009 Order, this Court's tentative order denying class certification is inconsistent with: (1) its *Acosta* decision, which found that all of the Rule 23 requirements (other than adequacy of the *Acosta/Pike* Plaintiffs and their counsel) are met in these cases, *Acosta*, 243 F.R.D. at 384; and (2) its injunctive relief order, which found that all of the Rule 23(a) requirements (including adequacy) were met as to substantially overlapping classes. (Approval Order ¶¶ 8.1 – 8.2, 9.2, Dkt. # 338).

### a. <u>The risk that Plaintiffs will be unable to satisfy Rule 23(b)(3)'s predominance requirement does not justify *any* discount.</u>

In its May 7, 2009 Order, this Court properly found that "common questions . . . overwhelm individual issues" in these cases and, hence, that the predominance

---

[37] *See, e.g., In re GMC Pick-Up*, 55 F.3d at 818 ("if the district court correctly concluded that there were insurmountable barriers to class treatment, it could not certify the class for settlement purposes"); *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 549 (S.D. Ohio 2000) (rejecting class counsel's argument that uncertainty in satisfying Rule 23 requirements supported approval of settlement because it "fail[ed] to recognize . . .that if class certification is not appropriate under Rule 23(a) and (b), then the Court cannot approve the proposed Agreement").

47

requirement poses no barrier to certification of a settlement class. (Order Granting Prelim. Approval at 17, Dkt. # 423). At the behest of the Settling Plaintiffs, however, this Court stated that this finding was somehow a product of the way "***the Settlement is structured***" – suggesting that it might have come out differently on the predominance issue in the context of a motion to certify a litigation class. (*Id.* at 17 (emphasis added)). The suggestion that Rule 23 authorizes a relaxed standard when evaluating predominance at the settlement stage is wrong. Under *Amchem*, the predominance showing for a settlement class is no less demanding than it is for a litigation class. 521 U.S. at 620.[38] Thus, if the settlement class satisfies the predominance test, then a litigation class must satisfy that test as well.

There is no question that it does. Under the law of this Circuit, common questions predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. As this Court correctly stated in *Acosta*, "[t]here is no dispute that the question of Defendants' liability for having violated the obligation to employ reasonable reporting procedures ***is common to the class and is the central issue in this case***." 243 F.R.D. at 393 (emphasis added). At the same time, as this Court also observed in *Acosta*, Plaintiffs' claims for statutory damages raise no individual questions because they are not "required to prove causation or actual damages in order" to obtain them. *Id.* at 393.[39] Thus, this Court's finding in *Acosta* (*id.* at 384) and in its May 7, 2009 Order (Order Granting Prelim. Approval at 17, Dkt. # 423) that these cases satisfy Rule 23(b)(3)'s predominance requirement was correct.

---

[38] *See also Hanlon*, 150 F.3d at 1022 ("[s]ettlement benefits cannot form part of a Rule 23(b)(3) analysis"); *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 314 (3d Cir. 1998) ("*Amchem* rejected the idea that the potential benefits of settlement are relevant to the predominance inquiry"); *Fleury v. Richemont North America, Inc.*, 2008 U.S. Dist. LEXIS 64521(N.D. Cal. July 3, 2008).

[39] *See also Murray*, 434 F.3d at 953; *Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702, 706 (6th Cir. 2009); *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009); *Holloway v. Full Spectrum Lending*, 2007 U.S. Dist. LEXIS 59934, at *15 (C.D. Cal. June 26, 2007) ("statutory damages . . . need not be determined on an individual basis, but rather can be determined based upon Defendant's conduct in the aggregate").

48

1

2          **b.   The risk that Plaintiffs will be unable to satisfy Rule 23(b)(3)'s**
3              **superiority requirement owing to trial manageability concerns**
               **does not justify a significant discount.**

4          Under *Amchem*, the one Rule 23 factor that relates purely to the propriety of

5    certifying a litigation class, as opposed to a settlement class, is the trial

6    manageability element of Rule 23(b)(3)'s superiority requirement.   *Williams v.*

7    *Boeing Co.*, 225 F.R.D. 626, 633 (W.D. Wash 2005).   However, the only

8    manageability concern that has ever been raised here relates to the supposed need

9    "to adjudicate" for each of 15 million class members whether the internally

10   inconsistent bankruptcy-related information contained in their credit reports was, in

11   fact, inaccurate.   Unlike other manageability concerns (*e.g.*, the concern of jury

12   confusion that arises when the laws of many different jurisdictions may be

13   applicable), this particular manageability concern is indistinguishable from the

14   predominance issue.   That is because the purported reason a class action would be

15   unmanageable is that individual accuracy issues predominate over common liability

16   issues.   In its May 7, 2009 order certifying a settlement class, however, this Court

17   found just the opposite, namely that "common questions . . . overwhelm individual

18   issues."   (Order Granting Prelim. Approval at 18, Dkt. # 423).   For all intents and

19   purposes that finding disposes of the manageability issue in these cases because it

20   will be far more efficient to adjudicate those overwhelming common questions in a

21   class action than through individual lawsuits.[40]

22         Even if that were not the case, however, the issue of trial manageability was not

23   even mentioned in this Court's tentative order denying class certification – and with

24   ───────────────────
     [40] *See, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004) ("the
25   predominance analysis . . . has a tremendous impact on the superiority analysis . . .
     for the simple reason that, the more common issues predominate over individual
26   issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating
     the plaintiffs' claims."). *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006
27   n. 12 (11th Cir.1997) ("The predominance and efficiency criteria are of course
     intertwined. When there are predominant issues of law or fact, resolution of those
28   issues in one proceeding efficiently resolves those issues with regard to all
     claimants in the class.").

                                                49

good reason.   By its terms, Rule 23(b)(3) does not allow the issue whether class-wide adjudication is manageable to be evaluated in the abstract, but rather commands the courts to determine whether it is "superior to other available methods."  As the Eleventh Circuit put it in *Klay*, "we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members)."   382 F.3d at 1273; *see also Hanlon*, 150 F.3d at 1023 (superiority "determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution").

Applying this standard in its *Acosta* decision, this Court has already found that "the most economical and efficient way" to resolve these matters is through a class action because the alternative would be "litigating millions of individual claims." 243 F.R.D. at 386.  That ruling is consistent with those of other courts, which have likewise held that "it would be better to handle" cases involving the systemic denial of consumer rights through a class action than to "clog[] the federal courts with innumerable individual suits litigating the same issues repeatedly."  *Klay*, 382 F.3d at 1273; *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30.").

In fact, where, as here, damages are "too slight to support individual suits," *Murray*, 434 F.3d at 953, the "realistic alternative" to class litigation is not a flood of individual suits, but none or virtually none.  *Carnegie*, 376 F.3d at 661. Needless to say, "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all."  *Id.* at 661. Recognizing as much, the courts have "rarely, if ever," found manageability concerns to "be in [themselves] sufficient to prevent certification of a class."  *Klay*,

382 F.3d at 1272.[41]   Thus, even if these cases presented "potentially severe management issues" that would "be insufficient to defeat class certification." *Id.* at 1273.

But these cases do not present severe management issues.  Any manageability concerns arising from the supposed need to adjudicate individual accuracy issues are overblown.  That is because, under the class definition, a consumer is eligible for class membership only when: (1) a Defendant has issued a credit report about a person at a time when his or her credit file showed one or more pre-bankruptcy debts in a delinquent status; and then (2) only if, at that same time, there was nothing in that person's credit file indicating that ***all*** such debts fell within one of the statutorily specified categories that would exclude them from the discharge order.  (Settlement Agreement ¶ 4.1(a)).

All pre-bankruptcy debts that do not fall within one of these excludable categories are automatically discharged.  (Declaration of Jay L. Westbrook, sworn to on July 18, 2007, ¶¶ 5-6, Dkt. # 144).  Furthermore, all of the Defendants employ a standardized coding protocol, known as Metro 2, and subscriber codes that enable them to identify those excludable debts through automated means.[42]   Thus, the only scenario in which the credit report of a consumer who meets the class definition might be accurate would be the exceedingly rare one in which, for example, ***all*** pre-bankruptcy debts with a derogatory notation in that consumer's credit file consist of non-dischargeable debts, such as student loans, which were not coded as such by the creditor (nor determinable as such by that creditor's identity – *e.g.*, Sally Mae).

---

[41]  *See also Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 605 (E.D. Cal. 2008); *In re Live Concert Antitrust Litig.,* 247 F.R.D. 98,148 (C.D. Cal. 2007).
[42]  Binder Decl. ¶¶ 52-54; Hendricks Decl. ¶¶ 10, 12-13, Declaration of John Ulzheimer, sworn to on Feb. 14, 2007, ¶ 17, ("Ulzheimer Decl. II") attached to Shaw Decl. as Ex. HH.  The codes that are used in the Metro 2 protocol correspond to all significant categories of non-dischargeable debt, namely reaffirmations, student loans, unpaid taxes and domestic support obligations.  (*Id.*).  Under their contracts with Defendants, creditors are obligated to use these codes for every account about which they furnish the Defendants information. (*See* Binder Decl. ¶ 52; Hendricks Decl. ¶¶ 10, 12-13).

51

Consequently, the manageability argument in these cases reduces to the notion that individual file reviews would be needed to find, at most, a miniscule number of needles in the hay stack.[43]

In short, the Settling Parties' professed concern about the need to make individual adjudications to determine whether the credit reports of class members are inaccurate is purely theoretical.  By definition, the class consists entirely of consumers whose discharged debts have been ***inaccurately*** reported as not discharged.  Indeed, the Settling Parties have admitted as much in their Notice, which expressly informs recipients that they are class members if they "received an order of discharge of Chapter 7 Bankruptcy" and they "have had a credit report issued by a Defendant . . . that contained debts . . . ***discharged in your bankruptcy that were not reported as discharged***."  (Final Forms of Notice, Ex. C, at 4).  That notice was sent only to persons who satisfied the criteria for membership in the class.  (Settlement Agreement ¶ 4.3(b)).  In other words, the Settling Parties sent a notice to 15 million class members, informing them that class members ***are*** people whose discharged debts were not reported as discharged.  This admission is fatal to their argument that individual adjudications are necessary to determine whether that is true.

In any event, even if individual file reviews were necessary to determine whether the pre-bankruptcy debts showing on a class member's credit report as delinquent were not, in fact, discharged in bankruptcy – *e.g.*, because they were reaffirmed or were student loans – that is a ministerial task that would never require an adversarial hearing to resolve.[44]  In the only case to have addressed this specific

---

[43] As creditors are diligent in coding their loans to show that they are statutorily non-dischargeable by their nature (*e.g.*, that they are student loans or tax liens), Defendants are able to identify all or almost all such non-dischargeable debts through an automated search of their credit files.  (Binder Decl. ¶ 53; *see also* Ulzheimer Decl. II ¶ 16-17).  And, in fact, the Settling Parties have properly excluded all debts that have been so coded from the class definition.  (Settlement Agreement ¶ 4.1(a)).

[44] Indeed, in the case of two categories of statutorily non-dischargeable debt (reaffirmed debts and those successfully challenged in an adversary proceeding),

52

issue – *Lau v. Arrow Financial Servs., LLC*, 245 F.R.D. 620 (N.D. Ill. 2007) – the district court held that this task of "determining whether a class member's debt was discharged in bankruptcy" is not "so daunting" as to defeat class certification. *Id.* at 624. Although this case involves a much larger class than the one in *Lau*, that is no argument against trial manageability; "[t]he more claimants there are, the more likely a class action is to yield substantial economies in litigation."[45] Applying that principle, the courts have consistently held that where, as here, eligibility for damages can be determined through a mechanical process, the burdens of doing so cannot defeat class certification, regardless of how many such determinations must be made.[46]

At any rate, the false specter of countless individual accuracy hearings "to determine the entitlements of the individual class members to relief . . . need not defeat class treatment of the question whether the defendants violated [the law]." *Carnegie*, 376 F.3d at 661. Only if plaintiffs succeed in establishing class-wide liability and no overall settlement has been reached by that time, would any individual damages issues even arise at all. But that wouldn't "be the end of the world." *Id.* Rule 23 "allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." *Id.*; *see also Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir. 1975). Here, at least three such solutions present themselves.

---

this determination could be made for all class members through an automated PACER search of Chapter 7 docket sheets. (Ulzheimer Decl. II ¶ 18; *see also* Deposition of Lisa Fenning, Sept. 25, 2007, attached to Shaw Decl. as Ex. JJ at 24:17-25:16, 68:4-69:4).

[45] *Carnegie*, 376 F.3d at 660-61 (rejecting argument that class is unmanageable because there were "millions of class members" as "no argument at all"); *see also In re Theragenics Corp. Secs. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002).

[46] *See, e.g.*, *Klay*, 382 F.3d at 1273 (finding class action manageable despite potential need to review 600,000 insurance claims); *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 250 (W.D. Pa. 2008) (holding action was manageable where determining accuracy of rates charged to insured class members, while requiring a time-consuming "individual review of each [of 530,000 title insurance file[s]," would be "a virtually automatic process"); *Alberton v. Commonwealth Land Title Ins. Co.*, 247 F.R.D. 469, 827 (E.D. Pa. 2008) (same); *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 560 (D. Md. 2006).

53

First, this Court could eliminate any manageability problems by using statistical sampling methods under which each defendant's aggregate class-wide liability would be determined by: (a) randomly selecting a statistically significant number of claims; (b) determining how many of those claims are invalid in that they involve accurate credit reports; and (c) multiplying the number of the remaining valid claims by a uniform statutory damages award. *Hilao v. Estate of Marcos*, 103 F.3d 762, 782-87 (9th Cir. 1996).[47]  This procedure "protects the due process rights of all involved parties" because, once the aggregate award is determined, the defendant has "no interest" in how it is distributed to class members. *Id*. at 786; *see also Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th 715, 751 (2004); *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1327 (N.D. Ill. 1991).

Another trial manageability solution would be for this Court to adopt an evidentiary inference that any pre-bankruptcy debts that were reported in Defendants' files without a non-dischargeability code were, in fact, discharged. *See, e.g., Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1306 n.3 (9th Cir. 1990) (where defendant's "records were absent or inaccurate, [class members] were rebuttably presumed to qualify for the relevant statutory damages"). Such an evidentiary inference is plainly justifiable given the facts that the vast majority of pre-bankruptcy debts are reached by the discharge order and that creditors have both a contractual obligation and a financial incentive to inform Defendants of any debts that are not discharged by assigning them a non-dischargeability code.  While Defendants would have the right to defeat this inference of inaccuracy by coming forward with evidence rebutting it, the fact that they may be able to do so in a few cases would hardly render these actions unmanageable. *Blackie*, 524 F.2d at 906.

---

[47] *See also Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2008); *Kirkpatrick v. Ironwood Communications, Inc.*, 2006 U.S. Dist. LEXIS 79708 (W.D. Wash. Nov. 1, 2006); *In re Nasdaq Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 524-27 (S.D.N.Y. 1996) (citing numerous cases).

54

Finally, this Court would always have the option to "decertify[] the [global] class after the liability trial" and then create subclasses consisting of class members whose eligibility for damages are obvious from the face of their credit reports. *Carnegie*, 376 F.3d at 661; *see also Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227 (9th Cir. 1996). The ability of this Court to do so should lay to rest any concerns it may have regarding the manageability of these cases through the class action device. *See* Part Two, Point II.D *infra*.

### c. **The risk that due process concerns will preclude satisfaction of Rule 23(b)(3)'s superiority requirement does not justify a significant discount.**

In its Tentative Order denying class certification, this Court stated that a class action is "an inferior form of adjudication" because it would expose Defendants to exorbitant liability to a class in which many persons may have suffered no actual damage. (Class Cert. Tentative Order. at 10, Jan. 26, 2009, Dkt. # 369-1). In fact, the risk that this Court (and the Ninth Circuit) would ultimately refuse class certification on the basis that it would expose Defendants to the possibility of a constitutionally excessive statutory damage award is not serious.

First, as the Seventh Circuit held in *Murray* and as this Court has itself twice acknowledged, to construe the FCRA as precluding class-wide statutory damage awards would subvert the language of that statute, which, unlike the Truth in Lending Act and the Fair Debt Collection Practices Act, imposes no limits on the size of those awards. *Murray*, 434 F.3d at 953; *Holloway*, 2007 U.S. Dist. LEXIS 59934, at *29-30; *Pirian v. In-N-Out Burgers*, 2007 U.S. Dist. LEXIS 25384, at *14-15 (C.D. Cal. Apr. 5, 2007).[48]

---

[48] *See also Reiter v. Sonotone Corp.*, 442 U.S. 330, 344-345 (1979) (argument that class treatment of Clayton Act claims should be denied because cost of defending them could be "potentially ruinous" to small businesses is "more properly addressed to Congress than to this Court"); *Kesler v. Ikea U.S., Inc.*, 2008 U.S. Dist. LEXIS 97555, at *23 (C.D. Cal. Feb. 4, 2008) (ruling that to deny class certification on superiority grounds based on "the potential for high damage awards" would be "inconsistent with the FCRA provision for statutory damages"); *White v. E-Loan, Inc.*, 2006 U.S. Dist. LEXIS 62654, at *26-27 (N.D. Cal. Aug. 18, 2006).

55

Second, the notion that "class action treatment might somehow influence the proportionality of a statutory damages award is logically flawed." *In re Napster Copyright Litig.*, 2005 U.S. Dist. LEXIS 11498, at *40 (N.D. Cal. May 31, 2005). "[T]he sum of the actual damages suffered by a class of plaintiffs will be the same regardless of whether their claims are prosecuted as a single class action or as a myriad of individual suits." *Id.* at *39. As the aggregation of claims that are "too slight to support individual lawsuits" is the *raison d'etre* of Rule 23, to deny class treatment on grounds that such aggregation would expose a defendant to too great a liability would be to turn that rule on its head. *Murray*, 434 F.3d at 953; *see also Kavu, Inc.   v. Omnipak Corp.*, 246 F.R.D. 642, 650 (W.D. Wash. 2007) (characterizing defendant's superiority argument as disguised "challenge to the statutory amount of damages" and an effort to "avoid damages for the vast majority of its violations"); *In re Napster*, 2005 U.S. Dist. LEXIS 11498, at *40. As the Eleventh Circuit has aptly remarked, if their "fears are truly justified, the defendants can blame no one but themselves. It would be unjust to allow corporations to engage in rampant and systematic wrongdoing, and then allow them to avoid a class action because the consequences of being held accountable for their misdeeds would be financially ruinous." *Klay*, 382 F.3d at 1274.

Third, Defendants' excessive damages argument incorrectly assumes that "the statutory remedy [must] be proportional to the plaintiff's own injury" in order to satisfy due process. *Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 545 F. Supp. 2d 768, 777 (N.D. Ill. 2008). But that is not so; "Congress may choose an amount that reflects the injury to the public as well as to the individual." *Id.* (citing *St. Louis, Iron Mountain & S. Ry. Co. v. Williams,* 251 U.S. 63, 66 (1919); *see also Ashby v. Farmers Ins. Co.*, 2008 U.S. Dist. LEXIS 105612, at *22 (D. Or. Dec. 12, 2008). The FCRA's "maximum possible accuracy" requirement serves the public interest in protecting the integrity of the consumer banking system. 15 U.S.C. § 1681(a). Even if Defendants could show that a class-wide

statutory award would be disproportionate to the injury suffered by the class, they have not – and cannot – show that such award would be disproportionate to the harm they have done to that vital public interest.

Apart from having no logical or legal merit, the argument that the possibility of a constitutionally excessive verdict precludes Plaintiffs from satisfying Rule 23(b)(3)'s superiority requirement is factually incorrect.

First, even assuming Defendants' litigation driven scoring studies reflect reality, which they do not, those studies confirm than a large majority of the class suffered an adverse scoring impact, resulting in losses which are conservatively estimated at $3 billion.[49] As that amount corresponds almost precisely with Defendants' overall damages exposure, the risk of a disproportionate statutory damages verdict provides no basis for denying class certification on superiority grounds.

Second, the litigation-driven scoring studies upon which Defendants base their argument that some class members benefitted from Defendants' inaccurate reporting practices are deeply flawed. (Binder Decl. ¶¶ 35-50) Because Defendants have refused to turn over any of the data against which their results can be tested, they are urging this Court to accept them on blind faith. (*Id.* ¶ 33). Moreover, of Defendants' studies only one – the August 2008 Equifax study – even employs criteria corresponding to the criteria that define class membership and, hence, that is the only study that even arguably seeks to measure the scoring impact of the

---

[49] All of the cases in which the courts have denied class certification of claims owing to excessive damage concerns have involved mere technical violations and a risk on injury that is less than minuscule. *See, e.g., Bateman v. Am. Multi-Cinema, Inc.,* 252 F.R.D. 647, 651 (C.D. Cal. 2008) (denying certification of claims against merchants for failing to properly truncate credit card numbers on customer receipts where increased risk of identity theft was one in 10 million at most). Those cases stand in stark contrast to this one in which there are credible allegations that the class has suffered serious losses as a result of Defendants' willful violation of their core reporting obligations under the FCRA. *See, e.g., Murray,* 434 F.3d at 954 (holding that excessive damage concerns cannot be properly addressed until after a jury has issued its verdict and, hence, are irrelevant at class certification stage); *Ashby,* 2008 U.S. Dist. LEXIS 105612, at *22-23; *Kesler,* 2008 U.S. Dist. LEXIS 97555, at *22-23; *Holloway,* 2007 U.S. Dist. LEXIS 59934, at *27; *Pirian,* 2007 U.S. Dist. LEXIS 25384, at *14; *White,* 2006 U.S. Dist. LEXIS 62654, at *24-25.

57

inaccurately reported judgments and tradelines on which these lawsuits are based. (*Id.* ¶ 47). That study, however,  is lacking reliability, as it is not based on the scoring model on which the great bulk of the lending community relies in deciding whether and on what terms to extend consumer credit – namely, the FICO scoring system. (*Id.* 36; see also *id.* ¶¶ 17-23).

At any rate, far from showing that Defendants' unlawful reporting practices actually helped the class's credit scores, the August 2008 Equifax study showed that they ***deflated*** the credit scores of 63.8% of the class and increased the scores of just 18.5% of the class. (Zhou Decl., Ex. 72 at 7-8; *see also* Binder Decl. ¶ 47). Furthermore, the scoring injuries were much more severe than any purported benefits. According to the Equifax study, the number of class members who suffered an adverse scoring impact of more than 25 points was ***78 times higher*** than the number whose scores increased by that amount. (Zhou Decl., Ex. 72 at 7-8; *see also* Binder Decl. ¶ 48).

Finally, as set forth in the declaration of the *White* Plaintiffs' scoring expert, these results significantly understate the adverse scoring impact of Equifax's inaccurate reporting practices. That is because, when performing its studies, Equifax entirely "blanked out" the accounts it had corrected to show a bankruptcy notation, thereby, needlessly removing certain information such as "type of account" and "high credit" – both of which figure positively in calculating a consumer's credit scores. (Binder Decl. ¶¶ 45-46 & 49).[50] In this connection, it is telling that neither Experian nor Trans Union – which, unlike Equifax, do not blank

---

[50] It is also worth noting that any beneficial scoring effect that might result from failing to substitute a delinquent notation on a discharged debts with a bankruptcy indicator would be temporary, as over time the net impact of such inaccurate reporting will always be adverse. (*See* Declaration of John Ulzheimer, sworn to on July 18, 2007, ¶ 19, attached to Shaw Decl. as Ex. II ("Ulzheimer Decl. III"); Binder Decl. ¶ 28). Further, the presence of certain kinds of errors (*e.g.*, judgment errors) can by themselves disqualify class members from obtaining mortgage and auto loans and can result in other non-scoring injuries. (Ulzheimer Decl. III, ¶ 17). Defendants cannot dispute their ability to identify class members whose files contains such errors as the Settlement requires that they do so.

out accounts showing a bankruptcy notation – have submitted a scoring study using criteria that corresponds to the criteria that defines class membership.   (Binder Decl. ¶ 48).

At any rate, even assuming that Defendants' unlawful reporting practices had a beneficial scoring effect for certain consumers, there would still be no basis for denying the benefits of the class action device to the large majority of consumers who suffered an adverse effect.  Indeed, through the same automated processes that Defendants have used to perform their scoring studies and identify class members, they can: (1) identify the instances in which class members applied for mortgages and other forms of credit (Binder Decl. ¶¶ 56-57); and (2) determine whether their credit scores were adversely affected by Defendants' inaccurate reporting practices at the time they did so.    (*Id*. ¶ 58; *see also* Ulzheimer I Decl. ¶ 24).   Thus, to the extent certain consumers suffered no adverse scoring consequences as a result of those practices, they can be identified easily and screened out.

### C. <u>The Amount Of The Settlement Pales In Comparison To The Litigation Value Of These Cases.</u>

In sum, this Settlement does not come close to the range of reasonableness.  It is a great deal for Defendants, who will each wipe out at least $1 billion in potential liability, a very good deal for Settling Plaintiffs' counsel who will reap $17.25 million in fees, and a fine deal also for the Settling Plaintiffs themselves who will be awarded $7,500 each, but it is a lousy deal for class members who will receive an average of less than one cent on the dollar for their claims.[51]

### D. <u>Other Relevant Considerations Do Not Justify Settling These Cases For A Tiny Fraction Of Their Litigation Value.</u>

None of the less significant factors relating to the adequacy determination favor

---

[51] *See, e.g., In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *23 (E.D. Tex. June 30, 2005) (rejecting preliminary approval of settlement under which class counsel "would recoup 100% of their $5.0 million in attorneys' fees and expenses," while the plaintiff class "would only be receiving a few pennies on the dollar").

approving the Settlement.

*The cost, complexity and duration of the proceedings:* Since "virtually all class actions will result in long, complex and expensive trials," the key question in evaluating this factor "is whether the likelihood of an especially long and complex trial is enough in a particular case to warrant a substantial reduction in what the class might otherwise receive in settlement." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217 (5th Cir. 1981). Whatever reduction might be justified here, it would not come close to bridging the huge gap between Defendants' litigation exposure and the paltry amount the classes would receive under the Settlement. Further, it does not matter much whether those class members who might bother to submit claims receive "$15 to $30 now or in the future, since it is such a trivial amount of money even to a person who is usually strapped for funds." *Reynolds*, 288 F.3d at 285. At any rate, this case can be trial ready within one year.

*The amount of discovery:* Although the Settling Plaintiffs tout the supposedly extensive discovery they have taken, the truth is that they have barely scratched the surface. Indeed, of the 40,000 pages of documents that Defendants have produced, only about half are internal documents that have anything to do with their reporting and reinvestigation practices.[52] (Shaw Decl. ¶¶ 6-7). In other words, the discovery in these cases was perfunctory at best – resulting in the production of about 7,000 pages of material (or about three banker's boxes) from each Defendant in an action challenging corporate practices that affect over 10 million consumers and span a six-year liability period. (*Id.*). And, of these 20,000 pages, less than 400 even mention Defendants' procedures for reporting pre-bankruptcy debts. (*Id.* ¶ 8).

Critically, with the single exception of the Experian charts showing the number of bankruptcy-related corrections they make, Defendants have not produced any

---

[52] The other 20,000 pages include copies of consumer credit reports, insurance contracts, furnisher contracts, public records such as bankruptcy petitions, deposition transcripts and interrogatory responses from other litigation, and various documents post-dating the filing of the complaints. (Shaw Decl. ¶ 7).

1  documents on the only truly disputed issue: willfulness.  For instance,

2  Redacted- Filed Under Seal

10

11      Further, Defendants have not produced a single memorandum or email

12  discussing the bankruptcy reporting problem that lies at the heart of this litigation.

13  (*See* Wolf Decl. ¶ 5).  Given the volume of consumer disputes relating to this

14  problem  and the fact that each Defendant attended tape recorded trade conferences

15  at which it was discussed, any claim that there are no such documents beggars the

16  imagination.  Indeed, a senior Trans Union official admitted Redacted- Filed Under Seal

17

18  Redacted- Filed Under Seal

22  Redacted- Filed Under Seal      Yet, taking Defendants' claim that they have no

23  documents mentioning this problem on faith, counsel for the Settling Plaintiffs

24  never deposed a custodian of records and, since defeating the *Acosta* settlement,

25  failed to file a single motion to compel.

26      Further, though the Settling Plaintiffs tout the 40 depositions in these cases, just

27  20 of these were of defendants' officials, eight of which concerned their post-

28  litigation scoring studies and four of which had no relevant testimony whatsoever

61

(including one that lasted just 90 minutes). (Shaw Decl. ¶ 9). Nor have they deposed anyone who might candidly discuss this problem – that is, they have deposed none of Defendants' lower or mid-level employees from their reinvestigation division, none of their former officers, and no one from Defendants' trade association or from any other third party. (Wolf Decl. ¶ 6).

As a result of this failure to take important discovery or to reveal "what information they reviewed on which they based their assessment of the strength of [their] claims," the Settling Plaintiffs have left this Court with no ability "to intelligently evaluate" those claims and, hence, no basis to approve the settlement. *Kullar v. Foot Locker Retail, Inc.,* 168 Cal.App.4th 116, 129 (2008); *see also Olden v. Gardner,* 294 Fed. Appx. 210, 217 (6th Cir. 2008).

***The views of the original named Plaintiffs and their counsel:*** Given that the entire point of requiring heightened judicial scrutiny of class settlements is to ensure that class counsel have not subordinated the financial interests of the class to their own, the *White* Plaintiffs believe that the views of class counsel is a factor that deserves very little, if any, weight in evaluating the fairness of such settlements. Be that as it may, however, the views of class counsel in these cases do not favor settlement. First, two of Plaintiffs' original counsel fiercely oppose the Settlement, including both the attorney who is most familiar with the harmful effects of Defendants' unlawful practices on class members and the attorney who authored all of the major briefs and argued the two major contested motions in this matter. (Wolf Decl. ¶ 4). *See, e.g., Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1420 (D. Minn. 1987) (giving careful consideration to views of named plaintiffs' counsel who opposed settlement). Second, inasmuch as counsel for the Settling Plaintiffs took "virtually no discovery related to the crucial issue[]" of willfulness, "their arguments are entitled to little deference." *Olden,* 294 Fed. Appx. at 219. And, here, even little deference would be too much given the pressures to support the Settlement that were created by a provision denying fees to any attorney who

might oppose it.

Furthermore, the fact that a majority of the nine original Named Plaintiffs are opposing the settlement, even though they were each offered $5,000 to support it, is a factor that should "weigh heavily" against approval.[53]  By contrast, no weight should be afforded the views of the four Named Plaintiffs who support the settlement, given that their interests conflict with the class and that three of them supported the defective *Acosta/Pike* settlement that would have sold out the class. *See* Part One, Points II.A and B *supra*.

## II.   The Settlement Is Fatally Defective Because It Sacrifices The Claims Of The Unfortunate Many For The Favored Few.

As noted, this Court must "give heightened scrutiny" to settlements that are reached prior to a ruling on class certification to guard against the creation of conflicts between different segments of the class.  *Hanlon*, 150 F.3d at 1020.  In order to detect such conflicts, the primary focus of such scrutiny should be on the settlement's "distribution terms."  *GMC Pick-Up*, 55 F.3d at 797.  A settlement that premises "the gain of one segment of a class . . . on the sacrifices of the other" is fatally defective.[54]   Or, as the Seventh Circuit has put it, "convenience and expediency cannot justify the disregard of the individual rights of even a fraction of the class."  *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1133 (7th Cir. 1979).  In attempting to divide a paltry fund of $28 million among

---

[53] *Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494, 497 (S.D.N.Y. 1994); *see also Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 837 (9th Cir. 1976) (noting that opposition of 5 of 9 named plaintiffs was "significan[t]" and required trial court to give "seasoned responses" to their objections); *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216-17 (5th Cir. 1978) (giving "great weight" to fact that named plaintiffs who had "provided exceptional representation" and showed no signs of "any conflict of interest" all opposed class settlement).

[54] *Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 299-300 (M.D. Pa. 1995); *see also GMC Pick Up*, 55 F.3d at 797, 816; *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 16 (2d Cir. 1981); *Piambino v. Bailey*, 610 F.2d 1306, 1329 (5th Cir. 1980) (holding that vacatur of order approving settlement "is demanded by the failure to assess the interests of the two categories of plaintiffs and whether the settlement was fair, adequate and reasonable as to each").

63

three different classes with some 10 million class members in each, the present Settlement impermissibly trades off the rights of 99% of all class members who will gain nothing or almost nothing for a select minority of 1% who will receive about two-thirds of the recovery.

**A.** **The Settlement Sacrifices The Claims Of The Large Majority Of Class Members Who Are Unaware Of The Information In Their Credit Reports For The Small Minority Who Are.**

To obtain an award under the Settlement, class members are required to submit a claim form, affirming that they "believe that there have been one or more errors in my credit reports regarding debts discharged in bankruptcy." (Final Forms of Notice, Ex. C, at 5). This requirement is a farce.

The Settlement provides for the Notice "to be sent via U.S. mail" only to "each Settlement Class Member identified on the Class List." (Settlement Agreement ¶ 4.3(b)). As the Notice itself states, a person can be a class member only if he or she "had a credit report issued by a Defendant that contained debts . . . *discharged in your bankruptcy* that were not reported as discharged." (Final Forms of Notice, Ex. C, at 4). Because the recipients of the Notice were all class members, the requirement making them attest to their belief that their credit reports inaccurately reported their discharged debts as not discharged requires class members to give Defendants information that they already have.

The transparent rationale for this bogus requirement is to create the appearance that the Settlement is less of a sell-out than it really is. Had the Settlement provided for the proceeds to be distributed to the entire class, each Defendant would be writing a check for about *90 cents* to each class member – or less than *1%* of the $100 minimum statutory award to which they would be entitled were they to prevail on the merits. In order to avoid this obviously absurd result, the Settling Parties had to find a way to structure the Settlement to make it appear as if class members were receiving real value. They did this by structuring the Settlement in a

64

way that would ensure that the recovery would go to just a tiny proportion of the class (*see* note 3 *supra*).  Ironically, NCLC, a proponent on the Settlement, has helped formulate ethical guidelines for the National Association of Consumer Advocates ("NACA") that castigate this very practice of using a claim form "to whittle the class down so that participating members receive more relief."[55]

The attestation requirement filled that "whittling down" need because, as the Settling Parties know full well, the large majority of class members have no knowledge of the bankruptcy-related information in their credit reports and, hence no basis for believing that their pre-bankruptcy debts were not being accurately reported as discharged.  Indeed, in their memorandum in opposition to preliminary approval of the *Acosta/Pike* Settlement, plaintiff Hernandez's counsel acknowledged that "most class members are unaware of the fact that their discharged debts are being inaccurately recorded as due and owing on their credit reports." (*Acosta* Br. at 53).  In its *Acosta* decision, this Court agreed, stating that "a considerable number of class members are likely unaware, through no fault of their own, that they even have viable claims" because they have never received copies of their credit reports and, even if they did, they would be unlikely to have "the uncommon legal sophistication" that is needed to "identify discharged debts showing inaccurately."   243 F.R.D. at 388-89.   (*See* Juntikka Decl. ¶ 41; Declaration of Prof. Katherine M. Porter, sworn to on Nov. 29, 2009, ¶¶ 33-42 ("Prof. Porter Decl.")).

To make matters worse, the Settlement provides no mechanism whereby enterprising class members who might be allured by the prospect of a $20 award could discover the bankruptcy-related information in their credit reports.  To the

---

[55]  NACA Class Action Guidelines at 52 (as revised 2006) (available at http://www.naca.net/_assets/media/RevisedGuidelines.pdf).    Under the NACA guidelines, claim forms should be used only when it is not possible to identify class members or determine their eligibility for relief from information in the defendant's records.  *Id.* at 53.  Yet, despite objecting to the *Acosta/Pike* settlement on that basis, the Lieff/Caddell team are supporting the use of a claim form here that will provide Defendants with no information that they do not already have.

65

contrary, in response to an inquiry from one class member seeking "information about how my debts were reported in my credit reports, so I can figure out if they were incorrect," the Settlement Administrator stated that he was "unable to assist you regarding the content of your credit report." (Declaration of Ralph Michael Porter, sworn to on Nov. 24, 2009, ¶¶ 8-9). Furthermore, any class member who might order a copy of his or her credit reports wouldn't discover any errors that may have been contained in them because Defendants have now corrected those errors due to the injunctive relief settlement.

Needless to say, class members who have no knowledge, understanding or memory of the information contained in their credit reports cannot honestly affirm even a belief that those reports contained errors regarding debts discharged in bankruptcy. And, likewise, they would have no way of knowing that the credit they had been denied and the higher interest rates that they were paying were caused by those bankruptcy-related errors.

In rejecting the *Acosta* settlement, this Court referred to its claims-made component as "present[ing] an unforgiving whipsaw," causing class members to "release[e] [Defendants] from all conceivable claims while granting nothing of monetary value in return." 243 F.R.D. at 394. Inasmuch as the *Acosta* claim form did not require consumers having no awareness of the information in their credit reports to affirm their belief that such information was erroneous, the whipsaw created by the present Settlement is worse. To enrich the few who read their credit reports during the liability period and had the sagacity to identify possible inaccuracies within them, this Settlement would sacrifice the claims of the many who did not see their reports and have no way of knowing how those reports were characterizing the status of their pre-bankruptcy debts. While not even affording these unfortunate class members even the opportunity to get a single dime, the Settlement will force them to relinquish "all conceivable claims."

At any rate, even if all class members were aware of the information on their

1   reports, it is a fact that "'claims made' settlements regularly yield response rates of

2   10 percent or less." *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me.

3   2005).  For the large majority who do not respond and who "will receive nothing in

4   exchange for their claims being extinguished . . . , the probability of success would

5   need to be zero percent in order to justify finding that the settlement was fair." *Id.*

6   at 51 n. 23.[56]

7
8   **B.  <u>The Settlement Abandons The Claims Of The Reinvestigation Subclass For Zero Compensation.</u>**

9       In their complaints in these actions, Plaintiffs have asserted two distinct types

10  of claims – a section 1681e(b) claim based on Defendants' unreasonable reporting

11  procedures on behalf of the classes, and a section 1681i claim based on Defendants'

12  unreasonable  reinvestigation  practices  on  behalf  of  subclasses,  consisting  of

13  consumers whose discharged debts continued to be erroneously reported after they

14  submitted disputes complaining of those errors.  Plaintiffs have submitted evidence

15  indicating that each Defendant's woeful reinvestigation practices fail to correct

16  inaccuracies in about 20% of the cases.   (Juntikka Decl. ¶ 44).   If it can be

17  established that Defendants employed these practices in reckless disregard of their

18  obligations under section 1681i of the FCRA, subclass members will be entitled to

19  a statutory damages award, separate and distinct from any award they might obtain

20  on their section 1681e(b) claim.   Furthermore, members of the reinvestigation

21  subclass class all had problems that they believed were significant enough to

22  warrant  the  expenditure  of  their  time  and  energy  to  fix  –  time  that  the *White*

23  Plaintiffs' expert values at approximately $60 per dispute.  (Smith Decl. ¶ 42).  This

24  is not counting the frustration and distress that subclass members have suffered in

25  their vain attempts to get Defendants to fix their credit reports – injuries that were

26

27  ───────────────
    [56] *See also Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 47515, at *15-16 (N.D.
28  Cal. June 19, 2007) (a settlement "cannot pass even the threshold of plausibility required for even preliminary approval" when rights of "those absent class members who wind up not submitting a timely claim . . . would be erased totally").

67

highlighted in a recent NCLC report entitled "Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in Their Credit Reports" (Jan. 2009).[57]

Without any explanation at all, however, the Settlement would release the claims of these subclass members in exchange for *zero* additional compensation. This failure to "provide for any additional payment" to an entire subclass "in return for the release of [their] claims" is a fatal defect that compels this Court to reject the Settlement. *National Super Spuds,* 660 F.2d at 18; *see also Piambino*, 610 F.2d at 1329-30 (disapproving settlement that required significant segment of class that placed judgment creditors, who had distinct claims of their own, on the same footing as other class members); NACA Class Action Guidelines at 44 ("a claim should not be released unless the settlement includes relief for the claim").

## C. The Settlement Irrationally Favors Class Members With Claims Against One Defendant Over Those With Claims Against Two Or Three.

This matter involves not one class action suit, but three, each against a different Defendant. Many class members have claims against just one Defendant, while many others have claims against two or three. Naturally, if each Defendant is found liable for willfully violating the FCRA, those class members who have claims against multiple Defendants will be entitled to a statutory damage award from each one. Yet, under the Settlement, all class members are entitled to the same award, regardless of whether they have claims against one, two or all three Defendants. The result is that the rights of those class members who have claims against multiple Defendants are traded off in favor of those who have claims against just one. As such a distribution formula is patently irrational on its face, the Settlement is fatally defective. *National Super Spuds,* 660 F.2d at 18.

## D. The Settlement Sacrifices The Claims Of Class Members Who Are Unable To Affirm Their Belief They Have Suffered Damages To Enrich A Tiny Minority Who Are.

---

[57] *See* www.nclc.org/issues/credit_reporting/content/automated_injustice.pdf.

As the Settlement is structured, the lion's share of the common fund is set aside for a tiny minority of the class who can affirm their belief that they have suffered actual damages as a result of errors on their credit reports.  Furthermore, the claims of these "actual damages" claimants, whose awards (depending on the number of claims filed) would range from an estimated $150 to $750 each, are given priority over all others, except for a residual pool of $10 million reserved for the claims of everyone else.  (Settlement Agreement ¶ 7.7).  In other words if, for example, just 0.8% of the class of 15 million class members file "actual damage" claims worth $150 and 0% file claims worth $500 or $750, the payout to the "actual damage" group would be $18 million of an estimated awards pool of $28 million – leaving just $10 million for the rest of the class or an average of about **67 cents** per person. If just 10% of that class filed claims, they would each get an award of $6.70 and, if 20% filed, they would each get $3.35 (or $1.12 per defendant).   Everyone else, of course, would get nothing.

This trading off of the claims of rank-and-file class members for the benefit of a handful of "actual damage" claimants is unjustified.  First, as set forth in Point III of Part One above, this trade off cannot be justified on the ground that these claimants are entitled to "actual damage" awards because, on the record presented here, this Court cannot certify "actual damage" claims for class treatment.   Thus, the only awards that can be made under the Settlement are statutory damage awards and the term "actual damage" claimants must be regarded as the misnomer that it is.  Under the FCRA, however, all class members are equally entitled to a statutory damages award of between $100 and $1,000, regardless of any actual damages.  *See Acosta*, 243 F.R.D. at 389 and cases cited in note 39 *supra* and accompanying text.  And, as statutory damages are not linked to actual harm, the FCRA does not permit any one consumer to be awarded more statutory damages than any other based on his ability to show that he or she suffered greater actual harm.  *Ashby*, 2008 U.S. Dist. LEXIS 105612, at *27 (rejecting "the proposition that actual harm is a relevant factor when

69

1   determining the amount of statutory damages under FCRA").

2   Moreover, even if actual harm were a relevant factor in assessing the amount of

3   actual damages, the Settlement's distribution formula would still be unfair and

4   unlawful for at least two reasons.  First, because any statutory damages award must

5   fall within a range of $100 to $1,000, the maximum permissible disparity between

6   any two consumers can never be greater than 10 to 1.  Yet, under the formula

7   established by the Settlement, the anticipated $500 and $750 amounts that would be

8   awarded to claimants who affirm their belief that they suffered a denial of a

9   mortgage or job would be 25 and 37.5 times higher, respectively, than the

10  anticipated $20 amount that would be awarded to those filing for "convenience"

11  payments.  In short, lacking enough money to go around, the Settlement picks

12  winners and losers – sacrificing the claims of the many for the claims of the few

13  without any basis in law.

14  Second, in picking those winners and losers, the Settlement uses criteria that are

15  arbitrary, unfair and irrational.  On the one hand, consumers who affirm their belief

16  that they were denied credit or a mortgage are eligible for estimated "actual

17  damage" awards of $150 and $500, respectively, regardless of whether they can

18  show or even believe that they suffered any out-of-pocket loss as a result.  On the

19  other hand, consumers who believe or can even prove that they were forced to pay

20  higher interest rates on their credit cards or mortgages as a result of the errors in

21  their credit reports are relegated to the estimated $20 "convenience" award.

22  If anything, the actual losses of these consumers, which could easily reach well

23  into the hundreds of dollars for those paying higher interest on credit cards and well

24  into the thousands for those paying higher interest on mortgages, are likely to be

25  much greater than the losses suffered by consumers who were denied high interest

26  credit cards and mortgages.  Yet, under the Settlement, the rights of consumers

27  falling into these distinct groups would be sacrificed in order to enrich those who

28  suffered much smaller losses.  In short, even if the FCRA permits disparities in the

70

size of statutory damages based on the amount of actual damages suffered, which it does not, the lines this Settlement draws are completely irrational.  On that basis alone, the Settlement is fatally defective.

### E. The Settlement Does Nothing To Account For The Claims Of Class Members Who Fall Into Subclasses That Present No Manageability Or Due Process Concerns.

As set forth above, the *White* Plaintiffs strongly believe that the broader classes are manageable.  However, if, as appears to be the case, any manageability-related litigation risk played a significant role in the Settling Plaintiffs' valuation of these claims, they should have heeded this Court's instruction and explored whether it was possible to identify any segments of the putative classes for which that risk is less substantial.  Notwithstanding their failure to do so, this Court has an independent obligation to examine the possibility whether the class could be divided in a manner that would mitigate the manageability and superiority concerns that it might otherwise think militate in favor of the Settlement.  *GMC Pick-Up*, 55 F.3d at 818 (stating that district court's conclusion that ability to maintain suit as class action "favored settlement may have reflected its mistaken all-or-nothing approach to certifying this national class").  Such an examination reveals that there are at least two distinct subclasses that raise neither of those concerns.

The first consists of all consumers who meet the criteria for inclusion in the class by virtue of their having an outstanding pre-bankruptcy civil judgment in the public records section of their credit files, which was not obtained by a governmental agency, taxing authority or natural person.  As such judgments are always reached by the discharge order, there would never be any need "to adjudicate" whether a credit report showing them as outstanding is accurate or inaccurate and, hence, their identification presents no manageability problems.[58]

---

[58]   In the real world, the only judgments that are not reached by a discharge order are those in which the creditor is a government agency, a taxing authority or a natural person.  (Declaration of John T. Orcutt, Esq., sworn to on Nov. 20, 2009; Declaration of Bruce R. Epstein, Esq., sworn to on Dec. 14, 2009; Declaration of

71

Furthermore, such outstanding judgments are black marks of the worst kind.  Their presence on a credit report can have only a deflationary effect on credit scores (Binder Decl. ¶ 51) and is, at any rate, an automatic disqualifier for both mortgages and auto loans.  (*See* Juntikka Decl. ¶ 45 & Ex. O; Ulzheimer Decl. II ¶ 17).  Accordingly, certification of a judgment class, which would consist of approximately 1,200,000 consumers per Defendant, (*see* Zhou Decl., Ex. 72 (noting that 8% of files with bankruptcy discharge orders showed pre-bankruptcy judgments as outstanding)), also raises no prospect of an aggregate statutory damage award that might exceed constitutional limits.

Finally, it is worth noting that the only excuse Defendants have ever offered for their inaccurate reporting practices – that they are privileged to rely on the information that is furnished to them by creditors – does not apply to judgments because Defendants obtain all of the relevant information solely from public records vendors such as LexisNexis.  (*See*        Redacted- Filed Under Seal

                              Ulzheimer Decl. III ¶ 22).  *See also, Summerfield v. Equifax Info. Servs., LLC*, 2009 U.S. Dist. LEXIS 91316 at *7-8 (D.N.J Sept. 30, 2009).

The second subset of the broader class that would present no manageability concerns is one that would consist of class members whose credit reports were corrected following their submission of a consumer dispute.  At a minimum, the existence of such a correction would create at least a *prima facie* case of inaccuracy – obviating any need for individual accuracy determinations.  Furthermore, the fact that members of this "corrected error" class felt it necessary to go through the trouble of submitting a dispute strongly suggests that they were experiencing problems with their credit.  And, in fact, all of them have suffered at least some

---

Robert Weed, Esq., sworn to on Nov. 18, 2009; Declaration of George T. Carlson, Esq., sworn to on Dec. 4, 2009); (Juntikka Decl. ¶ 49).  Because the identity of those creditors is determinable from the face of the credit report, the determination whether a pre-bankruptcy judgment has, in fact, been discharged presents no individual accuracy issues.  (Binder Decl. ¶ 55).

actual damage associated with the time and expense required to go through the dispute process. (Smith Decl. ¶ 42). Thus, the potential that this class, which would consist of approximately 600,000 consumers per Defendant (Binder Decl. ¶ 64) (noting that each Defendant receives about 150,000 "included in bankruptcy" disputes per year), might obtain an aggregate statutory damages award also raises no due process concerns.

In short, although the Settling Plaintiffs cite class certification risk as a key factor in valuing the strength of their claims, they have done nothing in their Settlement to distinguish between the claims of the broader class that arguably present that risk and the claims of at least two subsets of that class, which do not. Their failure to do so is a fatal defect that by itself defeats the Settlement.[59]

## III.    The Settlement Is Procedurally Defective.

### A.   The Class Notice Does Not Provide Class Members Information Sufficient To Determine Whether It Is In Their Interest To Participate.

In order to meet the requirements of Rule 23(c)(2), a class notice must "adequately describe" the substantive claims and "contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977); *see also Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1177 (9th Cir. 1977). Potential class members cannot make that decision if the class notice does not provide potential class members with the means to determine even "if they are part of the class." *Valentino*, 97 F.3d at 1234. Apart from running afoul of Rule 23(c)(2), such notice constitutes a violation of the constitutional right to due process of law.

---

[59] *See, e.g., Hanlon*, 150 F.3d at 1020 ("*Amchem* instructs us to give heightened scrutiny to cases in which class members may have claims of different strength."); *GMC Pick-Up*, 55 F.3d at 816 (holding that "failure to distinguish between groups of plaintiffs that did and those that did not confront difficult . . . defenses constitutes an abuse of discretion").

73

*Id.* The misleading and patently inadequate notice that the Settling Parties have fashioned here does precisely that.

Under the Settlement, Defendants were required to mail the Notice only to consumers who qualified for membership in the class by virtue of their having been issued credit reports showing one or more of their pre-bankruptcy debts as delinquent, despite the absence of any information in Defendants' files suggesting that such debts had been excluded from discharge.  In other words, the Notice was sent only to individuals who already qualify as class members.  (*See* Settlement Agreement ¶ 4.3(b)).  But that is not what the recipients of the Notice were told.  Instead, the Notice affirmatively tells those recipients that it is up to them "to see *if* you will be affected by this settlement or if you can get benefits from it," which requires that "you first have to determine *if* you are a Class member."  (Final Forms of Notice, Ex. C at 4.)  (emphasis added).  As everyone who was sent a class Notice is, by definition, a class member, this statement is grossly misleading.

That should itself be enough to invalidate the Settlement.  But the problem is even worse.  As set forth in Point II.A of Part Two above, the large majority of class members have no way of identifying themselves as such because they have never seen copies of their credit reports, did not understand them if they did and do not otherwise have any means of determining whether they are a class member – that is, they have no way of determining if those credit reports failed to show one or more of their pre-bankruptcy debts as "discharged in bankruptcy."  Lacking that information, these class members cannot make an intelligent decision whether or not to opt out of the Settlement and, hence, the Notice neither meets the minimum requirements of Rule 23(c)(2) nor of the Due Process Clause.

Even if class members were able to identify themselves, the Notice is still fatally defective in that it does not state the class size or describe the formula for distributing funds.[60]  Specifically, the Notice states that the size of the common

---

[60]  *See, e.g., Marshall,* 550 F.2d at 1178; *State ex rel. Byrd v. Chadwick*, 956

fund is $45 million, but it does not mention that, after payment of fees and expenses, what remains in that fund must be divided among 15 million class members.  Without that information, knowledge of the aggregate settlement amount is meaningless.  A settlement that divides a net fund of $29 million among 15 million people is 15 times worse than a settlement that divides the same fund among one million.  Yet, because the Notice does not provide even that basic information, class members cannot possibly make an intelligent and informed decision about whether to remain in the class, oppose the Settlement or opt out.  This simple point is illustrated by the fact that when class members were alerted of the class size and average payment per class member by their attorney, they opted out of the Settlement by a ratio of more than 900 to 1.  (Juntikka Decl. ¶¶ 60-63).

## B. <u>The Settlement Poses Unreasonable Restrictions On Opt-Out Rights That Are Designed To Deflate The Number Of Opt-Outs.</u>

Disregarding the spirit, if not the letter, of Rule 23(c)(2), the Settlement imposes gratuitous obstacles on opt-out rights designed to protect Defendants by ensuring that the number of opt-outs is as low as possible.  Though the Notice includes a postage prepaid claim form, that form contains no check box that would enable class members to opt-out.  Instead, class members are needlessly required to send in their own letter requesting they be excluded from the class – a requirement that courts have rejected.  *See, e.g., Vaughter v. Eastern Air Lines, Inc.,* 817 F.2d 685, 690-91 (11th Cir. 1987); *Medearis v. Oregon Teamster Employers Trust*, 2009 U.S. Dist. LEXIS 53453, at *12-13 (D. Ore. June 19, 2009) (ordering that the claim form "be changed so that the class member can select either to make a claim or to opt-out of the class"); *Tierno v. Rite Aid Corp.*, 2007 U.S. Dist. LEXIS 89582 (N.D.

---

S.W.2d 369, 386 (Mo. Ct. App. 1997) (rejecting notice where it failed to estimate "the number of persons in the class, the total potential number of claims, the number of claims which it was estimated would be filed, the formula for determining each class member's recovery, or any other information by which the absent class members could determine their potential amount or range of recovery").

75

Cal. Nov. 19, 2007).  Worse yet, rather than simply telling class members how they can opt-out, the postcard Notice needlessly requires them to go on the internet and review the long form Notice in order to obtain that information.

## **CONCLUSION**

For the reasons set forth above, the *White* Plaintiffs respectfully submit that the Court should reject the proposed Settlement.

1    DATED:  December 14, 2009    **BOIES, SCHILLER & FLEXNER LLP**

2    George F. Carpinello
    Adam R. Shaw

3    David L. Zifkin (SBN 232845)

4

5    By    /s/ Adam R. Shaw

6    Adam R. Shaw

7

8    DANIEL WOLF LAW OFFICES
    Daniel Wolf

9

10    CHARLES JUNTIKKA & ASSOCIATES
    LLP

11    Charles Juntikka

12

13    Attorneys for Plaintiffs Robert Radcliffe, Chester

14    Carter, Maria Falcon, Clifton C. Seale, III, Arnold
    E. Lovell, and all others similarly situated

15

16    S:\wpdata\7512001\Objections - 12.4.doc

17

18

19

20

21

22

23

24

25

26

27

28

77