BOIES, SCHILLER & FLEXNER LLP
David L. Zifkin (SBN 232845)
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA 90401
Telephone: 310-395-5800
Facsimile: 510-874-1460
Email: dzifkin@bsfllp.com

CHARLES JUNTIKKA & ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone: 212.315.3755
Facsimile: 212.315.9032
Email: charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone: 202.842.2170
Email: dan@danielwolflaw.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EXPERIAN INFORMATION SOLUTIONS, INC., et al., <br><br> Defendants. <br><br> and Related actions. | **CASE NO. 05-CV-1070 DOC (MLGx) (Lead Case)** <br><br> **DECLARATION OF DANIEL WOLF IN SUPPORT OF APPLICATION FOR ATTORNEYS' FEES IN CONNECTION WITH INJUNCTIVE RELIEF SETTLEMENT** <br><br> **[REDACTED]** |

I, DANIEL WOLF, declare that:

1. I am counsel for the *White* Plaintiffs and the injunctive relief class in this matter and was one of five members of the executive committee until the *White* Plaintiffs announced their decision to object to the Monetary Relief Settlement in March 2009.

**Background And Experience**

2. I was admitted to the Bar of the Commonwealth of Pennsylvania in 1987 and to the Bar of the District of Columbia in 1991, where I have remained an active member in good standing ever since. I am also a member in good standing of the bars of the following courts: the United States Supreme Court, the United States Courts of Appeals for the D.C., Third, Fifth and Ninth Circuits, the United States District Court for the District of Columbia and the Superior Court of the District of Columbia. A copy of my resume, including a list of representative reported matters in which I played the leading role, is attached hereto as Exhibit A.

3. I graduated *magna cum laude* from the University of Michigan Law School in 1986. For the next two years, I served as an attorney adviser at the Office of the Legal Adviser within the U.S. Department of State. In 1989, I joined the Washington, D.C. Office of Hughes Hubbard & Reed, LLP ("HHR"), where I worked until 2000 and where I ultimately became a full equity partner. In 2001, I joined Sprenger & Lang, P.L.L.C. ("SL"), as a partner in its Washington, D.C. office. In 2005, I left SL to form my own office – Law Offices of Daniel Wolf.

4. During the course of my career, I have been involved in the litigation of numerous complex commercial and class action lawsuits. I have appeared and argued before a wide range of trial and appellate courts, including the U.S Supreme Court, the U.S. Courts of Appeals for the D.C., Third, Fifth and Ninth Circuits, and the California Court of Appeal.

5. During the time I was at HHR, I played a significant role in the defense of a number of class action lawsuits, including *In re Phar-Mor, Inc. Sec.*

*Litigation*, No. 92-1938 (W.D. Pa.), which involved the defense of a major accounting firm in a multi-district litigation alleging securities fraud, common law fraud and professional malpractice, and *Balentine v. Union Mortgage*, No. 91-C-8213 (N.D. Ill.), which involved the defense of a major Finnish bank in a lawsuit alleging fraud and deceptive trade practices in connection with the certification of sale of home improvements secured by a second mortgage.  In addition, I spearheaded the prosecution of *Legal Assistance for Vietnamese Asylum Seekers ("LAVAS") et al., v. United States Department of State, Bureau of Consular Affairs, et al.*, No. 94-0361 (D.D.C.), a lawsuit challenging discriminatory visa processing procedures brought on behalf of a class of Vietnamese visa applicants and their U.S. sponsors.  My participation in *LAVAS* included oral argument in the U.S. Supreme Court and two oral arguments in the D.C. Circuit.

6. During the five years I worked at SL and the five years since I started my own office, my practice has been devoted exclusively to the prosecution of multi-plaintiff and class action lawsuits. I served as lead counsel in *Hill v. Republic of Iraq*, No. 99-3346 (D.D.C.), a lawsuit under the Foreign Sovereign Immunities Act ("FSIA") that I brought on behalf of 180 American citizens, alleging that they and/or their spouses had been taken hostage by the former Iraqi regime in violation of international law following its invasion of Kuwait in August 1990. I obtained judgments on behalf of all 180 plaintiffs totaling $95 million in the aggregate, which were collected in full (*see, e.g., Hill v. Republic of Iraq*, 175 F.Supp.2d 36 (D.D.C. 2001), and *Frazier v. Republic of Iraq*, 2003 U.S. Dist. LEXIS 3725 (D.D.C. Mar. 11, 2003)), and succeeded in reversing on appeal the district court's partial denial of certain plaintiffs' compensatory damages claims. (*Hill v. Republic of Iraq*, 328 F.3d 680 (D.C. Cir. 2003).)  I also served – and continue to serve – as lead counsel in *Vine v. Republic of Iraq*, No. 01-02674 (D.D.C.), a class action lawsuit that I brought on behalf of an additional 240 American citizens that arises out of the same hostage-taking policies and practices as were at issue in the *Hill*

case. *See Vine v. Republic of Iraq*, 459 F. Supp. 2d 10 (D.D.C. 2006) (denying Iraq's motion to dismiss and holding that jurisdiction existed under the FSIA).

7. While at SL in 2000, I conceptualized – and have since played a vital role in orchestrating – the litigation of 23 class action lawsuits against various television studios, networks and talent agencies, alleging that each has engaged in a pattern or practice of refusing to hire older writers on the basis of age. My participation in this litigation has included the preparation of the complaints, the drafting of virtually all the major substantive briefs relating to contested issues and the presentation of two arguments in the California Court of Appeal. In the first, I succeeded in obtaining the reversal of the trial court's various orders dismissing plaintiffs' class-wide claims and in getting virtually all of those claims reinstated. *Alch v. Superior Court*, 122 Cal.App.4th 339 (2004). In the second, I obtained a reversal of a trial court order that, on the basis of privacy concerns, had denied plaintiffs access to the biographical and anecdotal information they needed to prove their claims. *Alch v. Superior Court*, 165 Cal.App.4th 1412 (2008).

8. Two other major class action lawsuits I developed at SL and have subsequently helped orchestrate are: (1) *Romero, et al. v. Allstate Insurance Co.* ("*Romero I*"), No. 01-3894 (E.D. Pa.), a class action lawsuit brought on behalf of 6,200 former and current Allstate agents alleging that Allstate terminated their employment relationship in order to deprive them of retirement benefits in violation of section 510 of ERISA; and (2) *Romero, et al. Allstate Insurance Co.* ("*Romero II*"), No. 01-6764 (E.D. Pa.), a class action lawsuit brought on behalf of former and current Allstate agents alleging that Allstate amended its retirement plan to cutback on their early retirement benefits in violation of section 204 of ERISA. Two years ago, I successfully argued the appeal of the district court's ruling dismissing *Romero II* on statute of limitations grounds. *Romero. v. Allstate Insurance Co.* ("*Romero II*"), 404 F.3d 212 (3d Cir. 2007). Since that time, I worked with SL to achieve a reversal of both a district court order dismissing *Romero II* on different

grounds and a district court order granting a motion for summary judgment in *Romero I*.

### Initial Involvement In This Matter

9. In approximately June 2005, Charles Juntikka – my high school debate coach and friend of 30 years – approached me regarding the possibility of bringing class action lawsuits against the three major credit reporting agencies for employing practices that resulted in the systemic misreporting of delinquent pre-bankruptcy debts as still due and owing. Despite its apparent merits, I was very reluctant to take on these cases, as I was in the process of phasing out my legal practice so I could devote myself full time to the operation of the International Lifeline Fund – a private humanitarian foundation that I launched in late 2003 and that has since been providing clean water and fuel-saving stoves to refugees and other vulnerable individuals in Darfur and other parts of Sub Saharan Africa. Nevertheless, I agreed to explore the matter and, after discovering the magnitude of the problem and the extent of the injustice, I felt that this was a cause I had to pursue.

### Contribution To Injunctive Relief Settlement

10. The investigation that preceded the filing of these cases lasted approximately five months. As part of this investigation, I personally interviewed approximately fifteen consumers whose discharged debts one or more of the Defendants had erroneously reported as due and owing in their credit reports. I also reviewed dozens of credit reports that contained such errors and helped oversee the production of separate databases for each defendant by Mr. Juntikka's law firm – a project that involved the review of approximately 3,000 credit reports and that enabled us to quantify each defendant's error rate both in connection with the initial reporting of discharged debts and in the subsequent reporting of such debts upon reinvestigation. In addition, I consulted extensively with Mr. Juntikka and his staff in regard to some three-dozen individual cases that arose out of the same inadequate reporting practices as are at issue in these cases. Apart from my factual

investigation, I did a comprehensive evaluation of the legal merits of these claims under the federal Fair Credit Reporting Act ("FCRA") and the California's Consumer Credit Reporting Agencies Act ("CCRAA"), including research into every important legal issue that these cases might raise.

11. Following the completion of our initial factual and legal investigation into these cases, Mr. Juntikka and I engaged the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff") to serve as lead counsel for the *White* Plaintiffs and later entered into an agreement with counsel for Jose Hernandez to jointly prosecute these matters. Though our joint prosecution agreement with counsel for plaintiff Hernandez made Michael Sobol of Lieff and Michael Caddell of Caddell & Chapman, P.C. the lead counsel, the record will bear out that I played the most significant role by far in bringing about the Injunctive Relief Settlement.

12. Apart from the work I did with Mr. Juntikka in investigating these matters, I was the original drafter of the *White* Plaintiffs' complaints and, up to the approval of the Injunctive Relief Settlement (and beyond), I was the author of **all** of Plaintiffs' briefs on contested, substantive motions – none of which received extensive editing from any member of the Lieff/Caddell legal team.[1] Indeed, with at most a handful of exceptions, the only member of that team who made any significant individual edits to any sections of any of the briefs that I authored was Mr. Sobol.

---

[1] In two cases involving contested motions – the *White/Hernandez* Plaintiffs' brief in opposition to Trans Union's motion to dismiss and their brief in opposition to the *Acosta/Pike* Plaintiffs motion to disqualify their counsel –

Redacted - Filed Under Seal

13. In developing the legal arguments in these cases and with respect to each of the briefs I wrote, I did all or virtually all of the legal research. Indeed, my time records reveal only three instances in which I received research memoranda from members of the Lieff/Caddell team – all of which were quite brief and addressed no more than one or two discrete issues – and only a handful of emails in which one or two additional citations were recommended.

14. Apart from my core responsibilities with regard to all contested motions, I prepared numerous analytic and research memoranda relating to the legal issues in these cases, including several that related specifically to injunctive relief – one of which set forth Plaintiffs' original proposal for how to structure an injunctive relief settlement. By contrast, during the entire period between my first meeting with Mr. Sobol on September 19, 1995 and the filing of the Injunctive Relief Settlement on April 3, 2008, I did not receive a single detailed legal memorandum from any member of the Lieff/Caddell legal team and, at most, received a handful of cursory legal memoranda.

15. I also played a significant role in regard to expert witnesses, including, in particular, the identification of Plaintiffs' key credit reporting and scoring expert, John Ulzheimer and the provision of important assistance to Mr. Ulzheimer in connection with the preparation of his declarations.

16. In addition, I authored the mediation statement that the *White* Plaintiffs provided Judge Lourdes Baird and was an active participant in all of the mediation sessions that took place subsequent to the *Acosta/Pike* settlement.

17. With one exception, I was substantially involved in all other aspects of this litigation, including as an active participant in the countless conferences with the other members of Plaintiffs' legal team. Significantly, together with Len Bennett, I was given primary responsibility to negotiate the terms of the Injunctive Relief Settlement and was involved in virtually all of the major discussions relating to that negotiation.

18. As set forth in my declaration of May 21, 2009, the one area in which I had little role was in relation to the formal discovery of factual information from Defendants, which was, at any rate, very limited to begin with. (*See* Declaration of Adam Shaw, sworn to Dec. 14, 2009, ¶¶ 6-9.) I should clarify, however, that I was very much involved with other aspects of discovery, including preparation of each of the *White* Plaintiffs for their deposition, preparation of Mr. Ulzheimer for his deposition, and helping to prepare for the depositions of the other side's two bankruptcy experts. Furthermore, I also conducted informal discovery regarding Defendants' reporting practices, including assisting Mr. Juntikka in the performance of his study of their accuracy rates and researching publicly available records. Both forms of discovery contributed in a significant way to the Injunctive Relief Settlement. First, as the Court is aware, the Juntikka study was an essential component of both Plaintiffs' successful assault on the *Acosta/Pike* settlement and their defense against Experian's summary judgment motion. Second, it was through my research of public documents that Plaintiffs learned that bankruptcy-related disputes were one of the most five common types – a fact that forcefully demonstrated Defendants' awareness of their bankruptcy reporting problem and that added significantly to the pressure on them to settle the injunctive relief claims in the hope that it would win them enough good will to avoid a statutory damages trial. With regard to formal discovery from Defendants, my main contribution was the preparation of lists of key discovery issues and documents for the other members of the team to pursue.

19. As the person who wrote all the substantive arguments and as the only member of the team who was fully familiar with all their intricacies and the case law, it was agreed that I would argue – and I did, in fact, argue – the only two major substantive motions that were heard by the Court prior to the Injunctive Relief Settlement, namely the motion for preliminary approval of the *Acosta/Pike* Settlement and Experian's motion for partial summary judgment.

20. The vital role that I have played in this matter is corroborated by my time records, attached hereto as Exhibit B. Between September 19, 2005 when Mr. Juntikka and I first met with Mr. Sobol at Lieff's offices in San Francisco and April 3, 2007 when the Injunctive Relief Settlement was filed with the Court, I logged a total of 2,591 hours. This does not include any of the hours that I devoted to the initial investigation of these cases before meeting with Mr. Sobol (which I conservatively estimate to have totaled at least 50 hours) and 25.75 hours that I billed after the filing of the Injunctive Relief Settlement that pertained specifically to that settlement.

21. In order to give the Court a more complete picture of how this time was put to use, I have reviewed my records and categorized my work by project, excluding time that I spent reviewing and preparing emails (other than about a dozen cases in which I prepared a short legal memo and pasted it into the body of an e-mail), participating in meetings and telephone calls (other than moot courts), traveling to and attending hearings and mediation sessions, and reviewing papers (other than when such review was for purposes of preparing a brief I was writing or a hearing at which I would be arguing). The results of this review are as follows:

| Nature Of Task | Hours |
| --- | --- |
| Preparation Of Complaints And Amended Complaints | 43.75 |
| Preparation Of Briefs And Related Papers | |
| Opposition to Trans Union motion to dismiss | 18.25 |
| Opposition to motion to disqualify | 43.25 |
| Sur-reply in opp. to motion to disqualify | 11.75 |
| Opposition to *Acosta/Pike* Settlement | 94.5 |
| Sur-reply in opp. to *Acosta/Pike* Settlement | 15 |
| Briefs in support of class certification[2] | 84.5 |

---

[2] The *White/Hernandez* Plaintiffs prepared and filed two separate motions for class

| | |
|---|---|
| Reply briefs in support of class certification | 163.5 |
| Opposition to Experian summary judgment motion | 97 |
| Other legal briefs[3] | 34.5 |
| Other legal papers[4] | 29 |
| **Total (brief writing)** | **596.25** |
| **Preparation For Arguments Before Court** | |
| Preliminary Approval Of Acosta/Pike Settlement | 45.25 |
| Summary Judgment | 25 |
| Class Certification | 33 |
| **Total (argument prep)** | **103.25** |
| Preparation Of Mediation Statement | 28.75 |
| Preparation Of *Acosta/Pike* Settlement Memoranda | 92.5 |
| Preparation Of Other Legal Memoranda | 77.75 |
| **Research** | |
| FCRA (general) | 40.5 |
| FCRA (statutory damages and willfulness) | 29 |
| Class certification | 94.5 |
| Injunctive relief | 46 |
| Class settlement | 56.25 |

certification in these cases and two different sets of supporting papers in support of those motions. The time shown here for briefing regarding class certification and below for the preparation of argument before the Court reflects the combined time devoted to both class certification motions.

[3] These include, among others, preparation of an *ex parte* application to retroactively extend the page limits for our opposition to preliminary approval of the *Acosta/Pike* settlement, our opposition to Trans Union's motion to strike that brief, as well as editing of the briefs in support of our motions for appointment as interim class counsel and for consolidation (which were the only briefs regarding contested motions I did not author myself).

[4] These include, among others, preparation of the *White* Plaintiffs' initial status report, preparation of their statement of interest regarding transfer of the *Hernandez* lawsuit to this district, as well as substantial editing of the *White/Hernandez* Plaintiffs' proposed findings for a class certification order and of their statement of disputed issues in response to Experian's summary judgment motion.

DECLARATION OF DANIEL WOLF IN SUPPORT OF APPLICATION FOR ATTORNEYS' FEES

| Other | 36.5 |
|---|---|
| Total (research): | 303.75 |
| Discovery (formal and informal) | 107.25 |
| Expert Witness Declarations | 25 |
| **Grand Total** | 1,381 |

22. As this summary of my hours demonstrates, I have done the great bulk of the "heavy lifting" in this matter – work that was, by any measure, absolutely indispensable to the accomplishment of the Injunctive Relief Settlement. By contrast, the two firms that served as lead counsel – the Lieff and Caddell firms and the attorneys who worked with them – played what was, with certain exceptions, mainly a supporting role, albeit frequently an important one. I do not ask the Court to take my word for this because the nature and quantity of the work speak for themselves. Indeed, if the members of the Lieff/Caddell team were to perform the kind of calculations that I have performed – that is, if they broke their hours down by category and excluded travel time and time spent on items that we did as a team such as attending mediations and court hearings, exchanging emails, conversing with one another, etc.), I am confident that my hours would equal somewhere between 30% and 50% of all of their hours *combined*. I am even more confident, however, that they have not and will not do such a calculation because it would lay bare the true nature of their involvement in this litigation.

23. While I believe this summary of my hours is telling, the picture it paints of my contribution to the Injunctive Relief Settlement is far from complete. One very important element of that story it does not convey relates to the fact that, at various stages during the course of this litigation, Mr. Juntikka and I found ourselves having to persuade other members of our legal team to take positions that we wished to advance in support of the putative classes, but which all or most of

DECLARATION OF DANIEL WOLF IN SUPPORT OF APPLICATION FOR ATTORNEYS' FEES

them thought were not attainable. The following are three particularly important examples of this phenomenon.

24. Redacted - Filed Under Seal

25. Redacted - Filed Under Seal

In its tentative order denying Experian's motion for summary judgment, the Court adopted my analysis of the pre-emption issue, holding that injunctive relief was available under the CCRAA, despite several federal district court decisions to the contrary, which it agreed were wrongly decided. Further, though the Court's tentative order did not adopt my analysis as to why the federal district court cases holding that the FCRA itself does not authorize injunctive relief were also wrongly decided, a portion of that analysis has been embraced by at least one federal district court in a decision post-dating that order.

26. Second, as set forth in the declaration of Charles Juntikka, sworn to December 21, 2009, *Redacted - Filed Under Seal*

27. *Redacted - Filed Under Seal*

28. *Redacted - Filed Under Seal*

Redacted - Filed Under Seal

1  Then, with the exception of the introduction, I wrote the entire brief in opposition to preliminary approval and presented the argument that persuaded the Court to reject a settlement that would have left inaccuracies in the credit reports of about 90% of the class and would have given Trans Union and Equifax an unrestrained license to continue reporting those inaccuracies in violation of their statutory obligations.

29. During the period prior to the Injunctive Relief Settlement, the attorneys on the Lieff/Caddell team offered high praise for my legal work on behalf of the *White/Hernandez* plaintiffs and the classes they were seeking to represent. On numerous occasions – both orally and by e-mail – they informed me, in sum and substance, that they thought the briefs I had authored were exceptional, including e-mails in which Mr. Caddell characterized me as the team's "hard-working scribe" and my work as "excellent," in which Mr. Bennett variously described my work as "great," "fantastic" and "excellent", and in which Mr. Sobol remarked that my work was of such quality that "everyone" had come to "trust you so much that they let you take [the briefing] over" to the point "we can't do without you." Indeed, at one point, Mr. Caddell told me that I was one of the two best brief writers he had ever had the pleasure to work with. Likewise, though he has since criticized me as one of the two lawyers on the team (along with Mr. Juntikka) with the least experience in class action and consumer rights litigation, Mr. Bennett was so impressed with my analysis of the legal issues in these cases that he invited me to speak on the issues of class litigation and injunctive relief under the FCRA at the National Association of Consumer Advocates' annual meeting in 2007.

***Juntikka's Important Consultative Role***

30. In my Washington, D.C. office, I have had no one to bounce ideas off of, consult with, get feedback from or otherwise assist me in connection with the legal papers I have prepared in this or any of the other litigation I am involved with. From the first brief I wrote in these cases to the last, Mr. Juntikka has played that

very important sounding board role. Dating back to the time he first mentored me as my debate coach in high school, I have known Mr. Juntikka to be a person of extraordinary persuasive skills. He has an acute ability to conceptualize an argument in the clearest manner possible and can turn a phrase as well as anyone I know. Many of the arguments that I made in the briefs were refined and improved following my consultations with Mr. Juntikka.

**Total Time Expended**

31. As set forth above, between September 19, 2005 and the date the Injunctive Relief Settlement was filed on April 3, 2008, I billed a total of 2,591 hours to these matters.[5] However, a portion of this time is allocable to Plaintiffs' monetary relief claims. I have reviewed my hours in an effort to segregate time that was clearly directed Plaintiffs' injunctive relief claims and time that was directed to their monetary relief claims. Of the 2,591 hours, I was able to segregate that time as follows: 125.5 hours for injunctive relief issues; 160.75 hours for monetary relief issues. I do not believe there is any way to meaningfully segregate the remaining hours between injunctive relief and monetary relief. Accordingly, for purposes of my application for injunctive relief fees, I am allocating those hours equally between those two claims. In addition, as set forth above, I billed a total of 26.5 hours to injunctive relief matters after the filing of the Injunctive Relief Settlement, which consists mainly of my travel to, assistance in the preparation for and attendance at the hearing on the Injunctive Relief Settlement. Overall, therefore, my claim is for a total of ***1,276.75*** hours of time in connection with the Injunctive Relief Settlement. In addition, I have spent 33.25 hours working on my application in connection with that settlement. A copy of my daily time records are attached hereto as Exhibit A.

---

[5] In this application, I am not seeking an award of fees for the time I spent investigating these cases before meeting with Lieff on September 19, 2005 – time that I estimate totaled at least 50 hours.

*Billing Rates*

32. I have not billed clients on an hourly basis since shortly after I left HHR in September 2000. I have been informed by senior partners at HHR that I would be welcome to come back there at any time in which case my billing rate would be approximately $800 per hour.

*Expenses*

33. I have reviewed my records of the expenses that I incurred in connection with this matter. Though I had various different kinds of expenses, I am seeking reimbursement with respect to just two categories – travel related expenses (*e.g.*, air fares, taxis, car rentals and meals away) and computerized legal research. In this connection, I would note that I never traveled business or first class, always shopped for the lowest available air fares and, when available and reasonably convenient, took trains to airports, instead of taxis.

34. During the period between the inception of this matter and the filing of the Injunctive Relief Settlement, my total travel related expenses were not less than $25,280. Of this amount, $383 related specifically to Plaintiffs' injunctive relief claims – namely, a trip to Atlanta for a negotiating session on the Injunctive Relief Settlement. I do not believe there is any way to meaningfully segregate the remaining $24,897 in expenses from this period between injunctive and monetary relief. Accordingly, for purposes of my claim for injunctive relief fees, I am allocating those expenses equally between those two claims. In addition, after April 3, 2009, I incurred another $1,620 in expenses relating to the Injunctive Relief Settlement. As it is also impractical to allocate my computerized research expenses between the monetary and injunctive relief claims, I am also dividing that expense, which totaled $8,783 during the period at issue, equally between those claims. Thus, my total claim for injunctive relief-related expenses consists of $12,448.50 for travel related expense and $4,391.50 for computerized research for a total of $16,840.

DECLARATION OF DANIEL WOLF IN SUPPORT OF APPLICATION FOR ATTORNEYS' FEES

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 21st day of December, 2009.

*/s/ Daniel Wolf*

Daniel Wolf