| | |
|---|---|
| BOIES, SCHILLER & FLEXNER LLP<br>David L. Zifkin (SBN 232845)<br>225 Santa Monica Blvd., 11th Floor<br>Santa Monica, CA 90401<br>Telephone: 310-395-5800<br>Facsimile: 510-874-1460<br>Email: dzifkin@bsfllp.com | CHARLES JUNTIKKA & ASSOCIATES LLP<br>Charles Juntikka (admitted *pro hac vice*)<br>1250 Broadway, 24th Floor<br>New York, NY 10001<br>Telephone: 212.315.3755<br>Facsimile: 212.315.9032<br>Email: charles@cjalaw.com |
| | DANIEL WOLF LAW OFFICES<br>Daniel Wolf (admitted *pro hac vice*)<br>1220 N Street, NW, Suite PH 2<br>Washington, DC 20005<br>Telephone: 202.842.2170<br>Email: dan@danielwolflaw.com |

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., et al.,<br><br>          Defendants.<br><br>and Related actions. | CASE NO. 05-CV-1070 DOC (MLGx) (Lead Case)<br><br>**DECLARATION OF CHARLES JUNTIKKA, ESQ.**<br><br>**[REDACTED]** |

1

DECLARATION OF CHARLES JUNTIKKA, ESQ.

I, CHARLES W. JUNTIKKA, declare that:

## I.   Introduction

1. I am the personal Chapter 7 bankruptcy attorney for the *White* Plaintiffs: Clifton Seale, III, Arnold Lovell, Chester Carter, Robert Radcliffe, and Maria Falcon. This declaration explains how my law firm originated these three related class actions against Experian, Equifax and Trans Union and why the work of my lawyers should be compensated as part of this application for attorneys' fees for the injunctive relief settlement and should be reimbursed for expenses associated with the settlement.

2. This declaration discusses 1) my relevant professional experience, 2) my firm's initiation of these three related class actions, 3) the role of my pre-filing investigation in the defeat of the Acosta injunctive relief settlement, 4) the post-filing investigation, and 5) my role as the sole bankruptcy practitioner on the legal team.

## II.   Relevant Professional Experience

3. I graduated from the University of Michigan in 1978 and from New York Law School in 1982. As a member of the Association of the Bar of the City of New York, I accepted an invitation to serve as a member of the Committees on Judicial Ethics and the Campaign Finance Committee.

4. In 1984, I founded the bankruptcy firm bearing my name, Charles Juntikka & Associates. Within a few years, my firm became the largest personal bankruptcy firm in the New York City area, representing over 20,000 Chapter 7 bankruptcy clients in New York and New Jersey.

5. During the last fourteen years, I have become well known for my consumer activism. I have been consulted by and quoted on bankruptcy issues and credit reporting issues by media outlets including the New York Times, Wall Street Journal, Washington Post, CBS, NBC, and CNN, among others. I am a member of the National Association of Consumer Bankruptcy Attorneys.

6. I conducted an extensive investigation regarding the credit reporting agencies' chronic failure to accurately report the status of debts discharged in bankruptcy. As part of my bankruptcy practice, I have lived closely with the issue on a day-to-day basis since the day I founded my firm.

7. Since the beginning of my personal bankruptcy practice in 1984, I have received complaints from clients about inaccurate credit reports after their bankruptcy cases were discharged and closed. As our practice grew to five attorneys, filing between one thousand to two thousand Chapter 7 cases per year, the complaints about the credit reports increased to about half a dozen per week.

8. I often heard my clients' complain that their credit reports still showed debts as due and owing even though the debts were discharged. They were fearful that an error-ridden credit report meant that their bankruptcies had failed in some way. They also stated that they were certain this was impeding them from rebuilding their credit. I had too many clients who stated that they had failed to obtain rental apartments, jobs or promotions, mortgages or car loans or even high interest credit cards because of errors on their credit reports.

9. My firm's initial response to this problem was to provide our clients with instructions on how to correct their credit report errors by mailing a dispute letter to the credit reporting agencies as required under the Fair Credit Reporting Act.

### III. My Firm's Initiation of this Case

10. On or about February 2004, I became much more alarmed about my clients' credit report problems when I attended a national conference held by the National Association of Consumer Bankruptcy Attorneys (NACBA). One of the seminars chaired by Robert Weed, Esq., focused on the problems that debtors faced relating to post-bankruptcy credit report errors and the FCRA. It was only then that I realized the seriousness of this issue. I had yet to learn the truly staggering nature of this problem. I was very concerned that I was advising clients to mail

complaints to credit reporting agencies when those complaints were often simply ignored.

11. At that time, I speculated that this problem only existed for the half a dozen clients who complained to my firm per week or approximately 300 clients per year. I decided to ask those clients to bring in their credit reports for my firm to assist them with sending their complaints to the credit reporting agencies.

12. After just a few months, my firm concluded that everything I learned at the NACBA seminar had been true. The only way that I could be sure that all my clients would receive the "fresh start" that I and the Bankruptcy Code had promised them was to bring all my clients in and assist them in clearing their credit reports of their inaccuracies. Even at the outset, it was clear that this problem was too big to handle on a case by case basis. It appeared as if only a class action held out the hope for a practical solution, but more data was necessary to determine the scope of problem.

13. At the beginning of our project to correct our clients' credit reports, we made two fateful decisions. First, we would encourage every client to come to our office for our help ***whether or not*** the client had previously complained about his or her credit report. Second, we would not charge our clients for our assistance and services, including the cost of purchasing their credit reports, which were not at that time available for free in New York State. We also mailed the correspondence to the credit reporting agencies requesting reports and submitting dispute letters by certified mail, return receipt requested at our own expense.

14. We met with as many clients as possible to assist them in reviewing and, if necessary, obtaining, their credit reports. The eight attorneys and I consulted with our clients in our offices in Manhattan: Tamara Del Carmen, Michelle Labayen, Vivian Lee, Wendy Selwanes, Sharon Shou, Jeffrey Stark, Stacy Tamburrino, Kimberly Wachs. Over two thousand office visits occurred during the next year. If the clients' reports contained inaccuracies that showed discharged

debts as due and owing, my firm assisted clients at a second office visit. An official dispute letter was mailed to the credit reporting agency along with copies of their bankruptcy F schedules listing all of the debts and/or a bankruptcy court mailing matrix identifying all the creditors.

15.  In addition the following law clerks worked on this case. Their names are as follows: Jonathan Alwais, Nabeena Banerjee, Judith Estevez, Irene Kambos, Sumani Lanka. In addition, the following paralegals worked on this case: Massielle Acevedo, Melissa Ducker, Robin Kim, Siew Kwok, Marian Lee, Samuel Lee, Crystal Lentz, Yuriko Miyasaka, Radha Mohan, Linda Ng, Lindsay Schedeler.

16.  The achievements of our over year-long investigation were as follows: (1) the initiation of nearly 3,000 requests for consumer reports (incurring the cost of the reports plus the cost of certified mail); (2) the review of the reports for accuracy on each of the nearly 3,000 reports submitted to my firm by the clients; (3) creating a database identifying each client whose report contained errors, the number of such errors, and the identification of the errors; (4) preparing approximately 800 requests for reinvestigation on behalf of those clients whose credit reports contained such errors; (5) reviewing their new reports for errors following such re-investigation; and (6) creating a database identifying each client whose re-investigated report still contained errors, the number of such errors, and the identification of the errors.

17.  The results of my office's investigation revealed error rates that were staggering and outrageous. The investigation of approximately one thousand credit reports issued by Trans Union reveals that in about **64 percent** of those reports, Trans Union erroneously listed one or more of my clients' discharged debts as still due and owing. In the case of Equifax, **66 percent** of my clients' discharged debts were still listed as due and owing. And in the case of Experian, **76 percent**, were still listed as due and owing.

18.  To make matters even worse, the error rate involving the credit reporting agencies so-called "re-investigation" procedures was even more

DECLARATION OF CHARLES JUNTIKKA, ESQ.

disturbing. After sending in dispute letters with F schedule list of creditors, court mailing matrixes, and other documentation by certified mail, return receipt requested, Trans Union failed to correct the credit reports of **17 percent** of my clients. The "re-investigation" error rate for Equifax and Experian were **22 percent** and **24 percent**, respectively. If consumers faced this rate of failed re-investigations *with the assistance of their attorneys,* one could only assume that the error rate for a consumers without the aide of an attorney must be even higher.

19. I was astounded to discover that errors existed on over **sixty percent** of our clients' credit reports after their discharges were issued. I had expected an error rate of twenty to thirty percent based on the number of complaints we were receiving from clients regarding their credit reports. This assumption was false because the majority of my clients were completely unaware that the errors even existed. Most clients either could not read the credit report or simply did not know that, after their bankruptcy discharge, their discharged debts should no longer be listed with derogatory information such as "past due" or "account charged off".

20. I became increasingly appalled as I contemplated the impact of the true error rate. For twenty two years, I dedicated my legal career to giving my clients a fresh start by the use of the Bankruptcy Code. That fresh start had been rendered a sham by the credit reporting agencies. The majority of my clients–beset by financial struggles brought on by unemployment, medical problems, divorce, under-employment, and a host of other problems–had not received the full benefits of the bankruptcy discharge.

21. The credit reporting agencies denial of the benefits of the bankruptcy discharge was also a violation of the FCRA. However, it was clear that bringing individual FCRA lawsuits at the rate of one thousand or more per year was not a viable way for my small firm to correct this problem. Only a class action held out the possibility of giving my clients the bankruptcy relief they were entitled to, by stopping the illegal credit reporting practices of the credit reporting agencies.

22. From the beginning of our class action project, I consulted with my colleague Daniel Wolf. I have known Mr. Wolf for many years and was aware of his class action experience. He provided critical advice and guidance, especially in the preparation of our project's study results and conclusions.

23. At the conclusion of our study in September of 2005, Mr. Wolf and I interviewed a number of law firms as potential partners in the contemplated class action and chose to enter into a co-counsel agreement with the firm of Lieff Cabraser. At this same time, Mr. Wolf drafted three complaints against Experian, Equifax, and Trans Union that reference my office's study (the "Juntikka" study) and its conclusions and the case was filed shortly thereafter on November 3, 2005.

24. We later discovered that another group of lawyers led by Caddell & Chapman (the "Caddell Group") brought the *Hernandez* case in the Northern District of California against the same defendants in October of 2005. The *Hernandez* complaint did not request injunctive relief nor did it allege a re-investigation class. The action was also based on a legal theory that was not well grounded in the knowledge of bankruptcy law and the effect of a discharge in a Chapter 7 matter.

25. At the urging of this Court, we entered into a joint prosecution agreement with the Caddell Group and filed a Second Amended Complaint ("SACC") which incorporated the reference to the conclusions of the "Juntikka" study, a request for injunctive relief, and a re-investigation class. The SACC also used the same theory brought in the original *White* Plaintiff's complaint while abandoning the litigation theory set forth in the original "*Hernandez*" complaint.

IV. **The Importance of the Juntikka Pre-filing Investigation &** *Acosta*

26. On January 22, 2007, Trans Union and Equifax asked this Court for the preliminary approval of a settlement that would release the claims of the *White/Hernandez* Plaintiffs for an extremely inadequate injunctive relief and monetary damages in a case styled *Acosta v. Trans Union, LLC,* 243 F.R.D. 377

(C.D. Cal. 2007)   On March 6, 2007, this Court denied preliminary approval of the *Acosta* settlement.  On the injunctive relief issue, after pointing out that the "Juntikka" study was the "only" data any of the parties had introduced (*Id.* at 24.), the Court stated:

> (Acosta) Plaintiffs are now unable…to apprise the extent to which the "scrubbing" included in the Settlement's injunctive procedures would eliminate current inaccuracies in Plaintiffs' credit histories…Although Trans Union and Equifax possess the data upon which all these determinations depend, they have declined to produce this information as well.  As a result, the only concrete estimates now before the Court are those of the Objectors, and all of these estimates advise against approving the Settlement. (*Id.* at 34.)

27.   It is also worth noting that, in the very next paragraph, the Court was compelled to highlight the importance of my office's pre-filing investigation by stating as follows:

> The fact that an alternative set of plaintiffs capable of delivering more benefit to the class may hypothetically, or actually, exist must not control a court's decision in evaluating the fairness of a particular proposal.   Nonetheless, the stark contrast between the depth of (Acosta) Plaintiffs' investigation and that conducted by the Objectors casts considerable doubt on the sufficiency of the effort the Plaintiffs have invested in this litigation.  In this respect, while the Objectors' preparation of their case is irrelevant in determining whether Plaintiffs conducted sufficient discovery prior to settling, it does vividly accentuate the myriad areas in which the (Acosta) Plaintiffs' investigative efforts are deficient. (*Id.* at 34.)

28.   At the time of the Acosta decision in March 2007, the Court could not have known the degree of accuracy of my office's investigation.  On July 31, 2008, Equifax confirmed the accuracy of our study.  On August 1, 2008, Equifax filed with this Court a declaration of Mr. Qiying Zhou. (Zhou Decl., Dkt. # 306).  The declaration presented the results of Equifax's study (the "Zhou" study) using the criteria embodied by the injunctive relief settlement.   As stated above, the "Juntikka" study identified the Equifax error rate as ***66 percent*** in the first

complaint and the second amended complaint. Mr. Zhou buried the Equifax error rate in the last page of nearly the last line of the last Exhibit attached to his declaration. The Equifax error rate according to the "Zhou" study is **63.8 percent**.[1]

29.  It is impossible to compare the "Juntikka" studies Experian and Trans Union error rate estimates to either defendants own estimate because neither defendant has seen fit to submit their error rate to the Court. Nor have the Settling Plaintiffs obtained through discovery a database from the Defendants on which an expert could independently determine such a rate.

30.  The original "Juntikka" study set forth a baseline for the minimum error rate for all three Defendants. A second calculation was then conducted to see how many errors would be reduced under the *Acosta* settlement. This second review fully laid bare the utter worthlessness of the Acosta settlement. The conclusion of the review was that the *Acosta* settlement would fail to correct in excess of **95%** of my bankruptcy clients' credit reports. (Juntikka Decl., Dkt. # 61).

31.  My office's study was also a key fact cited in this Court's denial of Trans Union's motion to dismiss the complaints in October of 2006. The Court's decision states:

> The SACC references a survey of 960 Credit Reports issued by TransUnion showing that in sixty-four per cent of the cases involving no-asset Chapter 7 bankruptcy proceedings, TransUnion erroneously listed one or more of the consumer's discharged debts as due and owing. SACC¶17. The average number of falsely listed debts in this sample was between three and four per report, and some reports contained as many as ten or more such errors. *Id.* This allegation by itself is capable of demonstrating the type of repetitive and systematic errors in Trans Union's procedures that could render those procedures unreasonable. (Dkt. # 52).

---

[1] There is a real possibility that Equifax's error rate is even worse than Mr. Zhou's 66% claim. When we conducted our study we used criteria designed to conservatively estimate the error rate. We always gave the credit reporting agencies the benefit of the doubt to avoid any claim that we were exaggerating the error rate. We always assumed an independent expert using a database supplied by the agencies might reveal error rates as high as 80% or 90%.

It is clear from the Court's opinion that the factual allegations regarding my office's review of Trans Union's credit reports in the SACC gave the Court no choice but to deny Trans Union's motion to dismiss.

### V. Juntikka's Post-Filing Review of Credit Reports & Injunctive Relief

32. In addition to my investigation prior to filing of the class action complaints, my office conducted post-filing month-to-month reviews of hundreds of post-discharge credit reports from the filing of these actions in October 2005 until April 2008. This review revealed a continued high error rate. Disturbingly, all of the Defendants willfully continued to make even the few types of errors that even the inadequate *Acosta* injunctive relief would have fixed. These *Acosta*-style errors continued from the March 2007 defeat of *Acosta* until the implementation of our injunctive relief settlement in October 2008. For **twenty frustrating months** my clients had to endure errors that the Defendants admitted they could fix in the *Acosta* settlement. I regarded this conduct as morally outrageous as well as a willful violation of the FCRA.

33. This post-filing review of credit reports allowed me to exert maximum pressure on all parties to accomplish injunctive relief with urgency. I would repeatedly and at every opportunity cite this continued high error rate to pressure the Defendants and my co-counsel on the need for injunctive relief. I also would cite example after example of the continuing anguish of my clients in dealing with the damages to their credit reports in my quest for immediate injunctive relief.

34. The post-filing credit report review was supervised by our general manager/paralegal, Yuriko Miyasaka, and primarily conducted by a paralegal, Maiselle Acevado. Their hours are also set forth in attachment A.

### VI. THE BENEFIT OF MY BANKRUPTCY LAW KNOWLEDGE TO THE SETTLEMENT

35. My participation in these cases was valuable as I was the only bankruptcy attorney on the legal team. And beyond general bankruptcy knowledge, my particular expertise within bankruptcy law gave me specialized knowledge of

1  post-discharge credit reports issues that was an invaluable. This knowledge
2  included detailed understanding of the discharge provisions and their legal effect,
3  the bankruptcy data capabilities of PACER and actual experience with post-
4  discharge credit applications and credit reports obtained by consultations with
5  thousands of clients.

6      36. Perhaps the most important contribution in this area went to the heart
7  of the theory of the case and the possibility of complete injunctive relief.

Redacted - Filed Under Seal

    37. Redacted - Filed Under Seal

25      38. This Court should be aware that I also assisted the principal author of
26  all of the major briefs, Daniel Wolf, both with editing. I have known Mr. Wolf for
27  over thirty years. I have provided some assistance to Mr. Wolf in a half dozen
28  other cases in the past and I believe my help in this case improved the briefs. I also

on occasion I provided case law and public and governmental records research on bankruptcy.

39. Prior to the filing of the White class action suit, my firm filed approximately 40 individual FCRA cases in 2004 and 2005. The credit reporting agencies aggressively fought nearly every case. Each case settled. As the individual FCRA litigation multiplied, it confirmed my belief that only a class action suit held any hope of helping our clients. Although my work on these cases significantly enhanced my understanding of the issues in this class action and my ability to litigate it, I am not requesting any compensation solely relating to the litigation of these individual cases.

## VII. Attorney Compensation and Reimbursable Expenses

40. This fee application seeks an award of attorneys' fees for my work and the work of the associates in my office. As for my hourly fee, as an attorney who has over twenty-six years experience in my field, my unique experience in post-discharge consumer credit and credit report issues, and my national reputation on bankruptcy/credit report issues, I believe my hours added value to the injunctive relief settlement. Under our joint prosecution agreement with the Caddell Group attorneys with over twenty-five years experience would receive $650 per hour.

41. From the March of 2004 and the date of the Injunctive Relief Settlement was filed on April 3, 2008, I billed a total of 1068 hours to these matters. However, a portion of this time is allocable to Plaintiffs' monetary relief claims. I do not believe there is any way to meaningfully segregate the remaining hours between injunctive relief and monetary relief. Accordingly, for purposes of my application for injunctive relief fees, I am allocating those hours equally between those two claims. And I believe this same allocation should hold true for the all of my staff and attorneys.

42. This fee application seeks an award of attorneys' fees for my work and the work of the associates in my office. As for my hourly fee, as an attorney who

has over twenty-six years experience in my field, my unique experience in post-discharge consumer credit and credit report issues, and my national reputation on bankruptcy/credit report issues, I believe my hours added value to the injunctive relief settlement. Under our joint prosecution agreement with the Caddell Group attorneys with over twenty-five years experience would receive $650 per hour.

43. The associate attorneys in our office who worked on this project had two years experience or less with the exception of one attorney who had over ten years of experience – Jeffrey Stark. Our joint prosecution agreement with the Caddell Group, an attorney with ten years experience would receive $475 per hour. Under our joint prosecution agreement with the Caddell Group, the two year associates would be paid $275 per hour.

44. The following associate attorneys have worked the following hours on this case: Del Carmen, Tamara – 142 hours 7 minutes; Labayen, Michelle – 192 hours 36 minutes; Lee, Vivian – 156 hours 10 minutes; Selwanes, Wendy – 18 hours 30 minutes; Shou, Sharon – 1 hour 55 minutes; Stark, Jeffrey – 98 hours 30 minutes; Tamburrino, Stacy – 11 hours 43 minutes; Wachs, Kimberly – 116 hours 17 minutes.

45. The total billable hours for Charles Juntikka equals $694,200. This number divided by two equals $347,100.

46. The total billable hours for Jeffrey Stark equals $46,787.50. This number divided by two equals $22,393.75.

47. The total billable hours for all other associate attorneys equals $175,862.50. This number divided by two equals $87,931.25.

48. The hourly rate for law clerks under the joint prosecution is $230 per hour. The following law clerks have worked the following hours on this case: Alwais, Jonathan – 9 hours 4 minutes; Banerjee, Nabeena – 439 hours 58 minutes; Estevez, Judith – 16 hours; Kambos, Irene – 157 hours 13 minutes; Lanka, Sumani – 128 hours 33 minutes.

49. The total billable hours for law clerks equals $172,684. This number divided by two equals $86,342.

50. As for the paralegals that assisted with pre-filing investigation, their work was both exemplary and critical to the case. On many occasions, they would work until midnight and beyond. Under the joint prosecution agreement, they would be paid at the rates of $155 per hour. The following paralegals have worked the following hours on this case: Acevedo, Massielle – 121 hours 15 minutes; Ducker, Melissa – 308 hours 51 minutes; Kim, Robin – 26 hours 45 minutes; Kowk, Siew – 1 hour 33 minutes; Lee, Marian – 15 hours 22 minutes; Lee, Samuel – 103 hours 24 minutes; Lentz, Crystal – 102 hours 46 minutes; Miyasaka, Yuriko – 76 hours 57 minutes; Mohan, Radha – 153 hours 45 minutes; Ng, Linda – 1416 hours 9 minutes; Schedeler, Lindsay – 47 minutes.

51. The total billable hours for paralegals equals $360,772.83. This number divided by two equals $180,386.42.

52. All of the individual daily time record for myself are submitted herewith as Exhibit A.

53. I request reimbursement for expenses associated with travel and my firm's pre-filing and post-filing investigation. One half of the travel expenses for sixteen trips from New York City to California for this case is $21,839.05. As for the pre-filing investigation, one half the cost of the credit reports is $17,069.04. One half the cost of purchasing the post filing credit reports is $2,454.38. One half the cost for postage for certified mail and return receipt requests for our credit report review is $3,444.70.

DECLARATION OF CHARLES JUNTIKKA, ESQ.

1 | Executed this 21ˢᵗ day of December, 2009.

*Charles W. Juntikka*

_____

DECLARATION OF CHARLES JUNTIKKA, ESQ.