BOIES, SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY 10504
Telephone:   914.749.8200
Facsimile:   914.749.8300
Email:       dboies@bsfllp.com
(admitted *pro hac vice*)

George F. Carpinello
Adam R. Shaw
10 North Pearl Street
Albany, NY 12207
Telephone:  518.434.0600
Facsimile:  518.434.0665
Email:       gcarpinello@bsfllp.com
             ashaw@bsfllp.com
(admitted *pro hac vice*)

David L. Zifkin (SBN 232845)
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA   90401
Telephone:  310-395-5800
Facsimile:  510-874-1460
Email:  dzifkin@bsfllp.com

CHARLES JUNTIKKA &
ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone:   212.315.3755
Facsimile:   212.315.9032
Email:       charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone:   202.842.2170
Email:       dan@danielwolflaw.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., et al.,<br><br>            Defendants.<br><br>and Related actions. | **CASE NO. 05-CV-1070 DOC (MLGx) (Lead Case)**<br><br>***WHITE* PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR OBJECTIONS TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:   January 11, 2010<br>Time:   8:30 a.m.<br>Place:  Courtroom 9D<br>Judge:  Honorable David O. Carter |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................2

ARGUMENT...........................................................................................................2

I.   The Notice Furnished To Class Members Was Woefully Inadequate ..........2

    A.   The Notice Misled Actual Damage Claimants Into Believing They Would Get Something More Than The Pittance They Will Receive ...................................................................................2

    B.   The Notice Misleadingly Instructed Class Members That They Had To Determine If They Were Members Of The Class And Then Gave Them No Means Of Doing So .........................................9

II.   The Settlement's Distribution Scheme Is Fatally Defective ......................10

III.   The Settlement Is Structurally Flawed In That It Disregards The Interests Of Two Distinct Subclasses ...........................................................15

IV.   The Settlement Amount Is Patently Inadequate .........................................18

    A.   The Strong Prospects Of Plaintiffs' Establishing Liability Have Improved Since The Defeat Of The *Acosta/Pike* Settlement .............19

        1.   Satisfying The Requirement That Plaintiffs Show That The Credit Reports Defendants Issued Were Inaccurate Presents No Litigation Risk..................................................................19

        2.   Establishing That Defendants' Procedures Were Not Reasonable To Assure Maximum Possible Accuracy Presents Very Little Litigation Risk .........................................23

        3.   The Settling Parties Exaggerate The Risk Of Establishing Willfulness.................................................................27

    B.   The Risk That A Class-Wide Statutory Award Would Be Eviscerated By An Excessiveness Challenge Is Not Substantial .......31

    C.   The Settling Parties Have Exaggerated The Class Certification Risk .......................................................................................34

    D.   The Response Rate Highlights The Patent Inadequacy Of The Settlement Amount ..............................................................39

    E.   The Amount of Discovery Does Not Justify The Settlement............41

    F.   The Reaction Of The Class Does Not Favor The Settlement............41

V.   Neither Counsel For Settling Plaintiffs Nor The Settling Plaintiffs Themselves Can Adequately Represent The Class ......................................43

    A.   The Incentive Awards Have Created An Irremediable Conflict

i

Of Interest For The Settling Plaintiffs And Their Counsel ...............43

B.    The Lieff/Caddell Team's Violation Of The Prohibition On
      Simultaneous Representation Of Clients With Adverse Interests
      Bars Them From Representing The Class ........................................45

C.    The Lieff/Caddell Team's Failure To Consult With The *White*
      Plaintiffs Bars Them From Representing The Class.........................50

D.    The *Acosta/Pike* Plaintiffs And Their Counsel Are Unable To
      Independently Represent The Class .................................................51

CONCLUSION .................................................................................................54

# TABLE OF AUTHORITIES

## CASES

**Page**

*Acosta v. Trans Union LLC*, 243 F.R.D. 377 (C.D. Cal. 2007)......................passim

*Akselrod v. Chex Systems, Inc.*, 2005 WL 142390 (C.D. Cal. June 6, 2005)..........22

*In re "Agent Orange" Products Liab. Litig.*, 800 F.2d 14 (2d Cir. 1986)...............49

*Andrews v. Trans Union Corp.*, 7 F. Supp. 2d 1056 (C.D. Cal. 1998), *aff'd in part and rev'd in part on other grounds*, 225 F.3d 1063 (9th Cir. 2000), *rev'd on other grounds*, 534 U.S. 19 (2002) ....................................21

*Arrez v. Kelly Servs., Inc.*, 522 F. Supp. 2d 997 (N.D. Ill. 2007) ........................32

*Baker v. G.C. Services Corp.*, 677 F.2d 775 (9th Cir. 1982)................................38

*Barel v. Bank of America*, 255 F.R.D. 393 (E.D. Pa. 2009)................................40

*Beck v. Gold Key Lease, Inc.*, 272 B.R. 112 (E.D. Pa. 2002)................................22

*Berther v. TSYS Total Dept. Management Inc.*, 2007 WL 1795472 (E.D. Wisc. June 19, 2007)................................................................................39

*Boeing Airplane Co. v. Brown*, 291 F.2d 310 (9th Cir. Wash. 1961)....................26

*Bonner v. Home 123 Corp.*, 2006 U.S. Dist. LEXIS 54418 (N.D. Ind. Aug. 4, 2006)................................................................................38

*Braxton v. Farmers' Ins. Group*, 209 F.R.D. 654 (N.D. Ala. 2002).......................38

*Cairns v. GMAC Mortgage Corp.*, 2007 U.S. Dist. LEXIS 16689 (D. Ariz. Mar. 7, 2007)................................................................................25

*Cassara v. DAC Servs., Inc.*, 276 F.3d 1210 (10th Cir. 2002) ..........................24

*Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387 (N.D. Ill. 2006) .........................38

*Centerline Equip. Corp. v. Banner Personnel Serv., Inc.* 545 F. Supp. 2d 768 (N.D. Ill. 2008)........................................................................32

*Cerniglia v. County of Sacramento*, 2008 U.S. Dist. LEXIS 50983 (E.D. Cal. June 17, 2008)................................................................................26

*Cisneros v. U.D. Registry, Inc.*, 39 Cal.App.4th 548 (1995)................................21

*Cole v. Am. Family Mut. Ins. Co.*, 410 F. Supp. 2d 1020 (D. Kan. 2006) .............27

*Cooper v. Federal Reserve Bank*, 467 U.S. 867 ................................................20

*Dalton v. Capital Ass'n. Indus.*, 275 F.3d 409 (4th Cir. 2001)...........................21

*DeMando v. Morris*, 206 F.3d 1300 (9th Cir. 2000)................................38

*Diprinzio v. MBNA America Bank N.A.*, 2005 U.S. Dist. LEXIS 18002
(E.D. Pa. Aug. 4, 2005) ............................................................................ 20

*Dowell v. Wells Fargo Bank, N.A.*, 517 F.3d 1024 (8th Cir. 2008) ....................... 38

*Ehrheart v. Lifetime Brands, Inc.*, 498 F. Supp. 2d 753 (E.D. Pa. 2007) .............. 40

*In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist.
LEXIS 17457 (E.D. Tex. 2005) ............................................................... 18

*In re Farmers Inc. Co., FCRA Litig.*, 2006 U.S. Dist. LEXIS 27290 (W.D.
Okla. Apr. 13, 2006) ............................................................................... 38

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products
Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ................................................ 16

*Gustafson v. Valley Insurance Co.*, 2004 WL 2260605 (D. Or. Oct. 6, 2004) ....... 40

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................... 8, 16

*Int'l. Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) ......................... 20

*In re IPO Secs. Litig.*, 243 F.R.D. 79 (S.D.N.Y. 2007) ........................................ 5

*Korman v. Walking Co.*, 2007 U.S. Dist. LEXIS 63732 (E.D. Pa. Aug. 28,
2007) ....................................................................................................... 38

*Koropoulos v. The Credit CSC Credit Servs.*, 734 F.2d 37 (D.C.Cir. 1984) .......... 21

*Lazy Oil Co. v. Witco Corp.*, 166 F.3d (3d Cir. 1999) ....................................... 49

*Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455 (D.Md.
2004) ....................................................................................................... 31

*Mark v. Valley Insurance Co.*, 2005 WL 1334374 (D. Or. May 31, 2005) ........... 40

*McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917 (W.D. Wisc. 2004) ........ 24

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ..................................... 1, 5, 6, 8

*Moreno v. Autozone, Inc.*, 2007 U.S. Dist. LEXIS 98250,
(N.D. Cal. Dec. 5, 2007) .................................................................... 47, 49

*O'Brien v. Equifax Info. Servs. LLC*, 382 F. Supp. 2d 733 (E.D. Pa. 2005) .......... 23

*Pertuzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292 (W.D. Pa. 1995) ....... 41

*Pirian v. In-N-Out Burgers*, 2007 U.S. Dist. LEXIS 25384 (C.D. Cal.
Apr. 5, 2007) .......................................................................................... 38

*Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996) ............................... 24

*Razilov v. Nationwide Mutual Ins. Co.*, 2006 WL 3312024 (D. Or. Nov. 13,
2006) ....................................................................................................... 40

2

*Rodruiguez v. West Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74767 (C.D. Cal. Sept. 10, 2007) ...................................................................45

*Rodruiguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009)........... 1, 45, 52, 53

*Safeco Inc. Co. of Am. v. Burr*, 551 U.S. 47 (2007)...........................................28, 39

*Sarver v. Experian Info. Solutions*, 390 F.3d 969 (7th Cir. 2004)........................24

*Sepulvado v. CSC Credit Servs.*, 158 F.3d 890 (5th Cir. 1998)............................21

*Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) .....................................................................................38

*Smith v. Auto Mashers, Inc.*, 85 F. Supp. 2d 638 (W.D. Va. 2000).......................24

*Sonmore v. Checkrite Recovery Svcs., Inc.*, 206 F.R.D. 257 (D. Minn. 2001) .......40

*St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881 (5th Cir. 1989)...................27

*St. Louis I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919)...........................31, 32

*State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003).........................31

*Stoner v. CBA Information Services*, 352 F. Supp. 2d 549 (E.D. Pa. 2005) ..........40

*Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005) .............................41

*In re Torres*, 2007 Bankr. LEXIS 1478 (S.D.N.Y. Bankr. May 3, 2007)..............21

*United States v. Citrin*, 972 F.2d 1044 (9th Cir. 1992) .........................................31

*In re Veritas Software Corp. Secs. Litig.*, 496 F.3d 962 (9th Cir. 2007) ..........5, 6, 8

*Verizon California Inc. v. OnlineNIC, Inc.*, 2009 U.S. Dist. LEXIS 84235 (N.D. Cal. Aug. 25, 2009) ........................................................31

*Warth v. Seldin*, 422 U.S. 490 (1975)...................................................................38

*White v. Trans Union, LLC*, 462 F. Supp. 2d 1079 (C.D. Cal 2006).....................25

*Zomba Enters. v. Panorama Records, Inc.*, 491 F.3d 574 (6th Cir. 2007) ............31

3

## **INTRODUCTION**

As set forth in the *White* Plaintiffs' Objections, the Court should reject final approval of the Settlement for the following reasons:

- Owing to serious deficiencies in the class Notice: (a) two-thirds of the class members have been misled into thinking they would be getting 4 to 20 times more relief than they will actually receive; and (b) millions of others were denied an opportunity to receive anything because the Notice misleadingly instructed them to determine if they were class members, even though they all were, and then gave them no means of identifying themselves as such.

- Even if the amount it awarded the class was greater by an order of magnitude or more, the Settlement would still have to be rejected because it sacrifices the claims of certain segments of the class to enrich others, including the claims of the entire reinvestigation subclass and of everyone who is unaware of the existence of any errors on their credit reports.

- The Settlement fails to recognize the existence of two discrete subclasses, the members of which are plainly deserving of more than the penny on the dollar recovery the Settlement affords to the rest of the Class.

- A penny on the dollar is a patently inadequate Settlement amount as demonstrated by the undisputed facts that: (1) each Defendant's statutory damage exposure is at least $1 billion; (2) the actual losses suffered by the Class is at least $3 billion; and (3) each Defendant acted with full knowledge that it was generating systemically inaccurate credit reports.

- All counsel for the Settling Plaintiffs agreed to condition the named Plaintiffs' entitlement to a $5,000 incentive award on their support for the Settlement – thereby creating a disabling conflict of interest.

- The Lieff/Caddell team committed clear ethical breaches by actively working against the *White* Plaintiffs' interests at a time when two members of that team were still representing them and also by refusing to consult with them.

## **ARGUMENT**

**I.    The Notice Furnished To Class Members Was Woefully Inadequate.**

**A. The Notice Misled Actual Damage Claimants Into Believing They Would Get Something More Than The Pittance They Will Receive.**

4

The Notice's estimation of recovery is so materially inaccurate that it violates due process.  Notice to class members is crucial to the entire scheme of Rule 23(b)(3).  It set forth an impartial recital of the subject matter of the suit, informs members of their rights in litigation, provides them an opportunity to participate, and alerts them to take appropriate steps to make sure their individual interests are protected.  It must convey the information absent class members need to decide whether to opt out and the opportunity to do so.  Notice also provides an opportunity for class members to monitor the performance of class representatives and class counsel, and to ensure that the predictions of adequate representation made at the time of certification are fulfilled.

Here, the actual number and type of claims made against the Settlement differs so substantially from the information and explanation in the Notice that it makes the recovery stated in the Notice materially misleading.

The legal Notice sent to Class members by mail, attached as Exhibit C to Dkt. # 384 states as follows:

> There are two Options you can choose from to get a damage award.  If you certify that you believe you may have had one or more errors in your credit reports regarding debts discharged in bankruptcy, you can apply for a convenience award.  The amount of the award will depend on the number of class members making this claim, but the parties estimate it will be about $20.  If you certify that you believe you have been harmed by an error or errors in your credit reports regarding debts discharged in bankruptcy with respect to a denial of employment, a mortgage loan or housing rental, and/or a credit card, auto loan, other credit you applied for, or payment of a discharged debt to obtain credit, you can apply for an actual damage award, which is estimated to range from $150 to $750.

The published long form legal notice, attached as Exhibit C (Dkt. # 384), which appears on the assigned website, provides additional detail with regard to Actual Damage Awards and expressly states that claims for Actual Damage Awards "will be paid according to the schedule of estimated award amounts."  It

5

then lists the following schedule:

| | |
|---|---|
| A denial of employment you applied for: | $750.00 |
| A mortgage loan or a housing rental you sought | $500.00 |
| A credit card, auto loan, or other credit applied for, or payment of a discharged debt to obtain credit | $150.00 |

The Notice states that "the exact amounts may be somewhat higher or lower than the projected amounts, depending on the number of class members who qualify for awards under the Settlement."

In order to meet these estimates, the number of class members filing actual damage claims would have had to have been no more than about 100,000 or less than 1% of the class.  Instead, the total number of claims asserted and considered timely and valid are reported to be 744,618.  Keogh Decl. (Dkt # 604-3) at ¶ 14.  The Administrator received 495,562 Actual Damage Award claims and 249,056 Convenience Award claims.  *Id.* at ¶ 15.  Simple math shows that, if all the claims are accepted, the average Actual Damages Award will be $35.50 and the Convenience Award will be approximately $40 (because the Settlement requires that "in no event" that this convenience subclass receive less that $10 million). (Settlement Agreement ¶ 7.7(b)(i).)

Thus, where class members were told they would recover from $150 to $750, depending upon specific nature of the credit they applied for, Settling Plaintiffs now propose to pay them $35.50, or $4.50 *less* than the $40 set aside for Convenience Awards.  The disparity between what was promised and what is being delivered is illustrated in the chart below.

| Type Of Award | What Was Promised | What Is Being Delivered |
|---|---|---|
| Actual Damages: Denial of Employment | $750 | $35.50 |
| Actual Damages: | $500 | $35.50 |

6

| | | |
|---|---|---|
| Denial of Mortgage Loan or Housing Rental | | |
| Actual Damages: Denial of Credit Card or Auto Loan | $150 | $35.50 |
| Convenience | $20 | $40 |

The magnitude of this difference means that class members who submitted actual damage claims are receiving something that is fundamentally different and far worse than what they were told they were signing up for.  These $35.50 claimants were significantly misinformed about their potential individual recoveries.  Not a single one of them was able to intelligently evaluate whether it was in his or her right to participate in the class, opt-out or object.[1]

This result is a direct byproduct of the original deficiencies in the Notice itself.  Where, as here, "the certification notice is combined with a settlement notice, it should identify specific benefits for class or subclass members (or a formula for calculating such benefits) . . . and any other information a class member reasonably would need to make an informed judgment about whether to remain in the class." *Manual for Complex Litigation*, Fourth § 21.311 at 434.  As set forth in the *White* Plaintiffs' Objections (at 74-75), that includes an explanation of the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, a clear identification of those variations and "information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the class and any sub-classes." *Id.* § 21.312 at

---

[1]  *See, e.g., Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003) ("By failing to explain that only claims involving literally physical injuries were not released under the proposed consent decree, the notice misled the putative class members."); *In re Veritas Software Corp. Secs. Litig.*, 496 F.3d 962, 970-72 (9th Cir. 2007) (vacating settlement under PSLRS where it underestimated per claim recovery based on settling partners' erroneous assumptions.); *In re IPO Secs. Litig.*, 243 F.R.D. 79, 94 (S.D.N.Y. 2007) (rejecting notice on preliminary approval where "there is no way to predict actual payment to the claimant" and "[g]iven such uncertainty, it will be difficult, if not impossible, for class members to make adequately informed decisions because the Settlement Notice does not provide any estimate as to the range of actual recoveries on a recognized claim.").

7

438.

In short, the notice must "communicate[] the essentials of the proposed settlement in a sufficiently balanced, accurate, and informative way to satisfy due process concerns." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 963 (9th Cir. 2009). And, obviously, the notice cannot mislead the putative class members. *Molski*, 318 F.3d at 952.

Here, the Notice failed to meet these basic requirements primarily because it excluded any mention of the size of the class, despite the fact that Settling Counsel were specifically advised to do so by counsel for the *White* Plaintiffs. As a result, while the Settling Parties knew that the class consisted of 15 million consumers and were able to estimate awards on the basis of their presumed actual damage award response rate of less than 1%, class members were disable from making any such calculation of their own. As they had no means of determining the response rate upon which Settling Parties' award estimates were based, they were unable to assess the reasonableness of that rate or the stated recovery.

Settling Parties may not excuse the gross disparity between the Notice's stated recovery and the actual recovery based on the caveats that the former was merely an estimate. To the extent that a notice may permissibly provide estimates or ranges of recovery, it cannot do so recklessly, inaccurately and so as to mislead. *See, e.g., Molski*, 318 F.3d at 952; *Veritas* 496 F.3d at 970-72   Once the Settling Parties sought to tell the absent class members what they would recover under the settlement, they had to do so truthfully and with due care. They did not.

The Notice states that "the amounts to be paid to actual damage award claimants" only "***may be somewhat lower*** than the estimated amounts stated in the class notices" (Long Form Notice at 6 (emphasis added).) The Settling Plaintiffs repeat a similar statement in their Motion for Final Approval at 18 (Dkt. # 604), where they again repeat that the actual amounts paid to Actual Damage Award claimants "maybe somewhat lower than the estimated amount stated in the class

8

notices."  This caveat does not save the Notice.  The fact that these claimants will received an award that is anywhere from 1/4th to 1/20th of the promised amount does not come within any reasonable definition of "somewhat lower."  The term "somewhat lower" might excuse deviations of 5% or 10% from the expected amount, but it does not excuse deviations in orders of magnitude.

More importantly, the actual claim rate destroys the avowed *raison d'etre* of the Settlement.  The Settling Parties justify the two-tiered distribution system on their requirement that Actual Damage Claimants recover under the Settlement and that they do so at a greater rate than mere Convenience Claimants, who allegedly suffered less harm.  But because of the actual response rate, that structure is turned on its head.  Now, Actual Damage Claimants will recover *less* than Convenience Claimants.

It is unacceptable to structure a settlement premised on providing greater recovery to those who believe that they have suffered actual damages but which, in fact, provides them less recovery.   Indeed it destroys the whole rationale underlying the structure of the Settlement.  *See, e.g.,* (Settling Plaintiffs' Responses to Objections at 26-27 (Dkt. # 605) (reciting the need for different awards to different class members and noting that "[t]he allocation amounts were not arbitrary but part of a well-thought-out distribution scheme to compensate those who have suffered the most harm").

The Settling Parties recognize the fatality of the error by stating that "if the damage awards are drastically lower than estimates stated in the class notices" they may seek to issue a second notice and opportunity to opt out to actual damage award claimants."  (Settling Plaintiffs' Mot. at 18 n. 9.)  But it is already clear that the awards are going to be drastically lower and fundamentally inequitable.  There is almost no scenario where they will not be.  The Settlement Administrator would have to invalidate hundreds of thousands of claims in order to pay anywhere close to the estimates set forth in the Notice.

9

The *White* Plaintiffs have objected to the class settlement structure since they first learned of it.  (*See White* Plaintiffs' Mem. in Support of Motion to Reconsider (Dkt. # 430) at 19-22.)  The *White Plaintiffs* explained that it was unreasonable and unfair to ask class members to certify that they believed that were harmed by an adverse credit report.  But, of course, the *White* Plaintiffs were never consulted on the Settlement or its structure.

The inaccuracies and actual return rate of claims dooms the Settlement in its current form.  The Settling Plaintiffs' attempt to resuscitate their moribund Settlement through an amorphous and hoped for second notice cannot work.  That is because the only way they can even partially remedy the problem is to change the distribution formula and reduce the $10 million reserve pool cap for Convenience Claimants – changes which would amend the Settlement and which the parties are not at liberty to make if they want this Court to approve it.  *Molski*, 318 F.3d at 946.  As the Ninth Court has held, "[n]either the district court nor this Court ha[s] the ability to delete, modify or substitute certain provisions.  The settlement must stand or fall in its entirety."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

In addition, even if the parties could amend the Settlement at this late date, it would make no sense to provide a new notice only to Actual Damage Claimants.  Every member of the class who received the notice was duped and, if the Setting Parties wish to reduce the Settlement Fund, the Convenience Claimants are entitled to know that their rights under the Settlement are being compromised.  Indeed, if the Settling Parties intend to amend the Settlement in any particular, they would have to re-notify the entire class of the new Settlement, at a new additional cost of at least $6 million.  As the Ninth Circuit explained when confronted with a similarly defective notice:

> The absence of adequate notice injects a fatal flaw into the entire
> settlement process and undermines the district court's analysis of the

10

fairness of the settlement under the *Hanlon* factors.  While the district court has substantial discretion in approving the details of a class action settlement, it may not do so without giving class members an adequate opportunity to object.  In this case, where the notice was inadequate and overstated the likely recovery per share, it may have discouraged other objectors from speaking up.

*Veritas*, 496 F.3d at 972.

## B. The Notice Misleadingly Instructed Class Members That They Had To Determine If They Were Members Of The Class And Then Gave Them No Means Of Doing So.

The *White* Plaintiffs' second challenge to the notice is that it was grossly misleading because it instructed recipients that they needed to determine *if* they were class members when, in fact, the Notice was sent only to consumers who met the criteria for class membership.  (*White* Plfs' Objections at 74.)  The Settling Parties' *sole* response is that this is neither "incorrect" nor "misleading" because "it is possible that someone could fall within the Class definition but still be excluded from the Class" and they give, as an example, someone who has "already released his claims against the Defendants."  (Settling Plfs' Response at 19.)

That Settling Plaintiffs would have the chutzpah to take this position is simply incredible.  The Notice's representation that its recipients needed to make some kind of determination in order to find out if they were in the class is "correct" only in the most hyper-technical sense of that word.  But the notion that it is not misleading – and badly so – is preposterous.

Except for those who exercise their opt-out rights, the only persons who meet the class definition (*i.e.*, the only recipients of the notice) who are not class members are persons who: (1) have already released Defendants from the claims asserted in the complaints; (2) Defendants' officers, directors, and employees; (3) Defendants' attorneys; (4) Plaintiffs' attorneys; and (5) Judge David O. Carter (Settlement ¶ 1.48(d)) – in other words, at most, maybe a few dozen consumers who filed lawsuits against the Defendants and possibly one or two other persons

11

out of a class of 15 million.  Nonetheless, the Notice specifically lists these five categories on the very same page in which it tells recipients they have to determine if they are a class member.  (Long Form Notice, Ex. C, at 4.)

Instead of telling its recipients that they had to determine *if* they were class members and lulling them into the belief that they may well not be, the Notice should simply have informed them that they met all of the criteria for class membership and would be exempted only if they fell into one of the aforementioned categories of exclusion.  Yet, rather than doing that, the Notice affirmatively misled its readers into believing that there was a reasonable possibility that they were not class members when the chances that they were not were about the same as that of hitting a lottery jackpot.

As the *White* Plaintiffs' explain in their Objections (at 74) and as reiterated in Point II.A. below, the problem created by the misleading Notice is magnified by the fact that the large majority of class members have no means of identifying themselves as such because they have no way of determining if their credit reports failed to show one or more of their pre-bankruptcy debts as "discharged in bankruptcy".  Yet, though a notice that provides no means for class members to identify themselves satisfies neither the requirements of Rule 23(c)(2) or due process, the Settling Parties only response to this argument is to ignore it.

## II.    The Settlement's Distribution Scheme Is Fatally Defective.

As set forth in detail in the *White* Plaintiffs' Objections (at 63), the Settlement is structurally defective in that it sacrifices the claims of four distinct segments of the class in order to provide something more than a pittance to a favored group comprising 5% of the class.  The Settling Parties' defense of their supposed right to make these trade-offs, which are largely based on their schizophrenic attempt to base awards to a statutory damages class on the amount of actual damage suffered, is singularly unpersuasive.

### *1.    The Trading-off of the claims of class members who are unaware of*

12

*the information in their credits reports for the claims of those who are.* Without doubt, the group that has lost the most as a result of the Settling Parties' successful effort to winnow down the size of the class who would share in the recovery by 95% are the millions of class members who have no knowledge of the bankruptcy-related information contained in their credit reports. In their Response (at 25), Settling Plaintiffs assert that this is of no moment because, contrary to the *White* Plaintiffs' representation, the Settlement does not require class members to attest that they have "affirmative knowledge of errors on their credit report" in order to obtain a monetary award.

The *White* Plaintiffs, however, have never made that representation. Rather, the *White* Plaintiffs' argument is simply that without knowledge of the basic information in their credit reports – that is, without knowledge of which, if any, of their pre-bankruptcy debts Defendants have reported as not discharged – class members cannot form even so much as a "belief" that their credit reports contained errors and, hence, are completely disenfranchised by the Settlement's attestation requirement. As this Court has acknowledged, this describes a multitude of class members who do not know that their credit report were issued to third parties, who were unable to "identify discharged debts showing inaccurately" when they received copies of those reports, and who had "no hope of doing so with regard to credit reports that they ha[d] never received." *Acosta*, 243 F.R.D. at 389.

Defendants defend the attestation requirement, maintaining that it is necessary because they are better able to identify bankruptcy-related errors in their credit reports than are the credit reporting agencies themselves. (Defs' Response at 33.) Nothing could be further from the truth.

*First*, as set forth in the White Plaintiffs' Objections (at 64), the Notice was sent only to persons who met the class definition and the credit reports of everyone or virtually everyone who meets that definition are inaccurate. The

13

Settling Parties' own Notice acknowledges as much, stating that a person can be a class member only if he or she "had a credit report issued by a Defendant that contained debts . . . *discharged in your bankruptcy* that were not reported as discharged." (Long Form Notice, Ex. C, at 4 (emphasis added)).[2]  In other words, the attestation requirement asks for information that Defendants already have.

*Second*, the large majority of class members lack this information.  (*See White* Plfs' Objections at 65.)  As set forth above, this is because they have never seen the credit reports that Defendants issued about them during the liability period or, if they did, they lacked "the uncommon legal sophistication" necessary to identify bankruptcy-related errors in their reports. *Acosta*, 243 F.R.D. at 389.[3]

*Third*, even if these class members were to order their reports and could understand them, they would be lulled into thinking those reports (and the ones that preceded them) were accurate because any errors would have been fixed by Defendants as a result of their implementation of the Injunctive Relief Settlement or would have "aged out" through the passage of time.  15 U.S.C. §1681c(a). Further, a consumer who might request a copy of his archived reports would be unable to get them from either the Settlement Administrator or from the Defendants directly.  (Declaration of Ralph Michael Porter, sworn to on Nov. 24, 2009, ¶¶ 8-9).[4]

---

[2]  Defendants point out that "[t]he notice does *not* state that each and every person who receives the notice is a class member, as defined in the Settlement.  (Defs' Response at 11.)   True, but irrelevant.  The Settlement itself provides that the Notice would be sent only to persons who meet the class definition.

[3]  "[C]onsumers must be given written notice of denials of credit or housing, and such a denial would place them on notice of potential credit reporting issues." (Defs' Response at 34.)  In addition, any time credit is denied, a consumer is entitled to obtain a copy of his or her credit report free of charge.  (Defs' Response at 34.)  Consumers have always had the tools available to them to learn whether they were the subject of an inaccurate credit report.  (Defs' Response at 34.) Consumers enjoy the benefit of a series of statutory rights allowing them to identify inaccuracies. (Defs' Response at 34.)

[4]  As Objector Ralph Porter recounts in his declaration, he was affirmatively told by the Settlement Administrator that he could not get him a copy of his archived credit reports and advised him to contact Defendants for one, which Mr. Porter did to no avail.  (Porter Decl. ¶¶ 8-12.)  Counsel for Settling Plaintiffs' suggestion that, after receiving this response from the Settlement Administrator and the

14

1    As Settling Parties have nothing more to say in defense of an attestation

2  requirement that serves no purpose other than to disenfranchise millions of class

3  members who will be required to release their claims for zero compensation, the

4  Settlement is fatally flawed and should not receive the approval of this Court.

5    **2. *The sacrificing of the reinvestigation subclass.*** Even though their own

6  complaints asserted reinvestigation claims on behalf of this subclass, settling

7  Plaintiffs argue that the Settlement's failure to provide its members any additional

8  relief creates no intra-class conflict because "the harm suffered by the erroneous

9  initial reporting and the failure to reinvestigate is inseparable." (Settling Plfs'

10  Response at 33.) That is wrong.

11    Regardless of whether they suffered any distinct actual harm, all subclass

12  members suffered a violation of their distinct statutory right to have their disputes

13  reasonably reinvestigated in accordance with section 1681i of the FCRA and,

14  hence, are entitled to a separate statutory damages award of $100 to $1,000.

15  Further, as explained in the *White* Plaintiffs' Objections (at 67), reinvestigation

16  subclass members do suffer distinct injuries in the form of emotional distress and

17  the loss of time associated with their vein efforts to fix their reports.[5]

18    At any rate, Settling Plaintiffs ignore the fact that at least as to Experian,

19  the sole class representative, plaintiff Hernandez, is not a member of the

20  reinvestigation subclass. (*See* White Plfs' Objections at 33.)[6] Likewise, as to the

21  _____

22  Defendants, Mr. Porter (and presumably the millions of other class members who
   don't know what is in their old credit reports) should have taken the additional
   step of contacting them for a copy of his report is unrealistic and, quite frankly,

23  absurd. (Settling Plfs' Response at 17.)
   [5]  Defendants assert that this loss of time is not a compensable element of an

24  actual damages claim under the FCRA. (Defendants' Response at 35.) Be that as
   it may, the Settling Parties are seeking only to certify statutory damage claims

25  (Settling Plfs' Response at 36), which, by their nature, serve as a substitute for
   non-provable and non-compensable damages. Thus, even if time lost in the

26  dispute process is non-compensable as actual damages, a statutory damages award
   can serve as a substitute for such loss of time, just as it can for any other non

27  provable or non-compensable loss.
   [6]  Settling Plaintiffs note that two of the *Acosta/Pike* Plaintiffs (Robison and

28  Randall) "submitted disputes to Experian regarding their claims" and further assert
   that this Court can appoint them as class representatives even at this late date.

15

Plaintiffs' claims against Trans Union and Equifax, plaintiff Hernandez is the sole class representative who has not been ruled unfit to represent the class regarding those claims.  But as plaintiff Hernandez does not belong to the reinvestigation subclasses with regard to Trans Union and Equifax, there is no plaintiff who is competent to represent the interests of those subclasses – a fact that Settling Plaintiffs' argument that no one in the reinvestigation subclasses has suffered any separable harm serves only to reinforce.

    ***3.   Trading-off of claims of class members who are unable to affirm a belief that they suffered actual damages for those who do.***  In their Objections (at 68-70), the *White* Plaintiffs explained that the Settlement improperly trades-off the claims of those who have no basis for believing they suffered actual damages for those who do by reserving two-thirds of the common fund to the latter group. Settling plaintiffs justify this trading off (which, at least for the time being, has been negated by the "actual damage" response rate) on the ground those who can attest to having suffered credit losses are more deserving of payments than those who cannot.  But Settling Plaintiffs have abandoned their effort to have this Court certify an actual damage class (Settling Plfs' Response at 36) and they do not dispute that the FCRA does not permit distinctions in the amount of statutory damages based on allegations of actual harm.  (*See* White Plfs' Objections 69.)[7] Accordingly, the trade-offs this Settlement makes are legally improper and it cannot be approved by this Court.

---

(Settling Plfs' Response at 62-63.)  As the Settling Plaintiffs present no evidence that Experian failed to fix their reports in response to these disputes, they have not established that plaintiffs Robinson and Randall are members of the reinvestigation subclass.  Furthermore, even if this Court could appoint plaintiffs Robinson and Randall class representatives in the Experian case at this late date, such appointment would come too late for them to protect the already forfeited interests of that subclass.

[7]   Settling Plaintiffs proudly assert (Response at 24) that the attestation requirement is far more relaxed under their Settlement than "the rigorous standard of damages and causation proof otherwise required under the FCRA" – forgetting that plaintiffs are not "required to prove causation or actual damages in order" to obtain statutory damages under the FCRA.  *Acosta*, 243 F.R.D. at 393; *see also* cases cited in *White* Plfs' Objections at 48, n.39.

***4. Trading off of claims of class members with claims against two or three Defendants for those with claims against just one.*** As explained in the *White* Plaintiffs' Objections (at 68), the Settlement irrationally provides the same damages award to class members whose rights to accurate reporting have been violated by one Defendant as it provides to those whose rights have been violated by two or three. The Settling Plaintiffs justify this provision on their unproven assertion that there is no relationship between the quantum of actual harm suffered and the number of Defendants against whom class members can assert a claim. (Settling Plfs' Response at 28.) Again, the fundamental problem with Settling Plaintiffs' position is that a class member whose right to accurate credit reporting was recklessly violated by two or more credit reporting agencies has a distinct claim against each such agency for which he or she is entitled to a separate statutory damages award of $100 to $1,000 under the FCRA.

## III.   The Settlement Is Structurally Flawed In That It Disregards The Interests Of Two Distinct Subclasses.

In their Objections (at 71), the *White* Plaintiffs explain that even if the Settling Plaintiffs acted properly in discounting the value of the claims of the broader class by 99% as a result of alleged weaknesses in those claims, there are two distinct subclasses that don't share any of those supposed weaknesses.

***1.   The corrected error subclass.*** One such subclass consists of class members whose credit reports were corrected after they submitted disputes to the Defendants about their pre-bankruptcy debts being reported as still delinquent. (*White* Plfs' Objections at 72.) The response of both Settling Plaintiffs and Defendants to the *White* Plaintiffs' argument that this distinct group is deserving of higher awards – both because the errors in their reports have been admitted by Defendants and because they are most likely to have experienced problems with their credit – is a deafening silence. Yet, because fundamental fairness requires that a class settlement "distinguish between groups of plaintiffs" who have claims

17

of different strengths, the failure of this Settlement to do so with regard to the claims of the corrected error subclass is fatal. *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 816 (3d Cir. 1995); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ("*Amchem* instructs us to give heightened scrutiny to cases in which class members may have claims of different strength.").

   **2.    *The judgment error subclass.*    The second distinct subclass whose claims are impervious to Defendants' major challenges consists of consumers whose pre-bankruptcy judgments were reported as outstanding, despite the fact that they were not obtained by a governmental agency or natural person.   The Settling Plaintiffs devote all of one sentence to the *White* Plaintiffs' argument that this subclass is deserving of greater compensation, asserting that it would be "irrational" to recognize its existence because there is nothing to distinguish a judgment error from any other type.   (Settling Plfs' Response at 32.)

   That assertion completely ignores all of the points set forth in the *White* Plaintiffs' Opposition (at 71), namely that: (1) there is no inaccuracy or manageability argument against the judgment error subclass because, with the exception of judgments in favor of governmental agencies and natural persons (which are readily identifiable), pre-bankruptcy judgments are never or practically never excluded from the reach of a Chapter 7 discharge order; (2) there is no superiority or due process argument against the judgment error subclass because judgment errors are always harmful to the consumer and never have a beneficial scoring effect; and (3) there is no argument that Defendants could rely on the information furnished by creditors because the information they receive comes directly from court records that are provided to them by public records vendors.

   In their Response (at 36), Defendants take issue with just one of these three points – asserting that "judgments based on non-dischargeable debts (*e.g.*, student loans) are non-dischargeable" and that Defendants would not be able to identify

18

such non-dischargeable debts because, even though the identity of the judgment creditor generally appears in their files, they "do not know the character of the underlying debt."   This argument ignores the testimony of four bankruptcy attorneys, who have sworn that, excluding judgments in favor of governmental entities and natural persons, they were aware of just *one* case out of the combined *100,000* Chapter 7 bankruptcies they have handled in which an outstanding pre-bankruptcy judgment was not reached by a Chapter 7 discharge order. (*White* Plfs' Objections at 71-72, n. 58.)

This should not be surprising.  A debtor would never want to reaffirm a debt that has already been reduced to judgment.  A debt that has been reduced to judgment would never (or almost never) be the subject of a successful adversary proceeding because it would have been incurred too far in advance of the bankruptcy proceeding to have been incurred in anticipation of bankruptcy.  And student loans are never (or almost never) the subject of judgments in favor of private lenders because: (a) the large majority of them are originated or are transferred to government lenders after they have gone into default; or (b) they can be enforced through the imposition of a lien without reducing them to judgment.  As for judgments in favor of government agencies and natural persons, they are excluded from the definition of the subclass and, as the *White* Plaintiffs have shown (Objections at 71, n.58) and as Defendants themselves acknowledge, the identity of those creditors is determinable from the face of the credit report.

In short, given the fact that none of Defendants' major defenses are applicable to the claims of the judgment error subclass, the Settling Plaintiffs have not justified – and, indeed cannot justify – their refusal to recognize the existence of that subclass and to provide its members with anything more than the same penny on the dollar recovery they have negotiated for everyone else.  Further, as none of the Settling Plaintiffs are members of the judgment error subclass, they are not competent to protect its interests and, hence, the Settlement must be

19

rejected under *Amchem*.  (*See White* Plfs' Objections at 34.)

## IV.   The Settlement Amount Is Patently Inadequate.

In their Objections (at 38-39), the *White* Plaintiffs explained that, having assessed their prospects for success in this case at 50% when they were challenging the *Acosta/Pike* Settlement three years ago, it is incumbent on Settling Plaintiffs' lead counsel to explain what has happened since that time to so dramatically alter that assessment.  Far from doing so, they instead again offer this Court nothing but the barest conclusions – asserting, without elaboration, that the amount of the Settlement is justified by "uncertainty and risks of litigation and the difficulties of pro[ving]" that Defendants acted recklessly when they violated the FCRA.  (Settling Plfs' Response at 15.)  This defense is patently inadequate.

The issue is not whether this litigation involves risk – all litigation involves risk and virtually all class litigation involves significant risk.  The issue is what about that risk has caused lead counsel for Settling Plaintiffs to conclude that the class should settle for a recovery of about $9 million per case in three cases which they valued at hundreds of millions dollars just three years ago.  Their complete failure to address this issue is, by itself, fatal to Settling Plaintiffs' defense of the Settlement.  *See In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *20 (E.D. Tex. 2005) (denying preliminary approval of highly discounted settlement where parties had failed to show how "facts developed during discovery ha[d] weakened Plaintiffs' initial factual evaluation of this case" and where "legal risk ha[d] been present from the very first day this case was filed").  Indeed, as explained in the *White* Plaintiffs' Objections (at 40-46), far from being weaker than they were three years ago, the legal and factual developments surrounding Plaintiffs' claims have made them much stronger than they were then.

### A. The Strong Prospects Of Plaintiffs' Establishing Liability Have Improved Since The Defeat Of The *Acosta/Pike* Settlement.

20

### 1. Satisfying The Requirement That Plaintiffs Show That The Credit Reports Defendants Issued Were Inaccurate Presents No Litigation Risk.

Despite the undisputed fact that the vast majority of pre-bankruptcy debts are reached by Chapter 7 discharge orders (Westbrook Decl. ¶ 9) and Defendants' own litigation-driven studies confirming that the credit reports of the large majority of consumers who are the beneficiaries of such are inaccurate, Defendants somehow insist that Plaintiffs will have difficulty establishing even that their historical reporting procedures produced credit reports that were inaccurate. (Defs' Response at 9-11.)   Not even Settling Plaintiffs can bring themselves to mention this argument in their assessment (such as it is) of the litigation risk they face.

Examining its particulars, Defendants' argument is not that Plaintiffs face such risk in establishing that their historical procedures generate systematically inaccurate credit reports, but that Plaintiffs will face risk in establishing that the particular credit reports of individual class members are inaccurate.   This argument reflects a fundamental misunderstanding of the burdens faced by plaintiffs in class action lawsuits predicated upon an alleged pattern or practice of unlawful conduct.

In order to establish class-wide liability in such cases, Plaintiffs are not required to present evidence showing that any particular class member was a victim of a defendant's unlawful policy or practice – much less that each and every class member was.  *See, e.g., Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336 (1977).  Rather, their burden is to establish the existence of the policy itself, which Plaintiffs can do by establishing that Defendants' reporting procedures generate frequent and reoccurring errors in their credit reports and were otherwise not reasonably designed to assure the maximum possible accuracy of those reports.  *See, e.g., Teamsters,* 431 U.S. at 336; *Cooper v. Federal Reserve*

21

*Bank* 467 U.S. 867, 876.  In other words, contrary to the assumption underlying Defendants' argument, Plaintiffs need not produce evidence showing how the individual credit reports of each – or, indeed, any particular – class member were inaccurate in order to establish Defendants' liability to the class as a whole.[8]

Defendants make just three arguments that go the general accuracy of their bankruptcy reporting as a whole, as opposed to the remote possibility that the individual credit report of a particular class member might be accurate. First, Defendants assert that their reporting of many, if not most, of the discharged debts they listed as still delinquent in class members' credit reports are "historically accurate" in that they merely (and allegedly correctly) "describe the status of a debt only as of a particular date (typically, the date on which the furnisher "last reported" the debt to Defendant)." (Defs' Response at 9.)

Defendants are wrong.   Information contained in a credit report is inaccurate for purposes of § 1681e(b) of the FCRA if it is technically inaccurate or if "it is misleading or materially incomplete." *Diprinzio v. MBNA America Bank, BANK, N.A.*, 2005 U.S. Dist. LEXIS 18002, at *10 (E.D. Pa. Aug. 4, 2005).[9] Under their pre-injunction reporting practices, Defendants reported discharged debts as delinquent not as "historical" information, but in the "current accounts" section of their reports, which, in turn, listed the balance on those accounts as "current" – not historical – and which are construed as such by the credit industry at large.  (Plfs' Statement of Genuine Issues, filed July 20, 2007, ¶¶ 27-29 (Docket No. # 166.)  In short, it is both technically inaccurate and highly misleading for a

---

[8] Defendants' argument that it would be difficult or impossible to identify such debts is addressed in Point IV.C, *infra*.

[9] *See also Dalton v. Capital Ass'n, Indus.*, 275 F.3d 409, 415 (4th Cir. 2001) ("a technical truth . . . can be as misleading as an outright untruth"); *Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th Cir. 1998); *Koropoulos v. The Credit Bureau*, 734 F.2d 37, 40 (D.C.Cir. 1984) ("[r]eports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair"); *Andrews v. Trans Union Corp.*, 7 F. Supp.2d 1056, 1074 (C.D. Cal. 1998), *aff'd in part and rev'd in part on other grounds*, 225 F.3d 1063 (9th Cir. 2000), *rev'd on other grounds*, U.S. 19 (2002); *Cisneros v. U.D. Registry, Inc.*, 39 Cal.App.4th 548, 579 (1995).

22

Defendant to report the admittedly discharged debts of a consumer who is the beneficiary of a Chapter 7 discharge order as delinquent in a section of his or her credit report that purports to describe the "current" status of his or her accounts, regardless of whether the "last reported" date for that account precedes the date of the bankruptcy. *See, e.g.*, *In re Torres*, 2007 Bankr. LEXIS 1478, at *28 (S.D.N.Y. Bankr. May 3, 2007) (a "once-accurate credit report" can "become inaccurate in light of changed circumstances, such as the debtor's discharge").[10]

Citing this Court's Tentative Order of January 29, 2009 denying class certification (Dkt. # 369-1), Defendants further assert (Response at 9) that it is not inaccurate to report pre-bankruptcy secured and credit card debts as discharged when a debtor continues to make post-discharge payments on those debts. That is, however, just wrong as a matter of law. In the case of secured debts, it is black letter law that absent a reaffirmation agreement, all such debts are discharged. *See, e.g.*, *Beck v. Gold Key Lease, Inc.*, 272 B.R. 112, 121 (E.D. Pa. 2002). Furthermore, the class definition includes such debts only when they are reported in a derogatory status (Settlement ¶ 1.4 (b)) – indicating that they are not, in fact, being paid.[11]

Defendants also contend (Response at 9) that "[a] credit report credit report is not inaccurate under the FCRA where the claimed inaccuracy benefits the

---

[10] Experian's improper refusal to characterize its reporting of these debts as delinquent, despite the fact that they were discharged, provides much of the explanation for Defendants' assertion (Response at 14) that its litigation-driven accuracy study showed that 95% of the pre-bankruptcy debts it reported for consumers with Chapter 7 discharge orders were "likely" to have been "reported accurately." (Plfs' Statement of Genuine Issues ¶ 35.) It is also worth noting that, even if Defendants were correct on this point, which they are not, any tradelines that "merely" record the "historical status" of an account as of a pre-bankruptcy status date could be identified though an automated file search.

[11] To the extent that the voluntary payment of secured debts somehow makes it accurate to report those debts as not discharged and to the extent such voluntarily paid debts could not easily be identified through an automated search of Defendants' files, that would provide no reason to deny class certification. To the contrary, the problem could easily be addressed either by excluding secured debts from the class definition or, better yet, including them only when they were reported as "in collection" or "charged off" (in which case they obviously were not being voluntarily paid.

23

consumer." The notion that an otherwise inaccurate credit report could somehow be transformed into an accurate one if the inaccuracy benefitted the consumer is nonsense. Experian's argument to the contrary is based on its bastardized reading of *Akserod v. Chex, Systems, Inc.*, 205 WL 142390 (C.D. Cal. June 6, 2005). In that case, plaintiff contended that a credit reporting agency violated the FCRA by issuing a credit report, which *accurately* stated that his bank closed his account because of transactions involving "Checks Returned as Uncollectable," but failed to mention the bank suspected him of having engaged in fraud. *Id.* at *3. The court rejected that argument ruling that misleading, but "factually correct information," is not inaccurate for FCRA purposes if "*the only manner*" in which the report could mislead would be to the benefit of the consumer. *Id.* at *4 (emphasis added). That ruling is irrelevant here because the reporting of a discharged debt as due and owing is factually incorrect. Further, as this Court has itself recognized, "the facts of *Akselrod* are not analogous to the instant case, in which . . . the failure to report discharged debts subjected Plaintiffs to a variety of harms." (Tentative Order Granting In Part and Denying In Part Defendant's Motion for Partial Summary Judgment at 13, Aug. 13, 2007, Dkt. # 169) ("Summary Judgment Tentative Order").)

### 2. Establishing That Defendants' Procedures Were Not Reasonable To Assure Maximum Possible Accuracy Presents Very Little Litigation Risk.

Although Defendants' make a half-hearted attempt to argue that the difficulty of establishing that their pre-injunction procedures were reasonable to assure maximum possible accuracy, Settling Plaintiffs do not indicate that they even considered those arguments in assessing their litigation risk – and with good reason.

Defendants' principal argument is that Plaintiffs faced serious such risk because Defendants "are entitled, as a matter of law, to rely on furnishers of

24

information that Defendants reasonably deem to be reliable to report the status of pre-bankruptcy debts" (Defs' Response at 12).  That argument, which this Court has already *thrice* rejected, is dead wrong.

The notion that reliance on furnishers is a *per se* reasonable credit reporting procedure finds no support in the language or legislative history of § 1681e(b), which leaves room no for a reporting agency to argue that it can fulfill its "maximum possibly accuracy" obligation by "simply repeat[ing] information from reputable sources . . . even if there is easily available a procedure that would greatly improve accuracy at a minimal cost."  *O'Brien v. Equifax Info. Servs., LLC*, 382 F. Supp. 2d 733, 738 n.10 & 739 (E.D. Pa. 2005)

Defendants thus rely on a sentence from the FTC commentary, which states that when a credit reporting agency obtains "information received from a source that it reasonably believes to be reputable . . ., the agency does not violate [the FCRA] simply by reporting an item of information that turns out to be inaccurate." 16 C.F.R. Part 600 App. § 607(b).

Astonishingly, Defendants forget to quote the very next sentence – a sentence which encapsulates Plaintiffs' theory of the case – and which reads: **"However, when a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems . . . it must review its procedures for assuring accuracy."** *Id.* (emphasis added).  The same provision also requires a credit reporting agency to "also adopt reasonable procedures **to eliminate systematic errors** that it knows about, or should reasonably be aware of, *resulting from procedures followed by its sources of information*." *Id.* (emphasis added).  As the cases cited by Defendants (Defs' Response at 12-13) all rely on the FTC commentary and all make the same caveat in the case of systemic problems, they also defeat, rather than support, Defendants' position.  *See Cassara v. DAC Servs., Inc.*, 276 F.3d 1210, 1226 (10th Cir. 2002); *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 972 (7th Cir.

25

2004); *Smith v. Auto Mashers, Inc.*, 85 F. Supp. 2d 638, 641 (W.D. Va. 2000).

Under § 1681e(b) as it has been consistently construed by the FTC and the courts, "there exists an incentive for credit reporting agencies to re-evaluate periodically the reasonableness of their procedures and weigh the 'potential harm from inaccuracy against the burden of safeguarding against such inaccuracy.'" *Id.* (quoting *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996)). Defendants' view that credit reporting agencies need do "nothing more" than act as "mere conduits of information" would "eviscerate the [FCRA's] emphasis on reasonable compilation procedures," *McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917, 930 (W.D. Wisc. 2004), by destroying any "incentive for credit reporting agencies . . . to ever change or improve their current procedures." *O'Brien*, 382 F. Supp. 2d at 739.

Recognizing as much, this Court has rejected the exact same interpretation of § 1681e(b) that Experian advances here in both of its published opinions in this case, stating that it is:

> for a jury to decide whether procedures reasonably designed to ensure maximum possible accuracy include Defendants' presumption that all consumer debts included in Chapter 7 bankruptcy are undischarged, despite the fact that the majority of such debts are discharged, and their reliance on a consumer's past creditors to proactively volunteer information regarding discharged debts.

*Acosta*, 243 F.R.D. at 391-92; *see also White v. Trans Union,LLC*, 462 F. Supp. 2d 1079, 1082 (C.D. Cal. 2006).[12]

---

[12] Defendants' argument that they are always privileged to rely on furnisher information also ignores FTC commentary and case law, which make clear that where a furnisher's information "appears implausible or inconsistent" with other information in a consumer's credit report, the CRA's reporting "requirements are more stringent." 16 C.F.R. Part 600 App. § 607(3)(d); *accord Stewart*, 734 F.2d at 52-53; *O'Brien*, 382 F. Supp. 2d at 738 n.10. Here, Defendants' reporting of multiple pre-bankruptcy debts as still delinquent in the credit reports of millions of consumers is totally implausible and inconsistent with their reporting of a bankruptcy discharge order in the public records section of those reports. *Cairns v. GMAC Mortgage Corp.*, 2007 U.S. Dist. LEXIS 16689, at *16-17 (D. Ariz. Mar. 7, 2007) (*Cairns*, 2007 U.S. Dist. LEXIS 16689, at *16-17 (such "inconsistencies constitute evidence of the employment of unreasonable

26

Likewise, in its Summary Judgment Tentative Order denying Experian's motion for summary judgment, this Court rejected the notion that reliance on furnisher information in this context has anything to do with a reasonable "interpretation" of the FCRA, observing that such reliance amounted to "nothing more than" Experian's own "statistical guess" that the pre-bankruptcy debts it was reporting as delinquent had not been discharged. (*Id.* at 10.) Further, not only did this Court find that Experian was not privileged to rely on its furnishers to proactively volunteer information about the status of pre-bankruptcy debts, it found that "it remains for the trier of fact to ultimately resolve whether Experian's statistical guess ran an 'unjustifiably high risk of violating the FCRA. (*Id.*)

As the *White* Plaintiffs point out in their Objections (at 41), since the defeat of the *Acosta/Pike* settlement, the argument that Defendants' historical procedures failed to meet their maximum possible accuracy has become even stronger by virtue of the Injunctive Relief Settlement and this Court's order finding that the revised procedures are "reasonable to assure maximum possible accuracy" within the meaning of 15 U.S.C. § 1681e(b). Defendants dismiss this point as "a non-sequitur, in that it assumes there can be only one set of reasonable procedures for the reporting of pre-bankruptcy debts." (Defs' Response at 17.) While that may true in some cases, it cannot possibly be true where, as here, the assumption upon which Defendants' former procedures were based are the ***exact opposite*** of the procedures they now employ and that this Court has blessed, namely that a discharge order reaches all pre-bankruptcy debts, except when a furnisher has affirmatively provided Defendants with information showing that a given debt has been excluded from discharge or such exclusion is otherwise apparent from information in their files.

Defendants next assert that the Injunctive Relief Settlement is irrelevant because, as "a settlement and a subsequent remedial measure," it is inadmissible

procedures for preventing inaccuracies"). 27

to establish Defendants' culpability.  Fed. R. Evid. 407, 408.  (at 17)  Defendants are wrong.  First, rule 407 does not prevent the admission of subsequent remedial measures in order to prove feasibility.  *See, e.g., Boeing Airplane Co. v. Brown*, 291 F.2d 310, 315-316 (9th Cir. Wash. 1961); *Cerniglia v. County of Sacramento*, 2008 U.S. Dist. LEXIS 50983, 20-21 (E.D. Cal. June 17, 2008).  Likewise, nothing in Rule 408's prohibition on using an offer of compromise "to prove liability" prevents a party from citing a Court order, the existence of a settlement itself, or a party's performance thereunder as evidence supporting the feasibility of alternative practices.  Quite simply, the Injunctive Relief Settlement and this Court's order approving it foreclose Defendants from arguing that there were no other reasonable procedures available to them that could fulfill their maximum possible accuracy obligations.

Defendants' next argument is that they cannot be found liable for violating the FCRA's maximum possible accuracy standard because, in some instances, bankruptcy-related inaccuracies in a class member's credit report will have been caused not by Defendants' unlawful reporting procedures, but by the class member's failure to list one or more of his debts in a bankruptcy schedule.  (Defs' Response at 19-20.)  That argument is foreclosed by the undisputed existence of cost-effective procedures, which, had they been implemented earlier, would have enabled Defendants to accurately report the status of a consumer's pre-bankruptcy debts, whether he or she listed them on a schedule or not.  In other words, Plaintiffs will have no difficulty establishing causation because they can easily show that, but for each Defendant's defective procedures, those unlisted debts would have been accurately reported.

At bottom, Defendants' "causation" argument is really an argument that a credit reporting agency can avoid liability under the FCRA by establishing that a consumer was contributorily negligent or has "unclean hands."  Defendants fail to cite any authority for that proposition and, in fact, no such defenses are available

28

under the FCRA.[13]

### 3. The Settling Parties Exaggerate The Risk Of Establishing Willfulness.

In their Objections (at 42-45), the *White* Plaintiffs detailed a series of facts demonstrating that the Defendants' knew their reporting procedures were causing the systemic misreporting of discharged debts as still delinquent and did not even consider reviewing those procedures to see whether there were any cost-effective measures they could take to reduce their error rate, despite the fact that both the FTC and the case law commanded that they make such a review.

In response, Defendants make the incredible contention (Response at 21-22) that, even if Plaintiffs can prove that they were aware of these systemic errors, they could ignore this guidance and simply stick their head in the sand without running an "unjustifiably high risk" of contravening the maximum possible accuracy requirements of the FCRA. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007). That is mainly because of their view that, under *Safeco*, they cannot be deemed to have acted in reckless disregard of the FCRA absent the existence of specific judicial decision or administrative rule instructing them to follow a particular reporting procedure – in this case a procedure under which they would treat all pre-bankruptcy debts as discharged absent the receipt of information from a furnisher or some other source indicating that a particular debt has not been discharged. (Defs Br. at 21-22.)

This exact argument was squarely rejected by this Court in its Summary Judgment Tentative Order, observing that, under Experian's reading, *Safeco* somehow "altered the traditional maxim that a dispute as to willfulness  presents an issue of fact for summary judgment such that now a finding of willfulness will

---

[13] *See, e.g., St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir. 1989) ("there is no indication . . .that the protection provisions of the FCRA are reserved for only those who have done no wrong"); *Cole v. Am. Family Mut. Ins. Co.*, 410 F. Supp. 2d 1020, 1025 (D. Kan. 2006) (holding that "the unclean hands doctrine" does not "appl[y] to claims under the FCRA").

29

always be precluded 'in a case of first impression.'" (*Id.* at 8.)  Noting that, in

reality, "*Safeco* did no such thing, this Court than went on to decry Experian's

notion that this is "a case of first impression, explaining that the only sense in

which it was one, it was only in the very narrow sense:

> as to whether the specific procedures Experian followed in preparing
> credit reports relating to bankruptcy debts comported with [its]
> statutory [maximum possible accuracy] duty and, if not, whether this
> failure to comport was willful. For such a case to be ripe for summary
> judgment would be effectively to allow all credit reporting agencies to
> intentionally produce inaccurate reports, facing only the threat of
> actual damages, until Congress, a federal appellate court, or the FTC
> unambiguously declared that this precise procedure in operation was
> not 'reasonable' within the context of the FCRA.  In essence, it would
> be to eviscerate the civil liability for willful noncompliance provision
> of the FCRA.

(*Id.* at 9.)

To this the *White* Plaintiffs would simply add that Defendants' assumption

that the issue of recklessness turns solely upon the reasonability of their decision to

reject or accept a specific reporting procedure misses the boat.  The core reason

why their conduct was reckless is not that they considered and rejected an

alternative procedure as unreasonable or improper.  Rather, it is that they knew

their procedures were generating systemically inaccurate credit reports, but didn't

even bother to review those procedures or consider the possibility of any that better

ones might have been available that could have reduced their error rate at

reasonable cost.  In other words, they acted in reckless disregard for the FCRA's

requirement that they employ procedures reasonably designed to assure ***maximum***

***possible accuracy***.[14]

---

[14] Defendants also cite post-*Safeco* authority for the proposition that there is no
willful violation of the FCRA when a defendant bases its conduct on an
interpretation of the FCRA, which, though incorrect was objectively reasonable –
as if that proposition says something that *Safeco* did not.  (Defs' Response at 21.)
This argument is fully addressed in the *White* Plaintiffs' Objections (at 45-46),
wherein they explain that this rule does nothing prevent *Safeco* because there is no
reasonable interpretation of the words of § 1681e(b) upon which Defendants could

30

The *White* Plaintiffs hasten to add, however, that Defendants did not need judicial or administrative guidance to tell them that adopting procedures akin to those contained in the Injunctive Relief Settlement would have dramatically reduced their error rate.  As set forth in the *White* Plaintiffs' Objections (at 44), to figure that out they would have had to look no further than their own procedures for reinvestigating pre-bankruptcy debt – procedures pursuant to which they would correct all such debts, including those about which the consumer had not complained, to show they had been discharged (excepting those that they had coded as non-dischargeable).

While counsel for Settling Plaintiffs express concern that Defendants could prevail on "the first impression" argument that this Court eviscerated in its Summary Judgment Tentative Order (Settling Plfs' Response at 12), no where do they explain why the basis for their belief (if they have one) that Plaintiffs would have any trouble establishing Defendants' awareness that their reporting procedures were producing an alarming quantity of errors.  Likewise, in response to the devastating admission by William Stockdale of Trans Union that "the whole industry understands" that "we have a problem with getting the bankruptcy indicators into tradelines" and the testimony of the director of the National Credit Reporting Association that each Defendant openly acknowledged this problem in tape-recorded trade conferences, Settling Parties say absolutely nothing.  (*White* Plfs' Objections at 43-44.)

Instead, Defendants limit their attack on Plaintiffs' willfulness evidence to nit-picking over what two pieces of that evidence say about the quantity of the bankruptcy-related disputes they receive and of the bankruptcy-related corrections they make each year.  For instance, while not denying that such disputes are the fourth most common type, that each Defendant receives more than 150,000 of

---

have based their decision to do nothing in the face of their knowledge that their credit reports were systematically listing discharged debts as still delinquent.

31

them annually (or about one million over the length of the liability period), and that, on a per capita basis, they are nearly as frequent as all other kinds of disputes combined, Defendants argue that this evidence is meaningless because a portion of these disputes relate to accounts that should not have been reported as "included in bankruptcy" (*e.g.*, because the consumer never filed for bankruptcy).   (Defs' Response at 14.)

There are two problems with this argument.  First, both Mr. Stockdale and *White* Plaintiff expert Dean Binder (Decl. ¶ 64), who spent years as a supervisor in Equifax's reinvestigation divisions, have testified that the large majority of the bankruptcy-related disputes they receive concern the failure to report discharged debts as "included in bankruptcy."   Second, even if half of the bankruptcy-related disputes Defendants received related to some other kind of bankruptcy problem, "included in bankruptcy" disputes would still amount to more than 75,000 per year and, on a per capita basis would still be nearly as common as half of all other kinds of disputes combined.  Likewise, if just 25% of the bankruptcy-related corrections Experian makes each year involved pre-bankruptcy debts incorrectly reported as still delinquent, those corrections would still be *twice* as common as all other disputes combined.  (*White* Plfs' Objections at 42.)  Thus, the risk that a jury would find that Defendants knew that they had a systemic problem with the way they were reporting pre-bankruptcy debt is extremely high.

In view of the strength of the evidence that has been uncovered so far and this Court's principled, if tentative, rejection of Defendants' baseless argument that their behavior was justified by a reasonable interpretation of the meaning of the FCRA's maximum possible accuracy requirement, the massive discount the Settlement makes on Defendants' litigation exposure cannot possibly be justified by the notion that proof of willfulness is a long shot.

**B. The Risk That A Class-Wide Statutory Award Would Be Eviscerated By An Excessiveness Challenge Is Not Substantial.**

32

Defendants contend that Plaintiffs face a serious risk that any class-wide statutory punitive damages award they might obtain would be disproportionate to actual harm suffered and, hence, would violate Defendants' due process rights under the principles articulated in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).   (Defs' Settling Plfs. Response at 27-28; *see also* at Settling Plfs' Response at 10-11).)   At the most fundamental level, the flaw in this argument is that those principles relate to the ratio between compensatory and punitive awards and simply do not apply in the context of statutory damage awards.   *Zomba Enters. v. Panorama Records, Inc.*, 491 F.3d 574, 587 (6th Cir. 2007) ("We know of no case invalidating such an award of statutory damages under . . . *Campbell*"); *see also Verizon California Inc. v. OnlineNIC, Inc.*, 2009 U.S. Dist. LEXIS 84235, at *20 (N.D. Cal. Aug. 25, 2009) (same); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 460 (D. Md. 2004).

As numerous courts have recognized, the scope of constitutional restraints on statutory damage awards are governed not by *Campbell*, but by the Supreme Court's decision in *St. Louis, I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919). *See, e.g., United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992); *Zomba*, 491 F.3d at 587-88; *Verizon*, 2009 U.S. Dist. LEXIS 84235, at *20.   Under *Williams*, a defendant's due process rights are violated "only where the [statutory] penalty prescribed is 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable. '" *Citrin*, 972 F.2d at 1051 (quoting *Williams*, 251 U.S. at 66-67).   As the Sixth Circuit has noted, this review is "extraordinarily deferential." *Zomba*, 491 F.3d at 587.   Further, as set forth in the White Plaintiffs' Objections (at 56), "[t]here is no requirement" that Congress make "the statutory remedy . . . proportional to the plaintiff's own injury, as it is perfectly free to "choose an amount that reflects the injury to the public as well as to the individual." *Centerline Equip. Corp. v. Banner Personnel Serv., Inc.*, 545 F. Supp. 2d 768, 777 (N.D. Ill. 2008); *see also Williams*, 251 U.S. at 66 ("the legislature

33

may adjust its amount to the public wrong rather than the private injury"); *Verizon*, 2009 U.S. Dist. LEXIS 84235, at \*21; *Arrez v. Kelly Servs., Inc.*, 522 F. Supp. 2d 997, 1008 (N.D. Ill. 2007).

In short, as the FCRA vindicates both public as well as private rights, Defendants' argument that there must be some proportionality between the amount of actual harm suffered and the amount of statutory damages holds no water.

Even if the *Campbell* proportionality requirements did apply here, Defendants have furnished this Court with nothing that would allow it to conclude that there is a grave – or even significant – risk that a class-wide statutory damage award would run afoul of those requirements. The sole scoring study that Defendants have produced that employs relevant protocol – that is, a protocol that measures the scoring impact of the reporting errors that define class membership – was the August 2008 Experian study. (White Plfs' Objections at 57). And, as set forth in the *White* Plaintiffs' Objections (at 56-58), that study shows that the credit scores of nearly two-thirds of the class (or about 10 million consumers) have been adversely affected by Defendants' unlawful reporting practices, more than one million of whom suffered a decline of more than 25 points.[15]

---

[15] Displeased with the results of the Equifax study, Defendants put forward an Experian study that showed scoring declines for a much smaller portion of the class. (Defs' Response at 16.) As the *White* Plaintiffs' scoring expert, Dean Binder, has explained all of the Experian studies are flawed because, among other things, they improperly added bankruptcy indicators to accounts in **good standing** (that is, to accounts that were not delinquent) and, unlike the 2008 Equifax study, did not conform their protocol to those that define class membership. (Binder Decl. ¶¶ 40-47 & 49.) As Mr. Binder further explained, had Experian done so, the results would have shown an even more adverse scoring impact than the Equifax study. (*Id.* ¶ 50.) That is because Equifax suppresses all of the information in a discharged account – an indisputably needless practice that tends to deflate the scores of consumers with discharged accounts in their credit file. (*Id.* ¶¶ 45, 46, 50.)

Though Defendants' dispute Mr. Binders scoring credentials, he has more than ample expertise in that matter (Declaration of Dean Binder, sworn to Jan. 7, 2009,

34

Based on Equifax's own litigation-driven scoring study, Plaintiffs' damages expert, Prof. Stan V. Smith, has estimated that the losses suffered by the class as a result of Defendants' woeful reporting practices are between $3 billion and $5 billion – an amount that is easily proportionate to each Defendant's damages exposure. *Campbell*, 538 U.S. at 425 (suggesting that constitutional lines are not crossed when punitive damages awards are less than four times amount of compensatory damages).[16]

Defendants assert (Response at 29) that it is improper for Plaintiffs to aggregate the damages of the class for purposes of a proportionality argument. That makes no sense on two counts.  First, Defendants argument that they face huge and disproportionate statutory damages exposure itself depends on their being saddled with an aggregate class-wide damages award.  If it is proper to take into account an aggregate impact on the one end of the equation, it must be proper to take it into account on the other.  Second, the issue of disproportionality is measured not against the amount of benefit to the Plaintiff, but the amount of harm caused by the defendant.  If that harm is spread out among millions of individuals all of whom are parties to the action, there is no sense in which an award that bears

---

¶¶ 3-7.  And, at any rate, he was assisted in his analysis by Linda Willson, a woman who was one of Equifax's most knowledgeable FICO experts and who has endorsed each of Mr. Binder's conclusions. (Declaration of Linda Willson, sworn to Jan. 7, 2009, ¶¶ 3-12.)

[16]  Defendants' arguments against the declaration of Professor Stan Smith are unavailing.  First, most of the arguments go to the weight of his testimony, not its admissibility (e.g., criticizing the assumptions underlying his mathematical calculations).  Second, the point of Prof. Smith's opinion is not to determine with mathematical certainty the amount of the class's actual damages, but rather to provide a reasonable approximation of those damages against which the Court can measure the Settlement.  *See* Supplemental Declaration of Stan V. Smith, PhD., dated June 7, 2009, ¶ 2, and Smith Decl., dated Jan. 8, 2010.  Indeed, as Prof. Smith notes, the only barrier to his providing a more exact estimate of damages is Defendants' own failure to produce their internal data.  Smith Decl., June 7, 2009, ¶¶ 2-3, and Smith Decl., dated Jan. 8, 2010.  Also, the propriety of Prof. Smith's assumptions were confirmed by Dean Binder and Professor Porter.  Binder Decl., dated Dec. 11, 2009; Porter Decl., dated Nov. 29, 2009.  In the end, because of their glaring failure to provide any contrary estimate on the basis of such data, Defendants have left the Court with no choice but to evaluate the Settlement on the basis of the White Plaintiffs" evidence. *See Acosta, LLC*, 243 F.R.D. at 392, n. 3.

a reasonable relationship to that harm could be disproportionate.

Defendants' argument to the contrary is that a statutory damage award of $100 to an individual who can show no actual harm is disproportionate and unconstitutional. (Defs' Response at 29.) Response at Suffice it to say that, if that were true, virtually all statutory damage provisions would be unconstitutional, but Defendants cannot cite a single case that so holds.[17]

### C. The Settling Parties Have Exaggerated The Class Certification Risk.

As they do with respect to so many of the *White* Plaintiffs' other arguments, the principal way in which Settling Parties respond to the White Plaintiffs' arguments for why the risk of class certification being denied in these cases is not large is to ignore them. For instance, Settling Plaintiffs cite (Response at 10) this Court's tentative order denying class certification as a significant source of litigation risk, but they say nothing in response to the *White* Plaintiffs' argument (Objections at 46-47) that when this Court issued its order certifying a settlement class, it necessarily rejected the reasoning of its tentative, including, in particular, its tentative rulings that Plaintiffs could not satisfy the elements of adequacy, typicality, commonality and predominance. And the *White* Plaintiffs also ignore that the reasoning of the tentative could not be squared with this Court's *Acosta* decision or its order certifying the injunctive relief class. (*White* Plfs' Objections at 47, 48, 50.)

Recognizing that no Settlement Class could be certified if the Rule 23(a) and Rule 23(b)(3) requirements for class certification are not met, Defendants confine their argument that this case presents significant class certification risk to Rule 23(b)(3)'s manageability requirement. In so doing, however, they completely fail

---

[17]   Without any sense that they are contradicting themselves, Defendants also argue (Response at 28) that the "huge [aggregate] exposure they would face "to a class that suffered little actual harm" makes class certification improper in this case. In their Objections (at 54-59), the White Plaintiffs set forth this reasons why this argument has merit – all of which are ignored in Defendants' Response.

36

to address the argument that the class mechanism is vastly superior to litigating each of the cases individually.

This is a critical point. As explained in the *White* Plaintiffs' Objections (at 48-50), the issue is not whether class certification presents manageability problems. The issue is whether the manageability problems it creates are so severe as to render individual adjudication a superior method of adjudicating the matter. Certainly, that is not the case here because the core issues in this litigation – whether Defendants have failed to employ reasonable procedures to assure the maximum possible accuracy of their credit reports and whether such failure was willful – are common to the class. As this Court recognized in its *Acosta* decision, it would be infinitely more efficient to adjudicate these issues once for the entire class than to adjudicate them separately in 15 million different lawsuits. And, if no one would bring those suits, adjudicating this controversy as a class action, however unwieldy that might be, is a far superior alternative than (*See White* Plfs' Objections at 49-50.)

Also conspicuously absent from Defendants' submission is any rebuttal to the *White* Plaintiffs' argument that the manageability arguments are vastly exaggerated both because the need for individual files rules to determine whether the credit reports of class members are inaccurate is purely theoretical and because those reviews could be conducted through a mechanical process, the burdens of which are not so daunting as to defeat class certification. (*See White* Plfs' Objections at 50-53.)

Rather than respond to any of this, Defendants just assert that there is no process through which debts excluded from the reach of the discharge order, even if few in number, could be sifted out from the rest without millions of individual adjudications. (Defs' Response at 10, 11, 23.) That is pure hyperbole.

For instance, Defendants maintain that accuracy determinations would have to be made to identify cases in which a creditor had failed to report the existence of

a discharged debts or successful adversary challenge.   As all reaffirmation agreements and adversary proceedings are listed on docket sheets which are available from PACER in computer readable form, the identification of this tiny minority of excludable debts would involve nothing more than an automated comparison of public bankruptcy records with Defendants' credit file information. (See *White* Plfs' Objections at 54-55, n.44.)[18]  And, even if an individual click of a computer button would be required that would hardly constitute the kind of severe managerial burden that would make individual adjudication a superior alternative to the class action device.

Likewise, and contrary to Defendants' unsupported assertions, they can identify all or virtually all non-dischargeable student loans through automated means of their own files because it is standard operating procedure for Defendants' furnishers to report those loans with searchable identifying codes.  (Binder Decl. ¶ 53 ("in my experience, I have never seen a student loan that did not contain a student loan narrative identifying it as such").)

Citing this Court's tentative order denying class certification, Defendants also assert that it would be accurate to report post-bankruptcy debts that were incurred on pre-bankruptcy revolving accounts as not discharged and that individual adjudications would be necessary to identify such non-discharged debts. (Defs' Response at 9.)  While it is true that it is accurate to report those debts as due and owing when they were incurred ***after the filing of the bankruptcy petition***, Defendants' assertion that this creates a manageability problem is wrong.   Any

---

[18]   Defendants assert this is "no small issue" as "roughly *278,000 adversary proceedings* were filed during the class period." (Defs' Response at 11 (emphasis in original).)   While that may sound like a large number in the abstract, it constitutes less than 1/50[th] of 1% of the number of pre-bankruptcy debts that would have been reached by the 17.1 million Chapter 7 discharge orders that were issued during that period (assuming an average of about 8 to 10 discharged debts per case). (Juntikka Decl. ¶ 53).  Defendants surely can use their public record vendors to retrieve those adversary proceedings off of PACER and integrate them into their credit files, using their sophisticated computers and matching technology.  (*See* Declaration of John Ulzheimer, sworn to on Feb. 14, 2007, ¶ 18.)

38

such problem could easily be addressed by limiting the class definition to include credit card debts only when they were reported with a date of initial delinquency that is ***before the filing of the bankruptcy petition*** and that were not utilized after that filing.   Such pre-bankruptcy delinquent debts are, by definition, always reached by the discharge order, regardless of whether the account is kept open post-discharge.

As the *White* Plaintiffs note in their Objections (at 53), to the extent manageability problems become an issue, this Court has broad discretion to devise procedural solutions to minimize them.  The *White* Plaintiffs have suggested three such solutions – a statistical sampling approach, the use of an evidentiary inference that would shift the sequencing of proof and the creation of subclasses.

Defendants attack the use of statistical sampling methods on grounds that they violate their due process and jury trial rights, while, at the same, time would not sufficiently mitigate the alleged manageability problem.  (Defs' Response at 25-27.)  These attacks are fully addressed by the *White* Plaintiffs in their Closing Memorandum in Support of Class Certification, filed Aug. 8, 2008, at 18-20 (Dkt. # 321) and there is no need to repeat their arguments here.  Defendants object to the use of an evidentiary inference on the grounds that it would somehow alter substantive law by shifting the burden of proof and that it would not adequately address the supposed manageability problems.  (Defs' Response at 24-25.)  These arguments are also fully addressed in the *White* Plaintiffs' Closing Memorandum in Support of Class Certification, at 15-17.

Defendants assert that Plaintiffs face insurmountable manageable hurdles for one other reason, namely that they "would have to prove that each class member suffered some loss or injury as a result of Defendants' reporting." (Defs' Response at 20.)  This assertion flies in the face of a uniform body of case law, including three Circuit Court decisions, two opinions of this Court and more than a dozen other district court decisions, which holds that proof of actual damage is not a

prerequisite for statutory damages under the FCRA. (*See* cases cited in *White* Plfs' Objections at 48, n. 39.)[19]  Further, the Ninth Circuit has itself held that statutory damages are available without proof of actual damages" in at least two other statutory contexts, including the Fair Debt Collection Practices Act.  *Baker v. G.C. Services Corp.*, 677 F.2d 775, 781 (9th Cir. 1982); *see also Six (6) Mexican Worker v. Arizona Citrus Growers*, 904 F.2d 1301, 1306 (9th Cir. 1990).[20]

Unable to mount a serious challenge to these authorities, both Settling Plaintiffs and Defendants assert that there is a real danger that this Court would dismiss Plaintiffs' claims under the theory that, absent a showing of actual damage, they have no standing.  (Defs' Response at 20; Settling Plfs' Response at 11.) There is no such danger.  This argument that a plaintiff must show actual damage in order to have standing confuses Article III's "injury-in-fact" prerequisite for standing with compensable harm.  *Korman v. Walking Co.*, 2007 U.S. Dist. LEXIS 63732, at *8 (E.D. Pa. Aug. 28, 2007).  A person suffers injury-in-fact for standing purposes whenever he or she suffer a denial of his or her legally protected rights, including rights created by statute.[21]  As all class members have suffered a denial of their statutory right to be protected from the publication of inaccurate financial information about them, they all have standing to pursue their FCRA claims.

### D. The Response Rate Highlights The Patent Inadequacy Of The

---

[19]   *See also Pirian v. Inn-N-Out Burgers*, 2007 U.S. Dist. LEXIS 25384, at *12 (C.D. Cal. Apr. 5, 2007); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 393 (N.D. Ill. 2006) (same); *Bonner v. Home123 Corp.*, 2006 U.S. Dist. LEXIS 54418, at *18 (N.D. Ind. Aug. 4, 2006); *In re Farmers Ins. Co., FCRA Litig.*, 2006 U.S. Dist. LEXIS 27290, at *38 (W.D. Okla. Apr. 13, 2006) *Braxton v. Farmers' Ins. Group*, 209 F.R.D. 654, 661 (N.D. Ala. 2002).

[20]   Against this overwhelming weight of authority, Defendants find litigation risk in the musings of a single appellate court that expressly declined to address the issue.  *Dowell v. Wells Fargo Bank, N.A.*, 517 F.3d 1024, 1026 (8th Cir. 2008).

[21]   *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) (holding that by virtue of his having "suffered the loss of a statutory right to disclosure [under TILA]," plaintiff had "therefore suffered injury in fact for purposes of Article III standing"); *Korman*, 2007 U.S. Dist. LEXIS 63732, at *7-8 (holding that denial of statutory right to receipt that omits certain credit card information is sufficient to confer standing under FCRA); *Ehrheart v. Lifetime Brands, Inc.*, 498 F. Supp.2d 753 (E.D. Pa. 2007) (same).

40

1    **Settlement Amount.**

2        The fact that over 500,000 individuals sought Actual Damage Awards itself

3    demonstrates the patent inadequacy of the Settlement.[22]  If one were to take the

4    minimum amount that the Settling Parties propose to give to the Actual Damage

5    Claimants of $150 and multiply that by the 500,000 who make such claim, it is

6    clear that the full amount of the settlement available to the class, not including

7    Convenience Claimants, would total $75 million.   Now, the Actual Damage

8    Claimants will receive only $35.00 (or approximately $12 per Defendant).   Such

9    amounts are clearly out all of proportion to the awards made in other FCRA class

10   action cases.

11       For example, in *Gustafson v. Valley Insurance Co.*, 2004 WL 2260605, at

12   *1 (D. Or. Oct. 6, 2004), the court approved a settlement of an FCRA action,

13   which involved paying the class 50% of the ***maximum*** in statutory damages.  The

14   court noted that the legal issues presented were questions of first impression and

15   that there were "potentially substantial legal, factual, economic and practical

16   obstacles to recovery in this action" and there was a "significant risk of no

17   recovery" in the litigation.[23]

18       In another related group of cases, the same court approved the settlement in

19   the companion case of *Razilov v. Nationwide Mutual Ins. Co.*, 2006 WL 3312024

20   (D. Or. Nov. 13, 2006), which provided for a settlement to the class that was 20%

21   of the ***maximum*** statutory penalty.   Finally, in the third of this trio of cases, the

22   court approved a settlement that gave each member of the class the full minimum

23

24   [22] Settling Plaintiffs tout "the overwhelming success of the Settlement in generating claims for the Actual Damage Awards, at a volume that exceed the parties' initial

25   estimates."   (Notice of Motion and Motion for Final Approval of Class Action Settlement at (Dkt. # 604))8.  But the 5% overall response rate appears to be well

26   below average by historical standards.   *See, e.g., Berther v. TSYS Total Dept. Management Inc.*, 2007 WL 1795472, at *3 (E.D. Wisc. June 19, 2007) (noting that

27   return rates on class notices of 10 to 15% were normal).
     [23] The court noted that companion cases had preceded all the way to the Supreme

28   Court which ultimately resulted in the Supreme Courts decision in *Safeco*, 551 U.S. 47, where the Court ultimately rejected the claims.

41

statutory penalty.  *Mark v. Valley Insurance Co.*, 2005 WL 1334374 (D. Or. May 31, 2005).

Similarly, in *Stoner v. CBA Information Services*, 352 F. Supp. 2d 549 (E.D. Pa. 2005), the court approved an FCRA class action settlement that provided $260 to each and every class member.  In that case, the assertion was that the credit reporting agencies were not properly investigating disputes concerning consumer credit reports.  The court noted that the plaintiffs' ultimate recovery was problematic because the defendant was in a major dispute with its insurance carrier and the defendant was no longer in business.  The court noted that it was "very possible that defendant would have been unable to withstand a greater judgment."  352 F. Supp 2d at 552.  The settlement provided for recovery of $260 per member, even though the response rate was 16%, over 3 times the response rate in this case.

Most recently, in *Barel v. Bank of America*, 255 F.R.D. 393 (E.D. Pa. 2009), another FCRA class action, the court approved a settlement, which provided a package of services to each class member that amounted to over $50 in value and which the court calculated was 52% of the low end of the estimate of total damages and 5.2% of the high end of the damages range.  In approving the settlement, the court cited a number of other class action cases that approved settlement ranges which, *at their lowest point*, were no less than 4.4% of the total potential recovery.

Finally, in *Sonmore v. Checkrite Recovery Svcs, Inc.*, 206 F.R.D. 257, 265 (D.Min. 2001), the court rejected a class action as not being superior to individual actions because the class action would result in "paltry" award of only $25 to each class member, which the court characterized as "shockingly low when compared to the statutory damages of up to $1,000 that each class member maybe eligible to receive in an individual suit."

### E. The Amount Of Discovery Does Not Justify The Settlement.

42

In their Objections (at 60-62), the *White* Plaintiffs demonstrated that counsel for Settling Plaintiffs' claim that they had conducted "extensive discovery" was all smoke and mirrors.  They took an average of between two and three depositions per Defendant concerning the allegations set forth in the Complaints, they obtained what now appears to have been an average of just about 3,000 pages per Defendant of even potentially relevant internal documents, which contained not a single email or memorandum about the bankruptcy reporting issues that define this case, and they filed just a single motion to compel concerning exactly one document demand,   In defense to this assault on their discovery, counsel for Settling Plaintiffs said not a single word.

**F. The Reaction Of The Class Does Not Favor The Settlement.**

Settling Parties boast that for every class member who opted out or objected to the Settlement, about 99 submitted claim forms, asserting that this shows a "remarkable" level of support for the Settlement and "weighs heavily" in favor of its approval.  (Defendants Response at 32.)  Not really. While 5% of the class may be said to have expressed support for the Settlement, "the vast majority" – some 95% of the class – "have remained silent and essentially expressed a reaction of utter indifference to the settlement."  *Sylvester v. CIGNA Corp.*, 369 F. Supp.2d 34, 49 (D. Me. 2005).  Needless to say, "the silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the propose settlement."  *Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (W.D. Pa. 1995).   Thus, at most, "the reaction of the class is a factor that weighs neither in favor of approving or rejecting the proposed settlement."  *Sylvester*, 369 F. Supp. 2d at 49.

**V.     Neither Counsel For Settling Plaintiffs Nor The Settling Plaintiffs Themselves Can Adequately Represent The Class.**

**A. The Incentive Awards Have Created An Irremediable Conflict Of Interest For The Settling Plaintiffs And Their Counsel.**

43

As set forth in the *White* Plaintiffs' Objections (at 11-14), by conditioning named Plaintiffs' eligibility for $5,000 incentive awards on their "support" for the Settlement, counsel for the Settling Plaintiffs have created a disabling conflict between themselves and their clients, on the one hand, and the class on the other.

Settling Plaintiffs' principal response is that this conflict can be swept under the rug because their counsel advised named Plaintiffs not to consider those awards in making their decision. (Settling Plfs' Response at 49.) That argument is absurd. If a conflict of interest could be negated through a simple instruction not to consider it, all conflict of interest rules would be rendered toothless.

Settling Plaintiffs' next argument – that it was proper for their counsel to condition eligibility for incentive awards on support for the Settlement because named Plaintiffs "are not entitled to a service award for their unsuccessful efforts opposing [a] settlement" (Settling Plfs' Response at 48) – is even less persuasive. The problem with the Settlement is not that it denies incentive awards for unsuccessful **objections** to the Settlement. The problem is that it denies any named Plaintiffs who might make such objections incentive awards for their **pre-objection** services on behalf of the class. (*See* Declaration of Prof. William B. Rubenstein, sworn to Jan. 8, 2010, ¶ 26.)

In a last ditch effort to avoid the consequences of their counsel's conduct, Settling Plaintiffs argue that the incentive award provision in the Settlement creates no conflict because their counsel had no "obligation" to seek incentive awards for the *White* Plaintiffs and they "remain free to seek" such awards through their present counsel. (Settling Plfs' Response at 50.) This argument is highly disingenuous.

***First***, it ignores the fact that Settling Plaintiffs' counsel specifically instructed one of the *White* Plaintiffs – Plaintiff Arthur Lovell – that he hoped Lovell would change his mind because he "did not want [Lovell] to jeopardize the $5,000 [he] would receive if the Settlement was approved" and that "if [he] did

44

not change [his] mind [his] name would be taken off as a principal and [he] would not be entitled to anything." (Lovell Decl. ¶ 14, Dkt. 554.)

***Second***, if, in fact, Settling Plaintiffs' counsel really believed that the Settlement afforded named Plaintiffs who opposed it an equal right to apply for incentive awards, there would have been no reason for them to tell the *White* Plaintiffs not to consider the Settlement's incentive award provision in making their decision. Instead, they would have told them they should not worry about that provision because they would be eligible for such awards even if they opposed the Settlement.

***Third***, Settling Plaintiffs' argument that the Settlement leaves the *White* Plaintiffs free to apply for incentive awards ignores the language of the Settlement itself. The Settlement provides only for the payment of those awards to "Named Plaintiffs serving as class representatives in support of the Settlement." (Settlement ¶ 7.5) and expressly states that "[n]o portion of the Settlement Fund shall be disbursed except as expressly provided for herein." (Settlement ¶ 7.6.) The "threat" – or, more precisely, promise –"to not request incentive payments" for named plaintiffs "if they did not agree to [the] Settlement" that is embodied in this language constitutes "an actual manifestation of conflicting interest." *Rodriguez v. West Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74767, at *79 (C.D. Cal. Sept. 10, 2007).

If they wanted to give the *White* Plaintiffs the right to seek incentive awards themselves, Settling Plaintiffs' counsel should have written the Settlement to say "each of the Named Plaintiffs may file an application to the Court for an incentive award." This Court is not at liberty to rewrite history by rewriting the Settlement to add a provision that does not exist and Settling Plaintiffs cannot avoid the disabling conflict their counsel created by pretending that it says something that it does not.

Settling Plaintiffs next argue that the *White* Plaintiffs' citation to *Rodriguez*

45

*v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009), is inapposite because, unlike in that case, the incentive award provision at issue here did not tie "the requested awards . . . to the amount of the recovery." (Settling Plfs' Response at 50.) As explained in the *White* Plaintiffs Objections (at 13), the facts of this case are, if anything, worse because the Settlement ties eligibility for any award to the named Plaintiffs' support for it. (*See* Rubenstein Decl. ¶ 26 ("By interfering with the class representatives' ability to serve the class's interest, the provision at issue here shares the structural defect of the incentive arrangements condemned by the Ninth Circuit in *Rodriguez*[.] Arguably, this provision is even worse.") [24]

Having nothing left to say, Settling Plaintiffs rely on an assertion that incentive awards that are conditioned on support of the settlement are "common". (Declaration of Geoffrey P. Miller ¶77)   Professor Miller offers no empirical evidence for this assertion.  A random survey of 50 class action cases by Professor Rubenstein flatly contradicts that this is common practice, stating that "not one of these 50 cases contains a restriction on an incentive award like the one here that permits incentive awards be sought only for those representatives 'in support of the settlement.'  This informal survey confirms my own experience and lends empirical support to my conclusion that such a provision is very unusual." (Rubenstein Decl. ¶ 24 ) Professor Rubenstein's survey conforms with the experience of other seasoned class action litigators such as Brad Seligman, Executive Director of the Impact Fund and lead counsel in the *Wal-Mart* gender discrimination case:   "I have reviewed literally hundreds of class action

---

[24]  In their Objections (at 12), the *White* Plaintiffs also explained how the conflict of interest created by the provision making incentive awards contingent on support for the Settlement is compounded by the fact that the $5,000 amount of those awards is grossly disproportionate to the paltry amounts awarded to absent class members.  Settling Plaintiffs assert that this Court can disregard that fact because the incentive awards here are justified by the amount of work they have done. (Settling Plfs' Response at 55-56.)  But they ignore the *White* Plaintiffs' authorities holding that a court cannot properly grant class representatives thousands of dollar incentive awards as compensation for their services without providing some documentation of the amount of work performed, which Settling Plaintiffs have not done here. (*White* Plfs' Objections at 30.)

46

settlements as a consultant, a fee expert, a grant maker, and via our class action conference. I do not recall ever seeing a class settlement that expressly states only that class representatives who support the settlement are entitled to an incentive payment." (Declaration of Brad Seligman, sworn to Jan. 7, 2010, ¶ 10.)

Given the forgoing facts, the inescapable conclusion is that the Settling Plaintiffs' incentive provisions are as uncommon as they are improper.

### B. The Lieff/Caddell Team's Violation Of The Prohibition On Simultaneous Representation Of Clients With Adverse Interests Bars Them From Representing The Class.

As the *White* Plaintiffs have demonstrated, Lieff's and NCLC's simultaneous representation of parties with adverse interests (with the Caddell team's knowing and active participation) compels the Lieff/Caddell team's automatic disqualification.

The Settling Plaintiffs' principal defense of their counsels' behavior is predicated on a complete mischaracterization of the *White* Plaintiffs' position. According to Settling Plaintiffs, the *White* Plaintiffs' position is that, once the *White* Plaintiffs' voiced their objection to the Settlement, Lieff and NCLC "were rendered completely incapacitated" from supporting the Settlement and, thereby, from fulfilling their duties to do what they perceived to be was in the best interest of the class. (Settling Plfs' Response at 45-46.)[25] But it is not – and never has been – the *White* Plaintiffs' position that the ethical rules prohibited Lieff and NCLC from supporting the Settlement.

_____

[25] Settling Plaintiffs unjustifiably disparage *White* Plaintiffs' counsel, Charles Juntikka and Daniel Wolf, for having allegedly "contacted these Plaintiffs *ex parte* and poisoned them against the Settlement" before counsel for Settling Plaintiffs had an opportunity to contact them themselves. In fact, *White* Plaintiffs' counsel did not speak with the *White* Plaintiffs until after they had heard from Michael Sobol of Lieff, who sent the *White* Plaintiffs a 4-page letter expressing his views on February 6, 2009. (Juntikka Decl. ¶ 4.) Counsel for Settling Plaintiffs' attack on Messrs. Wolf and Juntikka for contacting the *White* Plaintiffs after they received Mr. Sobol's letter rings particularly hollow, given that in an e-mail informing Mr. Juntikka *ex post facto* of his letter to the *White* plaintiffs, Mr. Sobol stated that "I know you will have a more than adequate opportunity to express your own view to them." (*Id.* ¶ 5.)

47

To the contrary, the *White* Plaintiffs' position has always been that Lieff and NCLC could fulfill their ethical responsibilities either by: (a) following the *White* Plaintiffs' instructions to cease supporting the Settlement (at least until such time as Lieff and NCLC might have been able to change their clients' minds); or (b) withdrawing from representing the *White* Plaintiffs, while continuing to represent their other clients who favored the Settlement.  What Lieff and NCLC could not do, however – and what they were repeatedly warned not to do in writing – was continue to represent and advise the *White* Plaintiffs *at the same time* that they were taking actions on behalf of their other clients that were directly adverse to the interests and instructions of the *White* Plaintiffs.[26]

Not a single one of the cases the Settling Plaintiffs cite "intimate, let alone hold, that such *concurrent representation of adverse interests* could be appropriate." *Moreno v. Autozone, Inc.*, 2007 U.S. Dist. LEXIS 98250, at *19-20 (N.D. Cal. Dec. 5, 2007) (emphasis added).  Nor are Settling Plaintiffs able to distinguish any of the four cases the *White* Plaintiffs' cite in their Objections (at 18-20) for the proposition that the ethical rules prohibit class and/or putative class counsel from *simultaneously representing* clients who are both proponents and opponents of a proposed class settlement and, in particular, from championing the

---

[26]   Settling Plaintiffs rely on the conclusory opinions of two paid experts, Professors Geoffrey Hazard and Geoffrey Miller, to ratify their conduct. (Settling Plfs' Response at 41.)  But making the same mischaracterization of the *White* Plaintiffs' argument as the Settling Plaintiffs (likely because they each relied on Settling Plaintiffs' own stilted version of the facts), neither Professor Hazard nor Miller meaningfully opine on the real issue – whether Lieff and NCLC violated the ethical rules by *simultaneously* representing clients with adverse interests. Professor Hazard does not say word one about that issue.  Professor Miller, for his part, devotes all of one sentence to the topic, wherein he unhelpfully remarks that Lieff and NCLC "did in fact withdraw," without addressing the fact that they: (1) waited 7 weeks after they learned about the *White* Plaintiffs' opposition before they even purported to withdraw; (2) took acts directly adverse to their clients' interests and instructions in the interim; and (3) continued to take adverse acts for another three months before applying for and being granted leave to withdraw in accordance with local court rules.  At any rate, this Court may recognize that previous ethical opinions by Prof. Hazard have been criticized as deficient by his peers.   William H. Simon, "*The Market for Bad Legal Advice, Academic Professional Responsibility Consulting as an Example*", 60 Stan. L. Rev. 1555, 1572-74, 1583-85, 1590-94 (2008).

48

1  cause of one of these two sets of clients over the other.[27]

2      Unable to dispute that such simultaneous representation violates the ethical

3  rules, the Settling Plaintiffs' retreat to invective and a last ditch effort to argue that

4  Lieff and NCLC fulfilled their ethical responsibilities to the *White* Plaintiffs by

5  withdrawing as soon as it was reasonably practical for them to do so.  (Settling

6  Plfs. Response at 47.)   That argument contradicts the undisputed facts.   As set

7  forth in the Objections (at 23-25), more than *7 weeks* elapsed between the time

8  Lieff and NCLC learned of the *White* Plaintiffs' opposition to the Settlement on

9  March 9, 2009, and the time they purported to withdraw on April 29 and 30, 2009

10  – during which period Lieff and NCLC ignored no less than five written

11  instructions from their clients to suspend their support for the Settlement or

12  withdraw from representing them.   Further, as set forth in the *White* Plaintiffs'

13  Objections (at 24-25), the notices of withdraw Lieff and NCLC filed on April 29

14  and 30 had no legal effect and, hence, they continued to breach their ethical

15  obligations to the *White Plaintiffs* by taking acts contrary to their interest,

16  including opposing their motions for reconsideration and for appellate review,

17  until this Court granted them leave to withdraw on July 29, 2009.

18      Settling Plaintiffs argue that this delay was inconsequential because Lieff

19  and NCLC "did absolutely nothing during [that period] that was against the

20  interests of the *White* Plaintiffs." (Settling Plfs. Response at 47.)  That is patently

21  incorrect.   Indeed, even in the three weeks between the time the *White* Plaintiffs

22  sent Lieff and NCLC signed letters on April 9, 2009 demanding that they cease

23  supporting the Settlement or withdraw and their purported withdrawal on April 29

24  and 30, 2009, Lieff and NCLC continued to take adverse acts that were directly

25  contrary to the interests of the *White* Plaintiffs by: (a) continuing to negotiate a

26

27  ---

[27] Indeed, the only one of these four cases that the Settling Plaintiffs even try to distinguish is *Moreno* (Settling Plfs Response at 46, n. 34) – a failed effort that the

28  *White* Plaintiffs anticipated and fully addressed in their Objections (at 18-19, n.13).

settlement that the *White* Plaintiffs opposed; (b) inserting a provision in that settlement that denied them their right to incentive payments; (c) aggressively supporting and filing the Settlement on April 24; and (d) actively working to prevent their own clients from having an opportunity to present their objections before the preliminary approval hearing, including through the submission of a declaration on April 24 opposing their request for time to submit those objections. Whether Lieff and NCLC had waited one day or 100 to withdraw, they could not subvert their clients' interests while they were still representing them.

Settling Plaintiffs last line of defense (Settling Plfs' Response at 47) – that the *White* Plaintiffs were not prejudiced by Lieff's and NCLC's dual representation of parties with adverse interests and that they would have "take[n] the same course of action" had they withdrawn earlier – reflects a profound and disturbing misunderstanding of the ethical duty of loyalty that every attorney owes to his clients.  Indeed, the Lieff/Caddell team's assertion that they would have acted "no differently" were Lieff and NCLC not serving as the *White* Plaintiffs' counsel proves the point; instead of protecting the interests of their own clients in accordance with their most solemn professional responsibilities, they were acting as their adversaries.

As set forth in the *White* Plaintiffs' Objections (at 21), because the primary value that the rule prohibiting simultaneous representation seeks to protect is that of loyalty, an attorney who would violate that rule is subject to automatic disqualification without the need for any showing of prejudice.  Settling plaintiffs seek to distinguish the numerous cases espousing this rule (which include decisions of the Ninth Circuit and the California Supreme Court) on the ground that they "involve[e] completely different and inapplicable dual representation situations." (Settling Plfs. Response at 48.)  That, however, is no distinction at all.  This case is a paradigmatic example of dual representation of clients with adverse

interests. (*White* Plfs' Objections at 16.)[28]

Finally, even if a showing of prejudice were required to disqualify counsel in a simultaneous representation case, which it is not, the *White* Plaintiffs explained in their Objections (at 22) that Lieff/Caddell team's disloyal conduct prejudiced the *White* Plaintiffs by denying them the right to have their positions heard at the preliminary approval stage. Unable to dispute this contention, the settling Plaintiffs simply ignore it in favor of repeating their mantra that their counsels' refusal to withdraw caused no prejudice.

## C. The Lieff/Caddell Team's Failure To Consult With The *White* Plaintiffs Bars Them From Representing The Class.

Class counsel must attempt to communicate with the class representatives as if they were standard clients, soliciting their reaction to a proposed settlement, hearing and listening to their concerns, attempting to meet or mediate those concerns. (Declaration of Prof. William B. Rubenstein, sworn to Jan. 8, 2010 ("Rubenstein Decl."), ¶ 31) In their Objections (at 25-28), the *White* Plaintiffs show how, acting at all times in concert with the Caddell team, Lieff and NCLC failed to fulfill their responsibility to consult with the White Plaintiffs and excluded them from any meaningful participation in the Settlement process.

In their Response (at 43, n.31), Settling Plaintiffs admit that they never consulted two of the White Plaintiffs, plaintiffs Chester Carter and Maria Falcon. Further, counsel for Settling Plaintiffs' characterization of their efforts as "extensive" is a gross exaggeration. They never called plaintiff Carter at his place of employment, where it would have been easy to reach him (Carter Decl. ¶ 13),

---

[28] The Settling Plaintiffs cite three cases for the proposition that "there is no disqualification absent prejudice." (Settling Plfs' Response at 48.) Two of these cases – *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 590 (3d Cir. 1999), and *In re "Agent Orange" Products Liab. Litig.*, 800 F.2d at 18-19  (2d Cir. 1986) – are completely inapposite because they neither involve simultaneous representation situations nor apply California law. The third case – *Moreno*, 2007 U.S. Dist. LEXIS 98250 – clearly holds that under California law, the sanction for violation of the ethical proscription on simultaneous representation is "'*per se* or automatic' disqualification," without regard to prejudice. *Id.*, at *15-17.

never asked Mr. Juntikka for his assistance, which he would have willingly provided (Declaration of Charles Juntikka, sworn to on December 14, 2009, ¶ 30), never sent plaintiffs Carter or Falcon a letter asking for them to contact them, and, in the case of plaintiff Falcon left a grand total of one message on her cell phone informing her of an April 16 meeting in New York, which she did not receive until after the meeting.  (Falcon Decl. ¶ 9, Dkt. 554.)

With respect to plaintiff Radcliffe, counsel for Settling Plaintiffs say he was consulted by telephone.  (Settling Plfs' Response at 43, n.31.)  What they don't say here is that that phone conversation lasted all of about six or seven minutes, half of which was spent discussing the case and the other half of which concerned making arrangements for a meeting in Florida, which counsel for Settling Plaintiffs decided not to bother with - a decision they never communicated to plaintiff Radcliffe. (Radcliffe Decl. dated January 8, 2010 ¶¶ 3-5.)[29]

Settling Plaintiffs' assert that their meager efforts at consultation were sufficient to fulfill their fiduciary responsibilities because "approval of the named plaintiffs is not required every step of the way" and because objections involving the extent and nature of consultations with named plaintiffs have frequently been rejected by the courts.  (Settling Plfs' Response at 53.)

Approval of the named class representatives is not necessary, but a good faith consultation is not only required by the law, but is necessary for the class representative to policy function of providing their input into the settlement process.  As Professor Rubenstein states in his declaration:

What is essential is not whether class counsel may disagree with the class representatives but whether class counsel can avoid communicating with the class representatives in a timely fashion as they appear to have done given their own recitation of the time line

---

[29]  Settling Plaintiffs also apparently count, as an example of "consultation," Mr. Sobol's February 6, 2008 letter to the *White* Plaintiffs, informing them of the Settlement and his views about it.  While it is good that Mr. Sobol sent the *White* Plaintiffs a letter, that hardly meets the definition of "consultation".

52

noted above. The Manual for Complex Litigation suggests they cannot: "Class counsel must discuss with the class representatives the terms of any settlement offered to the class. . . . When the lack of timely communication is added to the settlement provision rewarding loyal class representatives, the Court is confronted by a fact situation containing not one but two distinct red flags.

(Rubenstein Decl. ¶¶ 34-35.)

When, as here, counsel for a class or putative class have no meaningful consultations with the class representatives and virtually shut them out from the settlement process, counsel so blur the role between themselves and class representatives, they erase the distinction between attorney and client and, thereby, disqualify themselves from representing the class.  (White Plaintiffs' Objections at 27-28.)

### D. The *Acosta/Pike* Plaintiffs And Their Counsel Are Unable To Independently Represent The Class.

As set forth in the *White* Plaintiffs' Objections (at 28), neither counsel for the *Acosta/Pike* Plaintiffs nor the *Acosta/Pike* Plaintiffs themselves can represent the interests of the class ***by themselves*** because: (1) counsel for the *Acosta/Pike* Plaintiffs have entered into a co-counsel agreement that creates a disconnect between themselves and the class by capping their fee award at 20% of the first $16 million in fees; (2) the same counsel supported the grossly inadequate *Acosta/Pike* Settlement; and (3) this Court has declared the *Acosta/Pike* Plaintiffs themselves inadequate to represent the Equifax and Trans Union class as a result of their support for that Settlement.

Settling Plaintiffs respond to each of these arguments by asserting that the *White/Hernandez* Plaintiffs submitted filings conceding that the *Acosta/Pike* Plaintiffs and their counsel are adequate class representatives.  (Settling Plfs' Response at 58, 63.)  That is simply untrue.  As explained in their Memorandum in Support of their Motion for Class Certification, the *White* Plaintiffs merely agreed that "to the extent" their motion to appoint the Lieff/Caddell team "as class

53

counsel is granted," they did "not oppose the appointment of [counsel for the *Acosta/Pike* plaintiffs] as additional co-class counsel, subject to the terms of their joint prosecution agreement."    Consistent with their agreement, the *White/Hernandez* Plaintiffs subsequently jointly filed a memorandum with the *Acosta/Pike* Plaintiffs in support of their joint motion for approval of the Injunctive Relief Settlement, in which the *White/Hernandez* Plaintiffs did not oppose the *Acosta/Pike* plaintiffs and their counsel being appointed to represent the class **in addition to** the *White/Hernandez* Plaintiffs and their counsel.

Likewise, to the extent this Court finds that plaintiff Hernandez and his counsel can adequately represent the class, which they cannot, the *White* Plaintiffs do not oppose the *Acosta/Pike* Plaintiffs and their counsel being appointed additional class representatives.   That is because in that case, such appointment could not harm the interests of the class.   *See Rodriguez*, 563 F.3d at 968 (noting that district court was not required to reject class action settlement where "two non-conflicted class representatives with non-conflicted counsel" participated in the process).   However, as set forth in the *White* Plaintiffs Objections, if this Court find that that the Lieff/Caddell team's ethical improprieties disqualify them from representing the class, then counsel for the *Acosta/Pike* Plaintiffs and their clients will not be able to do so in their stead because the conflict created by their co-counsel agreement and this Court's ruling in Acosta preclude them "from independently representing the class."  (*White* Plfs' Objections at 28.)

**The conflict created by the joint prosecution agreement with counsel for the *Acosta/Pike* Plaintiffs:**   Implicitly acknowledging that the joint prosecution agreement's cap on their attorneys fees renders counsel for the *Acosta/Pike* plaintiffs unable to represent the class by themselves, Settling Plaintiffs argue that that agreement does not preclude the Lieff/Caddell team from fulfilling that role – a proposition that the *White* Plaintiffs do not dispute.

Settling Plaintiffs also argue – almost halfheartedly – that the Ninth

54

Circuit's decision in *Rodriguez*, 563 F.3d 948, does not control the result here because that case involved an incentive agreement "between counsel and the class representatives, whereas here the [joint prosecution] agreement simply contains a fee sharing agreement amongst counsel." (Settling Plfs' Response at 57.)  That difference does not serve to distinguish *Rodriguez* from this case. Indeed, the conflict created by the cap on attorneys fees that counsel for the *Acosta/Pike* Plaintiffs agreed to is worse than the cap on incentive awards in *Rodriguez* because it eliminates any financial incentive for them to undertake the costly effort of bringing this case to trial or otherwise to continue prosecuting it. (*White* Plfs' Objections at 28.)

**The Acosta/Pike Plaintiffs' And Their Counsel's Support for the Grossly Inadequate Acosta/Pike Settlement:**  Settling Plaintiffs maintain that counsel for the *Acosta/Pike* Plaintiffs and their clients can independently represent the class, despite their support for the *Acosta/Pike* settlement because "support for a proposed settlement which is ultimately not approved does not render counsel [or named plaintiffs] automatically inadequate." (Settling Plfs' Response at 59.)  That may be.  But in this case, the Court found not only that the Settlement was inadequate, but contained "serious structural defects", including with regard to its injunctive relief provisions, "deliver[ed] grossly insufficient [monetary] relief," and was infected by an absence of meaningful discovery and the simultaneous negotiation of attorneys' fees and class relief.  *Acosta v. Trans Union LLC*, 243 F.R.D. 377, 397, 399- 400 (C.D. Cal. 2007).  In addition, the Court found that the *Acosta/Pike* plaintiffs (and, by logical extension, their counsel) could not satisfy the adequacy requirement because they had abandoned the interests of three huge segments of the class (comprising the large majority of the entire class) to which they did not belong.  *Id.* at 385-86, 400.  Far from considering its decision a close call, the Court stated that it was "unequivocal in concluding that it cannot be approved."  Given their negotiation of such a patently unacceptable settlement

when they were trying to represent the class on their own four years ago, the *Acosta/Pike* Plaintiffs and their counsel cannot be entrusted to represent the class by themselves now, regardless of whether this Court's deems its *Acosta* decision as establishing "the law of the case" on this issue or not.

## CONCLUSION

For the reasons set forth herein and in their opening memoranda, the *White* Plaintiffs respectfully submit that the Court should reconsider and vacate its orders granting conditional certification of the settlement classes, appointing class counsel, preliminarily approving the Settlement and approving class notice.


DATED:  January 8, 2010          **BOIES, SCHILLER & FLEXNER LLP**
                                 George F. Carpinello
                                 Adam R. Shaw
                                 David L. Zifkin (SBN 232845)

                        By       /s/ Adam R. Shaw
                                 Adam R. Shaw

                                 DANIEL WOLF LAW OFFICES
                                 Daniel Wolf

                                 CHARLES JUNTIKKA & ASSOCIATES LLP
                                 Charles Juntikka

                        Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated

56