BOIES, SCHILLER & FLEXNER LLP
George F. Carpinello
Adam R. Shaw
10 North Pearl Street
Albany, NY 12207
Telephone:  518.434.0600
Facsimile:  518.434.0665
Email:   gcarpinello@bsfllp.com
         ashaw@bsfllp.com
(admitted *pro hac vice*)

David L. Zifkin (SBN 232845)
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA  90401
Telephone: 310-395-5800
Facsimile: 510-874-1460
Email: dzifkin@bsfllp.com

CHARLES JUNTIKKA & ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone:  212.315.3755
Facsimile:  212.315.9032
Email:   charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone:  202.842.2170
Email:   dan@danielwolflaw.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., et al.,<br><br>  Defendants.<br><br>and Related actions. | **CASE NO. 05-CV-1070 DOC (MLGx) (Lead Case)**<br><br>**SUPPLEMENTAL DECLARATION OF DANIEL WOLF REGARDING ETHICAL ISSUES** |

[Type text]

I, DANIEL WOLF, declare that:

1. I submit this declaration in further support of the *White* Plaintiffs' challenges to the adequacy of counsel for Settling Plaintiffs on ethical grounds.

2. On February 5, 2009, counsel for Settling Plaintiff and counsel for two of the Defendants – Experian and Equifax – reached an agreement on the overall amount of a settlement. The terms of everything that had been agreed to up to and on that day were memorialized in Mr. Sobol's email to Steve Newman, one of Trans Union's counsel, dated Feb. 18, 2009, attached as Exhibit A. As set forth in that email those terms consisted of a requirement that each Defendant pay $15 million into a common fund, the use of that fund to pay actual and statutory claims (pursuant to a yet to be agreed upon allocation program), and a separate requirement that each Defendant pay $2 million as compensation for achieving the Injunctive Relief Settlement. (*Id.*)

3. On February 6, 2009, Mr. Sobol wrote a letter to each of the five *White* Plaintiffs expressing his views in support of the proposed settlement. In that letter, Mr. Sobol represented that "[w]e reached agreement on some key terms of the settlement" and then stated that "some of the key terms include . . . (e) Lastly, counsel will apply to the Court for an 'incentive award' of $5,000 to each representative such as yourself." This last representation was false in that incentive awards and their amount were not terms upon which agreement with any Defendant had been reached at the time Mr. Sobol wrote his February 6, 2009 letter. Rather, Mr. Sobol gratuitously interjected the unresolved issue of $5,000 incentive awards into his February 6 letter to persons he knew had very limited financial means.

4. On April 21, 2009, my co-counsel, Charles Juntikka, and I telephoned plaintiff Hernandez to share with him our views regarding the Settlement. Prior to making this call, I had reviewed the draft settlement agreement that counsel for Settling Plaintiffs had provided to two of the *White* Plaintiffs at a meeting that had taken place in New York five days before. I had been struck by a provision in that

draft settlement that made Named Plaintiffs' eligibility for $5,000 incentive awards contingent on their supporting the settlement and, mindful of the influence that provision might have on plaintiff Hernandez, I thought carefully about what I was going to say prior to getting him on the telephone.

5. The conversation was arranged by counsel for Settling Plaintiffs, including George Nino and Michael Sobol, who participated on the call. I opened that conversation by telling plaintiff Hernandez that Mr. Juntikka and I were not his lawyers, that we represented only the five *White* Plaintiffs and that the lawyers who were representing him were on the call – a proposition with which neither plaintiff Hernandez nor anyone else on the call voiced any dissent.[1] I then told plaintiff Hernandez that Mr. Juntikka and I were against the Settlement his lawyers had negotiated and told him that I wanted to share our views with him. I specifically asked plaintiff Hernandez to keep an open mind and listen to what we had to say before coming to a final conclusion on whether to support the Settlement and he assured me that he would do so.

6. While I do not recall the exact sequence of the conversation after that, I do specifically recollect that one of the next things I did was advise plaintiff Hernandez that, as a putative class representative, he had taken on a responsibility in these cases not to serve his own interests but to serve the interests of the class. I then explained to plaintiff Hernandez that, under the terms of the Settlement, he would be eligible for a $5,000 incentive award if he went along with it. I further explained that he would not be eligible for the award if he joined the five *White* Plaintiffs in opposing the Settlement, but they had all made the decision to do so against their own financial interests because they believed that the Settlement was not in the best interests of the class. I intentionally emphasized the *White* Plaintiffs'

---

[1] During a meet and confer telephone conference on March 2, 2010, in which I asked counsel for plaintiff Hernandez to turn over their retainer agreement with him, Mr. Caddell stated that we had no right to that document because, among other reasons, he had talked to Mr. Hernandez and "Hernandez believes that you have never represented him and he is happy about that."

3

sacrifice as a way of appealing to plaintiff Hernandez's conscience and reminding him of his fiduciary duties.

7. I spent the rest of the discussion explaining the reasons why I believed the Settlement was unfair and unreasonable. Among other things, I explained why I thought the amount of the Settlement was grossly inadequate and why I thought it was unfair to require class members to submit claim forms affirming their belief that there were bankruptcy-related errors on their credit reports as a condition to receiving any compensation.

8. Toward the end of the discussion, I returned to the issue of incentive awards. I specifically stated, in virtually these words, that the Settlement was good for the Defendants, each of which would be released from a minimum of $1 billion in potential liability, that it was good for Plaintiffs' attorneys, who would be getting millions of dollars in legal fees, and that it was good for any Named Plaintiffs who supported the Settlement, each of whom stood to get $5,000 incentive awards, but that it was bad for the ten-million member class, who would each be giving up their $100 minimum statutory damage claims for an average of about one dollar from each Defendant. At the close, plaintiff Hernandez thanked me and Mr. Juntikka for sharing our opinions, informed us of his view that I had made a number of good points, and told us he would think about what I had to say and further discuss the matter with his lawyers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April, 2010.

_Daniel Wolf_ (signature)

Daniel Wolf