Michael W. Sobol (State Bar No. 194857)
(msobol@lchb.com)
Allison S. Elgart (State Bar No. 241901)
(aelgart@lchb.com)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Michael A. Caddell (State Bar No. 249469)
(mac@caddellchapman.com)
Cynthia B. Chapman (State Bar No. 164471)
(cbc@caddellchapman.com)
George Y. Niño (State Bar No. 146623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar St., Suite 1070
Houston, TX 77010
Telephone:  (713) 751-0400
Facsimile:  (713) 751-0906

*Attorneys for Plaintiffs*

[Additional Counsel listed on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

(SOUTHERN DIVISION)

| | |
|---|---|
| TERRI N. WHITE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>    Defendant. | Case No. 05-CV-1070 DOC (MLGx) (Lead Case)<br><br>**[PROPOSED] ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| <u>and Related Cases:</u><br><br>05-cv-01073-DOC (MLGx)<br>05-cv-7821-DOC (MLGx)<br>06-cv-0392-DOC (MLGx)<br>05-cv-1172-DOC(MLGx)<br>06-cv-5060-DOC (MLGx) | Date:  May 20, 2010<br>Time: 7:30 a.m.<br>The Honorable David O. Carter |

853121.2

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

1  **I.    INTRODUCTION**

2      Plaintiffs Jose Hernandez, Kathryn Pike, Robert Randall, and Bertram

3  Robison (collectively, "Plaintiffs") have moved pursuant to Fed. R. Civ. P. 23 for

4  an order granting final approval of the nationwide class action settlement

5  ("Settlement"), with the consent of all Defendants, which resolves all monetary

6  damages claims in the Litigation.[1]  In August 2008, this Court approved the historic

7  settlement of the injunctive relief claims raised in this Litigation.  On May 7, 2009,

8  the Court granted preliminary approval of the Settlement and provisionally certified

9  the Settlement Class.  Pursuant to the Court's Preliminary Approval Order, notice

10  was disseminated to the Settlement Class.

11      The Court has received and reviewed class members' filed objections to the

12  Settlement, as well as the papers offered in support of the Settlement submitted by

13  the Plaintiffs and Defendants.  On January 11, 2010, the Court held a hearing

14  regarding the motion for final approval of the Settlement.  After consideration

15  thereof, the Court finds that the Settlement satisfies and exceeds the final approval

16  criteria that a settlement be "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e),

17  and therefore, Plaintiffs' Motion for Final Approval of the Settlement is hereby

18  GRANTED, as set forth herein.

19  **II.    BACKGROUND**

20      These cases have been pending before this Court since the Fall of 2005.  In

21  the Litigation, Plaintiffs alleged that Defendants recklessly or negligently violated,

22  and until enjoined by this Court, continued to violate the FCRA by failing to

23  maintain reasonable procedures to assure the accurate reporting of debts that have

24  been discharged in bankruptcy.  They further alleged that Defendants failed to

---

25  [1] *Terri N. White, et al. v. Experian Information Solutions, Inc.*, Case No. 05-cv-1070 (Lead Case number); *Terri N. White, et al. v. Equifax Information Services LLC*, Case No. 05-cv-7821; *Terri N. White, et al. v. Trans Union LLC*, 05-cv-1073;

26  *Jose Hernandez v. Equifax Information Services, LLC, et al.*, Case No. 06-cv-3924;

27  *Jose L. Acosta et al., v. Trans Union LLC, et al.*, Case No. 06-cv-5060; and *Kathryn L. Pike v. Equifax Information Services, LLC*, Case No. 05-cv-1172.  These cases

28  are collectively referred to herein as the "Litigation."

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

1    employ reasonable reinvestigation procedures pursuant to the FCRA.  Plaintiffs

2    asserted claims for (i) willful and/or negligent violation of Section 1681e(b) of the

3    FCRA and its California counterpart, Cal. Civ. Code Section 1785.14(b), for failure

4    to maintain reasonable procedures to assure maximum possible accuracy; (ii)

5    willful and/or negligent violation of Section 1681i of the FCRA and its California

6    counterpart, Cal. Civ. Code Section 1785.16, for failure to reasonably investigate

7    consumer disputes regarding the status of the discharged accounts; and (iii)

8    violation of California's Unfair Competition law, Bus. & Prof. Code section 17200,

9    *et seq.*

10        In the Court's rulings and comments to counsel, the Court has urged the

11    parties to proceed to mediation.  Since August 15, 2007, the parties have conducted

12    arm's-length, contentious, lengthy, and complicated negotiations (with the

13    participation of Defendants' insurance carriers), including seven in-person sessions

14    with a JAMS mediator, the Hon. Lourdes Baird (Ret.), and five in-person mediation

15    sessions with mediator Randall Wulff, as well as several additional in-person or

16    telephonic sessions involving counsel for the parties.

17        On or about April 3, 2008, the parties entered into the Injunctive Relief

18    Settlement Agreement, in which Defendants agreed to retroactively update the

19    credit files of 23(b)(2) Settlement Class members to reflect the discharge of certain

20    categories of pre-bankruptcy civil judgments and tradelines.  Defendants also

21    agreed to adopt new procedures for the update of certain pre-bankruptcy civil

22    judgments and tradelines when a public record entry of the bankruptcy has been

23    added to the consumer's file.  On August 19, 2008, the Court approved these new

24    procedures, found them to be reasonable under the FCRA, and entered an Approval

25    Order Regarding Settlement and Release for the Injunctive Relief Settlement

26    Agreement.  Dkt. 338.  In a separate, independently negotiated agreement,

27    Defendants have agreed to pay up to six million dollars for the injunctive relief fees

28    and expenses.  *See* Settlement Agreement re: Injunctive Relief Fees.  Dkt. 413-2.

Settlement Class Counsel submitted a motion for approval of an award of fees and expenses for their efforts in connection with obtaining this Injunctive Relief Settlement on December 21, 2009.  Dkt. 575.

After the Injunctive Relief Settlement was consummated, the parties' efforts to resolve the monetary relief portion of the Litigation resumed with several mediation sessions, but without success.  On January 26, 2009, the parties appeared for a hearing on Plaintiffs' Motion for Class Certification of a 23(b)(3) damages class.  Prior to the scheduled hearing, the Court issued a tentative ruling denying Plaintiffs' Motion for Class Certification pursuant to Fed. R. Civ. P. 23(b)(3), decided not to hear the Motion at that time, and directed the parties to make a final attempt to settle the Litigation.  The parties and Defendants' insurance carriers participated in an additional mediation session before mediator Wulff three days later but did not reach an agreement.  The parties and Defendants' insurance carriers then participated in a mandatory settlement conference at the Court on February 5, 2009.  At that conference, Plaintiffs, Equifax, and Experian reached agreement as to the principal terms of a settlement of all of Plaintiffs' claims in the Litigation for monetary damages, including statutory and punitive damages, as reflected in the Settlement Agreement described below.  No party or counsel voiced objection to the Court regarding the essential Settlement terms at that time.  TransUnion agreed to the same settlement terms on February 18, 2009.

On May 7, 2009, the Court issued an Order (1) Granting Preliminary Approval to Proposed Class Action Settlement; (2) Conditionally Certifying Settlement Class; (3) Approving Class Notice; (4) Appointing Class Counsel; and (5) Scheduling Final Approval Hearing Date and Related Dates ("Preliminary Approval Order").  Dkt. 423.  The Court, in its discretion, determined that the Settlement was potentially fair and realistically grounded in the strengths and weaknesses inherent in the litigation and well understood by the Court.  *Id.*  After years of litigation, the Court had developed an intimate knowledge of this case,

- 3 -

1  having presided over numerous status conferences and hearings on summary

2  judgment, class certification, and settlement approval. (By that time, the Court had

3  executed no fewer than thirty-eight minute orders, entered at least fifty signed

4  orders, and authored four published opinions.)

5       After the Court denied their Motion for Reconsideration of the preliminary

6  approval Order (Dkt. 438), Objecting Plaintiffs filed a 23(f) petition and a writ of

7  mandamus in the Ninth Circuit on June 23, 2009. The Ninth Circuit denied their

8  petition and writ. Dkt. 459.

9  ## III.    SUMMARY OF KEY SETTLEMENT TERMS

10      The Settlement Agreement and Release ("Settlement Agreement") will

11 resolve all of the claims of the Plaintiffs and the Settlement Class. Set forth below

12 is a summary of the key terms of the Settlement Agreement. A copy of the

13 Settlement Agreement is attached as Exhibit 1 to the Declaration of Michael W.

14 Sobol In Support of Motion for Preliminary Approval of the Settlement

15 ("Preliminary Approval Sobol Decl."), Dkt. 384.

16      ### A.    Settlement Class

17      The "23(b)(3) Settlement Class" includes all Consumers[2] who have received

18 an order of discharge pursuant to Chapter 7 of the United States Bankruptcy Code

19 and who, any time between and including March 15, 2002, and the present (or, for

20 California residents in the case of TransUnion, any time between and including

21 May 12, 2001 and the present), have been the subject of a Post-bankruptcy Credit

22 Report issued by a Defendant in which one or more of the following appeared:

23      a.    A Pre-bankruptcy Civil Judgment that was reported as outstanding

24           (i.e., it was not reported as vacated, satisfied, paid, settled or

25           discharged in bankruptcy) and without information sufficient to

26           establish that it was, in fact, excluded from the bankruptcy discharge;

27

28 [2] References to Settlement terms and definitions follow those in the Settlement Agreement. *See* Preliminary Approval Sobol Decl., Exh. 1.

b.    A Pre-bankruptcy Installment or Mortgage Loan that was reported as
delinquent or with a derogatory notation (other than "discharged in
bankruptcy," "included in bankruptcy" or similar description) and
without information sufficient to establish that it was, in fact, excluded
from the bankruptcy discharge;

c.    A Pre-bankruptcy Revolving Account that was reported as delinquent
or with a derogatory notation (other than "discharged in bankruptcy,"
"included in bankruptcy" or similar description) and without
information sufficient to establish that it was, in fact, excluded from
the bankruptcy discharge; and/or

d.    A Pre-bankruptcy Collection Account that remained in collection after
the Bankruptcy Date.

Settlement Agreement § 1.48.

**B.    The Benefits Of The Monetary Relief Settlement**

Pursuant to the Settlement Agreement preliminarily approved by the Court,
each Defendant paid $15 million into a Settlement Fund that will award monetary
damages to the 23(b)(3) Settlement Class.  The following provides a summary of
how the Settlement is structured.

**1.    Payments to the Class Members**

Each of the 23(b)(3) Settlement Class Members who returned to the
Settlement Administrator a properly completed Claim Form postmarked on or
before November 30, 2009 will be entitled to receive an award from the Settlement
Fund.

The Settlement provides relief for all Class members who have had a credit
report issued by a Defendant that contained alleged errors regarding debts
discharged in bankruptcy, as described in detail in the Settlement Agreement at
§ 7.7.[3]  Those Class members who believe that there have been one or more errors

---

[3] Certain Objectors misrepresent that the Settlement *requires* that Class members

*Footnote continued on next page*

1  in their credit reports regarding debt discharged in bankruptcy can apply for a fixed

2  or "Convenience" damage award, which will be an equal *pro rata* share of the

3  available Convenience Award Fund.  *Id.* § 7.7(b).

4       Those Class members who certified their belief that they were impacted by

5  an alleged error in their credit reports regarding debts discharged in bankruptcy,

6  with respect to a denial of employment, a mortgage loan or housing rental, and/or a

7  credit card, auto loan, other credit they applied for, or payment of a discharged debt

8  to obtain credit, can apply for an "Actual Damage Award."  *Id.* § 7.7(c).  If

9  Defendants' records confirm a post-bankruptcy employment inquiry, a consumer

10  can obtain an employment actual damage award.  *Id.* § 7.7(c)(iii)(1).  If Defendants'

11  records confirm hard inquiries consistent with a mortgage loan or other housing

12  inquiry within six months of the date on the Claim Form, the Consumer will receive

13  a mortgage award.  *Id.* § 7.7(c)(iii)(2).  If Defendants' records confirm a post-

14  bankruptcy hard inquiry within six months of the date indicated on the Claim Form,

15  and the Consumer does not apply for an employment or mortgage/housing award,

16  then the Consumer will receive an "Other Credit" award.  *Id.* § 7.7(c)(iii)(3).  The

17  Settlement Administrator will pay the Actual Damage Awards at the highest award

18  level for which the claimant is eligible (and only at that level).  *Id.* § 7.7(c)(iv).

19      **2.**     **Claims Administration**

20       Distributions from the Settlement Fund will be made to qualified 23(b)(3)

21  Settlement Class Members who have submitted valid claims by November 30, 2009

22  after the Settlement Administrator deducts from the Settlement Fund the sum of all

23  administrative and notice costs and amounts paid pursuant to the award of

24  attorneys' fees and costs.  *Id.* § 7.7(b)(i).

25       The Settlement Administrator will then calculate the estimated amounts to be

26  paid for Actual Damage Awards by identifying the highest award to which each

27  *Footnote continued from previous page*

28  have affirmative knowledge of errors on their credit report.  No such requirement exists.

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT CASE NO. 05-CV-1070 DOC (MLGX)

1  Actual Damage Award Claimant may be entitled, multiplying the total number of

2  such claims in each of the three categories, and totaling the results for all

3  categories. *Id.* The applicable award for each category will be increased or

4  decreased, *pro rata*, to reflect the number of valid claims in each category and the

5  funds available for distribution to the Actual Damage Award claimants.[4] *Id.*; *see*

6  *infra* V.B.2. The remaining amount will be available for the Convenience Damage

7  Award Fund, set at $10 million under the Settlement Agreement. *Id.* The

8  Settlement Administrator will then pay each Convenience Award Claimant an equal

9  *pro rata* share of the Convenience Damage Award Fund, determined by the number

10  of claimants for both types of Awards. *Id.* § 7.7(b)(ii). The Convenience Damage

11  Awards will be distributed within ninety (90) days of the Effective Date of the

12  Settlement. *Id.* § 7.7(b)(iii). Any unclaimed or uncashed awards will expire after

13  ninety (90) days and the amounts added to the amounts available for payment of the

14  Actual Damage Awards before said payments are distributed. *Id.*[5]

15              **3.      Class Representative Stipend**

16        The Settlement Agreement provides for $5,000 service awards for the Class

17  Representatives who support the Settlement—Jose Hernandez, Bertram Robison,

18  Robert Randall, and Kathryn Pike—in recognition of their service to and efforts on

19  behalf of the Class. *Id.* § 7.5. These incentive awards are in addition to the relief

20  the Class Representatives will be entitled to under the terms of the Settlement.

21  Throughout the Litigation, these Class Representatives have participated in

22  discovery, including extensive and probing depositions and responding to

23

24  [4] The final amounts of the actual damage awards are not known at this time. *See* Section V.B.2, below.

25  [5] Some objectors argue that the Settlement Administration and oversight is inadequate. These objections lack merit because the Court retains jurisdiction with respect to implementation and enforcement of the terms of the Settlement

26  Agreement, *id.* § 11.13, and because the Settlement is being administered in a way common to class settlements and with oversight by the parties. *See* Declaration of

27  Jennifer M. Keough Regarding Notice Dissemination and Settlement Administration ("Keough Decl.") ¶¶ 14, n.3 and ¶ 16.

28

interrogatories and requests for production of documents, and in the preparation of the pleadings.  They all were kept informed of the Litigation as it developed and all were kept abreast of, and signed off on, the Settlement.

Thus, in light of Plaintiffs' considerable effort and risk undertaken to obtain the outstanding result for the Class, the Court approves the payment of service awards of $5,000 to each of the named Plaintiffs.

## 4.    Attorneys' Fees and Costs

The 23(b)(3) Settlement Class Counsel separately filed an application with the Court, noticed to be heard at the Final Fairness Hearing, for approval of attorneys' fees and costs associated with this Settlement.  *See* Monetary Relief Fees MPA.  The 23(b)(3) Settlement Class Counsel are seeking approval of attorneys' fees of 25% of the Settlement Fund and for reimbursement of their costs and expenses.  The enforceability of the Settlement Agreement will not be contingent on the amount of attorneys' fees or costs awarded.  Settlement Agreement § 7.3(b). The Court will make a separate ruling on attorneys' fees and costs.

## 5.    Settlement Administration and Notice

As set forth in the Settlement Agreement, all costs of notice and claims administration will be invoiced by the Settlement Administrator and paid from the Settlement Fund.  *Id.* § 4.4(a).  The parties named The Garden City Group ("GCG") as the Settlement Administrator and Notice Provider in a Notice to the Court filed on June 30, 2009.  Dkt. 449.  GCG will administer the claims resolution process, subject to review by Settlement Counsel.  Their duties will include the following: (1) issuing Class notice and claim forms; (2) calculating and issuing settlement payments; and (3) responding to Class member inquiries regarding the claims administration process.  *Id.* §§ 4.3, 5.1.

## 6.    Review of 1,000 Actual Damage Award Claims

Prior to payment of the Actual Damage Award Claims, GCG has exercised its discretion to review the archived credit files of 1,000 Actual Damage Award

claimants to confirm the validity of such claims. *Id.* § 7.7(c)(ii). The Defendants shall bear the cost of providing such information from its archived files, if any, for this limited initial review. *Id.* If the Settlement Administrator deems it necessary to conduct further review of Actual Damage Award Claims, the costs of doing so will be borne by the Settlement Fund and subject to Court approval. *Id.*

## IV.    THE COURT-ORDERED NOTICE PROGRAM IS CONSTITUTIONALLY SOUND AND HAS BEEN FULLY IMPLEMENTED

### A.    Notice Standards

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for Complex Litig.*, § 21.312 (4th ed. 2004). In order to protect the rights of absent class members, the Court must provide the best notice practicable to class members. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-175 (1974). According to the *Manual for Complex Litig.*, the settlement notice should[6]:

> define the class; describe clearly the options open to the class members and the deadlines for taking action; describe the essential terms of the proposed settlement; disclose any special benefits provided to the class representatives; provide information regarding attorneys' fees; indicate the time and place of the hearing to consider approval of the settlement, and the method for objecting to or opting out of the settlement; explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations; provide information that will enable class members to

---

[6] Some Objectors argue that the Notice and Claim Forms were inadequate or confusing. These objections lack merit, as the Notice Plan and Claim Form were approved by the Court as part of the Order preliminarily approving the monetary relief Settlement on May 7, 2007, Dkt. No. 423, and meet all applicable standards for settlement Class notices. *See infra* at IV.B.

calculate or at least estimate their individual recoveries; and prominently display the address and phone number of class counsel and the procedure for making inquiries.

§ 21.312.

### B.   The Notice Program Has Been Fully Implemented And Meets Applicable Standards

The Class Notices satisfy all of criteria above.  The Notice Plan provided for a large mailing to known Class members and a one-time publication in a nationally distributed newspaper or magazine.  Settlement Agreement §§ 4.3(b), (e).  The Court approved versions of the Notices with the Settlement Agreement as part of its Preliminary Approval Order.  Further information was added to the Notices and claim forms, including a description of Plaintiffs' allegations in the lawsuit and the issues the Court will consider at the final fairness hearing.

As the Court-approved Settlement Administrator and Notice Provider, GCG was responsible for sending the Mail Notice and a Claim Form via U.S. mail to each Settlement Class Member.  Keough Decl. ¶ 3.  To that end, between July 29, 2009 and September 17, 2009, Defendants each provided GCG with files containing the list of Consumers identified as 23(b)(3) Settlement Class Members. *Id.* ¶ 5.  GCG loaded Defendants' lists into a database and used commercially reasonable measures to remove any duplication of Consumers' addresses. *Id.* ¶ 5.

GCG updated the U.S. mailing addresses through the National Change of Address ("NCOA") database maintained by the United States Postal Service. *Id.* ¶ 6.  Where a more current address was obtained, GCG updated the address accordingly. *Id.*  Of the 15,143,724 addresses provided to the United States Postal Service, 3,349,697 addresses were returned with an updated address. *Id.*

On September 28, 2008, GCG caused the Mail Notice to be mailed to 15,143,724 unique names and street addresses of potential Class members by first-class mail, postage pre-paid, at the U.S. Post Office. *Id.* ¶ 7.

1    Beginning on September 23, 2009, GCG established and continues to

2    maintain an automated toll-free telephone number (1-866-237-3432), where

3    potential Class members could obtain information about the Settlement.  *Id.* ¶ 9.

4    This toll-free help line is accessible 24 hours a day, 7 days a week.  *Id.*  Claimants

5    who call the toll-free number have the option of leaving a voice message so that a

6    call center representative can return the call.  *Id.*  As of December 27, 2009, there

7    have been 74,069 calls to the automated number and 18,629 callers have left voice

8    messages.  *Id.*  All of the voice messages have been returned promptly.  *Id.*

9    Additionally, GCG issued the Publication Notice through *USA Today*, a

10   nationally distributed newspaper, on October 15, 2009.  *Id.* ¶ 8.  GCG also

11   established and continues to maintain a Website dedicated to this Settlement

12   (www.BankruptcyDischargeSettlement.com) to provide additional information to

13   the potential Class members and to answer frequently asked questions.  *Id.* ¶ 10.

14   The Settlement Website provides generalized information, including: (1) the full

15   text of the Settlement Agreement; (2) a Long-Form Notice; (3) the Preliminary

16   Approval Order; and (4) contact information for 23(b)(3) Settlement Class Counsel

17   and GCG.  *Id.*  The Settlement Website was registered with Google to ensure that it

18   is easy to find on the Internet.  *Id.*  The Settlement Website became operational on

19   September 23, 2009, and is accessible 24 hours a day, 7 days a week.  *Id.*  As of

20   December 27, 2009, the website had received a total of 68,129 visits.  *Id.*

21   **V.      FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE**

22   "[V]oluntary conciliation and settlement are the preferred means of dispute

23   resolution," especially in complex class actions.  *Officers for Justice v. Civil Serv.*

24   *Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982);

25   *see also*, *e.g.*, *Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437,

26   443 (9th Cir. 1989).  Class action lawsuits readily lend themselves to compromise

27   because of the difficulties of proof, the uncertainties of the outcome, and the typical

28   length, costs, and risks of the litigation.  As a result, courts should exercise their

discretion to approve settlements "in recognition of the policy encouraging settlement of disputed claims." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) ("[S]trong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned."); 4 *Newberg on Class Actions* ("*Newberg*") § 11.41 (4th ed. 2002) (citing cases).

The *Manual for Complex Litigation* describes a three-step procedure for approval of class action settlements:  (1) preliminary approval of the proposed settlement at an informal hearing; (2) dissemination of notice of the settlement to all affected class members; (3) a formal "fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.  § 21.63 (4th ed. 2004).  All three of these steps have been completed.

First, in granting preliminary approval, the Court conducted a preliminary evaluation of the Settlement and determined it to be within the range of reasonableness, and also provisionally certified the Settlement Class.  The second step was the implementation of the notice program, which has been completed in accordance with the Court's Preliminary Approval Order.  The third step is the final approval of the Settlement and the fairness hearing.  This procedure, used by courts in this Circuit and endorsed by class action commentator Newberg, safeguards class members' due process rights and enables the court to fulfill its role as the guardian of class interests.  4 *Newberg* § 11.25.  After all of these steps, the Court now concludes that final approval of the Settlement is appropriate.

The decision to approve a settlement is committed to the Court's sound discretion.  *Class Plaintiffs*, 955 F.2d at 1276; *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (Ninth Circuit has "repeatedly stated that the decision to approve or reject a settlement is committed to the sound discretion of

1    the trial judge because he is exposed to the litigants and their strategies, positions,

2    and proof" (internal quotation omitted)); Rule 23(e)(1)(C) Advisory Committee

3    Notes to 2003 Amendments ("Subdivision (e)(1)(C) states the standard for

4    approving a proposed settlement that would bind class members. The settlement

5    must be fair, reasonable, and adequate."). Final approval of this Settlement is

6    warranted and well-within the Court's sound discretion.

## A.    The Settlement Is Fair, Adequate, And Reasonable

8         To approve a class action settlement under Fed. R. Civ. P. 23(e), the Court

9    must find that the settlement is "fair, adequate and reasonable," recognizing that "'it

10   is the settlement taken as a whole, rather than the individual component parts, that

11   must be examined for overall fairness.'" *Staton v. Boeing,* 327 F.3d 938, 960 (9th

12   Cir. 2003) (quoting *Hanlon,* 150 F.3d at 1026). "[T]he court's intrusion upon what

13   is otherwise a private consensual agreement negotiated between the parties to a

14   lawsuit must be limited to the extent necessary to reach a reasoned judgment that

15   the agreement is not the product of fraud or overreaching by, or collusion between,

16   the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable

17   and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625. The Court

18   should balance "the strength of plaintiffs' case; the risk, expense, complexity, and

19   likely duration of further litigation; the risk of maintaining class action status

20   throughout the trial; the amount offered in settlement; the extent of discovery

21   completed, and the stage of the proceedings; the experience and views of

22   counsel . . . and the reaction of the class members to the proposed settlement."

23   *Class Plaintiffs,* 955 F.2d at 1291 (internal quotation omitted). The relative degree

24   of importance to be attached to any particular factor will depend upon and be

25   dictated by the nature of the claims advanced, the types of relief sought, and the

26   unique facts and circumstances of each case. *Nat'l Rural Telecomms. Coop. v.*

27   *DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (citing *Officers for Justice*,

28   688 F.2d at 625).

1    In affirming the settlement approved by the trial court in *Class Plaintiffs*, the

2    Ninth Circuit noted that it "need not reach any ultimate conclusions on the

3    contested issues of fact and law which underlie the merits of the dispute, for it is the

4    very uncertainty of outcome in litigation and avoidance of wasteful and expensive

5    litigation that induce consensual settlements."  955 F.2d at 1291 (internal quotation

6    and citation omitted).  Where, as here, the Settlement is the product of arm's-length

7    negotiations conducted by capable counsel with extensive experience in complex

8    class action litigation, the Court begins its analysis with a presumption that the

9    Settlement is fair and should be approved.  *See* 4 *Newberg* § 11.41.  As discussed in

10   greater detail below, the Settlement presented here is entitled to a presumption of

11   fairness.  First, the Settlement was reached only after extensive arm's-length

12   negotiations.  *See* Declaration of Michael W. Sobol in Support of Plaintiffs' Motion

13   for Final Approval of Class Action Settlement ("Sobol Decl.") ¶¶ 2, 15.  Thus, there

14   is no indication of collusion.  Second, 23(b)(3) Class Counsel and counsel for the

15   Defendants are experienced in class action litigation, acted in good faith, and

16   represented their clients' best interests in reaching the Settlement.  *See id*.

17       **B.    All Of The Relevant Factors Support Final Approval of the
            Settlement**

18

19       **1.    The Settlement Is The Product Of Serious, Informed, and
                Arm's-Length Negotiations After The Parties Conducted
                Extensive Investigation And Analysis.**

20

21           **a.    The Parties Actively Litigated Disputed Issues and
                    Engaged in Substantial Discovery.**

22       Plaintiffs in this Litigation have undertaken substantial investigation, fact-

23   gathering, and formal discovery (including review of tens of thousands of pages of

24   documents, retention and consultation of numerous experts in the fields of credit

25   reporting and consumer bankruptcies, interviews with numerous consumers, review

26   of thousands of consumer credit reports, and numerous depositions).  Plaintiffs

27   have taken or defended forty depositions, produced over 50,000 pages of

28   documents, and reviewed over 40,000 pages of documents produced by the

Defendants.  *See* Declaration of Michael W. Sobol in Support of Motion for Attorneys' Fees for Monetary Relief Settlement ("Monetary Fees Sobol Decl."), Dkt. 577-3, ¶ 10.  They have retained several experts who have filed numerous declarations, and consulted with a number of additional experts throughout the Litigation.  *Id.*  Moreover, the parties engaged in extensive motion practice before reaching the Settlement Agreement.  They attended several status conferences and multiple-day hearings on settlement approval and summary judgment.  *Id.* ¶ 8.

> **b.** **The Parties Participated in Arm's-Length Negotiations Before Experienced Neutral Mediators.**

On or about August 15, 2007, the Court urged the parties to proceed to mediation.  Since then, the parties have conducted extensive arm's-length and contentious negotiations during the course of a lengthy and complicated mediation that included seven sessions with the Hon. Lourdes Baird (Ret.) and five sessions with Randall Wulff.  Sobol Decl. ¶ 2.  They did so with attorneys on both sides who are very experienced in the prosecution, defense, trial and settlement of class action litigation, including as it relates to FCRA and other consumer cases, and who are well-versed in the legal and factual issues implicated in this action.  *Id.*  Moreover, the parties had the benefit of the Court's guidance from its denial of settlement approval in the *Acosta* settlement, its tentative ruling denying Experian's summary judgment motion, and, for the most recent mediation sessions, the Court's tentative ruling denying the *White/Hernandez* Plaintiffs' Motion for Class Certification.

The parties also participated in a mandatory settlement conference with Randall Wulff at the Court on February 5, 2009.  *Id.* ¶ 3.  At the conference, Plaintiffs, Equifax, and Experian reached agreement as to the principal terms of the Settlement and were given authority to settle on those terms by their insurance carriers.  *Id.*  TransUnion agreed to those terms on February 18, 2009.  *Id.*

> **2.** **The Value of the Settlement, and the Substantial Benefits it Provides to Class Members, Support Final Approval.**

The Settlement provides for a $45 million, non-reversionary, cash fund.

After paying notice, administrative costs, and attorneys' fees, <u>all</u> of this money will go to the class. Because there is no reversion to the Defendants, the amount of the Settlement Fund alone justifies the approval of the Settlement, regardless of the number and type of claims made by the class members. That is because Plaintiffs are settling claims for statutory damage awards which are primarily meant to address the conduct of Defendants. *See*, *e.g.*, *Holloway v. Full Spectrum Lending*, 2007 U.S. Dist. LEXIS 59934, at *15 (C.D. Cal. June 26, 2007) ("the determination of statutory damages, which range from $100 to $1,000 per violations need not be determined on an individual basis, but rather can be determined based upon Defendant's conduct in the aggregate"). The $45 million dollar judgment for statutory damages is an appropriate deterrent of reckless conduct. Although actual damages are encompassed in the release of claims, should class members believe they have suffered significant *actual* damages, they may opt-out of the Settlement.

The Settlement provides relief for all Class members who have had a credit report issued by a Defendant that contained alleged errors regarding debts discharged in bankruptcy. *See* § III.B.1., *supra*. Class Members may qualify for either a "Convenience Damage Award" or an "Actual Damage Award." *Id.* As of December 27, 2009, the Settlement Administrator received 744,618 timely signed claim forms. Keough Decl. ¶¶ 14-15. Of those, 249,056 claimants chose the Convenience Award (or did not select an option), and 495,562 claimants chose the Actual Damage Award. *See id.* ¶ 15.

The Settlement Administrator has performed an initial review of the claims. Keough Decl. *Id.* Some claims appear to fail to conform to the claim requirements and may have to be rejected, or some actual damage claims may have to be converted into Convenience Awards. *Id.* While the Settlement Administrator is continuing its review, it appears possible that with respect to certain actual award claims there is information that appears inconsistent with the nature of the claim being made. *Id.* For example, the Settlement Administrator may review credit files

1    for claimants of the mortgage-related actual damage award for the indications of

2    evidence of the almost universal mortgage application requirement for a tri-merged

3    credit report.  *Id.  See Standfacts Credit Servs. v. Experian Info. Solutions, Inc.*,

4    405 F. Supp. 2d 1141, 1146 (C.D. Cal. 2005).

5         Accordingly, the Settlement Administrator has exercised its discretion under

6    the Settlement Agreement to require Defendants produce the credit files for 1,000

7    of the actual damage award claimants.  Keough Decl. ¶ 17.  By reviewing the

8    actual credit files, the Settlement Administrator may be better able to evaluate

9    whether or not suspect claims can in fact be validated.  *Id.*  Depending upon the

10   utility of the audit of the credit files of the 1,000 representative claimants, the

11   Settlement Administrator may request further information from the Defendants with

12   respect to all actual damage award claimants.  Settlement Agreement § 7.7(c)(ii).

13   Alternatively, for the claimants for whom the Settlement Administrator's review

14   indicates they do not have a valid claim, further information may be requested from

15   them.

16        The parties are thus taking all necessary steps to properly validate claims and

17   distribute the Settlement Fund in a fair and efficient manner to those Class

18   members for whom it is reasonably likely that they have suffered an actual harm or

19   injury based on the claims made.  However, an estimate of the final amounts of the

20   actual damage awards cannot be made at this time.  Because of the overwhelming

21   success of the Settlement in generating claims for the Actual Damage Awards, at a

22   volume which exceeds the parties' initial estimates, the amounts to be paid to actual

23   damage award claimants may be somewhat lower than the estimated amounts stated

24   in the class notices.  Importantly, the class Notice advised class members of this

25   possibility.  *See* Keough Decl. Exh. A-C.

26        Nonetheless, the Court finds that, in light of the totality of the circumstances,

27   the Settlement is fair, adequate, and reasonable, even if every claim was determined

28   to be valid and even if all claimants were awarded nothing more than their *pro rata*

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

share of the available Settlement Fund, *e.g.*, if the awards were $20 to Convenience Award claimants and $30 Actual Damage Award Claimants.  Actual Damage Awards are likely to be higher, but regardless of their eventual amount, the $45 million Settlement Fund is adequate compensation to the Class as a whole.

### 3.    The Risks Inherent in Continued Litigation and Trial Support Final Approval.

The Settlement provides Class members with benefits they would not enjoy if the case were to proceed to trial.  First, the Settlement provides Class members with prompt and efficient relief.  Even if the Class were successful in winning at trial, proceeding to trial would add years to the resolution of this case and could be further delayed by appeals.  Moreover, because the individual actions would be cost-prohibitive relative to the amount in controversy presented by any individual claim, the Class members receive the benefit of being part of a class action.

Second, the Settlement enables Class members to avoid the risks of going to trial.  The factual and legal issues in this action are complex, and the trial of Plaintiffs' claims under the FCRA and related state laws would require substantial preparation and ultimately the presentation of dozens of witnesses and numerous experts.  Although Plaintiffs and the Class believe their claims have merit, they also recognize that they would face significant legal, factual, and procedural obstacles to recovering damages on their claims.  Where, as here, the Court issued a tentative ruling on January 26, 2009 denying Plaintiffs' Motion for Class Certification pursuant to Fed. R. Civ. P. 23(b)(3) and directed the parties to make a final attempt to settle the Litigation, certifying a class would present challenges and difficulties.  The outcome of a trial is also uncertain.  The Defendants deny that they willfully or negligently violated FCRA or related state laws, and they would challenge Plaintiffs' claims at every stage of the Litigation.  Among other things, as evidence of their good faith, they would point to the fact that they have completely revised the challenged procedures independent of any monetary settlement.

1   Finally, the relief achieved in the Settlement would have been difficult to

2   achieve in a contested class action.  As a result of the Settlement, Class members

3   submitted 495,562 actual damage claims in the course of several months, a much

4   greater number than the number of individual actual damage cases asserting these

5   claims than have ever been brought before (and an even greater number than those

6   that have succeeded in obtaining a judgment or even a comparable settlement).  *See*

7   Declaration of Leonard A. Bennett ("Bennett Decl.") ¶¶ 8-9, 12, 15-19.  In addition,

8   any claimant who believes they have a viable actual damages claim had the

9   opportunity to opt out of the Settlement.  Here, just over 1,000 claimants opted out[7],

10  less than 0.002% of those who chose an actual damage award.

11  **4.   The Recommendations Of Experienced Counsel Favor Approval Of The Settlement.**

12  "The recommendations of plaintiffs' counsel should be given a presumption

13  of reasonableness."  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal.

14  1979); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822

15  (D. Mass. 1987); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal.

16  1980) ("the fact that experienced counsel involved in the case approved the

17  settlement after hard-fought negotiations is entitled to considerable weight");

18  *Linney v. Cellular Alaska P'ship*, No. C-96-3008 DLJ, 1997 WL 450064, at *5

19  (N.D. Cal. July 18, 1997).  Here, counsel for both parties endorse the Settlement as

20  fair, adequate, and reasonable.[8]

21  Settlement Counsel have extensive experience in prosecuting and litigating

22  consumer class action cases and FCRA actions.  Sobol Decl. ¶ 2; Bennett Decl. ¶¶

23

24  [7] The Court understands that 23(b)(3) Settlement Class Counsel will update these opt-out statistics after the extended opt-out deadline and include the updated

25  numbers in their Final Status Report Regarding The 23(b)(3) Settlement on or before August 31, 2010.

26  [8] The Executive Committee, comprised of Michael Sobol of Lieff Cabraser, Michael Caddell of Caddell & Chapman, Stuart Rossman and Charles Delbaum of

27  National Consumer Law Center, Leonard Bennett of Consumer Litigation Associates, and Dan Wolf of The Law Offices of Dan Wolf, voted 4-1 in favor of

28  the Settlement.  Dan Wolf was the lone vote against the Settlement.

2, 6-9, 15; Declaration of Michael A. Caddell in Support of Motion for Attorneys' Fees for Monetary Relief Settlement ¶¶ 3-15, 18.  Settlement Counsel have conducted extensive investigation of and discovery in this case.  *See* Monetary Fees Sobol Decl. ¶ 10.  The fact that qualified and well-informed counsel endorse the Settlement as being fair, reasonable, and adequate weighs heavily in favor of this Court's approval of the Settlement.

### 5.   The Presence of Good Faith and the Absence of Collusion Favors Final Approval.

Courts should consider the presence of good faith and the absence of collusion on the part of settling parties.  4 *Newberg* § 11.43.  Courts recognize that arm's-length negotiations conducted by competent counsel are prima facie evidence of fair settlements.  As the Supreme Court has held, "[o]ne may take a settlement amount as good evidence of the maximum available if one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arm's-length bargaining . . . ."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999).

There is no collusion or bad faith here.  The Settlement is the result of intensive, arm's-length negotiations between experienced attorneys who are highly familiar with class action litigation in general and with the legal and factual issues of this case in particular.  Sobol Decl. ¶¶ 2, 15.  Settlement negotiations in this case were conducted with the help of experienced mediator Randall Wulff.  *Id.* Following the mediations and a final settlement conference, an agreement was reached as to the essential terms of the Settlement on February 5, 2009.  *Id.*  After reaching this agreement, the parties continued to negotiate in detail and in good faith over the months that followed to finalize the Settlement Agreement.  *Id.*

### 6.   The Court Believes The Settlement Is In The Best Interests of The Class.

The 23(b)(3) Settlement Plaintiffs have actively participated in this Litigation by staying apprised of developments, producing documents, responding to discovery, and providing sworn declaration and deposition testimony.  Moreover,

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT CASE NO. 05-CV-1070 DOC (MLGX)

1    they have been kept informed about the progress of settlement negotiations and

2    mediation and the Settlement.  The Plaintiffs have been informed of the nature of

3    the Settlement and believe that the Court's approval of it would serve the best

4    interests of the Class.  *See* Declarations of Jose Hernandez, Kathryn Pike, Bertram

5    Robison, and Robert Randall In Support of Plaintiffs' Motion for Final Approval of

6    Settlement.

7         The Plaintiffs represent the interests of the Class in asking the Court to

8    approve this Settlement.  The claims of all of the original *White* plaintiffs were

9    consolidated with the claims of Jose Hernandez via the *White/Hernandez* Second

10   Amended Consolidated Class Action Complaints against each Defendant, and the

11   claims of the Acosta plaintiffs were related to *White/Hernandez*.  Therefore, even if

12   the *White* plaintiffs do not agree with the Settlement[9], Jose Hernandez, Robert

13   Randall, and Bertram Robison seek to resolve all of the claims in the complaints

14   against Defendants on behalf of the Class.  The Settlement resolves and releases all

15   claims of the Plaintiffs and 23(b)(3) Settlement Class Members as they relate to the

16   reporting of debts discharged in bankruptcy.  Settlement Agreement § 1.38.

17        As this Court has previously ruled in this case, the Ninth Circuit does not

18   require that all named plaintiffs agree with a settlement in order for it to be

19   approved.  *See* Dkt. Nos. 423 and 438; *see also Officers for Justice*, 688 F.2d at

20   631.  Moreover, the Court is not required to give any special deference to Objecting

21   Plaintiffs.  *Rodriguez v. West Publ'g Corp.*, No. CV-05-3222 R (MLx), 2007 U.S.

22   Dist. LEXIS 74849, at *51 (C.D. Cal. Sept. 10, 2007).  Since the Court determines

23   this Settlement is in the best interests of the Class, it can approve it.  *Maywalt v.*

24   *Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) ("[t]he

25   ultimate responsibility to ensure that the interests of class members are not

26   subordinated to the interests of either the class representatives or class counsel rests

27

28   _____

[9] The *White* Plaintiffs, Chester Carter, Maria Falcon, Arnold Lovell, Robert Radcliffe, and Clifton C. Seale III, are objecting to the Settlement.

1   with the district court").[10]

2   **7.      Class Members' Positive Reaction Supports Final Approval.**

3   **a.      Opt Outs and Objectors Are De Minimis**

4   A court may appropriately infer that a class action settlement is fair,

5   adequate, and reasonable when few Class members object to it.  *See, e.g.*,

6   *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977).  Indeed, a

7   court can approve a class action settlement as fair, adequate, and reasonable even

8   over the objections of a significant percentage of Class members.  *See Class*

9   *Plaintiffs*, 955 F.2d at 1291-96; *see also Nat'l Rural Telecomms.*, 221 F.R.D. at 529

10  ("It is established that the absence of a large number of objections to a proposed

11  class action settlement raises a strong presumption that the terms of a proposed

12  class settlement action are favorable to the class members"); *Bryan v. Pittsburgh*

13  *Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir 1974) ("While the proportion of the

14  class opposed to a settlement is one factor to be considered in assessing its

15  fairness, . . . a settlement is not unfair or unreasonable simply because a large

16  number of class members oppose it").

17  In any litigation involving a large class, an absence of objections would be

18  extremely unusual.  When a significant majority of Class members have not

19  objected to or excluded themselves from a class action settlement, courts have

20  interpreted that response as evidence that the settlement warrants final approval.

21  For example, in *Churchill Village,* the Ninth Circuit affirmed settlement approval

22  where 45 of approximately 90,000 notified class members objected and 500 opted

23  ───────────────

24  [10] The 23(b)(3) Settlement Counsel also have a duty to do what they believe is in the best interests of the class, even if the named plaintiffs do not agree.  *See, e.g.*, *Fleury v. Richemont North America, Inc.*, No. C-05-4525 EMC, 2008 U.S. Dist.

25  LEXIS 64521, at *44 (N.D. Cal. July 3, 2008) (citing *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) (stating that,

26  "[b]eyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint

27  is filed")); *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1239, 1245 (N.D. Cal. 2000) (noting that "lead counsel owes a generalized duty to unnamed

28  class members")).

1    out.  *Churchill Village, L.L.C. v. Gen. Elec.,* 361 F.3d 566, 577 (9th Cir. 2004).

2            Here, 1,049 Class members have timely opted out of the Settlement[11], and 56

3    Class members have objected to it.[12]  This is particularly significant in light of the

4    success of the Notice Program, which included individual notice to 15,143,724

5    people, publication notice in *USA Today* on October 15, 2009, and a Settlement

6    website.  Keough Decl. ¶¶ 7-8, 10.  The objections and opt-outs amount to just

7    0.000073% of the Class.  The small number of objections and requests to opt out of

8    the Settlement indicate the decisively positive response to the Settlement and

9    support its approval.  *See Marshall*, 550 F.2d at 1178; *Class Plaintiffs*, 955 F.2d at

10   1291-96 (upholding trial court's grant of final approval over Class member

11   objections); *see also Boyd*, 485 F. Supp. at 622 (finding that objections from only

12   16% of the class was persuasive that the settlement was adequate).

13                    **b.    Class Members Overwhelmingly Applied For Relief**

14           As of December 27, 2009, the Settlement Administrator has received

15   744,618 timely signed claim forms.  Keough Decl. ¶ 15.  The sheer number of

16   claims establishes that the claim forms were easy to understand, fill out, and return

17   (with pre-paid postage) to the Settlement Administrator.

18   **VI.    THE OBJECTIONS TO THE SETTLEMENT LACK MERIT.**

19           Individual mailed notice was sent to approximately 15.1 million potential

20   class members.  In response, a total of only 46 objections were timely filed by 56

21   objecting class members.  Therefore, objectors represent less than four-ten

22   thousandth of one percent of those who received class notice (*i.e.*, 0.00000371 of

23

24   [11] Of the 1,049 opt outs, approximately 788 came from just three referral sources. Keough Decl. ¶ 12.  The small number of opt outs is even more meaningful in light

25   of the significant and unsuccessful efforts made by Objecting Plaintiffs' counsel and their colleague Robert Weed to foment widespread opt outs and objections.

26   *See* Declaration of Leonard A. Bennett ¶ 24.
     [12] The Court understands that 23(b)(3) Settlement Class Counsel will update these

27   opt-out and objection statistics after the extended opt-out deadline and include the updated numbers in their Final Status Report Regarding The 23(b)(3) Settlement on

28   or before August 31, 2010.

those who received notice).[13]  Of the scant amount of objections received, several were advanced by so-called professional objectors, that is, via counsel who routinely object to class action settlements on mostly ideological grounds.  Further, several objections appear to have been filed at the direction of counsel who has been urging rejection of the Settlement since the preliminary approval stage.

None of the objections submitted in this case counsel against final approval of the Settlement.  The vast majority of the arguments contained in the objections are conclusory and contain no factual or legal support.  "General objections without factual or legal substantiation carry little weight."  4 *Newberg On Class Actions* (4th ed. 2002) ("Newberg") § 11.58.  None of the Objectors has offered a reasonable or workable alternative to address any weakness they claim may exist; rather, the theme of many of these objections is that the Settlement could have in some way been "better."  It is easy and inexpensive to criticize a Settlement when one has contributed nothing, yet Objectors have a right to do so.  However, as the Ninth Circuit recognized in *Hanlon v. Chrysler Corp.*:

> Of course it is possible . . . that [a] settlement could have been better.  But this possibility does not mean [a] settlement presented [is] not fair, reasonable or adequate.  Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.  In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.

150 F.3d 1011, 1027 (9th Cir. 1998).

As this Court is aware from its oversight throughout this litigation, the

---

[13]  The Court understands that 23(b)(3) Settlement Class Counsel will update these statistics after the extended objection deadline and include the updated numbers in their Final Status Report Regarding The 23(b)(3) Settlement on or before August 31, 2010.

1   Settlement presented here was reached after years of intensely adversarial litigation,

2   and – like any good settlement must – reflects both the strengths and weaknesses of

3   Plaintiffs' claims and Defendants' defenses.  Here, as with any compromise, both

4   sides were required to make some concessions to reach closure and both sides have

5   determined that the benefits of acceding to such concessions outweigh the risks of

6   further litigation.  For these reasons, and for the specific reasons set forth below, the

7   objections are overruled.

8       A.    **The Objectors.**

9       The identity of each Objector and the substantive nature of each objection is

10  set forth in a chart attached as Exhibit 2 to the Declaration of Michael W. Sobol in

11  Support of Motion for Final Approval of Class Action Settlement ("Sobol Decl.").[14]

12  The objections submitted are addressed below by category.

13      Several of the Objectors, including Darrell Joseph Palmer, Steven Helfand,

14  John W. Davis, C. Benjamin Nutley, R. Stephen Griffis, and Charles M. Thompson,

15  are professional objectors with long histories of objecting to meritorious settlements

16  such as this one.  For example, Darrell Palmer has objected in at least three cases in

17  the past three years.  *See, e.g., The Authors Guild, Inc., v. Google, Inc.*, 2009 WL

18  2980745 (S.D.N.Y. September 8, 2009); *Berger v. Property ID Corp.*, Case No.

19  2:05-cv-05373 (C.D. Cal. February 27, 2009) (Dkt. No. 6828423); *Collins v. Am.*

20  *Honda Motor Co. Inc.,* 2006 WL 4103767 (Cal. App. Supp. December 28, 2006).

21  In each of these cases, Mr. Palmer objected that the attorneys' fees were too high,

22  and in at least one he appeared *in propria persona* seeking a $25,000 incentive

23  award.  *See Berger v Property ID*, *supra*.

24      Steven Helfand has appeared as an objector or as counsel for objectors in at

25  least 14 cases, frequently appearing with John W. Davis.  *See, e.g., Davis v. Apple*

26  *Computer, Inc.,* 2005 WL 1926621, at *2 (Cal. Ct. App. August 12, 2005) (noting

27

28
   ---
   [14] The chart in Exhibit 2 does not include the objections filed by the *White* Plaintiffs in a separate submission.

1   that the lower court disqualified Helfand as Davis's attorney because "Helfand and

2   Davis had a business relationship that created a conflict of interest" and the two

3   "had in the past confidentially settled or attempted to confidentially settle putative

4   class actions in return for payment of fees and other consideration directly to

5   them"); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 2591402 at *9, 21 (S.D.N.Y.

6   2004) (finding that "Helfand's objections are not persuasive"); *Chavez v. Netflix,*

7   *Inc.*, 162 Cal. App. 4th 43, 63 (2008) (Helfand representing Davis) (finding that

8   Davis's proposed alternative to the approved settlement "seems highly unfair and

9   impractical by comparison"); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th

10   Cir. 2009) (Helfand objecting to attorneys' fees); *Barnhill v. Fla. Microsoft*

11   *Antitrust Litig.,* 905 So. 2d 195 (Fla. Dist. Ct. App. 2005) (Helfand and Davis

12   objecting to attorneys' fees); *White v. CellCo P'ship*, 2008 WL 5262009 (Cal. App.

13   Supp. October 21, 2008) (No. 04-137699) (Helfand and Davis objecting to, *inter*

14   *alia*, attorneys' fees); *Steiner v. ABC, Inc.*, 2005 WL 4133086 (C.D. Cal. April 4,

15   2005) (Helfand objecting to attorneys' fees); *In re Visa Check/Mastermoney*

16   *Antitrust Litig.,* 297 F. Supp. 2d 503, 506 (E.D.N.Y. 2003) (Helfand and Davis

17   objecting to class counsel's fee request); *In re Homestore.com, Inc.,* 2004 WL

18   2792185 (C.D. Cal. August 10, 2004) (Helfand and Davis objecting to class notice);

19   *Wal-Mart Stores, Inc. v. Buholzer*, 156 Fed. Appx. 346, 348 (2nd Cir. 2005)

20   (rejecting Helfand and Davis's appeal of district court's grant of fee award as

21   "unavailing" and "border[ing] on being frivolous"); *Hillis v. Equifax Consumer*

22   *Servs. Inc.*, 2007 WL 1953464, at *3 (N.D. Ga. June 12, 2007) ("A fatal flaw

23   running throughout all of the objections is that the Objectors did not give adequate,

24   or sometimes any, weight to the significant hurdles for Plaintiffs and the Class");

25   *Slayton v. Citibank (South Dakota), N.A.,* 2007 WL 731432, at *3 (Cal. Ct. App.

26   March 12, 2007) (rejecting Helfand and Davis's argument that the settlement is

27   unfair because it commits the entire monetary recovery to charitable organizations);

28   Appellant's Opening Brief, *Perrotti v. Microsoft Corp.,* 2005 WL 1124071 (Cal.

1    Ct. App. April 2, 2005) (No. A107775) (Helfand and Davis objecting to release of

2    claims).  Mr. Helfand also represented Walter F. Ellingwood, III (who he represents

3    here, *see* Sobol Decl. Exh. 2) in *In re: Natural Gas Anti-Trust Cases I, II, III, and*

4    *IV*, JCCP Nos. 4221, 4224, 4226 & 4228 (Cal. Super. Ct. 2003) but he withdrew his

5    Objection after Plaintiffs' counsel deposed Mr. Ellingwood.[15]

6    　　　C. Benjamin Nutley is also a frequent objector.  *See, e.g., Chavez, supra,* 75

7    Cal. Rptr. 3d 413; *Bronk v. Talarico*, 2007 WL 603405, at *7 (Cal. Ct. App.

8    February 28, 2007) (objecting to incentive awards and injunctive relief); *Edelist v.*

9    *First USA Bank, N.A.*, 2006 WL 1555765, at *1 (Cal. Ct. App. June 8, 2006)

10    (objecting to attorneys' fees and incentive award); *In re Relafen Antitrust Litig.*,

11    231 F.R.D. 52, 81 (D. Mass. 2005) (objecting to overall fairness, inadequacy of *cy*

12    *pres*, and attorneys' fees); *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166, 170 (D.

13    N.J. 2003) (objecting to attorneys' fees); *Vroegh v. Eastman Kodak Co.,* 2007 WL

14    4217144, at *6 (Cal. Ct. App. November 30, 2007) (objecting that settlement was

15    unfair and unreasonably excluded the claims of business purchasers); Appellant's

16    Opening Brief, *Evans v. Brookstone Co., Inc.*, 2005 WL 1900531, at *5 (Cal. Ct.

17    App. May 2, 2005) (No. B176652) (objecting to attorneys' fees and incentive

18    awards); Petition for Review, *Consumer Cause, Inc. v. Mrs. Gooch's Natural Food*

19    *Markets, Inc*., 2005 WL 1649387 (Cal. App. Supp. April 19, 2005) (No. S133166)

20    (arguing for attorneys' fees for objector's counsel).

21    　　　Likewise, R. Stephen Griffis's representation of objectors to class action

22    settlements has been prolific, almost always in tandem with Charles M. Thompson.

23    *See, e.g., Snell v. Allianz Life Ins. Co. of North America*, 2000 WL 1336640, at *9-

24    10 (D. Minn. September 8, 2000) (noting concern that professional objectors may

---

[15] During the deposition, Mr. Ellingwood testified he had an understanding or agreement with Mr. Helfand that if the case "does settle and we get a change in the settlement, there's a positive effect, we have discussed that I would get a $1,000" for his time.  *See* Sobol Decl. Exh. 4, Transcript of the Testimony of Walter F. Ellingwood, III, Oct. 31, 2003, at 11:22-12:6.  Mr. Ellingwood also testified that he had the same agreement with Mr. Helfand and that he received $1,000 for his participation as an objector in another case (Behr).  *Id.* at 21:19-22:18.

1   be "a pariah to the functionality of class action lawsuits, as they maraud proposed

2   settlements—not to assess their merits on some principled basis—but in order to

3   extort the parties, and particularly the settling defendants, into ransoming a

4   settlement that could otherwise be undermined by a time-consuming appeals

5   process" and concluding that "time will tell"); *Shaw v. Toshiba Am. Info. Sys., Inc.*,

6   91 F. Supp. 2d 942, 973-74, n.18 (E.D. Tex. 2000) (finding that Thompson's

7   objections were "obviously 'canned' objections filed by professional objectors who

8   seek out class actions to simply extract a fee by lodging generic, unhelpful

9   protests"); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 241 n.22 (D. N.J.

10  2005) ("The Court does recognize that many of the objections that have been raised

11  by the so-called 'professional objectors' have been raised in other courts in other

12  class actions. *See, e.g., Snell*, 2000 U.S. Dist. LEXIS 13611, at *42-3) (objection

13  by R. Stephen Griffis on behalf of a class member)."); *In re Diet Drugs Prod. Liab.*

14  *Litig.*; 553 F. Supp. 2d. 442, 448 (E.D. Pa. 2008) (objecting to attorneys' fees and

15  expense reimbursement); *Azizan v. Federated Dept. Stores, Inc.*, 2006 WL

16  4037549, at *6, 10 (N.D. Cal. September 29, 2006) (finding that "Coordinated

17  Objectors have vastly overstated the significance of the role they played in this

18  case" and recommending they receive no fees); *In re Relafen Antitrust Litig.*, 231

19  F.R.D. at 52; *Reynolds v. Beneficial Nat. Bank*, 260 F. Supp. 2d 680 (N.D. Ill.

20  2003); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002); *In re*

21  *Visa/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 503; *Baynham v. PMI*

22  *Mortgage Ins. Co.*, 313 F.3d 1337 (11th Cir. 2002); *In re Synthroid Mktg. Litig.*,

23  201 F. Supp. 2d 861 (N.D. Ill. 2002) (rejecting objectors' requests for attorneys'

24  fees); Plaintiff's Memorandum in Support of His Motion for Final Approval of

25  Class Action Settlement, *Park v. The Thomson Corp.*, 2008 WL 2305162

26  (No. 105CV02931) (S.D.N.Y. March 22, 2008) (objecting to cap placed per filed

27  claim, requirement that claim form be filed, and *cy pres* provision); Motion for

28  Protective Order and Motion to Quash Depositions, *In re Universal Serv. Fund Tel.*

1    *Billing Practices Litig.*, 2008 WL 2604266 (No. 02MD1468) (D. Kan. February 20,

2    2008); Objection to Class Action Settlement, *Coopoer v. Pac. Life Ins. Co.*, 2007

3    WL 4604954 (No. CV203-131) (S.D. Ga. September 4, 2007) (objecting that

4    settlement was not fair, reasonable or adequate, to purported conflict of interest, and

5    to attorneys' fees); Objection to Proposed Settlement, *Spahn v. Edward D. Jones &*

6    *Co. L.P.*, 2007 WL 5281756 (No. 404CV00086) (E.D. Mo. June 11, 2007)

7    (objecting to settlement amount, form, and attorneys' fees); *Nieme v. The Columbia*

8    *House Co.*, 2002 WL 32363789 (No. A099606) (Cal. Ct. App. October 22, 2002)

9    (objecting that relief was overvalued and attorneys' fees were excessive).

10   Charles M. Thompson has also appeared in at least one case without Griffis. *See*

11   *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 70 (S.D.N.Y. 2003)

12   ("[Thompson's clients] present nothing, besides conclusory allegations, that their

13   interests were not adequately protected.").

14         Finally, Steve A. Miller has appeared as an objector in at least one case this

15   year.  Plaintiffs' Notice of Motion and Motion to Compel Objector Depositions,

16   *CLRB Hanson Indus., LLC v. Google, Inc*., 2009 WL 1764539 (No. C 05-03649)

17   (N.D. Cal. June 19, 2009).

18         Professional objectors like these play no positive role in class action

19   litigation and do nothing to benefit the Class.  As one court recently explained in

20   requiring a professional objector to post a bond on appeal: "Repeat objectors to

21   class action settlements can make a living simply by filing frivolous appeals and

22   thereby slowing down the execution of settlements. The larger the settlement, the

23   more cost-effective it is to pay the objectors rather than suffer the delay of waiting

24   for an appeal to be resolved (even an expedited appeal).  Because of these economic

25   realities, professional objectors can levy what is effectively a tax on class action

26   settlements, a tax that has no benefit to anyone other than to the objectors.  Literally

27   nothing is gained from the cost: Settlements are not restructured and the class, on

28   whose behalf the appeal is purportedly raised, gains nothing." *Barnes v.*

*FleetBoston Fin. Corp.*, 2006 U.S. Dist. LEXIS 71072, *3-4 (D. Mass 2006).  As a result, "federal courts are increasingly weary of professional objectors."  *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, n.26 (E.D. Pa. 2003) (gathering cases involving professional objectors).

In addition to the professional objectors, there are objections presented by two of the original named plaintiffs' lawyers, Charles Juntikka and Daniel Wolf (the "*White* Objectors").  The *White* Objectors spend more time contriving issues surrounding the conduct of Class Counsel than they do examining the fairness of the settlement terms.  The *White* Objectors' assertions lack merit and do not raise a credible objection.

### B.    The Amount of the Settlement Fund is Fair, Adequate, and Reasonable Given The Strengths And Weaknesses Of The Litigation.

Without question, this Settlement provides an excellent result—generating a fund of forty-five million dollars *in cash* for the benefit of the class.  Declaration of Geoffrey P. Miller ("Miller Decl.") ¶¶ 33-38.  Notably, the Settlement here provides for the *pro rata* adjustment of compensation to ensure that *all* Settlement funds will accrue to the class and that none will *ever* revert to the Defendants' benefit.  *See id.* ¶ 35.  Nonetheless, the sufficiency of the Settlement consideration needs to be weighed against the strengths and weaknesses of the Plaintiffs' claims and the risks and delays associated with continued litigation.  *Id.* ¶¶ 39-50. Objectors asserting that the Settlement delivers insufficient benefits to the class members fail to adequately consider these factors.  *See* Sobol Decl. Exh. 2.

Some Objectors argue that, by way of settlement, they will not obtain all the relief they could hope to recover after years of 100% successful litigation, successful class certification, prevailing on the merits, appeals, and collection.  *See* Sobol Decl. Exh. 2.[16]  A few argue that the three Defendants faced probable

---

[16] These Objectors include Carol and Frank Bailey, Lisa Brisbane, Robert Clay, Thomas Collins, Walter Ellingwood III, Christy Driver, John and Sharon Easley, Ray and Dorothy Gabbard, Glenda Schilleci, Charlotte Gallentine, Janice Halsey,

*Footnote continued on next page*

1   liability (that is, not just theoretical exposure) of three billion dollars—nearly their

2   entire combined net worth.  To state the obvious, that is not a realistic goal, and it is

3   not the benchmark by which final approval of the Settlement is to be measured.

4   Miller Decl. ¶¶ 39-50.  The objections asserting billions of dollars in potential

5   liability state that there is "ample evidence" that Plaintiffs have a "high probability"

6   of prevailing on their claims, but offer no proof of such evidence nor any details nor

7   legal argument beyond their conclusory statements criticizing the adequacy of the

8   monetary relief.[17]

9        Such objections regarding the sufficiency of the Settlement Fund "offer

10  nothing more than speculation about what damages 'might have been' won had

11  they prevailed at trial."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th

12  Cir. 1998) (*quoting Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625

13  (9th Cir. 1982)).  As the Ninth Circuit has repeatedly held, "it is the very

14  uncertainty of outcome in litigation and avoidance of wasteful and expensive

15  litigation that induce consensual settlements.  The proposed settlement is not to be

16  judged against a hypothetical or speculative measure of what might have been

17  achieved by the negotiators."  *Id.*  The court explained, "the very essence of a

18  settlement is compromise, a yielding of absolutes and an abandoning of highest

19  hopes."  *Id.* (*quoting Officers for Justice*, 688 F.2d at 624).  "A demonstration that

20  the likelihood of recovery is greater than the estimate of the proponents is generally

21  contingent on the facts revealed by discovery."  *Newberg* § 11.58.  "Under most

22  circumstances, the increased benefits that may be secured are outweighted [sic] by

23  the additional time and expense necessary to obtain them."  *Id.*  Although the

24  Settlement terms reached here provide a significant benefit, "[t]he fact that a

*Footnote continued from previous page*

25  Karen Hansen, William Luster, Ivonne Martinez, Brenda Melendez, Valerie Miles-

26  Graves, Steven Signer, Deborah and Terry Moore, Katherine Nemeth, Kelly and
    Ralph Porter, Marc Randall, Ronald Revueltas, Nancy Segarra, Thomas Carder,

27  Mary Tucker, and Noel Zirbel.
    [17] *See* Sobol Decl. Exh. 2.  Objectors Glenda Schilleci and Steven Signer, both

28  represented by professional objectors, make this argument.

1    proposed settlement may only amount to a fraction of the potential recovery does

2    not, in and of itself, mean that the proposed settlement is grossly inadequate and

3    should be disapproved." *Id.* (citations and quotations omitted).

4        Counsel for the *White* Objectors decry the Settlements' outstanding recovery

5    and instead focus on the possibility of a hypothetical billion-dollar payout.[18]  While

6    the *White* Objectors' goal of a billion-dollar payout was doubtlessly unrealistic

7    from the start, this Court's tentative ruling denying Plaintiffs' Motion for Class

8    Certification ("Tentative"), Dkt. 369, highlights some of the difficult obstacles that

9    Plaintiffs would have to overcome before they could ever hope to recover the *White*

10   Objectors' imagined "billions" of dollars.  Miller Decl. ¶¶ 42, 48.  The tentative

11   Order discussed in detail the five class action requirements of Rule 23 and

12   concluded that numerosity was the only requirement satisfied in the 23(b)(3)

13   monetary relief case.  The Court stated that "[t]his case has neither" shared legal

14   issues nor a common core of facts.  Tentative at 7.  With respect to the typicality

15   requirement, the Court asserted that even inaccurate reports "had no impact on

16   many debtors, and actually improved the FICO scores for many debtors." *Id.* at 8-

17   9.  For adequacy of representation, the Court determined that "[c]onflicts exist

18   between those putative class members who benefited from Defendants' credit

19   reporting procedures and those who were harmed by them." *Id.* at 9-10.  Finally,

20   the Court concluded that "[a]llowing a claim of such magnitude – encompassing

21   persons with merely speculative damages as well as no plausible damages claims at

22   all – is clearly an inferior form of adjudication in this case as it presently stands."

23   _____

24   [18] Counsel for the *White* Objectors asserted in their Motion to Reconsider the
     preliminary approval of this Settlement that recovering billions of dollars in
     damages was a possibility in this case.  Dkt. 430.  However, those counsel were the

25   least experienced in FCRA litigation and consumer class actions and, by their own
     admission, had "very little to do with any of the discovery in these cases."

26   Declaration of Daniel Wolf, Dkt. 430-10, ¶ 4.  With their extensive experience in
     consumer class actions and FCRA litigation, the 23(b)(3) Settlement Class Counsel

27   concluded that proving liability and willful conduct were not a guaranteed result,
     and that it was in the best interests of the Class not to forfeit a $45 million

28   Settlement for the chance at some speculative recovery.

1    *Id.* at 10.

2    Although the FCRA permits statutory damage awards upon a showing of a

3    willful violation, it is possible—as some judges have suggested—that statutes of

4    this type should be interpreted to provide discretion to remit a large award of

5    statutory damages on due process grounds, even if such damages were otherwise

6    sustained. *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006).

7    *See also* Miller Decl. ¶ 47. Courts sometimes view statutory damages claims with

8    alarm because of the overwhelming liability exposure they can create when

9    consolidated in a class action—particularly when members of the class experienced

10   little or no actual damages. *Id. See, e.g.*, *Parker v. Time Warner Entm't Co.*, *LP*,

11   331 F.3d 13, 22 (2d Cir. 2003); *see also In re Trans Union Corp. Privacy Litig.*,

12   211 F.R.D. 328, 350-51 (N.D. Ill. 2002), *appeal dismissed*, 346 F.3d 734 (7th Cir.

13   2003) (declining to certify a class on the ground that the available statutory

14   damages would be "grossly disproportionate" to any actual harm suffered by the

15   plaintiffs). In addition, some of these courts—most notably the Second Circuit—

16   have also suggested that these due process considerations are of particular concern

17   in class actions, where the aggregation of individual claims "may expand the

18   potential statutory damages so far beyond the actual damages suffered that the

19   statutory damages come to resemble punitive damages." *Parker*, 331 F.3d at 22. If

20   the FCRA were interpreted in this case as giving discretion as to the amount of

21   statutory damages to sustain post-trial, the possibility existed that the Class would

22   wind up with only token or nominal damages. *Id.*; *see also* Miller Decl. ¶¶ 46-47.

23   In keeping with this sentiment, the Court's decision tentatively denying class

24   certification contained an ominous warning about the statutory damages claims.

25   Miller Decl. ¶ 48. The Court noted that allowing persons who had suffered no

26   injury to sue for damages might well raise questions under Article III of the United

27   States Constitution. *Id.*; Tentative at 11. The implication was that plaintiffs had

28   suffered no injury-in-fact, and that it would therefore be beyond the Article III

1    powers of the federal courts to award them relief, even if Congress purported to

2    create a cause of action entitling them to such a remedy.  Miller Decl. ¶ 48.  The

3    constitutional issue, if eventually decided in Defendants' favor, has the potential to

4    destroy the claims for statutory damages on the part of many, if not most, class

5    members.  *Id.*

6        Based on this tentative Order, the 23(b)(3) Settlement Class Counsel

7    recognized that the issues raised by the Court would be challenging to resolve,

8    perhaps requiring a reversal through successful appeal to the Ninth Circuit.  If the

9    Ninth Circuit affirmed the Court's Order, the Class would receive zero monetary

10   relief.  The Court itself acknowledged in a hearing on November 9, 2009 that

11   continued litigation posed risks and that the tentative order could have been upheld,

12   stating: "[t]hat was a tentative, and how do you advise your clients in good faith

13   that the Court might not [sic] uphold that tentative and have you completely out of

14   court, with zero money."  November 9, 2009 Tr. at 60:18-21.

15       The *White* Objectors attempt to neutralize these concerns by dismissing the

16   disparity between the alleged damages and the billions they seek—attacking the

17   scoring studies upon which Defendants base their argument that some Class

18   members benefited from Defendants' reporting practices.  *See* Dkt. No. 553 at 57.

19   The Settling Plaintiffs do not dispute that Defendants' studies are flawed.  To the

20   contrary, the Settling Plaintiffs have argued as much in the past.  However, the

21   *White* Objectors expert, Dean Binder, who opines on the flawed nature of

22   Defendants' studies, fails to refute the ultimate contention that Defendants'

23   reporting practices had a disparate impact on consumers—and that some

24   consumers' credit reports were not adversely affected by Defendants' conduct.

25   Thus, even assuming Mr. Binder were qualified to provide such opinions (his

26   résumé reports that his experience and responsibilities are primarily in account

27   management and sales), his testimony does not offer any effective criticism of the

28   Settlement.

1    The *White* Objectors likewise suggest the Court could not have conditionally

2    certified the settlement class without finding that all of Rule 23's standards had

3    been met, thereby eliminating any doubt raised in the Court's tentative denial.  *See*

4    Dkt. No. 553 at 47.  The *White* Objectors ignore that the tentative order

5    foreshadowed not only the Court's opinions regarding class certification, but also

6    the possibility—or more accurately, impossibility—of the Court ever approving any

7    arrangement involving the billions of dollars in recovery that the *White* Objectors

8    insist is virtually certain.  Indeed, it is for precisely this reason that Plaintiffs' expert

9    Geoffrey Miller has opined that even if this case were certified and litigated to a

10    favorable judgment, a court realistically would be hesitant to impose ruinous

11    liability on credit reporting agencies, which serve an important role in the nation's

12    financial system, even if it is established at trial that they failed to correctly report

13    on the status of discharged debts of consumers who have gone through Chapter 7

14    bankruptcy proceedings.  Miller Dec. ¶ 49.

15    Moreover, Defendants have disputed Plaintiffs' willfulness claim and

16    allegations since the inception of this case.  Any recovery of statutory damages for

17    the Class must be predicated on a finding that the Defendants willfully violated the

18    FCRA.  *See* 15 U.S.C. § 1681n(a); *see also* Miller Decl. ¶ 43.  While the *White*

19    Objectors demonstrate that there are certainly arguments favoring a willfulness

20    finding (*see* Dkt. No. 553 at 40-45), they ignore the fact that, especially when faced

21    with the ruinous liability the *White* Objectors seek to impose, Defendants would

22    doubtlessly dispute Plaintiffs' willfulness claim through trial and beyond.

23    A reckless violation of the FCRA satisfies the willfulness prerequisite for

24    statutory and punitive damages.  *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47,

25    56-57 (2007); Miller Decl. ¶ 43.  Plaintiffs' burden to prove that Defendants'

26    conduct was reckless, however, is magnified by the fact that the claims here were

27    largely questions of first impression.  Plaintiffs asserted that Defendants' failure to

28    reconcile the public record reports of bankruptcy discharge orders with creditors'

1  reporting of post-discharge tradelines was willful.  No verdict or reported decision

2  had required the Defendants to implement procedures to cross-check data between

3  their furnishers and their public records providers.  Indeed, the injunctive relief

4  obtained earlier in the case, which required new procedures to effectively reconcile

5  such conflicting information in credit files, was recognized as "ground breaking."

6  Declaration of Evan Hendricks ("Hendricks Decl.") ¶ 2.  While not an

7  insurmountable burden for Plaintiffs, the dearth of supporting precedent made

8  success at trial on the merits possible for either side.  Defendants have cited

9  authority to the contrary.  *See*, *e.g.*, *Sarver v. Experian Info. Solutions*, 390 F.3d

10  969 (7th Cir. 2004) (agency not required under FCRA to examine each computer-

11  generated credit report for anomalous information in order for its procedures to be

12  considered reasonable); *but see O'Brien v. Equifax Info. Serv., LLC,* 382 F. Supp.

13  2d 733 (E.D. Pa. 2005) (denying defendant's summary judgment motion and

14  refusing to adopt *Sarver* in the Third Circuit).  Defendants relied on creditors to

15  report changes in status due to events such as discharges in bankruptcy.  Miller

16  Dec. ¶ 43.  Defendants could argue that this reliance was reasonable because

17  creditors were apparently required by law to supply such information (although it

18  seems that many creditors did not in fact comply with this requirement).  *Id.*

19      This case was filed in 2005.  In 2007, the Supreme Court rendered an

20  intervening decision addressing the standard for willfulness under the FCRA.

21  *Safeco Ins. Co. of America*, 551 U.S. 47.  Defendants have thereafter argued that

22  *Safeco* requires a previous determination from a governing court or administrative

23  agency concluding that its conduct or procedures were unlawful before they are

24  exposed for a willfulness claim.  *See, e.g.,* Defendant Experian Information

25  Solutions Inc.'s Memorandum of Points and Authorities in Support of Motion for

26  Partial Summary Judgment, filed July 5, 2007, Dkt. 109.  While Plaintiffs disagree

27  with Defendants' interpretation of *Safeco*, this argument and necessary proof of

28  willfulness remained a significant risk for a class recovery, as a number of reported

1  decisions since 2007 have accepted Defendants' position.  *See, e.g., Levine v.*

2  *World Fin. Network Nat. Bank*, 554 F.3d 1314 (11th Cir. 2009) (summary judgment

3  granted as to willfulness in FCRA class action, with court concluding that to prove

4  reckless violation of FCRA, a credit reporting agency's interpretation of FCRA

5  must be objectively unreasonable under either text of the Act or guidance from

6  courts of appeals or Federal Trade Commission that might have warned the agency

7  away from its interpretation); *Harper v. Trans Union, LLC*, 2009 WL 415940 (E.D.

8  Pa. 2009) (summary judgment granted to Defendant regarding willfulness in FCRA

9  class action arising from reporting of tradelines as included in bankruptcy where

10  public record did not show bankruptcy); *Godby v. Wells Fargo Bank*, 599 F. Supp.

11  2d 934, 944 (S.D. Ohio Sept. 30, 2008) (although a former creditor's, conducting an

12  account review by accessing plaintiff's credit information concerning an account

13  which had been discharged in bankruptcy may violate the Act, in the absence of

14  guidance from a court of appeal or the FTC, willfulness was not shown); *King v.*

15  *Movietickets.com, Inc.*, 2008 WL 2127995, at *4 (S.D. Fla. May 20, 2008)

16  (dismissing plaintiff's amended complaint because even if "FACTA applied to

17  electronically transmitted receipts where the merchant does not provide the

18  customer with a tangible, paper receipt, such an interpretation is not clear from the

19  statute").  Worse still would have been the possibility of summary judgment after

20  class certification.  *See e.g. Harris v. Experian*, 6:06cv1808 (D. S.C. June 30, 2009)

21  ("[T]his Court concludes that Plaintiff is unable, as a matter of law, to establish that

22  Experian acted willfully.").

23        Thus, in light of the uncertainty and risks of litigation and the difficulties of

24  proof, as well as the exclusion option for Class members who wish to pursue their

25  own claims, the objections regarding the amount of the Settlement Fund are without

26  merit and are overruled.  *See* Miller Decl. ¶¶ 69-82.

27

28

C. **The Class Notice and Claim Form Provided Sufficient Information From Which Class Members Could Determine Whether to Participate, And the Claims Administrator Has Been Available Throughout the Litigation to Provide Straightforward Answers to Questions.**

Some Objectors[19] argue that the Class Notice and Claim Forms were confusing or untimely or provided insufficient information. *See* Sobol Decl. Exh. 2. The Class Notice and Claim Form are straightforward and provide adequate information, as well as the contact information of the Settlement Administrator, Class Counsel, and the Web site address established solely for this Settlement. Objectors, individually or through counsel, could have easily called 23(b)(3) Settlement Class Counsel, defense counsel, or the Claims Administrator at any time to seek guidance in understanding the Class Notice or Claim Form.

### 1. **The Class Notice Was Timely.**

The Class Notice allowed all Class members sufficient time to respond and either submit a claim, exclude themselves from the Settlement, or object. "[T]he bulk of [settlement notices that require a proof of claim response have] 30- to 60-day intervals between mailing or publishing class notice and the filing of an affirmative response by class members." *Newberg* § 8.37. Notice was sent out to all Class members on September 28, 2009. Declaration of Jennifer M. Keough Regarding Notice Dissemination and Settlement Administration ("Keough Decl.") ¶ 7. Claim forms were due on November 30, 2009, and objections or requests to opt out were due the same date. Thus, Class members had 63 days' notice to make a claim or otherwise decide how they wished to proceed. This is ample time to make a claim and/or contact the Settlement Administrator or 23(b)(3) Class Counsel if Class members had any questions regarding the Settlement or Claim Forms. There was no requirement for Class members to document a claim beyond making the certification required to make an actual damage claim or checking the

---

[19] *See, e.g.,* Objections of Walter Ellingwood III, Glenda Schilleci, Steven Signer, Katherine Nemeth, Maria Borbon, Vincent Perillo, and Thomas Carder.

1    box for a convenience award, so the Class members did not need more than two

2    months to make a claim.[20]

3         The *White* Objectors submit the affidavit of Ralph Michael Porter, who

4    criticizes the Settlement Administrator for failing to respond to his questions

5    regarding the Notice.  *See* Dkt. No. 558.  In addition to the Settlement

6    Administrator's e-mail address, the Class Notice also provided Mr. Porter with a

7    toll-free number and Settling Class Counsel's contact information.  Mr. Porter

8    could have contacted Settling Class Counsel, who would have been (and still are)

9    happy to assist him in resolving any questions he may have.  And even if there were

10   a single lapse in the Settlement Administrator's response, this certainly does not

11   establish a pattern of non-responsiveness.

12        Three Objectors[21] argue that it is improper to require Class members to

13   submit claim forms before the Settlement is approved.  These Objectors cite no

14   authority for these conclusory statements, nor do they offer any alternative for the

15   settlement of a 23(b)(3) class action that would allow time for class members to

16   join the Class or exclude themselves or object before the final fairness hearing.

17   "[I]f notice is to be effective – if class members are to have a meaningful

18   opportunity to request exclusion, appear in the action, object to the representation,

19   etc. – the invitation must go out as promptly as the circumstances will permit."

20   *Newberg* § 8.9.  Here, Class members had meaningful opportunity to request

21   exclusion, submit an intent to appear at the final fairness hearing, or object to the

22   Settlement.

23

24

---

25   [20] Objector Katherine Nemeth made the argument that she had insufficient time to document her case and certify her class membership.  *See* Sobol Decl. Exh. 2.

26   However, there was no time required to document her case, and if she had any questions or concerns about her class membership or the type of claim she could

27   make, she was informed that she could contact the Settlement Administrator.
     [21] Glenda W. Schilleci, Steven Signer, and Thomas A. Carder, all represented by

28   professional Objectors, make this objection.  *See* Sobol Decl. Exh. 2.

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

### 2.      The Class Notice Was Adequate and Straightforward.

Objectors argue that the Settlement Notice was confusing, vague, or did not provide sufficient information about who can make a claim, what damages can be claimed, how a consumer can determine whether he or she qualifies to make a claim, and what are an individual's rights under the FCRA.[22]  *See* Sobol Decl. Exh. 2.

Rule 23(e) mandates "direct notice in a reasonable manner" to the Class in the event of a settlement.  "The contents of a Rule 23(e) notice are sufficient if they inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing.  The notice should be brief and reasonably clear to the minimally sophisticated layperson."  *Newberg* § 8.32.

The Class Notice mailed to more than 15 million people in this case accomplished all of these goals.  *See* Keough Decl. Exhibit A; *see also* Declaration of John R. Ulzheimer ("Ulzheimer Decl.") ¶ 4; Hendricks Decl. ¶ 9.  The Notice described who is included in the Settlement; the subject and nature of the Litigation and the Settlement; the Fund established by the Settlement and the options available to all Class members, including submitting a claim for a damage award, submitting a claim for a convenience award, or opting out of or objecting to the Settlement.  Keough Decl. Exhibit A.  The Notice also indicated that Class members can ask to appear at the fairness hearing.  *Id.*  Class members were referred to the Settlement website and the toll-free number of the Settlement Administrator for further information.  *Id.*  The Notice was written in language that was clear and could be understood by a lay person.

In contrast to what Objectors argue, the Settlement Notice does describe what it takes for a Class member to submit a claim for damages and estimates the range

---

[22] *See supra* n.17.

1    of the amount of award for such claims, subject to the caveat that the awards would

2    be adjusted based on the Class's response.  *Id.*  The Notice does inform Class

3    members about how precise the approximate date of harm has to be, stating that

4    claim forms need to include a month and a year.  *Id.*  The Settlement Agreement

5    further details the specific rules used by the Settlement Administrator to process

6    and verify claims.  *See* Settlement Agreement § 7.7.

7        One professional Objector, Mr. Walter Ellingwood III, claims that the Notice

8    is vague and ambiguous as to whether a loan or credit applied for must have been

9    denied in order to make a claim pursuant to an actual damage award.  *See* Sobol

10   Decl. Exh. 2.  The Notice indicates that a Class member can apply for an actual

11   damage award if he can certify that he has been damaged by an error in his credit

12   report regarding debts discharged in bankruptcy with respect to one or more of the

13   following transactions:

14       A *denial* of employment you applied for                    $750.00

15       A mortgage loan or a housing rental you sought              $500.00

16       A credit card, auto loan, or other credit applied for, or payment of a

17       discharged debt to obtain credit                           $150.00

18   *See* Keough Decl. Exh. A, Question 10 of Long-Form Notice (emphasis added).  It

19   is clear from this language that either a denial of employment is required, or *any*

20   *other harm* they have suffered, denials or otherwise, with respect to mortgage loans,

21   credit cards, auto loans, etc.  If a Class member is harmed because of higher interest

22   payments on a loan, they could apply for an actual damage award for that harm.

23       The *White* Objectors complain that the Notice is misleading because, while

24   everyone who was sent the Notice was theoretically a Class member, the Notice

25   suggests otherwise when it tells recipients that they must determine if they are

26   Class members.  Dkt. 553 at 74.  The portion of the Notice the *White* Objectors cite,

27   however, is followed by a recitation of the class definition as well as certain

28   exceptions to the Class definition.  Because it is possible that someone could fall

1  within the Class definition but still be excluded from the Class— for example,

2  because he has already released his claims against the Defendants—there is nothing

3  either incorrect or misleading about indicating as much to Class members.  Yet, to

4  the extent that anyone was confused, the Notice—in a section just three paragraphs

5  below the sentence with which the *White* Objectors take issue—provides anyone

6  unsure of his status as a Class member with multiple means of resolving any

7  confusion, including via a toll-free number, email, the Internet, or regular mail.

8        The *White* Objectors' other objections to the Notice are likewise unfounded.

9  The continued complaint that the large majority of Class members have not seen

10  their credit reports has nothing to do with Class Notice, and it would obviously be

11  impossible for any notification program to inform Class members of their

12  individual credit reports in any event.  Another Objector, Ms. Schilleci, similarly

13  complains that the Notice fails to provide any information to enable Class Members

14  to determine whether any erroneous information was included on their credit

15  reports, whether such credit reports were provided to potential creditors, or how

16  such Class Members would obtain such information.  By federal law, consumers

17  denied credit or employment, or charged a higher rate for credit because of a credit

18  report, must be provided an "adverse action" letter by their prospective

19  employer/lender.  15 U.S.C. § 1681m.  *See also* Ulzheimer Decl. ¶ 14.  That is the

20  perfectly reasonable basis for a requiring a Class member's certification of belief

21  that they had been denied a certain type of credit.

22        Further, the *White* Objectors' and other Objectors' complaints regarding the

23  purported lack of information regarding Class size and formula for distributing

24  funds is belied by the plain language explanation that it will depend on the claims

25  response rate and may be as low as a $20 Convenience Award.  *See* Keough Decl.

26  Exh. A, B.  Further, as the *White* Objectors are forced to acknowledge, the Notice's

27  opt-out procedure easily satisfies Rule 23, which states that "the court will exclude

28  from the class any member who requests exclusion," and the Notice will describe

1  the "time and manner" by which class members can request exclusion.  Fed. R. Civ.

2  P. 23(c)(2)(B)(v)-(vi).

3      Moreover, if any Class members were genuinely confused about the

4  Settlement and whether they were entitled to an actual damage award, they could

5  have visited the Web site and/or called the Settlement Administrator.  More than

6  74,000 people did call the toll-free phone number established for the Settlement,

7  with more than 18,600 calls requesting live support.  Keough Decl. ¶ 9.  More than

8  68,100 people visited the Settlement Web site, and more than 1,600 emails were

9  received via the Web site.  *Id.* ¶ 10.  Thus, Class members had numerous resources

10  at their disposal if there was any confusion regarding the certification needed to

11  make an actual damage claim.  Moreover, the Class Notice was approved by this

12  Court when it preliminarily approved the Settlement.  Dkt. 423.

13      The Green Objectors, Sobol Decl. Exh. 2, argue that the Notice fails to

14  provide basic information about the fees that Class Counsel anticipate requesting

15  and does not mention that Class Counsel are also anticipating separate payment

16  from the defendants in connection with the injunctive relief.  In fact, the Long-Form

17  Notice on the Settlement website explicitly states that Class Counsel "will ask the

18  Court for approval of attorneys' fees of no more than 25% of the Settlement Fund

19  and for reimbursement of their costs and expenses in connection with this

20  settlement" and that "Class Counsel and possibly additional counsel will, prior to

21  the approval of this Settlement, be seeking approval of an award of fees and

22  expenses for their efforts in connection with obtaining the injunctive relief

23  settlement referenced above; in a separate, previously negotiated agreement,

24  Defendants have agreed to pay up to six million dollars for the injunctive relief fees

25  and expenses, subject to Court approval.  The amount of injunctive relief fees and

26  expenses approved will in no way reduce the size of the Settlement Fund."  Keough

27  Decl. Exh. B.  The Mail Notice that was sent to more than 15 million potential

28  Class members also indicated that at the final fairness hearing, the Court would

1  consider "a request by the lawyers representing all Class Members for attorneys'

2  fees and costs, for investigating the facts, litigating the case, and negotiating the

3  settlement.  The fees and costs will come out of the settlement fund."  Keough

4  Decl. Exh. A.  Thus, Class members were well-informed about Counsel's request

5  for attorneys' fees.

6         The Green Objectors also argue that Class Counsel do not provide their

7  lodestar in the Notice, but Counsel are not required to do so.  In their fee

8  applications to the Court, Class Counsel provided the Court with their lodestar

9  calculations and all other information the Court would need to decide whether the

10 requested fees are reasonable.  *See* Plaintiffs' Memorandum of Points and

11 Authorities in Support of Motion for Order Granting Application for Attorneys'

12 Fees for Injunctive Relief Settlement ("Injunctive Relief Fees MPA"), Dkt. 575;

13 Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Order

14 Granting Application for Attorneys' Fees for Monetary Relief Settlement

15 (Monetary Relief Fees MPA"), Dkt. 577.  The Court will make a separate ruling on

16 attorneys' fees.

17        The mail Notice does not explain in detail a consumer's rights under the

18 FCRA, but it is not required to do so.  The mail Notice and long form internet Web

19 site notice do detail Class members' rights under this lawsuit, and the Web site has

20 links to the Settlement Agreement and Release and the Order Granting Preliminary

21 Approval to the proposed Settlement, which delineate consumers' rights under this

22 lawsuit.  *See* Keough Decl. Exh. A.  The Notice does not have to list a consumer's

23 rights under the FCRA if they had nothing to do with this lawsuit; if any Class

24 member had specific questions about his or her rights, they were free to contact the

25 Settlement Administrator or Class Counsel.

26        Thus, the Court-approved Notice is clear and straightforward and meets all

27 due process standards for the Settlement.

28

### 3.    The Claim Form Was Adequate and Straightforward.

Objectors also argue that the Claim Form was confusing, vague, or did not provide sufficient information about who can make a claim or what damages can be claimed.[23]  *See* Sobol Decl. Exh. 2.

The Claim Form clearly lays out the two damages options available to Class members who wish to make a claim and the categories of harm for which they can receive an actual damage award, as well as an estimate of the range of award value. This, in conjunction with the Notice, is sufficient information for Class members to make an informed decision about what action they would like to take regarding the Settlement.  Again, Class members also were informed via the Notice that they could contact the Settlement Administrator or visit the Settlement Web site for further information.

The Claim Form details a Class member's rights under the Settlement, alerting all Class members that if they do not choose either of the options for damages on the Forms, they will get nothing from the Settlement and lose their rights to damages based on the practices that are the subject of the Settlement, unless they exercise their right to opt out.  *See* Keough Decl. Exh. A.

### D.    The Allocation of the Monetary Award is Fair and Reasonable.

Objectors assert that the Allocation Plan is confusing, arbitrary, or not comprehensive enough, or that the distribution is unfair, does not include some types of claims, or creates subclasses with inadequate representation or that create conflicts.[24]  *See* Sobol Decl. Exh. 2.  Their assertions are conclusory and do not offer a way in which the Plan could be described more clearly or concisely.

---

[23] Objectors making this argument include Walter Ellingwood III, Glenda Schilleci, Steven Signer, Kenneth Griffin, and Colleen Shinn.

[24] *See, e.g.*, Objections of Lisa Brisbane, Debbie Culleton, Anthony D'Apice, Walter Ellingwood III, Glenda Schilleci, Michael Kennedy, Ivonne Martinez, Brenda Melendez, Steven Signer, Katherine Nemeth, Marcia and Jimmy Green, Vincent Perillo, Kelly and Ralph Porter, Nancy Segarra, Thomas Carder, and Kenneth Griffin and Colleen Shinn.

1.      **The Allocation Plan is Sufficiently Clear.**

The Allocation Plan in the Settlement Agreement outlines the distribution plan, the relief available to Class members, and the manner in which their claims will be processed and verified.

The Settlement is structured to provide relief for all Class members who have had a credit report issued by a Defendant that contained alleged errors regarding debts discharged in bankruptcy.  *See* Settlement Agreement § 7.7.  The Claim Form has a very simple requirement for claimants: they must confirm only that they "*believe* that there have been one or more errors in [their] credit reports regarding debt discharged in bankruptcy" or that they "*believe*" [they] have been damaged by an error in [their] credit reports regarding debts discharged in bankruptcy" with respect to one or more specific types of transactions.  *See* Keough Decl. Exh. A. This simple requirement serves to filter out those who know that their credit reports contain no errors.

Those Class members who *believe* that there have been one or more errors in their credit reports regarding debt discharged in bankruptcy can apply for a "Convenience Damage Award," which will be an equal *pro rata* share of the Available Convenience Damage Award Funds.  Settlement Agreement § 7.7(b)(ii). Those Class members who can certify they merely *believe* they have been *damaged* by an error in their credit reports regarding debt discharged in bankruptcy, with respect to a denial of employment, of a mortgage loan or housing rental, and/or a credit card, auto loan, other credit they applied for, or payment of a discharged debt to obtain credit, can apply for an "Actual Damage Award."  *Id.* § 7.7(c)(i).  *See also* Ulzheimer Decl. ¶ 8; Hendricks Decl. ¶ 12.

The attestations required of Class members are purposefully relaxed, in contrast to the rigorous standard of damages and causation proof otherwise required under the FCRA.  *See e.g., Riley v. Equifax Credit Info. Servs.*, 194 F. Supp. 2d 1239, 1248 (S.D. Ala. 2002) ("The Plaintiffs provide the Court with no evidence,

other than their own affidavit affirming the response brief, that [lender] based its decision on a Trans Union report, or that [lender's] decision turned on a inaccurate information in any report.  Plaintiffs could not possibly have personal knowledge of what [lender] based its decision on, so their affidavit cannot support their linking this denial to a Trans Union report.  Thus, this denial provides no basis for actual damages."); *Heupel v. Trans Union, LLC*, 193 F. Supp. 2d 1234 (N.D. Ala 2002) (no actual damages where denial of credit was based on accurate portion of consumer report, even though other portions were inaccurate).  Even if a Class member is not certain that his or her credit reports contained errors, but believes they may have, he or she can check the box on the claim form and make a claim.  The notice would only exclude those claimants who have knowledge that their credit reports did not contain any errors.  Objectors misrepresent that the Settlement *requires* that Class members have affirmative knowledge of errors on their credit report.  No such requirement exists.  Unlike what some Objectors argue, *see* Sobol Decl. Exh. 2, Class members also do not need to know the extent to which they have been harmed by inaccuracies in their credit reports or the exact amount of the harm suffered, only that they believe they have in fact been harmed.[25]  If they do know the extent of their damages and wish to pursue their own claims, they have the option of excluding themselves from the Settlement.  Settlement Agreement § 5.2; *see also* Ulzheimer Decl. ¶ 13.

In the end, the *White* Objectors attempt to manufacture a disparity between haves and have-nots by making what amounts to a generic attack on the Settlement's claims-made procedure.  The final consequence of the *White* Objectors' logic is that any claims-made Settlement would be *de facto* unfair given that there would always be some risk that a certain number of Class members—for

---

[25] *See* Objections of James and Lisa Brisbane, Priscilla Canoy, Debbie Culleton, Anthony D'Apice, Walter Ellingwood, Christy Driver, Michael Kennedy, Ivonne Martinez, Brenda Melendez, Vincent Perillo, Kelly and Ralph Porter, and Nancy Segarra.

whatever reason—may fail to make a claim.  The *White* Objectors are unable to muster anything to support this proposition, as both of their proffered authorities involve claims-made settlements that—unlike the instant Settlement—involved a "reverter" provision allowing unclaimed funds to return to the Defendant.  *See Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) (rejecting settlement when presence of "reverter" and "clear sailing" provisions in combination with claims-made settlement premised on 100 percent response rate had resulted in distribution of only 13 percent of settlement fund to class members, with remainder going to class counsel or reverting to defendants); *Kakani v. Oracle Corp.*, No. C 06-06493 WHA 2007 WL 1793774, at *1 (N.D. Cal. June 19, 2007) (rejecting claims-made settlement with reverter provision).  Indeed, the *Sylvester* court explicitly cautioned against the result the *White* Objectors urge here (the *de facto* disapproval of any claims-made settlements), observing that the situation before it was a "telling example of how [claims-made settlements, payout caps based on 100 percent response rates, reverter clauses, or clear sailing provisions] can work in concert to produce a settlement that is unfair, inadequate and unreasonable and that in practice yields comparably little value for the Class."  *Sylvester*, 369 F. Supp. 2d at 53.  By contrast, the instant Settlement provides a $45 million fund and *pro rata* adjustment of compensation to ensure that ***all*** settlement funds will accrue to the class and that none will ***ever*** revert to the Defendants' benefit.  Miller Decl. ¶ 35.  *Kakani* and *Sylvester* simply do not compare.

### 2.    The Class Members Are Treated Fairly in Proportion to the Harm They Suffered.

Some Objectors assert that the Settlement treats claimants differently and fails to adequately compensate Class Members for other categories of harm.  *See* Sobol Decl. Exh. 2.

The Settlement addresses the Court's concern, expressed in its Tentative Order Denying Plaintiffs' Motion for Class Certification, that some Class members

1   may not have been harmed by Defendants' credit reporting procedures.  While

2   Class members "would not be required to prove causation or actual damages in

3   order" to obtain statutory damages under the FCRA, as this Court itself held in

4   *Acosta v. TransUnion, LLC*, 240 F.R.D. 564, 579 (C.D. Cal. 2007), the Settlement's

5   claims process allows for Class members who believe they have been harmed by

6   alleged errors in their credit reports to certify the type and approximate date of the

7   harm they suffered.  Settlement Agreement § 7.7(c).  Those Class members who

8   believe they had errors that are presumptively harmful but cannot certify the type of

9   harm will still get a fixed damage award from the Settlement.  *Id.* § 7.7(b).  The

10  parties to this Settlement reasonably agreed to provide a standard, pro-rated

11  payment schedule for claims related to different types of harm suffered in an effort

12  to provide Class members with immediate cash relief that accounts for the impact

13  of the harm suffered and eliminates the burden on Class members of proving

14  individualized damages.  Ulzheimer Decl. ¶ 8; Hendricks Decl. ¶¶ 12-13.  The

15  allocation amounts were not arbitrary but part of a well-thought-out distribution

16  scheme to compensate those who have suffered the most harm.  *Id.*

17      The Actual Damages Award categories are significant because they

18  incorporate the recognition that certain types of damages resulting from errors in

19  credit reports should be compensated at a higher level than others.  Ulzheimer Decl.

20  ¶¶ 8, 15; Hendricks Decl. ¶¶ 12-13.  As a result, a claim regarding a denial of

21  employment is recognized as generally causing more harm than a denial of a

22  mortgage.  *Id.*  Employment equates to income, among other things, and therefore is

23  appropriately valued at the highest award level.  *Id.*  Similarly, a claim regarding a

24  denial of a mortgage is more potentially damaging than a claim regarding a denial

25  of a credit card, auto loan, or other forms of credit.  *Id.*  Home ownership equates to

26  wealth building and a sizable tax deduction, so awarding that type of inquiry the

27  second largest award is proper.  *Id.*  Finally, the value of having a credit card is

28

largely limited to convenience, so assigning that type of inquiry the lowest value is anything but arbitrary. *Id.*

In contrast to Objectors' arguments that the allocation is biased towards those with the least viable damage claims and that the monetary damages for some categories are individuated and difficult to attribute to adverse credit reports[26], *see* Sobol Decl. Exh. 2, the Settlement sets up a claims distribution such that Class members only have to state a belief that they have been harmed. The allocation is not a substitute for actual damage claims, and those who believe they have been harmed at a higher damages level than estimated in the Settlement can exclude themselves and bring their own claim. In addition, as described *supra* at p. 42, federal law requires that consumers denied credit or employment or charged a higher rate must be provided with an adverse action letter. Thus, Class members would know that their denial of a job or credit would be due to errors in their credit reports.

Further, the claim form actually sets up a relaxed reduced standard from what Class members would have to prove if they pursued their own individual FCRA claims. Here, the Class members simply have to attest to a subjective belief that they have been harmed by inaccuracies in their credit reports. If they brought their own FCRA case, they would have to show by a preponderance of competent evidence that they have suffered from a violation of the FCRA. Objectors' argument that the requirements to make a claim here are onerous are clearly unsupported.

Some Objectors also argue that the Settlement is inadequate because Class members receive the same benefit whether they were harmed by one of the Defendants or all three of the Defendants.[27] However, this argument does not demonstrate an understanding of how credit reports are using for lending or

---

[26] *See* Objection of Marcia and Jimmy Green.
[27] These Objectors include Steven Signer and Thomas Carder.

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

1   employment screening.  Ulzheimer Decl. ¶ 16.  When a consumer applies for any

2   type of credit (except a mortgage), the lender or employer pulls only one of their

3   credit reports to make a decision.  *Id.*  If there is an inquiry from the same lender on

4   credit reports from all three credit reporting agencies, it is likely because the

5   consumer applied for different credit benefits at different points in time.  *Id.*  If any

6   inquiries resulted in credit denials, the consumer should have received a notice of

7   adverse action, which would be an incentive for the consumer to challenge any

8   incorrect reporting through a reinvestigation.  *Id.*  After such a reinvestigation,

9   subsequent credit denials would be more likely due to a consumer having bad, but

10  not incorrect, credit files, which would not entitle him to an award in the

11  Settlement.  *Id.*  When a consumer applies for a mortgage loan, the standard

12  practice in the industry is to obtain an inquiry from all three credit reporting

13  agencies on the same day.  *Id.*  In that situation, the consumer was only applying for

14  one mortgage loan – not three – and should therefore only be entitled to one

15  damage award.  *Id.*  And again, if a Class member believes he was denied credit or

16  employment multiple times because of errors in credit reporting regarding debts

17  discharged in bankruptcy, and he believes he can obtain more than the estimated

18  damage awards of the Settlement in an individual action, that Class member has the

19  option of excluding himself from the Settlement.  *Id.*; Settlement Agreement

20  § 5.2(a).

21      Moreover, the Settlement's actual damage allocation does not and cannot

22  provide a remedy for every conceivable type of harm.  The Settlement addresses

23  broad categories of harm that predominantly affect the lives of consumers with

24  post-bankruptcy-discharge inaccuracies in their credit reports.  It is a compromise

25  to provide some compensation for those likely to have been most harmed by

26  Defendants' practices, but does not purport to be an exhaustive compensation

27  scheme.[28]  "The proposed settlement is not to be judged against a hypothetical or

28  ───────────────
[28]  For example, denial of employment or denial of (or an increased rate for) a home

*Footnote continued on next page*

speculative measure of what might have been achieved by the negotiators." *Linney*, 151 F.3d at 1242 (*quoting Officers for Justice*, 688 F.2d at 625).

For example, since a consumer cannot buy insurance regarding a home or car if he is prevented from owning these assets because of an error in his credit report, a claim regarding a denial of insurance for these assets is not considered as significant as the other Actual Damage Award categories and is not provided its own Actual Damage category.  Moreover, credit report data and credit scores are not the primary factor in determining insurance risk or policy holder profitability; consequently, even if a Class member has an insurance inquiry on their credit report, there is no way to conclude that credit had any bearing at all on the insurance company's decision to increase their premium or refuse coverage. Ulzheimer Decl. ¶ 11.  Many insurance companies do not even use credit data or credit scores because of restrictions at the state level.  *Id.*

Nevertheless, any class member not eligible for an Actual Damage Award can still apply for a Convenience Award.[29]  In the four years this case has been litigated, no competing actions were filed and few if any individual cases have been prosecuted.   In contrast, over 700,000 class members filed claims after Class Notice – presumably all of whom were amongst the 99.9%+ portion of the Class that had elected not to file individual actions over that four-year period.  Finally, if any Class member believed they could prove higher damages than the estimates of the award value in the Settlement, they had the option to exclude themselves from the Settlement and pursue their own claim.  Settlement Agreement § 5.2(a).

_____

*Footnote continued from previous page*
mortgage is significantly more harmful than a higher rate for insurance.
[29] In contrast to Objector Signer's argument that millions of Class members would receive no benefit or payment in exchange for the broad release of all claims, *see* Sobol Decl. Exh. 2, all Class members can apply for a Convenience Award. Moreover, it is important to note that Class members obtained the benefit of the Injunctive Relief Settlement, which also benefited future filers of Chapter 7 bankruptcies.  *See* Injunctive Relief Settlement Agreement and Release, Dkt. 289.

1

### 3.        There are No Subclasses.

Objectors argue that the Settlement denies compensation for a reinvestigation class and creates subclasses with different rights and benefits and which cannot be represented by the named Plaintiffs.[30]  However, the Settlement does not create any subclasses and Objectors are attempting to create a typicality problem where there is none.  Though Class members may have different proof of actual damages, under the Settlement all Class members have an equal opportunity to demonstrate their entitlement to a damage award.  All of their rights and remedies are the same and are typical of the 23(b)(3) Class Representatives and other members of the Class.

Under Rule 23's "permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members."  *Hanlon*, 150 F.3d at 1020.  This standard is satisfied when "other members have the same or similar injury," when "the action is based on conduct which is not unique to the named plaintiffs," and when "other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *see also Espinoza v. Domino's Pizza, LLC*, 2009 U.S. Dist. LEXIS 31093, at *24 (C.D. Cal. Feb. 18, 2009) (typicality achieved when each member's claim arises from same course of events and each class member makes similar legal arguments to prove defendant's liability) (internal quotations and citations omitted).  Where, as here, the claims arise from a similar course of conduct and share the same legal theory, factual differences, including differences in the amount of damages, will not defeat typicality.  *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999); *accord Barnes v. American Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998).

Here, the named Plaintiffs and the Class members they represent have suffered substantially the same injury – violation of their statutory right to accuracy

---

[30] These Objectors include Glenda Schilleci, Steven Signer, Lisa Brisbane, Christy Driver, Ivonne Martinez, Brenda Melendez, Kelly and Ralph Porter, and Nancy Segarra.

1    in the reporting of bankruptcy information.  Moreover, some of the named Plaintiffs

2    have initiated reinvestigations themselves.  *See* Declaration of Lee Sherman

3    ("Sherman Decl.") Exh. 1-3.  The conduct precipitating their injuries derives from

4    the same course of conduct that has given rise to the injuries suffered by all other

5    Class members – namely, Defendants' deficient procedures for reporting the status

6    of pre-bankruptcy debt.  Finally, the claims of the named Plaintiffs and those of

7    other Class members are based on the exact same legal theories.  The three

8    categories of harm that have to be certified in order to get an actual damage award

9    do not create different rights or remedies but offer all Class members the same

10   opportunity to make a claim.  Thus, the named Plaintiffs can represent all Class

11   members.

12        The *White* Objectors argue that the named Plaintiffs cannot represent Class

13   members with pre-bankruptcy judgments.  Plaintiffs restricted the Class to

14   consumers whose pre-bankruptcy debts were reported as past due or with a

15   derogatory notation (as opposed to those whose pre-bankruptcy debts were reported

16   to be in good standing).  Objectors' argument could just as well and just as

17   irrationally complain that there be a subclass and representative for each different

18   inaccuracy permutation—a subclass for persons with an inaccurate Wells Fargo

19   tradeline, another for an inaccurate Sears credit card tradeline, another for a person

20   with a credit card showing a charge-off, and still another with a credit card merely

21   showing ninety days late.  If Class members had pre-bankruptcy judgments

22   reported with a derogatory notation, they are well represented by other named

23   Plaintiffs who also had derogatory notations, since the type of derogatory notation

24   does not make a difference in terms of having a pre-bankruptcy debt reported

25   inaccurately and causing harm.  The claims of the named Plaintiffs are typical of all

26   Class members in that regard.

27        Objectors specifically argue that the named Plaintiffs cannot represent

28   consumers who are unaware of the information in their credit reports.  Objectors are

1  asserting that the Settlement should do the impossible and have someone come

2  forward as a subclass representative who does not believe he or she had any errors

3  in their credit reports; that is, they effectively argue that a plaintiff should bring a

4  federal lawsuit when such plaintiff has no knowledge of any basis for such a suit.  If

5  there are no errors in a person's credit report, they are not a member of the Class,

6  and if a person cannot certify that he or she believes there have been errors in their

7  credit reports, he or she would have no reason to come forward in a lawsuit

8  addressing that very problem.

9      The objection that a reinvestigation class is denied compensation in the

10  Settlement also lacks merit and should be overruled.  This case concerns errors in

11  credit reports concerning debt discharged in bankruptcy.  All Class members have a

12  claim for the initial reporting of these errors, and some Class members who

13  complained about them to the credit bureaus may also have a claim for the failure to

14  properly reinvestigate such complaints.  However, the harm suffered in this case by

15  the erroneous initial reporting and the failure to reinvestigate is inseparable.  The

16  injury is exactly the same.  Ulzheimer Decl. ¶ 9.  Initiating a reinvestigation does

17  not mean that a claimant was harmed to a greater extent.[31]  *Id.*  If anything, those

18  class members who did bring a reinvestigation likely significantly reduced the

19  range of harm they would have otherwise suffered in relation to those consumers

20  who did not submit such a dispute.  All Class members, with or without a basis to

21  bring a reinvestigation claim, would seek remedies to: (1) fix the credit report; and

---

22  [31] A reinvestigation claimant would at most have undertaken an effort to call a
   Defendant to lodge a complaint or send a reinvestigation letter.  The *White*

23  Objectors make various efforts at valuing this time.  Stan Smith opines that three
   hours is a conservative estimate of the time involved, and valuing consumer time at

24  $20 per hour, submits that the value of reinvestigation time would total $60.  Dkt.
   554-2, Declaration of Stan V. Smith In Further Support of the White Plaintiffs'

25  Motion for Reconsideration and to Vacate ("Smith Decl.") ¶ 42.  Katherine Porter
   opines that a typical person who has filed for bankruptcy would have to dedicate

26  three to five hours to the investigation process.  *See* Dkt. 557 ¶ 50.  Even assuming
   that these estimations, which appear to based on nothing more than speculation

27  from vaguely detailed "experience," are correct, the *White* Objectors do not (and
   cannot) explain how the allegedly separate reinvestigation injury merits more

28  compensation than the injury to those who suffered an actual denial.

---

(2) be awarded damages for the ensuing harm.  *Id.*  The Settlement here, together with the previous Injunctive Relief Settlement, accomplishes both.  *Id.*  All class members would be adequately compensated in rough proportion to the harm suffered, whether or not they had a reinvestigation claim.

### E.    The Enforcement Mechanisms Are Adequate.

Objector Thomas Carder argues that the enforcement mechanisms of the Settlement are somehow inadequate.  *See* Sobol Decl. Exh. 2.  This criticism is meritless.  The dispute resolution and enforcement procedures are sufficient and will be effective.  The Settlement Agreement provides procedures for disputes between the parties relating to the Agreement.  § 11.6.  Moreover, the Court retains jurisdiction with respect to the implementation and enforcement of the terms of the Settlement Agreement.  § 11.13.

Some Objectors also claim that Class members have no recourse for claims by Class members relating to errors that still appear on their credit reports.[32]  *See* Sobol Decl. Exh. 2.  This Court has already approved the Injunctive Relief Settlement and its enforcement mechanisms.  Dkt. 338.  Through that Settlement, Class members still retain all reinvestigation rights if they find any errors or inaccuracies in Defendants' credit reporting, *see* Injunctive Relief Settlement Agreement and Release, Dkt. 289, § 4.1 and Ulzheimer Decl. ¶ 12, and now have a well-defined set of procedures against which to measure and prosecute a Defendant's future misconduct.

### F.    The Settlement Administration and Oversight Are Adequate.

Objectors Maria Borbon and Walter Ellingwood III argue that there is not adequate oversight of the Settlement Administrator and that the Administrator does not have a financial incentive to process claims efficiently.  Sobol Decl. Exh. 2.  As described above, the Court retains jurisdiction with respect to the implementation

---

[32] *See, e.g.,* objections of Norman Clark, Walter Ellingwood III, Susan Phillips, and Larry Smith.  *See also* statements of Jodi and Robert Ditler.

1    and enforcement of the terms of the Settlement Agreement, which include the

2    Notice and Claims Administration duties of the Settlement Administrator.  For

3    example, the Settlement Administrator has the authority to withhold payment of

4    Actual Damage Award Claims that it believes are fraudulent or otherwise invalid

5    and advise the Court accordingly.  Settlement Agreement § 7.7(b)(i).  In addition,

6    the Settlement Administrator has the discretion to review 1,000 Actual Damage

7    Award Claims, which may include an examination of information in the archived

8    credit files for those Claims to confirm their validity.  *Id.* § 7.7(b)(ii).  The

9    Settlement Administrator is presently working to obtain the credit files for these

10   1,000 claims.  Keough Decl. ¶¶ 15, 17.  The Settlement Administrator has also been

11   in regular contact with counsel for all parties and has provided them with weekly

12   reports on the receipt and processing of the claims.  *Id.* ¶ 16.

13   **G.    Plaintiffs Have Satisfied Rule 23(b)(3)'s Predominance**
14   **       Requirement for All Claims.**

15        In the context of this Settlement, questions common to the Class members

16   predominate over questions affecting only individual Class members, and the class

17   action device provides the best method for the fair and efficient resolution of the

18   Class's claims, thereby satisfying Rule 23(b)(3)'s predominance requirement for all

19   claims.  When addressing the propriety of class certification, the Court should take

20   into account the fact that, in light of the settlement, trial will now be unnecessary,

21   and that the manageability of the Class for trial purposes is not relevant to the

22   Court's inquiry.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997);

23   *Hanlon*, 150 F.3d at 1021-23.

24        A class action is appropriate under 23(b)(3) if "questions of law or fact

25   common to the members of the class predominate over any questions affecting only

26   individual members . . . ."  Fed. R. Civ. P. 23(b)(3).  "When common questions

27   present a significant aspect of the case and they can be resolved for all members of

28   the class in a single adjudication," there is clear justification for class treatment.

1  *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands,*

2  *Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).  Here, as the Settlement is structured,

3  common questions of law and fact overwhelm individual issues.  Thus, the

4  predominance requirement is satisfied.

5          The *White* Objectors argue that certification of Plaintiffs' actual damage

6  claims is improper.  However, Objectors are mistaken – Plaintiffs did not seek an

7  order certifying claims for an actual damage class.[33]  Though Plaintiffs negotiated

8  an Injunctive Relief Settlement that dealt with the core liability issue underlying

9  actual damage claims – namely, whether Defendants' procedures for reporting the

10  status of pre-bankruptcy debts were reasonable to assure maximum possible

11  accuracy – Plaintiffs are not attempting to certify an actual damages class.  Those

12  who wish to pursue unusually large or extraordinary actual damages claims have

13  the option to opt out and litigate their claims independently.  This preserves Class

14  members' due process rights, and is consistent with the Supreme Court's decision

15  in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and the Ninth Circuit's decision

16  in *Brown v. Ticor Title Ins. Co.*, which explains that due process requires an

17  opportunity to opt out of significant monetary relief.  *Ortiz*, 527 U.S. at 846-48;

18  *Brown*, 982 F.2d 386 (9th Cir. 1992).  Because the Settlement allows people who

19  wish to pursue actual damage claims the option of excluding themselves from the

20  Settlement, the Settlement does include a release of all actual damages claims to

21  cover all possible liability for Defendants.  This practice is common in class action

22  Settlements and has been approved by numerous district courts.  *See*, *e.g.*, *Whitford*

23  *v. First Nationwide Bank*, 147 F.R.D. 135, 142-143 (W.D. Ky. 1992) (approving

24  settlement release of "any and all claims for any and all types of damages" over

25  [33] This point is confirmed by the *White/Hernandez* Plaintiffs' Closing
Memorandum in Support of Plaintiffs' Motion for Class Certification.  Dkt. 321.

26  There, Plaintiffs assert that they "are not pursuing certification of the actual
damages issue itself" and that "the vast majority of class members do not stand to

27  lose anything as a result of Plaintiffs' decision to forego seeking certification of the
actual damages issue, and the tiny minority who do may always 'opt out and litigate

28  independently.'"  *Id.* at 24.

1  objection that potential recovery would be much greater if acts of defendant were

2  proved to be intentional, and concluding that a "settlement may properly prevent

3  class members from subsequently asserting claims relying upon a legal theory

4  different from that relied upon in the class action complaint, but depending upon

5  the very same set of facts" and that "[i]t is common for a class action settlement

6  agreement to contain a release of "any and all related civil claims the plaintiffs had

7  against the settling defendant[] based on the same facts") (internal citations

8  omitted); *Turner v. Gen. Elec. Co.*, 2006 WL 2620275, at *6-7 (M.D. Fla. Sep. 13,

9  2006) (approving broad release of all damages claims where class members had

10 opportunity to opt out); *Smith v. Sprint Commc'ns Co.*, 2003 WL 103010, at *1-2

11 (N.D. Ill. Jan. 10, 2003) (same); *In re Gen. Amer. Life Ins. Co. Sales Practices*

12 *Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) (rejecting argument that settlement

13 unfairly gave up particular claims for nothing); *Curtis-Bauer v. Morgan Stanley &*

14 *Co., Inc.*, 2008 WL 4667090, at *9 (N.D. Cal. Oct. 22 2008) (approving broad

15 release of claims over objections).  Nevertheless, this does not mean, as Objectors

16 argue, that Plaintiffs sought an order certifying actual damage claims.

17    **H.    The 23(b)(3) Settlement Class Counsel Are Adequate.**

18       Counsel for *White* Objectors have asserted supposed conflicts of interest

19 based upon purported unethical conduct by Class Counsel.  However, Class

20 Counsel have at all times acted in a manner consistent with their obligations to both

21 the Class and their clients and have done nothing to prejudice any Objectors' claims

22 or rights in this case.  *See* Declaration of Geoffrey C. Hazard, Jr. ("Hazard Decl.")

23 ¶¶ 4-12; Miller Decl. ¶¶ 75-82.  Objectors' assertions of impropriety are completely

24 frivolous.  Hazard Decl. ¶¶ 8, 12; Miller Decl. ¶ 75.

25       The *White* and *Hernandez* claims were consolidated for all purposes, and

26 thereafter counsel for all Plaintiffs worked cooperatively in this litigation for some

27 time.  The *White/Hernandez* counsel entered into a Joint Prosecution Agreement,

28 established a five member executive committee, and designated as co-lead counsel

Michael Caddell and Michael Sobol.  Among other things, Plaintiffs' counsel worked together to negotiate the injunctive relief settlement which this Court previously approved.  Plaintiffs' counsel also worked cooperatively for many months negotiating for a monetary relief Settlement.  *See* Sobol Decl. ¶ 14.

On February 5, 2009, after the Court issued its Tentative Order denying class certification, the parties held a Court-ordered mediation, the parties' twelfth mediation regarding the monetary relief portion of this case.  *See id.* ¶ 3; Order Granting Motion to Withdraw (Dkt. No. 453) at 2.[34]  Both Class Counsel and counsel for the *White* (now Objecting) Plaintiffs were in attendance.  At the mediation, Class Counsel and Defendants agreed on the essential terms of a monetary relief Settlement, including the gross amount of the monetary payment (but not how the Settlement funds would be distributed to the class), which they reported to the Court the same day.  *See* Sobol Decl. ¶¶ 3, 15; Dkt. No. 453 at 2. The very next day, Class Counsel sent a letter to all Plaintiffs, informing them of the terms agreed to at the mediation.  *See* Sobol Decl. ¶ 4; Dkt. No. 453 at 2-3.

The *White* Objectors' counsel were dissatisfied with the terms that were reached at the mediation.  In particular, they believed that the amount of the monetary consideration was insufficient.  Though they did not object when the essential Settlement terms were presented to the Court on February 5, 2009,[35] they eventually set out to gain exclusive control of this litigation and to keep the Settlement from going forward.

Beginning in early March 2009, the *White* Objectors' counsel started trying to manufacture a false conflict of interest between Class Counsel and the *White* Plaintiffs.  Without prior notice to their co-counsel, including the National Consumer Law Center and Lieff Cabraser, the *White* Objectors' counsel apparently

---

[34] Many of the facts regarding these issues have already been the subject of factual findings by the Court.  *See* Dkt. No. 453.
[35] *See* Dkt. No. 453 at 2.

1   contacted these Plaintiffs *ex parte* and poisoned them against the Settlement.  They

2   then began demanding that Class Counsel withdraw from the case and discontinue

3   their support of the Settlement.  *See* Sobol Decl. ¶ 6.  Moreover, they sent letters to

4   Class Counsel claiming that the *White* Plaintiffs had rejected the Settlement, even

5   though the allocation terms were still being negotiated.  *See id*.  As Class Counsel

6   were not obligated to take instructions from their co-counsel without first

7   discussing it with the *White* Plaintiffs themselves, and given that Plaintiffs could

8   not yet make a fully-informed decision regarding whether to support the Settlement,

9   Class Counsel responded that they intended to communicate and review the final

10   Settlement terms with all of the Plaintiffs, and suggested a meeting with all

11   Plaintiffs once the terms were finalized.  *See id*. ¶¶ 6, 8.  Class Counsel invited the

12   *White* Objectors' counsel to continue to participate in negotiations, but they refused.

13   *See id*. ¶ 8; Dkt. No. 453 at 3.

14       On April 9, 2009, Class Counsel heard directly from the *White* Plaintiffs for

15   the first time, receiving form letters apparently prepared at Mr. Juntikka's office.

16   *See* Sobol Decl. ¶ 9; Dkt. No. 453 at 3.  Class Counsel promptly responded the next

17   day by expediting scheduling the meeting with the *White* Plaintiffs to discuss the

18   anticipated final Settlement terms.  *See ibid*.  On April 16, 2009, one week after

19   Class Counsel heard from the *White* Plaintiffs, they met with two of the *White*

20   Plaintiffs (those whom they were able to contact), as well as Messrs. Wolf and

21   Juntikka, to review a near-final draft of the Settlement.  *See* Sobol Decl. ¶ 10; Dkt.

22   No. 453 at 3.[36]

23       Class Counsel presented all of the Plaintiffs the final Settlement terms for

24   their consideration on April 24, 2009.  *See* Sobol Decl. ¶ 12; Dkt. No. 453 at 4.

25   Within two days, the *White* Plaintiffs stated their objections to the Settlement and

26   _____

27   [36] Class Counsel tried repeatedly to meet and speak with the other three *White* Plaintiffs about the Settlement.  They were able to speak with one by phone, but, despite their extensive efforts, were unable to connect with the other two.  *See*

28   Sobol Decl. ¶ 11.

1  provided their express, written consent for Class Counsel to withdraw as their

2  counsel.  *See* Sobol Decl. ¶ 13.  Class Counsel promptly filed withdrawal notices

3  with the Court, beginning on April 29, 2009.[37]  Class Counsel and Defendants

4  submitted the Settlement to the Court for preliminary approval, which the Court

5  granted on May 7, 2009.  *See* Dkt. No. 423.

6        Since then, the *White* Objectors' counsel have remained focused on forcing

7  out Class Counsel and taking control of this Litigation—ostensibly to try to

8  negotiate a larger monetary payment to the class.  They have tried just about every

9  conceivable angle, argument, and litigation tactic to get what they want.  Their

10  baseless assertions of misconduct by Class Counsel ignore both reality and well-

11  settled class jurisprudence, and are nothing more than another misguided attempt to

12  take over this case.

13      **I.      Class Counsel Have Fulfilled Their Role as Fiduciary.**

14        As this Court has recognized, it is well settled as a matter of class action

15  jurisprudence that "class counsel has a duty to do what is in the best interests of the

16  class, even if some class representatives disagree."  Dkt. No. 423 at 24-25[38]; *see*

17  *also* Hazard Decl. ¶¶ 4, 10-12; Miller Decl. ¶¶ 75-76.  Contrary to the *White*

18  Objectors' assertion, this special duty to the Class exists both prior to and after

19  class certification.  *See* Miller Decl. ¶ 80; *Fleury*, 2008 U.S. Dist. LEXIS 64521, at

20  *44; *Jones v. Casey's General Stores*, 517 F. Supp. 2d 1080, 1084 (S.D. Iowa

21  2007); *Schick v. Berg*, 2004 WL 856298, at *6 (S.D.N.Y. Apr. 20, 2004).  Courts

---

[37] Objectors argue that Class Counsel remained counsel for the *White* Plaintiffs until July 29, 2009, the date of the Court's order granting Class Counsel's application to withdraw.  *See* Objection at 17.  However, the Court's July 29, 2009 Order expressly states that Class Counsel's application to withdraw was granted "effective as to April 29, 2009."  *See* Dkt. No. 453 at 6.

[38] Citing *Officers for Justice*, 688 F.2d at 631; *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982); *Kincade v. Gen. Tire and Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981); *Maywalt v. Parker & Parsley Petroleum Co.*, 864 F. Supp. at 1430, *aff'd*, 67 F.3d 1072 (2d Cir. 1995); *Rodriguez v. West Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74849, at *49-50 (C.D. Cal. Sep. 10, 2007); *Fleury v. Richemont North America, Inc.*, 2008 U.S. Dist. LEXIS 64521, at *44 (N.D. Cal. July 3, 2008)); *see also* Dkt. No. 423 at 25, n.8 (citing additional cases)

have consistently recognized that no individual plaintiff(s) hold a "pocket veto" over the interests of the Class. *See, e.g., Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982); *Maywalt v. Parker & Parsley Petroleum*, 864 F. Supp. 1422, 1430 (S.D.N.Y. 1994).

Where, as here, named plaintiffs in a class action oppose a Class Settlement, but Class Counsel believes the Settlement is in the Class's best interests, Class Counsel should not be disqualified merely because they represented the objecting named plaintiffs. *See Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 589 (3d Cir. 1999) ("If, by applying the usual rules on attorney-client relations, class counsel could easily be disqualified in these cases, not only would the objectors enjoy great 'leverage,' but many fair and reasonable settlements would be undermined by the need to find substitute counsel after months or even years of fruitful settlement negotiations."); *In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 18-19 (2d Cir. 1986) ("[W]hen an action has continued over the course of many years, the prospect of having those most familiar with its course and status be automatically disqualified whenever class members have conflicting interests would substantially diminish the efficacy of class actions as a method of dispute resolution."). Indeed, it is incumbent upon Class Counsel in such circumstances to pursue the Settlement for the benefit of the Class. *See* Miller Decl. ¶ 76.

The *White* Objectors and their counsel are trying to exercise a "pocket veto" here. Their position is that when Class Counsel had any indication that the *White* Plaintiffs might oppose the Settlement, they were rendered completely incapacitated from fulfilling their duties towards the Class while the *White* Plaintiffs considered exercising their "pocket veto" over the Class's interests. Even now, after Class Counsel properly resisted their calls for them to withdraw from the case and discontinue pursuing the Settlement, the *White* Objectors are trying to disqualify Class Counsel on contrived ethics grounds, the goal of course being to leave only the *White* Objectors and their counsel standing to control this litigation.

1   As set forth above, Class Counsel was not only *allowed* to continue to pursue the

2   Settlement despite the *White* Plaintiffs' objections, they were ethically *obligated* to

3   do so. *See* Hazard Decl. ¶¶ 8, 11-12; Miller Decl. ¶ 76. The *White* Objectors'

4   argument that Class Counsel should be disqualified for their ongoing support of the

5   Settlement is thus completely without merit. *See Lazy Oil Co.*, 166 F.3d at 589; *In*

6   *re "Agent Orange"*, 800 F.2d at 18-19.[39]

7        The *White* Objectors argue, in essence, that Class Counsel should have

8   withdrawn as their counsel a few weeks earlier than they did, and that their efforts

9   to advance the Settlement in March and April 2009, before Class Counsel were able

10  to effectuate their withdrawal as counsel for the *White* Plaintiffs, demonstrate an

11  impermissible conflict of interests. This "gotcha" argument has no merit

12  whatsoever. *See* Hazard Decl. ¶ 8; Miller Decl. ¶ 75. First, it cannot reasonably be

13  disputed that Class Counsel promptly withdrew as the *White* Plaintiffs' counsel

14  when they objected to the Settlement and provided the necessary consents. *See*

15  Sobol Decl. ¶¶ 13-14.[40] Second, Class Counsel did absolutely nothing during

16  [39] None of the cases that the *White* Objectors cite are even remotely applicable to

17  the situation here. *Moreno v. Autozone, Inc.*, 2007 U.S. Dist. LEXIS 98250 (N.D. Cal. Dec. 5, 2007), involved the very different situation of counsel's concurrent

18  representation of clients with conflicting interests in two separate lawsuits without written consent. The *Moreno* court expressly distinguished the situation there from

19  the type of situation that arises here. *See id*. at *20 ("[t]he circumstances here are distinguishable from these cases, which involve counsel that first represented the

20  class, and then had sought to represent only portion of the class, once various class members newly took adverse positions"). The *White* Objectors' attempt to

21  analogize this case to *Moreno* ignores the facts that Class Counsel promptly withdrew as counsel for the *White* Plaintiffs when they objected to the Settlement,

22  and did nothing between February 5, 2009—when the parties announced the agreement in principle to the Court—and their withdrawal as counsel for the *White*

23  Plaintiffs in late April 2009 but finalize and memorialize the Settlement for all parties consideration. The *White* Objectors' assertion that Class Counsel

24  "simultaneously represented clients with conflicting interests" is thus completely wrong.

25  Similarly, none of the other cases cited by the *White* Objectors support the notion that Class Counsel should have ignored the interests of the Class at the whim of the

26  few objecting *White* Plaintiffs. At most, they suggest the proper course was for Class Counsel to withdraw as counsel for the *White* Plaintiffs and continue to

27  support the Settlement on behalf of their remaining clients and the Class, which is exactly what Class Counsel did.

28  [40] The *White* Objectors present a skewed version of the facts that, among other

*Footnote continued on next page*

March and April 2009 that was against the interests of the *White* Plaintiffs. Indeed,

the case was effectively stayed as soon as the parties informed the Court regarding

the settlement on February 5, 2009, and the only action that Class Counsel took

thereafter was to finalize and memorialize the Settlement for all parties'

consideration. Whether Class Counsel withdrew in March or April 2009 is of no

consequence to the *White* Objectors because: (a) the *White* Objectors had other

counsel representing them the entire time; (b) Class Counsel, if they had withdrawn

earlier, still would have been compelled to take the same course of action to fulfill

their duties to the Settling Plaintiffs[41] and the class; (c) the *White* Objectors retain

the right to object to the Settlement at final approval; and (d) the *White* Objectors

retained the right under the Settlement to opt-out of the Settlement altogether.[42]

---

*Footnote continued from previous page*

things, ignores that the Court has already made substantial factual findings regarding this issue. *See* Dkt. No. 453.

[41] The *White* Objectors argue that one of the Settling Plaintiffs' Counsel, Lieff Cabraser, does not represent Settling Plaintiff Jose Hernandez. However, this Court has already properly held that Lieff Cabraser does represent Mr. Hernandez:

> "at all times relevant, all the *White and Hernandez* claims were, by agreement, consolidated in a single complaint….Working in cooperation, the *White* **and** *Hernandez* counsel did in fact appear on behalf of *all* of the plaintiffs….Lieff Cabraser and its attorneys have long been appearing for plaintiff Jose Hernandez….[A]ll of Class Counsel…have represented the interests of the *White* and *Hernandez* plaintiffs, by signing pleadings and making court appearances on their behalf and by defending them in depositions…As the Court docket reveals, Lieff Cabraser has in fact appeared for Jose Hernandez by virtue of signing and filing pleadings on his behalf and appearing for him at Court hearings."

Dkt. No. 453 at 4-5 & nn.2-3. The *White* Objectors' reliance on the joint representation agreement in arguing that Lieff Cabraser does not represent Mr. Hernandez is misplaced. That agreement predates the consolidation of the cases and the clear representation in fact of Mr. Hernandez by Lieff Cabraser and the other Class Counsel. *See Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1505 (9th Cir. 1993) (citing *Hecht v. Superior Ct.*, 237 Cal. Rptr. 528, 531 (Cal. Ct. App. 1987)) (need to look at the intent and conduct of the parties to determine whether there was an attorney-client relationship). Moreover, even if they did not previously represent Jose Hernandez, Lieff Cabraser is free to begin representing him or to find a new class representative to represent, and can properly serve as Class Counsel in this case. *See Fleury*, 2008 U.S. Dist. LEXIS 64521, at *43-45 (proper for class counsel to find new class representatives to replace plaintiff opposing proposed class settlement).

[42] Indeed, by continuing to pursue the Settlement, Class Counsel merely helped to create an option for the *White* Objectors for resolving their claims, which they were

*Footnote continued on next page*

1   *See Lazy Oil*, 166 F.3d at 590 (no disqualification absent prejudice); *In re "Agent*

2   *Orange"*, 800 F.2d at 18-19 (same); *Moreno*, 2007 U.S. Dist. LEXIS 98250, at

3   *12.[43]

4   **J.      Class Counsel Acted Properly With Respect to the Service**
         **Awards.**

5

6        The Settlement provides that Class Counsel will seek a service award of

7   $5,000 for each appointed Class Representative.  Such awards are "fairly typical in

8   class action cases" to compensate class representatives for their time and effort.

9   *Rodriguez*, 563 F.3d 958; *see also, e.g., In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d

10  454, 463 (9th Cir. 2000); *Stevens v. Safeway, Inc.*, 2008 U.S. Dist. LEXIS 17119

11  (C.D. Cal. 2008).  Plaintiffs who object to a class settlement, like the *White*

12  Objectors here, are not entitled to a service award for their unsuccessful efforts

13  opposing the settlement.  *See Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp.

14  2d 242, 277-279 (E.D.N.Y. 2009).  Thus, it is appropriate that the Settlement here

15  does not provide for service awards for objecting plaintiffs.  *See* Miller Decl. ¶ 77.

16       Objectors argue that Class Counsel improperly dangled the awards before the

17  *White* Plaintiffs to try to entice them to change their minds and support the

18  Settlement.  That is absolutely false.  To the contrary, Class Counsel acted properly

19  at all turns with respect to the service awards.  Miller Decl. ¶ 78.  On February 6,

20  2009, Class Counsel informed Plaintiffs about the essential terms of the Settlement

21  _____

*Footnote continued from previous page*

22  completely free to accept or reject.

[43] No doubt recognizing the lack of prejudice, the *White* Objectors attempt to pull a

23  fast one on the Court, arguing that no showing of prejudice is required to justify the
    disqualification of Class Counsel here.  *See* Objection at 21-22.  To support this

24  argument, the *White* Objectors cite cases involving completely different and
    inapplicable dual representation situations.  *See Moreno*, 2007 U.S. Dist LEXIS

25  98250 at *8-14 (counsel represented clients in different actions who had divergent
    interests); *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354 (9th

26  Cir. 1998) (plaintiff's counsel had represented division of defendant for six years in
    other matters); *Certain Underwriters at Lloyd's of London v. Argonaut Ins. Co.*,

27  264 F. Supp. 2d 914, 919 (N.D. Cal. 2003) (counsel concurrently represented
    plaintiff in one action and defendant in another).  The *White* Objectors' attempt to

28  apply automatic disqualification to this case borders on the frivolous.

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
                                                               FINAL APPROVAL OF CLASS ACTION SETTLEMENT
                                                               CASE NO. 05-CV-1070 DOC (MLGX)

presented to the Court the previous day, expressly mentioning the service award provision. *See* Sobol Decl. ¶ 4.[44]  To mitigate against the possibility that Plaintiffs might consider the award in deciding whether to support the Settlement, Class Counsel expressly instructed them that the presence of any potential service award "should absolutely not be a reason for you to support the settlement." *See* Sobol Decl. ¶ 10.  Out of an abundance of caution, this admonition was repeated to the *White* Plaintiffs present at the April 16, 2009 in-person meeting, where Class Counsel made sure the *White* Plaintiffs had other counsel present. *See* Declaration of Charles Juntikka, Dkt. 431-5 ("Mr. Sobol said that the [*White* Plaintiffs] 'should not consider the $5000' [service award] in making their decision.").[45]  The fact is that Class Counsel had absolutely no reason to entice support from the *White* Plaintiffs through unethical means.  Miller Decl. ¶ 78.  As this Court has previously held, "[t]he Ninth Circuit does not require that all named plaintiffs agree with a settlement in order for it to be approved."  Dkt. No. 423 at 24 (citing *Officers for Justice*, 688 F.2d at 631).[46]

The *White* Objectors also imply that Class Counsel acted improperly by not seeking service awards for them.  Class Counsel sought service awards for the *White* Plaintiffs for their efforts in connection with the injunctive relief settlement, which all parties supported.  To the extent they may be entitled to some award for their constructive efforts in connection with the monetary Settlement, the *White* Objectors remain free to seek additional compensation for their contributions.

---

[44] As their counsel, Class Counsel had a duty to inform the *White* Plaintiffs of this provision.  Miller Decl. ¶ 78.

[45] The *White* Objectors fail to cite a single fact that supports their charge of misconduct.  The only fact that they do cite is a statement that one of the Class Counsel allegedly made to one of the *White* Plaintiffs that if he objected to the Settlement, he would not be designated as a class representative and thus Class Counsel would not be requesting a service award for him.  That statement was not a threat, as the *White* Objectors assert, but rather was an accurate description of the Settlement's terms provided by an attorney to his client.

[46] *See also, e.g., Parker*, 667 F.2d at 1211 (affirming approval of class settlement opposed by ten of eleven named plaintiffs); *Lazy Oil*, 95 F. Supp. 2d at 333-336 (citing cases and approving settlement where three of four plaintiffs objected).

1  However, they fail to cite any authority for the proposition that Settling Plaintiffs or

2  Class Counsel have an obligation to seek such awards for them, particularly given

3  that they have been represented by other counsel at all times in this litigation (and

4  still are).[47]  *See* Miller Decl. ¶ 77.

5       The *White* Objectors' reliance on *Rodriguez*, 563 F.3d 948, is misplaced.  In

6  *Rodriguez*, counsel's original retainer agreement with class representatives included

7  "incentive agreements," pursuant to which counsel promised to seek awards for the

8  class representatives in an amount proportional to the recovery.  *See id*. at 959.

9  These agreements were not disclosed at preliminary approval.  The court found that

10 these "incentive agreements" created potential conflicts, but nevertheless affirmed

11 the approval of the proposed settlement, finding, *inter alia*, that the class was

12 represented by adequate class counsel.  *See id*. at 959-961.  Here, the request for

13 service awards was disclosed to the Court at preliminary approval and to the Class

14 through the Court-approved Notice.  Moreover, the request here is not being made,

15 as was the case in *Rodriguez*, pursuant to some pre-existing agreement, nor are the

16 requested awards tied to the amount of the recovery.  Rather, the awards here are

17 the type that are "normal and appropriate,"[48] in that they are "sought after a

18 settlement . . . has been achieved" and are "intended to compensate class

19 representatives for work done on behalf of the class."  *Id*. at 958-959

20 (distinguishing the unusual "incentive agreements" in that case from the type of

21

22 _____

23 [47] None of the cases cited by the *White* Objectors support such a suggestion.  In
   *Lazy Oil*, 95 F. Supp. 2d at 324-25, the court awarded service awards to objecting
   plaintiffs pursuant to objecting plaintiffs' own separate motion, which class counsel
24 opposed, based on testimony and other evidence regarding their specific expenses
   and contributions.  In *Martin v. Foster Wheeler Energy Corp*., 2008 WL 906472, at
25 * 9 (M.D. Pa. Mar. 31, 2008), after a class settlement was approved, objecting
   plaintiffs, along with the other plaintiff, successfully moved the court for service
26 awards based on their contributions.  The other cases the *White* Objectors cite
   involved the entirely different question of when non-objecting class members who
27 participate (*e.g.*, by being deposed) can receive service awards.  *See* Objections at
   14, n.8.
28 [48]  See Miller Decl. ¶ 81.

1    incentive award requests at issue here).[49]

2    ### K.    Class Counsel Acted Properly With Respect to Attorneys' Fees.

3    By separate motions, Class Counsel has moved the Court for an award of

4    attorneys' fees and costs for work performed in connection with the injunctive

5    relief and monetary relief settlements, respectively.  *See* Dkt. Nos. 573 and 576.  As

6    for the injunctive relief settlement, Counsel seeks an award for the work that all

7    Plaintiffs' counsel—including the *White* Objectors' counsel—performed in

8    connection with that part of the litigation.[50]

9    The Court will rule on whether and to what extent the *White* Objectors'

10   Counsel are entitled to recover for their work in connection with the monetary relief

11   Settlement in a separate Order.  Nevertheless, Class Counsel have done absolutely

12   nothing to prevent or discourage the *White* Objectors' counsel from seeking any

13   fees they may be legitimately entitled to for their work in connection with the

14   monetary relief Settlement.  The *White* Objectors' assertion of misconduct in this

15   respect is thus completely without merit.  Indeed, the *White* Objectors' counsel

16   have moved the Court for an award regarding the portion of the Court-awarded fees

17   and costs they seek for their work in connection with the Settlement.  *See* Statement

18   of Daniel Wolf and Charles Juntikka Regarding Rights to Attorneys' Fees in

19   Connection with Injunctive Relief Settlement, Dkt. 572.  The Court will make a

20   separate ruling on fee applications from all counsel.

21   ### L.    Class Counsel Appropriately Consulted With the *White* Plaintiffs.

22   As the factual record demonstrates, Class Counsel have dutifully consulted

23   ───────────────

[49] Equally misplaced is Objection Plaintiffs' reliance on *In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257 (N.D. Cal. 1996), and other cases recognizing the importance of class representatives being able to independently monitor class actions.  The *White* Objectors' argument that the *White* Plaintiffs' independence has been compromised is based entirely on the unsubstantiated false assertion that Class Counsel held their potential service awards "hostage to their support of the Settlement."

[50] Any suggestion that the *White* Objectors' counsel risk recovering nothing for their work in this case due to their (or their clients') opposition to the monetary relief Settlement is therefore false.

1  with the *White* Plaintiffs and other Plaintiffs in this litigation,[51] making the *White*

2  Objectors' assertion to the contrary particularly curious.  The *White* Objectors argue

3  that Class Counsel failed to properly consult with them regarding monetary terms,

4  but the very next day after the parties reached an agreement on the overall monetary

5  payment amount, Class Counsel provided that information to Plaintiffs.  *See* Sobol

6  Decl. ¶ 4.  Moreover, when agreement was reached regarding allocation, the final

7  agreement was promptly provided to Plaintiffs for their consideration.  *See id*. ¶

8  12.[52]  The *White* Objectors' suggestion that Class Counsel were required to get

9  approval from Plaintiffs at every step of the way throughout the extensive

10  settlement process is simply incorrect, and ignores both the role that Class Counsel

11  plays in a class action and their overriding duty to do what is in the best interests of

12  the Class:

13      "Because the 'client' in a class action consists of numerous unnamed class

14      members as well as the representatives," and because the class itself "often

15      speaks in several voices," it "may be impossible for the class attorney to do

16      more than act in what he believes to be the best interest of the class as a

17      whole."  *Parker v. Anderson*, 667 F.2d 1204, 1211-12 (5th Cir. 1982).

18      Accordingly, courts have rejected objections involving the extent and nature

19      of class members' involvement in the settlement process.  *See Anderson v.*

20      *Torrington Co.*, 755 F. Supp. 834, 837 (N.D. Ind. 1991) (because counsel

21      were not required to, and indeed could not, remain in constant

22      communication with the class, certain "objections based on the extent and

23      manner of contact between counsel and class" were not "well-taken.").

24  *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 703-704 (E.D. Mo. 2002); *see*

---

25  [51] *See* section VI.H., *supra*.

26  [52] In sharp contrast to this case, the cases that the *White* Objectors cite involved the failure of counsel to communicate the terms of settlement offers received and actual

27  settlements to their clients.  *See Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421, 427-428 (E.D. La. 1997); *Deadwyler v. Volkswagen of Am., Inc.*, 134 F.R.D.

28  128, 139 (W.D. N.C. 1991).

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

1   *also Kincade,* 635 F.2d at 508 (class counsel authorized to negotiate settlement on

2   behalf of class); *Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494, 497

3   (S.D.N.Y 1994) (rejecting argument that "the perceived inadequacy of

4   communication" between class counsel and objecting plaintiffs warranted

5   disqualification).

6       The *White* Objectors' other arguments fare no better.  Their assertion that

7   Class Counsel "ignored" their direction to not pursue the Settlement and refused to

8   communicate with them regarding the Settlement terms are absolutely false.  As

9   discussed in detail above, Class Counsel responded appropriately to the *White*

10  Plaintiffs' opposition, declining to put their interests ahead of those of the class and

11  promptly withdrawing as their counsel.  Moreover, Class Counsel scheduled an in-

12  person meeting with the *White* Plaintiffs as soon as they heard from them to discuss

13  the terms of the Settlement, and further made extensive efforts to communicate with

14  the three *White* Plaintiffs who were unable to attend the in-person meeting.  *See*

15  Sobol Decl. ¶¶ 10-11.

16      Finally, as discussed above, the *White* Objectors' assertion that Lieff

17  Cabraser has not represented Plaintiff Hernandez is wrong and, even if true, would

18  have no bearing on whether Lieff Cabraser can represent Mr. Hernandez or the

19  class now.  *See supra* at pp. 59-60.

20      **M.    The 23(b)(3) Settlement Class Representatives Are Adequate.**

21      Objectors argue that the class representatives are inadequate and that the

22  incentive fee award is unjustified and excessive.[53]  Whether the class

23  representatives can fairly and adequately protect the interests of the Class turns on

24  just two questions:  "(1) [d]o the representative plaintiffs and their counsel have any

25  conflicts of interest with other class members, and (2) will the representative

26  plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

27  [53] *See*, *e.g.*, Objections of Steven Signer, Glenda Schilleci, Lisa Brisbane, Christy
    Driver, Ivonne Martinez, Brenda Melendez, Kelly and Ralph Porter, and Nancy
28  Segarra.

1    *Staton*, 327 F.3d at 957; *see also Hanlon*, 150 F.3d at 1020.  "The burden is on the

2    defendant[] to demonstrate that the representation will be inadequate."  *Johns v.*

3    *Rozet*, 141 F.R.D. 211, 217 (D.D.C. 1992); *see also Lewis v. Curtis*, 671 F.2d 779,

4    788 (3d Cir. 1982); *Trautz v. Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994).

5         Both components of the "adequacy" test are met here.  First, Plaintiffs do not

6    have any interests antagonistic to those of the 23(b)(3) Class and are prepared to

7    pursue this Litigation vigorously to redress the wrongs Defendants have

8    perpetrated.  The Plaintiffs and Class members share an identical interest in

9    establishing Defendants' liability for failing to employ reasonable reporting

10   procedures to assure maximum possible accuracy in their reporting of pre-

11   bankruptcy debts.  To establish liability, all members of the Class seek the same

12   findings on the common questions of law and fact.  Like the members of the Class

13   they seek to represent, the named Plaintiffs have been adversely affected by

14   Defendants' alleged unlawful reporting procedures and have every incentive to

15   vigorously pursue their claims.

16        The Settlement Agreement provides for $5,000 incentive awards for the

17   Named Plaintiffs as Class Representatives in recognition of their service to and

18   efforts on behalf of the Class.  *Id.* § 7.5.  These incentive awards are in addition to

19   the relief the class representatives will be entitled to under the terms of the

20   Settlement.  Throughout the Litigation, these Class Representatives have

21   participated in discovery, including extensive and probing depositions and

22   responding to interrogatories and requests for production of documents.  They all

23   were kept informed of the Litigation as it developed and all were kept abreast of,

24   and signed off on, the Settlement.

25        Enhancement awards like the ones requested here are appropriate.  Miller

26   Decl. ¶ 81.  Unlike unnamed Class members, who will enjoy the benefits of the

27   Representatives' efforts without taking any personal action, the named Class

28   Representatives made themselves available as witnesses at deposition and subjected

1    themselves to all the obligations of named parties, including participating in

2    discovery and following the Litigation.  Small incentive awards, which serve as

3    premiums in addition to any claims-based recovery from the settlement, promote

4    the public policy of encouraging individuals to undertake the responsibility of

5    representative lawsuits.  *See*, *e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at

6    463; *Staton*, 327 F.3d at 977; *Stevens*, 2008 U.S. Dist. LEXIS 17119; *see also*

7    *Manual for Complex Litig.*, § 21.62 n. 971 (4th ed. 2004) (incentive awards may be

8    "merited for time spent meeting with class members, monitoring cases, or

9    responding to discovery").

10       Objectors' argument that incentive awards were dangled before them to

11   entice them to accept the settlement is false, and no further discovery is needed on

12   this issue, as it has already been extensively briefed before this Court and the Ninth

13   Circuit.  On February 6, 2009, the day after the parties announced the 23(b)(3)

14   Settlement to the Court, the *White* Objectors were informed in writing of the terms

15   of the settlement by one of the Settling Plaintiffs' counsel.  The *White* Objectors

16   were expressly told that the presence of any potential incentive award "should

17   absolutely not be a reason for you to support the settlement."  This admonition was

18   repeated at the in-person meeting with two of the *White* Objectors.  *See* Declaration

19   of Charles Juntikka, Dkt. 431-5 ¶ 34 ("Mr. Sobol said that [the *White* Objectors]

20   'should not consider the $5000' [incentive award] in making their decision.").

21       Thus, the Objection that the incentive award for the named plaintiffs is

22   unjustified or was dangled in front of the *White* Objectors is baseless and is

23   overruled.  Miller Decl. ¶ 78.

24       N.    **Counsel for the *Acosta/Pike* Plaintiffs Have Repeatedly Proven**
             **They Are Adequate to Represent the Class.**
25
26           1.    **The Co-Counseling Agreement Counsel Entered Has No**
                   **Effect on Their Representation or The Settlement.**

27       The *White* Objectors assert that the co-counseling agreement *they*[54] proposed

28   _____
     [54] Both Wolf and Juntikka executed the subject co-counseling agreement with

                                                          *Footnote continued on next page*

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
                                                                      FINAL APPROVAL OF CLASS ACTION SETTLEMENT
                                                                      CASE NO. 05-CV-1070 DOC (MLGX)

1    and entered into with *Acosta/Pike* counsel and the other settling counsel creates a

2    conflict for *Acosta/Pike* counsel because it eliminates financial incentive for them

3    to continue to litigate this case.  However, the incentive agreement in *Rodriguez*,

4    563 F.3d 948, on which objectors rely, was between counsel and the class

5    representatives, whereas here the co-counseling agreement simply contains a fee

6    sharing agreement amongst counsel.  Namely, the *White* Objectors raise the specter

7    of a possible conflict without a scintilla of evidence to suggest that *Acosta/Pike*

8    counsel (with whom they worked side-by-side on the injunctive relief settlement

9    and on the monetary relief settlement until after the Settlement was reached) have

10    done anything less than consistently and vigorously litigate this matter on behalf of

11    this settlement class.  Rather, as this Court noted several months ago in

12    preliminarily approving this settlement, *Acosta/Pike* counsel and other settling

13    plaintiffs' counsel have demonstrated that they are ready, willing, and able to

14    commit the resources necessary to litigate the case vigorously.  Dkt. 423.

15        Furthermore, in their zeal to create an objection and wrest control of this

16    litigation, the *White* Objectors fail to acknowledge the most important part of the

17    holding in *Rodriguez*.  Specifically, the Court of Appeals in *Rodriguez* found that

18    even if there was a conflict of interest created as a result of the incentive agreement

19    between counsel and the class representatives (which, again, does not exist here),

20    *the court need not reject the settlement advanced so long as it was otherwise fair*

21    *and there were additional counsel and class representatives involved that were not*

22    *subject to the incentive agreement.* [55]  That would be the case here as well, even if

23    this Court were to treat the co-counseling agreement between all plaintiffs' counsel

24    in this case like the incentive agreement in *Rodriguez*.  This is because the other

25    settling plaintiffs' counsel here (Lieff Cabraser, Caddell & Chapman, Consumer

26    _____

*Footnote continued from previous page*
*Acosta/Pike* counsel.

27    [55] Approval of the settlement by the District Court in *Rodriguez* was actually

28    affirmed.  *Rodriguez v. West Publ'g Corporation, supra,* 563 F.3d at 948

1   Litigation Associates, and the National Consumer Law Center, among others) have

2   no cap on recovery pursuant to the agreement and therefore had (and have) every

3   incentive to seek the best recovery possible.  Consequently, as in *Rodriguez,* the co-

4   counseling agreement in question does not impact this Court's determination as to

5   the fairness of this settlement.

### 2.   Denial of the Prior Settlement Does Not Impact the Adequacy of *Acosta/Pike* Counsel

8        The *White* Objectors now argue that class counsel for *Acosta/Pike* are

9   somehow inadequate because they supported a settlement that the court rejected

10  over two and a half years ago.  However, this argument directly contradicts the

11  position these very same parties and lawyers[56] took in written submissions to this

12  Court earlier in the case when they supported *Acosta/Pike* counsel's request for

13  appointment as class counsel in connection with the previously approved

14  *White/Hernandez/Acosta/Pike* injunctive relief settlement (Dkt. 300), *which also*

15  *occurred well after denial of the earlier Acosta/Pike settlement.*  The *White*

16  Objectors' current argument is further contradicted by their counsel's prior conduct,

17  which included actively negotiating with and alongside the *Acosta/Pike* plaintiffs

18  and their counsel at numerous mediation sessions toward a monetary relief

19  settlement on behalf of the class.  Sherman Decl. ¶ 4.  In fact, though now alleging

20  that support for the earlier settlement (which this Court later remarked was "very

21  close", *see id.* ¶ 7) somehow renders *Acosta/Pike* counsel inadequate, *White*

22  Objectors' counsel actively solicited the participation of both the *Acosta/Pike*

23  plaintiffs and their counsel during the negotiations toward a class wide settlement.

24  *Id.* ¶¶ 4-5.  The simple fact is that it is only now, after a long, hard-fought and

25  closely-supervised Settlement was reached that does not deliver them the "billions"

26  they claim to be expecting, that the *White* Objectors allege that support for the

27  earlier settlement somehow creates an issue.

[56] This refers to Dan Wolf and Charles Juntikka.

1      Notwithstanding the glaring contradiction in *White* Objectors' counsel's

2   current and former positions, the reality is that support for a proposed settlement

3   which is ultimately not approved does not render counsel automatically inadequate.

4   *See generally In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675 (E.D.N.Y.

5   Sept. 18, 2007) (wherein class counsel made multiple errors in the settlement

6   documents, but was ultimately deemed adequate); *Orser v. Select Portfolio*

7   *Servicing, Inc.*, 2009 WL 4667378 (W.D. Wash. Dec. 2, 2009) (wherein second

8   amended class settlement was approved with the same representatives after

9   preliminary approval and the amended settlement were denied); *Chemi v.*

10  *Champion Mortgage*, 2009 WL 1470429 (D. N.J. May 26, 2009) (wherein

11  settlement was approved with the same representatives after preliminary approval

12  of class settlement was denied and the court recommended changes to an amended

13  settlement to keep it from being denied as well); *Clark v. Experian Info. Solutions,*

14  *Inc.*, 2004 WL 256433 (D. S.C. January 14, 2004) (wherein settlement was

15  approved with the same representatives after the court had previously denied class

16  certification, prompting amendment of the complaint).  Indeed, in determining

17  adequacy of class counsel, the court looks to: whether the attorney representing the

18  class is qualified and competent; whether the class representatives have interests

19  antagonistic to the rest of the class; and whether the named plaintiff has prosecuted

20  the action vigorously on behalf of the class.  *In re Mego Fin. Corp. Sec. Litig.*, 213

21  F.3d at 462.

22      The *White* Objectors do not allege that *Acosta/Pike* counsel (or for that

23  matter) Plaintiffs fail to meet any of the requirements for adequacy.  Instead, they

24  rely totally on the denial of the proposed settlement from over two and a half years

25  ago.  As this Court has already found at the preliminary approval stage of this

26  Settlement (years after the aforementioned denial), *Acosta/Pike* plaintiffs and their

27  counsel fully satisfy the adequacy requirement.

28      The proposed settlement from over two and half years ago cannot be viewed

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

1   in a vacuum.  At the time the prior settlement was advanced, this Court did not have

2   the benefit of the results of the last several years of litigation.  Thus, when

3   *Acosta/Pike* counsel argued that compromise was required because the matter had

4   noteworthy certification risks, the argument did not significantly impact this

5   Court's consideration.  However, a few years later, after significant discovery and

6   law and motion practice, this Court validated *Acosta/Pike* counsel's prior position

7   by issuing a tentative ruling denying class certification.  In fact, at a hearing

8   subsequent to the issuance of the order denying preliminary approval of the earlier

9   settlement and after substantial further litigation, this Court later remarked that the

10  original settlement was actually "very close" and had "promising" injunctive relief

11  provisions.[57]

12          The bottom line is that this Court, *with full knowledge of Acosta/Pike*

13  *counsel's support for the earlier settlement*, has already found (in preliminarily

14  approving this settlement and appointing *Acosta/Pike* counsel as Class Counsel)

15  that:

16          "Plaintiffs are represented by counsel who are 'qualified, experienced and

17          able to vigorously conduct the proposed litigation on behalf of the class'.

18          (Citation omitted) …  [L]ead counsel for the *Acosta/Pike* plaintiffs, Lee A.

19          Sherman … has participated in the negotiations and mediation leading up to

20          the settlement, and is one of the 23(b)(3) Settlement Class Counsel moving

21          for the Court's approval of the Settlement.

22          The 23(b)(3) Settlement Class Counsel have drawn on their considerable

23          experience and human resources to zealously represent the proposed Class in

24          this Litigation.  Likewise, the 23(b)(3) Settlement Class Counsel are

---

[57] Notably, the injunctive relief provisions in the earlier settlement brought about by the *Acosta/Pike* Plaintiffs and their counsel constituted the first time in this (or any other case) that any of the Defendants agreed to any type of business practice changes with regard to the practices at issue in this case, and served as a base point for the injunctive relief settlement ultimately obtained in this matter and praised by this Court.

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

committed to devoting the financial resources necessary to litigate the case to a successful resolution. . . . Where, as here, proposed class counsel 'include some of the most experienced lawyers in the United States in the prosecution of . . . class actions' and have demonstrated that they are 'ready, willing and able to commit the resources necessary to litigate the case vigorously,' the adequate representation requirement is more than satisfied.

Dkt. 423 (internal citation omitted).

Thus, the *White* Objectors' argument regarding support for the earlier settlement adds nothing new to the thorough analysis this Court conducted seven months ago in preliminarily approving this settlement and finding *Acosta/Pike* counsel adequate.

### O. The *Acosta/Pike* Plaintiffs are Adequate to Represent the Class.

The *White* Objectors raise two arguments in support of their claim that the *Acosta/Pike* plaintiffs in particular are not adequate. Both lack merit.

First, the *White* Objectors allege that the *Acosta/Pike* plaintiffs have not "asserted a claim" against Experian and are therefore "plainly unable" to represent the interests of any of the Experian class members. Objectors' Brief at 31:5-7. However, their argument is misleading and contradicted by established class action principles. The argument misleads because Experian confirmed that each of the three *Acosta/Pike* plaintiffs (Robison, Randall, and Pike) are members of the Experian monetary relief settlement class. Sherman Decl. ¶ 9 and Exh. 1. In fact, both Robison and Randall confirmed in their depositions that they submitted disputes to Experian regarding their claims. *See* Sherman Decl. Exh. 2, Deposition of Robert Randall at 29:14-30:3; Sherman Decl. Exh. 3, Deposition of Bertram Robison at 24:22-25:13. So, in actuality, not only does each of the *Acosta/Pike* plaintiffs have typical claims against Experian sufficient to allow them to represent the Experian class, but Robison and Randall have actually submitted disputes on these claims.

1    Additionally, *White* Objectors' argument is plainly contradicted by

2 established class action principles which allow an otherwise adequate individual

3 with typical claims to step forward and serve as a class representative as needed

4 even if he or she did was not a named plaintiff at the time the case was filed.  For

5 example, in *Bromley v. Michigan Educ. Ass'n-NEA*, 178 F.R.D. 148 (E.D. Mich.

6 1998), unnamed class members were allowed to intervene and become class

7 representatives to cure an alleged defect that there were no named class

8 representatives to represent certain portions of the class.  Likewise, courts regularly

9 allow replacement of class representatives by way of substitution.  After a class has

10 been certified, courts regularly allow replacement of the named plaintiff.  *See*

11 *Birmingham Steel Corp. v. Tennessee Valley Auth.,* 353 F.3d 1331 (11th Cir. 2003).

12 "The reason substitution is appropriate after class certification is that once certified,

13 a class acquires a legal status separate from that of the named plaintiffs, such that

14 the named plaintiff's loss of standing does not necessarily call for the simultaneous

15 dismissal of the class action, if members of that class might still have live claims."

16 *Velazquez v. GMAC Mortgage. Corp.,* 2009 WL 2959838, at *3 (C.D. Cal.,

17 Sept. 10, 2009).

18    Thus, given that 1) this matter has been certified for settlement purposes; 2)

19 the *White* Objectors have provided nothing to prove that the *Acosta/Pike* plaintiffs

20 are otherwise inadequate; and 3) the *Acosta/Pike* plaintiffs have standing to assert

21 claims typical of the Experian class, this Court has ample basis on which to appoint

22 the *Acosta/Pike* plaintiffs as class representatives for the entire Class even though

23 they did not originally file against Experian.

24    The second argument advanced by the *White* Objectors is that the

25 *Acosta/Pike* plaintiffs are inadequate because they supported the earlier *Acosta/Pike*

26 settlement that was not approved.  This argument was addressed above.  However,

27 it bears mention that calling this Court's earlier ruling relating to the adequacy of

28 the *Acosta/Pike* plaintiffs in connection with denial of the earlier settlement "the

1    law of the case" and therefore "control[ing]," Objectors' Brief at 31:18-20, is flatly

2    wrong.  Such a suggestion completely ignores the facts that:  1) the *White* Objectors

3    and their counsel supported both the *Acosta/Pike* plaintiffs and their counsel for

4    appointment on behalf of the class on the injunctive relief settlement despite denial

5    of the earlier settlement relating to injunctive relief; and 2) since the order denying

6    approval of the *Acosta/Pike* settlement (which was limited to that settlement[58]), this

7    Court has issued orders finding the *Acosta/Pike* plaintiffs and their counsel as

8    adequate to serve these classes.  Dkt. 338, 423.

9    **VII.   THE ADDITIONAL NOTICE TO ACTUAL DAMAGE AWARD**
      **CLAIMANTS IS APPROPRIATE IN LIGHT OF THE SETTLEMENT**
10   **ADMINISTRATOR'S AUDIT OF THE ACTUAL DAMAGE AWARD**
      **CLAIMS.**
11
          Pursuant to its authority under the Settlement Agreement, the Settlement
12
      Administrator conducted an audit of 1,000 claims, which took place from
13
      December 2009 through early May 2010 with a team of 13 people completing 1900
14
      hours of work at a cost of $140,526 (excluding expenses).  The Settlement
15
      Administrator has concluded from this audit that more than 34% of employment
16
      claims are likely invalid, more than 25% of the mortgage/housing claims are likely
17
      invalid, and more than 22% of the other credit claims are likely invalid.  The
18
      Settlement Administrator has therefore concluded that it cannot determine the
19
      validity of the Actual Damage Award claims, based on the information available to
20
      it, without individual scrutiny of each and every one of the approximate 500,000
21

22   [58] In its Order denying the *Acosta/Pike* settlement, this Court held: "Given the
      structure of the proposed settlement and its specific terms regarding the potential
23   abandonment of the federal claims and injunctive relief, the Court is unconvinced
      that the named plaintiffs are able to adequately protect the interests of the entire
24   class."  Dkt. 143, Case No. 06-CV-5060.  The Court was careful to limit its holding
      to that proposed settlement, and this is a far cry from any alleged finding that the
25   *Acosta/Pike* Plaintiffs were inadequate as a matter of "the law of the case."
      Furthermore, though not mentioned in the Objectors' briefing, an exception to the
26   "law of the case" doctrine arises when new evidence is presented to the court.  *U.S.
      v. Escobar-Urego,* 110 F.3d 1556, 1561 (11th Cir. 1997).  Here, during the two and
27   a half years between this Court's Order denying approval of the *Acosta/Pike*
      settlement and this Court's Order preliminarily approving the instant Settlement,
28   substantial new evidence has been presented to the Court on all facets of this case.

1   such claims, a task that would be prohibitively expensive and time consuming.

2   Accordingly, the Settlement Administrator has, as provided for under the

3   Settlement Agreement, "deemed it necessary to conduct further review of Actual

4   Damage Award Claims."  Agreement §7.7(c)(ii).  The Settlement Administrator

5   and the Settling Parties assert that such review shall be implemented by requiring

6   Actual Damage Award Claimants to provide minimal documentary evidence

7   supporting their claim.  The Court agrees that this request and requirement is

8   reasonable and consistent with the terms of the Settlement Agreement as written.

9        A.    **The Settlement Administrator's Request For Additional**

10  **Information From Actual Damage Award Claimants**

11       A further communication proposed by Settling Plaintiffs and the Settlement

12  Administrator informs all Actual Damage Award claimants that they must submit

13  an Additional Claimant Information Form and additional documentation to validate

14  their claims and be eligible for an Actual Damage Award.  The Court has reviewed

15  the proposed communication and hereby approves it for dissemination to the Actual

16  Damage Award Claimants. See Exhibit "A" hereto.

17       The Additional Claimant Information Form requests background information

18  to verify the identity of the Actual Damage Award Claimant and instructs them to

19  provide the creditor name and date associated with the transaction underlying their

20  claim.  It also details the kind of third-party documentation that will be acceptable

21  to the Settlement Administrator to verify the Actual Damage Award claims.

22       The Additional Claimant Information form explains that the dollar amount

23  that will be paid for Convenience and Actual Damage Award claims will depend on

24  the total number of claims validated by the Settlement Administrator, and that

25  given the response rate to the prior Notice, the amount paid for such awards will

26  likely be lower than previous estimates.  The Notice informs claimants that those

27  who do not submit such documentation will have their claims converted to a

28  Convenience Award.

1    Actual Damage Award claimants will have the opportunity to submit the

2    Additional Claimant Information form and documentation online or by mail.  The

3    Additional Claimant Information form satisfies Rule 23(e)(1)(B)'s requirement that

4    such class communications be provided "in a reasonable manner."

5    **B.    Extension of Opt Out and Objection Deadline for Actual Damage Award Claimants**

6

7    The Court will extend the deadline to opt out of, or object to, the Settlement

8    for those Class Members who previously made a claim for an Actual Damage

9    Award.  An Actual Damage Award claimant may object to the Settlement or

10   request to be excluded from the 23(b)(3) Settlement Class by sending a written

11   objection or a written request for exclusion to the Settlement administrator no later

12   than July 30, 2010.  The opt-out request must contain the Class Member's original

13   signature, current postal address, and telephone number, the last four digits of the

14   Class Member's Social Security number, and a specific statement that the Class

15   Member wants to be excluded from the 23(b)(3) Class.  Agreement § 5.2(a).

16   **VIII.  THE COURT CAN APPROPRIATELY ENTER A FINAL ORDER ON BEHALF OF THE CLASS.**

17   In its Preliminary Approval Order dated May 7, 2009, the Court

18   provisionally certified a 23(b)(3) Settlement Class.[59]  All required criteria for Class

19   certification remain satisfied.[60]  The Court refers to the discussion of class

20   certification in its Preliminary Approval Order on May 7, 2009.  Dkt. 423, at 12-19.

21   The Court finds that for the reasons set forth in the preliminary approval order, and

22   as otherwise stated herein, certification of the Settlement Class is appropriate.

23

24   [59] *See supra* at 2-3 for the definition of the "23(b)(3) Settlement Class" preliminarily approved by the Court.

25   [60] Some Objectors challenge the certification of the Class on adequacy grounds. *See* Sobol Decl. Exh. 2.  The 23(b)(3) Settlement Class Counsel are qualified,

26   experienced, and able to vigorously conduct the proposed litigation on behalf of the Class.  Moreover, the 23(b)(3) Class representatives do not have any interests

27   antagonistic to those of the 23(b)(3) Class and have been and are prepared to pursue this Litigation vigorously to redress the wrongs Defendants have perpetrated.  Thus,

28   these objections are without merit.

## IX.    **ORDER GRANTING FINAL APPROVAL OF SETTLEMENT.**

Accordingly, the Court hereby GRANTS final approval of the Settlement and ORDERS and ADJUDGES as follows:

1.    The Notice to the 23(b)(3) was constitutionally sound and fully and properly implemented;

2.    Pursuant to Fed. R. Civ. P. 23(b)(3), the Court hereby certifies the 23(b)(3) Settlement Class;

3.    The 23(b)(3) Settlement is fair, adequate and reasonable, and is hereby approved the on behalf of the 23(b)(3) Settlement Class;

4.    The 23(b)(3) Settlement Class Counsel have adequately represented the 23(b)(3) Settlement Class;

5.    The 23(b)(3) Settlement Class Representatives are adequate representatives of  the 23(b)(3) Settlement Class;

6.    On or before June 30, 2010, the Settlement Administrator shall communicate with Class Members who filed timely, complete claims for Actual Damage Awards, directing those claimants to provide documentary evidence to assist the Settlement Administrator in validating their claims, substantially in the form attached hereto as Exhibit A;

7.    Actual Damage Claimants may provide the Settlement Administrator with the documentary evidence to validate their claims on or before August 15, 2010;

8.    The deadline for Actual Damage Award Claimants to opt-out of or object to the 23(b)(3) Settlement is hereby extended to July 30, 2010;

9.    On or before August 31, 2010, Settling Plaintiffs shall file a Final Status Report Regarding The 23(b)(3) Settlement and a proposed form of Final Judgment of 23(b)(3) Settlement;

10.    The Court, upon review of the Final Status Report Regarding The 23(b)(3) Settlement and the proposed Final Judgment Of 23(b)(3) Settlement, shall

1    determine whether to notice a further hearing before entering a final judgment.

2          11.    The Settlement Administrator shall submit a final report on settlement

3    administration to the Court by October 19, 2010.

4

5                            IT IS SO ORDERED,

6

7                            _____
                             David O. Carter
8                            United States District Court Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 05-CV-1070 DOC (MLGX)

# EXHIBIT A

## SUPPLEMENTAL NOTICE TO ACTUAL DAMAGE AWARD CLAIMANTS

In the class action settlement with TransUnion LLC, Experian Information Solutions, Inc., and Equifax Information Services LLC, you submitted a claim for an Actual Damage Award.

It has been determined that additional information is required in order to ensure the validity of the Actual Damage Award claims. For further information concerning the process that resulted in that determination, please consult the website referenced below.

To be eligible to receive the Actual Damage Award you claimed, you must submit an Additional Claimant Information Form and additional documentation so that it is either submitted online or postmarked on or before August 15, 2010. **The Additional Claimant Information Form is attached or can be submitted online by using your Claim Number at www.bankruptcydischargesettlement.com.** If you are unable to access the form online, please call 1 (866) 237-3432, or write to White, et al. v. Experian Information Solutions, Inc., c/o The Garden City Group, Inc., P.O. Box 9517, Dublin OH 43017-4817.

**If you do not submit the Additional Claimant Information Form and required documentation, your claim will be converted to a Convenience Award.**

The dollar amount that will be paid for Convenience and Actual Damage Award claims will depend on the total number of claims validated by the Settlement Administrator. The amount of awards to be paid with respect to each category of Actual Damage Claims will be increased or decreased, pro rata, to reflect the number of valid claims in each category.

Given the response rate to the prior Notice of this Settlement, and the number of Class Members who may qualify for Actual Damage Awards, the amount paid for such awards will likely be lower than prior estimates. The current estimate is that the amount of the Convenience Award will be $20 or less, and the amount of the Actual Damage Awards will be higher than the Convenience Awards.

**The Court has extended the deadline to opt-out of (request exclusion from) or object to the Settlement for those Class Members who previously made a claim for an Actual Damage Award.** If you choose, you may still opt-out of the Settlement so as not to be bound by its terms and retain the right to pursue your own lawsuit. The new postmark deadline for Actual Damage Award claimants to opt-out or object is July 30, 2010. To opt-out you must send a written request to: White, et al. v. Experian Information Solutions, Inc. Attn: Exclusion Requests, c/o The Garden City Group, Inc., P.O. Box 9517, Dublin OH 43017-4817. Be sure to include your full name, address, telephone number, your signature, and a specific statement that you want to be excluded from the settlement. Consult the detailed notice on the website for instructions concerning how to object.

**If you have questions, please call toll-free 1 (866) 237-3432
or visit www.bankruptcydischargesettlement.com.**

**Para una notificatión en Español, visite nuestro sitio de internet.**

# ADDITIONAL CLAIMANT INFORMATION FORM

**I.**    **GENERAL INSTRUCTIONS:** Type or legibly print all information in blue or black ink, and answer all questions below. Sign and date this form under penalty of perjury. Please print or copy the completed Additional Claimant Information Form and accompanying documents for your files. **Please note that you may also fill out and submit this form and any documentation online at www.bankruptcydischargesettlement.com.** You must submit this Additional Claimant Information Form and additional documentation so that it is either submitted online or postmarked on or before August 15, 2010. If you have questions, please call toll-free 1 (866) 237-3432.

**II.**    **CLAIMANT INFORMATION:**

A.    Enter the Claim Number found above your name on the Supplemental Notice to Actual Damage Award Claimants:
WHE_____.

B.    Enter the last 4 digits of your Social Security Number: _____.

C.    Name of Claimant:
Last: _____ First: _____ MI: _____
Also known as (any additional name that might also appear on your credit report):
Last: _____ First: _____ MI: _____

D.    Street Address: _____ City _____ State ____ Zip _____

E.    Home Phone Number: (____)_____ Work (____)_____ Mobile (____)_____

F.    Date of Birth (mm/dd/yyyy): _____/_____/_____

**III.**    **DETAILED CLAIM INFORMATION:** Type of Inquiry, Approximate Date of Inquiry, and Prospective Employer or Creditor Name

☐    Employment I actually applied for
Date (mm/yyyy): _____/_____ Name of prospective employer: _____

☐    A mortgage or a housing rental I actually applied for
Date (mm/yyyy): _____/_____ Name of prospective mortgage broker, lender, bank, housing or other mortgage creditor: _____

☐    A credit card, auto loan, or other credit I actually applied for, or payment of a discharged debt to obtain credit
Date (mm/yyyy): _____/_____ Name of creditor (bank, credit union, department/retail store, auto dealership/lender, other): _____

**IV.**    **DOCUMENTATION:** Indicate below what type of documentation you have included.

**ALL TYPES OF CLAIMS**
☐ Notice or letter of an Adverse Action from a prospective creditor, employer, landlord

**EMPLOYMENT CLAIMS**
☐ Letter/other correspondence from prospective employer or employment agency
☐ Affidavit from prospective employer or employment agency that an employment inquiry occurred
☐ Other (explain) _____

**MORTGAGE/OTHER HOUSING CLAIMS**
☐ Letter/other correspondence from a bank, mortgage broker, or potential housing lender
☐ Letter/other correspondence from a landlord, apartment complex, or rental agency
☐ Affidavit from any of the above that a credit inquiry occurred
☐ Other (explain) _____

**OTHER CREDIT CLAIMS**
☐ Letter/other correspondence from any prospective lender, such as a bank, credit union, department store, or auto dealership/lender
☐ Affidavit from any of the above that a credit inquiry occurred
☐ Other (explain) _____

I am certifying under penalty of perjury that I have personal knowledge of all the information I provided in this Additional Claimant Information Form and that such information is true and correct to the best of knowledge, and, additionally, that I believe that I have suffered an adverse action or other harm on or around the approximate dates I have provided, and I believe such harm or adverse action to be a result of errors in my credit reports regarding debts discharged in bankruptcy.

Signature: _____

Return completed Additional Claimant Information Form along with documentation indicated above to White, et al. v. Experian Information Solutions, Inc., c/o The Garden City Group, Inc., P.O. Box 9517, Dublin OH 43017-4817. If you have questions, please call 1 (866) 237-3432.

**White, et al. v. Experian Information Solutions, Inc.**
**c/o The Garden City Group, Inc.**
**P.O. Box 9517**
**Dublin, OH 43017-4817**

---

**Important Settlement Update: Your response is**
**required by August 15, 2010.**