BOIES, SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY 10504
Telephone:   914.749.8200
Facsimile:   914.749.8300
Email:        dboies@bsfllp.com
(admitted *pro hac vice*)

George F. Carpinello
Adam R. Shaw
10 North Pearl Street
Albany, NY 12207
Telephone:   518.434.0600
Facsimile:   518.434.0665
Email:        gcarpinello@bsfllp.com
              ashaw@bsfllp.com
(admitted *pro hac vice*)

David L. Zifkin (SBN 232845)
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA   90401
Telephone:  310-395-5800
Facsimile: 510-874-1460
Email:  dzifkin@bsfllp.com

CHARLES JUNTIKKA &
ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone:   212.315.3755
Facsimile:   212.315.9032
Email:        charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone:   202.842.2170
Email:        dan@danielwolflaw.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, *et al.*,<br><br>       Plaintiffs,<br><br>       v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.*,*<br><br>       Defendant.<br><br>And Related Actions. | **Case No. 08-CV-1070 DOC (MLGx) (Lead Case)**<br><br>***WHITE* PLAINTIFFS' OPPOSITION TO SETTLING PLAINTIFFS' MOTION FOR RECONSIDERATION**<br><br>Place:      Courtroom 9D<br>Judge:    Honorable David O. Carter |

1

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 1

I.    Settling Plaintiffs' Motion Does Not Satisfy The Standards For Reconsideration ......................................................................... 1

II.    Settling Plaintiffs' Arguments For Overturning This Court's Decision Ordering Re-Notice To The Entire Class Are Meritless .............. 4

    A.   This Court's Reasons For Ordering Re-Notice Remain Correct ......... 4

    B.   The Fact That The Notice And Claim Form Were Fatally Defective Is Confirmed By The Abysmally Low Response Rate ...... 13

    C.   The Cost Of The Secondary Notice Is No Reason Not To Re-Notice The Entire Class ................................................................ 15

CONCLUSION ..................................................................................................... 17

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4

*Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007) .......................... 6, 7

5

*Berther v. TSYS Total Debt Management, Inc.*, 2007 WL 1795472
  (E.D.Wis. 2007) ............................................................................................. 13

6

*In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110
  (S.D.N.Y. 2009) ............................................................................................. 14

7

*In re Domestic Air. Transp. Anti-Trust Litig.*, 148 F.R.D. 297 (N.D. Ga.
  1993) ............................................................................................................... 14

8

*In re Friedman's Inc. Sec. Litig.*, 2009 WL 1456698 (N.D.Ga. 2009) ................ 13

9

*Parker v. Time Warner Entertainment Co., L.P.*, 631 F.Supp.2d 242
  (E.D.N.Y. 2009) ............................................................................................. 14

10

*Stoner v. CBA Info. Servs.*, 352 F.Supp.2d 549 (E.D.Pa. 2005) ........................... 13

11

*In re TJX Comps. Retail Sec. Breach Litig.*, 584 F.Supp.2d 395
  (D.Mass. 2008) ............................................................................................... 13

12

*Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86
  (3d Cir. 1985) ................................................................................................. 13

13

## FEDERAL STATUTES

14

15 U.S.C. §1681c(a) ............................................................................................... 7

15

Fed. R. Civ. P. 23(c)(2) ........................................................................................ 15

16

Fed. R. Civ. P. 23(f) .............................................................................................. 16

17

## OTHER AUTHORITIES

Christopher R. Leslie, *The Significance of Silence: CollectiveAction
  Problems and Class Action Settlements*, 59 Fla. L. Rev. 71 (2007) ............. 13

18

William B. Rubenstein et al., 3 Newberg on Class Actions § 8:38 (4th
  ed. 2010) ......................................................................................................... 14

19

20

21

22

23

24

25

26

27

28

ii

**PRELIMINARY STATEMENT**

Settling Plaintiffs have moved for reconsideration of this Court's June 30, 2010 Order ("6/30/10 Order"), insofar as it requires the re-noticing of the entire class, rather than just the 750,000 who have already filed claims. This Court should deny the motion because it says nothing new and, hence, does not satisfy the standard for reconsideration of Local Rule 7-18.

If the Court is willing to consider Settling Plaintiffs' arguments anew, it should nonetheless reaffirm its Order compelling re-notice to the entire class because: (1) the documentation requirement for actual damage claims has changed the evaluation for all class members, including those who did not submit a claim form; (2) the attestation requirement disenfranchised millions of class members who did not know (and had no way of finding out) that credit reports were issued about them, which inaccurately listed their pre-bankruptcy debts as still delinquent; and (3) the Notice affirmatively misled its recipients by informing them that they had to determine *if* they were members of the class (something that most of them could not possibly do) when, in fact, the Notice was sent only to class members.

**ARGUMENT**

**I.  Settling Plaintiffs' Motion Does Not Satisfy The Standards For Reconsideration.**

The standards governing a motion for reconsideration of a court's order are set forth in Local Rule 7-18, which provides that:

> any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

1

Local Rule 7-18 further mandates that a motion for reconsideration shall not "in any manner repeat any oral or written argument made in support of or in opposition to the original motion."  Settling Plaintiffs' motion does not come close to meeting these standards.

*First*, nowhere in their motion do Settling Plaintiffs cite any "new material facts" or any "changes of law" that emerged between the date of this Court's order and the filing of their motion.  Nor could they have done so because there were none.

*Second*, Settling Plaintiffs have not shown – and cannot show – a manifest failure on the part of this Court "to consider material facts" that were presented to it before the issuance of its decision.  Indeed, the only "material fact" that Settling Plaintiffs cite in support of their motion for reconsideration is that the cost of re-noticing the entire class would approach $5 million.  But that is hardly a new fact that eluded the consideration of this Court.  The parties had repeatedly advised the Court about the high cost of notice in these cases and, acknowledging the amounts at stake, the Court specifically instructed Settling Plaintiffs to make a proposal regarding the allocation of that cost in its order.  (6/30/10 Order at 4.)

*Third*, Settling Plaintiffs' motion is based entirely on facts and legal authorities that they were fully aware of (or at least should have been aware of) prior to the issuance of this Court's June 30, 2010 Order.  In particular, Settling Plaintiffs' argument is that the *White* Plaintiffs have misled this Court into believing that the credit reports of all class members are inaccurate when, according to Settling Plaintiffs, many are not.  But, like their argument that the cost of re-notice is too high, that contention is not new.  Indeed, each and every one of Settling Plaintiffs' arguments as to why the credit reports of class members might not be inaccurate is either: (1) a rehash of arguments that Settling Parties made in their combined 105 pages of briefing in response to the *White* Plaintiffs' Objections (Dkt.

2

## 594 & 605)[1]; or (2) an argument that, in "the exercise of reasonable diligence", could have been made in that briefing.

Settling Plaintiffs' attempt to obtain reconsideration on the basis of arguments that have already been made repeatedly and that this Court has already rejected is more than a little hypocritical.  In May of last year, the *White* Plaintiffs filed a properly noticed motion seeking reconsideration of this Court's order preliminarily approving ***the same notice and claim form*** that is at issue here, in part, on the ground that most of the recipients of that notice and claim form had no way of knowing whether they were class members or had errors in their credit reports.  Even though this Court issued its preliminary approval order without affording the *White* Plaintiffs an opportunity to present their objections on those very issues, Settling Plaintiffs successfully opposed the *White* Plaintiffs' motion for reconsideration on the ground that it violated Local Rule 7-18 because it allegedly "offer[ed] nothing new."  (Dkt. # 432, at 1.)  Yet, now, Settling Plaintiffs are asking for reconsideration so this Court can address anew issues that Settling Plaintiffs persuaded this Court not to address when the *White* Plaintiffs were trying to bring them to its attention more than one year ago.

It should go without saying that there are not two different standards for reconsideration – one for the Settling Plaintiffs, which permits them to re-argue whatever they want whenever they want to, and another for the *White* Plaintiffs, which precludes them from seeking reconsideration, even when they never had a chance to present any of their arguments in the first place.  There is one standard, that standard applies to all parties and Settling Plaintiffs' motion does not satisfy it.

---

[1]   The *White* Plaintiffs' addressed those arguments in their Objections to Final Approval, filed Dec. 14, 2009, at 51-52 & 64-66, Dkt. # 553, and in their Reply in Further Support of their Objections to Final Approval, filed Jan. 8, 2010, at 11-15, 21-24 & 37-39, Dkt. # 619.

3

## II. Settling Plaintiffs' Arguments For Overturning This Court's Decision Ordering Re-Notice To The Entire Class Are Meritless.

### A. This Court's Reasons For Ordering Re-Notice Remain Correct.

Settling Plaintiffs pretend that this Court arbitrarily ordered them to re-notice 15 million class members without having any reason for doing so. (Settling Plfs' Submission ¶ 1-2.)   In fact, this Court gave three reasons – the logic of which Settling Plaintiffs cannot dispute.

*1.   The re-evaluation rationale:*   Settling Plaintiffs' motion for reconsideration ignores the principal reason this Court ordered that the secondary notice be sent to all class members – namely, that the actual damage documentation requirement has "change[d] the evaluation" of the Settlement's value for everyone. (6/30/10 Order at 3.)   As this Court explained, that is because "there will naturally be a number of actual damage award claimants who are unable to provide this information." (*Id.*)

As a result, the number and type of claims that are likely to be filed and the amount of the award that any potential actual damage claimant might expect to receive has undergone a material change since the time of the original notice.  The Settlement has become something very different from the one that class members were told about when they received that Notice ten months ago and, thus, both Fed. R. Civ. P. 23(c)(2) and due process require that they all be given an opportunity to reevaluate their options.

For example, a class member who may have chosen not to file an actual damage claim based on his prescient calculation that it would profit him little to do so given the multitude of others who were likely to file such claims may now make a very different calculation.  That same class member may now reckon that, owing to the difficult-to-satisfy documentation requirement, only a tiny fraction of the class may end up filing actual damage claims and, hence, that it may be well worth his time to submit one.  Thus, far from blindly "assuming" that any re-notice would

4

have to be sent out to everyone, this Court properly ruled that re-noticing all class members was essential to afford that critical re-evaluation option.

In addition to changing the evaluation for all class members considering whether to file actual damage claims, the documentation requirement also changes the evaluation for all class members considering whether to file objections. After reviewing the original Notice, many class members may have opted against objecting based on the accessibility of actual damage awards to anyone who might file for them. Though previously they may not have been interested in filing a claim themselves, they may now regard the documentation requirement as so unfair that they would be motivated to file an objection.

Separate from the documentation requirement, the decision whether to object may well have been influenced by a class member's understanding that actual damage awards would likely range from $150 to as much as $750. Had the Notice informed class members that actual damage awards would be just more than $15 (as Settling Plaintiffs' revised notice now states), many class members may have reacted very differently. (Settling Plfs' Submission, Ex. A.)

In short, both Fed. R. Civ. P. 23(c)(2) and due process require that all class members be given an opportunity to reevaluate their decision whether to object to a Settlement that is fundamentally different from the one that was described to them in the Notice they received ten months ago.

**2.    *The lack of knowledge rationale:*** Having determined that the new documentation requirement necessitated re-noticing the entire class, this Court then examined the *White* Plaintiffs' other arguments regarding why the notice and claim form were fatally flawed. The Court agreed with one of the *White* Plaintiffs' core objections – namely, that the "previously required attestation," pursuant to which class members were required to affirm their belief that their credit report inaccurately reported the status of their pre-bankruptcy debts, unfairly denied relief to many class members who do "not know that there was an error" in their credit

5

report and who would find it "very difficult . . . to now investigate and confirm whether there was an error." (6/30/10 Order at 4.)

The Court's order rejecting the attestation requirement on these grounds is consistent with its opinion rejecting the *Acosta/Pike* settlement, where it also acknowledged that a great many class members have no way of knowing whether their credit reports were inaccurate because they "never received" copies of those reports or because they lacked the ability to "identify discharged debts showing inaccurately" when they did. *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 389 (C.D. Cal. 2007).

As if to underscore that their request for reconsideration is based on nothing new, Settling Plaintiffs' response is limited to a blocked quote from Defendants' previously filed Response to Objections to Monetary Relief Settlement, dated Jan. 4, 2010, at 33-34, Dkt. # 605, which asserts that class members are "'uniquely situated to assess the accuracy'" of their credit reports, because: (1) they "'must be given written notice of denials of credit or housing,'" which "'would place them on notice of potential credit reporting issues'"; and (2) they are entitled to a copy of their credit reports "'free of charge'" whenever  such denials occur and can otherwise purchase their reports "'at any time for a small, statutorily capped fee.'" (Settling Plfs' Submission ¶ 14.) Settling Plaintiffs' argument is unpersuasive.

*First*, denial of credit notices typically provide either no reasons for such denial or only the most cryptic reasons therefore (*e.g.*, "bankruptcy" or "outstanding obligation"); they rarely, if ever, give consumers sufficient information to determine that their credit reports inaccurately listed one or more of their pre-bankruptcy debts as still due and owing. (Declaration of Charles Juntikka, sworn to Aug. 20, 2010, ¶¶ 2-5, Exs. A-B.)

*Second*, that creditors may have sent letters to class members whose credit was denied provides no help to the millions of class members who are unable to demonstrate a credit denial. These class members, many of whom have been forced

to pay higher interest rates as a result of their deflated credit scores, are nonetheless eligible for convenience awards because Defendants issued credit reports about them that inaccurately reported the status of their pre-bankruptcy debts.

*Third*, although class members may have been able to get copies of their credit reports for free or for a small charge, in the large majority of cases in which credit reports containing inaccurate bankruptcy information were issued, class members either: (1) did not, in fact, obtain copies of those reports, or (2) lacked "the uncommon legal sophistication" necessary to identify any bankruptcy-related errors. *Acosta*, 243 F.R.D. at 389; *see also* Juntikka Decl. ¶¶ 4-5; Declaration of Prof. Katherine M. Porter, sworn to Nov. 29, 2009, ¶¶ 33-42, Dkt. # 557).

*Finally*, even if these class members were to have ordered their reports after receiving the class notice and were able to understand them, they would have been lulled into thinking those reports (and the ones that preceded them) were accurate because any errors would have been fixed by Defendants as a result of their implementation of the Injunctive Relief Settlement or would have "aged out" through the passage of time. 15 U.S.C. §1681c(a). Further, a consumer who might request a copy of his archived reports would be unable to get them from either the Settlement Administrator or from the Defendants directly. (Declaration of Ralph Michael Porter, sworn to Nov. 24, 2009, ¶¶ 8-9, Dkt. # 558.) As Objector Ralph Porter recounts in his declaration, he was affirmatively told by the Settlement Administrator that he could not get him a copy of his archived credit reports and that he should contact Defendants for one, which Mr. Porter did to no avail. (*Id.* ¶¶ 8-12.)

As is the case with many of their other arguments, the position of Settling Plaintiffs with regard to the ability of class members to assess the accuracy of information in their credit reports is driven solely by the direction of the prevailing winds. Thus, when they were seeking to defeat preliminary approval of the *Acosta/Pike* Settlement, Settling Plaintiffs acknowledged that "most class members

7

are unaware of the fact that their discharged debts are being inaccurately recorded as due and owing on their credit reports." (*White/Hernandez* Plaintiffs" Opposition to *Acosta/Pike* Plaintiffs Motion for Preliminary Approval, filed Dec. 15, 2006, at 53, 06-CV-5060, Dkt. # 42.)  Now, however, when they are trying so desperately to get their own settlement approved, Settling Plaintiffs are taking the position that the same class members are "uniquely situated" to assess the accuracy of those reports. As this Court has now twice ruled, Settling Plaintiffs were right the first time around.

   ***3.  The misleading notice rationale:***  Having nothing to say about the first two reasons this Court gave for ordering re-notice to the entire class, Settling Plaintiffs assert that the real reason for its decision was that the Court was duped by the *White* Plaintiffs into believing their "oft-repeated" and supposedly "false premise" that "'the Notice was sent only to individuals who already qualify as class members.'"  (Settling Plfs' Submission ¶ 8.)  The problem with that argument is that the *White* Plaintiffs' statement is correct.

   Under the terms of the Settlement itself, Defendants were required to generate a list of all "Settlement Class Members" from the information contained in their archived files.  (Settlement Agreement ¶ 4.1(a).)  The Settlement further provided that notice was to be sent only to "each Settlement Class Member identified on the Class List."  (Settlement Agreement ¶ 4.3(b).)  Thus, there is nothing false or even remotely misleading about the *White* Plaintiffs' representation that Notice was sent only to class members.

   By contrast, the Notice itself was highly misleading.  Even though it was sent only to "each Settlement Class Member identified on the Class List," the Notice informed its recipients that "***you first have to determine if you are a Class member***."  (Notice of Final Forms of Notice of Class Action Settlement, Ex. C at 4, Aug. 18, 2009, Dkt. # 458.)  In other words, the notice was sent only to beneficiaries of Chapter 7 discharge orders for whom Defendants' file information

showed: (1) one or more pre-bankruptcy debts having been reported in a delinquent status; and (2) nothing to suggest that *all* such debts were excluded from discharge. (Settlement Agreement ¶ 4.1(a).)   At the same time, however, the Notice affirmatively informed these class members that they had to figure out for themselves whether they met these criteria.

Inasmuch as eligibility for class membership is based on information that is contained in Defendants' internal files, this instruction was worse than just misleading.   Although Defendants can identify who is a class member and who is not, that is something that the large majority of class members could not possible know because, as set forth above: (1) they did not know how their pre-bankruptcy debts had been reported in Defendants' files at the time those Defendants were issuing credit reports about them listing those debts as delinquent; and (2) they have no way of getting that information today.   Accordingly, to ask recipients of the Notice to determine *if* they are class members is to ask the impossible.

Ignoring the language of the Settlement describing the Class List as a list of Settlement Class Members, Settling Plaintiffs assert (¶¶ 8, 12) that the Class List could potentially include some individuals who are not class members.   This again is sophistry.   The distinction Settling Plaintiffs seek to draw between being a Settlement Class Member and being on the Class List is illusory and devoid of any practical significance.   A Settlement Class Member is defined as a person who has been issued (a) a Chapter 7 discharge order by a court, and (b) a post-discharge credit report by a defendant, which shows (i) one or more of his or her pre-bankruptcy debts as delinquent, despite (ii) the absence of any information in his or her credit file supporting that conclusion.   Every person who makes it on the Class List and, hence, every person who received the Notice is irrebuttably presumed to have met these exact same criteria and, as such, is entitled to submit a claim for relief.[2]

---

[2] To the extent there is any practical distinction between being a Settlement Class

Thus, the Notice should have informed its recipients that they were entitled to make a claim because a search of Defendants' files had revealed that one or more of their pre-bankruptcy debts had been reported as still delinquent, despite the absence of any information in those files to suggest that those debts had all been excluded from discharge.  Instead, the Notice informed its recipients that before they could make a claim they needed to determine if they were class members.  Because that instruction was materially misleading and impossible to follow, this Court's decision to re-notice the entire class was correct.

To deflect this Court's attention from this core problem with the Notice, Settling Plaintiffs conflate the *White* Plaintiffs' argument that the Notice was sent only to class members into an argument that not all class members have valid claims (because, in many cases, their credit reports were supposedly error free).[3] Settling Plaintiffs then use the supposed fact that many class members do not have valid claims to justify their attestation requirement and pretend that this Court's confusion on that point was the sole reason for its having invalidated that

---

Member and being on the Class List, which there is not, Settling Plaintiffs have failed to show that the Class List includes a single consumer – much less "millions" of them – who do not meet the criteria for being a Settlement Class Member. The sole illustration Settling Plaintiffs provide is one in which an archived snapshot of a consumer's file shows that a "questionable tradeline," which appeared in an archived snapshot that had taken been taken one year earlier, had been corrected. (Settling Plfs' Submission ¶ 12.)  According to Settling Plaintiffs, that correction may have taken place before the date on which that consumer's credit report had been issued but because Defendants reviewed just one archived snapshot of their files each year when generating the Class List, that consumer might nonetheless have made it onto the Class List. (*Id.*)  The problem with that hypothetical is that it could never happen.  Under the terms of the Settlement, the Class List is generated by looking at an archive snapshot, which shows both a "questionable tradeline" and a credit report having been issued during the year ***preceding*** the snapshot. (Settlement Agreement ¶ 4.1(d)(3).)  In other words, the "questionable tradeline" could not have been corrected at the time the credit report was issued and the fact that a subsequent snapshot might show that it was ***later*** corrected hardly disqualifies the consumer who was the victim of that report from class membership.

[3] Ironically, Settling Plaintiffs' Notice defined a class member as a person who "had a credit report issued by a Defendant that contained debts . . . ***discharged in your bankruptcy*** that were not reported as discharged." (Final Forms of Notice, Ex. C, at 4, Dkt. # 458 (emphasis added).)  In other words, the Notice informed its recipients that a class member was someone with an inaccurate credit report.

requirement.

There are two problems with Settling Plaintiffs' sleight of hand. *First*, even if many class members had invalid claims that would not salvage (a) a Notice that misled its recipients into believing they did not meet the criteria for class membership, or (b) an attestation requirement that would disenfranchise millions of them who do not have the slightest idea whether the pre-bankruptcy information that was reported in their credit reports was accurate or not. *Second*, in any event, Settling Plaintiffs' argument that the attestation requirement is necessary to prevent class members with invalid claims from depleting the settlement fund is disingenuous. Indeed, the same Settling Plaintiffs who are making that argument had previously contended that finding class members whose credit reports accurately list all of their pre-bankruptcy debts as delinquent is like finding a needle in a haystack. (*See* Plaintiffs' Supplemental Memorandum in Support of Class Certification, filed July 11, 2008, at 16, Dkt. # 297.)

To understand why Settling Plaintiffs were right the first time and are wrong now, it is important to recall that an individual cannot get on the class member list unless a Defendant's credit files show (a) one or more of his or her pre-bankruptcy debts having been reported in a delinquent status, and (b) nothing to suggest that those debts had been excluded from discharge. (Settlement ¶ 4.1(a).) All class members meeting these criteria are presumptively entitled to an award and the number who are not is infinitesimal.

In a complete about-face from the past, however, Settling Plaintiffs now embrace Defendants' discredited argument that their reporting of pre-bankruptcy debts as delinquent is frequently accurate because those debts might have been excluded from discharge "due to a multitude of reasons." (Settling Plfs' Submission ¶ 9.) That argument ignores three critical points, all of which Settling Plaintiffs have made repeatedly throughout this litigation.

*First*, Defendants employ a standardized coding protocol that enables them to

11

1  identify *all* of the major categories of discharged debt (*e.g.*, reaffirmations, student

2  loans, domestic support obligations, unpaid taxes and debts associated with

3  "authorized user" accounts) and an individual cannot make it on to the Class List if

4  his credit file shows that all of his pre-bankruptcy debts that had been reported as

5  delinquent fell within those categories.[4]  ***Second***, however many "exceptions" to

6  discharge there might be, the fact is that the overwhelming majority of pre-

7  bankruptcy debts are reached by the discharge order.   (Declaration of Jay L.

8  Westbrook, sworn to on July 18, 2007, ¶ 9, Dkt. # 144.)  ***Third***, the file of a typical

9  consumer will show between three and four pre-bankruptcy debts as having been

10  reported in a delinquent status.  (Declaration of Charles Juntikka, sworn to Dec. 14,

11  2009, ¶ 43, Dkt. # 555.)

12        Thus, in order for the credit report of such a consumer to be accurate, not

13  only would *all* of those multiple debts have had to fall within a non-dischargeable

14  category, but that consumer's creditor would have had to have failed to report ***each***

15  ***and every*** one of them with a code showing it to be non-dischargeable.  Needless to

16  say, the chances of that happening are miniscule.  But it is to prevent the minute

17  fraction of the class who may have been issued accurate credit reports from

18  receiving an undeserved payment that Settling Plaintiffs would deny any

19  opportunity for relief to millions of others whose reports are unquestionably

20  inaccurate.[5]

21  _____

22  [4]   *See, e.g.*, Declaration of Dean Binder Decl., sworn to Dec. 11, 2009, ¶¶ 52-54,
Dkt. # 556; Declaration of Evan Hendricks, sworn to July 19, 2007, ¶¶ 10 & 12-13,
23  Dkt. # 145; Declaration of John Ulzheimer, sworn to Feb. 14, 2007, ¶ 17, Dkt. # 67.

24  [5]   To create the impression that a significant portion of the class has invalid claims,
Settling Plaintiffs pretend that exclusions from discharge are much more common
25  than there really are and cite, as examples of such non-discharged debts, those that
were not listed on bankruptcy schedules and those on which voluntary post-
26  bankruptcy payments were made.  As set forth in the *White* Plaintiffs' Objections to
Settling Plaintiffs Proposed Secondary Notice (at 6-7) and in their Reply in Further
27  Support of their Objections to Final Approval (at 22-24), these debts are, in fact, all
discharged as a matter of law – a truth that Counsel for Settling Plaintiffs had
28  themselves repeatedly pointed out before their interests became aligned with those
of Defendants and it became convenient for them to argue the other side.

12

**B. The Fact That The Notice And Claim Form Were Fatally Defective Is Confirmed By The Abysmally Low Response Rate.**

Since the filing of the Settlement in April 2009, the *White* Plaintiffs have consistently asserted that the defective Notice and attestation requirement would serve to disenfranchise 95% of the class.   And, in fact, that is exactly what happened.  Of the 15 million class members who received the notice just 744,809 or 5% submitted a claim.

Settling Plaintiffs maintain that this abysmally low response rate is actually "a very successful response rate," which serves to validate the Notice and claim form.  (Settling Plfs' Submission ¶ 15.)  That is no more correct than it sounds.

In consumer class actions in which claim forms are mailed directly to class members, the average response rate is at least 10 to 15 percent.  *Berther v. TSYS Total Debt Management, Inc.*, 2007 WL 1795472, at *3 (E.D.Wis. 2007) ("[T]he parties were in agreement that a ten to fifteen percent return rate is normal, but return rates have been as high as twenty-five percent in other cases"); *see also Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92 (3d Cir. 1985) (finding that even though a 12% response rate "appears low…[it] is in line with response rates in similar settlements"), *Stoner v. CBA Info. Servs.*, 352 F.Supp.2d 549, 552 (E.D.Pa. 2005) (approving a settlement with a response rate over 16%); *In re Friedman's Inc. Sec. Litig.*, 2009 WL 1456698, at *4 (N.D.Ga. 2009) (finding a 17.2% response rate "relatively low"); Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71 (2007) ("It is not unusual for only 10 or 15% of the class members to bother filing claims.").

As a response rate that is at least one-half to one-third of the norm is indicative of a fatally defective notice, this Court's decision to reevaluate the sufficiency of the Notice was plainly appropriate.  *See In re TJX Comps. Retail Sec. Breach Litig.*, 584 F.Supp.2d 395, 404-05 (D.Mass. 2008) ("class member

13

nonparticipation may be attributed to . . . an ineffective notice program that fails to make class members aware of their rights"); *Parker v. Time Warner Entertainment Co.*, L.P., 631 F.Supp.2d 242, 265-266 (E.D.N.Y. 2009) (same).  Undoubtedly, if the class is sent a revised Notice, which enables class members to identify themselves as such and which does not make them to attest to something they cannot possibly know, the response rate will dramatically increase – just as it has in other cases in which the original notice was "wholly inadequate."  *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 119 (S.D.N.Y. 2009) (noting that response rate went from less than 1% to over 26% following re-notice).

In support of their assertion that a 5% response rate is more than satisfactory, Settling Plaintiffs cite the *In re Trans Union Privacy Litigation*, in which the court approved a notice that yielded a response rate of just .317%.  (Settling Plfs' Submission ¶ 15.)   This is like comparing apples to oranges.  First, unlike the present case in which notice was mailed to 15 million known class members, *Trans Union Privacy* involved publication notice to an "estimated" class of 190 million consumers.  Obviously, "individual notices are more effective in eliciting responses than are published notices" and, hence, this Court should expect and demand far more out of a mailed notice than it would a published one.  William B. Rubenstein et al., 3 Newberg on Class Actions § 8:38 (4th ed. 2010). Second, as much of the relief in *Trans Union Privacy* was free product (in the form of free credit monitoring), the response rate can hardly be compared with a case involving cash relief estimated to be as much as $750.[6]

---

[6]  Settling Plaintiffs' citation to *In re Domestic Air. Transp. Anti-Trust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993), is similarly inapposite.  That case involved a coupon settlement and published notice to 50 million consumers for which the response rate was 2.8%.  *Id.* at 318, n.33.  Critically, of the 10 million consumers who received mailed notice, 1.4 million submitted claims, yielding a more reasonable response rate of 14%.  *Id.*

14

**C. The Cost Of The Secondary Notice Is No Reason Not To Re-Notice The
Entire Class.**

Settling Plaintiffs' also object to re-noticing the 14.25 million class members
who did not submit claims on the ground that the cost would be "significant" –
approximately $5 million – "and would significantly reduce the amounts available
to claimants." (Settling Plfs' Submission ¶ 7.) At the outset, to the extent the
notice was fatally flawed, which it was, sending out a secondary notice to the entire
class is mandatory under Fed. R. Civ. P. 23(c)(2) and, hence, cost is no more valid a
reason to dispense with such re-notice than it would be for dispensing with notice in
the first place.

Moreover, Settling Plaintiffs' argument assumes that the cost of re-notice
must necessarily be borne by the class itself. But that is not so. In its June 20, 2010
Order, this Court instructed Settling Plaintiffs to provide a statement regarding the
"segment of the fund" that should bear the cost of re-notice. (*Id.* at 7.) In response,
Settling Plaintiffs simply stated that this cost "should be assessed against the
amounts available for awards to claimants." (Settling Plfs' Submission ¶ 6.) As to
why they believed it is proper to saddle the class with this burden, Settling Plaintiffs
do not say word one. That is because there is nothing that can be said in support of
their indefensible position.

The need for a secondary notice is solely a product of Counsel for Settling
Plaintiffs' insistence on sending out a notice and claim form that were fatally
defective for all of the reasons set forth in this opposition. To make matters worse,
counsel for Settling Plaintiffs sent out their notice, even though the *White* Plaintiffs
repeatedly advised them of these defects and repeatedly warned them that millions
of dollars would go to waste if they were not fixed.

For instance, in their Memorandum in Support of their Motion for
Reconsideration of the Order Granting Preliminary Approval, dated May 2, 2009 (at
23-24, Dkt. # 430), the *White* Plaintiffs advised that the "notice is fatally defective

15

in that it . . . does not state the class size or describe the formula for distributing funds" and "provides no information that would enable class members to tell whether the information on their credit reports was erroneous."  And, in that same motion, the *White* Plaintiffs warned that "[m]illions of . . . class members who are unaware of any errors on their credit reports" would be "disenfranchised by the Settlement's requirement that anyone submitting a claim affirm their belief that their credit reports were inaccurate."  (*Id.* at 2.)  Then, following this Court's denial of their motion for reconsideration, the *White* Plaintiffs sought appellate review under Fed. R. Civ. P. 23(f) in a last ditch effort to have their arguments heard before more than $5 million would be wasted on notice costs.

Not only did Counsel for Settling Plaintiffs fail to heed the *White* Plaintiffs' warnings about the defects in the Notice and claim form, they succeeded in their effort to deny the *White* Plaintiffs so much as a hearing on that issue.  Had Counsel for Settling Plaintiffs been less anxious to rush their settlement through the preliminary approval stage, this Court would have had the opportunity to assess whether the Notice and claim form were deficient before they were sent to some 15 million recipients and the issue of having to re-notice those recipients would never have come up.

Given these circumstances, that Counsel for Settling Plaintiffs would even suggest that the class should pay the $5 million cost of their mistake speaks volumes about whose interests they hold most dear.  Basic principles of fairness demand that the cost of re-notice be paid for by those who were responsible for crafting the original notice and claim form, who failed to heed repeated warnings that they were defective and who worked to prevent those warnings from being brought to the attention of this Court.  In other words, the cost associated with re-notice should not serve to reduce the amount available for distribution to claimants by a single cent and, hence, this Court should not consider those costs in determining whether its decision to order such re-notice was the correct one.

16

## CONCLUSION

1
2        For the reasons set forth herein, this Court should deny Settling Plaintiffs'
3   motion for reconsideration.

4
5   DATED:  August 23, 2010            **BOIES, SCHILLER & FLEXNER LLP**
                                       George F. Carpinello
                                       Adam R. Shaw
6                                      David L. Zifkin (SBN 232845)

7
                                       By /s/ *Adam R. Shaw*
8                                           Adam R. Shaw

9                                      CHARLES JUNTIKKA & ASSOCIATES LLP
                                       Charles Juntikka
10

11                                     DANIEL WOLF LAW OFFICES
                                       Daniel Wolf
12

13
                                       Attorneys for Plaintiffs Robert Radcliffe, Chester
14                                     Carter, Maria Falcon, Clifton C. Seale, III,
                                       Arnold E. Lovell, and all others similarly situated
15

16

17

18

19

20

21

22

23

24

25

26

27

28

17