Daniel J. McLoon (State Bar No. 109598)
djmcloon@jonesday.com
Michael G. Morgan (State Bar No. 170611)
mgmorgan@jonesday.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071-2300
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539

Attorneys for Defendant
EXPERIAN INFORMATION SOLUTIONS, INC.

Additional Counsel Listed on Signature Page

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI N. WHITE, et al.,<br><br>    Plaintiff,<br><br>    v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>    Defendant.<br><br>AND RELATED CASES | Case No. 05-cv-1070-DOC (MLGx) LEAD CASE<br><br>Assigned for all purposes to Honorable Judge David O. Carter<br><br>**DEFENDANTS' JOINT SUPPLEMENTAL BRIEF REGARDING GENERATION OF THE INITIAL NOTICE LIST**<br><br>[Filed concurrently with Declarations of Angela Granger, Nancy Everett, Lisa Komanski, William Stockdale, and Michael G. Morgan] |

LAI-3112889v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................... 1

II. GENERATION OF THE NOTICE LIST ................................................. 1

    A. Defendants' Databases and Monthly Archive Files ............................ 1

    B. Generation of the Notice List ............................................................. 4

    C. Mailing of the Initial Notice and Claim Form .................................... 5

III. THE NOTICE LIST INCLUDED MANY CONSUMERS WHOSE CREDIT REPORTS WERE ENTIRELY ACCURATE ............................. 5

IV. THERE IS NO NEED FOR SECONDARY NOTICE TO NON-CLAIMANTS ........................................................................................... 11

V. CONCLUSION ........................................................................................ 12

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Beezley v. California Land Title Co.*,
  994 F.2d 1433 (9th Cir. 1993) ................................................................................. 9

*Bova v. St. Vincent De Paul Corp.*,
  326 F.3d 300 (1st Cir. 2003) .................................................................................. 9

*In re Nielsen*,
  383 F.3d 922 (9th Cir. 2004) .................................................................................. 9

**STATUTES**

11 U.S.C. § 523(a)(3)(A) .......................................................................................... 9

11 U.S.C. § 524(a)(1) ............................................................................................... 9

11 U.S.C. § 704(a)(1) ............................................................................................... 9

11 U.S.C. § 726 ......................................................................................................... 9

## I. INTRODUCTION

Pursuant to the Court's Order, this supplemental brief describes the procedures and data used to generate the notice list ("Notice List") and explains why it was impossible to exclude from the list those consumers whose credit reports were entirely accurate and thus had no legitimate right to receive a cash payment out of the $45 million Settlement Fund. As detailed in the concurrently filed declarations,[1] the Notice List contained 15,143,724 names and addresses that were identified as a result of costly and time-consuming searches of Defendants' massive archive files. These searches aimed to identify all consumers who potentially were the subject of an inaccurate credit report and to minimize the risk that any such consumer would be left off the Notice List. However, for a host of reasons discussed below, use of the archive files does not allow for the generation of a perfect notice list because the archive files lack the detail necessary to discern whether a tradeline in fact was discharged or to determine what actually appeared on an issued credit report. Thus, it was necessary to require claimants to attest to the inaccuracy of at least one credit report issued by at least one Defendant. Accordingly, there is no justification for requiring secondary notice to consumers who did not submit a timely claim in response to the initial notice.

## II. GENERATION OF THE NOTICE LIST

### A. Defendants' Databases and Monthly Archive Files

Defendants do not have the information required to compile a list of those consumers who were the subject of an inaccurate credit report issued by a Defendant, i.e., who were the subject of a credit report issued by a Defendant that reported a discharged debt without a discharge indicator. Each Defendant issues more than a million credit reports each day and does not in the normal course of

---

[1] For the Court's convenience, copies of the documents cited herein, including previously filed declarations, briefs, and orders from this Court, are attached as exhibits to the Declaration of Michael G. Morgan ("Morgan Decl.").

LAI-3112889v1

-1-

business retain copies of those reports.² When a Defendant receives a request for a credit report concerning one of the more than 200 million consumers whose credit information appears in its database, it generates that report by searching its database and taking a "snapshot" of the information associated at that moment in time with the identifying information provided with the request.³ Each Defendant's database is continuously updated as additional information is received from more than 10,000 data sources.⁴ Moreover, the process of linking particular credit information to a particular consumer is a dynamic one. Thus, information reported to a credit reporting agency may not initially be linked to a consumer's file. Such linkage often occurs as additional information is reported to the credit reporting agency. Knowing that a particular credit account has been linked to a particular consumer at one point in time does not mean the linkage has always been present. Thus, there is no way to "recreate" a credit report that was generated for a particular consumer at a specific time in the past.⁵

Each Defendant creates a monthly archive of the information appearing in its database by taking a "snapshot" of its database as of the moment when the archive is created.⁶ For example, a July 2007 archive file would contain information about how tradelines appeared at the particular moment on June 30, 2007 when the archive was created.⁷ The archive file also would identify the dates within the two-

---

² Morgan Decl., Ex. 1 (Dkt. 120, Declaration of Patricia Finneran) at ¶¶ 5-6; Declaration of Nancy Everett ("Everett Decl.") at ¶¶ 3-4; Declaration of William R. Stockdale ("Stockdale Decl.") at ¶ 7.

³ Morgan Decl., Ex. 1 (Finneran) at ¶¶ 5-6; Everett Decl. at ¶¶ 3-4; Stockdale Decl. at ¶ 7.

⁴ Morgan Decl., Ex. 2 (Dkt. 120, Declaration of David A. Browne) at ¶ 9; Everett Decl. at ¶¶ 3-4; Stockdale Decl. at ¶ 5.

⁵ Morgan Decl., Ex. 1 (Finneran) at ¶ 6; Stockdale Decl. at ¶ 7; *see also* Morgan Decl., Ex. 3 (Dkt. 321, Pltfs' Closing Memo in Support of Motion for Class Certification) at 6:19-21 (*White* Plaintiffs concede that Defendants "may not be able to recreate a credit report…issued about a consumer on, for example, November 15, 2001.").

⁶ Declaration of Angela Granger ("Granger Decl.") at ¶ 3; Everett Decl. at ¶ 5; Stockdale Decl. at ¶ 8.

⁷ Granger Decl. at ¶ 3.

LAI-3112889v1

year period preceding the archive (e.g., July 1, 2005-June 30, 2007) on which a credit report was issued as well as the recipients of those reports.[8]

However, the archive files do not capture the information contained in actual credit reports for four reasons. First, the archive files do not contain copies of any issued credit reports, nor do they reflect how a tradeline would have been reported during the archival period unless the tradeline had remained linked to the consumer and remained completely unchanged between the time when the credit report was issued and when the archive was created.[9] Even *White* Plaintiffs concede that the archive files contain information that may have changed in the days after a credit report was issued.[10] Second, sometimes particular tradelines are suppressed due to maintenance or other issues. If a credit report is issued during the suppression period, the suppressed tradeline will not appear on the credit report; however, the archive files may show the suppressed tradeline.[11] Third, each Defendant frequently changes tradelines at the request of consumers, but the archives only reflect the changed tradelines and do not contain any information concerning what these changes were or when the changes were made, and thus it is not possible to discern how the tradelines may have appeared at an earlier time when a credit report was issued.[12] Fourth, sometimes an Experian credit file includes the contents of two previously separate files that have merged, but the archives contain no detail showing which of the pre-merged files was used to create any credit reports issued during the archival period.[13] There is no way to determine systematically which or how many of the consumers on the Notice List were affected by the above issues.

---

[8] Granger Decl. at ¶ 3; Everett Decl. at ¶ 5; Stockdale Decl. at ¶ 8.

[9] Granger Decl. at ¶ 4; Morgan Decl., Ex. 1 (Finneran) at ¶ 6.

[10] Morgan Decl., Ex. 3 (Pltfs' Closing Memo in Support of Motion for Class Certification) at 6:19-26.

[11] Granger Decl. at ¶ 5.

[12] Granger Decl. at ¶ 6; Morgan Decl., Ex. 4 (Dkt. 326, Second Supplemental Declaration of Patricia Finneran) at ¶ 5.

[13] Granger Decl. at ¶ 7; Morgan Decl., Ex. 4 (Finneran 2d Supp.) at ¶ 6.

LAI-3112889v1

Additionally, the archive files do not contain information that often is required in order to determine the discharge status of tradelines and to assess whether the tradelines were accurately reported without a discharge indicator. From the information appearing in the archive files, it is impossible to identify many categories of nondischargeable debts, such as nondischargeable debts reported to Defendants with generic account type codes and reaffirmed debts reported to Defendants without any reference to the reaffirmation. These categories are discussed in detail in Section III below.

### B. Generation of the Notice List

Despite their limitations, the archive files are the only source of data that, as a practical matter, could be used to compile a list of consumers who potentially were the subject of an inaccurate credit report. Accordingly, as required under the Settlement Agreement and this Court's Preliminary Approval Order, each Defendant searched a selection of its archive files — one for each twelve-month period between March 15, 2002 through September 31, 2008, as well as an archive created in mid-2008 shortly before each Defendant completed the Retroactive Scrub required under the Injunctive Relief Settlement.[14] In general, a consumer was identified if any archive file for any Defendant reflected: (i) the entry of a Chapter 7 discharge; (ii) a qualifying tradeline, collection or judgment; and (3) a hard inquiry within the archival period.[15] To reduce the risk that a consumer might be excluded from the Notice List as a result of changes to tradelines that occurred during the archival period (e.g., due to pre-archive data reporting, data suppression, file mergers, etc.), Defendants staggered their searches of annual archives.[16] Experian

---

[14] Granger Decl. at ¶ 9; Everett Decl. at ¶ 6; Stockdale Decl. at ¶ 17; Morgan Decl., Ex. 5 (Dkt. 384, Settlement Agreement and Release) at § 4.1(a)-(b); *see generally*, Morgan Decl., Ex. 6 (Dkt. 423, Order Granting Preliminary Approval to Proposed Class Action Settlement).

[15] Granger Decl. at ¶¶ 10-15; Everett Decl. at ¶ 7; Stockdale Decl. at ¶ 18.

[16] Granger Decl. at ¶ 9; Stockdale Decl. at ¶ 17; *see* Morgan Decl., Ex. 5 (Settlement Agreement and Release) at § 4.1(b)(ii).

LAI-3112889v1

reviewed its archives created in June of each year within the class period, while Equifax and TransUnion reviewed their October and February archives, respectively.[17] For each identified consumer, Defendants provided identifying information, including name and address, the date of the consumer's Chapter 7 discharge order, and information concerning the archival periods for which the consumer qualified for the Notice List.[18]

Defendants completed their searches and timely delivered their lists of identified consumers to the Settlement Administrator by the July 31, 2009 deadline.[19] After receiving Defendants' lists, the Settlement Administrator combined the lists into a single Notice List by removing duplicate entries for consumers and resolving address conflicts using the National Change of Address registry. The final Notice List contained 15,143,724 names and addresses.[20]

### C. Mailing of the Initial Notice and Claim Form

On or before September 28, 2009, the Settlement Administrator timely mailed the initial notice and claim form to the entire Notice List.[21] 770,798 consumers submitted timely claims by the November 30, 2009 deadline.[22]

## III. THE NOTICE LIST INCLUDED MANY CONSUMERS WHOSE CREDIT REPORTS WERE ENTIRELY ACCURATE.

In the ten scenarios discussed below, a consumer would qualify for the Notice List even though the consumer was not the subject of an inaccurate credit

---

[17] Granger Decl. at ¶ 9; Everett Decl. at ¶ 6; Stockdale Decl. at ¶ 17.

[18] Granger Decl. at ¶ 17; Everett Decl. at ¶ 13; Stockdale Decl. at ¶ 21; *see* Morgan Decl., Ex. 5 (Settlement Agreement and Release) at § 4.1(d).

[19] Granger Decl. at ¶ 17; Everett Decl. at ¶ 13; *see* Morgan Decl., Ex. 5 (Settlement Agreement and Release) at § 4.1(a); Morgan Decl., Ex. 6 (Order Granting Preliminary Approval to Proposed Class Action Settlement) at § III(A)(1).

[20] Morgan Decl., Ex. 7 (Dkt. 604-3, Declaration of Jennifer M. Keough) at ¶ 5.

[21] Morgan Decl., Ex. 7 (Keough) at ¶ 7; *see* Morgan Decl., Ex. 5 (Settlement Agreement and Release) at § 4.3(b); Morgan Decl., Ex. 8 (Dkt. 478, Order Granting Settling Pltfs' and Defs' Joint Ex Parte Application to Amend the Court's May 7, 2009 Order).

[22] Morgan Decl., Ex. 7 (Keough) at ¶ 14.

report and had no legitimate claim against Defendants. These scenarios have been the subject of extensive discovery, briefing, and argument over the course of this litigation because they were impediments to Plaintiffs' attempts to identify an ascertainable litigation class.[23] Indeed, this Court mentioned several of these scenarios in its ruling tentatively denying class certification.[24]

**Ride-Throughs of Revolving Debts:** As *White* Plaintiffs have conceded, "consumers may be using their credit card for purchases subsequent to the bankruptcy filing, in which case that debt would not be subject to the bankruptcy discharge."[25] It is undisputed that any post-bankruptcy delinquency is accurately reported without a discharge indicator. However, the accurate reporting of a delinquency that resulted from post-bankruptcy charges would qualify a consumer for the Notice List, because there is nothing in Defendants' archive files to identify accounts for which charges were incurred after the bankruptcy.[26]

**Tradelines Updated to Qualifying Status After a Credit Report was Issued:** Because an archive file only shows how a tradeline appeared at the moment when the archive file was created, it is impossible to know whether any tradelines that qualify a consumer for the Notice List actually appeared on any credit report issued during the archive period. For example, a consumer would

---

[23] *See generally* Morgan Decl., Ex. 9 (Dkt. 209, Experian's Opposition to Pltfs' Motion for Class Certification); Morgan Decl., Ex. 10 (Dkt. 308, Experian's Supplemental Opposition to Pltfs' Motion for Class Certification); Ex. 11 (Dkt. 220, Opposition of Equifax to Pltfs' Motion for Class Certification); Morgan Decl., Ex. 12 (Dkt. 305, Equifax's Supplemental Brief in Opposition to Pltfs' Motion for Class Certification); *see also* Morgan Decl., Ex. 13 (Dkt. 594, Defs' Joint Response to Objections to Monetary Relief Settlement) at 10:5-11:20, 33:3-12; Morgan Decl., Ex. 14 (Dkt. 705, Defs' Joint Statement Regarding Secondary Notice to Non-Claimants) at 1:27-2:8.

[24] Morgan Decl., Ex. 15 (Dkt. 369-2, [Tentative] Order [Denying] Pltfs' Motion for Class Certification) at 7:24-8:11.

[25] Morgan Decl., Ex. 16 (Dkt. 300, Pltfs' Memorandum of Points & Authorities in Support of Motion for Certification of Settlement Class & Final Approval of Proposed Injunctive Relief Class Settlement) at 10:6-8; *see also* Morgan Decl., Ex. 17 (Dkt. 120, Declaration of Lisa Hill Fenning) at ¶¶ 31, 46 ("revolving accounts [may be] intentionally left off a debtor's [bankruptcy] schedules in an attempt to gain continued access to credit post-discharge").

[26] Everett Decl. at ¶ 14; Stockdale Decl. at ¶ 12.

qualify for the Notice List whenever a Defendant's archive file showed a delinquent revolving account at the time of the archive and the issuance of a credit report any time during the archival period. Obviously, if the delinquency was not reported until after the credit report was issued, the delinquency would not have appeared on the credit report, but there would be no way to identify this situation from the information in the archive file. Settling Plaintiffs recently made this point in their Reply to *White* Plaintiffs' Opposition to Motion for Reconsideration, in which they pointed out that a tradeline could qualify a consumer for the Notice List based on how that tradeline appeared at the end of the archive period even though the tradeline had been reported accurately in an earlier credit report.[27]

**Unreported Reaffirmations:** Debtors often enter into formal reaffirmation agreements with their creditors, but their creditors fail to notify Defendants of that fact by reporting the specific Metro II code associated with reaffirmed debts.[28] In this situation, the reporting of a delinquency on the reaffirmed debt would qualify the consumer for the Notice List because there is nothing on the archive file showing the nondischargeable nature of the debt, even though it was entirely accurate to report the debt without a discharge indicator.

**Nondischargeable Debts Reported with Generic Account-Type Codes:** Creditors sometimes use generic account-type codes to describe accounts that are not dischargeable, such as student loans.[29] Any derogatory reporting of these tradelines would qualify a consumer for the Notice List, even though the tradelines were accurately reported without a discharge indicator, and there is nothing in the archive files to show the debts' nondischargeable nature.

---

[27] Morgan Decl., Ex. 18 (Dkt. 720, Settling Pltfs' Reply to *White* Pltfs' Opposition to Motion for Reconsideration) at 7:18-28.

[28] Morgan Decl., Ex. 19 (Dkt. 311, Supplemental Declaration of Patricia Finneran) at ¶ 4 & Ex. 17 (Fenning) at ¶ 25; Everett Decl. at ¶ 14.

[29] Morgan Decl., Ex. 19 (Finneran Supp.) at ¶ 4; Granger Decl. at ¶ 13; Everett Decl. at ¶ 14; Stockdale Decl. at ¶ 16.

LAI-3112889v1

For example, Wells Fargo reported 100,000 student loans to Equifax as generic unsecured loans rather than as student loans.[30] When Equifax conducted the Retroactive Scrub required under the Injunctive Relief Settlement in the Third Quarter of 2008,[31] approximately 9,000 of these loans were updated to include a discharge indicator because they satisfied the criteria under the Retroactive Scrub.[32] However, these loans were nondischargeable student loans, and it is inaccurate to report them with a discharge indicator. Accordingly, Equifax and Wells Fargo recently agreed that Equifax would purge these tradelines from its database and that Wells Fargo would re-report the loans with the specific Metro II code for student loans on a going-forward basis.[33] However, these student loans would have appeared in Equifax's archive files as unsecured debt, which typically is dischargeable, and thus any derogatory reporting of these loans during the settlement class period would qualify the consumer for the Notice List, even though the reporting was accurate.

**Successful Adversary Proceedings:** Furnishers may not report to Defendants when they successfully challenge the discharge of a debt in an adversary proceeding.[34] Rather, they may continue to report the pre-bankruptcy debt after the bankruptcy and the successful adversary proceeding as an ongoing obligation without a discharge indicator. Because Defendants have no record of the proceedings, these consumers would have qualified for the Notice List based on the derogatory reporting of these debts, even though these debts were not discharged and were accurately reported without a discharge indicator. This is no small matter;

---

[30] Declaration of Lisa Komanski ("Komanski Decl.") at ¶ 4.

[31] *See* Morgan Decl., Ex. 20 (Dkt. 338, Approval Order Regarding Settlement Agreement and Release) at § 3.1.

[32] Komanski Decl. at ¶¶ 6-8.

[33] *Id.* at ¶8.

[34] *See* Morgan Decl., Ex. 1 (Finneran) at ¶ 25 & Ex. 2 (Browne) at ¶ 20.

LAI-3112889v1

over the course of the class period, roughly 278,000 adversary proceedings were filed.[35]

**Unscheduled Debts of Consumers Who Obtained Discharges in "Asset" Bankruptcies:** Some Chapter 7 bankruptcies are of the "asset" variety, meaning that some of the consumer's assets are distributed to the consumer's creditors as part of the bankruptcy.[36] In such cases, the Chapter 7 discharge order extends only to those debts that the consumer properly listed in his or her bankruptcy schedules.[37] However, Defendants do not possess any data indicating whether a particular bankruptcy was an "asset" or "no asset" case or identifying which debts were listed or omitted from the bankruptcy schedules.[38] Nor is there any automated process for retrieving this information from the bankruptcy courts.[39] Accordingly, consumers who obtained discharges in "asset" cases would qualify for the Notice List based on the reporting of debts that were not scheduled in bankruptcy and thus were not discharged, even though such debts were accurately reported without a discharge indicator.

**Civil Judgments Based on Nondischargeable Debts:** Civil judgments based on nondischargeable debts are likewise statutorily nondischargeable.[40] However, there often is nothing in Defendants' archives indicating whether the

---

[35] Morgan Decl., Ex. 21 (Dkt. 309-2, Second Supplemental Declaration of Michael G. Morgan) at Ex. 70 (exhibit as numbered in attached declaration).

[36] *See* 11 U.S.C. § 726; *see also* 11 U.S.C. § 704(a)(1).

[37] 11 U.S.C. § 523(a)(3)(A); *see, e.g.*, *In re Nielsen*, 383 F.3d 922, 926 (9th Cir. 2004); *Beezley v. California Land Title Co.*, 994 F.2d 1433, 1434-41 (9th Cir. 1993).

[38] Morgan Decl., Ex. 1 (Finneran) at ¶ 29 & Ex. 10 (Experian's Supplemental Opposition to Pltfs' Motion for Class Certification) at 6:28-7:4; Stockdale Decl. at ¶¶ 13-14.

[39] Morgan Decl., Ex. 17 (Fenning) at ¶ 5; Morgan Decl., Ex. 22 (Dkt. 329, Defendant Experian's Surreply in Opposition to Class Certification) at 5:14-16 & Ex. 23 (Dkt. 297-2, Declaration of Michael W. Sobol) at Ex B (exhibit as numbered in attached declaration, which attaches portions of Lisa H. Fenning's September 25, 2007 deposition transcript at 69:2-4); Stockdale Decl. at ¶¶ 13-14.

[40] *See* 11 U.S.C. § 524(a)(1); *see, e.g.*, *Bova v. St. Vincent De Paul Corp.*, 326 F.3d 300, 303 (1st Cir. 2003) (holding that a civil judgment enforcing a nondischargeable debt is nondischargeable).

judgment is dischargeable, and thus it is impossible to distinguish nondischargeable judgments from dischargeable ones.[41]  A consumer would qualify for the Notice List based on the reporting of any judgment, even though that reporting without a discharge indicator may have been accurate.

**Ride-Throughs of Secured Loans:**  Consumers often chose to pay secured loans on their original terms, even though that loan ordinarily would be subject to discharge.[42]  As the Court has noted, these debts should be reported without discharge indicators.[43]  Nevertheless, any derogatory reporting of these tradelines ordinarily would qualify a consumer for the Notice List, even though the tradelines were reported accurately without a discharge indicator.

**Suppressed Tradelines:**  As noted above, the archive files do not contain information regarding the suppression of tradelines.[44]  Because this information is not present, consumers would have qualified for the Notice List based on tradelines that had been suppressed when the credit reports were issued but remained on the Defendant's database at the end of the archive period.  In other words, merely because an archive shows a qualifying tradeline and a credit inquiry during the archival period does not establish that the credit report actually contained the qualifying tradeline because that tradeline may have been suppressed when the credit report was generated.  This is an example of the scenario described in Settling Plaintiffs' recent reply brief in which a tradeline vacillates from qualifying to not qualifying during the archive period.[45]

---

[41] Morgan Decl., Ex. 1 (Finneran) at ¶ 29.

[42] *See* Morgan Decl., Ex. 1 (Finneran) at ¶ 13 & Ex. 17 (Fenning) at ¶¶ 23, 31, 46.

[43] Morgan Decl., Ex. 15 ([Tentative] Order [Denying] Pltfs' Motion for Class Certification) at 8:1-3.

[44] Morgan Decl., Ex. 4 (Finneran 2d Supp.) at ¶ 4.

[45] Morgan Decl., Ex. 18 (Settling Pltfs' Reply to *White* Pltfs' Opposition to Motion for Reconsideration) at 7:17-19.

- 10 -

**Merged Files:**  As noted above, files that have been merged in Experian's database could qualify a consumer for the Notice List by showing a discharge order, a qualifying tradeline, and the issuance of a credit report.[46]  However, the consumer would not have been the subject of any inaccurate credit report if, in truth, the credit report had been prepared based on a pre-merger file that had no qualifying tradeline because the qualifying tradeline appearing in the other pre-merger file.[47]

## IV. THERE IS NO NEED FOR SECONDARY NOTICE TO NON-CLAIMANTS.

In order to exclude those consumers whose credit reports were entirely accurate and who had no potential claim against Defendants, the claim form required prospective claimants to attest to a belief that they were the subject of an inaccurate credit report.  *White* Plaintiffs assert that the attestation served no legitimate purpose because everyone on the Notice List already had been determined to have had an inaccuracy on their credit reports based upon information appearing in the archive files.[48]  Not so.

To the contrary, it was impossible to generate a list that was limited to those consumers who were the subject of inaccurate credit reporting because *none* of the ten scenarios described above can be identified based on information contained in the archive file.  At best, it was possible to generate a list that identified as many potential claimants as possible and minimized the risk that potentially legitimate claimants would be unfairly deprived of the opportunity to submit a claim.  However, the list necessarily included consumers whose credit reports were entirely accurate.

---

[46] Morgan Decl., Ex. 4 (Finneran 2d Supp.) at ¶ 6.
[47] *Id.*
[48] Morgan Decl., Ex. 24 (Dkt. 715, *White* Pltfs' Opposition to Settling Pltfs' Motion for Reconsideration) at 9:6-10:5.

LAI-3112889v1

Under the circumstances, it would have been wholly unreasonable not to require notice recipients to provide some type of minimal attestation as to the inaccuracy of a credit report in order to submit a claim. This attestation requirement was a modest one, and it sensibly advanced this Court's interest in directing payments from the Settlement Fund to those consumers who had inaccuracies on their credit report.[49]

## V. CONCLUSION

For the foregoing reasons, it was entirely reasonable to require claimants to attest to the inaccuracy of a credit report issued by a Defendant, and there is no justification for requiring secondary notice to the millions of non-claimants. Accordingly, Defendants respectfully urge the Court to order a secondary notice only to the 770,798 consumers who submitted a timely claim, but not to require any further notice to the full Notice List.

Dated: November 4, 2010

JONES DAY

By: /s/ Michael G. Morgan
Michael G. Morgan

Attorneys for Defendant
EXPERIAN INFORMATION SOLUTIONS, INC.

Dated: November 4, 2010

STROOCK & STROOCK & LAVAN LLP

By: /s/ Stephen J. Newman   by permission
Stephen J. Newman

Attorneys for Defendant
TRANSUNION LLC

---

[49] Morgan Decl., Ex. 25 (Dkt. 703, Order Conditionally Granting Request for Secondary Notice) at 3:8-9 (notice should "effectuate the ultimate purpose of providing different awards to persons who suffered different types of damages from errors in their credit report.").

LAI-3112889v1

- 12 -

| | |
|---|---|
| Dated: November 4, 2010 | KILPATRICK STOCKTON LLP |
| | By: *Cindy P. Hanson* by permission /s/<br>Cindy D. Hanson |
| | Attorneys for Defendant<br>EQUIFAX INFORMATION SERVICES LLC |