BOIES, SCHILLER & FLEXNER LLP
George F. Carpinello
Adam R. Shaw
10 North Pearl Street
Albany, NY 12207
Telephone: 518.434.0600
Facsimile: 518.434.0665
Email: gcarpinello@bsfllp.com
ashaw@bsfllp.com
(admitted *pro hac vice*)

CHARLES JUNTIKKA & ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone: 212.315.3755
Facsimile: 212.315.9032
Email: charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone: 202.842.2170
Email: dan@danielwolflaw.com

David L. Zifkin (SBN 232845)
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA 90401
Telephone: 310-395-5800
Facsimile: 510-874-1460
Email: dzifkin@bsfllp.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)

| | |
|---|---|
| TERRI N. WHITE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendant.<br><br>And Related Actions. | **Case No. 05-CV-1070 DOC (MLGx)**<br>**(Lead Case)**<br><br>**THE *WHITE* PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER DATED OCTOBER 20, 2010**<br><br>Place: Courtroom 9D<br>Judge: Honorable David O. Carter |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT .............................................................................................................2

I. The Number Of Notice Recipients Who Are Not Class Members Because Their "Ridden Through" Revolving Accounts Were Not Listed As Delinquent At The Time Their Credit Reports Were Issued Is Miniscule. ........................................................................................................4

   A. The Overwhelming Majority Of Chapter 7 Beneficiaries Who Might Qualify For Class Membership On The Basis Of A "Ridden Through" Revolving Account Would Also Qualify For Class Membership On The Basis Of At Least One Other Qualifying Entry. ...................................................................................................6

   B. The Chances That A Notice Recipient Whose "Ridden Through" Account Fell Into Delinquency Post-Bankruptcy Would Not Have A Credit Report Issued Reflecting That Fact Are Extremely Remote. ..............................................................................................9

II. In Any Event, The Supposed Over-Inclusivity Of The Class Notice Does Not Justify Reconsideration Of The Court's Order Mandating Re-Notice Of The Entire Class. ..............................................................10

   A. Even If The Notice Were Over-Inclusive As To Consumers With "Ridden Through" Accounts That Became Delinquent *Post-Bankruptcy*, That Would Neither Justify The Attestation Requirement Nor Render The Notice Less Misleading As To Class Members With Qualifying Entries That Were Delinquent *Pre-Bankruptcy*. ...........................................................................................10

   B. The Supposed Over-Inclusiveness Of The Notice Does Not Even Justify The Attestation Requirement As To The Members Of The Post-Bankruptcy Delinquency Subclass. ...........................................13

CONCLUSION ........................................................................................................14

## PRELIMINARY STATEMENT

Settling Plaintiffs' defense of their class notice and attestation requirement is based on their assertion that many – "perhaps millions" – of those who received that notice are not members of the Settlement Class. In their most recent submission, Settling Plaintiffs asserted that many of these supposed "millions" could be found in the ranks of notice recipients whose credit reports were all issued **before** any errant tradelines appeared in their archived credit files. Noting that Settling Plaintiffs had failed to submit any evidence in support of this bald assertion, this Court instructed the parties to submit supplemental briefing with supporting evidence on this limited issue. (10/20/10 Order at 2)(Dkt. # 726).

Far from describing millions of consumers who received the notice, the hypothetical Settling Plaintiffs have proffered fits almost no one. That is because it could arise only if several highly unlikely circumstances all occurred at the same time and the chances of that happening are miniscule. This Court, however, need not take the word of the *White* Plaintiffs or that of their experts on this point. As set forth below, Defendants have already conducted a study, which conclusively demonstrates that "the overwhelming number of consumers" who were recipients of the class notice are also members of the Settlement Class. (Second Supplemental Declaration of Angela Granger, sworn to Aug. 31. 2008 ("Second Supp. Granger Decl.", ¶ 7)(Dkt. # 310).

Even if Settling Plaintiffs' contention that the notice was over-inclusive were correct, that is a problem of their own making. If the notice is overbroad that is only because Settling Plaintiffs chose to define the class in a manner that complicates Defendants' ability to identify its members. Had Settling Plaintiffs instead defined the Settlement Class in the same manner as they had earlier defined a litigation class, Defendants could have easily identified every one of its members through information in their own files and sent the notice only to them.

At any rate, the fact – if it is a fact – that Settling Parties may have sent the

1

notice to some consumers who might not meet their class definition cannot justify: (1) a notice that instructed a distinct group of identifiable class members that they had to determine if they were Settlement Class Members when Settling Parties knew who they were; and (2) an attestation requirement that would disenfranchise millions of these same class members who do not know and have no way of discovering whether the pre-bankruptcy information that was reported in their credit reports was accurate or not.

Nor can Settling Parties justify the attestation requirement on the ground that the information in their archived files does not precisely mimic the information contained in the actual credit reports that they sent to third parties. However imperfect the information in those archived files may be (and it is not), it is by far the best information available and infinitely superior to that possessed by class members, many of whom have never seen any of their credit reports and all of whom would have no way of knowing what information was contained in the multiple such reports that were sent out to third parties during the course of the seven-year liability period. Thus, it is totally unfair for Defendants, who are in exclusive possession of all the information, to shift the burden of identifying errors in their credit reports to the class, who have little or no information about what is in those reports.

## ARGUMENT

Settling Plaintiffs' rationale for why the class notice was so vastly over-inclusive is but the most recent of three different explanations they have proffered for why that is allegedly so – none any more accurate than the last.

Initially, in their Response to the *White* Plaintiffs' Objections, filed Jan. 4, 2010 (Dkt. # 605), Settling Plaintiffs suggested that many notice recipients might fall within one of the narrow exclusions to class membership set forth in section 1.48(d) of the Settlement such as, "for example, because [they had] already released [their] claims against the Defendant." (*Id.* at 19). In their Reply in Support of their

Objections (Dkt. # 619), the *White* Plaintiffs explained that the number of notice recipients who might be so excluded could not exceed "a few dozen" at most (*id.* at 9) and, subsequently, this Court found that the existence of this limited group could not possibly justify Settling Plaintiffs' attestation requirement. (6/30/10 Order at 4)(Dkt # 703).

Next, in their Motion for Reconsideration (Dkt. # 704), Settling Plaintiffs abandoned this justification and, instead, asserted that the reason the notice was so over-inclusive was that it was sent to Chapter 7 beneficiaries for whom a credit report had been issued only ***after*** all errant tradelines that had shown up as delinquent during an archival review of their files had already been "corrected or dropped." (*Id.* at 8). As the *White* Plaintiffs' pointed out in their Opposition (Dkt. # 715) and as "Settling Plaintiffs appear to concede," this scenario "'could never happen'" (10/20/10 Order at 2 (quoting *White* Plaintiffs' Opposition to Motion for Reconsideration at 10)), because notice was sent only to consumers who showed an errant tradeline "'at the end' of the archive period during which a credit report was published." (*Id.* (quoting Settling Plaintiffs' Reply in Support of Motion for Reconsideration at 7)).

The fallacy in this second scenario having been revealed, Settling Plaintiffs manufactured the rationale for why the class notice was over-inclusive that prompted this Court to order this briefing.[1] This new rationale seeks to exploit a minor difference between the criteria for receiving class notice and the criteria for

---

[1] During the course of preparing this brief, the *White* Plaintiffs were served with Defendants' response to this Court's order, which trots out a parade of nine additional rationale for why the notice recipients might include consumers who would not be eligible for relief. A couple of these involve entirely new and extremely narrow (and unquantified) hypotheticals. The rest constitute nothing more than a rehash of Defendants' arguments as to why the credit reports of certain class members might be accurate and do not relate to the narrow issue this Court asked the parties to address, namely the extent to which the notice may have been sent to non-class members. All of the ten scenarios Defendant have proffered, however, share one thing in common: they make no effort to quantify the extent to which the notice was over-inclusive and offer absolutely no support for the assertion that it could have been sent to "millions" of Chapter 7 beneficiaries who do not satisfy the criteria for class membership.

3

being a Settlement Class Member relating to the point in time at which the issuance of a post-bankruptcy credit report will show up in a Defendant's credit files.

Under the Settlement, a class member is defined as a Chapter 7 beneficiary who, during the course of the class period, had a post-bankruptcy credit report issued about them in which at least one qualifying pre-bankruptcy judgment or one qualifying pre-bankruptcy account (*i.e.*, a judgment or account for which the Defendant's files contained insufficient information to show its exclusion from discharge) was listed as outstanding or delinquent. (Settlement Agreement ¶ 1.48.) The Settlement provides for notice to be sent to all Chapter 7 beneficiaries for whom any of the three Defendants' annual archived file reviews showed: (1) at least one qualifying judgment as outstanding or at least one qualifying account as delinquent at the end of the archival period covered by that review; and (2) a post-bankruptcy "hard inquiry" issued ***at any time during the term of any of the archival periods*** in which one or more of those qualifying entries appeared. (Settlement Agreement ¶ 4.1(d)).

Settling Plaintiffs' hypothetical concerns notice recipients who might not be class members because all of the post-bankruptcy hard inquiries that showed up in an annual archival review of their credit files may have ***pre-dated*** the point in time in which their qualifying accounts were first reported as delinquent. As set forth, below, however, in order for this hypothetical to materialize several highly unlikely circumstances would have to come together at the same time and the chances of that happening are exceedingly remote.

I. **The Number Of Notice Recipients Who Are Not Class Members Because Their "Ridden Through" Revolving Accounts Were Not Listed As Delinquent At The Time Their Credit Reports Were Issued Is Miniscule.**

Settling Plaintiffs' hypothetical of a qualifying account that became delinquent only after the issuance of any post-bankruptcy credit reports posits a Chapter 7 beneficiary who (1) "rode through" one of his or her revolving accounts (*i.e.*, decided to keep a current credit card accounts open at the time of the

4

bankruptcy) and (2) then allowed that "ridden through" account to become delinquent after the bankruptcy.[2]

At the outset, this scenario, which requires that the consumer violate the law by failing to list the account he or she wishes to "ride through" on a bankruptcy schedule, applies to a very small universe of consumers. (Porter Decl. ¶¶ 10-19). That is because: (1) bankruptcy attorneys routinely advise their clients of their legal obligation to report all of their debts to the bankruptcy court and otherwise take steps aimed at ensuring that they comply with that obligation (*id.* ¶ 15); and (2) it is unlikely that a consumer would allow an account, which he or she valued so highly that he or she managed to keep it current through his or her bankruptcy, to fall into arrears after the bankruptcy. (*Id.* ¶¶ 20-26).

Settling Plaintiffs have proffered no evidence to support their assumption that the phenomenon of "ridden through" revolving accounts falling into delinquency post-bankruptcy is a common one. Nor have they presented any evidence to support the other critical assumptions underlying their argument that the number of notice recipients far exceeded the number of class members, namely: (1) that many – "perhaps millions" – of those recipients could qualify for class membership only on the basis of a "ridden through" credit card account that was reported as delinquent for the first time after the bankruptcy (*i.e.*, they could not qualify for class membership on the basis of some other qualifying entry); and (2) that in many – "perhaps millions" – of these cases involving a notice recipient whose claim to class membership turns solely on a "ridden though" credit card having become delinquent, such delinquency never appeared in a single credit report about that notice recipient. As set forth below, both of these assumptions are demonstrably

---

[2] As a practical matter, the chances that a Chapter 7 beneficiary would "ride through" an account that was not current at the time of the bankruptcy are almost zero. (Declaration of Professor Katherine Porter, sworn to Nov. 4, 2010 ("Porter Decl."), ¶ 17). That is because a consumer who allowed an account to become delinquent would not want to pay the debt on that account. (*Id.*)

inaccurate.

### A. The Overwhelming Majority Of Chapter 7 Beneficiaries Who Might Qualify For Class Membership On The Basis Of A "Ridden Through" Revolving Account Would Also Qualify For Class Membership On The Basis Of At Least One Other Qualifying Entry.

Settling Plaintiffs' single-minded focus on ridden through "revolving accounts," which allegedly will vacillate" from qualifying to non-qualifying "during the span of one archive period," ignores literally millions of other qualifying debts which populate the credit files of Chapter 7 beneficiaries and which, by their very nature, cannot vacillate. (Declaration of Dean Binder, sworn to Nov. 4. 2010 ("Binder Decl."), ¶¶ 33-36). One such category of debt consists of pre-bankruptcy judgments which, of course, will continuously be reported as outstanding until such time as they may be corrected at the instigation of the creditor or the consumer or purged as a result of the passage of time. Likewise, to the extent that the qualifying account of a consumer – whether it be a credit card account, a secured account or a collection account – was delinquent at the time of the bankruptcy (*i.e.*, had a "date of initial delinquency" pre-dating the bankruptcy), that pre-bankruptcy delinquency would necessarily continue to appear in the credit files of that consumer until such time as it was corrected or purged. (*Id.* ¶¶ 35-36). In other words, to the extent an end-of-year archived file review for any given consumer shows a qualifying debt that was delinquent at the time of the bankruptcy still being listed as delinquent after the bankruptcy, any post-bankruptcy credit report that showed up during that file review would necessarily contain that delinquency. (*Id.* ¶ 37).

Two separate studies establish that the overwhelming number of consumers who cannot qualify for class membership on the basis of a qualifying "ride though" account would nonetheless qualify for class membership on the basis of a qualifying "non-ridden through" debt whose date of initial delinquency pre-dated the filing of their bankruptcy petition. Defendants cannot dispute the veracity of at

least one of these studies because they are the ones that produced it.

That study was proffered by Experian in August 2008 in order to persuade this Court that the class would be no smaller under Plaintiffs' revised class definition than it was under their original definition. That original definition defined the class as consisting of all consumers who during the liability period:

> had a credit report relating to them issued by Defendants in which one or more of their [pre-bankruptcy] debts was listed as due and owing despite the fact that such debts has been discharged as a result of their no asset bankruptcy under Chapter 7 of the Bankruptcy Code.

(Second Supp. Granger Decl. ¶ 7 (Dkt. # 310)). This original class definition overlaps with the criteria for receiving class notice in that it is broad enough to cover consumers whose qualifying credit card accounts became delinquent for the first time *after* the bankruptcy.

In response to concerns expressed by this Court and arguments raised by Defendants, including, in particular their argument that it would be difficult or impossible to determine whether a debt on a "ridden through" revolving account was incurred pre- or post-bankruptcy, Plaintiffs revised and narrowed their original class definition. (Plaintiffs' Closing Memorandum in Support of Class Certification, filed Aug. 8, 2008, at 3-4 (Dkt. # 321)). That new definition was essentially the same as the definition set forth in the Settlement with one critical caveat: namely, it limited the definition of a pre-bankruptcy revolving account to one that was "reported with a date of initial delinquency that *predates* the month in which the bankruptcy petition was filed." (Plaintiffs' Supplemental Memorandum in Support of Class Certification, filed July 11, 2008, at 2 (Dkt. # 297)).

The study Experian submitted in connection with Defendants' opposition to Plaintiffs' motion for class certification compared the number of consumers who would fit within Plaintiffs' original class definition (*i.e.*, a definition that included consumers whose revolving accounts became delinquent for the first time after the bankruptcy) with Plaintiffs' revised class definition (*i.e.*, a definition that excluded

7

such consumers) using a statistically significant data sample of 500,000 consumers. Experian reported the results in the Declaration of Alison Granger, its Vice President of Analytics, which concludes that "***the overwhelming number of consumers who fell within the previous definition would also fall within the new one***." (Second Supp. Granger Decl. ¶ 7 (Dkt. # 310)). In other words, as Experian has itself already attested, the number of notice recipients whose eligibility for class membership depends upon the presence of a "ridden through" account that became delinquent for the first time after the bankruptcy is miniscule.[3]

The results of the Experian study are corroborated by Mr. Juntikka's pre-filing study of some 2,000 credit reports of Chapter 7 beneficiaries – a study that was limited to debts that were listed on his clients' bankruptcy schedules and, hence, that did not include any "ridden through" accounts. (Declaration of Charles W. Juntikka, sworn to Nov. 4, 2010 ("Juntikka Decl."), ¶ 3). According to the Juntikka study, the average credit report for a Chapter 7 beneficiary will list three to four discharged debts that were delinquent at the time of the bankruptcy as still delinquent after the bankruptcy. (*Id*. ¶ 1).

***In other words, for the great majority of notice recipients, the fact that they might not qualify for class membership on the basis of a qualifying "ride through" account appearing in their credit report is irrelevant; they would still be class members by virtue of one or more "non-ride through" errors on that report.*** (And, as set forth below, the chances that the tiny residue of such notice recipients for whom the ***only*** qualifying entry in their credit files is a "ride through" account will not qualify for class membership because no credit report about them was issued at the time that "ride through" account became delinquent are exceedingly

---

[3] It is worth noting in this connection that, under the Settlement, a notice recipient is a Settlement Class Member so long as a qualifying judgment or account appears in an archived review of the credit files of any one of the three Defendants. Thus, the tiny residue of class members who do not qualify as class members because no qualifying judgment or account appeared in an archived review of Experian's files would nonetheless fall within the class definition if such a qualifying entry appeared in the archival reviews performed by Trans Union or Equifax.

small.

> B. **The Chances That A Notice Recipient Whose "Ridden Through" Account Fell Into Delinquency Post-Bankruptcy Would Not Have A Credit Report Issued Reflecting That Fact Are Extremely Remote.**

Settling Plaintiffs' hypothetical posits a situation in which all of the credit reports that were issued about a notice recipient during the course of any given archival period pre-dated the appearance of a delinquency on that recipient's "ridden through" credit card account. In other words, to fall outside the criteria for class membership, the recipient could not have had a single credit report issued about him or her between the date on which a post-bankruptcy delinquency first appeared in his or her credit file and the end date of every archival period in which that delinquency continued to appear. This hypothetical circumstance is not one that could occur frequently.

That is because, during the course of an average year, each Defendant is likely to issue a credit report about a typical Chapter 7 beneficiary at least six to eight times or at least once every other month. (*See* Juntikka Decl. ¶ 11; Binder Decl. ¶¶ 22-25; Porter Decl. ¶¶ 27-42)). Thus, for any given notice recipient, the chances that even a post-bankruptcy delinquency would have shown up on one or more of his or her credit reports are extremely high.

The fact that Defendants have produced no data to support the assertion that there are millions of notice recipients who do not meet the class definition is telling. Settling Parties assertion to the contrary notwithstanding, Defendants could easily have quantified that number by, for example, conducting a monthly archival review of their files pertaining to Chapter 7 beneficiaries using a statistically significant data sample. In view of Defendants' failure to produce such numbers with their supplemental brief, the presumption should be that the numbers do not support Settling Plaintiffs' allegation that class notice was sent to "millions" – or, indeed any significant number – of consumers who are not class members.

THE *WHITE* PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER DATED OCTOBER 20, 2010

II. **In Any Event, The Supposed Over-Inclusivity Of The Class Notice Does Not Justify Reconsideration Of The Court's Order Mandating Re-Notice Of The Entire Class.**

   A. **Even If The Notice Were Over-Inclusive As To Consumers With "Ridden Through" Accounts That Became Delinquent *Post-Bankruptcy*, That Would Neither Justify The Attestation Requirement Nor Render The Notice Less Misleading As To Class Members With Qualifying Entries That Were Delinquent *Pre-Bankruptcy*.**

As set forth above, Settling Plaintiffs "ride through" hypothetical does not apply to consumers for whom an archived review of Defendants' files showed either: (1) one or more qualifying accounts, which were reported as delinquent prior to the bankruptcy, still being reported as delinquent post-bankruptcy; or (2) one of more qualifying pre-bankruptcy judgments still being reported as outstanding post-bankruptcy. As to this separate and distinct group (the "pre-bankruptcy delinquency subclass"), the attestation requirement was wholly unjustified and the class notice demonstrably misleading because all of its members are easily identifiable from information contained within Defendants' own files.

Having proffered a revised class definition that limited qualifying revolving accounts to those "with a date of initial delinquency that *predates* the month in which the bankruptcy petition was filed," Settling Plaintiffs can hardly argue otherwise. (Settling Plfs' Supplemental Memorandum in Support Of Class Certification, filed July 11, 2008, at 2 (Dkt. # 297)). Indeed, the very reason why Settling Plaintiffs so limited the definition of revolving accounts was to remove the difficult problems associated with determining whether the debts on "ridden through" revolving accounts had been incurred pre- or post-bankruptcy and, thereby, to make the class more easily identifiable. Plaintiffs' Closing Memorandum in Support of Class Certification, filed Aug. 8, 2008, at 3-4 (Dkt. # 321)). As Settling Plaintiffs then recognized, and as remains true today, Defendants would have no difficulty separating out accounts that were delinquent prior to the filing of the bankruptcy petition from the rest because they are required by law to keep track of the date of initial delinquency for every account on which they report. (Binder Decl.

¶ 26).[4]

The purported over-inclusiveness problem Settling Plaintiffs have invoked to justify an attestation requirement that would disenfranchise millions of their fellow class members is, therefore, entirely of their own making. Settling Plaintiffs obviously could have defined the Settlement Class in the same way that they had defined the litigation class. Had they done so, the class notice could have been sent only to those whose qualifying pre-bankruptcy debts had a date of initial delinquency prior to the filing of the bankruptcy petition and the "ride through" hypothetical that Settling Plaintiffs have identified would not exist.

Instead, to ensure that the notice reach every Chapter 7 beneficiary for whom a qualifying account may have become delinquent for the first time after the bankruptcy ("the post-bankruptcy delinquency subclass"), Settling Parties sent that notice to all Chapter 8 beneficiaries for whom an archival review showed a single pre-bankruptcy account as delinquent after the bankruptcy, even if that account were current at the time of the bankruptcy. That is all well and good. However, the mere fact that Settling Parties might have needed to send their notice to some Chapter 7 beneficiaries who did not fall within the post-bankruptcy delinquency subclass is no justification for their having sent a notice to members of the pre-bankruptcy delinquency class, which (1) misled them into believing they might not be class members, and (2) required them to make an attestation on the basis of knowledge that they did not have and could not discover.

That the notice was misleading as to consumers who fall within the pre-bankruptcy delinquency class is indisputable. Defendants are able to identify each and every member of that class by performing an archival review of their files which would turn up the name of every Chapter 7 beneficiary for whom: (1) at least one

---

[4] For instance, that Chapter 7 beneficiaries with qualifying pre-bankruptcy judgments are easily identifiable is apparent from an Equifax review of its own credit files, which identified 44,123 such beneficiaries out of a data sample of 533,706. (Declaration of Qiying Zhou, sworn to July 31, 2008, Ex. 72 at page 7 (Dkt. # 306)).

qualifying judgment or account with a date of initial delinquency that pre-dated the filing of the bankruptcy petition appeared at the end of any given archival period; and (2) at least one hard inquiry appeared during the course of the same archival period. Yet, even though Defendants know precisely who the members of the pre-bankruptcy delinquency subclass are, they sent them a notice instructing them that they had "to determine *if* [they] are a Class member" – something that the large majority of them could not possibly do. (Notice of Final Forms of Notice of Class Action Settlement, Ex. C at 4, Aug. 18, 2009, Dkt. # 458). Accordingly, at least as to the members of the pre-bankruptcy delinquency subclass, the notice was materially misleading in that it informed them they might not be class members when they all were and, hence, the Settlement cannot be approved without re-noticing that subclass.[5]

For the same reason, the fact that the notice might have been over-inclusive as to the post-bankruptcy delinquency subclass cannot justify the attestation requirement as to the pre-bankruptcy delinquency subclass. As set forth in the *White* Plaintiffs' Opposition to Settling Plaintiffs' Motion for Reconsideration (at 6 (Dkt. # 715)), and as this Court has itself twice recognized, the large majority of Chapter 7 beneficiaries, including necessarily the large majority of the pre-bankruptcy delinquency subclass, have either "never received" copies of their credit reports or, if they did receive them, lacked the ability to "identify discharged debts showing inaccurately." *Acosta v. Trans Union LLC*, 243 F.R.D. 377, 389 (C.D. Cal. 2007); *see also* 7/2/2010 Order at 4.) Given that fact and given that Settling Parties are

---

[5] As set forth in the *White* Plaintiffs' Opposition to Settling Plaintiffs' Motion for Reconsideration (at 4-5)(Dkt. # 715), the fact that the Notice also misled its recipients by informing them that actual damage awards would be an order of magnitude higher than the actual amount of those awards provides independent grounds for re-noticing the entire class. *In re Veritas Software Corp. Secs. Litig.*, 496 F.3d 962, 972 (9th Cir. 2007) (holding that district court may not approve a class action settlement "without giving class members an adequate opportunity to object," which was denied by a notice that "overstated the likely recovery" and, as a result, "may have discouraged other objectors from speaking up").

12

able to identify all Chapter 7 beneficiaries who had a credit report issued about them showing at least one qualifying debt with a date of initial delinquency that pre-dated the bankruptcy, Settling Parties cannot possibly defend their decision to condition relief for members of the pre-bankruptcy delinquency subclass on their attesting to their belief that their credit reports were erroneous.

### B. The Supposed Over-Inclusiveness Of The Notice Does Not Even Justify The Attestation Requirement As To The Members Of The Post-Bankruptcy Delinquency Subclass.

The underlying premise of Settling Plaintiffs' argument that many notice recipients who rode their qualifying revolving accounts through their bankruptcy are not Settlement Class Members is that this supposed fact justifies the attestation requirement. It does not.

First, like other Chapter 7 beneficiaries, most consumers whose ridden through credit cards accounts became delinquent after the bankruptcy would have no way of knowing how those accounts were characterized in their credit reports or, if they did have that information, would not know whether that characterization was accurate. (*See* Porter Decl. ¶ 25; Juntikka Decl. ¶¶ 12-13)). Accordingly, the attestation requirement does nothing to help identify which notice recipients who kept their accounts open post-bankruptcy are Settlement Class Members and which are not.

At any rate, even if some notice recipients who rode though their credit card accounts were able to attest to the existence of errors in their credit reports, there are far better ways of identifying who among that group are, in fact, Settlement Class Members. Specifically, as set forth above, Defendants maintain records of the date on which each of a consumer's debts, including debts on ridden through accounts, first became delinquent. (Binder Decl. ¶ 26). Likewise, as the Settlement itself acknowledges (Settlement Agreement ¶ 4.1(d)(iv)), Defendants maintain records of the dates on which they issue credit reports about any given consumer. (Binder Decl. ¶ 30). Accordingly, Defendants should have no problem conducting an

automated file search that would identify which notice recipients who rode through their credit card accounts are class members and which are not. (Binder Decl. ¶¶ 27-32). Alternatively, Defendants could achieve the same result by conducting a monthly archival review of the files of any consumer for whom the annual archival review showed a ridden through revolving account that became delinquent after the bankruptcy and no other qualifying debts being reported as delinquent.

## CONCLUSION

For the reasons set forth herein, this Court should deny Settling Plaintiffs' motion for reconsideration.

DATED: November 4, 2010         BOIES, SCHILLER & FLEXNER LLP
                                George F. Carpinello
                                Adam R. Shaw
                                David L. Zifkin (SBN 232845)

                                DANIEL WOLF LAW OFFICES
                                Daniel Wolf

                                CHARLES JUNTIKKA & ASSOCIATES LLP
                                Charles Juntikka


                                By /s/ Adam R. Shaw
                                    Adam R. Shaw

                                Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated