BOIES, SCHILLER & FLEXNER LLP
George F. Carpinello
Adam R. Shaw
10 North Pearl Street
Albany, NY 12207
Telephone: 518.434.0600
Facsimile: 518.434.0665
Email: gcarpinello@bsfllp.com
ashaw@bsfllp.com
(admitted *pro hac vice*)

CHARLES JUNTIKKA & ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone: 212.315.3755
Facsimile: 212.315.9032
Email: charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone: 202.842.2170
Email: dan@danielwolflaw.com

David L. Zifkin (SBN 232845)
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA 90401
Telephone: 310-395-5800
Facsimile: 510-874-1460
Email: dzifkin@bsfllp.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### (Southern Division)

| | |
|---|---|
| TERRI N. WHITE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXPERIAN INFORMATION SOLUTIONS, INC., <br><br> Defendant. <br><br> And Related Actions. | Case No. 05-CV-1070 DOC (MLGx) <br> (Lead Case) <br><br> **DECLARATION OF DEAN BINDER** <br><br> Place: Courtroom 9D <br> Judge: Honorable David O. Carter |

I, DEAN BINDER, declare that:

1. I have been retained to provide an opinion in connection with the *White* Plaintiffs' Response to the Court Order dated October 20, 2010 in the above-referenced matter.

**Expert Background and Qualifications**

2. I have worked in the consumer credit, consumer credit reporting and consumer credit scoring industries for over 13 years.

3. From 1991 to 1997, I was employed by Equifax Credit Information Services. I spent most of those years in various roles, including as a Quality Assurance Specialist, as a Maintenance Operator and as an Assistant Manager of a team of consumer service agents, which handled thousands of consumer contacts (both by telephone and mail) on a daily basis.

4. As one of the Equifax Team Leaders, I managed the Fraud Investigation Team functions, including the reinvestigation process and adherence to productivity and quality expectation. I worked closely with fraud victims to determine the accuracy and validity of their consumer claims.

5. As a Quality Assurance Specialist, I was responsible for checking the accuracy and integrity of specialty teams such as Consumer Fraud Victims, Mixed Credit Files, Credit Repair Clinics, disputes and CDV processing (Consumer Dispute Verification Forms). This included listening in on consumer calls, sampling the dispute input of service agents and grading the adherence to company policy with respect to the accuracy of each of the dispute events, including call scripting as needed. I followed up with team members and delivered feedback for training purposes.

6. As a Maintenance Operator, I logged investigation results into Equifax's main database as instructed by the data furnisher. I also performed other roles specific to consumer disputes such as Dispute Analyst, Information Consultant and Verification Processor.

7. In addition to my consumer experience at Equifax, I also worked with customers (data furnishers, purchasers and users of Equifax credit data and credit scores) at the Small Business Sales Division selling Equifax products and services.

8. From 2001 to 2008, I was employed by the Fair Isaac Corporation. Fair Isaac is best known for their work in credit risk score development. Their core product, the "FICO" Credit Score, is widely known in the consumer credit and lending environment and is by far the dominant credit risk score used in those industries.

9. My time at Fair Isaac was spent in the Mid Markets Account Management and Sales Division. I was responsible for new customer and renewal sales for a suite of Fair Isaac loan origination products, including web-based credit decisioning, application processing software and custom scorecards, including those specific to home equity, revolving, indirect and direct lending.

10. I also participated in a collection of credit bureau score trainings, both internal and external to Fair Isaac.

11. In addition to my time at Equifax and Fair Isaac, I worked as Finance and Insurance Manager at Morgan from 1997 to 1998. I was responsible for working directly with lenders to secure financing for consumer purchasing large ticket recreational vehicles. My duties included pulling and analyzing credit reports and FICO scores, matching applicant credit risk with the most appropriate loan product given the consumer's credit history and score. I then executed the final sales and finance contracts between the consumer and lender.

12. I have served as a credit expert for a personal finance website called Filife.com. FiLife is an IAC/Dow Jones joint venture. In addition, I am FCRA Certified.

13. I have served as a credit and credit score blogger for *The New York Times*.

*DECLARATION OF DEAN BINDER*            3

14. Because of my work at Fair Isaac and Equifax, I am well-versed on credit scoring, scoring analysis and the use of credit scoring and credit models in the financial services industry.

**The Number of Consumers Who Received Notice And Who Are Not In the Class Is Exceedingly Low and Defendants Have The Information To Determine Whose Accounts Were Delinquent Prior to the Issuance of a Credit Report**

15. In a submission dated July 8, 2010, the Settling Plaintiffs asserted that the group of consumers who received the original class notice was overinclusive, exceeding the number of legitimate class members by "millions." (Dkt. # 704, at p. 8).

16. In support of their claim, the Settling Plaintiffs stated that tradelines can vacillate from non-questionable to questionable[1] during the span of one archival period. By way of example of the type of purportedly "millions" of people who would fit that scenario, the Settling Plaintiffs provided the hypothetical situation of "a consumer who shows an errant tradeline at the end of an archival period [who] may have had a post-bankruptcy credit report published only at an earlier time when the tradeline was not in questionable status."

17. In an Order dated October 20, 2010, the Court asked for factual information concerning the number of people who received the original notice who would fall into the Settling Plaintiffs' hypothetical.

18. It is my opinion that the number of people who would fall into the Settling Plaintiff's hypothetical description and would not otherwise be a member of the class would be very small because credits reports are so frequently issued.

---

[1] In this instance, "questionable tradelines" can only refer to the type of tradelines that qualify for inclusion in the class, which are pre-bankruptcy tradelines, whether judgments, loans or accounts, for which a defendant's files contained insufficient information to show their exclusion from discharge and which show up as delinquent on the archival review. See Settlement Agreement § 1.48.

*DECLARATION OF DEAN BINDER* 4

19. At any rate, the Defendants should be able to identify which consumers fall within their hypothetical and which do not because their archived records show: (1) the dates on which an account was initially reported as delinquent; and (2) relative dates on which credit reports about a consumer were issued because the credit bureaus databases are archived monthly.

**The Average Consumer Has Many Credit Reports Issued About Him Or Her Every Year**

20. The Settling Plaintiffs have posited that there are millions of consumers who received noticed who are not in the class because they are consumers who show an errant tradeline at the end of an archival period but who may have had a post-bankruptcy credit report published only at an earlier time when the tradeline was not in questionable status.

21. It is my opinion that the number of people who could fall within that definition are very small because credit reports are issued so frequently. In other words, the only people who could fit within the Settling Plaintiffs' hypothetical scenario are those whose accounts became delinquent after a credit report was issued and prior to the archival snapshot. But because credit reports are issued so frequently, the time frame for such a scenario to occur is highly constricted.

22. According to the Federal Trade Commission in 2004, "[t]he three nationwide CRAs maintain files on approximately 200 million U.S. consumers and issue more than 1.5 billion reports a year in response to consumer applications for credit, employment and insurance." Fed. Trade Comm., Report to Congress under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, at 8-9 (December 2004), http://www.ftc.gov/reports/facta/041209factarpt.pdf (last visited November 2, 2010); Fed. Trade Comm. & the Bd. of Governors of the Fed. Res. Sys., Report to Congress on the Fair Credit Reporting Act Dispute Process, at 3 (August 2006).

23. By simple math, that translates into the average consumer applying

*DECLARATION OF DEAN BINDER*                    5

for credit, employment or insurance 7.5 times per year and results in an equal number of credit reports being issued based on such applications (*i.e.*, "hard inquires" or "hard pulls") each year.

24. That is only the number of credit reports issued in response to consumer applications for credit. There are also millions of credit reports issued in response to creditor-initiated actions each year. One type of creditor-initiated action that will result in the issuance of a credit report is an account review. These account reviews are mostly performed by the holder of a consumer's revolving account, but may also be performed by his or her mortgage or auto lender, his or her utility or cell phone company. Such reviews are typically performed on a monthly or quarterly basis.

25. Account reviews typically contain information about a consumer's outstanding judgments and delinquent tradelines, including at a minimum, the number of such judgments and tradelines and frequently provide enough information to identify the creditor and the nature of the delinquency. Accordingly, owing to both the consumer's own application for credit and the creditor's account reviews, a credit report containing information about the status of a consumer's judgments and tradelines is issued about the average consumer at least once per month.

**Defendants Have the Information In their Files to Determine Whose Accounts Were Delinquent Prior to the Issuance of a Credit Report.**

26. Credit reporting agencies are required by law to keep track of the date of any delinquencies in a consumer's accounts. It is clear that they must maintain information about the dates such delinquencies first appear because they are required to remove any delinquencies from a consumer's account seven years after the date of first delinquency. Obviously they could only properly remove the delinquencies if they know the date they first occurred.

27. As we know from this case, credit reporting agencies are able to

*DECLARATION OF DEAN BINDER*                                6

determine the month that a consumer files a bankruptcy petition that lead to a public record of the entry of a Chapter 7 discharge Order.

28. By combining the above information already in their files, through a computerized search, credit reporting agencies are able to readily identify those consumers that have at least one account in their credit files containing a date of initial delinquency that pre-dates the filing of their bankruptcy petition.

29. Credit reporting agencies can also determine the date that a tradeline has been changed as a direct result of a consumer dispute.

30. Credit reporting agencies maintain records of the exact dates on which credit reports are issued for a consumer's account and the dates on which account reviews are conducted on a consumer's account.

31. Through a computer search, credit reporting agencies can readily determine the dates such credit reports and account reviews were issued.

32. Accordingly, the credit reporting agencies can readily determine the relative dates of delinquencies and the issuance of credit reports and account reviews and consequently the consumers who had delinquencies that preceded a credit report.

**Pre-Bankruptcy Delinquency Is Not Dynamic**

33. The Settling Plaintiffs have suggested that a consumer's account is dynamic in that it can change from delinquent to non-delinquent.

34. However, there is nothing dynamic about tradelines that are listed with a date of initial delinquency prior to the date of the consumer's bankruptcy.

35. By definition, the delinquency on such a tradeline will appear at all times up to and until the point in time at which the delinquency is replaced with a bankruptcy indicator or is automatically purged as a result of the passage of time

36. Once the delinquency of such a tradeline is removed – whether by virtue of a successful consumer dispute or by lapse of the seven year statutory period – it is removed forever and can never reappear.

37. Thus if an account is reported without a bankruptcy indicator at the end of an archival period, it is almost certain that it would have been reported without a bankruptcy indicator during the entirety of that period.

*DECLARATION OF DEAN BINDER*         8

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of November, 2010, at Buford, Georgia.

_____
Dean Binder

S:\wpdata\7512001\Binder Supp Decl.doc

DECLARATION OF DEAN BINDER