1  BOIES, SCHILLER & FLEXNER LLP
2  George F. Carpinello
   Adam R. Shaw
3  10 North Pearl Street
   Albany, NY 12207
4  Telephone:  518.434.0600
   Facsimile:  518.434.0665
5  Email:       gcarpinello@bsfllp.com
              ashaw@bsfllp.com
6  (admitted *pro hac vice*)

CHARLES JUNTIKKA &
ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone:  212.315.3755
Facsimile:  212.315.9032
Email:       charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone:  202.842.2170
Email:       dan@danielwolflaw.com

9
10 David L. Zifkin (SBN 232845)
   225 Santa Monica Blvd., 11th Floor
11 Santa Monica, CA  90401
   Telephone:  310-395-5800
12 Facsimile:  510-874-1460
   Email:  dzifkin@bsfllp.com

14 Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon,
15 Clifton C. Seale, III, Arnold E. Lovell, and all others similarly situated.

16            UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
17                   (Southern Division)

19 TERRI N. WHITE, *et al.*,

20            Plaintiffs,

21 v.

22 EXPERIAN INFORMATION
   SOLUTIONS, INC.,
23
             Defendant.
24
25 And Related Actions.

**Case No. 05-CV-1070 DOC (MLGx)**
**(Lead Case)**

**DECLARATION OF PROFESSOR**
**KATHERINE M. PORTER**

Place:  Courtroom 9D
Judge:  Honorable David O. Carter

1

I, KATHERINE M. PORTER, declare that:

1.     I have been retained to provide an opinion in connection with the White Plaintiffs' Supplemental Briefing in response to the Court's Order dated October 20, 2010 in the above-referenced action.

## I. EXPERT BACKGROUND AND QUALIFICATIONS

2.     I am the Robert Braucher Visiting Professor of Law at Harvard Law School and Professor of Law at the University of Iowa College of Law. I teach bankruptcy, secured transactions, consumer law, and related classes.

3.     I earned my J.D. *magna cum laude* from Harvard Law School in 2001. At graduation, I was the recipient of the American Bankruptcy Law Institute Medal of Excellence for the study of bankruptcy law at Harvard.

4.     I conduct empirical research on households that file consumer bankruptcy. I am a principal investigator in the 2001 Consumer Bankruptcy Project, the 2007 Consumer Bankruptcy Project, the Mortgage Study, and the ongoing Chapter 13 Drop-Out Study. Each of these studies gathered original data on thousands of households that filed consumer bankruptcy.

5.     I am an expert on the consumer bankruptcy system. I have particular expertise on how consumers' fare after filing bankruptcy, including their experiences with creditors and credit markets after bankruptcy. My research on bankruptcy outcomes has been published in journals such as *The American Bankruptcy Institute Law Review,* the *Cornell Law Review,* and the *Iowa Law Review*. My consumer bankruptcy research has also been published in peer-reviewed journals, including the *Journal of Consumer Education* and the *American Bankruptcy Law Journal*, and in other top academic journals such as the *Georgetown Law Journal,* the *Michigan Law Review,* and the *Texas Law Review*.

6.     As part of my research on consumer bankruptcy practice, I have conducted in-depth interviews with more than 30 consumer bankruptcy attorneys.

2

1    These interviews included extensive discussions of how attorneys counseled

2    debtors about access to and use of post-bankruptcy credit.

3            7.      I am an elected member of the National Bankruptcy Conference, a

4    60-person group of judges, lawyers, and professors who work to improve the

5    nation's bankruptcy laws. I serve on the editorial board of the *American*

6    *Bankruptcy Institute Law Review*. I am a frequent speaker at meetings of the

7    National Conference of Bankruptcy Judges and the Federal Judicial Center. I

8    have testified several times before Congressional committees on consumer credit

9    and bankruptcy issues and have consulted on bankruptcy research with the

10   RAND Corporation.

11           8.      I attach my curriculum vitae as Appendix A.

12           9.      I have reviewed the Court's Order for Supplemental Briefing dated

13   Oct. 20, 2010 and the Settling Plaintiffs' Reply to White Plaintiffs' Opposition to

14   Motion for Reconsideration. In preparing this declaration, I have relied upon

15   academic studies of consumer bankruptcy and consumers' use of credit, including

16   my own research on these topics. I have also relied upon my knowledge of the

17   consumer bankruptcy system, which is based on my numerous discussions with

18   consumer bankruptcy attorneys, bankruptcy judges, and other bankruptcy

19   professionals during the last decade.  I attach a list of the documents that I have

20   reviewed or relied upon in preparing this declaration as Appendix B.

21   **II.  A CHAPTER 7 BANKRUPTCY LEADS TO THE CANCELLATION AND CLOSURE**

22   **OF VIRTUALLY ALL OF CHAPTER 7 DEBTORS' UNSECURED CREDIT LINES**

23           10.     In nearly all instances, the filing of a chapter 7 bankruptcy causes

24   creditors to close or cancel all of a bankruptcy's debtor's tradelines (such as

25   credit cards). When a bankruptcy is filed, the clerk of court mails a notice of the

26   bankruptcy petition to the debtor's creditors. This filing is made from a "creditor

27   matrix," a filing list prepared from the information on creditors in the debtor's

28   bankruptcy schedules. Upon getting this notice, creditors freeze debtor's accounts

3

1   and close them. Thus, within a few days of filing chapter 7 bankruptcy, debtors

2   lose access to all pre-bankruptcy credit cards listed on their schedules.

3        11.    It has been suggested that debtors sometimes may fail to list an

4   unsecured debt on their bankruptcy schedules to avoid cancellation of their credit

5   cards or credit lines. It is my understanding that in this case, those unlisted

6   unsecured debts have been referred to as "ridden through." While technically

7   incorrect because ride-through (also called retention) only applies to secured

8   debts, I will use the term ridden-through in this declaration for ease of clarity.

9   The similarity with unsecured debts that are not listed on schedules and remain

10   active after bankruptcy and secured debts current at filing in which the debtor

11   retains the collateral as long as payments are made is simple: the debtor continues

12   to pay on the debt according to the contract terms despite the bankruptcy filing.

13        12.    This section of the declaration explains why this hypothetical

14   scenario of unsecured debt being ridden-through a chapter 7 bankruptcy and then

15   occurs in a minority of cases and why debtors rarely ride-through more than one

16   unsecured debt out of the dozen or more they typically owe at bankruptcy filing.

17   There are both legal and practical reasons why unsecured debt is rarely retained

18   during and after a chapter 7 bankruptcy.

19        13.    First, the Bankruptcy Code requires debtors to complete schedules of

20   their debts. (11 U.S.C. § 521(a)(1)(B)(i); Fed. R. Bankr. P. 1007(b)(1)(A))

21   Bankruptcy filers sign these schedules "under penalty of perjury that the

22   information" in their petition "is true and correct." (Bankruptcy Official Form 1

23   (4/10)).  Debtors who commit perjury on their schedules face severe risks,

24   including having their discharges denied and possible criminal prosecution. (11

25   U.S.C. § 724(a)(4); NCLC CONSUMER BANKRUPTCY LAW & PRACTICE, pp. 65,

26   455).

27        14.    Schedule F unambiguously instructs bankruptcy filers to include all

28   their unsecured debts.  Specifically, Schedule F requires, "the name, mailing

4

1  address, including zip code, and last four digits of any account number, of *all*

2  entities holding unsecured claims without priority against the debtor or the

3  property of the debtor, as of the date of filing of the petition." (emphasis added)

4  Furthermore, it states that, "If all creditors will not fit on this page, use the

5  continuation sheet provided."

6        15.    Under § 707(b)(4)(D) of the Bankruptcy Code, a lawyer who signs a

7  debtor's bankruptcy petition certifies that " the attorney has no knowledge after an

8  inquiry that the information in the schedules filed with such petition is incorrect."

9  Therefore, bankruptcy lawyers routinely take measures to ensure that their clients

10  have listed all their unsecured debts.  For instance, lawyers frequently obtain their

11  clients' credit reports to check or supplement the information provided by their

12  clients. (*National Consumer Law Center Consumer Bankruptcy Law & Practice*,

13  p. 64) Many attorneys use vendors that download credit reports and load the list

14  of creditors directly onto Schedule F.  The leading bankruptcy practice manual

15  offers lawyers the following advice:

16        [M]any debtors ask that certain debt be omitted from their

17        bankruptcy papers … because of a continuing intent to repay. *The*

18        *answer to this request must always be that every existing liability*

19        *has to be listed* (including personal debts to family members and

20        friends).  The debtor's signature on the schedules is a certification

21        under penalty of perjury that the information provided is complete

22        and accurate.

23  The *National Consumer Law Center Consumer Bankruptcy Law & Practice*, p.

24  63 (emphasis added).

25        16.    Therefore, the benefits would be few and the risks great for debtors

26  attempting to keep a pre-bankruptcy credit card account open, particularly in light

27  of debtors' substantial access to new credit cards after bankruptcy.

28

5

17.     Additionally, debtors are delinquent on the vast majority of their unsecured credit cards at the time of filing.  It only makes sense for a debtor to ride through an account if the account is current. Because most cards are in default or maxed out to their full credit limits, there is little or no benefit to ride through any card that is in default.

18.     Debtors are likely to ask their attorneys about the difficulty of obtaining new credit cards after bankruptcy. Most attorneys are well aware, both as a matter of practice and because of the dissemination of research, including *Bankrupt Profits* and *Life After Debt*, that they can obtain new credit after bankruptcy. That availability, detailed in full in my prior declaration and summarized below, means that debtors weigh the risks of keeping a card off their schedules against the ease of obtaining a new post-bankruptcy credit card.

19.     For the reasons detailed above, the number of Chapter 7 debtors who fail to list one or more unsecured debts on their schedules is small. The practical disadvantages combined with the legal risks mean that the majority of debtors list nearly all their unsecured credit lines on their schedules, resulting in creditors getting notice of the bankruptcy and cancellation of the accounts.  Given that the typical debtor has approximately a dozen tradelines at the time of bankruptcy, and that only a fraction of debtors do not list an unsecured debt, most tradelines will be discharged at bankruptcy.

**III. EVEN FOR THE MINORITY OF DEBTORS WHO RETAINED A PRE-BANKRUPTCY CREDIT CARD, IT IS LIKELY THOSE ACCOUNTS STAY CURRENT AFTER BANKRUPTCY**

20.     Upon receiving their discharges, Chapter 7 filers are released from the burden of paying all or nearly all of their other debts.  Therefore, people who have received a Chapter 7 discharge find themselves well-positioned to keep up with their payments on a ridden through credit card.  Put another way, because anyone who would ride-through a credit card is likely to do so for only one card,

6

and because nearly all of their other unsecured obligations are discharged in bankruptcy, the debtors' post-bankruptcy income is freed up to make payments on the one card that survived the bankruptcy.

21.     When Chapter 7 debtors "ride-through" a pre-bankruptcy debt, they retain that debt's original credit terms.  Those terms are almost always superior to any terms they would have received on any new cards they may could obtained in the first few years after filing for bankruptcy.

22.     Because a card that survived bankruptcy is likely to be less expensive and have a higher credit line than the "fee-harvester" subprime cards that are marketed to people who have filed bankruptcy, a Chapter 7 debtor has a particularly high incentive to stay current on the ridden-through account.   Even if those debtors encountered difficulty making ends meet after bankruptcy, they would likely attempt to avoid delinquency on their ridden-through card because that prior card  is likely to have relatively favorable terms compared to the credit cards they could obtain or have obtained after bankruptcy.

23.     The available data on how people fare paying their bills after bankruptcy suggest that default on credit cards is relatively uncommon in the first few years after receiving a chapter 7 discharge. In a survey of chapter 7 debtors conducted three years after the bankruptcy cases were filed, Deborah Thorne and I found that only 17.2% of respondents said that they were struggling to pay a credit card bill. (Porter & Thorne, *Financial Education*, Figure 2.)

24.     Another factor that decreases the likelihood that Chapter 7 debtors with "ridden-through" pre-bankruptcy credit cards will default after bankruptcy is the treatment of unlisted debt with regard to the bankruptcy discharge. A competent attorney, familiar with advice such as that found in the National Consumer Law Center's highly-regarded and widely-read manual on advising consumer debtors, would have ensured that their clients understood the consequences of leaving out debts from their schedules. (*See NCLC Consumer*

1 *Bankruptcy Law & Practice*, p. 483). (And estimates of the number of *pro se*

2 filers in bankruptcy vary from 3.5% to 11%, (*See* Credit Slips), meaning the large

3 majority of filers have attorneys). Therefore, the vast majority of Chapter 7

4 debtors with "ridden-through" credit cards would almost certainly have chosen to

5 keep their cards current.

6       25.   If these individuals became delinquent on these credit cards after

7 bankruptcy, there is little reason to accept an assertion that they would have

8 believed that their credit reports were inaccurate for reporting the "ridden-

9 through" accounts as "delinquent." Consumers have great difficulty

10 understanding their credit reports, as I explained in great detail in my prior

11 declaration in this case. Because consumers do not know how to interpret their

12 credit reports, it is particularly unlikely that debtors would be able to make the

13 sophisticated argument that a ridden-through debt that became delinquent after

14 bankruptcy should be reported as though it had been listed on the schedules and

15 discharged.

16       26.   The key point in the preceding two sections is that the hypothetical

17 offered by the Settling Plaintiffs on pages 7-8 of their Reply to White Plaintiffs'

18 Opposition to Motion for Reconsideration is very unrealistic. At best, it describes

19 a situation that only a small proportion of those who received a chapter 7

20 bankruptcy would experience. To fit into the hypothetical, *all* of the following

21 would have to be true:

22               i.  A debtor would have to have chosen to disobey her attorney

23                  (assuming competent and ethical representation) and the

24                  instructions on the bankruptcy schedules and not list an

25                  unsecured debt;

26             ii.  The creditor would not have received notice of the bankruptcy

27                  from an alternate source (such as the public records or the

28                  credit report);

8

iii.   The debtor would have had to default on their ridden-through unsecured credit after bankruptcy, despite having made the decision to keep this creditline specifically so they could borrow on it in the future.

Given this complex set of factors and the fact the vast majority of tradelines are not ridden through, the hypothetical situation is unlikely to have occurred.

## IV. CHAPTER 7 DEBTORS HAVE NUMEROUS INQUIRIES TO THEIR CREDIT REPORTS AFTER BANKRUPTCY

27.     People file chapter 7 bankruptcy because of overwhelming debts and because of job problems, medical problems, or a change in family circumstances. (See Warren & Warren-Tyagi, THE TWO-INCOME TRAP, p. 81).  The delinquencies on their prior credit accounts and the larger adverse-event causes of bankruptcy lead to many inquiries on the credit reports of debtors after they have been discharged with bankruptcy. These hard inquiries come both from credit purposes, such as debtors responding to marketing of post-bankruptcy credit or seeking replacement credit cards or new loans, and from life purposes related to achieving a fresh start after bankruptcy, such as seeking a higher paying job or a second job, moving into an apartment after losing a home to foreclosure during or before bankruptcy, or seeking insurance if it was cancelled or their rate increased because of their bankruptcy.

28.     This section of the declaration explains why, as compared to the average consumer, Chapter 7 debtors receive disproportionately high and continuous inquiries to their credit reports.  This phenomenon stems from two major contributors.  First, most Chapter 7 debtors actively seek and obtain new credit after bankruptcy.  Second, many Chapter 7 debtors' post-bankruptcy realities involve seeking employment, housing, and transportation, all of which involve decision-makers that habitually check applicants' credit reports.

9

29.     While some Chapter 7 debtors forgo acquiring new credit for several years after bankruptcy, a larger proportion apply for new credit cards and successfully obtain them. *See* Porter, *Bankrupt Profits*.  Their frequent credit activity necessarily results in numerous inquiries into Chapter 7 debtors' credit reports.

30.     Specifically, the 2001 Consumer Bankruptcy Project data show that 60 percent of households obtained a credit card within the first three years after filing for chapter 7.  These cards were new credit issued to the households based on their credit records as they existed after their bankruptcy filings.

31.     Other studies have reached similar conclusions on how many consumers obtain credit cards after bankruptcy.  Using data from the Federal Reserve's Survey of Consumer Finance, Song Han and Geng Li of the Federal Reserve,  find that 60 percent of people who have ever filed chapter 7 or chapter 13 have credit cards.

32.     Car loans are also widely accessible to recently bankrupt debtors.  The 2001 Consumer Bankruptcy Project interview data show that during the first three years after filing chapter 7 bankruptcy, 43 percent of households purchased a car.  About two-thirds (65 percent) of this group obtained an auto loan to finance their car purchase.  Therefore, nearly 28 percent of chapter 7 debtors obtain car loans within the first three years after bankruptcy.

33.     Similarly, Han and Li find that 48 percent of people who have ever filed bankruptcy acquired a car loan after bankruptcy.  This estimate includes individuals who filed for both chapter 7 and chapter 13 bankruptcies.  The Han and Li estimate is likely higher than the Consumer Bankruptcy Project estimate because the latter only considered credit obtained in the first three years following bankruptcy.

34.     Studies also suggest that the availability of credit for bankrupt debtors also extends to the mortgage market.  Han and Li report that consumers

*DECLARATION OF PROFESSOR KATHERINE M. PORTER*

1   who filed for bankruptcy had a similar likelihood of acquiring mortgages to

2   consumers who never filed for bankruptcy.

3        35.     After bankruptcy, debtors are frequently bombarded with credit

4   offers.  Using nationally-representative data from credit reports, researchers from

5   the Federal Reserve Bank of Boston found that 90 percent of bankrupt individuals

6   have access to some form of credit within 18 months of filing for Chapter 7 or

7   Chapter 13.  Three-fourths of consumer debtors had access to unsecured credit

8   within 18 months of filing.  (Cohen-Cole, Duygan-Bump & Montoriol-Garriga,

9   2009)

10        36.     The Consumer Bankruptcy Project data also demonstrate that credit

11   cards are widely available to individuals who have filed bankruptcy.  As I report

12   in my article, *Bankrupt Profits,* more than 96% of people who filed chapter 7

13   bankruptcy received credit solicitations in the first year after bankruptcy. The

14   typical (median) debtor received 10 offers per month. Solicitations for both

15   unsecured and secured lending were common.

16        37.     A recent extended abstract released by Song Han, Benjamin Keys,

17   and Geng Li (2010) reports that within two years of filing, bankrupt households

18   received more credit card offers than households that never filed for bankruptcy.

19        38.     Most credit offers received by Chapter 7 debtors after bankruptcy

20   carry unfavorable credit terms and qualify as subprime products (e.g. fee-

21   harvester credit cards). *See* Porter, *Bankrupt Profits,* p. 1404.  Even though these

22   debtors constantly received new credit offers, my study found that 44 percent of

23   debtors reported having been denied at least once after applying for a credit card.

24   *Id.*  These findings suggest that after bankruptcy, Chapter 7 debtors likely shop

25   around for credit products with more favorable terms than those being offered to

26   them at a high frequency.

27        39.     Under the 2005 amendments, Chapter 7 bankruptcy filers must

28   complete a debtor education course "concerning personal financial management"

11

1   before discharge. 11 U.S.C. §111(d). The courses focus on four major topics.

2   The money management module includes information on how to comparison

3   shop for goods and services, understand different types and costs of credit, and

4   recognize warning signs. 28 C.F.R. § 58.25(f); GAO Report No. 07-203, p.26.

5   This new knowledge may partly explain why Chapter 7 debtors are actively

6   shopping for new credit on the best terms possible, which requires comparison

7   shopping by making formal application.

8        40.   The second major reason why Chapter 7 debtors' credit reports

9   receive so many inquiries relates to their post-bankruptcy realities. After

10   bankruptcy, many Chapter 7 debtors find themselves searching for new

11   employment, housing (either bought or rented), or transportation. In these

12   contexts, the relevant decision- makers (e.g. employers, landlords, auto retailers)

13   frequently pull up applicants' credit reports for consideration. *See* Thorne,

14   *Personal Bankruptcy and the Credit Report*; Porter, *Damage of Debt*.

15        41.   Filing for bankruptcy negatively impacts an individual's credit report

16   on a very large magnitude. After filing for bankruptcy, consumers' scores

17   generally drop a minimum of 100 points. CONSUMER CREDIT COUNSELING

18   SERVICES, 2007; *see also* Thorne, *Personal Bankruptcy and the Credit Report*, p.

19   28.

20        42.   Deborah Thorne analyzed interview data from the 2001 Consumer

21   Bankruptcy Project and found that after their bankruptcies, a significant number

22   of bankrupt debtors reported experiencing denials or difficulties in finding

23   housing, employment, credit cards, or transportation due to their bankruptcies'

24   presence on their credit reports. *See* Thorne, *Personal Bankruptcy and the Credit*

25   *Report*, pp. 30-31, 34-37; Porter, *Damage of Debt*, p. 17. Because they

26   experience a high denial rate, people who have filed bankruptcy must make

27   numerous applications for things such as insurance and cell phone contracts to

28   find a provider who will serve them and to try to secure a reasonable rate. The

1  result is that people who have filed bankruptcy have numerous inquiries made to

2  their credit reports, both for borrowing and non-borrowing purposes.

13

1        I declare under penalty of perjury that the foregoing is true and correct.

2  Executed this 4th day of November, 2010, at Cambridge, Massachusetts.

Katherine M. Porter

# APPENDIX A

# Katherine Porter

Permanent Appointment                              Current Appointment (10-11)
Professor                                          Robert Braucher Visiting Professor
University of Iowa College of Law                  Harvard Law School
Phone: (319) 335-7490                              Phone: (617) 496-6710
katie-porter@uiowa.edu                             kporter@law.harvard.edu

## RESEARCH AND TEACHING INTERESTS

Bankruptcy and Debtor-Creditor Law, Commercial Law (Secured Transactions and Payment Systems), Consumer Law, Residential Mortgages and Housing Law, Empirical Studies of Legal Systems, and Rural Law and Policy.

## ACADEMIC APPOINTMENTS

Robert Braucher Visiting Professor, Harvard Law School          July 2010 to June 2011
    Teaching bankruptcy courses and consumer protection seminar.

Visiting Associate Professor, University of California, Berkeley Law          July 2009 to June 2010
    Taught bankruptcy and secured credit courses.

Professor, University of Iowa College of Law          July 2010 to present
    Teach bankruptcy, commercial law, and consumer law, including courses on mortgages and credit cards. Nominated for Collegiate Teaching Award in 2007, 2008, and 2009. Elected to University Faculty Senate and Faculty Council (Spring 2008). Associate Professor from July 2005 to June 2010.

Visiting Associate Professor, University of Illinois College of Law          Nov. 2008
    Taught intensive 1-credit course on credit cards.

Visiting Associate Professor of Law, William S. Boyd School of Law          July 2004 to June 2005
University of Nevada, Las Vegas
    Taught bankruptcy and secured transactions courses, and seminar on consumer credit.

## EDUCATION

Coursework and Studies on Empirical Methods
    Advanced Topics in Quantitative Methods: Casual Inference. UC Berkeley Law, Jurisprudence and Social Policy PhD program. Instructor: Kevin Quinn. Audited Spring Semester 2010.

    Social Statistics, UC Berkeley Graduate Program of Sociology, Soc. 271c. Instructor: Mike Hout. Audited Fall Semester 2009.

    Empirical Workshop for Law Teachers. Three-day workshop. Washington University, St. Louis. Instructors: Lee Epstein and Andrew Martin. Spring 2004.

Harvard Law School, Cambridge, MA                                    J.D., 2001
    Final Paper: *Learning by Doing: A History of the Board of Student Advisers 1910-2000*
        Graduated *magna cum laude* (top ten percent of class or better)
        2001 Medal of Excellence from the American Bankruptcy Institute
        Board of Student Advisers – Head Instructor for 140 student section
        Notes Editor, *Harvard Women's Law Journal*

Yale University, New Haven, CT                          B.A., *American Studies*, 1996
    Thesis: *The Effects of Corporate Farming on Rural Community*
        Graduated *cum laude*; earned Distinction in Intensive Major
        Norman Pearson Prize for Best Senior Essay in American Studies

## PUBLICATIONS

*Debtors' Assessments of Bankruptcy Financial Education* (with Dr. Deborah Thorne), in DOUGLAS LAMDIN (ED.), FINANCIAL DECISIONS ACROSS THE LIFESPAN (forthcoming 2010).

*Life after Debt: Understanding the Credit Restraint of Bankruptcy Debtors*, 18 AM. BANKR. INST. L. REV. 1 (2010).

*Arrears and Default Costs of Homeowners*, 22 NACTT QUARTERLY 15 (2010).

*Saving up for Bankruptcy*, 98 GEORGETOWN L.J. 289 (2010) (with Ronald J. Mann).

*Interpreting Data, A Reply to Professor Pardo*, 83 AM. BANKR. L.J. 47 (2009) (peer-reviewed) (with five other co-investigators of 2007 Consumer Bankruptcy Project).

*Saving Homes in Bankruptcy: Housing Affordability and Loan Modifications*, 2008 UTAH L. REV. 1123 (symposium volume) (with John Eggum and Tara Twomey) (reprinted excerpt in 7 NORTON BANKR. L. ADVISER 1 (2009).

*Mistake and Misbehavior in Bankruptcy Mortgage Claims*, 87 TEX. L. REV. 121 (2008).

*Did Bankruptcy Reform Fail?: An Empirical Study of Consumer Debtors*, 82 AM. BANKR. L.J. 349 (2008) (peer-reviewed) (with five co-investigators of 2007 Consumer Bankruptcy Project). Awarded 2008-09 Editor's Prize for best article.

*Bankrupt Profits: The Credit Industry's Business Model for Postbankruptcy Lending*, 93 IOWA L. REV. 1369 (2008).

*The Debt Dilemma*, 106 MICH. L. REV. 1167 (2008) (reviewing RONALD J. MANN, CHARGING AHEAD: THE GROWTH AND REGULATION OF PAYMENT CARD MARKETS (2006)).

*Financial Education of Bankrupt Families: Attitudes & Needs*, 24 J. OF CONSUMER EDUC. 15 (2007) (peer-reviewed) (with Dr. Deborah Thorne).

*The Failure of Bankruptcy's Fresh Start*, 92 CORNELL L. REV. 67 (2006) (with Dr. Deborah Thorne).

*The Potential and Peril of BAPCPA for Empirical Research*, 71 MO. L. REV. 963 (2006) (symposium volume).

*Phantom Farmers: Chapter 12 of the Bankruptcy Code*, 79 AM. BANKR. L.J. 727 (2005) (peer-reviewed).

*Going Broke the Hard Way: The Economics of Rural Failure*, 2005 WISC. L. REV. 969.

*Recent Developments in Asbestos Bankruptcies*, 2004 NORTON ANN. SURV. OF BANKR. L.

*Extension of Section 524(g) of the Bankruptcy Code to Nondebtor Parents, Affiliates and Transaction Parties*, 59 BUS. LAW. 503 (2004) (with Susan Power Johnston).

*In the Best Interests of the INS: An Analysis of the 1997 Amendments to the Special Immigrant Juvenile Law*, 27 J. LEGIS. 441 (2001).

## WORKS-IN-PROGRESS

BROKE: HOW CONSUMER DEBT UNDERMINES THE MIDDLE CLASS: Winner of competitive university-wide grant to organize and lead the University of Iowa Obermann Center's 2009 Summer Research Seminar, a week-long workshop for a dozen nationally-known scholars. The Seminar produced a volume of empirical papers using 2007 Consumer Bankruptcy Project data, which I am editing. Under review at Stanford University Press.

*College Lessons: The Financial Risks of Dropping Out*: My chapter in the *Broke* book described above, which discusses the overrepresentation of people with some college (but not a four-year degree) in bankruptcy and discusses implications of financial risks of college non-completion.

*Risk Allocation in Homeownership: Revisiting the Role of Mortgage Contract Terms*: Co-authored with Tara Twomey. Chapter in book, SHARED RISK, SHARED RESPONSIBILITY, edited by Jacob Hacker and Ann O'Leary (forthcoming 2010, Oxford University Press).

CONSUMER LAW. Textbook under contract with Aspen Publishing.

## ORIGINAL EMPIRICAL PROJECTS

*Assessing Success and Failure in Chapter 13 Bankruptcy*: Telephone interviews with national random sample of bankruptcy debtors who did not complete their chapter 13 cases to determine the trigger event for the case ending and the outcome to their financial distress. Data collection in progress. Fully funded by the National Conference of Bankruptcy Judges' Endowment for Education and the University of Iowa Social Science Funding Program.

*2007 Consumer Bankruptcy Project*: National study of more than 2,000 consumer bankruptcy debtors. Co-investigator with interdisciplinary team of researchers. Particular research interests in student loan debt, effects of severe financial distress, and military families in bankruptcy.

*Mortgage Study*: Empirical examination of the intersection of homeownership and bankruptcy. Sample of 1,733 bankruptcy cases from 24 states. Co-investigator with Tara Twomey. Fully funded by the National Conference of Bankruptcy Judges' Endowment for Education.

*2001 Consumer Bankruptcy Project*: Project Director for large empirical study of consumer bankruptcy administered by interdisciplinary team of researchers. Participated in research design. Coordinated data collection with bankruptcy judges, trustees, and field researchers.

## SCHOLARLY PRESENTATIONS

*Safe Products Conference*, FDIC (June 4, 2010).

*Life after Debt: Understanding the Credit Restraint of Bankruptcy Debtors,* St. Johns Law School (Feb. 1, 2010); Duke Law School (Feb. 18, 2010).

*Law, Economics, and Catastrophe*, American Association of Law Schools, Law and Economics section meeting (Jan. 9, 2010).

*The Damage of Debt,* Notre Dame Law School (Oct. 30, 2009); UC Berkeley Law (Nov. 4, 2009); Maurer College of Law, University of Indiana-Bloomington (Nov. 13, 2009); James Rogers College of Law, University of Arizona (Nov. 16, 2009); UC Irvine College of Law (Dec. 14, 2009); Seton Hall Law School (Feb. 3, 2010); UC Davis Law (Mar. 18, 2010).

*Risk Allocation in Homeownership: Reviewing the Role of Mortgage Contract Terms*, Shared Responsibility, Shared Risk. Center for American Progress (Oct. 16, 2009); UC Berkeley Law (May 7, 2009).

*Saving up for Bankruptcy*, American Law and Economics Association Annual Meeting (May 17, 2009); Florida State Law School (Jan. 15, 2009).

*Assessing Success in Chapter 13 Bankruptcy*, Conference on Commercial Law Realities, University of Texas School of Law (March 28, 2009).

*Falling Further Behind: Default Costs and Homeownership*, The Subprime Housing Crisis: Interdisciplinary Policy Perspectives, University of Iowa Public Policy Center (Oct. 11, 2008).

*Borrowing After Bankruptcy*, Conference on Commercial Law Realities, Harvard Law School (Feb. 28, 2008); Big Ten Aspiring Scholars Conference, University of Indiana (Aug. 6, 2007); Center for Law, Business, and Economics, University of Texas School of Law (Dec. 5, 2006).

*The Structural and Empirical Benefits of Mortgage Modification in Bankruptcy*, Subprime Meltdown: The Law & Finance of the American Home Mortgage Market, University of Utah College of Law (Feb. 25, 2008).

*Subprime Mortgage Markets*, American Association of Law Schools, Financial Institutions and Consumer Financial Services section meeting (Jan. 5, 2008).

4

*Profiting from Profligates: Postbankruptcy Lending*, Conference on Empirical Legal Studies, New York University School of Law (Nov. 10, 2007).

*First Insights from the 2007 Consumer Bankruptcy Project*, American Association of Law Schools, Debtor-Creditor Section meeting, Orlando, FL (Oct. 13, 2007).

*Messing with Mortgages*, National Conference of Bankruptcy Judges' Annual Meeting (Oct. 12, 2007).

*Mistake and Misbehavior in Mortgage Claims*, Department of Justice, Executive Office of the U.S. Trustee (July 24, 2007).

*Owning Up: Homeowners in Bankruptcy*, Conference on Commercial Law Realities, University of Texas School of Law (Apr. 13, 2007).

*What Determines Who Goes Bankrupt? How Do They Fare?* Discussant, Financing Community Development conference, Federal Reserve, Washington, D.C. (Mar. 29, 2007).

*Consumer Credit Arbitrations*, Conference on Commercial Law Realities, Harvard Law School (Apr. 27, 2006).

*The Bright Side of BAPCPA for Empiricists*, Interdisciplinary Perspectives on Bankruptcy Reform Symposium, University of Missouri-Columbia Law School (Feb. 24, 2006).

*Going Broke and Staying Broke: Life After Chapter 7*, Conference on Commercial Law Realities, University of Texas School of Law (Apr. 2005).

*Can a Successor Succeed Despite Successor Liability?—Innovative Uses of Section 524(g) of the Bankruptcy Code*, New Developments in Business Bankruptcy, Course in L.L.M. Program, St. John's University School of Law (Mar. 2, 2004).

*Mass Tort Liability and Business Restructurings: Fraudulent Transfer and Successor Liability Issues*, ABA Business Bankruptcy Committee Presentation at National Conference of Bankruptcy Judges (Oct. 16, 2003).

*Developments in Bankruptcy and Economic Rights: As We Forgive Our Debtors, or Not*, Celebration 50 Harvard Law: 50 Years of Women Graduates, Harvard Law School (May 3, 2003).

## LEGAL EMPLOYMENT

Business Bankruptcy Project Update, Cambridge, MA                     Jan. 2004 to June 2004
     Project Director for empirical study of 400 chapter 11 cases undertaken by Professor
     Elizabeth Warren and Professor Jay Lawrence Westbrook.

Stoel Rives LLP, Portland, OR                     Oct. 2002 to Jan. 2004
     Associate in bankruptcy and creditors' rights practice group.

The Honorable Richard S. Arnold, Little Rock, AR                     Sept. 2001 to Sept. 2002
     Law clerk to Judge Richard S. Arnold, U.S. Court of Appeals for the Eighth Circuit.

5

## SERVICE ACTIVITIES
### (including legislative testimony, CLE presentations, and peer reviews)

Co-founder and Regular Contributor, *Credit Slips* blog, www.creditslips.org. (July 2006 to present).

Conferee, National Bankruptcy Conference (2009-present)

Fellow, Bankruptcy Data Project at Harvard, http://bdp.law.harvard.edu/fellows.cfm

Chair, Section on Debtor-Creditor Law, American Association of Law Schools (2010-present)

Advisory Committee, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW (2009-present).

Guest blogger, SALT law blog, www.saltlaw.org/blog. (June 2010).

Board of Directors, American Board of Certification (certifying lawyers in consumer and business bankruptcy and creditors' rights). Faculty committee member. 2006-2009.

Chair-Elect, Section on Debtor-Creditor Law, American Association of Law Schools, (2009).

Planning Committee, National Conference of Bankruptcy Judges Annual Meeting (2009).

*Saving Homes in Bankruptcy*, Farm-Ranch Bankruptcy Institute, Lubbock, TX (Oct. 2, 2009).

*Foreclosure and Loss Mitigation*, Hudson Valley Bankruptcy Association, Hyde Park, NY (Sept. 11, 2009).

*Permissible Plans or Modifying Mortgages*, University of Texas Law School Consumer Bankruptcy CLE, Galveston, TX (Aug. 14, 2009).

*Debtor v. Creditor,* Federal Judicial Center Workshop for Bankruptcy Judges, Chicago, IL (July 11, 2009).

Keynote Speaker, *Saving Homes in Bankruptcy,* 2nd Annual Frank Koger Bankruptcy CLE, Kansas City, MO (June 5, 2009).

*Bankruptcy as a Home-saving Tool*, Training for Iowa Homeownership Education Project, Ames, IA (April 28, 2009).

*Mortgages: Prime, Subprime, and Crime*, Nevada U.S. District Court Conference, Las Vegas, NV (April 16, 2009).

*Mortgage Mishaps and Mysteries*, Northwest Bankruptcy Institute, Vancouver, WA (April 11, 2009).

*Great Debate, Resolved: Now is the time for consumer bankruptcy reform?,* American Bankruptcy Institute Annual Spring Meeting, Washington, D.C. (April 2, 2009).

*Introduction for Elizabeth Warren*, Recipient of Lifetime Achievement Award, Emory Bankruptcy Developments Journal, Atlanta, GA (March 17, 2009).

Peer reviewer, INT'L J. OF CONSUMER STUD. (2008).

Executive Committee, Section on Debtor-Creditor Law, American Ass'n of Law Schools (2007, 2008).

Executive Committee, Section on Financial Institutions and Consumer Financial Services, American Ass'n of Law Schools (2008).

Keynote Address, *Mortgage Meltdown: The Homeowners*, National Consumer Law Center Litigation Conference, Portland, OR (Oct. 25, 2008).

Instructor, Debtor-Creditor Academy, Federal Trade Commission, Division of Financial Practices Academy, Washington, D.C. (Oct. 14, 2008).

Mortgage Servicing Developments, panel at National Association of Consumer Bankruptcy Attorneys Annual Meeting, Hollywood, CA (May 16, 2008).

Presentation on mortgage servicing, Trustee training for Region 1, Boston, MA (May 8, 2008).

*Policing Lenders and Protecting Homeowners*, Testimony before the U.S. Senate Judiciary Committee, Subcommittee on Administrative Oversight and Courts (May 6, 2008).

*The Foreclosure Prevention and Sound Mortgage Servicing Act of 2008* (H.R. 5679), Written Testimony before U.S. House Subcommittee on Housing and Community Opportunity (Apr. 16, 2008).

*Mortgage Claims in Bankruptcy*, Arkansas Debtor-Creditor CLE (Apr. 10, 2008).

*The Credit Cardholders' Bill of Rights of 2008: Providing New Protections for Consumers*, Testimony before U.S. House Committee on Financial Services, Subcommittee on Financial Institutions and Consumer Credit (Mar. 13, 2008).

*Capital Markets "Advances" and Impacts on Consumers*, The Current State of Capital Markets: Federal Judicial Center program (Mar. 5, 2008).

*Misbehavior and Mistake in Bankruptcy Mortgage Claims*, U.S. Trustee Training, Region 4 (Feb. 21, 2008).

*Mortgage Servicing in Bankruptcy*, University of Texas Jay L. Westbrook Bankruptcy CLE (Nov. 15, 2007).

Presenter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, University of Iowa College of Law Subprime Foreclosure CLE (Nov. 16, 2007).

*BAPCPA Case Law*, National Association of Consumer Bankruptcy Attorneys, Las Vegas, NV (Oct. 26, 2007).

*Older Americans and Credit Cards*, Testimony before U.S. House Committee on Financial Services, Subcommittee on Financial Institutions and Consumer Credit (Aug. 7, 2007).

Advised U.S. Senate committee members on statutory drafting of legislation to regulate credit card industry (Apr. 2007).

Peer Reviewer, Institute of Civil Justice, RAND Corporation (Mar.-Apr. 2007).

*Fighting Predatory Lending Using Federal Law*, University of Iowa College of Law Consumer
Law CLE (also conference organizer) (Nov. 10, 2006).

*Rural Bankruptcy*, University of Iowa College of Law Commercial & Bankruptcy Law CLE
(Nov. 18, 2005).

*Joint Presentation of Professional Compensation and Consumer Bankruptcy Committees*,
American Bankruptcy Institute Winter Leadership Conference (Dec. 3, 2004).

### INTERVIEWS AND MEDIA APPEARANCES (selected)

*Only a fraction of those in need file for bankruptcy,* USA TODAY, June 9, 2010.

*Personal Bankruptcies Hit a High and May Keep Rising*, TIME.COM, Apr. 5, 2010.

*Sharp Increase in March in Personal Bankruptcies*, N.Y. TIMES, Apr. 1. 2010.

*Business Bankruptcies Rising Faster than Individiuals,* BLOOMBERG, Oct. 8, 2009.

*A Little Judge Who Rejects Foreclosures, Brooklyn Style*, N.Y. TIMES, Aug. 31, 2009.

*About that New, "Friendly" Consumer Contract,* BUSINESSWEEK, May 1, 2009.

*The Debt Crusader*, NEWSWEEK, April 20, 2009.

*Extent of Bankruptcy Reform Hinges on Details*, WASH. POST, Feb. 21, 2009.

*Bankruptcy as a Step to Solvency,* N.Y. TIMES, Jan. 24, 2009.

*When Bankruptcy Makes Sense,* NEWSWEEK, Jan. 12, 2009.

*Plan to Cut Foreclosure Rate Clears Key Hurdle*, WALL ST. J., Jan. 8, 2009.

*Capital One in Settlement Over Card Debt*, WALL ST. J., Oct. 3, 2008.

*Mortgage Lenders Abusing Court System*, USA TODAY, May 8, 2008.

*Are Companies Forcing Foreclosures?*, THE TODAY SHOW, May 6, 2008.

*Couple lose home in Countrywide dispute but may yet win*, ATLANTA JOURNAL-CONSTITUTION,
Mar. 30, 2008.

*Demystifying the Mortgage Mess*, ABC WORLD NEWS, Feb. 8, 2008.

*Countrywide Draws Ire of Judges*, WALL ST. J., Jan. 14, 2008.

*Mortgage Servicing*, ABC NIGHTLINE, Dec. 14, 2007.

*Gold's Quirk: It's Volatile But Holders Feel Secure*, N.Y. TIMES, Dec. 8, 2007.

*Mortgage Crises in Iowa*, IOWA PUB. TELEVISION, IOWA J., Dec. 5, 2007.

*Judge Demands Documentation in Foreclosures*, N.Y. TIMES, Nov. 17, 2007.

*Mortgage Misprint Muddle Begets Blogosphere Myth*, Am. Banker, Nov. 6, 2007.

*Borrowers Face Dubious Charges in Foreclosures*, N.Y. Times, Nov. 6, 2007, at A1.

*Borrowers Often Hit By Dubious Fees*, Nat'l Pub. Radio, Marketplace, Nov. 6, 2007.

*Broke But Still Borrowing*, N.Y. Times, Sept. 15, 2007.

*Card Offers Flood Ex-Bankrupt*, Forbes.com, Aug. 9, 2007

*Jury Still Out on Bankruptcy Reforms*, Cnn.com, Jan. 3, 2007.

*Bankrupt and Swamped with Credit Offers*, Wash. Post, Apr. 15, 2005.

### OTHER

Admitted to the bars of Oregon and Iowa, and the U.S. Court of Appeals for the Eighth Circuit.

9

# APPENDIX B

## APPENDIX B

### Documents Relied Upon in Declaration of
### Katherine Porter dated Nov. 4, 2010

1. Angela K. Littwin, *The Do-It-Yourself Mirage: Complexity in the Bankruptcy System* (forthcoming 2010).

2. Bob Lawless, *One of Every Nine Bankruptcy Cases Is Filed Without a Lawyer*, CREDIT SLIPS BLOG (Sept. 8, 2010, 5:15 PM), http://www.creditslips.org/creditslips/2010/09/one-of-every-nine-bankruptcy-cases-is-filed-without-a-lawyer.html.

3. 5-77 COLLIER BANKRUPTCY PRACTICE GUIDE P. 77.03 (2010).

4. CONSUMER CREDIT COUNSELING SERVICES, *Bankruptcy's Impact on Your Credit Report*, http://www.cccsstl.org/creditchannel/bankruptcyCredit.asp (last visited Nov. 4, 2010).

5. Deborah Thorne, *Personal Bankruptcy and the Credit Report: Conflicting Mechanisms of Social Mobility*, 11 J. POVERTY 23 (2007).

6. Deborah Thorne & Katherine Porter, *Financial Education for Bankrupt Families: Attitudes & Needs*, 24 J. CONSUMER EDUC. 15 (2007).

7. Deborah Thorne & Katherine Porter, *The Failure of Bankruptcy's Fresh Start*, 92 CORNELL L. REV. 67 (2006).

8. ELIZABETH WARREN & AMELIA WARREN TYAGI, THE TWO-INCOME TRAP: WHY MIDDLE-CLASS PARENTS ARE GOING BROKE (2004).

9. Ethan Cohen-Cole, Burcu Duygan-Bump & Judit Montoriol-Garriga, *Forgive and Forget: Who Gets Credit After Bankruptcy and Why?* (Fed. Res. Bank of Boston, Working Paper No. QAU09-2, 2009), *available at* http://www.bos.frb.org/bankinfo/qau/wp/2009/qau0902.htm.

10. HENRY J. SOMMER ET AL., NATIONAL CONSUMER LAW CENTER, CONSUMER BANKRUPTCY LAW AND PRACTICE (9th ed. 2009).

11. Katherine Porter, *Bankrupt Profits: The Credit Industry's Business Model for Postbankruptcy Lending,* 93 IOWA L. REV. 1369 (2008).

12. Katherine Porter, *Life After Debt: Understanding the Credit Restraint of Bankruptcy Debtors*, 18 AM. BANKR. INST. L. REV. 1 (2010).

13. Katherine Porter, *The Damage of Debt*, unpublished manuscript, (on file with author).

14. Katherine Porter, *The Debt Dilemma*, 106 MICH. L. REV. 1167 (2008).

15. NATIONAL CONSUMER LAW CENTER, *Learning Financial Literacy in Bankruptcy Consumer Bankruptcy Education Project: Survey Report*, *available at* http://www.abiworld.org/Content/NavigationMenu/NewsRoom/BankruptcyResearchCent er/BankruptcyReportsResearchandTestimony/General/bankruptcyreport.pdf (last visited Nov. 3, 2010).

16. Song Han, Benjamin J. Keys & Geng Li, *Credit Supply to Bankrupt Households* (Fed. Reserve Bd., Extended Abstract, 2010 Annual Mtg. of the Society for Economic Dynamics, Montreal), https://editorialexpress.com/cgi-bin/conference/download.cgi?db_name=SED2010&paper_id=1292.

17. Song Han & Geng Li, *Household Borrowing After Personal Bankruptcy* (Fed. Res. Bd., Working Paper No. 2009-17, 2009), *available at* http://www.federalreserve.gov/PUBS/feds/2009/200917/200917pap.pdf.

18. U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-07-203, BANKRUPTCY REFORM: VALUE OF CREDIT COUNSELING REQUIREMENT IS NOT CLEAR (2007), *available at* http://www.gao.gov/new.items/d07203.pdf.