

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI N. WHITE,<br><br>          Plaintiff(s),<br><br>v.<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC.,<br><br>          Defendant(s). | Case No. SACV 05-1070 DOC (MLGx)<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT FOR MONETARY RELIEF** |

Plaintiffs Jose Hernandez, Kathryn Pike, Robert Randall and Bertram Robinson (collectively, "Settling Plaintiffs") along with Defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax") and Trans Union, LLC ("Trans Union") (collectively, "Defendants") move this Court for an order granting final approval of the monetary relief class action settlement ("Settlement") reached in the above-captioned case ("Motion for Final Approval") (Docket 604). After considering all relevant written submissions and oral argument, and for the reasons set forth below, the Court GRANTS the Motion for Final Approval.

1

# I.   BACKGROUND

## a.   Factual History

Plaintiffs filed this suit in 2005 as a result of allegations that Defendants had recklessly and/or negligently violated — and were continuing to recklessly and/or negligently violate — the Fair Credit Reporting Act ("FCRA").  Specifically, Plaintiffs accused Defendants of failing to maintain reasonable procedures to ensure the accurate reporting of debts discharged in bankruptcy and of refusing to adequately investigate consumer disputes regarding the status of discharged accounts.  Plaintiffs brought causes of action for (i) willful and/or negligent violation of Section 1681e(b) of the FCRA and its California counterpart, Cal. Civ. Code Section 1785.14(b), (ii) willful and/or negligent violation of Section 1681 i of the FCRA and its California counterpart, Cal. Civ. Code Section 1785.16, and (iii) violation of Cal. Bus. & Prof. Code Section 17200 *et seq.*

After briefing and hearings on motions for class certification and for summary judgment, class counsel[1] began to mediate their claims with Defendants on August 15, 2007.  The parties negotiations included seven in-person sessions with a JAMS mediator, the Hon. Lourdes Baird (Ret.), five in-person sessions with mediator Randall Wulff, and various other in-person and telephonic meetings involving counsel for the parties.  These sessions ultimately yielded two settlements: one for injunctive relief and the instant Settlement for damages.  Several objectors emerged in response to the monetary relief Settlement, the most prominent being plaintiffs Maria Falcon, Chester Carter, Arnold Lovell, Jr., Clifton C. Seale, III, and Robert Radcliffe (collectively, "White Plaintiffs").

The Court approved the injunctive relief settlement in an order dated August 19, 2008.

---

[1] Class counsel includes: Lieff, Cabraser, Heimann & Bernstein, LLP, and its attorneys Michael W. Sobol and Allison S. Elgart; Caddell & Chapman and its attorneys Michael A. Caddell, Cynthia B. Chapman, and George Y. Nino; National Consumer Law Center and its attorneys Stuart T. Rossman and Charles M. Delbaum; Consumer Litigation Associates, P.C. and its attorneys Leonard A. Bennett and Matthew Erausquin; Well, Green, Toups & Terrell, LLP and its attorney Mitchell A. Toups; and Callahan McCune & Willis and its attorney Lee A. Sherman.

1    Approval Order Regarding Settlement Agreement and Release, Aug. 19, 2008 (Docket 338).

2    The Court now approves the instant Settlement for damages.

3           **b.       Key Terms of the Settlement**

4           Before discussing the adequacy of the Settlement, a brief review of its terms is in order.

5                  ***i:       Class Definition***

6           The Rule 23(b)(3) Settlement class includes all consumers who have received an order of

7    discharge pursuant to Chapter 7 of the United States Bankruptcy Code and who, at any time

8    between and including March 15, 2002 and the present (or, for California residents in the case of

9    Trans Union, any time between and including May 12, 2001 and the present), have been the

10   subject of a Post-bankruptcy Credit Report issued by a Defendant in which one or more of the

11   following appeared:

12          a.       A Pre-bankruptcy Civil Judgment that was reported as

13                   outstanding (i.e. it was not reported as vacated, satisfied, paid,

14                   settled or discharged in bankruptcy) and without information

15                   sufficient to establish that it was, in fact, excluded from the

16                   bankruptcy discharge;

17          b.       A Pre-bankruptcy Installment or Mortgage loan that was

18                   reported as delinquent or with a derogatory notation (other

19                   than "discharged in bankruptcy," "included in bankruptcy," or

20                   similar description) and without information sufficient to

21                   establish that it was, in fact, excluded from the bankruptcy

22                   discharge; and/or

23          c.       A Pre-bankruptcy Revolving Account that was reported as

24                   delinquent or with a derogatory notation (other than

25                   "discharged in bankruptcy," "included in bankruptcy" or

26                   similar description) and without information sufficient to

27                   establish that it was, in fact, excluded from the bankruptcy

28                   discharge; and/or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        d.      A Pre-bankruptcy Collection Account that remained in collection after the bankruptcy date.

Settlement Agreement § 1.48.[2]

### ii:    Settlement Terms

The total settlement fund in this case equals $45 million, comprised of $15 million contributed by each of the three Defendants.  There is no possibility that any of the $45 million fund will revert back to any Defendant.  Rather, after the costs of settlement administration, notice and claims administration are deducted, the parties will distribute each remaining dollar of the $45 million fund to class members according to the distribution plan described below.

### A.    Convenience Awards

To qualify for a Convenience Award, a claimant need only to sign a statement attesting to her belief that she qualifies as a class member.  The Settlement Agreement mandated that the amount of money available for Convenience Awards be no less than $10 million.  After deductions for attorney's fees and costs, incentive awards, actual damage awards and administrative expenses, it is estimated that $20,213,088 will remain for distribution to convenience award claimants.

Approximately 754,783 class members made such an attestation and submitted a claim for a Convenience Award.  May 2, 2011 Keough Decl., ¶ 4.  Each Convenience Award claimant stands to recover approximately $26.78 as a result of the Settlement.  *Id.*

### B.    Actual Damages Awards

Actual Damages Awards are reserved for class members who can demonstrate, by compliance with the documentation requirement described below, that they experienced actual harm as a result of Defendants' improper credit reporting.  The type of harm sufficient to qualify a class member for an Actual Damages Award includes a denial of employment ("Employment award"), a denial of a mortgage or housing rental ("Mortgage or Housing Rental award"), and a

---

[2] All capitalized terms are defined in the manner set forth in the Settlement Agreement crafted by Settling Plaintiffs and Defendants.

1   denial of credit or auto loan ("Credit, Auto or Other Credit award").  Class members denied

2   employment stand to recover the largest Actual Damages Award under the Settlement, whereas

3   class members denied credit or auto loans will receive payments at the lowest end of the actual

4   damages spectrum.

5        Approximately 15,000 Actual Damages Awards claimants exist currently.  Of this group,

6   2,141 claimants were denied employment and are therefore eligible for a minimum award of

7   $750; 5,593 claimants were denied a mortgage or housing rental and are therefore eligible for a

8   $500 minimum award; and 7,600 claimants were denied credit or auto loans and are therefore

9   eligible for a minimum award of $150. Decl. of J. Keough Re Final Report of Supp. Claims, ¶ 8,

10  May 2, 2011 ("May 2, 2011 Keough Decl.") (Docket 751).  The Actual Damage Awards will be

11  paid after the Convenience Award claimants are sent their awards.  Ninety days after the

12  Convenience Awards are sent, any funds remaining from the Convenience Awards (due to

13  returned or not negotiated checks) will be added to the amount distributed to Actual Damage

14  Award claimants.

15         **c.**       **Procedural History**

16       Having discussed the relevant terms of the Settlement, the Court turns to the procedural

17  history that surrounds it.  On May 7, 2009, the Court granted preliminary approval of the

18  Settlement and provisionally certified the settlement class under Fed. R. Civ. P. 23(b)(3).  Order

19  Granting Preliminary Approval to Proposed Class Action Settlement . . ., May 7, 2009

20  ("Preliminary Approval Order") (Docket 423).  Pursuant to the Preliminary Approval Order,

21  notice and claim forms were disseminated to approximately 15 million people who, according to

22  Defendants' records, likely qualified as putative class members.  The initial notice allowed

23  claimants to select between a Convenience Award and an Actual Damage Award simply by

24  making certain attestations.  Specifically, to qualify for an Actual Damages Award under the

25

26

27

28

initial notice regime, a claimant needed only to attest to her belief that she had incurred certain types of damage as a result of Defendants' inaccurate credit reporting.

In response to this initial notice, 744,618 people submitted timely and signed claim forms. Decl. of J, Keough, ISO Plaintiffs Motion for Final Approval, ¶ 15, January 4, 2010 ("January 4, 2010 Keough Decl.") (Docket 604-3). Fifty-six people filed objections and 1,049 people requested exclusion. *Id.* ¶¶ 12, 13. After a first-level analysis of the claim forms, the claims administrator determined that approximately 345,268 claim forms stated a facially valid claim for an Actual Damages Award. Pl.'s Supp. Report of Settlement Administration, p. 1, May 7, 2010 (Docket 667). However, after the claims administrator exercised her discretion to conduct an audit of a random sample of 1,000 of the Actual Damages Award claims, see Settlement Agreement § 7.7(c)(ii), it was revealed that a large number of the Actual Damages Award claims were invalid. In order to ensure that Actual Damages Awards were disbursed only to eligible class members, the Settling Parties proposed a secondary notice process wherein claimants were required to submit documentation in order to support a claim for Actual Damages. Acceptable documentation under the secondary notice regime included, for instance, a credit denial letter, an affidavit from an approved entity, or other similar documentation. The Court approved this secondary notice process in orders dated June 30, 2010 and December 14, 2010. Order Conditionally Granting Request for Secondary Notice, Jun. 30, 2010 (Docket 703); Order Granting Settling Plaintiffs' Motion for Reconsideration, Dec. 14, 2010 (Docket 732).

Secondary notice was mailed to all persons who previously responded to the initial notice of Settlement, including people who filed a claim, requested exclusion, or lodged an objection. The secondary notice form communicated anticipated recoveries of between $150 and $750 for Actual Damage Awards and between $15 and $35 for Convenience Awards (the estimated actual pay-outs of between $150 and $750 for Actual Damage Awards and $26.78 for Convenience Awards fall at the middle-to-high end of these estimations). Settling Plaintiffs' Notice of Revised Supplemental Notice, Exh. A, Jan 19, 2011 (Docket 739). As a result of the secondary notice, 614 class members who previously had filed a claim asked to be excluded from the Settlement and forty-three class members who previously had requested exclusion filed claims

6

1    for payment.  Decl. of J. Keough Re Final Report of Supp. Claims, ¶ 3, May 2, 2011 ("May 2,

2    2011 Keough Decl.")  Fifteen of the original 56 objectors filed new or amended objections.  *Id.*

3    Finally, 57,968 of the people who initially filed a claim for compensation submitted

4    supplemental claims either to switch their claim from the Actual Damages Award category to the

5    Convenience Award category (or vice versa) or to reiterate their initial claim in light of the

6    documentation requirement.  *Id.*, ¶ 4.  Approximately 15,000 claimants submitted claims for

7    Actual Damages Awards accompanied by the requisite documentation.  All other claims were

8    considered requests for a Convenience Award.  An approximate total of 754,000 Convenience

9    Award claimants exist currently.

10        **II.    LEGAL STANDARD**

11        Federal Rule of Civil Procedure 23(e) requires court approval of class action settlements,

12    as well as notice of settlement to all class members.  In deciding whether to grant approval,

13    district courts must evaluate "whether a proposed settlement is fundamentally fair, adequate, and

14    reasonable."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  To determine if a

15    settlement is fair, some or all of the following factors should be considered: (1) the strength of

16    Plaintiffs' case; (2) the risk, expense, complexity, and duration of further litigation; (3) the risk

17    of maintaining class certification; (4) the amount of settlement; (5) the amount of investigation

18    and discovery that preceded the settlement; (6) the experience and views of counsel; and (7) the

19    reaction of class members to the proposed settlement.  *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150

20    F.3d 1011, 1027 (9th Cir. 1998); *Staton*, 327 F.3d at 959.  The relative degree of importance

21    attached to any particular factor depends on the nature of the claims advanced, the types of relief

22    sought, and the unique facts and circumstances of each case.  *Officers for Justice v. Civil Service

23    Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th cir. 1982).  The ultimate

24    decision to approve a class action settlement rests in the district court's sound discretion.  *Class

25    Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

26        **III.    DISCUSSION**

27            **a.    Class Certification for the Purposes of Settlement**

28        Where, as here, "the parties reach a settlement agreement prior to class certification,

7

1  courts must peruse the proposed compromise to ratify both the propriety of the certification and

2  the fairness of the settlement." *Staton*, 327 F.3d at 952.  The first step in such cases is to assess

3  whether a class exists.  *Id.* (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  In

4  its Preliminary Approval Order, the Court discussed the propriety of conditional class

5  certification for the purposes of settlement.  The Court sees no reason to depart from its previous

6  conclusions regarding the existence of a proper settlement class.  In lieu of rehashing this

7  analysis, the Court incorporates its class certification findings from the Preliminary Approval

8  Order into the instant Order.[4]

9                    **b.      Settlement Approval**

10          The Court turns next turns to the propriety the Settlement.  The relevant factors weigh in

11  favor of granting the Motion for Final Approval and indicate that, on the whole, the Settlement is

12  fair, reasonable, and adequate to the class.

13                *i:*       *Strength of Plaintiff's Case and the Risk, Expense, Complexity*

14                          *and Duration of Further Litigation*

15          The strength of Plaintiffs' case, as well as the risks, expense and complexity inherent in

16  continuing this litigation, support the decision to settle.  Unlike protracted litigation with an

17  uncertain outcome, the Settlement offers class members prompt, efficient and guaranteed relief.

18  If this case had proceeded to summary judgment and/or trial, Plaintiffs would have needed to

19  prove that Defendants acted willfully in violating the FCRA.  *See* 15 U .S .C. § 1681n(a).[5]

20  Given that Plaintiffs' claims largely presented questions of first impression, proving willfulness

21  in this case would have been no easy task.

22          To explain, Plaintiffs' case hinges on the theory that Defendants' failure to reconcile the

23  public records of bankruptcy discharge orders with creditors' reporting of post-discharge

24

25          [4] In the Objections section of this Order, the Court does independently address White
    Plaintiffs' objection that Settling Plaintiffs are attempting — unsuccessfully — to certify an
26  actual damages class as opposed to a statutory damages class.

27          [5] A reckless violation of the FCRA satisfies the willfulness requirement.  *Safeco Ins. Co.
    of America v. Burr*, 551 U.S. 47, 56-57 (2007).
28

                                              8

tradelines was willful.  Prior to the injunctive relief order entered in the instant case, however, no verdict or reported decision had required Defendants to implement procedures to cross-check data between their furnishers and their public records providers.  On the contrary, authority cited by Defendants suggested that such efforts had been deemed unnecessary.  *See Sarver v. Experian Info Solutions*, 390 F.3d 969 (7th Cir. 2004) (agency not required under FCRA to examine each computer generated credit report for anomalous information in order for its procedures to be considered reasonable."); *but see O'Brien v. Equifax Info Serv., LLC*, 382 F. Supp. 2d 733 (E.D. Pa. 2005) (denying defendant's motion for summary judgment and refusing to adopt *Sarver* in the Third Circuit).  In addition, Defendants advanced an interpretation of the Supreme Court's decision in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007) that would require a previous determination from a governing court or administrative agency concluding that a defendant's conduct or procedures were unlawful before that defendant could be exposed to a willfulness claim.  *See, e.g.*, Defendant Experian Information Solution, Inc.'s Mem. ISO Motion for Partial Summary Judgment, July 5, 2007 (Docket 109).  Although courts in the Ninth Circuit have yet to determine the validity of Defendants' interpretation, cases from other jurisdictions have indicated that, at the least, Defendants arguments merit serious consideration.  *See, e.g. Levine v. World Fin. Network Nat. Bank*, 554 F.3d 1314 (11th Cir. 2009) (summary judgment granted as to willfulness in FCRA class action, with court concluding that in order to prove a reckless violation of the FCRA, a credit reporting agency's interpretation of the FCRA must be objectively unreasonable under either the text of the Act or guidance from a court to warn the agency against its interpretation).  If Defendants' reading of *Safeco* had carried the day, Plaintiffs' legal theory would have been dead in the water.

Of course, legitimate arguments likely exist in support of Plaintiffs' view of the FCRA as well.  The Court does not mean to suggest that success on Plaintiffs' claims would have been impossible.  However, a review of the legal landscape certainly suggests that Plaintiffs' case was far from a slam dunk.  The uncertainty involved in continued litigation militates in favor of approving the Settlement.

### ii:    Risk of Maintaining Class Certification

The risks of maintaining class certification likewise weigh in the Settlement's favor. Before deciding to settle, the parties attended a hearing on class certification, wherein the Court issued a tentative order denying certification. Minutes of Motion Hearing Re: Motions to Certify Class, Jan. 26, 2009 (Docket 369). As the Court has noted previously, continued class action litigation poses significant manageability issues. Settling Plaintiffs reasonably considered these concerns when they decided to settle this case.

White Plaintiffs' argument that alternately defined classes would have easily gained certification are not convincing. White Plaintiffs contend that, instead of accepting Defendants' $45 million settlement offer, Plaintiffs should have eschewed their representation of the current class and attempted to certify one of the following two alternate classes which, according to White Plaintiffs, would have faced better odds of receiving certification. First, White Plaintiffs suggest pursuing a "judgment error class," encompassing only those people with credit reports still showing post-bankruptcy judgments as outstanding at the time of the litigation and excluding anyone for whom the judgment creditor was a governmental entity or an educational lending institution. Second Final Fairness Hearing Transcript at 10. Based on a study submitted by Equifax, White Plaintiffs estimate that this "judgment error class" would number approximately 800,000 people. *Id.* In the alternative, White Plaintiffs contend that the current class could be changed to a "corrected error class," defined to include only people whose credit report was corrected following the submission of a dispute. *Id.* at 12. White Plaintiffs estimate that the size of this class would be 600,000 consumers. *Id.* White Plaintiffs believe that either of these two classes would have enjoyed greater success at the certification stage and, consequently, would have yielded a better settlement. *Id.* at 11, 13.

At the final fairness hearing, Defendants vigorously disputed the proposition that neither of these alternative classes posed class certification problems. With respect to the corrected error class in particular, Defendants point out that the fact of a post-dispute correction to a credit report does not, as White Plaintiffs posit, amount to an admission that the previous report was in error. Rather, Defendants point to laws mandating that bureaus who receive a dispute from a consumer and who do not receive a response from the source of the report after alerting the

1    source of the dispute must make the changes to the credit file that the consumer requests — even

2    if this means changing the file from accurate to inaccurate.  *See* 15 U.S.C. § 1681i.  The Court

3    need not express an opinion on this debate.  `*See Class Plaintiffs*, 955 F.2d at 1291 (explaining

4    that courts approving class action settlements "need not reach any ultimate conclusions on the

5    contested issues of fact and law which underlie the merits of the dispute . . .").  The Court need

6    only note that credible arguments exist on both sides and that Settling Plaintiffs were entitled to

7    take Defendants' position into account when negotiating the Settlement.

8        Moreover, the Court does not review class action settlements with an eye towards

9    determining whether Plaintiffs pursued the best case possible with a class that the Court

10   determines to be superior to all others.  *See Hanlon*, 150 F.3d at 1027 ("Of course it is possible .

11   .. that a settlement could have been better.  But this possibility does not mean that [the]

12   settlement presented [is] not fair, reasonable or adequate. . . . The question we address is not

13   whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate

14   and free from collusion."); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th

15   Cir. 1982) ("[T]he court's intrusion upon what is otherwise a private consensual agreement

16   negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a

17   reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion

18   between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and

19   adequate to all concerned.").  Recognizing that Monday morning quarterbacking rarely works

20   out well, courts properly evaluate settlements — including the decisions made along the path to

21   the settlement — with some degree of deference to the parties actually involved in the litigation.

22       Settling Plaintiffs' assessment of the risks of maintaining class certification was

23   reasonable. These risks counsel in favor of approving the Settlement.

24                        *iii:    Amount of Settlement*

25       In lieu of proceeding with uncertain litigation, Settling Plaintiffs have negotiated a $45

26   million cash settlement fund that guarantees that not a single dollar will revert back to

27   Defendants.  White Plaintiffs, along with several other objectors, decry this amount as too low,

28   arguing that an appropriate settlement fund would number in the billions of dollars.  As support

for their insistence on higher damages, the White Plaintiffs submit that a $45 million total recovery constitutes a ninety-nine percent reduction of the minimum, aggregate amount of statutory damages available to class members under the FCRA. Although superficially compelling, this argument fails.

As an initial matter, White Plaintiffs rely on controversial variables in order to arrive at their claim of a ninety-nine percent discount rate. To calculate their baseline, *White* Plaintiffs multiply $100, the, minimum amount of statutory damages recoverable under the FCRA, by the fifteen million people who received the initial notice of the Settlement. As the Court has explained in previous orders, the fifteen million person initial notice list was over-inclusive, encompassing people who did not qualify as class members.[6] Order Granting Settling Plaintiffs' Motion for Reconsideration, Dec. 14, 2010 (Docket 732).

But the flaws in *White* Plaintiffs' methods run deeper than that. Not only are *White* Plaintiffs' variables questionable, the premise on which their calculations are based rests on less than solid ground. Some courts have suggested that due process requires a cap on the total amount of statutory damages recoverable in a class action under the FCRA. *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("An award [under the FCRA] that would be unconstitutionally excessive may be reduced . . . after a class has been certified. Then a judge may evaluate the defendant's overall conduct and control its total exposure."). Specifically, certain courts have expressed alarm at the overwhelming liability that can result when class members aggregate their claims to statutory damages, even in cases where the defendant's conduct caused little to no actual harm. *Parker v. Time Warner Entertainment Co.*,

---

[6] Although conceding that there are a variety of hypothetical scenarios in which an individual could have appeared on the notice list but not qualified as a class member, *White* Plaintiffs argue that, as a practical matter, the number of non-class members who received notice of the Settlement is "minuscule," and that fifteen million therefore constitutes a proper approximation of the number of class members. But *White* Plaintiffs' characterization of the number of non-class-member notice recipients as "minuscule" contradicts the attestations of Defendants — the parties with the greatest first-hand knowledge of the composition of the initial notice list. The Court therefore refuses to adopt *White* Plaintiffs' dismissive description of the over-inclusiveness problem. The calculations used to arrive at *White* Plaintiffs' baseline remain problematic.

*LP*, 331 F.3d 13, 22 (2d Cir. 2003) ("We acknowledge [the] legitimate concern that the potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues. Those issues arise from the effects of combining a statutory scheme that imposes minimum statutory damages awards on a per-consumer basis — usually in order to encourage the filing of individual lawsuits as a means of private enforcement of consumer protection laws — with the class action mechanism that aggregates many claims — often because there would otherwise be no incentive to bring an individual claim."). The instant Court neither endorses nor criticizes this view. *See Class Plaintiffs*, 955 F.2d at 1291 (explaining that courts approving class action settlements "need not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute . . ."). Settling Plaintiffs, however, certainly were entitled to consider the risk that any large, cumulative statutory damages award obtained at trial ultimately might have been reduced by the trial or appellate courts.

In addition, courts long have recognized that even where "the total settlement fund is small," in comparison to the possible recovery available after trial, the settlement may not be "unreasonable in light of the perils plaintiffs face" in continuing to litigate their case. *In re Critical Path, Inc.*, 2002 WL 32627559 at *7 (N.D. Cal. June 18, 2002); *see also Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."); *Jaffe v. Morgan Stanley & Co.*, 2008 WL 346417, at *9 (N.D. Cal. Feb.7, 2008) ("The settlement amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial."); *Newberg on Class Actions* § 11.58 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."). Courts must tread cautiously when comparing the amount of a settlement to speculative figures regarding "what damages 'might have been won' had [plaintiffs] prevailed at trial." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (*quoting Officers*

*for Justice*, 688 F.2d at 625).  Indeed, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  *Id.* (*quoting Officers for Justice*, 688 F.2d at 624).  In negotiating with Defendants and assessing their claims, Settling Plaintiffs legitimately could have realized that a stubborn fixation on the hopes of a billion-dollar recovery was unrealistic and counterproductive.  In this situation, it was not unreasonable for Settling Plaintiffs to decide that a guaranteed recovery of $45 million was better than the risk of no recovery at all.

The lack of any reversion clause in the Settlement Agreement also merits consideration when discussing the adequacy of the settlement amount.  No matter what happens in the claims process, Defendants each will be forced to pay $15 million, for a combined hit of $45 million.  Given the FCRA's goal of deterring offenders from improperly reporting credit, the detriment that the Settlement imposes on Defendants ought to be considered alongside the benefit that the Settlement confers on the class members.  The Court finds that a $45 million judgment suffices to deter conduct similar to that which precipitated the lawsuit.  The importance of such deterrence cannot be overlooked.

In sum, the $45 million settlement fund is fair, adequate and reasonable; the amount of recovery weighs in favor of approving the Settlement.[7]

### *iv:     Investigation and Discovery*

Significant investigation and discovery preceded the Settlement.  In addition to taking or defending more than forty depositions, Settling Plaintiffs produced over 50,000 pages of documents and reviewed over 40,000 pages of documents produced by Defendants.  Decl. of M. Sobol ISO Mot. for Attorneys' Fees for Monetary Relief Settlement ("Sobol Attorneys Fees Declaration"), ¶ 10 (Docket 577-2).  Settling Plaintiffs further retained several expert witnesses

---

[7] To be sure, class members may exist who could recover more in an individual action than they stand to receive under the Settlement.  As always, however, those class members had the option of excluding themselves from the Settlement and preserving their right to file an individual claim.  *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("When a few class members' injuries prove to be substantial, they may opt out and litigate independently. . . . Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether.") (internal citations and quotations omitted).

1    and consulted with many more.  *Id.*  Extensive motion practice, including briefing on motions for

2    summary judgment and motions for class certification, took place prior to entering into the

3    Settlement.  *Id.*, ¶ 8.  In addition, the parties attended several status conferences and multiple day

4    hearings on settlement approval and summary judgment.  *Id.*, ¶ 9; *see also* Decl. of M. Sobol

5    ISO Final Approval of Class Action Settlement ("Sobol Final Approval Declaration"), ¶¶ 2, 3, 5,

6    7 (Docket 604-2).  The record indicates that the Settlement was only reached after significant

7    investigation and discovery — a factor that speaks positively of the fairness of the Settlement.

8                              *v:*      ***Experience and Views of Counsel***

9              The experience and views of counsel further support a finding that the Settlement is fair.

10    As courts have noted, "the fact that experienced counsel involved in the case approved the

11    settlement after hard-fought negotiations is entitled to considerable weight."  *Ellis v. Naval Air*

12    *Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980); *see also Boyd v. Bechtel Corp.*, 485 F. Supp.

13    610, 622 (N.D. Cal. 1979) ("The recommendations of plaintiffs' counsel should be given a

14    presumption of reasonableness.").  Here, the attorneys representing Settling Plaintiffs have

15    significant experience in both complex class actions and FCRA litigation.  Sobol Attorneys Fees

16    Declaration, ¶ 2-6; Decl. of M. Caddell ISO Mot. for Attorneys' Feels for Monetary Relief

17    Settlement, ¶¶ 3-14 (Docket 577-4); Decl. of L. Bennett ISO Mot. for Attorneys' Fees for

18    Monetary Relief Settlement, ¶¶ 2-10 (Docket 577-7).  In light of counsels' experience and hard

19    work, the Court gives due weight to the attorneys' views in favor of the Settlement.

20                             *vi:*      ***Reaction of the Class Members to the Proposed Settlements***

21              The Court next turns to the class members' reactions to the Settlement.  Overall, the

22    class's reaction to the Settlement was positive.  Although several groups have pursued their

23    objections with notable vigor, the total number of objectors and/or opt-outs is small when

24    compared with the number of class members who responded favorably.  As a result of the initial

25    and supplemental notice campaigns, a total of 770,117 class members filed a claim for relief,[8]

26

27              [8] This number consists of 2,141 class members eligible for a denial of Employment
       award, 5,593 class members eligible for a denial of Mortgage or Housing Rental award,
28    7,600 class members eligible for a Credit, Auto Loan or Other Credit award and 754,783
       class members eligible for a Convenience Award.

whereas only 56 class members filed objections and 1,663 class members opted to exclude themselves.  Proportionally, the number of objectors and opt-outs amounts to 0.000371% of the people who received direct notice of the Settlement and 0.2% of the people who responded to the notice.  Courts have approved settlements where the percentage of objectors was equal to or higher than this amount. *See e.g. Boyd*, 485 F. Supp. at 624 (approving settlement over objections from 16% of the class); *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (approving settlement where 545 people out of an initial notice pool of 90,000 objected to the settlement or excluded themselves).

The number of opt-outs in this case appears even less significant when the Court takes into account the opt-out campaign spearheaded by certain members of the objectors' legal team.  See Decl. of L. Bennett ISO Response to Objections to Final Approval of Monetary Relief Settlement, ¶¶ 24-26 (Docket 605-2) (describing the websites established for the purpose of encouraging opt-outs).  The existence of this campaign suggests that absent class members in this case were particularly well-informed about their right to exclude themselves from the Settlement, as well as the potential reasons for doing so.  Class members' failure to exclude themselves in large numbers indicates that reaction to the Settlement was generally positive.

The Court, however, is not blind to the fact that only approximately five percent of the people who received notice of the Settlement responded at all.  The Court grappled with this reality when it crafted the scope of the secondary notice campaign in this case.  The Court found then — as it does now — that although a five percent response rate to a settlement disseminated via direct notice is low, this underwhelming response rate does not mean that the Settlement, on the whole, is not fair, reasonable and adequate.  *See* Order Granting Settling Plaintiffs' Motion for Reconsideration, Dec. 14, 2010 at 7-8 (Docket 732) (citing cases where settlements have been approved in spite of similarly low response rates and noting that the initial notice list was overinclusive).

As class members' overall view of the Settlement appears to be positive, the Court finds that this factor weighs in favor of approving the Settlement.  The Court proceeds, however, to consider the merits of each objection.

1

2               *vii:*     **Objections**[9]

3        Finding the settlement fair, adequate, and reasonable thus far, the Court must at last take

4 into account the numerous objections.  Although opposition of a significant number of class

5 members is a factor to be considered when approving a settlement, it is not controlling.  *Boyd*,

6 485 F. Supp. at 624.  An otherwise fair settlement is not doomed simply because a certain

7 percentage of class members oppose it.  *Id.*; *see also Mandujano v. Basic Vegetable Products,*

8 *Inc.*, 541 F.2d 832, 837 (9th Cir. 1976); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977);

9 *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173-74 (4th Cir. 1975).  Nor should a settlement be

10 rejected merely because certain named plaintiffs object.  *Boyd*, 485 F. Supp. at 624; *Flinn*, 528

11 F.2d at 1174. Rather, in order to block a fairly negotiated settlement, the merits of the objections

12 must be substantial.  *Boyd*, 485 F. Supp. at 624.  The Court evaluates each objection in turn.

13                    *A.*       Counsel's Simultaneous Representation of Settling

14                            Plaintiffs and White Plaintiffs

15        White Plaintiffs contend that the Settlement is irreparably tainted by the fact that class

16 counsel simultaneously represented Settling Plaintiffs and White Plaintiffs until July 29, 2009,

17 even after learning that White Plaintiffs did not approve of the Settlement.  White Plaintiffs

18 allege that, on five separate occasions prior to July 29, 2009, White Plaintiffs informed their

19 attorneys of their unanimous opposition to the settlement and instructed them to oppose it or

20 withdraw.  White Plaintiffs' Objections to Class Action Settlement, Dec. 14, 2009 at 16 (Docket

21 553). White Plaintiffs claim that class counsel refused to withdraw and continued to advance the

22 Settlement by subsequently filing the Settlement, filing a declaration resisting their clients'

23 motions for time to file objections, and opposing their clients' motions for reconsideration.  *Id.* at

24 17.  Because class counsel also represented named plaintiffs who supported the Settlement

25

26 _____

27       [9] The Court does not separately address objections to the adequacy of the amount of the settlement fund.  All such objections are overruled for the reasons explained in the

28 Court's discussion of the settlement amount.

1   during this time, White Plaintiffs submit that class counsel simultaneously represented clients

2   with adverse interests in violation of California ethics rules. *Id.*

3        Class counsel dispute White Plaintiffs' recitation of the facts. According to class

4   counsel, White Plaintiffs did not directly communicate their objections to the Settlement until

5   April 9, 2009. Prior to this date, class counsel assert that it was White Plaintiffs' counsel — not

6   White Plaintiffs themselves — who demanded that class counsel withdraw from the case and

7   discontinue their support of the Settlement. Decl. of M. Sobel ISO Application to Withdraw as

8   Counsel . . ., July 27, 2009, ¶¶ 4 (Docket 451).[10] Class counsel submit that they were not

9   required to take instruction from their co-counsel without first discussing it with the White

10  Plaintiffs themselves and that, in any event, White Plaintiffs' counsels' objections were

11  premature because the Settlement terms had not yet been finalized.

12       Class counsel assert that when they first heard from White Plaintiffs directly — on

13  April 9, 2009 — they promptly responded by attempting to organize an in-person meeting for the

14  next week. Class counsel met with two of the White Plaintiffs on April 16, 2009 to discuss near-

15  final settlement terms and then again on April 24, 2009 to discuss the final Settlement. *Id.*, ¶¶ 5.

16  Class counsel submit that, despite their best efforts, they were unable to reach the other three

17  White Plaintiffs. Decl. of M. Sobol ISO Motion for Final Approval, Jan. 4, 2010, ¶ 11 (Docket

18  604-2). On April 26, 2009, White Plaintiffs stated their objections to the Settlement and

19  provided express, written consent for Lieff, Cabraser, Heimann & Bernstein, LLP and the

20  National Consumer Law Center, two of the lead firms representing the class, to withdraw as

21  White Plaintiffs' counsel. *Id.*, ¶¶ 6. Three days later, on April 29, 2009, class counsel began to

22  file notices of withdrawal. *Id.*, ¶ 7. Notices of withdrawal from all counsel were filed by May 5,

23

24

25

26       [10] Class counsel also accuse *White* Plaintiffs' counsel of engaging in improper ex
parte communications with the named plaintiffs attempting to "poison[] them against the
27  Settlement." Settling Plaintiffs' Responses to White Plaintiffs' Objections, Jan. 4, 2010 at
28  43 (Docket 605).

2009.[11]  The Court issued an order granting class counsel's application to withdraw as counsel to the White Plaintiffs on July 29, 2009.  Order Granting Application to Withdraw as Counsel . . ., July 29, 2009 (Docket 453).  The Court specified that the application to withdraw was granted "effective as of April 29, 2009."  *Id.* at 6.  In light of these facts, the Court finds that class counsel moved promptly to terminate any potential conflicts arising from the simultaneous representation of plaintiffs with different opinions on the Settlement.

   The Court also notes that White Plaintiffs have failed to demonstrate that any significant prejudice arose as a result of this short-lived conflict.  The bulk of White Plaintiffs' prejudice assertions rest on the fact that class counsel continued to prosecute the Settlement during the period of simultaneous representation.  But class counsel's efforts on behalf of the Settlement would have continued regardless of the date on which they withdrew as counsel for the White Plaintiffs, given the large number of named plaintiffs who continued to support the Settlement and class counsel's duty to the absent class members.  *See Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494, 496 (S.D.N.Y. 1994) (explaining that because class counsel's duty to the class as a whole "frequently diverges from the opinion of either the named plaintiff or other objectors, . . . class counsel must act in a way which best represents the interest of the entire class.") (internal citations and quotations omitted).  White Plaintiffs have not shown that the Settlement would have been less vigorously pursued even if class counsel somehow had gained immediate court approval to withdraw as White Plaintiffs' counsel the first moment that they suspected White Plaintiffs' disagreement.  White Plaintiffs contend that, had class counsel withdrawn immediately, White Plaintiffs would have had more time to file briefs in support of their objections in advance of the hearing on preliminary approval of the Settlement.  But the receipt of fully-briefed objections at the preliminary approval stage would not have changed the Court's decision on preliminary approval.  In determining whether preliminary approval is appropriate, the settlement under review need only be *potentially* fair; the court makes a final

---

[11] Callahan McCune & Willis and its attorney Lee A. Sherman did not seek to withdraw as counsel for *White* Plaintiffs because this firm had never appeared on White Plaintiffs' behalf.

adequacy determination at the final approval hearing, after all parties have a chance to object and/or opt out.  *See Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). A brief from one group of objectors would not have induced the Court to denial preliminary approval.  Given the lack of significant prejudice to the White Plaintiffs, the Court is not inclined to bar class counsel from representing the class after more than five years of hard work on their behalf.

White Plaintiffs, however, ask the Court to ignore this lack of prejudice in considering whether to disqualify class counsel.  According to White Plaintiffs, the simultaneous representation of disagreeing named plaintiffs results in *per se* disqualification, regardless of any "showing of specific 'adverse effect' resulting from such representation." *Id.* at 21 (citing *Moreno v. Autozone, Inc.*, 2007 WL 4287517 (N.D. Cal. Dec. 6, 2007); *Certain Underwriters at Lloyd's of London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 919 (N.D. Cal. 2003).  In White Plaintiffs' world, any class counsel who learns of a named plaintiff's disagreement with a settlement — and who does not gain *instantaneous* approval to withdraw from representing that plaintiff — is forever barred from serving as a lawyer to the class.

White Plaintiffs' position is not persuasive.  White Plaintiffs' logic cavalierly imports traditional attorney disqualification rules into the class action context.  The circuit courts to consider this issue have held that this kind of "mechanical[] transposition" is inappropriate.  *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 589-590 (3d Cir. 1999).  *See also In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 18-19 (2d Cir. 1986).  As the "*Agent Orange*" court explained, "[a]utomatic application of the traditional principles governing disqualification of attorneys on grounds of conflict of interest would seemingly dictate that whenever a rift arises in the class, with one branch favoring a settlement or a course of action that another branch resists, the attorney who has represented the class should withdraw entirely and take no position." *In re "Agent Orange,"* 800 F. 2d at 18.  This kind of rigid application would "substantially diminish the efficacy of class actions as a method of dispute resolution." *Id.* at 19.  Indeed, "[i]f, by applying the usual rules on attorney-client relations, class counsel could easily be disqualified in

1    these cases, not only would the objectors enjoy great 'leverage,' but many fair and reasonable

2    settlements would be undermined by the need to find substitute counsel after months or even

3    years of fruitful settlement negotiations." *Lazy Oil*, 166 F.3d at 589.

4         Instead of mechanically applying traditional disqualification rules to class action cases,

5    the *"Agent Orange"* and *Lazy Oil* opinions instruct courts to conduct a balancing test, weighing

6    the interest of the class in continued representation by experienced counsel against any actual

7    prejudice incurring to the objectors from being opposed by their former counsel. *Lazy Oil*, 166

8    F.3d at 590; *In re "Agent Orange,"* 800 F. 2d at 18-19. This pragmatic approach makes sense to

9    the instant Court.

10         There is nothing in California law that precludes the Court from following the path laid

11   by the Second and Third Circuits. In a recent decision, the California Court of Appeals

12   approvingly cited the balancing test endorsed in *"Agent Orange"* and *Lazy Oil*. *See Kullar v.*

13   *Foot Locker Retail, Inc.*, 191 Cal. App. 4th 1201, 1207 (2011). Given that motions to disqualify

14   counsel are decided under state law, *see In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir.

15   2000), the California appellate court's view is entitled to considerable weight. The *Kullar* case

16   indicates that there is nothing particular about California ethics rules that counsels against use of

17   a pragmatic balancing test when deciding whether to disqualify class counsel.[12]

18

19

20

---

21         [12] The *Moreno v. Autozone, Inc.* case cited by White Plaintiffs, 2007 WL 4287517

22   (N.D. Cal. 2007), comes closest to supporting White Plaintiffs' view of the law. *Moreno*,
     however, is factually distinguishable. In *Moreno*, the attorneys subject to disqualification

23   motions sought to represent the objectors, not the class. As the *Lazy Oil* court noted, the
     balance tips more heavily against denying a motion for disqualification when the subject

24   attorneys represent the entire class, as opposed to a few objectors. *Lazy Oil*, 166 F.3d at
     590. In addition, the *Moreno* court found that the attorneys at issue had withheld critical

25   information from the three clients who favored the settlement and had committed two other
     ethical breaches while involved in the litigation. No such misdeeds are alleged here.

26   Clearly, significant differences separate *Moreno* from case at bar. Nevertheless, the Court
     acknowledges that the instant Order conflicts somewhat with the result reached in *Moreno*.

27   This conflict exists because the Court finds the authority contrary to *Moreno* (specifically,
     *"Agent Orange"* and *Lazy Oil*) to be more persuasive.

28

As discussed above, when weighing class members' interests in retaining experienced counsel against the risk of prejudice to White Plaintiffs, the balance tips in favor of the class. Class counsel do not need to be disqualified and the Settlement is not tainted by conflict.

**_B._**    Settling Plaintiffs' Attorneys Alleged Failure to

Consult with White Plaintiffs

White Plaintiffs' next objection is related to the last. White Plaintiffs allege that class counsel failed to adequately consult with White Plaintiffs during the period that they served as White Plaintiffs' counsel. Specifically, White Plaintiffs accuse class counsel of (1) agreeing to the core money terms of the Settlement without discussing them with White Plaintiffs; (2) refusing to discuss the terms of the Settlement with White Plaintiffs until the Settlement was finalized; and (3) failing to consult with three of the White Plaintiffs — Ms. Falcon, Mr. Carter and Mr. Radcliffe — after the Settlement was finalized. White Plaintiffs' Objections to Class Action Settlement, Dec. 14, 2009 at 26 (Docket 553). Thus, White Plaintiffs argue that class counsel excluded their clients from the settlement process, in contravention of ethical rules such as Model R. Prof. Conduct 1.2, which requires a lawyer to "abide by a client's decisions concerning the objectives of representation." _Id._

The record does not support White Plaintiffs' accusations. On February 5, 2009, all parties and Defendants' insurers participated in a Court-mandated settlement conference at the courthouse. Decl. of M. Sobol ISO Motion for Final Approval, Jan. 4, 2010, ¶ 3 (Docket 604-2). All counsel — including counsel for the White Plaintiffs — were present. _Id._ Plaintiffs reached agreement with two of the three Defendants regarding the essential terms of the Settlement as a result of the mediation session. _Id._ No party or counsel voiced an objection on that date. _Id._ On February 6, 2009, class counsel wrote a letter to all plaintiffs — including the White Plaintiffs — informing them of the essential terms agreed upon at the mediation session and stating that a final agreement, if reached, would be provided for the plaintiffs' consideration. _Id._, ¶ 4. Having not received any objections, class counsel proceeded to negotiate the final settlement terms with Defendants for the next month. _Id._, ¶ 5. On March 9, 2009, one of the White Plaintiffs' attorneys contacted class counsel to voice disagreement with the Settlement. _Id._, ¶ 6. The White

22

1  Plaintiffs' attorney also informed class counsel that he had been contacting White Plaintiffs in

2  order to advise them to reject the Settlement, even though its terms were not yet final. *Id.* Class

3  counsel suggested that a meeting with all plaintiffs be held once the terms of the proposed

4  settlement were finalized with Defendants, so that the plaintiffs could make a fully-informed

5  decision on whether the Settlement merited support. *Id.*, ¶ 8. In the meantime, class counsel

6  invited White Plaintiffs' counsel to continue to participate in the negotiations — an offer that

7  White Plaintiffs' counsel rejected. *Id.* When White Plaintiffs contacted class counsel directly

8  for the first time, on April 9, 2009, to express their concerns regarding the Settlement, class

9  counsel promptly attempted to organize an in-person meeting with these Plaintiffs. *Id.*, ¶ 9.

10  Contrary to White Plaintiffs' assertions, the record depicts a class counsel team who took

11  appropriate steps to confer with all of their clients — including the White Plaintiffs — as the

12  settlement talks proceeded.

13       White Plaintiffs' objection that class counsel failed to consult with three of the White

14  Plaintiffs once the Settlement was finalized similarly lacks merit. The record indicates that class

15  counsel made repeated attempts to arrange in-person meetings with these three plaintiffs, often

16  going so far as to try to contact them through family members. Decl. of M. Sobol ISO Motion

17  for Final Approval, Jan. 4, 2010, ¶ 10 (Docket 604-2). When these efforts failed, class counsel

18  presented the terms of the Settlement to each White Plaintiff in a letter. *Id.*, ¶ 12. Under the

19  circumstances, this action was sufficient.

20              *C.*      *Acosta/Pike* Counsel's Fee Sharing Arrangement

21       White Plaintiffs' final objections to the adequacy of class counsel's representation

22  focuses on the role of the *Acosta/Pike* counsel. *Acosta/Pike* was an earlier filed case that was

23  ultimately consolidated with the instant action. When consolidation occurred, the *Acosta/Pike*

24  counsel entered into a fee sharing agreement with the rest of class counsel. Under the fee-

25  sharing arrangement, *Acosta/Pike* counsel's fees are capped at "20% of the first $16 million in

26  aggregate fees recovered collectively from [Defendants] in the *White/Hernandez* and *Acosta/Pike*

27  cases." *Id.* at 28. White Plaintiffs claim that this agreement prevents *Acosta/Pike* counsel from

28  independently representing the class because the agreement eliminates any financial incentive for

23

the attorneys to take this case to trial or otherwise seek a recovery in excess of one that would yield $16 million in aggregate fees.  *Id.*  Other than this speculative fear of conflict, White Plaintiffs present no evidence whatsoever indicating a lack of vigor on the part of the *Acosta/Pike* counsel.  White Plaintiffs submit, however, that the situation raised by the fee-sharing agreement is similar to the one confronted by the Ninth Circuit in *Rodriguez v. West Publishing Corp*, 563 F.3d 948 (9th Cir. 2009), where the Circuit disapproved of the use of an ex ante incentive award agreement between class counsel and class representatives that tied the incentive award to a percentage of the class recovery up to a $75,000 limit. *Id.* at 959.

    As an initial matter, the factual distinctions between *Rodriguez* and the instant case outweigh the factual similarities.  The incentive agreement discussed in *Rodriguez* was between counsel and named plaintiffs, whereas here the co-counseling agreement simply contains a fee sharing arrangement amongst counsel.  Furthermore, the fee-sharing agreement in this case poses a perverse incentive, if at all, for only one group of class counsel.  The majority of class counsel (Leiff Cabraser, Caddell & Chapman, Consumer Litigation Associates and the National Consumer Law Center, among others) do not operate under a compensation cap and therefore have every reason to seek the highest possible recovery.  Indeed, in their zeal to use *Rodriguez* in order to construct an objection to the Settlement, White Plaintiffs have overlooked the case's central holding.  Specifically, Ninth Circuit found that the improper incentive agreement in *Rodriguez* did *not* require rejection of the proposed class settlement, as long as the settlement was otherwise fair, reasonable and adequate and as long as there existed additional counsel and class representatives not subject to the agreement.  *Id.* at 961.  The instant Settlement passes this test.  White Plaintiffs' objection to the *Acosta/Pike* fee-sharing arrangement is overruled.

### D.    Adequacy of the *Acosta/Pike* Class Representatives

    In addition to challenging the adequacy of the *Acosta/Pike* counsel, White Plaintiffs object to the *Acosta/Pike* class representatives.  White Plaintiffs contend that because the *Acosta/Pike* plaintiffs did not assert a claim against Experian in the *Acosta/Pike* action, they cannot properly represent consumers with claims against this Defendant.  White Plaintiffs' Objections to Class Action Settlement, Dec. 14, 2009 at 31 (Docket 553).  In addition, White

Plaintiffs claim that the *Acosta/Pike* plaintiffs are unfit to represent the Trans Union and Equifax classes because the Court previously rejected the settlement reached with those Defendants in *Acosta/Pike* before that action was consolidated with the instant case. *Id.* Both of these arguments fail.

The fact that the *Acosta/Pike* plaintiffs did not assert a claim against Experian initially does not make them inadequate class representatives. An otherwise adequate representative with claims typical of the class may step forward and serve as a class representative as needed even if he or she was not a named plaintiff at the time a case was filed. *See Bromley v. Michigan Educ. Ass'n-NEA*, 178 F.R.D. 148, 156-60 (E.D. Mich. 1998) (allowing unnamed class members to intervene and become class representatives). The *Acosta/Pike* representatives should be allowed to step forward here. Each of these plaintiffs are members of the Experian monetary relief class. In fact, two of these three named *Acosta/Pike* representatives submitted disputes to Experian regarding their credit claims. Depo. of R. Randall at 29 (attached as Exh. 2 to Decl. of L. Sherman ISO Settling Plaintiffs' Responses to White Plaintiffs' Objections (Docket 605-3)); Depo. of B. Robinson at 24 (attached as Exh. 3 to Decl. of L. Sherman ISO Settling Plaintiffs' Responses to White Plaintiffs' Objections (Docket 605-3)). The Court therefore overrules White Plaintiffs' objection to the *Acosta/Pike* plaintiffs' role as representatives of the Experian class.

The Court also rejects White Plaintiffs' argument that the *Acosta/Pike* plaintiffs are rendered unfit by virtue of their support for the settlement that the Court rejected in *Acosta/Pike* before that case was consolidated with the instant action. This "one shot and you're out" approach is not supported by the law. *See Orser v. Select Portfolio Servicing*, 2009 WL 4667378 (W.D. Wash. 2009) (approving second amended class settlement with the same representatives who had supported the earlier, rejected settlement); *Chemi v. Champion Mortgage*, 2009 WL 1470429 (D. N.J. 2009) (approving class action settlement with the same class representatives as the preliminary settlement which the court rejected); *Clark v. Experian Info. Solutions, Inc.*, 2004 WL 256433 (D. S.C. 2004) (approving class action settlement with same representatives after the court had previously denied class certification, prompting an amended complaint). In sum, White Plaintiffs have not shown that the *Acosta/Pike* representatives are inadequate.

*E.*    "Abandonment" of Reinvestigation Claim

White Plaintiffs further object to the Settlement's purported "abandonment" of certain class members' claims that Defendants employed unreasonable debt reinvestigation procedures in violation of Section 1681i of the FCRA. According to White Plaintiffs, the Settlement only offers compensation for claims based on a violation of Section 1681e(b) of the FCRA, the provision that forbids unreasonable reporting procedures. White Plaintiffs contend that, as the complaint filed in this case asserted causes of action under both Section 1681i and Section 1681e(b), there is no reason for the Settlement to eschew one of these two claims. Settling Plaintiffs deny that they are abandoning any claim; they argue, rather, that the Settlement offers combined relief for all errors experienced by the class vis a vis post-bankruptcy debt reporting. Settling Plaintiffs contend that they are not required to provide extra compensation to class members who also happened to initiate a reinvestigation request because there is no indication that class members who asked for reinvestigation suffered any greater harm. In fact, Settling Plaintiffs argue that the class members who did move for reinvestigation likely suffered a reduced range of harm, given the chance that their credit report was corrected more promptly as a result of the reinvestigation.[13]

Settling Plaintiffs' response misses the point somewhat. Although a class member who lodged a reinvestigation request may not have incurred greater actual injury than a class member

_____

[13] White Plaintiffs argue that, in fact, class members with reinvestigation claims did experience greater injury as a result of the time they were forced to dedicate to the reinvestigation process. The White Plaintiffs value this additional injury at $60 — a figure they arrive at by multiplying three hours (the amount of time White Plaintiffs estimate that it takes to initiate reinvestigation) by $20 per hour (the value one of the White Plaintiffs' experts places on the consumers' time). Settling Plaintiffs attack these variables, arguing that it takes no more than a brief phone call or a letter to lodge a reinvestigation request and asserting that White Plaintiffs' figures lack support in empirical evidence. Putting aside the problems in the reliability of White Plaintiffs' calculations, the Court finds that an expenditure of minimal extra time does not yield a finding of a substantially greater injury. Presumably, it took each member of the class differing amounts of time to uncover the errors in their credit reports and/or to figure out the source of their problems. It would be unmanageable to force the Settlement to distinguish along these lines. The Court accepts Settling Plaintiffs' submission that the fact of initiating a reinvestigation does not mean that the class member suffered greater harm.

who did not submit a claim for reinvestigation, the class member with the reinvestigation claim has higher potential statutory damages, because he or she can recover under two separate provisions of the FCRA as opposed to only one.  Class members with reinvestigation claims and class members without them are thus not in identical legal positions.  Yet, the Settlement offers these two class members identical compensation prospects.  A class member with no reinvestigation claim therefore stands to recover a higher percentage of his or her possible statutory damages under the Settlement than a class member with both a reinvestigation claim under Section 1681i and a flawed reporting claim under Section 1681e(b).  The potential problems posed by this disparity merit thoughtful consideration.  Settling Plaintiffs are wrong to try to sweep this issue under the rug.

On the other hand, the relative parity of the actual harm suffered by the class members who both did and did not file reinvestigation requests is certainly relevant.  A class action settlement need not benefit all class members equally.  *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983); *In re AT &T Mobility Wireless Data Services Sales Tax Litigation*, 2011 WL 2204584 at *42 (N.D. Ill. 2011); *In re MetLife Demutualization Litigation*, 689 F. Supp. 2d 297, 344 (E.D.N.Y. 2010); *In re Excess Value Insurance Coverage Litigation*, 2004 WL 1724980 at *14 (S.D.N.Y. 2004).  Rather, although disparities in the treatment of class members may raise an inference of unfairness and/or inadequate representation, this inference can be rebutted by showing that the unequal allocations are based on legitimate considerations.  *Holmes*, 706 F.2d at 1148; *In re AT&T*, 2011 WL 2204584 at *42.  *See also In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (approving a distribution plan that left certain class members without recovery); *Officers for Justice*, 688 F.2d at 625 (explaining that the decision to approve a class action settlement "is nothing more than an amalgam of delicate balancing, gross approximations and rough justice.").  Accordingly, the fact that class members who did not submit reinvestigation requests will receive a proportionally higher share of their possible statutory damages does not require rejection of the Settlement if the distribution plan reasonably can be explained.

Here, Settling Plaintiffs' focus on the relative equality of harm incurred by the class members is one such legitimate explanation. Settling Plaintiffs were entitled to conclude that it was unfair to use limited settlement resources to provide extra money to class members who did not suffer any greater actual injury and who, in fact, may have suffered less harm by virtue of their credit reports being corrected more quickly. Furthermore, the fact that two of the named plaintiffs — Robert Randall and Bertram Robinson — lodged reinvestigation requests suggests that class members with reinvestigation experience were adequately represented in the negotiating process. *See* Depo. of R. Randall at 29 (attached as Exh. 2 to Decl. of L. Sherman ISO Settling Plaintiffs' Responses to White Plaintiffs' Objections (Docket 605-3)); Depo. of B. Robinson at 24 (attached as Exh. 3 to Decl. of L. Sherman ISO Settling Plaintiffs' Responses to White Plaintiffs' Objections (Docket 605-3)). Finally, any potential prejudice to class members with possible reinvestigation claims is mitigated by class members' ability to opt out of the Settlement and to preserve their rights to bring individual claims. *Cf. Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 266 (S.D.N.Y. 1998) (explaining that any prejudice arising as a result of the fact that the settlement agreement relinquishes certain class members' future claims is lessened by the ability to opt-out of the settlement). Although the Court may have structured the distribution plan somewhat differently if it were itself involved in the negotiations, White Plaintiffs have not "overcome the deference that should be given to the rational allocation of benefits that has been negotiated by counsel for the parties." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 65 (S.D.N.Y. 2003). This objection is overruled.

                    *F.*      Settlement Favors Class Members with Claims Against One Defendant Over Those With Claims Against Two or Three

In an objection similar to the one just discussed, White Plaintiffs, along with objectors Glenda Schillici and Steven Singer, complain that the Settlement, by failing to distinguish between class members with claims against one Defendant and class members with claims against two or three of them, improperly favors class members with only one claim. For the reasons described in the foregoing section, this objection is overruled.

1                   *G.*        Allocation Plan is Otherwise Confusing, Arbitrary, Not

2                             Sufficiently Comprehensive or Otherwise Unfair

3         In another similar objection, several class members complain that the allocation plan is

4 confusing, arbitrary, not sufficiently comprehensive in terms of the type of claims represented in

5 the Actual Damages Award category, or otherwise unfair. *See, e.g.* Objections of Lisa Brisbane,

6 Debbie, Culleton, Anthony D'Apice, Walter Ellingwood III, Glenda Schilleci, Michael Kennedy,

7 Ivonne Martinez, Brenda Melendex, Steve Singer, Katherine Nemeth, Marcia and Jimmy Green,

8 Vincent Perillo, Kelly and Ralph Porter, Nancy Segarra, Thomas Carder, Kennetth Griffin and

9 Colleen Shinn. These objections are conclusory and do not offer sufficient alternative

10 distribution proposals. These objections are overruled for the reasons set forth in the two

11 preceding sections.

12                      *H.*        Lack of "Subclass" Representation

13         Next, a group of objectors comprised of the White Plaintiffs, Glenda Schilleci, Steven

14 Singer, Lisa Brisbane, Christy Driver, Ivonne Martinez, Brenda Melendez, Kelly and Ralph

15 Porter, Nancy Segarra and Thomas A. Carder (collectively, "Subclass Objectors") submit that

16 the Settlement is inadequate because the named plaintiffs do not include members of the

17 following subclasses: (1) consumers victimized by Defendants' unreasonable reinvestigation

18 practices, and (2) consumers whose credit reports listed pre-bankruptcy *judgments* (as opposed to

19 other debts) as still outstanding.[14] The Supreme Court has instructed that, in cases where distinct

20 subgroups exist within a class, a settlement may not be certified unless one or more of the named

21 representatives belongs to each subgroup. *Anchem Products, Inc. v. Windsor*, 521 U.S. 591, 627-

22

23            [14] Subclass Objectors also lament the lack of a named plaintiff to represent

24 consumers who are unaware of information in their credit reports. The notion that the class
representative group should include a plaintiff who is ignorant of the content of his or her

25 credit report is nonsensical: Subclass Objectors are effectively arguing that someone should
have come forward as a named plaintiff in this lawsuit who does not believe that he or she

26 has any basis for filing a claim under FCRA. In any event, under the terms of the
Settlement, absent class members are required to attest to their belief that they have suffered

27 errors on their credit reports. Clearly, then, there is no subclass comprised of people with

28 zero knowledge of their credit files.

28 (1997).  However, not every distinction among groups of class members gives rise the existence of a subclass.  *Shaffer v. Continental Cas. Co.*, 362 Fed. Appx. 627, *2 (9th Cir. 2010) (explaining that "the fact that it is *possible* to draw a line between categories of class members" does not necessarily mean that subclasses exist for the purposes of an *Anchem* analysis); *see also Staton*, 327 F.3d at 958 (finding class representative adequate to represent both supervisors and rank-and-file employees).  Indeed, if every difference among class members "required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair."  *Intl Union, United Auto., Aerospace & Agr. Implement Workers v. GMC*, 497 F.3d 615, 629 (6th Cir.2007). The law does not require this unhappy result.  *Id.*

In this case, groups comprised of (1) class members victimized by Defendants' unreasonable reinvestigation practices and (2) class members whose credit reports listed pre-bankruptcy *judgments* (as opposed to other debts) as still outstanding need not be elevated to subclass status.  Subclass Objectors simply have picked two categories of class members and have argued that these groups merit special designation.  Subclass Objectors' arguments could just as well and just as irrationally complain that there should be a separate subclass and representative for each different permutation of inaccurate reporting — a subclass for persons with an inaccurate Wells Fargo tradeline, another for an inaccurate Sears credit card tradeline, another for a person with a credit card showing a charge-off, and still another with a credit card merely showing ninety days late.  There is no need to draw such distinctions.  The named plaintiffs and each of the class members that they seek to represent have suffered substantially the same injury: violation of their statutory right to accurate reporting of debts discharged in bankruptcy.  Likewise, the actions precipitating these injuries arises from the same course of conduct: Defendants' allegedly deficient procedures for reporting the status of pre-bankruptcy debt.  The *Anchem* rule requiring one representative from each subclass therefore does not apply.[15]

---

[15] The Court additionally notes that, as described above, at least two of the named Plaintiffs *did* initiate reinvestigation requests.  *See* Depo. of R. Randall at 29 (attached as

1      <u>I.</u>      <u>Purported Attempt to Certify An Actual Damages Class</u>

2              Next, White Plaintiffs contend that, as a result of the Settlement's distribution of Actual

3      Damages Awards, Settling Plaintiffs have transformed the class from a statutory damages class

4      to an actual damages class.  According to White Plaintiffs, an actual damages class cannot

5      survive Fed. R. Civ. P. 23(b)(3)'s predominance requirement because the individualized issues of

6      causation and damages inherent in such a class would overwhelm issues common to the group.

7      White Plaintiffs' Objections to Class Action Settlement, Dec. 14, 2009 at 34 (Docket 553) (citing

8      *Murray*, 434 F.3d at 952-53).  White Plaintiffs argue that because part of the Settlement is

9      predicated on the improper certification of an actual damages class, it cannot be approved by the

10     Court.  *Id.* at 35.

11             The Court disagrees.  The fact that the Settlement's distribution plan offers a

12     proportionately larger recovery to class members with evidence of actual injury does not mean

13     that the Settlement is predicated on the certification of an actual damages class.  Plaintiffs were

14     entitled to forego their actual damages claims in order to achieve class certification more readily

15     on their statutory damages claims, so long as class members with substantial actual injuries were

16     provided an opportunity to opt-out of the class and to pursue individual claims.  *Murray*, 434

17     F.3d at 953.  That is what Plaintiffs did.  However, as all Plaintiffs (Settling Plaintiffs and White

18     Plaintiffs alike) have asserted previously in this litigation, the fact that Plaintiffs exercised their

19     right under the FCRA to proceed on a statutory damages theory "is hardly tantamount to a

20     concession that Defendants' unlawful reporting practices do not cause actual harm . . .."

21     White/Hernandez Plaintiffs' Closing Memo. ISO Mot. for Class Certification, Aug. 8, 2008 at 21

22     (Docket 321).  In exercising their discretion to structure a distribution plan in the best interests of

23     the class members, Settling Plaintiffs decided to offer increased compensation to class members

24     who incurred actual injury, despite the fact that all class members experienced the same statutory

25     _____

26     Exh. 2 to Decl. of L. Sherman ISO Settling Plaintiffs' Responses to White Plaintiffs'
       Objections (Docket 605-3)); Depo. of B. Robinson at 24 (attached as Exh. 3 to Decl. of L.
27     Sherman ISO Settling Plaintiffs' Responses to White Plaintiffs' Objections (Docket 605-
       3)).  Subclass Objectors' claim that no member of the "reinvestigation" subclass served as a
28     class representative thus lacks factual, as well as legal, support.

violation of the FCRA.  This decision was reasonable.  *See Holmes*, 706 F.2d at 1148 (holding that a plan of allocation need not benefit all class members equally); *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. at 65 (explaining that a rational allocation plan devised by experience counsel is entitled to deference).

### *J.*      Enforcement Mechanisms

Objector Thomas Carder objects to the Settlement's enforcement mechanisms, arguing that they are somehow inadequate.  This objection lacks merits.  The Settlement provides procedures for dispute resolution between the parties.  Furthermore, the Court retains jurisdiction with respect to the implementation and enforcement of the Settlement's terms.

Another group of objectors including Norman Clark, Walter Ellingwood III, Susan Phillips, Larri Smith and Jodi and Robert Diller, complain that the instant Settlement does not offer recourse for class members with errors that continue to appear on their credit reports.  The Court has already approved the injunctive relief settlement in this case, which was designed to remedy that problem.  Under the injunctive relief settlement, class members retain all reinvestigation rights if they find errors or inaccuracies in Defendants' credit reporting.  *See* Injunctive Relief Settlement Agreement and Release § 4.1 (Docket 289). The injunctive relief settlement also provides class members with a well-defined set of procedures against which to measure and prosecute a Defendant's future conduct.  For these reasons, objections to the adequacy of the Settlement's enforcement mechanisms are overruled.

### *K.*      Settlement Administration / Oversight

Objectors Maria Borbon and Walter Ellingwood III contend that the Settlement is not subject to sufficient oversight by the Settlement Administrator.  The Court disagrees.  The Settlement Administrator has performed admirably thus far; there is no reason to expect anything less in the future.  If problems do arise, the Court retains jurisdiction to hear claims related to the Settlement's administration.  This objection is overruled.

### *L.*      Previously Addressed Objections

Finally, the objectors reiterate their concerns regarding the attestation requirement to opt into the class, the documentation requirement for Actual Damages Awards, the decision not to

re-notice the entire initial notice list as part of the secondary notice campaign, the adequacy of the notice procedures, and the form of the notice disseminated.  All of these issues have been the subject of intensive prior briefing and argument; they have all been addressed by prior Orders from the Court.  The Court stands by its previous findings regarding the fairness, adequacy and reasonableness of the attestation requirement, the documentation requirement, the decision not to re-notice the entire initial notice list as part of the secondary notice campaign, the adequacy of the notice procedures, and the form of the notice disseminated.  Any objections based on these issues are overruled for the reasons stated in the Court's previous orders.

c.      <strong>Service Awards</strong>

Having addressed the objectors' concerns with the structure of the Settlement, the Court turns to the propriety of granting service fees to the Settling Plaintiffs' class representatives.  The trial court has discretion to award an incentive payment to named plaintiffs as compensation for the tasks performed on behalf of the class.  *In re Mego Fin'l Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).  The criteria that courts may consider in determining the propriety and amount of an incentive award include: (1) the risk to the class representative in commencing a class action, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit, or lack thereof, enjoyed by the class representative as a result of the litigation. *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995).

Here, the Settlement contemplates service awards of $5,000 to each of Settling Plaintiffs' class representatives: Jose Hernandez, Kathryn Pike, Robert Randall, and Bertram Robinson. White Plaintiffs object to the provision of these incentive awards, arguing that it is unfair to offer service payments only to the class representatives who supported the Settlement and not to the class representatives who object to it.

Although White Plaintiffs acknowledge that service fees intended to compensate class representatives for work performed on behalf of the class are "fairly typical," *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958 (9th Cir. 2009), White Plaintiffs contend that conditioning

the awards on support for the Settlement disables the representatives' ability "to effectively monitor the conduct of class counsel when such monitoring [is] needed most," and creates a conflict of interest.  White Plaintiffs' Objections to Class Action Settlement, Dec. 14, 2009 at 13 (Docket 553).  Settling Plaintiffs respond by noting, first, that incentive awards are being sought on behalf of the objecting class representatives for these representatives' role in the injunctive relief settlement.  In addition, Settling Plaintiffs argue that they are under no obligation to seek incentive awards for the White Plaintiffs with regard to the monetary relief Settlement, given that these Plaintiffs did not help to produce the Settlement and that they are represented by independent counsel.

Settling Plaintiffs' point regarding White Plaintiffs' independent representation is well-taken.  Service awards for the White Plaintiffs should have been sought, if at all, by White Plaintiffs' counsel.  *See e.g. Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 324-25 (W.D. Pa. 1997) (service awards to objecting plaintiffs sought by objecting plaintiffs' own separate motion); *Martin v. Foster Wheeler Energy Corp.*, 2008 WL 906472 at *9 (M.D. Pa. 2008) (same).  White Plaintiffs declined to move for any such awards (and to subject themselves to the arguments and objections from other class members that may have accompanied such a request).  White Plaintiffs will not receive incentive payments that they failed to request.

Whether the Court should award $5,000 incentive payments to each of the Settling Plaintiffs' representatives, however, is another matter.  Although service awards are "fairly typical" in class action cases, *Rodriguez*, 563 F.3d at 958, courts must carefully scrutinize requests for such awards, given their potential for putting "class representatives in conflict with the class," *id.* at 960, by making the representatives "more concerned with maximizing [the] incentive [payments] than with judging the adequacy of the settlement as it applies to class members at large."  *Staton*, 327 F.3d at 977.  Concerns over potential conflicts may be especially pressing where, as here, the proposed service fees greatly exceed the payments to absent class members.  Indeed, the $5,000 incentive awards contemplated by the Settlement in this case represent a payout five times larger than even the highest minimum Actual Damages Award.

On the other hand, Settling Plaintiffs' request for service fees does not suffer from the tell-tale signs of conflict that have caused courts to reject such awards in the past.  Settling Plaintiffs have not requested service awards as part of a pre-existing agreement between class representatives and class counsel, and the incentive payments are not in any way tied to the amount of the recovery in the case.  *Compare Rodriguez*, 563 F.3d at 959-60 (finding incentive awards inappropriate where they were contemplated as part of an ex ante agreement between class representatives and class counsel and where the amount of the award depended on the amount recovered in the case).  Moreover, the possibility of large service fees was disclosed to the court, and absent class members, at the preliminary approval stage.  *Compare id.* (disapproving of service fees that were not disclosed until after the preliminary approval stage). Finally, the amount of the service fees requested here — although large — is not out-of-line with amounts approved by courts in the past.  *See, e.g. Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995) (awarding $50,000 to the class representative out of a total settlement fund of $76,723,213.26); *In re Domestic Transp.*, 148 F.R.D. 297, 357-58 (N.D. Ga. 1993) (awarding $142,500 to class representatives out of a $50 million fund); *In re Dun & Bradstreet*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (awarding $215,000 to class representatives out of an $18 million fund). Given the significant benefits afforded to the class by the Settlement, a $5,000 service award is within the realm of possibility for this kind of case.

Settling Plaintiffs, however, are fatally short on detail regarding the specific actions that the class representatives took to entitle them to such large service awards.  Each of the named plaintiffs' declarations submitted in support of these awards states only that the plaintiff "regularly stayed informed regarding the status of this lawsuit," and that they "actively participated in the litigation . . . by responding to discovery requests, producing documents and providing sworn testimony at my deposition."  Decl. of J. Hernandez ¶ 2 (Docket 385); Decl. of B. Robinson, ¶ 2 (Docket 386); Decl. of R. Randall, ¶ 2 (Docket 387); see also Decl. of K. Pike, ¶ 2 (offering the same declaration with slightly different wording).  These broad-strokes descriptions, devoid of specific itemizations of time, do not suffice to justify a $5,000 award. *See Apparicio v. Radioshack Corp.*, 2009 WL 1490560 at *2 (C.D. Cal. 2009) (expressing

skepticism at an incentive free request where plaintiffs "provided no detail on the amount of time and effort expended by the named plaintiffs, or any risk they incurred.").

The Court therefore reduces the amount of approved incentive payments to $3,000 per representative. This reduction is made without prejudice to Settling Plaintiffs' ability to submit revised declarations justifying their request for a $5,000 service fee per class representative. Any such revised declarations must be submitted within ten (10) days of the issuance of the instant Order. If such revised declarations are submitted, other parties shall be given five (5) days to file objections.

### IV.    DISPOSITION

For the reasons set forth above, the Motion for Final Approval of Monetary Relief Settlement is GRANTED. The Settlement is hereby APPROVED.

Service fees to named plaintiffs Jose Hernandez, Kathryn Pike, Robert Randall, and Bertram Robinson are approved in the amount of $3,000, without prejudice to Settling Plaintiffs' ability to seek increased service awards by following the procedures outlined above.

IT IS SO ORDERED.

DATED: September 10, 2011

_David O. Carter_

DAVID O. CARTER
United States District Judge