1
2   Michael W. Sobol (State Bar No. 194857)
3   (msobol@lchb.com)
    LIEFF, CABRASER, HEIMANN &
    BERSTEIN, LLP
4   275 Battery St., 30th Floor
5   San Francisco CA 94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   Michael A. Caddell (State Bar No. 249469)
8   mac@caddellchapman.com
    Cynthia B. Chapman (State Bar No. 164471)
9   cbc@caddellchapman.com
    Caddell & Chapman
10  1331 Lamar, Suite 1070
11  Houston TX 77010-3027
    Telephone:  (713) 751-0400
12  Facsimile:  (713) 751-0906

13  *Attorneys for Plaintiffs*

14  [Additional Counsel listed on signature page]

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17                  (SOUTHERN DIVISION)

18  TERRI N. WHITE, *et al.*,              Case No. SA 05-cv-1070 DOC (MLGx)
19                                           (Lead Case)

20  Plaintiffs,                            **REPLY IN SUPPORT OF CROSS-
                                           MOTION TO APPOINT INTERIM
21          v.                             CLASS COUNSEL**

22  EXPERIAN INFORMATION                   Date:  August 14, 2013
    SOLUTIONS, INC.                        Time:  8:30 a.m.
23                                         Courtroom:  9D
    Defendant.                             Judge:  Honorable David O. Carter
24
25  and Related Cases:

26  05-cv-017073-DOC (MLGx)
    05-cv-7821-DOC (MLGx)
27  06-cv-0392-DOC (MLGx)
    05-cv-1172-DOC (MLGx)
28  06-cv-5060-DOC (MLGx)

# **TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................1

II.  ARGUMENT AND AUTHORITIES .................................................................2

  A.   The Court Should Consider all Relevant Factors and not Apply
       Automatic Per Se Rules in Choosing Counsel Who Will Best
       Represent the Class. ...........................................................................2

  B.   *Hernandez* Counsel's Extensive Class Action and FCRA
       Experience Render Them Best Able to Represent the Class ...............5

       1.   No one on the *White* Counsel team is a FCRA lawyer...............6

       2.   No one on the *White* Counsel team has ever been appointed
            lead counsel in a class action. ....................................................9

       3.   Contrary to Professor Rubenstein's opinion, experience in and
            knowledge of the applicable law must guide the Court's
            appointment of class counsel. ...................................................11

  C.   *White* Counsel's Conduct in This Matter and Others Further
       Reveals They Are Not Best Able to Represent the Class. .................15

       1.   *White* Counsel wrongly deny the fact that they raised
            disqualification on multiple occasions in the District Court
            proceedings. .............................................................................16

       2.   *White* Counsel misled the Ninth Circuit in an apparent
            effort to cast doubt on this Court's approval of the
            settlement ................................................................................17

       3.   *White* Counsel's transgressions in other matters further
            render them unsuitable to serve as interim counsel here. .........20

  D.   Public Justice and Francis & Mailman Are Independent and
       Incentivized to Represent the Best Interests of the Class ................23

i

III.    CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Allen v. Stewart Title Guar. Co.*,
  No. 06-cv-4534, 2007 WL 119953, at *1
  (E.D. Pa. Jan. 9, 2007) ...................................................................12

*Bernal v. Netflix, Inc.*,
  2011 U.S. Dist. LEXIS 89903, at *1
  (N.D. Cal. Aug. 12, 2011) .............................................................15

*Cabrera v. Cordis Corp.*,
  134 F.3d 1418 (9th Cir. 1998) .......................................................11

*Compressor Eng'g Corp. v. Mfgs. Fin. Corp.*,
  No. 09-cv-14444, 2013 WL 1789273, at *1
  (E.D. Mich. April 26, 2013) ...........................................................12

*County of Suffolk v. Long Island Lighting Co.*,
  710 F. Supp. 1407 (E.D.N.Y. 1989) ...........................................3, 12

*Daniel Wolf & Maia Caplan Kats v. Sprenger & Lang*, PLLC,
  Nos. 11-CV-1206, 11-CV-1208,
  2013 WL 3466348, at *1 (D.C. July 11, 2013) .............................22

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).......................................................................11

*Hill v. Republic of Iraq*,
  175 F. Supp. 2d 36 (D.D.C. 2001).................................................9

*In re "Agent Orange" Prod. Liab. Litig.*,
  800 F.2d 14 (2d Cir. 1986) .............................................................3

*In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*,
  2008 U.S. Dist. LEXIS 106327, at *1
  (S.D.N.Y. Dec. 29, 2008) ..............................................................14

REPLY IN SUPPORT OF CROSS-MOTION
TO APPOINT INTERIM CLASS COUNSEL
CASE NO. 05-CV-1070 DOC

*In re Cardinal Health ERISA Litig.*,
    225 F.R.D. 552 (S.D. Ohio 2005)............................................................12, 13

*In re HSBC Bank USA*,
    No. 13-md-02451, 2013 WL 3816597, at *1
    (E.D.N.Y. July 22, 2013)..........................................................................12

*In re Terazosin Hydrochloride Antitrust Litig.*,
    220 F.R.D. 672 (S.D. Fla. 2004)..............................................................6

*Lazy Oil Co. v. Witco Corp.*,
    166 F.3d 581 (3d Cir. 1999)....................................................................3

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998)................................................................4

*Lewis v. Nical of Palm Beach, Inc.*,
    10 So. 3d 159 (Fla. Dist. Ct. App. 2009)................................................21

*Nowak v. Ford Motor Co.*,
    240 F.R.D. 355 (E.D. Mich. 2006).........................................................12–14

*Rand v. Monsanto*,
    926 F.2d 596 (7th Cir. 1991)..................................................................3

*Rodriguez v. Disner*,
    688 F.3d 645 (9th Cir. 2012)..................................................................5

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
    No. 97 Civ. 5499 (LAP), 2003 WL 282187, at *1
    (SD.N.Y. Feb. 7, 2003)............................................................................22

*Susman v. Lincoln Am. Corp.*,
    561 F.2d 86 (7th Cir. 1977)....................................................................25

*White v. Experian Info. Solutions, Inc.*,
    803 F. Supp. 2d 1086 (C.D. Cal. 2011)..................................................3

*Vine v. Republic of Iraq*,
    No. 1:01-cv-02674 (D.D.C. May 29, 2007).............................................9

REPLY IN SUPPORT OF CROSS-MOTION
TO APPOINT INTERIM CLASS COUNSEL
CASE NO. 05-CV-1070 DOC

RULES

FED. R. CIV. P. 23 ............................................................................................ *passim*

v

*Hernandez* Counsel file this Reply in support of their Cross-Motion to appoint *Hernandez* Counsel as Interim Class Counsel.

## I. INTRODUCTION

Having filed a Rule 23(g) motion bereft of any evidence demonstrating their experience in handling class actions or FCRA claims, in reply, *White* Counsel concede that *Hernandez* Counsel meet the requirements of Rule 23(g)(1)(A) and belatedly offer their own declarations—all of which fall well short of matching the extensive class action and FCRA expertise *Hernandez* counsel bring to bear on behalf of the Class.   *White* Counsel also offer the declaration of Professor Rubenstein, whose failure to acknowledge *White* Counsel's lack of relevant expertise perhaps explains why—in a 25-page declaration largely devoted to an unbalanced interpretation of case law—he provides nothing more than two pages of conclusory statements concerning *White* Counsel's alleged class action and FCRA experience.   (Rubenstein Decl. at 23–24.)   In addition, while Professor Rubenstein agrees that Rule 23(g)(1)(B) allows the Court to consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," he noticeably sidesteps any discussion (or investigation) of *White* Counsel's questionable conduct, including their judgment, here and in other matters.

Unable to gain traction in the context of Rule 23(g), *White* Counsel largely focus on disqualification, still insisting—with absolutely *no support* from Professor Rubenstein—that California law mandates the "automatic" disqualification of *Hernandez* Counsel. While *White* Counsel may be uncomfortable with this Court exercising its discretion, the law is clear: in this context, disqualification remains a discretionary decision, one which cannot be made without reference to federal class action procedure or the unique circumstances of this particular case.

As demonstrated below, *White* Counsel fail to bring to the table the appropriate experience and judgment required to best represent *this class* on the claims alleged.  Further, *White* Counsel's repeated lack of candor with this Court and the Ninth Circuit, as well as their conduct in other litigation, render them unsuitable to serve as interim class counsel.

## II.  ARGUMENT AND AUTHORITIES

**A.  The Court Should Consider all Relevant Factors and not Apply Automatic Per Se Rules in Choosing Counsel Who Will Best Represent the Class.**

While Rule 23(g)(1)(A) focuses on "experience in handling class actions," "the work counsel has done," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class," *White* Counsel devote a scant four pages of their 32-page Combined Reply Brief to discussing their own qualifications to serve as lead counsel.  (Dkt. 902 at 25–29.)  Instead, they stake their hopes primarily on being the only group left standing after securing the supposed "automatic" disqualification of *Hernandez* Counsel.  (Dkt. 902 at 5–20 (devoting 14 pages to their arguments for disqualification).)  Recognizing that this is a reply in support of their Rule 23(g) Motion and not a disqualification surreply, *Hernandez* Counsel will be prepared to address any new arguments for disqualification raised in the Combined Reply at the August 14, 2013 hearing.  As an initial matter, however, it is worth noting that *White* Counsel's hopes of securing a lead counsel appointment by default are misplaced: no "automatic" disqualification takes *Hernandez* Counsel out of the Rule 23(g) running here.

*White* Counsel repeatedly assert, although their own expert *again* conspicuously refuses to opine on disqualification at all, that *Hernandez* Counsel's disqualification is "automatic" under California law.  To the contrary, as this Court has previously ruled, California law, like federal law, not only makes

disqualification discretionary in all cases, it rejects a mechanical application of state ethics law without regard to federal class action procedure or the circumstances of any particular case.

As class action procedure inherently involves simultaneous representation of clients, conflicts resulting from such representation must be evaluated within the context of controlling class action jurisprudence under Rule 23, including whether such a conflict warrants disqualification. *See Rand v. Monsanto*, 926 F.2d 596, 600–01 (7th Cir. 1991) (rejecting application of state ethics law where it frustrates purposes of Rule 23); *see also County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1407, 1415 (E.D.N.Y. 1989) ("To the extent the enforcement of a state ethics rule might frustrate congressional ends, the Supremacy Clause would be a bar to any such enforcement.").  It is for this reason that courts—including *this* Court in *this* case—have repeatedly rejected the mechanical application of traditional state law disqualification rules to class cases. *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1102–03 (C.D. Cal. 2011) (rejecting *White* Counsel's attempt to "cavalierly import[] traditional [California state law] attorney disqualification rules into the class action context," and declining to mechanically apply "per se" disqualification notwithstanding period of alleged simultaneous representation); *see also Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 589–91 (3d Cir. 1999); *In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 16–19 (2d Cir. 1986).[1]

---

[1]  *White* Counsel's and Prof. Rubenstein's attempts to distinguish *Lazy Oil* and *Agent Orange* are misguided.  It is clear from both decisions that the courts there were *not* addressing whether any conflict existed, but rather were determining, in light of the simultaneous representation that did exist in those cases, whether disqualification of counsel was warranted.  Both the Second and Third Circuits rejected the mechanical application of traditional disqualification rules in the class context and determined that disqualification was not appropriate after considering

Thus, *White* Counsel's argument that disqualification is mandated here because the case does not fit into some defined "exception," adopts the wrong framework.  The question is not whether some "exception" applies, but rather whether disqualification is warranted and in the best interests of the Class under the circumstances here and in light of Rule 23 and its purposes.  Thus, *White* Counsel's treatment of *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998), misses the point entirely.  *Hernandez* Counsel have never argued that the addition of new, un-tainted counsel constitutes some blanket "exception" that makes disqualification inappropriate in all circumstances.  Rather, *Hernandez* Counsel have demonstrated that the addition of Public Justice, P.C. ("Public Justice") and Francis & Mailman P.C. is an important *factor*, along with other factors—including counsel's respective expertise in FCRA and class-action litigation and their work in this case to date—that this Court should consider in determining which counsel will best represent the Class.[2]

Finally, *White* Counsel's treatment of *Rodriguez II*—the case that is by far the most on point—ignores that the Ninth Circuit there specifically rejected the argument that the incentive award-based simultaneous representation warranted

---

the case-specific circumstances.  This Court fully endorsed this approach the last time *White* Counsel sought "per se" disqualification of *Hernandez* Counsel in this case.  *White*, 803 F. Supp. 2d at 1102-1103.

[2]  Moreover, *White* Counsel's characterization of the proceedings in *Linney* is highly misleading.  Contrary to their suggestion, the Ninth Circuit expressly considered and rejected the argument that the original counsel should be disqualified from continued participation because of the conflict identified there.  *Linney¸* 151 F.3d 1239.  And in fact, while new counsel did come in to serve as class counsel, the Ninth Circuit expressly found, in rejecting the application of a "per se" rule, that the original counsel's disqualification would *not* be in the best interests of the class and that their "wealth of experience" in the case made their continued participation "highly beneficial."  *Id.*

counsel's disqualification and, in fact, affirmed an award to that counsel of $500,000—hardly a "nominal" fee, as White Counsel and Prof. Rubenstein characterize it—for their continued work on behalf of the class after that conflict was "cured," which work the Ninth Circuit concluded was "properly performed." *Rodriguez v. Disner*, 688 F.3d 645, 660 n.12 (9th Cir. 2012).

## B. *Hernandez* Counsel's Extensive Class Action and FCRA Experience Render Them Best Able to Represent the Class.

*Hernandez* Counsel's Motion showed that *Hernandez* Counsel include the nation's top FCRA experts and extensive class action expertise.  (Dkt. 886 at 18–19.)   In response, *White* Counsel do not dispute *Hernandez* Counsel's qualifications.   To the contrary, they concede—which *Hernandez* Counsel do not—that, in terms of FCRA and class action experience, "both teams are more than capable of representing the class." (Dkt. 902.)  And *White* Counsel's expert, Prof. Rubenstein, agrees that "[t]he record in this case supports the Lieff Group's assertions that it generally meets the requirements of Rule 23(g)(1)(A)." (Dkt. 903 at 9.)

Rather than take on *Hernandez* Counsel's unarguable record of expertise, *White* Counsel contend that FCRA and class action experience are not relevant, asserting that "the resolution of this issue does not turn on which of the two team's [sic] has more FCRA or class action experience or has devoted the most time and resources to this matter." (Dkt. 902 at 24.)  Prof. Rubenstein similarly downplays the importance of *relevant* experience, passing over the Rule 23(g)(1)(A) factors with little or no analysis.  (Dkt. 903 at 8 ("As it is my opinion that both counsel teams generally meet the four requirements in Rule 23(g)(1)(A), my analysis of the competing applications focuses on the conflicts issue.").)   However, under the Federal Rules, knowledge of and experience with the relevant law are exactly the factors this Court must consider.  Fed. R. Civ. P. 23(g)(1)(A)(i)–(iii) (directing

courts to consider "the work counsel has done," "counsel's experience in handling class actions," and "counsel's knowledge of the applicable law" in appointing class counsel); *see also In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) (finding counsel's "experience in, and knowledge of, the applicable law in this field" to be the "most persuasive" factor).

It is no wonder that *White* Counsel attempt to divert the Court's attention away from the Rule 23(g)(1)(A) factors: with regard to FCRA and class action experience, *Hernandez* Counsel are overwhelmingly superior. (*See* Declaration of Professor Geoffrey P. Miller ("Prof. Miller  Decl."), filed concurrently herewith, at 3 ("What matters most is not the reputation of the firm but rather the qualifications of the attorneys who will actually work on this case.  On that score the Lieff Group is the stronger candidate.").)

### 1.       No one on the *White* Counsel team is a FCRA lawyer.

*White* Counsel admit "that the Boies Team does not include a practitioner who specializes in the FCRA."  (Dkt. 902 at 26; *see also* Ex. 1, July 26, 2013 Hr'g Tr. at 62:23–24 (Wolf: "I am not an FCRA lawyer").)  This is a serious deficiency, particularly in contrast to the vast FCRA experience available to *Hernandez* Counsel, including Leonard Bennett and James Francis, the nation's top—and virtually only—FCRA specialists who have tried hundreds of FCRA cases, as well as Caddell & Chapman, who served as co-lead counsel in the largest FCRA class settlement in history.  (*See* Dkt. 886 at 18–19.)

*White* Counsel attempt to gloss over this weakness, belittling the FCRA as "not a particularly complex body of law."  (Dkt. 902 at 26.)  This glib dismissal only exposes *White* Counsel's lack of expertise.  As Mr. Bennett, Mr. Francis, and the handful of lawyers who litigate high-stakes FCRA cases understand, success in FCRA litigation demands detailed knowledge of the Credit Reporting Agencies' ("CRAs'") business practices.  (*See* Declaration of Leonard A. Bennett ("Bennett

Decl."), filed concurrently herewith, at 1–2; Declaration of James A. Francis ("Francis Decl."), filed concurrently herewith at 1–2.)  While *White* Counsel surely are capable of reading and understanding the relevant statutory provisions and case law, statutes and cases are only a small part of what is required to be successful in FCRA litigation.  (*Id.*)

Over the years in which Mr. Bennett and Mr. Francis have worked on FCRA cases, they have acquired detailed technical knowledge of "the internal procedures, manuals, and documents maintained and used by Equifax, Trans Union and Experian in their credit reporting business."  (Dkt. 894 at 7; *see also* Bennett Decl. at 2; Francis Decl. at 1–3.)  Often these internal manuals and documents are not initially produced in discovery and/or are subject to protective orders in previous litigation, and it is only after multiple rounds of discovery motion practice that experienced FCRA counsel are able to ferret out helpful information.  (Bennett Decl. at 2.)  In addition, experience and highly specialized knowledge are required to understand the detailed electronic files (which are far more complex than the ordinary consumer credit reports seen by consumers or produced in response to routine requests from non-FCRA attorneys) that CRAs create and maintain.  (Dkt. 894 at 7.)

Even with regard to ordinary consumer credit reports, such as those Mr. Juntikka requested on behalf of his clients, the course of this litigation has shown that Mr. Juntikka and Mr. Wolf could not correctly interpret the reports themselves, or determine whether information on them was accurate or inaccurate.  (*Id.* at 9.)   To correct Mr. Juntikka's mistakes, Mr. Bennett and his FCRA-specialist attorneys and paralegals from CLA (Consumer Litigation Associates) had to re-review each and every report.  (*Id.*)  Only because they had reviewed and litigated thousands of similar reports were they able to develop the factual record

required to represent the Class in this case.  No amount of study in a law library, by however apt a pupil, can replace this experience.  (*See* Bennett Decl. at 2.)

Mr. Bennett's FCRA expertise was also invaluable in negotiating the detailed provisions of the Injunctive Relief Settlement.  (*Id.* at 3–4.)  In doing so, Mr. Bennett was able to draw on an intimate understanding of the capabilities of the CRAs' computer systems, developed over years of reviewing the CRAs' documents and taking depositions of CRA employees, without which plaintiffs' objectives could not have been translated into an actual set of procedures that made real world sense for the CRAs and which fit within the existing uniform industry reporting code.  (Bennett Decl. at 3–4.)  This experience will be invaluable to the Class again if this Court determines that additional class certification discovery is appropriate regarding manageability.  (*See* Ex. 1, July 26, 2013 Hr'g Tr., at 17–20.)  Indeed, issues of manageability particularly require "inside" knowledge regarding the CRAs' record-keeping practices, the capabilities of their computer systems, and the knowledgeable employees on relevant subjects.  (Bennett Decl. at 3.)  Mr. Wolf and Mr. Juntikka, never having even accessed the documents produced by the CRAs in this case, cannot know what discovery has been taken to date, much less what additional discovery would be needed.  (*See* Dkt. 894 at 10 (noting that Mr. Juntikka never had log-in credentials for the electronic database that contained Defendants' production and that Mr. Wolf never used his log-in credentials); (*see also* Bennett Decl. at 2; Dkt. 502, Nov. 9, 2009 Hr'g Tr. at 40–41 (Mr. Wolf admitting that he never accessed documents produced by the Defendants although he had access to the file server containing the documents for several years).)  *White* Counsel simply do not have the knowledge required, and it would ill-serve the Class to jettison the wealth of FCRA expertise assembled in *Hernandez* Counsel.  (*See* Prof. Miller Decl. at 5–6.)

### 2. No one on the *White* Counsel team has ever been appointed lead counsel in a class action.

It would also be a disservice to the Class to squander the accumulated expertise of two class-action specialty firms—Lieff Cabraser and Caddell & Chapman—and two of the nation's premier consumer public interest law firms with broad class action experience—NCLC and Public Justice—in favor of lawyers who have never served as lead or co-lead counsel in a class action before. (*See* Prof. Miller Decl. at 5–7.)  Mr. Juntikka does not dispute that he has no class action expertise and has never been appointed Rule 23(g) counsel in a class action. (Dkt. 902-5, *passim*.)  While Mr. Wolf no doubt did creditable service to his clients in *Hill v. Republic of Iraq* and *Vine v. Republic of Iraq*, it does not appear that the courts in those cases ever certified a class or appointed Rule 23(g) counsel. Indeed, following the denial of class certification in the *Hill* case,[3] Mr. Wolf elected not to file a motion for class certification in the *Vine* matter, instead pursuing relief on behalf of his clients individually.  (*See* Ex. 3, Pls.' Notice of Intent Not to File Motion for Class Certification, *Vine v. Republic of Iraq*, No. 1:01-cv-02674, Dkt. 71 at 3 (D.D.C. May 29, 2007) ("[P]laintiffs have concluded that there is little point in their pursuing class certification in this case.").  Similarly, regardless of the work Mr. Wolf may have done "conceptualizing" or "helping to orchestrate" class litigation, (*see* Dkt. 902-5 at 3–4), simply working on a matter as a role player is not the same thing as being appointed Rule 23(g) lead counsel—certainly Mr. Wolf knows this, which is why both he and Mr. Juntikka

---

[3] *Hill v. Republic of Iraq*, 175 F. Supp. 2d 36, 39 n.5 (D.D.C. 2001) (noting that the court declined to certify a class "in light of the fact that the case was proceeding by default," as well as because of significant variations between the plaintiffs' claims).

supported Mr. Sobol and Mr. Caddell as co-lead counsel when the *White-Hernandez* team sought a Rule 23(g) appointment several years ago.

Apparently, neither has Mr. Carpinello ever been appointed lead or co-lead counsel in a class action.  While he lists fourteen cases in which the Boies Schiller firm was involved in class litigation, (Dkt. 902-6 at 2–3), Mr. Carpinello does not claim that he personally was involved in any of these cases, and an examination of the docket sheets confirms that Mr. Carpinello did not appear on behalf of the class in any of the actions on which he relies for his supposed "class-action experience." (*See* Declaration of Kathryn E. Kersh, filed concurrently herewith, at 1 & Exs. 1–13 thereto (confirming that George R. Carpinello does not appear as counsel in any of the cases he lists for which electronic docket records are available); Prof. Miller Decl. at 5–6 (discussing Mr. Carpinello's lack of class action experience).)

Whatever class action experience other lawyers at Boies Schiller may have, they have not appeared at any hearings in this case.[4]  If this Court were to appoint Mr. Carpinello, Mr. Wolf, or Mr. Juntikka lead counsel for the Class under Rule 23(g), it would apparently be the first time any of them had ever served in such a role.

_____

[4] *White* Counsel include a recitation of David Boies's credentials in their brief in support of their motion to be appointed Rule 23(g) counsel.  (Dkt. 879 at 5.) Mr. Boies's name, however, does not appear in the signature block of the brief, (Dkt. 879 at 15), nor has Mr. Boies appeared on the signature block of any of *White* Plaintiffs' pleadings since early 2010.  (*See* Dkt. 619 (filed Jan. 8, 2010) (listing Mr. Boies's name on the first page caption, but not on the signature block).)   Mr. Boies has never appeared at a hearing on behalf of the *White* Plaintiffs since being admitted *pro hac vice* over four years ago.  (Dkt. 442.)  In addition, Mr. Boies has not submitted a declaration in support of *White* Counsel's Motion.  Therefore, even were Mr. Boies to make an appearance next week, it is uncertain at best whether Mr. Boies would play any significant role in this litigation going forward, nor is there any support in the record that he has any experience with the FCRA or otherwise meets the Rule 23(g)(1)(A) criteria.

### 3.   Contrary to Professor Rubenstein's opinion, experience in and knowledge of the applicable law must guide the Court's appointment of class counsel.

In arguing that the Court should disregard counsel's class action and FCRA experience and focus instead on "which of the two teams can be counted on to loyally discharge its fiduciary responsibilities in the best interests of the class," *White* Counsel rely on the opinion of their expert, Prof. Rubenstein.  (Dkt. 902 at 24.)  Prof. Rubenstein's opinion, however, is little more than legal argument, no more convincing for having a supposed "expert's" imprimatur.  (*See* Declaration of Professor Charles Silver, ("Prof. Silver Decl.") filed concurrently herewith, at 1.)

Remarkably, in light of the clear dictates of the Federal Rules that the court "must consider" all of the Rule 23(g)(1)(A) factors, Prof. Rubenstein apparently did nothing to investigate the credentials of the lawyers he briskly opines the Court is "blessed" to have available as alternative counsel.  (Dkt. 903 at 5.)  Instead, Prof. Rubenstein declares—based on nothing more than the general reputation of Mr. Carpinello's firm—that *White* Counsel "surely possess the judgment and wisdom" required.  (*Id.*)  The Court, however, need not consider "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997).  The list of materials that Prof. Rubenstein reviewed in preparing his declaration, which was provided in response to a request from counsel, reveals that Prof. Rubenstein did not even review Mr. Carpinello's, Mr. Wolf's and Mr. Juntikka's declarations submitted with *White* Counsel's reply in support of their 23(g) Motion, much less conduct any independent investigation of these lawyers' qualifications and experience.  (*See* Ex. 4.)  Because Prof. Rubenstein thus has no objective factual basis for his opinion that *White* Counsel meet Rule 23's adequacy requirements, his opinion is neither reliable nor helpful, and this Court should disregard it.  *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422–23 (9th Cir. 1998) (holding that in

order for an expert opinion to be admissible, an expert "'must explain precisely how [he] went about reaching [his] conclusions and point to some objective source . . . .'"); (*See* Prof. Miller Decl. at 7–8 (commenting on Rubenstein's failure to analyze Rule 23(g)(1)(A) criteria).)

The cases cited by Prof. Rubenstein, moreover, provide no support for passing over the Rule 23(g)(1)(A) knowledge and experience factors in such conclusory fashion. (*See* Dkt. 903 at 24.) To the contrary, in the five cases Prof. Rubenstein has picked out as his "best" examples—which he represents as cases in which one group of competing class counsel raised a "credible ethical concern while the other did not," (Dkt. 903 at 14), the courts primarily based their decisions—as Rule 23(g) dictates—on counsel's knowledge of and experience in the specialized field of law and the work they had performed in the actions. *See In re HSBC Bank USA*, No. 13-md-02451, 2013 WL 3816597, at *12 (E.D.N.Y. July 22, 2013) (appointing class counsel "in light of their extensive experience with the parallel litigation in state court"); *Allen v. Stewart Title Guar. Co.*, No. 06-cv-4534, 2007 WL 119953, at *2 (E.D. Pa. Jan. 9, 2007) (finding that "all counsel are qualified to handle the matter"); *Nowak v. Ford Motor Co.*, 240 F.R.D. 355, 366 (E.D. Mich. 2006) (finding no conflict of interest and declining to appoint counsel "not as experienced in ERISA litigation"); *In re Cardinal Health ERISA Litig.*, 225 F.R.D. 552, 555 (S.D. Ohio 2005) (appointing class counsel who "will be best able to represent fairly and adequately the class because of their extensive experience in ERISA litigation").[5]

---

[5]   In the remaining case that Professor Rubenstein relies on, the court did not appoint class counsel because it denied the motion for class certification. *Compressor Eng'g Corp. v. Mfgs. Fin. Corp.*, No. 09-cv-14444, 2013 WL 1789273, at *1 (E.D. Mich. April 26, 2013).

Far from supporting Prof. Rubenstein's characterization that "[i]n all five of these cases, the court selected . . . the group without the ethics problem over the group with it," (Dkt. 902 at 14), the courts considered any ethical concerns raised in light of *all* relevant factors—primarily focusing on relevant experience—and in some cases chose class counsel despite their competitors' attempts to raise purported ethical conflicts.  (*See* Prof. Silver Decl. at 7 ("The class' interest will be best served, I believe, if the Court draws upon the entire universe of information it possesses when deciding which group will represent the class."))  For example, in *Nowak*, the court rejected allegations that proposed class counsel had an ethical conflict because they also represented another class bringing claims against a defendant's former subsidiary, for which the *Nowak* defendant might retain some contractual indemnification obligation.  *Nowak*, 240 F.R.D. at 367.  Competing *Nowak* class counsel cited the *Cardinal Health* decision in support of their argument that a potential future conflict exists when counsel represent different classes against the same defendant, because the defendant might not have sufficient funds to satisfy its liabilities to both classes.  *Id.* (citing *Cardinal Health*, 225 F.R.D. at 557).  Rather than mechanically selecting the "group without the ethics problem," the *Nowak* court disagreed that the purported conflict would compromise counsel's ability to represent the class.  *Id.*  Distinguishing *Cardinal Health*, the *Nowak* court found no conflict of interest and appointed the allegedly "conflicted" lawyers as class counsel, based primarily on their superior ERISA litigation experience.  *Id.* at 366–67.

Moreover, in *Nowak*, as in *Cardinal Health*, the alleged conflicts at issue were purported existing conflicts.  *Id.*  Prof. Rubenstein has not cited a single case in which past, subsequently cured, conflicts were decisive in a 23(g) contest.  Particularly where, as here, the conflict issue no longer exists nor compromises counsel's ability and commitment to loyally represent the Class going forward,

REPLY IN SUPPORT OF CROSS-MOTION
TO APPOINT INTERIM CLASS COUNSEL
CASE NO. 05-CV-1070 DOC

nothing in the cases Prof. Rubenstein cites supports truncating the Rule 23(g) analysis, much less passing over the more knowledgeable and experienced counsel. (*See* Prof. Silver Decl. at 4–5 (opining that "it seems likely to me that the presence of the restrictive service award provision in the Settlement Agreement has an innocent explanation" and that "Professor Rubenstein's assertion that the lawyers in the Hernandez Counsel Group operate under an 'ethical cloud' holds only if one attributes nefarious motives to them"); Prof. Miller Decl. at 8 ("The error, however, is not one that reflects badly on counsel's ethics in general, nor is it one that suggests, even remotely, that counsel cannot be trusted to represent the class going forward.").)

Prof. Rubenstein is also too quick to dismiss the specialized demands of FCRA practice, concluding based on nothing more than Mr. Carpinello's firm's having handled a "diverse portfolio of matters," that they are equally qualified to handle a FCRA matter.  (Dkt. 903 at 23.)   Even more so than other highly specialized areas of law, such as ERISA litigation and privacy litigation, FCRA class action litigation has few specialist practitioners and qualified experts, making it all the more important for courts to look to experience in the particular legal specialty at issue and appoint the lawyers with the most experience in that field as class counsel. (*See* Bennett Decl. at 2 (explaining that there are "less than ten Plaintiffs' lawyers who have substantial litigation or industry knowledge, and less than a handful who have litigated FCRA class cases")); *see also Nowak*, 240 F.R.D. at 361 (appointing class counsel primarily due to "their extensive experience in ERISA litigation" which made them "well-versed in trial practice and in conducting discovery relevant" to the ERISA claim and "allowed them the opportunity to establish relationships with key experts in the field, as well as defense and insurance counsel who regularly appear in these actions . . . ."); *In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*, 2008 U.S. Dist. LEXIS

106327, at *38–39 (S.D.N.Y. Dec. 29, 2008) (appointing the counsel with the most extensive experience in ERISA litigation, noting that ERISA "is a highly specialized area of law"); *Bernal v. Netflix, Inc.*, 2011 U.S. Dist. LEXIS 89903, at *10 (N.D. Cal. Aug. 12, 2011) (commending all firms on "their impressive resumes," but appointing as "superior" the firm with "expertise in electronic privacy litigation").

Contrary to Prof. Rubenstein's suggestion that appointing *Hernandez* Counsel would be "unprecedented," (Dkt. 903 at 15), what would truly be unprecedented is appointing a group of lawyers with no FCRA or class action experience to represent one of the largest FCRA classes in history.  As Professor Miller confirms, because only *Hernandez* Counsel have the required knowledge and expertise, *Hernandez* Counsel are the better choice for this Class. (*See* Prof. Miller Decl. at 8 (finding that criteria of Rule 23(g)(1)(A) favor appointment of Lieff Group and disfavor the appointment of Boies Group).)

**C.     *White* Counsel's Conduct in This Matter and Others Further Reveals They Are Not Best Able to Represent the Class.**

Even with respect to the ethical considerations that Prof. Rubenstein opines the Court should focus on exclusively, his analysis is revealingly one-sided.  Prof. Rubenstein neither addresses the *White* Plaintiffs' conduct in this matter nor states that he has investigated their history—a relatively simply task—in past litigation. (*See* Prof. Miller Decl. at 9–10 (discussing Boies firm's past transgressions and stating that "if the Court is to engage in the enterprise of analyzing attorneys' ethics, it should do so evenhandedly rather than focusing only on the alleged shortcomings of the Lieff Group while overlooking those of its rival").)  Rather, he superficially concludes with no elaboration whatsoever that "[t]he Boies Group is not tainted by any finding of wrong-doing in this action," and as to *White* Counsel's oft-expressed desire for a judgment in excess of a billion dollars, "[i]t is

unlikely that a firm with Boies' expertise and experience would undertake to litigate and/or negotiate this class's claims in a wildly unrealistic manner" and "[a] firm could not be as successful as the Boies firm has been were it not guided by clear-headed assessments of the law and sound judgments on behalf of its clients." (*Id.* at 23–24.)  Such general conclusions are betrayed by both the record in this matter and other matters in which *White* Counsel have been involved.

### 1. *White* Counsel wrongly deny the fact that they raised disqualification on multiple occasions in the District Court proceedings.

In an effort to dissuade this Court from believing that the issue of disqualification was ever before the Ninth Circuit, *White* Counsel misrepresent that the issue of disqualification "was [also] never before this Court."  (Dkt. 902 at 2–3.)  To the contrary, *White* Counsel pressed for disqualification—in many pages of briefing—on multiple occasions prior to the appeal, including in the *White* Plaintiffs' motion for reconsideration of preliminary approval and in their objections to the settlement.[6]  In their motion for reconsideration, *White* Counsel devoted two entire sections of their supporting brief to disqualification arguments, one of which falls under the subheading, "Counsel for the Settling Plaintiffs' Unethical Conduct in regard to Named Plaintiff Incentive Awards Disqualifies Them from Representing the Class." (Dkt. 433 at 13.) Moreover, certainly Prof. Rubenstein—who filed a declaration in support of *White* Counsel's reconsideration motion—believed disqualification was raised given his statement that "objectors suggest that class counsel is so conflicted by this (and other problems) that they should be disqualified."  (Dkt. 621 at 16.)  Similarly, in their objections to final

---

[6] Not only did *White* Counsel press for disqualification in their briefing, but they did so at more than one final approval hearing.  (Jan. 11, 2010 Hr'g Tr. at 23 ("They are all infected and they are all disqualified."); May 20, 2010 Hr'g Tr. at 60 11:18–25.)

approval of the settlement, regarding the settlement's incentive award provision, *White* Counsel stated that *Hernandez* Counsel "have disqualified themselves from representing the class." (Dkt. 553 at 11.)

This Court issued orders denying the reconsideration motion and rejecting the objections to the settlement, both of which the *White* Plaintiffs necessarily included in their notice of appeal. (*See* Dkt. 796.)   Given this record, *White* Counsel's claim that the issue of disqualification was never before this Court is curious at best, and at worst, stands as yet another example of their willingness to mislead this Court.

### 2. *White* Counsel misled the Ninth Circuit in an apparent effort to cast doubt on this Court's approval of the settlement.

*White* Counsel's defense of Mr. Carpinello's misrepresentation to the Ninth Circuit that this Court failed to make "any mention of *Rodriguez*" is nonsensical and further reveals their lack of candor and poor judgment.   While they claim that Carpinello's "statement about the failure to mention *Rodriguez* was explicitly in reference . . . to the conditional incentive clause," they still get it wrong—that is, the Court expressly considered the incentive award issue against the facts and analysis set forth in *Rodriguez*:

> On the other hand, Settling Plaintiffs' request for service fees *does not suffer from the tell-tale signs of conflict* that have caused courts to reject such awards in the past.  Settling Plaintiffs have not requested service awards as part of a pre-existing agreement between class representatives and class counsel, and the incentive payments are not in any way tied to the amount of the recovery in the case.  *Compare Rodriguez*, 563 F.3d at 959–60 (finding incentive awards inappropriate where they were contemplated as part of an ex ante agreement between class representatives and class counsel and where the amount of the award depended on the amount recovered in the case).

17

(Dkt. 37 at 35, emphasis added.)  Moreover, *White* Counsel's claim that "Judge Wardlaw agreed" with Mr. Carpinello's characterization of this Court's order does not alter the simple truth that this Court analyzed the incentive award provision— both in its final order and at *multiple* hearings—with express reference to *Rodriguez*.

Unfortunately, Mr. Carpinello's version of the underlying record did not end with his discussion of the Court's alleged failure to make *any* findings under *Rodriguez*.   He also advised the Ninth Circuit that this Court prohibited Mr. Juntikka from sending his former clients a letter stating his disapproval of the monetary relief settlement:

> Carpinello: Mr. Juntikka wanted to send a letter to 20,000 former clients. What he wanted to say in the letter, and ***that the judge would not let him say***, is, "I do not approve of the settlement."

(Dkt. 888-1 at 17:21–24, emphasis added.)  Challenged by Judge Haddon, Mr. Carpinello repeated unequivocally:

> Carpinello: He said, "You can't send it."
>
> Haddon: You think that's what he said?
>
> Carpinello: Absolutely. You couldn't read the record any other way, "You cannot send it." **Because he said, "I don't want you sending a letter where you say, 'I disagree with the settlement.'** That conflicts with the letter that I have approved that's gone out by class counsel."

(*Id*. at 18:19–19:4, emphasis added.)

As the Court knows, Mr. Carpinello's representation to the Ninth Circuit was not accurate.  In fact, Mr. Juntikka was never precluded from sending a letter on his own; the real issue was what would be said in a letter approved by the Court.  (*See* Dkt. 502, Nov. 9, 2008 Hr'g Tr. at 11.)  Even as to that letter, at the

REPLY IN SUPPORT OF CROSS-MOTION
TO APPOINT INTERIM CLASS COUNSEL
CASE NO. 05-CV-1070 DOC

November 9, 2008 hearing, the Court offered Mr. Carpinello the option (which *Hernandez* Counsel did not oppose) of adding language to the draft letter stating "I now represent plaintiffs objecting to the settlement."  (*Id.* at 27:21–22.)  When Mr. Carpinello complained that Mr. Juntikka's former clients "would have to read all the way through almost to the very end of the letter to recognize that Mr. Juntikka is opposing it," (*id.* at 28:20–22), this Court again accommodated Mr. Carpinello:

> With that addition and if I shifted that portion to, you know, earlier in the letter, what's your position now, if I added that sentence or a similar sentence, would you prefer the Hernandez letter or no letter?

(*Id.* at 29:2–6.)  Mr. Carpinello and Mr. Juntikka decided not to submit the letter—which the Court offered to approve—informing Mr. Juntikka's former clients that Mr. Juntikka opposed the settlement.   Removing any grounds for legitimate confusion, the Court's order denying Mr. Juntikka's motion explicitly stated that the Court "would have approved" a communication "alerting [Mr. Juntikka's former clients] that he now represents plaintiffs objecting to the settlement." (Dkt. 520 at 13–14.)  Given this record—and the fact that the Juntikka letter has now been the subject of briefing and oral argument in this Court, on interlocutory appeal, and on appeal—Mr. Carpinello's statements cannot be explained as another "mistake of memory."[7]

---

[7]   As to *White* Counsel's false statement that the Lieff/Caddell team failed to include a request for injunctive relief in their original prayer, they now chalk up that falsehood to a "mistake of memory." (Dkt. 902 at 31.)  Rather than closing the issue with an apology, Mr. Wolf attempts to revive his notion he had to "convince" the later-formed *White/Hernandez* team to pursue injunctive relief—remarkably, he insists on this notwithstanding the fact that Mr. Caddell and Mr. Bennett sought injunctive relief in the *Hernandez* complaint, which was filed *before* Mr. Wolf and Lieff Cabraser filed their *White* complaint. Further belying Mr. Wolf's notion that he originated the idea of pursuing injunctive relief in a FCRA suit is the reality that

Simply and fairly stated, counsel who so falsely portray the unambiguous statements of this Court are not "best able to represent the interests of the class," and *White* Counsel's motion should be denied on these grounds as well.  FED. R. CIV. P. 23(g)(2).

### 3.  *White* Counsel's transgressions in other matters further render them unsuitable to serve as interim counsel here.

Following his cursory decision that both *Hernandez* and *White* Counsel meet the requirements of Rule 23(g)(1)(A), Prof. Rubenstein turns to Rule 23(g)(2), which allows courts to consider any pertinent matter when faced with an interim class counsel application.  (*See* Rubenstein Decl. at 8.)  In the case of a "counsel contest," Rubenstein advises that "courts regularly consider ethical concerns in selecting the counsel 'best able to represent the interests of the class' under Rule 23(g)(2)."  (*Id.*)  In support of this statement, Rubenstein references opinions where courts not only examined counsel's conduct in the instant matter, but also other matters, including counsel's disciplinary history.  (*Id.* nn.15, 17 (*see* parenthetical descriptions).)  Notwithstanding his recitation of the case law to be applied in a counsel contest, Rubenstein *never* comments on *White* Counsel's lack of candor to this Court, let alone indicates that he has conducted any inquiry into *White* Counsel's background in other matters.  Had he so much as scratched the surface, his ultimate opinion may have been different.[8]  Needless to say,

---

Mr. Caddell and Mr. Bennett have sought and obtained injunctive relief in multiple other FCRA class actions—none of which included a CCRAA claim (or Mr. Wolf for that matter).  (*See* Caddell Decl. at 2–5; Bennett Decl. at 4–5.)

[8]  While *White* Counsel's efforts to disparage *Hernandez* Counsel's reputations largely focus on conduct of lawyers not involved in this litigation or on comments quoted out of context, *Hernandez* Counsel respond to each of the instances raised in their accompanying declarations.  (*See* Sobol Decl. at 2; Caddell Decl. at 1-2; Francis Decl. at 5; Bennett Decl. at 5.)

Rubenstein's opinions and *White* Counsel's intemperate and off-base attacks on *Hernandez* Counsel, (*see* Combined Reply at 18 n.9), are unfortunate, not to mention fail to inform the Court's determination under Rule 23(g)—that said, the attacks have been made and Prof. Rubenstein indicates a review of past transgressions is relevant, which is why *Hernandez* Counsel reluctantly provide the brief information below.

A *quick* investigation of *White* Counsel reveals transgressions that inexplicably escaped Prof. Rubenstein's attention.  Starting with Boies Schiller, a simple Google search reveals matters that appear to involve conflicts, requests for sanctions, and/or disqualification issues.  Just recently, a former client of Boies Schiller accused it of ignoring a conflict of interest stemming from its past representation of Host Hotels & Resorts ("Host"), which Boies Schiller subsequently targeted in a $350 million antitrust lawsuit.  *See Madison 92nd Street Associates LLC v. Marriott International Inc.*, No. 1:13-cv-00291-CM (SDNY) ("*Madison 92nd Street*").   In a motion filed in March of this year seeking sanctions against Boies Schiller in the case, (*Madison 92nd Street*, Dkt. 39), it was represented that Boies Schiller filed the lawsuit despite express notification of the conflict.  Eventually, Boies Schiller filed a motion to withdraw from the case, but according to the dockets in the case, remains subject to Host's motion for sanctions.  (*See Madison 92nd Street* docket, available on PACER).  Similarly, in another matter, where an appellate court found that parties had demonstrated a "preliminary basis for disqualification," on remand, rather than face the motion, Boies Schiller once again "sought to avoid and/or remedy the issue by withdrawal from its representation of [its clients] the Nical parties." *See Lewis v. Nical of Palm Beach, Inc.*, 10 So. 3d 159, 163 (Fla. Dist. Ct. App. 2009).  Finally, in litigation where the accusation of judge shopping was lodged, a client of Mr. Boies admitted under oath that he and Mr. Boies were fined over $46,000 by the

Supreme Court of the State of New York, County of New York, for seeking disqualification of a judge in bad faith. *See Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97-cv-5499, 2003 WL 282187, at *8 (S.D.N.Y. Feb. 7, 2003).

Concerning Mr. Wolf, he recently emerged from a contentious fee arbitration (against his former co-counsel) in which he challenged his co-counsel's lodestar—a lodestar that he knowingly allowed to be submitted to the trial court in making a request (on behalf of all counsel) for a $25,000,000 fee. *See Daniel Wolf and Maia Caplan Kats v. Sprenger & Lang, PLLC*, 2013 WL 3466348 (D.C. July 11, 2013).   Not only did he lose the arbitration over fee allocation, but following his defeat, he returned to the trial court "challenging [as excessive] the rates and hours that had been submitted in the petition for attorneys' fees." *Id*. at *6 n.3. Apparently, the trial court criticized his initial act of allowing the alleged excessive lodestar to be submitted, and the court of appeal characterized this lack of candor as "suggesting a violation of ethical rules governing attorneys' behavior." *Id*. at *11 n.10.[9]

As for Mr. Juntikka, he has repeatedly failed to pay his taxes—as recently as this year—and has apparently been the subject of dozens of city, state, and federal tax liens or judgments. (Kersh Decl. at 4.)  Professionally, Mr. Juntikka's history

_____

[9]   The D.C. Court of Appeals stated:  "Rule 8.4(c) of the District of Columbia Rules of Professional Conduct provides that '[i]t is professional misconduct for a lawyer to [e]ngage in conduct involving dishonesty, . . . or misrepresentation.' When Ms. Caplan and Mr. Wolf returned to the California court following receipt of the arbitrator's Stage One decision to lodge complaints about the rates and hours submitted with the fee petition, the California judge said to Ms. Caplan Kats, '[y]ou're claiming that there are misrepresentations to the [c]ourt, you knew them and you participated in making them to me,' suggesting a violation of ethical rules governing attorneys' behavior."

reveals two disciplinary actions (in the 1980's and in 2006) resulting in the New York Bar issuing two "letters of caution" and nine Bar Complaints "give or take." (Ex. 2, Juntikka Depo. at 159–63.)

Concerning the issue of judgment—particularly with respect to *White* Counsel's statement to this Court that a settlement of the Class's claims should exceed a billion dollars—*White* Counsel now indicate that "it is not Messrs. Wolf and Juntikka, but the Boies Firm that would take the lead in any future settlement negotiations" and that Mr. Boies—who has yet to appear for a single hearing—(and his firm) "can be counted on to take a reasonable and realistic approach to settlement." (Combined Reply at 27.) Setting aside the obvious implication that Wolf and Juntikka are incapable of taking a reasonable and realistic approach to settlement, at the May 26, 2011 final approval hearing, Mr. Carpinello stood by when Mr. Wolf characterized a "reasonable settlement" in the range of $1.5 billion to $2 billion. (*See* Dkt. 773 (May 26, 2011 Hr'g Tr. (Vol. II)) at 10:11–13:20.) In addition, as recently as March 2013, Mr. Carpinello advised the Ninth Circuit that "this is a statutory damages case," and according to his expert, the "class was harmed $3–5 billion." (Dkt. 888-1 at 15.) Hence, *White* Counsel's collective judgment remains a legitimate concern.

## D. Public Justice and Francis & Mailman Are Independent and Incentivized to Represent the Best Interests of the Class.

As the declarations submitted by counsel and by Prof. Charles Silver demonstrate, Public Justice and Francis & Mailman P.C. are independent and incentivized to pursue the best interests of the Class. (Dkt. 889–891; Declaration of Arthur H. Bryant, filed concurrently herewith ("Bryant Decl."); Francis Decl. at 3–4; Prof. Silver Decl. at 7–10.) *White* Counsel's contention that these firms cannot exercise independent judgment is flat wrong. That Public Justice has received donations and other support from some members of the *Hernandez* team

does not impair its ability to exercise its own independent judgment in this or any other case.  That is confirmed by, among other things, the numerous instances in which Public Justice has advocated for positions directly adverse to the financial interests of its supporters, including Lieff Cabraser and some of its other most generous and long-standing supporters.  (Bryant Decl. at 7–9; Sobol Decl. at 2–3; Caddell Decl. at 4; Bennett Decl. at 7–8.)  Public Justice's unwavering advocacy in support of the public interest demonstrates that its involvement in cases and its strategic decisions are guided by principle and not by a desire to maximize its funding.  (Bryant Decl. at 7–10.)

*White* Counsel's suggestion that Francis & Mailman cannot act independently because they have co-counseled with members of the *Hernandez* team in other cases is nonsensical.  Under that logic, no firms could co-counsel in multiple cases without losing their ability to exercise independent judgment.  Most ironically, that would disqualify Messrs. Wolf and Juntikka—who have worked together in various other matters—from acting as co-counsel in this case.[10]

The co-counseling agreement entered into between the existing *Hernandez* Counsel, Public Justice, and Francis & Mailman specifically documents their shared understanding that all counsel will exercise their independent professional judgment solely for the benefit of the Class, and that they are making no commitments regarding the future course of the litigation.  (*See* Prof. Silver Decl. at 7 ("Having participated in the negotiations that created the new co-counsel agreement, I believe that all members of the *Hernandez* Counsel Group, including the new ones, are strongly motivated to maximize the class' recovery.").)  Moreover, as Prof. Silver explains, and contrary to *White* Counsel's suggestion,

---

[10]   The fact is that, as successful practitioners, it is unsurprising that the members of the *Hernandez* team (old and new), and indeed members of the *Hernandez* and *White* teams, have collaborated in other cases.

*Hernandez* Counsel's fee sharing formula is appropriately designed to ensure that *all* counsel—new and old—will be incentivized to represent the Class's best interests going forward, by, among other things, ensuring that new counsel will not receive a windfall in the event a new settlement is reached quickly, and properly motivating new counsel (and existing counsel) to pursue a larger settlement than was achieved previously, should that be possible.  (Prof. Silver Decl. at 8–10.)[11]

### III.   CONCLUSION

For the reasons stated above, the Court should appoint *Hernandez* Counsel to represent the Class.

_____

[11] The cases cited by *White* Counsel—*Apple Computers*, *Sussman*, and *Jaroslawicz*—all involved the entirely different issue of whether it is appropriate to have a named class representative who is either a member of, or has close ties with, the firm seeking to serve as counsel for the class.  Even in that situation, the determination is within the trial court's discretion.  *See, e.g., Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 94–96 (7th Cir. 1977).

Dated:  August 9, 2013                        Respectfully submitted,

                                       By:   /s/ Michael W. Sobol
                                             Michael W. Sobol (SBN 194857)
                                             LIEFF, CABRASER, HEIMANN &
                                             BERNSTEIN, LLP
                                             Embarcadero Center West
                                             275 Battery Street, 29th Floor
                                             San Francisco CA 94111-3339
                                             Telephone:  (415) 956-1000
                                             Facsimile:  (415) 956-1008

                                             Michael A. Caddell (SBN 249469)
                                             Cynthia B. Chapman (SBN 164471)
                                             CADDELL & CHAPMAN
                                             1331 Lamar St., Suite 1070
                                             Houston TX 77010
                                             Telephone:  (713) 751-0400
                                             Facsimile:  (713) 751-0906

                                             Stuart T. Rossman (BBO No. 430640)
                                             (srossman@nclc.org)
                                             Charles M. Delbaum (BBO No.
                                             543225)
                                             (cdelbaum@nclc.org)
                                             NATIONAL CONSUMER LAW
                                             CENTER
                                             7 Winthrop Square, 4th Floor
                                             Boston MA 02110
                                             Telephone:  (617) 542-8010
                                             Facsimile:  (617) 542-8028

Leonard A. Bennett (VSB No. 37523)
(lenbennett@cavtel.net)
Matthew Erausquin (VSB No. 65434)
(matt@clalegal.com)
CONSUMER LITIGATION
ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 201
Newport News VA 23606
Telephone:  (757) 930 3660
Facsimile:  (757) 930-3662

Lee A. Sherman (SB No. 172198)
CALLAHAN, THOMPSON,
SHERMAN & CAUDILL
2601 Main St., Suite 800
Irvine CA 92614
Telephone:  (714) 730-5700
Facsimile:  (714) 730-1642

James A. Francis
David Searles
FRANCIS & MAILMAN
100 South Broad St., 19th Floor
Philadelphia PA 19110
Telephone:  (215) 735-8600
Facsimile:  (215) 940-8000

Arthur H. Bryant
PUBLIC JUSTICE
555 12th Street, Suite 1230
Oakland CA 94607
Telephone:  (510) 622-8150 x 202
Facsimile:  (510) 622-8155

REPLY IN SUPPORT OF CROSS-MOTION
TO APPOINT INTERIM CLASS COUNSEL
CASE NO. 05-CV-1070 DOC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F. Paul Bland
PUBLIC JUSTICE, P.C.
1825 K Street NW, Suite 200
Washington DC 20006
Telephone:  (202) 797-8600
Facsimile:  (202) 232-7203

Attorneys for *Hernandez* Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2013, the foregoing document was filed electronically with the Court using the CM/ECF system, which sent notification of that filing to all counsel who are registered to receive notification.  In addition counsel below is not registered to receive notification, a copy was mailed via U.S. First Class Mail:

Daniel Wolf
Daniel Wolf Law Offices
1220 N Street. NW, Suite PH 2
Washington DC 20005
Telephone:  (202) 842-2170
Email:  dan@danielwolflaw.com


 /s/ Cynthia B. Chapman
Cynthia B. Chapman

# EXHIBIT 1

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  - - - - - - -

5   TERRI N. WHITE, et al.,          )
                                      )
6            Plaintiffs,              )
                                      )
7        vs.                          ) No. SACV 05-1070 DOC
                                      )    Item No. 5
8   EXPERIAN INFORMATION SOLUTIONS,   )
    INC.,                             )
9                                     )
             Defendant.               )
10  _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   Status Conference

16                 Santa Ana, California

17                Friday, July 26, 2013

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141

24

25  05CV1070 White 2013-07-26 StConf

 1    **APPEARANCES OF COUNSEL:**

 2

      FOR THE WHITE PLAINTIFFS:

 3

 4            BOIES SCHILLER & FLEXNER, LLP
              BY:  George F. Carpinello
 5                 Attorney at Law
              30 South Pearl Street
 6            Albany, New York 12207
              518-434-0600
 7            gcarpinello@bsfllp.com

 8

              DANIEL WOLF LAW OFFICES
 9            BY:  Daniel Wolf
                   Attorney at Law
10            1220 N Street NW
              Suite PH 2
11            Washington, DC 20005
              202-772-1154

12

13            CHARLES JUNTIKKA & ASSOCIATES LLP
              BY:  Charles W. Juntikka
14                 Attorney at Law
              350 Fifth Avenue
15            Suite 2212
              New York, New York 10118
16            212-315-3755
              charles@cjalaw.com

17

18    FOR THE HERNANDEZ PLAINTIFFS:

19

              CADDELL & CHAPMAN
20            BY:  Michael A. Caddell
                   Attorney at Law
21            1331 Lamar
              Suite 1070
22            Houston, Texas 77010
              713-751-0400
23            mac@caddellchapman.com

24

25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR THE HERNANDEZ PLAINTIFFS (Continued):

4
            LIEFF CABRASER HEIMANN AND BERNSTEIN
5            BY:  Michael W. Sobol
                Attorney at Law
6            275 Battery Street
            30th Floor
7            San Francisco, California 94111
            415-956-1000
8            msobol@lchb.com

9

10   FOR DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.:

11           JONES DAY
            BY:  Daniel J. McLoon
12               Attorney at Law
            555 South Flower Street
13           50th Floor
            Los Angeles, California 90071
14           213-489-3939
            djmcloon@jonesday.com
15

16
     FOR EQUIFAX INFORMATION SOLUTIONS LLC:
17

18           KILPATRICK STOCKTON
            BY:  Cindy D Hanson
19               Attorney at Law
            1100 Peachtree Street
20           Suite 2800
            Atlanta, Georgia 30309
21           404-815-6470
            chanson@kilpatricktownsend.com
22

23

24

25

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 40 of 128   Page ID #:14522
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

4

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR TRANSUNION LLC:

4
              STROOCK AND STROOCK AND LAVAN LLP
5             BY:  Stephen J. Newman
                   Attorney at Law
6             2029 Century Park East
              16th Floor
7             Los Angeles, California 90067
              310-556-5800
8             snewman@stroock.com

9
     ALSO PRESENT:
10
              Nicole D. Reynolds, Attorney at Law
11            Lieff Cabraser Heimann & Bernstein LLP

12            Robert W. Thompson, Attorney at Law
              Callahan Thompson Sherman & Caudill LLP
13
              James A. Francis, Attorney at Law
14            Francis & Mailman PC

15            F. Paul Bland, Attorney at Law
              Public Justice (Washington DC)
16
              Arthur H. Bryant, Attorney at Law
17            Public Justice (California)

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

**PROCEEDINGS**                                    **PAGE**

Status Conference                                    6

**SANTA ANA, CALIFORNIA, FRIDAY, JULY 26, 2013**

**Item No. 5**

(3:20 p.m.)

03:20   THE COURT:  Counsel, please make your appearances.

03:20   MR. CARPINELLO:  George Carpinello, Boies,
Schiller & Flexner, for the White plaintiffs, Your Honor.

03:20   THE COURT:  Counsel, how did we get turned around?

03:20   MR. CARPINELLO:  We just came in and sat down,
Judge.  You want us in a different spot?

03:20   THE COURT:  That's fine.

03:20   MR. CADDELL:  Mike Caddell, Your Honor, Caddell &
Chapman, for Jose Hernandez and the plaintiffs.

03:20   THE COURT:  Okay.

03:20   MR. SOBOL:  Good afternoon, Your Honor.  Michael
Sobol for the Hernandez plaintiffs.

03:20   THE COURT:  Pleasure.

03:20   MR. BRYANT:  Good afternoon, Your Honor.  Arthur
Bryant from Public Justice PC for the Hernandez plaintiffs.

03:20   THE COURT:  Pleasure.

03:20   MR. FRANCIS:  Good afternoon, Your Honor.  Jim
Francis from Francis & Mailman for the plaintiff.

03:20   THE COURT:  Pleasure.

03:20   And?

03:20   MR. BLAND:  Good afternoon, Your Honor.  Paul
Bland, also Public Justice, for the plaintiffs.

03:20    1            THE COURT:  Okay.

03:20    2            MS. REYNOLDS:  Good afternoon, Your Honor.

         3   Nicole --

03:20    4            THE COURT:  Nice meeting you.  Make sure we can

         5   hear you.  Debbie, could you get that?

03:20    6            Counsel, go over and use the lectern.  And,

         7   Counsel, once again, would you make your appearance, and let

         8   us get a card from you.

03:21    9            MS. REYNOLDS:  Nicole Reynolds of Leiff Cabraser

        10   Heimann & Bernstein, for the Hernandez plaintiffs.

03:21   11            Thank you very much.

03:21   12            Counsel.

03:21   13            MR. THOMPSON:  Good afternoon, Your Honor.  Bob

        14   Thompson for the Hernandez plaintiffs.

03:21   15            MR. CADDELL:  And, Your Honor, if I might note --

03:21   16            THE COURT:  Oh, just a moment.  We'll be right

        17   with you.

03:21   18            MR. McLOON:  Good afternoon, Your Honor.  Daniel

        19   McLoon for the defendant, Experian Information Solutions.

03:21   20            MS. HANSON:  Good afternoon.  Cindy Hanson for the

        21   defendant, Equifax Information Services LLC.

03:21   22            MR. NEWMAN:  Good afternoon, Your Honor.  Stephen

        23   Newman for TransUnion.

03:21   24            THE COURT:  Well, my, how I've missed you all.

        25   It's nice to have you back.

03:21   1          *(Laughter in the courtroom.)*

03:21   2               THE COURT:  Counsel.

03:21   3               MR. WOLF:  Daniel Wolf, Law Office of Daniel Wolf,

        4      for the White plaintiffs.

03:21   5               THE COURT:  All right.

03:21   6               MR. JUNTIKKA:  Charles Juntikka for the White

        7      plaintiffs.

03:21   8               THE COURT:  Nice seeing all of you.

03:21   9               Now, I want to start with the August 19 date.

        10     It's a bad day for me.  I cannot entertain you on that day;

        11     and number two, I think the motions are going to be

        12     extended, and I don't want to catch you on a calendar with

        13     30 other cases; you're going to spend most of the day

        14     sitting.

03:22   15              So I'd like to advance that to the week before.

        16     And I didn't want to just send a note out to you; it's a

        17     little discourteous, because I don't know what your plans

        18     are, concerning counsel, but I don't know that I'll ever get

        19     unanimity.

03:22   20              So I was thinking about the dates of either

        21     August 14th, 15th or 16th.  And I was hoping that you might

        22     be available on the 14th or 15th, in case we needed one more

        23     day.  And I just don't know how long the arguments will be,

        24     and I think that they're going to be fairly extensive, and

        25     I'm going to have a lot of questions.

03:22   1          So I'm going to ask you to check your calendars

2    for the 14th for just a moment.  And if that's not good,

3    then I'm going to move to the 15th, and then we're going to

4    move to the holiday season of 2018.  I'm just kidding you.

03:23   5          So look at your calendars for just a moment and

6    see just what position you're in temporarily for August

7    14th.  And I'd like to give that a full day so I'd like you

8    to come in on Tuesday, if possible.

03:23   9          Okay.  Counsel, would you be available on the

10   14th?

03:23   11         MR. WOLF:  Your Honor, this is Dan Wolf.  I would

12   be available, but we have to check for one other person's

13   availability.

03:24   14         THE COURT:  Okay.

03:24   15         MR. WOLF:  So he was just checking right now.

03:24   16         MR. JUNTIKKA:  Yeah.  We're trying to reach them.

03:24   17         THE COURT:  Would you be available the 14th?

03:24   18         MR. CADDELL:  Yes, Your Honor.

03:24   19         THE COURT:  Counsel?

03:24   20         MR. SOBOL:  Yes, Your Honor.

03:24   21         MR. BLAND:  Yes, Your Honor.

03:24   22         MR. FRANCIS:  Yes, Your Honor.

03:24   23         MR. BRYANT:  Yes, Your Honor.

03:24   24         MULTIPLE COUNSEL IN UNISON:  Yes, Your Honor.

03:24   25         THE COURT:  All right.  If you would just inform

1    me in a few moments if, whoever that other person is, is

2    available.

03:24    3          Now, let me give you a caveat to that:  We're

4    supposed to start about a three-month trial on the Tuesday,

5    August 13th.  And it's a case from the Eastern District that

6    the Ninth Circuit asked if we'd take.  Judge Wanger

7    resigned -- or retired -- I'm sorry -- and went into private

8    practice.  And this involved a significant amount of the

9    water rights up in the San Joaquin Valley.  The first part

10   of that case, which was supposed to be a two- or three-month

11   trial, resolved unexpectedly the ninth day of trial.

03:25    12         I have no idea if this case is going to settle or

13   not.  Right now, the indications are that they're talking.

14   I don't want to, obviously, be involved in those

15   discussions, and we've reserved a jury for that day.

03:25    16         If that case starts, then I either need to call

17   you or schedule a night session with you, and I would change

18   that morning to the evening and ask you to start at 4:00 or

19   5:00 o'clock in the evening after I excuse the jury.

03:25    20         I would try to hold to that date, regardless of

21   being in litigation on that matter, as a courtesy.  So as

22   long as you change your calendar around, I won't try to flip

23   that hearing date around; I just might have to move you into

24   the evening hours, but I'd like not to.

03:25    25         The second concern I have is that we get to that

DEBBIE GALE, U.S. COURT REPORTER

Case 8:05-cv-01070-DOC-MLG  Document 911  Filed 08/09/13  Page 47 of 128  Page ID #:14529
SACV 05-1070 DOC 7/26/2013 - Item No. 5

11

 1  day and a number of initial thoughts but not rulings that I

 2  might have for you haven't been discussed with you.  And one

 3  I'm afraid about doing in this process is throwing out a

 4  question, and one side perceives that they're winning or

 5  losing.  It's extraordinarily dangerous.  Each of you will

 6  go away believing that the Court might do X, when it's not

 7  my intent at all.  It's an exploration.

 8       And I can go through some of those musings, and

 9  I've put down a number of things that I think would be

10  helpful now for you to think about, and also possibly answer

11  today, if you can, to help me.  But I don't know if -- how

12  comfortable you are with that.  I've done that on a couple

13  other cases, and it's had good results; and in some ways,

14  it's been difficult for counsel because they believed what

15  the Court inquired or said in a certain way was going to be

16  a dispositive ruling.

17       So I prefer to have you talk.  I can just leave

18  our discussion with, "It was nice to see you, and I'll see

19  you on the 14th," after you've traveled all this way.  Or we

20  can get into some of the questions I have, you know, today,

21  and make this somewhat more productive than, you know, an

22  all-day session.  But I'd like you to discuss that amongst

23  your groups for a moment so you're comfortable; and then,

24  with each other -- lead counsel -- for a moment.

25       And then you tell me how you'd like the Court to

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 48 of 128   Page ID #:14530
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

12

```
        1    conduct itself today.  Okay?
03:28   2         (Counsel confer.)
03:28   3              THE COURT:  Counsel, what are your thoughts?
03:28   4              MR. CADDELL:  Your Honor, we're prepared to
        5    address most of these.  I think some of these may actually
        6    take a little more thought, but I think some of them we
        7    could easily address, and it would help the Court, and take
        8    some issues off the table for both parties as we move
        9    forward.
03:28  10              THE COURT:  Counsel, what are your thoughts?
03:28  11              MR. CARPINELLO:  We're prepared to discuss any or
       12    all of them as you wish, Judge.
03:28  13              THE COURT:  Okay.  If anybody's uncomfortable,
       14    stop me.
03:28  15              And, first, anything I say today that sounds like
       16    a criticism or disparagement, please understand that it's
       17    not intended.  I think I've got wonderful counsel on all
       18    sides of this issue.  And the Court is ultimately
       19    responsible for this decision that brings it back to my
       20    court.  And so, if I accept that responsibility fully and
       21    completely as the trial judge, I think that's the
       22    appropriate thing, where the responsibility lies.  So I
       23    think that spares, you know, any insinuation of criticism or
       24    concern about any of your performances.
03:29  25              So let me just start with you, Mr. Juntikka.  I've
```

1    known you the longest.  Your passion for your clients is

2    phenomenal, and I heard that loud and clear before.  And I

3    thought the ability and competency to unwind the complexity

4    of at least the injunctive relief was extraordinary and had

5    a benefit.

6            But I don't view ultimately that this is a contest

7    between counsel.  This is who's the best able to represent

8    the class, eventually.  That will ultimately be my only

9    concern.

10           The difficulty, in a practical matter, was I

11   didn't know that you'd reached a resolution when I'd issued

12   a tentative.  And that tentative, if you recall, was not for

13   class certification.  Now, I had not heard argument at that

14   time, if you recall.  I stepped out in court, and that

15   tentative had gone out.

16           And, frankly, if I would have known that there had

17   been a resolution, I probably wouldn't have published the

18   tentative because, from the banks' perspective, I think it

19   was extraordinarily difficult for counsel for the bank,

20   probably, during these negotiations, just with a little bit

21   of clairvoyance maybe, to get the number up to a settleable

22   number in this matter, when the initial number had been down

23   in the tens of millions, if you will, when the Acosta

24   plaintiffs were representing this case law.

25           So the question I'm ultimately asking myself is,

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 50 of 128   Page ID #:14532
SACV 05-1070 DOC   7/26/2013 - Item No. 5

14

1    as a broad, broad question:  Should one of you prevail?

2    Should the Hernandez counsel eventually prevail?  And you'll

3    answer that, yes, that the White counsel should not for many

4    of the reasons that you've espoused.  And the White counsel

5    plaintiffs will believe that they should prevail for many,

6    you know, good reasons that they espouse.  And the Court

7    will decide that later on.

03:31      8         But when you're done, is there -- because of

9    the -- choose my word's carefully -- unique, let's say,

10   interrelationship between the parties, the counsel in this

11   matter -- I'm not sure that ultimately there isn't a third

12   option that the Court should consider, and that's whether

13   there's complete, independent counsel who've not been

14   connected with this case before.

03:32      15        And the difficulty with that is, Mr. Juntikka, is

16   then I'd lose your able passion, wisdom, knowledge from the

17   beginning, unless there's some kind of structure set up, if

18   I ever take that road.  I lose all of this incredible work

19   by the Lieff, Cabraser firm, that got this injunctive

20   relief.

03:32      21        And from the bank's perception, it's deadly

22   because if there was to be a settlement now, new counsel is

23   going to come in and make the same offer, without proving

24   their value, so this $40-some-odd million settlement goes

25   up.

03:32    1          The second, just general question that I've been

         2    running through is, what's the true value of the settlement

         3    now to get back in the same position even.  If there was a

         4    settlement, isn't there another $7 million out?  I mean, the

         5    bank said "49 million," and now there's another 7 million

         6    out.

03:32    7          The third generalized question that I just have

         8    from a trial perspective is, are these class representatives

         9    ever, under these circumstances, capable of being class

        10    representatives again?  I have severe doubts about that.

03:33   11          Number four, as you suggest independent interim

        12    counsel, the difficulty for you, Counsel, will be that, in a

        13    sense, in recommending those able counsel, who do a lot of

        14    work in this area, the fact that you're recommending them

        15    may be a far different process and procedure than the other

        16    parties would ever be comfortable with, because the

        17    perception is that you're choosing, even though they may be

        18    independent, in fact, the perception is that they're not;

        19    that there's some kind of, you know, arrangement between

        20    counsel that's not nefarious.  It may be even open, but

        21    funds are passing forth.  The White plaintiffs are never

        22    going to be comfortable with that.

03:34   23          And if I went down that third road -- and I don't

        24    want you to think I am; otherwise, I would have had counsel

        25    sitting here today -- but if that was a viable third option,

1    does the Court reach out independently and start inquiring

2    of esteemed counsel to come in and make this representation?

3    And then, do I lose you all?

03:34    4          I mean, what a shame, with all the work you've

5    done on a very personal and professional nature, that I lose

6    and put -- I'd lose your wisdom in this.  The banks are now

7    going back and trying to settle, if at all.  And I don't

8    know what that committee structure would look like.  But

9    we've gotten here because of dysfunctionality.  I mean,

10    that's how we got here.

03:34    11          And I think in my career, in the 31 years, it's

12    probably, in a sense, with no fault of your own, but with

13    the end result, the most dysfunctional representation that's

14    gone back and forth between the two of you.  And I don't

15    know the degree of it.  I know some of it.  And I know a lot

16    more actually reading the Ninth Circuit opinion, believe it

17    or not, then I recognized at the time.  I heard the

18    arguments for the two days, but the gravamen of it didn't

19    really hit me until I see the opinion.

03:35    20          So I want to go through a couple questions:

03:35    21          First, if one of you proceeded forward on the

22    class certification, and now we were hearing oral arguments,

23    assuming each of you, you know, were in that position, is

24    there any more discovery to take; and if so, what is it, and

25    how long would it take?  Because, remember, on that day, we

1  were ready to argue class certification, and I'd handed down

2  a tentative -- by the way, I've been wrong on my tentatives

3  many times and I've changed them about 20 percent of the

4  time.  Argument means something here.

03:35  5  What else has to be done or what else would you

6  like to be done in terms of class certification?

03:36  7  MR. CARPINELLO:  May I, Your Honor?

03:36  8  THE COURT:  Please.

03:36  9  MR. CARPINELLO:  At the lectern?

03:36  10  THE COURT:  I just need to hear you.  Doesn't

11  matter if you're seated or at the lectern, as long as I've

12  got a microphone near you.

03:36  13  MR. CARPINELLO:  Your Honor, George Carpinello.

03:36  14  We think there should be some limited discovery on

15  the manageability issue.  I think that the act of processing

16  the settlement and the notice demonstrated to us that we

17  think that the class is manageable, but we do want some

18  discovery as to particularly the issues that the defendants

19  raised about lack of manageability before Your Honor and the

20  Ninth Circuit, about all these -- as we call them, the

21  parade of horribles -- because we're picking -- even though

22  we -- even though, through their own computer system, they

23  identified 15 million people who we believe met the

24  definition, they said, "Oh, well, you know, there's probably

25  gonna be" -- there's gonna be some number.  They never said

| | | |
|---|---|---|
| | 1 | X number.  They said there's gonna be some number of people |
| | 2 | who we picked up that didn't have errors in their reports. |
| | 3 | We think some limited discovery of their data and their |
| | 4 | data -- and we'll want our expert to look at their data to |
| | 5 | specifically address the manageability issue.  'Cause I |
| | 6 | think that -- that, in Your Honor's mind, is also a key |
| | 7 | issue:  Is this a manageable class. |
| 03:37 | 8 | THE COURT:  Okay.  Let me turn to Hernandez |
| | 9 | counsel. |
| 03:37 | 10 | MR. CADDELL:  Your Honor -- |
| 03:37 | 11 | THE COURT:  Either use the lectern or have a seat. |
| | 12 | I'm not worried about you standing.  I just want to make |
| | 13 | sure I get it. |
| 03:37 | 14 | MR. CADDELL:  All right, Your Honor. |
| 03:37 | 15 | Your Honor, we've thought about that issue.  The |
| | 16 | concern we have about manageability is the one the Court |
| | 17 | expressed:  That more than half of the class either |
| | 18 | benefited from this practice, the prior practice, or was not |
| | 19 | harmed.  And if there were a way through discovery to |
| | 20 | identify who those people are and you could then identify a |
| | 21 | narrower class that -- of people who actually were harmed by |
| | 22 | the prior practice, we think that would be beneficial. |
| 03:38 | 23 | I'm not convinced that that could happen.  But |
| | 24 | that would be one thing that we would explore in terms of |
| | 25 | discovery. |

03:38    1          Other than that, actually, I agree with

2    Mr. Carpinello, that any discovery we would propose would be

3    limited.  His term "some limited discovery" I think would

4    probably sum up how we would feel -- if any.

03:38    5          THE COURT:  Okay.

03:38    6          Counsel, anything from the bank's perspective?

03:38    7          MR. McLOON:  Your Honor, Daniel McLoon for

8    Experian, the credit reporting agency defendant.

03:38    9          It would be a huge concern to our clients if this

10   case were to be repositioned to active litigation without

11   some attempt to see whether this work that was done to

12   produce the settlement agreement could somehow be confirmed

13   in some way that would be acceptable to the Court.

03:38   14          I'll remind the Court that the settlement was

15   largely funded with our carrier's funds.  And the defendants

16   are very concerned that if all of a sudden this case is back

17   in an active litigation mode, not in a settlement discussion

18   mode, that we don't know that we can keep the funds from the

19   carriers.  I mean, the carriers advanced the funds with the

20   understanding we had a settlement.

03:39   21          And it is a real issue if this case is now:  The

22   settlement's gone; there's no settlement discussions; we're

23   now in active litigation.  And I just think, given the fact

24   that there's some 700,000-plus people who submitted claims

25   and were kind of expecting money, that -- the money is there

1    in the Court right now -- that, if we start unwinding that

2    and get back into discovery mode without first making some

3    determination -- you know, the settlement that was reached,

4    is there some way to reconfirm that?  Is there some way to

5    adjust it in some way?  It would certainly be our preference

6    that we explore that so that we don't lose the benefit of

7    the very difficult negotiations we had to have with our

8    carriers to get them to fund what we thought was the

9    settlement.

03:40    10    THE COURT:  Let me take a reverse hypothetical for

11    a moment; and that is, that I follow through with the

12    tentative, which is a win for the bank --

03:40    13    MR. McLOON:  Sure.

03:40    14    THE COURT:  -- at least for the first battle.  The

15    question becomes the war.  How that breaks out in terms of

16    separate class actions across the country, you know, the

17    eventual hypothetical payout, or defending, or none.  And so

18    I have to determine which counsel is best able to represent

19    the class.  And I didn't want counsel surprised on what was

20    April 19th -- I'm sorry -- August 19th with a discussion for

21    the first time that there's a third possibility in play.

03:41    22    My hesitancy, among others, is I don't know why

23    it's fair for me to invite other potential class counsel to

24    come into this case.  If I held to the tentative ruling,

25    they've worked for free.

03:41    1          MR. McLOON:  Right.

03:41    2          THE COURT:  And that's a huge detriment and a real

         3     betrayal.  By the same token, it is the third option.  And I

         4     didn't want there to be any surprises that the Court was

         5     considering that, as well as, you know, whether the White

         6     plaintiffs would be the class reps or the Hernandez would.

03:41    7          MR. McLOON:  Understood.  And I certainly am not

         8     gonna minimize the difficulty of the Court resolving that.

         9     It was just, I think, speaking for my client, the

        10     defendant -- and I suspect all three of the defendants --

        11     that, rather than starting down a path of further discovery

        12     with the idea that there'd be some sort of reformulated

        13     motion for class certification, that the Court satisfy

        14     itself that there's a process that can be followed to

        15     determine whether all of the work that went into -- and the

        16     difficult negotiations with the carriers to create a very

        17     sizeable fund, not be lost.

03:42   18          Because I've a real concern, if we start down an

        19     active litigation path, that it undoes -- we will unwind a

        20     lot of what we were able to accomplish with Your Honor's

        21     assistance, with several very able mediators.  It took a

        22     great deal of work to create the second largest fund --

        23     settlement fund in the history of this type of litigation.

        24     And Your Honor, we think, accurately found that the

        25     settlement was fair.  Nothing in the Ninth Circuit's

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 58 of 128   Page ID #:14540
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

22

1  decision in any way indicated that the settlement that was

2  reached was unfair for the absent class members.

03:42   3          And so it just -- you know, I appreciate the Court

4  asking the question about what other discovery might be

5  needed, if we were to pursue active litigation of the class

6  certification question.  It would just be our request that

7  the Court consider a process that we at least try to figure

8  out, is there a way to avoid unwinding the progress that

9  we've already made.

03:43  10          THE COURT:  You don't have to answer this

11  question, but I think one of the monumental accomplishments

12  of all counsel -- whether you were working together or

13  separately, I don't know -- but I was extraordinarily

14  pleased about what I'm going to call the "injunctive

15  relief," or the changes.  And that seemed to be monumental

16  going forward in and of itself.

03:43  17          MR. McLOON:  Yes.

03:43  18          THE COURT:  I think it also put the banks in the

19  best position, because of your cooperative attitude, that it

20  made -- it was harder to be angry at your client, if you

21  were the American juror, because you'd implemented those.

03:43  22          I'd assume that those have been enacted?

03:43  23          MR. McLOON:  Oh, yes.  They've been active for

24  years now, and they're functioning very well, Your Honor.

03:43  25          THE COURT:  As a practical matter, that part of

1    the lawsuit is over.

03:43    2    MR. McLOON:  Yes.

03:43    3    THE COURT:  So it's probably the cornstone, I

4    think, of just some really good litigating by all of you, in

5    a sense, that that change is made going forward.  We're

6    talking about a past harm now.

03:44    7    So, therefore, I say to all of you Counsel, you

8    really have my compliments about that.  It's a good and

9    wholesome change.  And it was extraordinarily complex and

10    difficult.  Well, that takes one issue off.

03:44    11    Has the class been told of the rejection of the

12    settlement?  I'm sure they read Ninth Circuit opinions

13    across the country in depth, but -- Mr. Wolf has broadcast

14    that and he's put that in U.S.A today.  I'm just joking.

03:44    15    But do you know if the class has been told; and if

16    so, how would the class have been told?

03:44    17    MR. WOLF:  Your Honor, I have looked at their

18    website.  I don't think that constitutes adequate notice to

19    the class.  About three weeks, I think it was, after -- or

20    couple weeks after the mandate issued, and after we had

21    notified in our papers that the class had not been notified

22    in any way, shape, or form, even on the website --

03:45    23    THE COURT:  Just a moment.  Does it cost money to

24    notify the class?

03:45    25    MR. WOLF:  Yes.

03:45   1           THE COURT:  How much?

03:45   2           MR. WOLF:  It'll cost probably about $350,000.

        3   They could say if I'm wrong.

03:45   4           THE COURT:  Okay.

03:45   5           MR. WOLF:  And that has not happened, to my

        6   knowledge.

03:45   7           MR. JUNTIKKA:  That assumes just the people who

        8   put in the claims.

03:45   9           THE COURT:  I can't hear.

03:45  10           MR. WOLF:  There's two different questions here.

       11   I should have been more clear.  If you're just talking about

       12   the claimants, it's $350,000.  If it's the entire class,

       13   then we're talking about 6 million, 5 million, something

       14   like that.

03:45  15           THE COURT:  Is anybody suggesting that we spend

       16   that money to notify the class?

03:45  17           MR. WOLF:  Can I speak to that?

03:45  18           MR. CARPINELLO:  Ask the Judge.

03:45  19           MR. WOLF:  Well, I think that with regard to the

       20   750,000, they need to be notified.  They're expecting money,

       21   and I think they need to be notified.

03:45  22           THE COURT:  Let's just chalk up 350,000.

03:45  23           MR. WOLF:  Yeah, that -- that's pretty clear.

03:45  24           Now, with respect to the rest, I think that, you

       25   know, there would be some arguments for deferring the

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 61 of 128   Page ID #:14543
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

25

1    notice.

2              THE COURT:  What would the arguments be on behalf

3    of the White --

4              MR. WOLF:  Well, I mean, I -- I guess what you

5    could say is, if -- if you're gonna have another settlement,

6    it would depend if it's an identical settlement; then maybe

7    you don't have to notify them.

8              I suppose, if you're going to -- I think one

9    argument would be this:  If you're going to have a class

10   certification hearing, and then you wait, if that happens

11   relatively soon -- uh, a month, two months, three months,

12   whatever it may be -- then you could do it all at once.  You

13   could say, okay, well, a litigation class could be -- so if

14   you went and you had a certification motion and the class

15   was certified, I think it would make sense to notify

16   everybody at once.

17             On the other hand, if the class is de-certified

18   is -- well, is not certified, put it that way -- the law is

19   pretty clear that when a class is de-certified, as it will

20   have been here without any subsequent certification, then

21   the law's absolutely clear that the whole class, all

22   15 million people, would have to be notified.  So I think --

23   you know, you might be able to put it off a bit, but

24   ultimately it's gotta happen.

25             MR. JUNTIKKA:  May I consult with him for a

DEBBIE GALE, U.S. COURT REPORTER

|     |    |                                                                    |
|-----|----|--------------------------------------------------------------------|
|     | 1  | moment?                                                             |
| 03:47 | 2  | THE COURT:  *(Nods head.)*                                        |
| 03:47 | 3  | MR. JUNTIKKA:  Thank you.                                         |
| 03:47 | 4  | MR. WOLF:  Well, my colleague is mentioning one                  |
|     | 5  | other point, and I think it goes to what the website says         |
|     | 6  | about the, um -- the, uh, Ninth Circuit's decision.               |
| 03:47 | 7  | It says simply -- and this might go to who's                     |
|     | 8  | writing it -- it says simply that, uh, the Ninth Circuit has      |
|     | 9  | overturned the settlement.  There's no extra line as to           |
|     | 10 | explaining the reason why the Ninth Circuit overturned the        |
|     | 11 | settlement; nor, the last time I looked at the website, was       |
|     | 12 | there even the Ninth Circuit opinion as one of documents on       |
|     | 13 | the website, though every other major decision was on the         |
|     | 14 | website.                                                           |
| 03:48 | 15 | I think the class has a right to know what                       |
|     | 16 | happened.                                                          |
| 03:48 | 17 | MR. JUNTIKKA:  Why haven't they gotten their                     |
|     | 18 | money.                                                             |
| 03:48 | 19 | THE COURT:  Okay.                                                 |
| 03:48 | 20 | What are your thoughts?                                           |
| 03:48 | 21 | MR. CADDELL:  Yes, Your Honor.                                    |
| 03:48 | 22 | I think what you just heard from Mr. Wolf and                    |
|     | 23 | Mr. Juntikka and Mr. Carpinello illustrate why there is no       |
|     | 24 | notice going out to the class right now because we don't          |
|     | 25 | know what we would tell them.                                     |

03:48   1          The class has waited.  This settlement was reached

2   in 2009.  It was finally approved by the Court, after two

3   and a half years of vetting, in 2011.  It took two years for

4   there to be an appeal.  There was no notice -- there was an

5   interim notice -- a supplemental notice sent out in late

6   2010 to the class, to a portion of the class.

03:49   7          So to suggest that, after five years -- or four

8   years, we should rush out, after the Ninth Circuit opinion,

9   and spend 5 or $6 million -- whether it comes out of class

10   counsel's pocket or it comes out of the insurance funds that

11   are on deposit with the Court -- I think is not, uh, not a

12   good suggestion.  Put it that way.

03:49   13          I think we are in the process right now of sorting

14   through.  We occasionally are contacted by class members.

15   We respond to them.  I don't have any problem with posting

16   on the website -- we've posted on website and asked

17   Garden City to do so.  They sent out a language that they

18   drew up.  We can refer class members to the opinion and put

19   that on the website.  I don't have a problem with that.

03:49   20          But right now, Your Honor, I don't know what we're

21   gonna do, and I don't know what I would tell people.  I

22   don't know I would tell them that there's going to be

23   another settlement, or the settlement -- the Ninth Circuit

24   made it clear that this Court was free to consider that

25   settlement, if the offending provision -- which I take, as

DEBBIE GALE, U.S. COURT REPORTER

1    class counsel, full responsibility for -- was removed.  And

2    so that is certainly a possibility.

03:50    3        The defendants -- and Mr. McLoon talked about the

4    fact that the money is on deposit in the registry of the

5    Court.  And that weighs on us, as well.

03:50    6        But the defendants don't feel comfortable trying

7    to talk with us about a settlement while there is a pending

8    motion to disqualify.  They may find out they talked to the

9    wrong people.

03:50   10        THE COURT:  And, by the way, let me say something.

03:50   11        My indication of praise for you -- really, for all

12   of you, goes to the injunctive relief.  If we get into the

13   motion to disqualify, which we will, then there is a

14   discussion about fault.  And so I want the record clear that

15   that comment doesn't pertain to that motion.

03:51   16        MR. CADDELL:  And, Your Honor, if I might, while

17   we're on this subject -- because the next to the next one

18   down, where you ask about the value to the settlement has

19   been lost -- I think while we're sort of on the issue of

20   notice, if I might respond to that briefly just 'cause

21   that's more objective information.

03:51   22        THE COURT:  Uh-huh.

03:51   23        MR. CADDELL:  The defendants calculate that in the

24   registry of the Court is about $37,330,000.

03:51   25        Now, the Court may recall that we already agreed,

1    as class counsel, to eat the supplemental notice cost and

2    have that deducted out of the attorneys fees.

03:51  3            At the present time, to -- but that would have to

4    be, obviously, for attorneys fees -- if you left attorneys

5    fees where they were, there would have to be some 6 and a

6    half, $7 million of new money.

03:51  7            Now, there's several sources for that, obviously.

8    One source would be from class counsel and a further

9    reduction in attorneys fees, and that's certainly a

10   possibility.

03:52  11           It may be that the defendants, if they feel that

12   notice is necessary -- and as Mr. Wolf pointed out, if the

13   settlement were the same -- it may not be necessary for

14   completely new notice.

03:52  15           So, I mean, that's an issue that has to be dealt

16   with, but I wanted to address that directly.  So that's the

17   number that's on registry of the Court, Your Honor.  And,

18   obviously, that is a little better than it looks, because,

19   as I noted, class counsel had already agreed to eat the

20   supplemental notice and have that come out of attorneys'

21   fees.

03:52  22           THE COURT:  Okay.

03:52  23           MR. CADDELL:  Anything else, Your Honor, on that

24   issue?

03:52  25           MR. WOLF:  May I just?

03:52     1              THE COURT:  Just a moment.  Let me make certain.

03:52     2              Any other comments?

03:52     3              Okay.  Then, Counsel.

03:52     4              MR. WOLF:  May I just clarify a couple -- one

          5    thing.  I actually think we're in agreement that the

          6    15 million shouldn't go out right away, so there -- I wasn't

          7    saying that.  I said that we have to see what's going to

          8    happen before you make a decision on that.  I agree.

03:53     9              I think that with respect to the 750,000 people

         10    waiting, I think that's a different question.

03:53    11              THE COURT:  If I didn't grant class certification,

         12    what notice would go out?

03:53    13              MR. WOLF:  If -- Your Honor, if -- as I was trying

         14    to explain last time I was speaking, there is a case law,

         15    very serious case law in the Ninth Circuit courts --

03:53    16              THE COURT:  I always like "serious" case law,

         17    rather than just case law.

03:53    18          (Laughter in the courtroom.)

03:53    19              MR. WOLF:  Well, I mean, it's --

03:53    20              THE COURT:  On point.

03:53    21              MR. WOLF:  Yeah, on point case law in the Circuit

         22    courts that deal with the situation of what kind of notice

         23    goes out when a class has been de-certified.

03:53    24              Now, normally, a denial of certification, denial

         25    of a litigation class would not trigger the notice

1     obligation.  The problem here is that the class has been

2     informed of that -- that -- of the case.  15 million people

3     have gotten notice.  And because they have been notified, if

4     the Court were to de-certify the class, or not certify a

5     class, it's been de-certified, and the -- the class has a

6     right to learn about that because then the statute of

7     limitations is going to begin to run.

03:54   8             THE COURT:  And who will pay for that?

03:54   9             MR. WOLF:  Well, I think it's very clear who I

10    believe should pay for that:  I think that the people who

11    were responsible have to pay for that.  And that wasn't the

12    White plaintiffs.

03:54   13            THE COURT:  All right.

03:54   14            The third general concern I having is that, over

15    the history of the case, many Supreme Court rulings have

16    come out that pertain to class certification.  And,

17    hypothetically, class actions might have been generally a

18    little stronger seven or eight years ago than perhaps that

19    type of suit is today.

03:55   20            So, besides discovery, I was concerned about

21    additional briefing, and not bringing you back for two or

22    three sessions.  And I just tossed out if *Comcast* or *Leyva*,

23    *Dukes*, *Wang* -- any of these seminal cases that have come

24    down over the course of our dealing together -- require

25    additional briefing before our August date?  And that was

DEBBIE GALE, U.S. COURT REPORTER

|   |   |
|---|---|
| | 1   another reason I had to fly you across the country to have |
| | 2   that kind of discussion with you. |
| 03:55 | 3   So you can't answer that now.  Just think about |
| | 4   that for an hour or so, and we'll come back to it.  But, if |
| | 5   so, I'm going to provide that briefing, obviously.  That's |
| | 6   why I was asking you about dates, because the 19th's not |
| | 7   available to me. |
| 03:55 | 8   But if you can be here on the 14th, can you get it |
| | 9   done in that period of time?  And if so, what's the briefing |
| | 10   schedule in that period of time?  What does that look like? |
| | 11   How busy are you?  Who are your clients out there that you |
| | 12   aren't servicing, if you devote your full time to this |
| | 13   Court? |
| 03:56 | 14   So think about that August 14th date in relation |
| | 15   to additional briefing, because I would probably allow that |
| | 16   under these circumstances.  And I don't know that that |
| | 17   change has necessarily been healthy for class certification |
| | 18   in the last couple of years from the Supreme Court's |
| | 19   perspective. |
| 03:56 | 20   MR. CARPINELLO:  Judge, do you want a comment on |
| | 21   that now, or no? |
| 03:56 | 22   THE COURT:  You can, if you'd like to. |
| 03:56 | 23   MR. CARPINELLO:  Well, I'd like to briefly. |
| 03:56 | 24   THE COURT:  Sure. |
| 03:56 | 25   MR. CARPINELLO:  I actually think, from |

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 69 of 128   Page ID #:14551
SACV 05-1070 DOC 07/26/2013 - Item No. 5

33

1    plaintiff's perspective, that certain class actions have

2    gotten stronger because we've had clarification on this

3    issue.  And I think the *Leyva* case from the Ninth Circuit is

4    probably the best clarification and the most on-point case.

5    And *Leyva* makes it very clear that, in terms of

6    manageability, two points:

03:56    7        Number one, it's not manageability in the

8    abstract, but in relation to the alternative.  And almost

9    always where there's a common question of liability, as

10   there is here, that's almost always preferable to tens of

11   thousands, or in *Leyva*, even 500 individual cases.

03:57    12       And the second point is that the Ninth Circuit

13   made it very clear that the common -- that, if you were to

14   say that there were individual issues with regard to damages

15   or liability as to individual members of the class, whether

16   they fit in after the general liability question is

17   determined, then you'd almost never have a class action,

18   because there are always going to be individual issues.  And

19   in *Leyva*, the court said whether individual employees get

20   extra money because of -- the wage-and-hour claim could be

21   mechanically determined from the defendant's own computer

22   system, which is exactly what we came -- claimed is the case

23   here.  That -- I think *Leyva* is directly on point in that

24   regard.

03:57    25       THE COURT:  Okay.  Any other comments?

DEBBIE GALE, U.S. COURT REPORTER

03:57    1          All right.  I listed some of the other issues that

         2   the Ninth Circuit identified; and that is, the fee cap

         3   arrangement from the Acosta-Pike counsel that raised

         4   concerns about their adequacy to represent the class.  And I

         5   don't need comment on that now, unless you want to.

03:58    6          But, Counsel?

03:58    7          MR. CADDELL:  Uh, Your Honor, I think I could -- I

         8   think it might help the Court if Items 1 -- this one, the

         9   fee cap arrangement, has been eliminated.  That's a

        10   non-issue.

03:58   11          THE COURT:  Explain that to me a little bit

        12   further.

03:58   13          MR. CADDELL:  Well, we've entered into a new

        14   cooperating counsel agreement with -- including Public

        15   Justice and Francis & Mailman, Mr. Sherman's law firm, the

        16   Acosta-Pike counsel, as well as Caddell & Chapman, Lieff,

        17   Cabraser, and the National Consumer Law Center, who, by the

        18   way, asked me to make their apologies, but Mr. Rossman and

        19   Mr. Delbaum were tied up today and couldn't make it on short

        20   notice.  But they apologized and asked me to convey their

        21   apologies.

03:59   22          That fee agreement was developed under the

        23   supervision of Professor Silver at the University of Texas,

        24   who writes on class actions and ethics.  We told him that it

        25   would be critical, because we knew that would be examined

1   very -- and closely scrutinized -- that the new counsel

2   would have to be properly incentivized to both, uh, consider

3   whether a settlement was in the best interest of the class,

4   but also consider whether it would be better to proceed with

5   the litigation and move forward, perhaps despite *Comcast* and

6   *Dukes* and some of these other cases, which, frankly, in our

7   opinion, have made things less friendly for class actions.

8   And so he did that.  We have that agreement with

9   us.  And one of the things that was done in that agreement

10  is there is no cap on the percentage interest and any fees

11  recovered for the Acosta-Pike counsel.

12  If I might, Your Honor, then the next item --

13  similarly, the next item, I think we can dispose of that, as

14  well:  The First Amendment issues.  I think I'm authorized

15  to say on behalf of all of the Hernandez counsel, as well as

16  the defendants, that if it turns out that the parties wish

17  to present a settlement to the Court again, that would be,

18  we believe, in the best interest of the class, if

19  Mr. Juntikka wants to write a letter to his former clients

20  and tell them that he doesn't support the settlement, we

21  don't have any objections to that.

22  I would point out for the record that, for the

23  people that Mr. Juntikka did persuade to opt out of this

24  settlement, not a single one filed a lawsuit.  Mr. Juntikka

25  never pursued a single claim for anyone that he persuaded to

DEBBIE GALE, U.S. COURT REPORTER

1   opt out of the settlement.  So that's not a non-issue.

04:01   2          The other one I would go ahead and address, if I

3   might jump a couple ahead, since we're sort of in this -- in

4   the area of the fee agreement, Your Honor.

04:01   5          MR. CARPINELLO:  Your Honor, I would request that

6   we take it item by item 'cause I do have responses.  And

7   he's on his third item.

04:01   8          THE COURT:  Yeah, item by item.

04:01   9          So, counsel.

04:01   10          MR. CARPINELLO:  I'd like to go back to at least

11   the two that he raised.

04:01   12          MR. CADDELL:  And -- and, Your Honor, I've been

13   passed a note by Mr. Bland, who would like to respond

14   briefly on the issue of class certification briefing, if he

15   might?

04:01   16          THE COURT:  Sure.  But then we'll let the White

17   folks.

04:01   18          So why don't you come up for just a moment.

04:01   19          MR. CADDELL:  Thank you, Your Honor.

04:01   20          MR. BLAND:  So Paul Bland, Public Justice, one of

21   the new proposed counsel on the Hernandez team.

04:01   22          Um, I wanted to say to the Court that, with all --

23   the enormous respect I have for Mr. Caddell, who is a more

24   sophisticated attorney and brilliant than I will ever will

25   be.

04:02    1              THE REPORTER:  That's not reportable, Your Honor.

04:02    2              THE COURT:  Just a little slower.

04:02    3              MR. BLAND:  From my perspective as an appellate

         4    lawyer, the Supreme Court cases -- the *Comcast* case, I

         5    think, does not hurt this case at all.  *Comcast* case is a

         6    case about --

04:02    7              THE COURT:  No.  I'm not asking for that.  I just

         8    raised the opportunity --

04:02    9              MR. BLAND:  I wanted to clarify --

04:02   10              THE COURT:  -- so I'm not going to go through each

        11    case now.

04:02   12              MR. BLAND:  Okay.  I just -- we would be very

        13    happy to brief the class certification issues and the

        14    changes in the law --

04:02   15              THE COURT:  Just a moment.  I think you've got the

        16    wrong message, and I apologize.  I'm not encouraging that.

        17    I'm giving the opportunity.

04:02   18              It's an invitation so that I just don't close the

        19    doors.  So you'll make your wishes known, but I'm not going

        20    to hear about *Comcast* today.  I'm just raising *Leyva*, some

        21    other cases that are seminal.  They don't have to be

        22    addressed today.  And if you want to, I'll extent the same

        23    invitation, but then we need to figure out a briefing

        24    schedule, and then I need to know that that August 14th date

        25    is solid.  Okay?

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 74 of 128   Page ID #:14556
SACV 05-1070 DOC 7/26/2013 - Item No. 5

38

04:03    1            MR. BLAND:  Okay.

04:03    2            THE COURT:  That's why I'm raising this, not for

         3    argument on these cases.

04:03    4            MR. BLAND:  All right.  I just wanted to express

         5    that, as we're coming in and taking a new look at things,

         6    there -- there are some of us who think there's a

         7    substantial chance, if the case goes forward, that the

         8    settlement could be improved, because some of us think that

         9    the atmosphere, the legal -- uh, in this particular type of

        10    case has actually improved.  And in this respect, I think

        11    that Mr. Carpinello makes some very strong points.

04:03   12            THE COURT:  Okay.  Great.

04:03   13            Counsel on behalf of White.

04:03   14            MR. CARPINELLO:  I'm glad to see we finally have

        15    an ally on the other side of the courtroom.

04:03   16            With regard to the Acosta-Pike issue, I think that

        17    is a non-issue now; although, I -- because we raised the

        18    Acosta-Pike group to say that they -- if the Caddell Lieff,

        19    Cabraser group was out, that Acosta-Pike, on their own --

        20    for their own problems, their own reasons -- could not go

        21    forward.

04:04   22            THE COURT:  Yeah.

04:04   23            MR. CARPINELLO:  So I think it's a non-issue.

04:04   24            But I do want to emphasize that we did get an

        25    affidavit from Professor Silver saying, "We drafted this

| | | |
|---|---|---|
| | 1 | great agreement," and we heard Mr. Caddell reference it, but |
| | 2 | it hasn't been produced.  And I think it has to be produced |
| | 3 | to the Court, certainly before the hearing on the 14th, to |
| | 4 | see -- so that Your Honor and we can evaluate, and our |
| | 5 | experts can evaluate, whether, in fact, it properly |
| | 6 | incentivizes these new people. |
| 04:04 | 7 | With regard to Mr. Juntikka, I don't know what the |
| | 8 | offer was; but if the offer was, "We'll allow him to send a |
| | 9 | letter once we approve it," we respectfully decline.  If the |
| | 10 | offer was we're not going to -- "We have no opposition, him |
| | 11 | sending what he wishes to send and that he deems |
| | 12 | appropriate," we appreciate it. |
| 04:04 | 13 | THE COURT:  Why don't you ask him what their offer |
| | 14 | is? |
| 04:04 | 15 | MR. CADDELL:  You're welcome. |
| 04:04 | 16 | MR. CARPINELLO:  Thank you. |
| 04:04 | 17 | THE COURT:  So apparently he can send the letter. |
| 04:04 | 18 | MR. CARPINELLO:  Great. |
| 04:04 | 19 | And Mr. Caddell made a point:  Not a single |
| | 20 | lawsuit has been brought.  That signifies nothing because |
| | 21 | there would be no reason to bring a separate lawsuit while |
| | 22 | this case was on appeal in the Ninth Circuit, given a |
| | 23 | settlement that we respectfully thought was going to get |
| | 24 | reversed.  Why would we bring a separate lawsuit? |
| 04:05 | 25 | But we do -- we do -- Mr. Juntikka, as you know, |

DEBBIE GALE, U.S. COURT REPORTER

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 76 of 128   Page ID #:14558
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

40

 1   has thousands of clients, which are real clients, which he's

 2   represented for years, that are prepared to bring separate

 3   lawsuits should a class not go forward for whatever -- or

 4   for whatever other reason that they're -- they're

 5   independently ready to bring separate lawsuits.

04:05   6        THE COURT:  I want to go back in this third

 7   section and expand a little bit, because you've covered some

 8   of the questions I have.  But I think that there might be

 9   confusion about something I said, that the Court was tossing

10   out as a third option.

04:06  11        Hernandez -- your idea, Counsel, on behalf of the

12   Hernandez class, is to associate independent counsel.  It's

13   certainly not a proposal to step aside, and that completely

14   non-prior involved independent counsel would take over.

04:06  15        Now your position is that you've contacted what

16   you've called "interim counsel" and the proposal's to add

17   these counsel, it appears, to the existing Hernandez team.

04:07  18        Before I go to the third group of questions, I

19   want to come back to that for a moment.  I can't imagine the

20   White class ever feeling comfortable with that.  It's like a

21   Court:  It's not sometimes what we do, it's the perception

22   of what we do.  We have to guard our ethics jealously in

23   that regard.

04:07  24        And I don't know if there's -- I'm not asking, but

25   I don't know if there's a fee structure.  I don't know if

DEBBIE GALE, U.S. COURT REPORTER

 1    there's a percentage.  I don't know that there's anything

 2    improper about that.  I just don't know what's happening

 3    because I'm not part of the original settlement.  I'm not

 4    part of the way that the division would take place in terms

 5    of attorneys fees, et cetera.

04:07
 6           Why would this Court, if it was thinking about

 7    what I'm going to call "independent interim counsel," ever

 8    allow either of the parties, you know, to make that

 9    suggestion?  And I'll tell you my uncomfortableness with

10    that thought.  I'm uncomfortable reaching out personally to,

11    you know, a particular law firm or group of law firms across

12    the country.  We rely on counsel.  And that's a very

13    uncomfortable place.

04:08
14           But, by the same token, no matter how virtuous

15    these firms are, by you bringing them in, you know, to this

16    case, they're going to be suspect by the White class.  And

17    I'm going to hear strenuous argument, no matter how pristine

18    you believe that they are, and they are, that they shouldn't

19    be involved; that the Court shouldn't allow, you know, the

20    choosing by the very party on the other side of this

21    adversarial argument.

04:08
22           So maybe we could just have a little discussion

23    about that, because I don't want there to be a misstatement

24    or misgiving on my part, if I'm inarticulate about -- the

25    Court was tossing out that third option and that's the real

1    possibility of some methodology on the Court's part, in

2    terms of reaching out to a third, independent

3    non-preselected group.  And the shame of that is that, if I

4    don't grant class cert, that group's working for free,

5    basically.

6              Number two, I lose, in a sense, the passion,

7    wisdom and longevity of Mr. Juntikka and your group.  And I

8    lose the -- you know, the wisdom of the settlements that

9    went on from your perspective from Lieff, Cabraser, so --

10   and for the banks.  They end up being, you know, a potential

11   big loser, either with just straight litigation, which they

12   could prevail on if the class was certified on the opposite

13   side, or getting forced into, you know, an increased

14   settlement amount, which is not where they bargained to be.

15             So you don't have to comment.  Those are some of

16   the thoughts running through my mind as late as this

17   weekend.

18             Let me just start with Lieff, Cabraser, and then

19   back to White.

20             MR. CADDELL:  Yes, Your Honor.

21             THE COURT:  Just that area, though.  We'll get

22   back to class reps in a moment.

23             MR. CADDELL:  Your Honor, actually, we anticipated

24   the Court's concern.  While it was not our intent to create

25   this problem, we certainly accept responsibility for having

1    language in the settlement agreement that the Ninth Circuit

2    found created a conflict.  And while, again, it was not our

3    intent -- and we clearly had our class representatives

4    already approving the settlement months before that language

5    came into being -- we recognize that the Court and the Ninth

6    Circuit's duty is to be very vigilant with respect to class

7    actions, and to act as a fiduciary.  We act as a fiduciary,

8    and the Court has to supervise that fiduciary responsibility

9    or fiduciary relationship.

04:11    10    So, having said that, once we saw the Ninth

11    Circuit's opinion and -- and recognized that we had

12    unknowingly placed language into the agreement that created

13    this conflict, we immediately recognized that the best thing

14    we could do for the class, and to act in the best interest

15    of the class, was to associate new counsel.

04:11    16    And we're guided by, um, this -- the Ninth

17    Circuit.  The *Linney v. Cellular Alaska Partnership* case,

18    151 F.3d one -- uh, 1234, where the Court said,

04:11    19    "There is no *per se* rule that the

20    continued participation by previous

21    class counsel, whose conflict of

22    interest led the district court

23    previously to deny class

24    certification" -- and that's effectively

25    what happened here -- "constitutes

1          inadequate representation under

2          Rule 23(a)."

04:12    3          As was the case here, the addition of new and

4    impartial counsel can cure a conflict of interest, even

5    where previous counsel continues to be involved in the case.

04:12    6          THE COURT:  Let me stop you right there.

04:12    7          MR. CADDELL:  Yes, Your Honor.

04:12    8          THE COURT:  I understand that.

04:12    9          The new counsel, though, when selected by one of

10    the parties, is the issue.  It's not -- in fact, they may be

11    independent.  In fact, they may be extraordinarily

12    competent.

04:12   13          But having one of the parties pick those and then

14    having the Court acquiesce to that is the difficulty.  So,

15    in good faith, you may have picked those persons resolving

16    the problem.  It's still my responsibility to make certain

17    that there's not a perception of a conflict.

04:12   18          MR. CADDELL:  And, I think, Your Honor, that the

19    perception has to be in the context of the qualifications,

20    the credentials, the experience of the new counsel.

04:12   21          You saw a demonstration a moment ago that Public

22    Justice is not going to simply rubber stamp whatever we say.

23    Mr. Bland came over here and gave you his take on the recent

24    class certification decisions and how they would impact this

25    case.

04:13   1          You will see -- um, I was -- I brought with me

2    copies of the new cooperating attorney agreement.  And plan

3    to, if -- I was gonna jump ahead, and Mr. Carpinello didn't

4    want me to do that, which is fine -- but when we get to

5    that, I will give the Court one, as well as opposing

6    counsel.  Um, there -- there's an express statement in that

7    agreement that they express no opinion and take no position

8    on the prior settlement.

04:13   9          THE COURT:  I see.

04:13  10          MR. CADDELL:  That they're going to do what is in

11    the best interest of the class.

04:13  12          The fact that, Your Honor, we reached out to these

13    people says more about the level at which we practice, and

14    the people who we deal with on a regular basis, than it does

15    about who our relationships are.  The reality is, the Fair

16    Credit Reporting Act community is a small community.  And

17    there are very few people that work at the very top level.

04:14  18          THE COURT:  Have I met all of them, so far?

04:14  19          MR. CADDELL:  Yes, you have.  Yes, you have.

04:14  20          With Mr. Francis here today, you have now met them

21    all.  Mr. Bennett, myself, Mr. Frances -- I mean, that's --

22    that's the small club at the very top.  In the public

23    interest world, NCLA, Public Justice, they're as good as it

24    gets.

04:14  25          And Public Justice -- in fact, Mr. Bryant can tell

DEBBIE GALE, U.S. COURT REPORTER

```
 1    you in no uncertain terms, and I would -- happy to defer to

 2    him, if you would rather hear it directly from him -- but

 3    Public Justice has opposed settlements, class action

 4    settlements that have been proposed by members of their own

 5    Board of Directors.  And they have had members of their

 6    Board of Directors resign because of that.  So these are not

 7    people who will simply rubber stamp.

 8              And I think that the Court -- so I recognize the

 9    Court -- and let me contrast this to another situation.  The

10    recent situation in the Northern District with Judge Alsup

11    in the Wells Fargo case, where he sent out a solicitation to

12    everyone in the Northern District about a series of cases.

13    And that issue that -- it's the forced flood insurance case

14    that, uh -- Wells Fargo.

15              What happened in that was very different.  I mean,

16    one, the case was very short.  That case was only filed in

17    July of last year.  The motion to dismiss was not decided

18    finally until late April.  The class certificate motion was

19    filed in early May.  What the Court found was that, in fact,

20    there were active misrepresentations made to the Court --

21              THE COURT:  Right.

22              MR. CADDELL:  -- by the parties -- the individuals

23    seeking to be named class counsel.  But, unlike this case,

24    the Court was able to readily identify counsel that had

25    similar cases.
```

04:15   1                So there was a cadre of experienced, knowledgeable

        2   counsel in that area, and it was at an early stage in the

        3   case.  So he was able to do that.  And, as recently, I

        4   think, as yesterday, or day before yesterday, he issued an

        5   order identifying four counsel that he would -- that he

        6   wanted to then contact the plaintiff in the case before him

        7   and have that plaintiff make a recommendation to the Court

        8   as to which counsel would be appropriate.

04:16   9                That's not this case.

04:16   10                I understand why it worked in that case and why it

        11   was appropriate.  We received that notice.  Actually, we

        12   didn't respond because we don't know anything about those

        13   cases.  That's not an area in which we have any expertise.

04:16   14                But this case is the area of Fair Credit Reporting

        15   Act complex litigation.  It's a very short list.  And we

        16   brought the right people.  I recognize that we may have made

        17   it more difficult for the Court by our reaching out; but,

        18   frankly, Your Honor, given the circumstances, um, I think,

        19   if you look at the credentials and you hear directly -- and,

        20   in fact, I would be happy to defer to Mr. Bryant so he can,

        21   uh -- or he can do that on the 14th.

04:17   22                THE COURT:  Yeah, on the 14th.  It's not -- this

        23   isn't a dispositive day.  I'm just alerting you to how much

        24   we're going to cover on the 14th.

04:17   25                Counsel.

DEBBIE GALE, U.S. COURT REPORTER

04:17    1          MR. McLOON:  Your Honor, Daniel McLoon for

         2    Experian.

04:17    3          The Court has been complimentary of all the

         4    counsel for the work that was done on the injunctive relief

         5    settlement.  It was successful because lawyers who are truly

         6    expert in the field got together and -- and got into the

         7    details of what's available, what can be done, what can't be

         8    done.

04:17    9          I have a real concern, to the extent that the

        10    Court is considering bringing in somebody labeled "truly

        11    independent," who hasn't had any contact with any of the

        12    parties before now, that, if you were to bring in lawyers

        13    who don't have the kind of technical expertise that was

        14    applied to the injunctive relief settlement, you're not

        15    gonna have someone in a position anytime within the

        16    foreseeable future able to make a knowledgeable assessment

        17    of these manageability issues.

04:18   18          I mean, I in no way intend to criticize

        19    Mr. Carpinello, who was successful in the Ninth Circuit,

        20    so -- nothing better than winning.  But, you know, he's not

        21    an FCRA lawyer.  And when he stands before the Court and

        22    says that he believes you can tell by looking at the

        23    defendants' records who has inaccurate credit reports, he's

        24    just mistaken.  And that someone who has a sophisticated

        25    knowledge of what's in the records and what's not is gonna

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 85 of 128   Page ID #:14567
SACV 05-1070 DOC   7/26/2013 - Item No. 5

49

1    be much better equipped to assess those manageability issues

2    and understand the risks that the class faces, if they were

3    to press forward with a litigated class certification

4    motion.

04:18   5         And so, you know, I think, again, we've done such

6    great work in the past with this group of lawyers, the Court

7    is not gonna jettison either side.  I mean, to the extent

8    the Court is put in the position of selecting one side or

9    the other to take the lead.  The other side isn't gonna be

10   jettisoned from the case.

04:19   11        And to the extent that the parties are either able

12   to either reaffirm the prior settlement or negotiate a new

13   settlement, and there's disagreement amongst this group, one

14   side or the other, the Court's gonna hear that and have the

15   benefit of it, but you're gonna have the benefit of lawyers

16   who have true expertise in the field and who will be arguing

17   with knowledge of what the detailed facts are just the way

18   we brought that same expertise on the injunctive relief.

04:19   19        So -- I mean, I know the Court isn't gonna decide

20   today how it wishes to proceed.  But I'd have a real concern

21   if you were to bring in someone who didn't have the kind of

22   knowledge of the defendants' credit reporting records the

23   way this group collectively already does.

04:19   24        MR. CARPINELLO:  Your Honor?

04:19   25        THE COURT:  Mr. Carpinello, thank you.

04:19     1          MR. CARPINELLO:  Let me start by saying I'm truly

          2     astounded that this is the second issue today on which we

          3     have agreement, and I also think that it would be a mistake

          4     to bring in independent counsel at this stage of the case.

04:20     5          Obviously, we disagree as to who should be lead

          6     counsel going forward.  But we concur that -- with the

          7     defendants and the other plaintiffs that it would be a

          8     mistake.

04:20     9          Your Honor, one of the problems with class actions

         10     is the perceived lack of coincidence of a relationship

         11     between the class counsel and the class.  And for that

         12     reason, you see many opinions about whether the class

         13     representative is the brother-in-law of the attorney, or

         14     the -- or some -- the person in the stock room of the law

         15     firm.

04:20    16          You don't have to worry about that in this case

         17     because Mr. Juntikka has several thousand clients who have

         18     suffered this problem, and he recognized it as a bankruptcy

         19     attorney.  And this case is as much about, if not more

         20     about, bankruptcy law and how these companies dealt with

         21     that bankruptcy issue, than about the FCRA.  And

         22     Mr. Juntikka was the moving force behind the largest and, we

         23     believe, the most vociferous portion of the class.  He has

         24     literally thousands of people who suffered this problem.

04:21    25          So this was not a made-up class action, where a

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 87 of 128   Page ID #:14569
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

51

1    lawyer saw an opportunity to bring a class action, went

2    looking for a client.

04:21    3         THE COURT:  Right.

04:21    4         MR. CARPINELLO:  He had thousands of them.

04:21    5         I don't see any reason why the White plaintiffs

6    and their counsel should be jettisoned in favor of

7    independent counsel.  Respectfully, we don't think we did

8    anything wrong.  We argued four years ago, Your Honor, in

9    our first motion for reconsideration on the preliminary

10   approval that we thought that the incentive award provision

11   was improper, and we've consistently argued that,

12   Your Honor.  And we argued it in the Ninth Circuit, and we

13   were successful.

04:21    14        We believe that the White plaintiffs and their

15   counsel have consistently acted in the best interest of the

16   class.  And with regard to the argument that we don't have

17   FCRA experience, Mr. Wolf and Mr. Juntikka have been

18   litigating this case for eight years.  We know about the

19   issue in the FCRA.  And we have -- we've retained and put in

20   affidavits of four or five different experts, who are

21   leaders in their field, on the credit reporting industry.

04:21    22        And it's not the FCRA that Mr. McLoon is

23   complaining about.  It's the credit reporting industry.  And

24   Mr. Wolf and Mr. Juntikka, and our experts that we've been

25   consulting for several years, know as much about this as the

1    defendants do, and perhaps, respectfully, maybe a little bit

2    more.

04:22    3    Now, with regard to -- what regard to the counsel

4    that they brought in, you're absolutely right, Your Honor.

5    This is not at the *Linney* situation at all.  In fact, in

6    *Linney*, the attorneys who took over -- ironically, Lieff,

7    Cabraser -- were objectors' counsel, as we are.  They were

8    objectors' counsel.  And they came in -- as soon as the

9    court said class counsel is not qualified to take this case

10   forward, objectors' counsel took the case forward.  And the

11   District Court and the Ninth Circuit said the mere fact that

12   Lieff, Cabraser consulted with the other counsel does not

13   invalidate the settlement.

04:22    14   That's nothing like what they are trying to do

15   here.  They have been found, respectfully, to have committed

16   a "serious, egregious, ethical violation," said the Ninth

17   Circuit.  And they're simply trying to bring people who

18   allegedly are independent, brought on to sanitize them of

19   the ethical violation.  It doesn't work.  There's not a case

20   that says it.

04:23    21   Now, with all due respect to the new independent

22   counsel, they are not independent.  Lieff, Cabraser partners

23   are on the board of Public Justice.  Lieff Cabraser, and

24   Caddell, have given substantial money to Public Justice.

25   Lieff, Cabraser, and Caddell, and Toups and Bennett have all

  1   co-counseled with Public Justice and Francis & Mailman on
  2   half a dozen cases.
04:23  3           And, most importantly, Lieff, Cabraser, through
  4   its efforts as class counsel has funneled over a million
  5   dollars in *cypres* money to Public Justice.  Lieff,
  6   Cabraser's -- one of their partners is about to get an award
  7   given at the next dinner for Public Justice.  As I say, he
  8   sets on the executive committee, which determines the salary
  9   of the gentlemen who sit here.
04:23 10           I'm not -- I'm saying, given those objective
 11   facts, I think it's very unlikely that the Ninth Circuit
 12   would say these people are so independent that they've
 13   cleansed this team of the ethical violations that the Ninth
 14   Circuit found.
04:24 15           Thank you.
04:24 16           MR. WOLF:  One correction.
04:24 17           I believe it was -- it's $1.1 million.  And it was
 18   from both -- I think there was $800,000 of the *cypres* money
 19   was Caddell Chapman --
04:24 20           Is that right?
04:24 21           MR. JUNTIKKA:  Caddell Chapman and Bennett.
04:24 22           MR. WOLF:  -- and the other 300,000 was from
 23   Lieff, Cabraser, if I'm not mistaken.
04:24 24           THE COURT:  Okay.
04:24 25           A very naive question on my part:  Before the

DEBBIE GALE, U.S. COURT REPORTER

Case 8:05-cv-01070-DOC-MLG  Document 911  Filed 08/09/13  Page 90 of 128  Page ID #:14572
SACV 05-1070 DOC 7/26/2013 - Item No. 5

54

1    class certification motion is heard, since it's been

2    briefed, and even if I allow re-briefing, as I've indicated

3    I probably would -- um, not too certain about limited

4    discovery at this point because I'd want to know why, who,

5    how that changes the landscape, when there seems to be

6    plenty of time before.  So I want to have specifics.  Not

7    closed to that.  But I'd want to know why.

8            Why would I choose, at this point, any one of the

9    three options:  The White, the Hernandez -- why wouldn't I

10   let all of you argue?  And if it's not going forward, if I

11   don't grant class certification, you've had a full and fair

12   hearing.

13           I've had the best representation from Lieff,

14   Cabraser.  I've had the best representation to the White --

15   there's -- I've had the best representation from the banks.

16           And if class cert isn't granted, there can't be a

17   complaint that one party was disadvantaged at that argument.

18           MR. CARPINELLO:  May I respond?

19           THE COURT:  So -- yeah.

20           And then, why wouldn't I be deciding, if it was

21   going forward, which of the class counsel?  So it's a very

22   naive question on my part.

23           MR. CARPINELLO:  Well, two answers.  Two answers,

24   Judge.

25           I think, first of all, we are gonna give you

```
 1    specifics on the discovery.  And I think we should be
 2    allowed to take that discovery.  We have clients in the
 3    case.  We have a pending motion that this team should be
 4    disqualified.  And I think that allowing that team to go
 5    forward, um, on any of the substantive merits in the face of
 6    the pending motion to disqualify would be improper,
 7    respectfully.
 8              THE COURT:  Okay.  So you would be opposed to
 9    that.  You would like the Court to decide which counsel
10    should be representing this class prior to this class
11    certification?
12              MR. CARPINELLO:  I --
13              THE COURT:  Well, you might talk about that for
14    just a moment.
15              MR. CARPINELLO:  I'm going to talk about that.
16              THE COURT:  Why don't you talk about that for just
17    a moment.  I'm not encouraging or discouraging.
18              And remember, I'm raising these questions today.
19    You don't have to respond to them.  Okay?  Just give me some
20    thoughts.  And that's -- let me say again:  This is the part
21    I get concerned about because, by tossing that out, one or
22    more of the parties are thinking, "Oh, that's what the Judge
23    is gonna do."  No, I'm not.
24              Or, "The Judge is going to grant summary
25    judgment" -- or, I'm sorry -- "class cert or he's not going
```

1    to."  No, I'm not.

04:27    2         I'm tossing out to you a thought I had, and that

3    is:  Wait a minute.  I've got counsel who are prepared on

4    both sides.  Maybe the class is possibly best served from

5    hearing from White and Hernandez before the class cert, and

6    then choosing after class cert.  Maybe it's not.  Maybe

7    there's a pending motion, and the appropriate way is kind of

8    the road map that the Ninth Circuit's given me.  And I don't

9    disagree that possibly I should make that and probably

10    should make that determination first.

04:27    11         I'm tossing out what you want to do as a practical

12    matter.

04:27    13         MR. CARPINELLO:  We want to take limited discovery

14    and then argue.

04:27    15         THE COURT:  I'll put that off to the side.  I've

16    heard you.

04:27    17         MR. CARPINELLO:  Okay.

04:27    18         THE COURT:  That's not my question.

04:27    19         And that is, do you want the Court to resolve the

20    qualification or disqualification issue prior to?  And I

21    would suggest this:  Don't answer that today.

04:27    22         MR. CARPINELLO:  Okay.

04:27    23         THE COURT:  Tell me on the 14th.

04:27    24         MR. CARPINELLO:  I have an answer, but I'll wait.

04:27    25         THE COURT:  Yeah.  Tell me on the 14th.  I'll be

1  prepared on the 14th to either qualify or disqualify one of

2  you, trust me.  But I'm just tossing out ideas right now --

3  not because of you, because of the class.

04:28   4      My whole focus is on what best protects the class.

5  If I hear even redundant arguments from Lieff, Cabraser and

6  from the White -- I don't know if I'm disadvantaged or

7  advantaged by that.  I don't know.  I'm naively asking that

8  question.

04:28   9      Okay.  Counsel?

04:28  10      MR. McLOON:  Your Honor, very briefly.

04:28  11      The defendants are concerned that -- we've read

12  the papers that the White plaintiffs have put in both the

13  Ninth Circuit and in this Court.  And they think that some

14  different class certification motion should be made than the

15  one that's already pending.

04:28  16      And from the defendants' point of view, it seems

17  pretty unfair to go forward with their motion, and then

18  maybe at some future date, they become class counsel, and we

19  get a new class certification motion.  So we can see some

20  value getting resolution as to who's directing the class

21  before we address class certification.

04:29  22      THE COURT:  Okay.

04:29  23      If the Court was concerned about the present class

24  representative being appropriate, you know, going forward,

25  how would new class representatives be chosen?

DEBBIE GALE, U.S. COURT REPORTER

04:29  1          MR. CADDELL:  Your Honor, if I might?

04:29  2          THE COURT:  Please.

04:29  3          MR. CADDELL:  As the Court can imagine, we have

4    been contacted through the years with a number, from a

5    number, or by a number of class members about the progress,

6    about what's going on, about some of their own problems and

7    things of that nature.  Again, recognizing that we wanted to

8    bring in new and objective viewpoints on whatever happens --

9    whether it's -- propose a settlement, the same settlement,

10   new settlement, a different settlement, or go forward with

11   litigation.  We have provided those to Francis & Mailman,

12   and they have made those contacts, and have talked with

13   people who have contacted them and contacted us about

14   serving as class representatives.

04:30 15          And there has been at least one who has agreed to

16   do so.  I have not had any contact with him, nor has anyone

17   else on our team, except for Francis & Mailman.  And that

18   sort of is similar to, or analogous to, your point, which is

19   I didn't go out -- you know, the tainted counsel -- or

20   supposedly tainted counsel did not go out and talk to new

21   class reps.  We've now done that through Francis & Mailman.

04:30 22          THE COURT:  Okay.  Thank you.

04:30 23          And the question's very simple:  How would the new

24   class reps be chosen?

04:30 25          MR. CARPINELLO:  I don't think it's appropriate to

DEBBIE GALE, U.S. COURT REPORTER

1  go out and look for new class reps, when we have an active

2  and engaged and informed group of class representatives who

3  have stayed with this case for eight years.

04:31

4           THE COURT:  Just a moment.  Let me test that for a

5  moment.  They were signing off with an incentive award?

04:31

6           MR. CARPINELLO:  Not our people.  Their people.

04:31

7           THE COURT:  Oh, I see.  I'm sorry.

04:31

8           MR. CARPINELLO:  Our people were -- and I will

9  remind the Court that they rejected the incentive award,

10 even when it was dangled in front of them, as the Ninth

11 Circuit said.  Counsel specifically told them they would

12 lose it, if they did not agree to it and they said, "We

13 don't care."  I think that that alone entitles them to

14 continue with this case.

04:31

15          They gave up -- these people, who were in

16 bankruptcy, gave up an offer of $5,000 because, in

17 principle, they did not like this settlement.

04:31

18          And why would -- why would the Court go out and

19 look for a new representative when these people have sat

20 with this case and met with Mr. Juntikka and spent

21 tremendous amount of time, especially when this

22 settlement -- whole thing came up with should they take it,

23 should they not take it, should they listen to these people.

24 They read all the letters.  They met with these counsel.

25 *(Indicating.)  They met with these counsel.  (Indicating.)*

04:32   1         They spent an inordinate amount of time, and they
        2   gave up $5,000 that was offered to them.
04:32   3         Why should they be disenfranchised?  I see no
        4   reason why they should be disenfranchised.  They've done
        5   nothing wrong.  And they have followed this case diligently
        6   for eight years.  And the mere fact that we have had
        7   disagreements is not a basis to, I think, go out, get new
        8   representatives, or get new counsel.
04:32   9         The fact that they -- with all due respect, Judge,
       10   they committed an ethical violation.  The Ninth Circuit
       11   agrees with us that they did.  We fought for four years over
       12   that ethical violation.  What did we do wrong in doing that?
04:32  13         We have said, from day one, $45 million is less
       14   than a penny on the dollar.  It is inadequate.  What is
       15   wrong with articulating that?
04:32  16         We have a very different view of the merits of
       17   this case.  Apparently, some of Mr. Caddell's new counsel
       18   agree with us on some of those issues.  But what have we
       19   done wrong as counsel or as representatives that would
       20   justify going out and getting new people?
04:33  21         I agree with Mr. Caddell, the *Wells Fargo* case is
       22   night and day from this case, where the people before the
       23   court committed all kind of misconduct.  It's at the
       24   beginning of the case.
04:33  25         We have been litigating this case for eight years.

1    We could argue for a long time about who wrote what brief.

2    But there's no question that Mr. Juntikka and Mr. Wolf were

3    one of the leaders of this case.  Many of the theories were

4    developed by Mr. Wolf.  Mr. Wolf was the one who said

5    California Law provides an injunctive relief.

04:33  6         He had a fight with co-counsel about whether it

7    was even worth arguing the injunctive issue.  And that

8    resulted, because of his efforts, in what you have praised,

9    rightfully, as a great result:  An injunctive settlement.

04:33  10        What has he done wrong that would justify

11   disenfranchising him or Mr. Juntikka's clients at this point

12   in time?  I don't -- I see none.

04:33  13        THE COURT:  Okay.

04:33  14        MR. WOLF:  Your Honor, can I mention one point to

15   follow through with this?

04:33  16        THE COURT:  Well, certainly.

04:33  17        MR. WOLF:  Thank you.

04:33  18        It wasn't just that we met, pointed out the

19   problem with the $5,000 incentive award.  We bent over

20   backwards to save the class from all of this time and, with

21   respect, we put the argument before your Honor.

04:34  22        But when Your Honor denied it, we did something

23   unusual because we didn't want $7 million to be spent

24   needlessly.  So we actually took up a mandamus petition and

25   a Rule 23 -- H, is it? -- motion, trying to get interim

Case 8:05-cv-01070-DOC-MLG Document 911 Filed 08/09/13 Page 98 of 128 Page ID #:14580
SACV 05-1070 DOC 7/26/2013 - Item No. 5

62

04:34

1    relief to stop this from -- to stop what we perceived to be

2    an eight years' waste of time, and a lot of waste in terms

3    of the money on notice. So we've really bent over backwards

4    to try and -- and resolve this issue.

5         And, you know, with respect, I do not dispute for

6    a moment that the Lieff-Caddell team has a lot of expertise

7    in -- with respect to the FCRA and with respect to class

8    actions. Their judgment is in question, but their

9    experience is not. And I also do not take issue at all that

10   they had an important role, these lawyers, with respect to

11   the injunctive relief settlement.

04:34

12        But I do take issue with the notion that my role

13   in this case was minor and that we don't understand those

14   issues. I have been working on those issues for eight

15   years, as has Mr. Juntikka. I know that they will argue

16   that it's not true; but the fact of the matter is you know,

17   Your Honor, because I sat here and argued against the

18   Acosta-Pike settlement for two days -- I argued the, uh,

19   summary judgment motion. You know that because I -- because

20   it happened in front of you. And the reason why I argued

21   those things is because I was doing the research and I was

22   writing the briefs.

04:35

23        And the bottom line is, despite the fact that I am

24   not an FCRA lawyer, but I learned the stuff. I worked hard,

25   and I put the arguments before your -- you, Your Honor. And

         1    they put their trust in me.  So I don't understand why it is
         2    that, at this late date, you know, to -- that this team is
         3    not qualified to represent the class?
04:35    4           We've been doing it all along, even whether we
         5    were with them.  And again, they -- yes, they did
         6    contribute.  I'm not saying they didn't.  But we don't need
         7    them at this point, and they're disqualified, and we can go
         8    forward.  We have the expertise.  We have the knowledge.
         9    We've made the investment.
04:36   10           THE COURT:  That's not what the Circuit said.
        11    They didn't say that they were disqualified.
04:36   12           MR. WOLF:  Oh, no.  Absolutely, Your Honor.
04:36   13           THE COURT:  Quite the opposite.
04:36   14           MR. WOLF:  They did not say that.
04:36   15           MR. JUNTIKKA:  That's right.
04:36   16           MR. WOLF:  They did not say that, but they did
        17    not -- I have to take issue with the notion that they said
        18    the opposite.  And we will brief that issue, and we will
        19    explain to you why the effect of the Ninth Circuit decision
        20    is that they have to be disqualified.
04:36   21           Ultimately, you may agree or disagree, but we have
        22    an argument.
04:36   23           THE COURT:  Well, the concurring opinion by
        24    Judge Hayden, who sits in the District Court, was that they
        25    should be disqualified --

04:36  1          MR. WOLF:  Correct.

04:36  2          THE COURT:  -- the majority opinion was not.

04:36  3          All right.  Well, listen, I think that that will

       4   give a little bit of a flavor of how we're going to spend

       5   the day on the 14th.

04:36  6          And my question now is back to you.  If you have

       7   any further comments that you want to make on any of the

       8   things I've raised today, that's fine.  But it's not an

       9   argument day.  It's just raising some issues.

04:37  10         And the second thing is, what does our briefing

       11  schedule look like?  Can we really make the 14th?  I'll set

       12  that day aside, but you may get a memo from me saying,

       13  "Oops, Counsel.  7:30 or 8:00 o'clock.  I'm sorry.  It's

       14  4:00 o'clock in the afternoon."  It just depends on that

       15  Eastern District *Abarca* case.

04:37  16         MR. CARPINELLO:  I think we should consult, but

       17  you've raised today many more issues than we planned to put

       18  in our reply brief.

04:37  19         We can brief them, and we can certainly brief them

       20  by the 14th.  But if there's going to be a back and forth on

       21  these issues, I think the 14th is probably a little tight.

04:37  22         THE COURT:  You know, for me, I'm almost gonna

       23  push all of you into it.  I'm going to push you into a 24-7.

       24  I've got to have you that week some time.

04:37  25         MR. CARPINELLO:  Okay.

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 04:37 | 1 | THE COURT:  That's going to be my best week.  I |
| | 2 | can give you a parade of horribles that gets even worse. |
| 04:37 | 3 | I also think that it might be to everybody's |
| | 4 | benefit to look a little bit more closely, and I have |
| | 5 | allowed re-briefing, on these issues concerning the |
| | 6 | *Rodriguez* cases. |
| 04:38 | 7 | At the start was litigation in the *Rodriguez*, |
| | 8 | several class reps had signed retainers that required class |
| | 9 | counsel to request incentive awards that increased on a |
| | 10 | sliding scale as class monetary recovery increased.  And the |
| | 11 | awards maxed out, I think, at $75,000, if recovery was of |
| | 12 | $10 million or more.  And the settlement was for 49? |
| 04:39 | 13 | MR. CADDELL:  49, yes, Your Honor. |
| 04:39 | 14 | THE COURT:  *Radcliffe* makes clear that the aspects |
| | 15 | of the *Rodriguez* deal were bad, but the central problem is |
| | 16 | on one of the conditioning payments of class reps on a basis |
| | 17 | independent from the merits of settlement. |
| 04:39 | 18 | And apparently it doesn't matter that the |
| | 19 | settlement is a good one or it doesn't appear that the |
| | 20 | behavior of counsel did not reflect the conflict.  The |
| | 21 | *Rodriguez* settlement was way above the cap at which the |
| | 22 | class plaintiff awards maxed out.  I mean, it's a weird |
| | 23 | wrinkle on *Rodriguez* that the settlement was actually |
| | 24 | approved because not all of the settling class plaintiffs |
| | 25 | had the conflict identified. |

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 102 of 128   Page ID #:14584
SACV 05-1070 DOC   7/26/2013 - Item No. 5

66

04:40    1          The *Rodriguez* -- I'm going to call it "*Rodriguez*

    2    *II*" -- might be helpful and instructive at the argument on

    3    the 14th.  The appellate court held that the trial court's

    4    decision after remand to pay counsel for the work they did

    5    had invalidated the incentive agreements.  And these

    6    agreements were the sliding-scale bounty that class counsel

    7    agreed they had to request for their class plaintiffs based

    8    on the amount of class recovery, but capped at that

    9    previously mentioned $75,000.

04:40   10          The appeals court noted, quote, that:

04:40   11          "The district judge properly determined

   12              that its rejection of the incentive

   13              awards cured any conflict of interest

   14              and that class counsel's services

   15              thereafter were properly performed and

   16              conferred a benefit on the class," and

   17              it cited *Jeffry*.

04:41   18          Not dispositive.  But I expect to spend some time

   19    with you on it, okay? -- both *Rodriguez I* and *Rodriguez II*

   20    and et al.  So just to forewarn you it's -- I believe my

   21    memory's correct -- the limitation on *Rodriguez* was that, in

   22    that case, the settlement was actually approved upon review

   23    by the Ninth Circuit the first time the case went up to the

   24    circuit.  What was rejected was, once again, the attorneys'

   25    fees decision by the District Court.

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 103 of 128   Page ID #:14585
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

67

04:41  1        And the District Court, on remand, decided not to

    2  pay class counsel any fees for their work leading up to the

    3  settlement, but decided that they could fairly be paid for

    4  the work after the bounties were cut out of the settlement

    5  approved by the District Court level.

04:42  6        In our case, there's no settlement approved, so

    7  counsel may have to go back to the drawing boards in a way

    8  that *Rodriguez* counsel never had to.

04:42  9        Some questions I'm raising for myself in my own

    10  notes are:  I don't know if this meaningfully distinguishes.

    11  If the conflict is cured in *Rodriguez* with the District

    12  Court's rejection of the incentives, why isn't it

    13  potentially cured by the Circuit Court rejection of the

    14  incentives in our case?

04:42  15        But I'm really anxious in your brief to respond to

    16  that, and I don't want to catch you off guard.  But I'm

    17  really looking closely at *Rodriguez* right now and this whole

    18  scenario.

04:42  19        I don't have any question about the Acosta-Pike

    20  issues.  Without giving you a ruling, I think we've come

    21  together on that.  Okay?

04:42  22        So, if there's anything else -- I know that I

    23  don't want either side to go away feeling they're

    24  disadvantaged, or feeling like this turned into a

    25  dispositive hearing date and the Court's influenced by it.

DEBBIE GALE, U.S. COURT REPORTER

| | |
|---|---|
| 1 | The 14th is really the concrete day for us.  But if you have |
| 2 | anything else to say, you know I'd welcome that so you have |
| 3 | a feeling... |
| 04:43 | 4 | MR. CADDELL:  Your Honor, if I might, the only |
| 5 | other point that I -- I've underlined on your list of |
| 6 | questions was choosing new counsel -- it's the "What court |
| 7 | involvement in appointing counsel is appropriate?" |
| 04:43 | 8 | THE COURT:  Oh, that is if I took that third |
| 9 | option that you pointed out.  I tried to unartfully say I'm |
| 10 | uncomfortable as a Court, if I was considering the third |
| 11 | option of completely independent, non-chosen counsel.  I |
| 12 | don't like Court's reaching out, you know, and hand-picking |
| 13 | because it's not the adversarial process.  It's not |
| 14 | selection by the aggrieved persons.  It's -- but courts have |
| 15 | done that before -- |
| 04:44 | 16 | MR. CADDELL:  Well -- |
| 04:44 | 17 | THE COURT:  -- to protect the case law. |
| 04:44 | 18 | MR. CADDELL:  And, actually, it seemed to me -- |
| 19 | and so I may have misunderstood it, but it seemed to me that |
| 20 | you were actually proposing a fourth option, sort of a |
| 21 | hybrid of one or two or three -- choosing new counsel to add |
| 22 | to any group of plaintiff's counsel.  And, of course, that |
| 23 | might cure the appearance concern that the Court expressed |
| 24 | that we had reached out to Public Justice and to Frances & |
| 25 | Mailman. |

04:44  1        But you could, if you wished, Your Honor, I think,

2    choose additional counsel to add to the Hernandez team,

3    counsel that was completely independent.  And that would

4    remove any issue of it being counsel that we selected;

5    although, frankly, I think we picked the best people.

04:44  6        But if the Court had someone else, there are other

7    good, of course, excellent class counsel.  Then, that is

8    something that -- I just wanted to raise that and make sure

9    I understood the Court's point, because I think we would be

10    fine with that if the Court wishes to go that way.

04:45  11    THE COURT:  The -- well, it's one of the things

12    that I threw out at the beginning, though, about timing.  I

13    haven't decided yet who's going to represent the class.

04:45  14        But if you did prevail, when should a Court do

15    that?  Shouldn't a Court do that in the inception when the

16    arguments are going on?  I mean -- or do I wait and, if you

17    did prevail, do I then add, you know, these persons or

18    parties?

04:45  19        For instance, what's the role right now of interim

20    counsel?  Are they going to be arguing this on -- or on the

21    14th?

04:45  22    MR. CADDELL:  Your Honor, as I --

04:45  23    THE COURT:  I don't think so.  I think you're

24    arguing it on the 14th.

04:45  25    MR. CADDELL:  Well, actually, I would expect you

1   to hear from both Public Justice and Francis & Mailman.  And

2   I guess, in response to the question you just posed, I think

3   the appropriate time to do that would be after the Court --

4   because, at the hearing on the motions -- the motion to

5   disqualify and the competing motions for 23(g) class

6   counsel -- interim class counsel, I think the Court could

7   very easily -- we won't be deciding class cert at that time.

04:46   8        You'll be deciding who would be the best

9   positioned to represent the class.  And I think an outcome

10  of that could very well be that the Court could say, "Well,

11  I'm going to go with one team or the other" -- and I won't,

12  uh, you know, posture and say it's the Hernandez -- but one

13  team or the other, "But I'm going to avoid any concern about

14  the independence of that counsel.  I'm going to appoint an

15  additional counsel to work with that team so that everyone

16  can be sure that there is independent counsel."

04:47   17       So I think that's -- and I think that would be the

18  time to do that, Your Honor, in response to your question.

19  I don't think you should do it today.  I think you would do

20  it after the hearing on the competing motions on the 14th.

21  If you decided that that was something you felt would be

22  appropriate, I think you certainly have the power to do that

23  as part of your decision on those motions.

04:47   24       THE COURT:  Okay.

04:47   25       Counsel, I want to make sure you've got equal

DEBBIE GALE, U.S. COURT REPORTER

1    time.

04:47    2                MR. CARPINELLO:  Yes, Your Honor.

04:47    3                I don't think that cures the conflict.  I don't

4    think it resolves the disqualification motion.  We think

5    California law is clear they have to be disqualified.  So

6    adding another lawyer to their team doesn't solve that.

04:47    7                And in addition, adding another lawyer doesn't

8    make them the best available counsel.  There is a team of

9    seven lawyers who the Ninth Circuit said committed a very

10   serious ethical violation.  Adding another lawyer to that

11   team doesn't solve that problem at all.

04:47   12                You don't have to add another lawyer to our team.

13   We believe we're competent to carry on the case.  We haven't

14   been found to be ethically -- to have committed unethical

15   violation.

04:48   16                So why would you burden the class with yet another

17   lawyer so to -- as to proceeding with the team that the

18   Ninth Circuit -- had committed unethical violation.  I

19   don't -- I don't -- I don't see why you do that.  I don't

20   see any precedence for it.  I don't think -- A, it wouldn't

21   solve the problem; and, B, it would add yet another person

22   to an already top-heavy team that the class is gonna have to

23   pay for, 'cause every time everybody -- these people get on

24   a telephone call, it's going to cost $10,000 to the class,

25   just eight or nine people getting -- so we add a tenth

DEBBIE GALE, U.S. COURT REPORTER

1    person or twelfth person to get on that team to make that

2    call.

04:48   3        Um, so that's my only point on that.  But I did

4    want to ask the Court, in terms of briefing schedule, we --

5    our reply brief is due -- is due the 1st on our issues on

6    our motions.

04:48   7        Is there a time -- I would suggest that both sides

8    submit -- without replies, submit their papers on a date you

9    pick, Judge, on any of the other issues that you've outlined

10   today 'cause these -- these issues go -- obviously, go well

11   bond -- beyond the actual motions.

04:48   12       THE COURT:  What would be fair in that regard?

04:49   13       I mean, right now, you've got the reply.  If I'm

14   going to open this up for briefing, I'd rather hear, you

15   know, what you're agreeing to do rather than me just

16   dictating from the bench for a moment.

04:49   17       MR. CARPINELLO:  Well, they have -- they have a

18   reply on their motion, which -- I don't know when that is

19   due.

20       MR. CADDELL:  The 15th is what we talked -- well,

21   I'm sorry -- it was the 12th.

04:49   22       MR. CARPINELLO:  Okay.

04:49   23       MR. CADDELL:  But my concern is --

04:49   24       MR. CARPINELLO:  Uh, that's a problem.

04:49   25       MR. CADDELL:  -- moving it from the 19th to the

1    14th may not give the Court enough time, if we don't file

2    our reply until the 12th.  Those were the dates that we

3    proposed in our stipulation, Your Honor, premised on the

4    hearing on the 19th.  And we fully expect -- I fully

5    expected the Court -- one of the topics to be taken up today

6    would be what works for the Court.  I didn't really think

7    you wanted to have this to go through your normal docket

8    call on a Monday morning at 8:30.

04:49    9        Could I suggest that we take 5 minutes and confer

10   on that?

04:49    11       THE COURT:  Try to control your own future.  If I

12   go back -- and once I've sent out a minute order, that's

13   gonna be it.  So see if you can control your own future in

14   terms of briefing.  But I would really like to hear it on

15   the 14th.  Okay?

04:50    16       MR. CADDELL:  Yes, Your Honor.

04:50    17       THE COURT:  Okay.  I'll join you when you're

18   ready.

04:50    19       MR. CARPINELLO:  Yes, Your Honor.

04:50    20       MR. WOLF:  Thank you, Your Honor.

04:50    21       *(Pause in the proceedings at 4:50 p.m.)*

05:03    22       *(Proceedings resumed at 5:03 p.m.)*

05:03    23       THE COURT:  Well, we're back on the record.

05:03    24       And there's been a brief, informal conversation

25   with counsel.  I'm going to try to reiterate what the Court

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 110 of 128   Page ID #:14592
SACV 05-1070 DOC - 7/26/2013 - Item No. 5

74

1    had suggested.

05:03    2            First, I think that that initial kindness on the

3    Court's part trying to "collapse" hearings is inappropriate.

4    I think we should take the disqualification motion on the

5    14th.  It decreases the briefing for all counsel.

05:03    6            That way, also, if one of these parties -- or if

7    one of these counsel is continuing, they can then make known

8    in a subsequent hearing what discovery, why, why they need

9    additional briefing, but I'm dealing with one of the

10    counsel, not both in conflict.

05:04    11            Second -- or having different needs Paragraph.

05:04    12            Second, the "incentification" of the Hernandez

13    class is of particular interest to the Court.  And I think

14    that not only do I need to be aware what that is prior to

15    the hearing, but whatever this incentive arrangement is, I

16    need to know how that would properly incentivize the newly

17    added counsel to pursue the best result in this.  And the

18    White class plaintiffs need that also.

05:04    19            So how are we going to resolve that?

05:04    20            MR. CADDELL:  Well, Your Honor, we agree that that

21    would be relevant to the 23(g) motions, which we understand

22    will be heard at the same time as the motion to disqualify.

23    So I brought copies with me today of the June 21st, 2013,

24    cooperating counsel agreement on Public Justice letterhead.

05:05    25            If I may approach and give it to your clerk and

1    also to opposing -- to the *White* counsel.

05:05    2             THE COURT:  Yes.  Thank you very much.

05:05    3             The record will reflect it's been handed to the

4    clerk and to opposing counsel.

05:05    5             All right.  Is there anything further this

6    evening, then, or is there a briefing schedule that you've

7    agreed upon?

05:05    8             You know, I think it decreases the pressure a

9    little bit.  And I think it's a better way to proceed.

05:05    10            MR. CARPINELLO:  Yes, Your Honor.

05:05    11            Our reply's currently due on the 1st.  We'll file

12    and serve it on the 1st.  And they've agreed that -- to

13    their reply on the their motion on the 9th.

05:05    14            Ours is on the 1st.

05:05    15            And theirs is on the 9th.

05:05    16            THE COURT:  Okay.  Thank you very much for your

17    courtesy.  Have a good trip back.

05:05    18            COUNSEL IN UNISON:  Thank you, Your Honor.

05:05    19            *(Proceedings adjourned at 5:05 p.m..)*

05:05    20                              -oOo-

05:05    21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

05:05      1                            -oOo-

05:05      2

05:05      3                         CERTIFICATE

05:05      4

05:05      5        I hereby certify that pursuant to Section 753,

           6    Title 28, United States Code, the foregoing is a true and

           7    correct transcript of the stenographically reported

           8    proceedings held in the above-entitled matter and that the

           9    transcript page format is in conformance with the

          10    regulations of the Judicial Conference of the United States.

05:05     11

05:05     12    Date:   July 28, 2013

05:05     13

05:05     14
05:05                             /s/ Debbie Gale
05:05     15          _____
05:05                 DEBBIE GALE, U.S. COURT REPORTER
05:05     16          CSR NO. 9472, RPR, CCRR

05:05     17

          18

          19

          20

          21

          22

          23

          24

          25

DEBBIE GALE, U.S. COURT REPORTER

# EXHIBIT 2

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

TERRI N. WHITE, ROBERT )Case No. 05-cv-1070-DOC (MLGx)
RADCLIFFE, CHESTER )Lead Case
CARTER, ARNOLD LOVELL, )and related cases:
JR., CLIFTON C. SEALE, )
III and ALEX GIDI, )05-cv-1073-DOC (MLGx)
et al., )05-cv-7821-DOC (MLGx)
            )06-cv-0392-DOC (MLGx)
        Plaintiffs, )
                     )
    vs.              )
                     )
EXPERIAN INFORMATION )
SOLUTIONS, INC., )
                     )
    Defendant. )
_____)
JOSE HERNANDEZ, et al.,)
                     )
        Plaintiffs, )
                     )
    vs.              )
                     )
EXPERIAN INFORMATION )
SOLUTIONS, INC., )
                     )
    Defendant. )

(CASE STYLES CONTINUED ON PAGE 2)

_____
VIDEOTAPED DEPOSITION OF CHARLES W. JUNTIKKA
JUNE 20, 2007
9:50 A.M.
_____

## Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JOSE L. ACOSTA, JR., )Case No. 06-cv-5060-DOC (MLGx)
ROBERT RANDALL, and )
BERTRAM ROBISON, )
individually, and on )
behalf all others )
similarly situated, )
                     )
        Plaintiff, )
                     )
    vs.              )
                     )
TRANSUNION LLC, )
                     )
    Defendant. )
_____)
KATHRYN L. PIKE, )Case No. 06-cv-3924-DOC (MLGx)
individually, and on )
behalf all others )
similarly situated, )
                     )
        Plaintiff, )
                     )
    vs.              )
                     )
EQUIFAX INFORMATION )
SERVICES LLC, and DOES )
1 through 1000, )
inclusive, )
                     )
        Defendants. )

## Page 3

INDEX TO DEFENDANT'S EXHIBITS

No.      Description          Page

212  12-14-06, Declaration of Charles        27
     Juntikka in Support of Opposition to
     the Plaintiffs' Motion for an Order
     Granting Preliminary Approval of
     Settlement re: Acosta v. TransUnion.

213  Protocol re: C.R. Training.             55

214  WH PL 1597 thru 1612, Spreadsheet re:   180
     Credit report review.

215  Spreadsheet re: Equifax credit report   181
     review.

216  Spreadsheet re: Experian credit         181
     report review.

217  Spreadsheet re: TransUnion credit       181
     report review.

218  WH PL 1595, Key for List of Major       192
     Creditors.

219  WH EQ 102245 thru 102251, 5-10-05,      197
     Equifax Credit File re: Deanna Inez
     Harrison.

220  WH EQ 102689 thru 102691, 6-6-05,       226
     Equifax Credit File re: Willie E.
     Johnson.

221  WH EQ 102283 thru 102288, 5-2-05,       233
     Equifax Credit File re: Gloria M.
     Hatchett.

222  WH EQ 102533 thru 102540, 1-11-05,      238
     Equifax Credit File re: Shirley A.
     Jackson.

223  WH EQ 102699 thru 102705, 2-15-05,      243
     Equifax Credit File re: Geneva Mrs.
     Jones.

## Page 4

INDEX TO DEFENDANT'S EXHIBITS (Continued.)

No.      Description          Page

224  WH PL 1596, Spreadsheet re: Credit      248
     report review.

225  WH PL 5357, List of Debtors missing     251
     F-Schedules for credit review.

226  WH EQ 106666 thru 106688, Spreadsheet   257
     re: Tally of erros discovered in
     credit report review.

227  2-14-07, Declaration of Charles         312
     Juntikka in Support of Plaintiffs'
     Motion for Class Certification.

- - -

1 (Pages 1 to 4)

PREMIER REPORTING

Page 157

1   but I don't think so.
2        Q     Okay.
3        A     But we, that was a theory we had.
4        Q     Okay.  And have you made a
5   reasonable search to locate all of the either
6   credit reports or dispute letters that are
7   referenced on the spreadsheet that were used in
8   connection with the analysis?
9        A     Yes.
10       Q     Okay.  And to your knowledge, is
11  your search complete?
12             Do you think you have found
13  everything you can possibly find?
14       A     Well, there's ten missing files
15  that are just missing --
16       Q     Uh-huh.
17       A     -- that we just can't locate as
18  best as we've tried.  And I think there might be
19  another from either first or second credit
20  reports that are not in the files.  We're having
21  trouble with that.  And that, I'm not sure of
22  that number.  It might be more than two dozen.
23       Q     Uh-huh.
24       A     Other than that we located like
25  40 -- 50 missing files right before I came to

Page 158

1   Atlanta.  And the -- and we discovered the
2   problem with the database.  We were able to
3   locate the names of the people with clean credit
4   reports.
5             And so that's quite a few files,
6   actually.  And we're going through the process of
7   right now getting those over to you.
8        Q     When you say you've located 50
9   files, I think is what you just said --
10       A     Uh-huh.
11       Q     -- were those files with people
12  that had errors or files of people who didn't
13  have errors?
14       A     People who had errors.  There were
15  60 files we just couldn't find.  And by a lot of
16  hard effort we found 50 of them.  But we're still
17  missing ten.
18       Q     Okay.  And I take it those
19  documents are in process to be produced to me?
20       A     Yeah.  We're trying to get them
21  over to you as soon --
22       Q     Okay.
23       A     -- as possible, yeah.
24       Q     Mr. Juntikka, are you taking any
25  medication today that would in any way affect

Page 159

1   your ability to testify?
2        A     No.
3        Q     Okay.  Have you ever been arrested?
4        A     Yes.
5             MR. SOBOL:  Yeah.  He's answered
6   that question, but it's outside the scope of this
7   deposition.
8             MS. HANSON:  So you're not going to
9   let him testify as to what it is?
10            MR. SOBOL:  Advising him not to do
11  it.
12            MS. HANSON:  Okay.  Will you let
13  him testify as to when he was arrested?
14            MR. SOBOL:  Sure.
15            THE WITNESS:  1988.
16  BY MS. HANSON:
17       Q     Have you ever been convicted of a
18  crime?
19       A     No.
20       Q     Have you ever had a Bar complaint
21  filed against you?
22            MR. SOBOL:  Go ahead.
23            THE WITNESS:  Yes.
24  BY MS. HANSON:
25       Q     Approximately how many?

Page 160

1        A     I guess about nine.  But that's a
2   guess, give or take.
3        Q     And over what period of time have
4   these Bar complaints been filed?
5        A     It's 20 -- I've been practicing for
6   22 years, but about 20 years.
7        Q     And can you give me the nature of
8   what the complaints were against you?
9        A     They are bankruptcy-related
10  matters, people wanting refunds.
11       Q     Have you ever been subject to any
12  sort of a disciplinary action by the New York
13  State Bar?
14       A     Like some sort of public censure or
15  something like that?
16       Q     A public censure, a private
17  censure, anything like that?
18       A     Well, I guess yes.
19       Q     Okay.
20       A     Yeah.
21       Q     When was that?
22       A     The fall of 2005.
23       Q     Fall of 2005?
24       A     No, no, no.  It would be the
25  beginning of 2006.

                              40 (Pages 157 to 160)

Page 161

1       Q       Beginning of 2006?
2       A       Uh-huh.
3       Q       Is there only one disciplinary
4    action, one?
5       A       Where action was taken?
6       Q       Where action was taken.
7       A       I think there's two.  I think
8    there's one from the early -- like late '80s and
9    then this one.  And both were private, they were
10   not public in any way.
11      Q       If we focus on the one in 2006,
12   will you give me the circumstances under which
13   you were censured?
14              MR. SOBOL:  Okay.  I think we've
15   gone far enough here.  Because I -- you know,
16   he's given you a general indication of this, but
17   we're not going to go into the specifics of
18   these.
19              THE WITNESS:  Yeah.  And there's,
20   you know, censure has a technical term, and it
21   was not a censure.
22   BY MS. HANSON:
23      Q       Okay.
24      A       That's a much higher level.
25      Q       Okay.  Then --

Page 162

1       A       In New York state, there are
2    letters of caution.
3       Q       Okay.
4       A       Yeah.
5       Q       Just so I'm clear --
6       A       Uh-huh.
7       Q       -- in the late 1980s and in 2006,
8    were you given a letter of caution?
9       A       Yeah.  They termed it something
10   different back then.  It's the lowest level, I
11   think.
12      Q       Okay.  Is it called a letter of
13   caution in 2000 --
14              MR. SOBOL:  I object.  That's
15   outside the scope.
16              MS. HANSON:  Well, I want to just
17   understand -- I mean, he -- I want to make sure I
18   understand what it is.  I mean, he's objected to
19   the word "censure."  So.
20              THE WITNESS:  Uh-huh.
21   BY MS. HANSON:
22      Q       What is the proper term for
23   whatever disciplinary action was taken against
24   you in 2006?
25              MR. SOBOL:  Same objection.

Page 163

1              THE WITNESS:  And I'm not going to
2    answer.
3    BY MS. HANSON:
4       Q       Have you ever been sued by one of
5    your clients?
6       A       Yes.
7       Q       How many times?
8              MR. SOBOL:  I object.  This is
9    outside the scope of the deposition.
10             There may be an occasion for me to
11   lodge an objection, so you should pause before
12   you answer the question.
13             THE WITNESS:  Okay.
14   BY MS. HANSON:
15      Q       Mr. Juntikka, if we return to
16   Exhibit 213.
17      A       I'm sorry.  I'll turn it off.
18             (Whereupon, there was a
19   telephonic interruption.)
20   BY MS. HANSON:
21      Q       And I believe we left off, we were
22   finished with number five, which went through the
23   various steps of preparing a dispute letter.
24             Number six says:
25             "Call for C.R.C. appointment -

Page 164

1    type: C.R.C."
2              What does that mean?
3       A       That's where the clients would come
4    to discuss the dispute letter.
5       Q       Well, number seven is:
6              "C.R.C. appointment (photo ID)."
7              Do you know what that means?
8       A       Again, this is like -- I've only
9    recently seen this.  I'm not sure what she meant
10   by that.
11      Q       Next is number eight:
12             "C.R.C. dispute letter -
13   certified mail."
14             What does that mean?
15      A       I think it means that's sending a
16   certified mail letter out with the dispute.
17      Q       Did you send all of the dispute
18   letters by certified mail?
19      A       Yes.
20      Q       Did you record whether or not you
21   received the green card back from the credit
22   reporting agency that they had, in fact, received
23   the letter?
24      A       That is -- we tried to record that
25   data, but I'm not sure it was uniformly obeyed.

41 (Pages 161 to 164)

# EXHIBIT 3

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 118 of 128   Page ID
Case 1:01-cv-02674-HHK   Document 71   Filed 05/29/07   Page 1 of 5
#:14600

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| James S. Vine, *et al.*,            ) | |
| ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | Civ. Action No. 1:01CV02674 (HHK) |
| v.   ) | |
| ) | |
| REPUBLIC OF IRAQ,   ) | |
| ) | |
| Defendant.   ) | |
| ) | |

## PLAINTIFFS' NOTICE OF INTENT NOT TO FILE
## MOTION FOR CLASS CERTIFICATION


Daniel Wolf (DC Bar No. 429697)
LAW OFFICES OF DANIEL WOLF
1220 N Street, NW, Suite PH2
Washington, D.C.  20005


Michael D. Lieder (DC Bar No. 444273)
SPRENGER & LANG PLLC
1614 Twentieth Street, N.W., Suite 500
Washington, D.C. 20009

*Attorneys for Plaintiffs*

Pursuant to this Court's scheduling order, dated May 14, 2007, plaintiffs hereby inform

this Court of their intent not to file a motion for class certification. In addition, plaintiffs are

presently unaware of any similarly situated individuals who wish to join this action and, hence,

do not plan on filing any motions to join additional plaintiffs in this action. Plaintiffs, however,

reserve their right to do so should any such individuals come forward.[1]

## STATEMENT

Plaintiffs' decision not to pursue class certification is based on practical concerns. As

this Court is aware, there are 236 named plaintiffs in this case—consisting of 206 American

citizens who were held hostage by Iraq following its invasion of Kuwait and another 30

individuals who are the spouses of those American citizens. Another 179 American citizens had

previously filed suit against Iraq in the *Hill* case—143 of whom were held hostage and 36 of

whom were their spouses. Plaintiffs believe that, taken together, the plaintiffs in these two cases

comprise the large majority of putative class who desire to pursue legal claims for redress against

Iraq.

During the course of these lawsuits, plaintiffs' counsel have made a concerted effort to

identify as many of the putative class members as possible. Based on information obtained from

the Department of State and other sources, plaintiffs have determined that there were about 110

putative class members who were held as human shields, another 110 or so who were evacuated

from the U.S. Embassy in Kuwait in late August 1990, about 40 others who remained trapped in

the U.S. Embassy in Kuwait until their subsequent release between September 1 and December

9, 1990, and about another 40 who were detained at the U.S. Ambassador's residence in Iraq and

---

[1] No one has approached plaintiffs' counsel seeking to join this action since the Third Amended
Complaint was filed on February 18, 2005. Accordingly, plaintiffs' counsel believe it unlikely
that they will be seeking leave to join any additional plaintiffs to this action and, if they do, they
believe the number will be small.

Case 8:05-cv-01070-DOC-MLG   Document 911   Filed 08/09/13   Page 120 of 128   Page ID
Case 1:01-cv-02674-HHK   Document 71   Filed 05/29/07   Page 3 of 5
#:14602

were released during the same time frame.  As a result of the efforts of plaintiffs' counsel,

approximately 80 percent of the individuals in these groups became plaintiffs in this case or in

the *Hill* case.  Several others who were contacted chose not to file claims.

    In addition to those who are included in the groups identified above, the plaintiffs in the

*Hill* and *Vine* cases include more than 100 American citizens who spent the duration of the crisis

in hiding.  Plaintiffs' counsel have, however, been unable to determine—or even to reliably

estimate—how many American citizens in this group have not come forward.  At the time, the

State Department estimated that the total number of American citizens detained in Kuwait and

Iraq was upwards of 3,000.  However, based on the information they have obtained from their

clients and other sources, plaintiffs' counsel believe that number grossly exaggerates the actual

number of American detainees and that it includes at least some who were either dual nationals

or the family members of Kuwaiti and Iraqi nationals and who did not wish to leave the region.

    At any rate, despite discovery requests, the Department of State has not identified the

names of these individuals or provided plaintiffs with any information as to their past or current

address.  As set forth above, plaintiffs' counsel have, however, made their own extensive efforts

to identify and contact members of the putative class.  Moreover, the *Hill* case received a great

deal of coverage on cable and network television, including CBS, CNN and Fox News, and in

major newspapers, including the New York Times, Washington Post, Wall Street Journal and

USA Today.

    In view of these circumstances, plaintiffs have concluded that there is little point in their

pursuing class certification in this case.  As the only remedy that is available to them is

monetary damages, the putative members of the class cannot benefit unless they come forward

and actively participate at the damages phase through the presentation of evidence establishing

their eligibility for relief and the amount of their damages.  Given the efforts of plaintiffs'

counsel and the extensive coverage these cases have received, plaintiffs' counsel believe that the

large majority of those who wish to pursue claims have already surfaced and seriously doubt that

any court-approved notice program would unearth many others.  If a small number of persons

become aware of the suit and wish to participate, they can move to join just as many other

plaintiffs already have done, both here and in the *Hill* case.  Because class certification is

unlikely to expand such participation to any appreciable extent, plaintiffs have concluded that the

advantages of pursuing it are not worth the costs.

   Moreover, any judgment rendered against Iraq at the liability stage in this case would

have preclusive effect in this or in any related proceedings under the doctrines of law of the case

and collateral estoppel.  Accordingly, the one significant benefit that certification could yield for

the members of the putative class—a binding judgment against Iraq on the issue of liability—is a

benefit that will be equally available to them in the absence of certification.  On the other hand,

pursuit of class certification will needlessly consume the resources of the parties and the Court

and would likely delay the outcome of these already protracted proceedings for an extended

period—particularly since Iraq would almost certainly exercise its right to pursue an

interlocutory appeal in the event certification were granted.

## CONCLUSION

For the reasons set forth above, plaintiffs will not file a motion for class certification in this action and will not seek to join any additional plaintiffs at this time.


Dated:  May 29, 2007

                                    Respectfully submitted,


                                     /s/ Daniel Wolf
                                    Daniel Wolf (DC Bar No. 429697)
                                    LAW OFFICES OF DANIEL WOLF
                                    1220 N Street, NW, Suite PH2
                                    Washington, D.C.  20005
                                    (202) 842-2170

                                    Michael D. Lieder (DC Bar No. 444273)
                                    SPRENGER & LANG PLLC
                                    1614 Twentieth Street, N.W., Suite 500
                                    Washington, D.C. 20009
                                    (202) 265-8010

                                    *Attorneys for Plaintiffs*

# EXHIBIT 4

BOIES, SCHILLER & FLEXNER LLP
George F. Carpinello
Adam R. Shaw
30 South Pearl Street
Albany, NY 12207
Telephone:   518.434.0600
Facsimile:   518.434.0665
Email:       gcarpinello@bsfllp.com
             ashaw@bsfllp.com
(admitted *pro hac vice*)

David L. Zifkin (SBN 232845)
401 Wilshire Blvd., Suite 850
Santa Monica, CA   90401
Telephone:   310.752.2400
Facsimile:   310.752.2490
Email:       dzifkin@bsfllp.com

CHARLES JUNTIKKA &
ASSOCIATES LLP
Charles Juntikka (admitted *pro hac vice*)
1250 Broadway, 24th Floor
New York, NY 10001
Telephone:   212.315.3755
Facsimile:   212.315.9032
Email:       charles@cjalaw.com

DANIEL WOLF LAW OFFICES
Daniel Wolf (admitted *pro hac vice*)
1220 N Street, NW, Suite PH 2
Washington, DC 20005
Telephone:   202.842.2170
Email:       dan@danielwolflaw.com

Attorneys for Plaintiffs Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C.
Seale, III, Arnold E. Lovell, and all others similarly situated.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI N. WHITE, et al.,<br><br>              Plaintiffs,<br><br>    *v.*<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC., et al.,<br><br>              Defendants.<br><br>and Related actions. | CASE NO. SA 05-CV-1070 DOC<br>(MLGx) (Lead Case)<br>Assigned to the Hon. David O. Carter |

Documents Reviewed by Professor Rubenstein (other than case law and scholarship on the relevant issues).

1.    [Tentative] Order [Denying] Plaintiffs' Motion for Class Certification (Jan. 26, 2009; Dkt. #369-2).

2.    Memorandum in Support of Motion for Order (1) Granting Preliminary Approval to Proposed Class Action Settlement; (2) Conditionally Certifying Settlement Class; (3) Approving Class Notice; (4) Appointing Class Counsel; and (5) Scheduling Final Approval hearing Date and Related Dates (Apr. 24, 2009; Dkt. #383).

3.    Declaration of Michael W. Sobol in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement and Conditional Certification of Settlement Class (Apr. 24, 2009; Dkt. # 385)

4.    Declaration of Bertram Robison in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement (Apr. 24, 2009; Dkt. #386).

5.    Declaration of Robert Randall in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement (Apr. 24, 2009; Dkt. #387).

6.    Declaration of Kathryn Pike in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement (May 1, 2009; Dkt. #412).

7.    Original Settlement Agreement (May 1, 2009; Dkt. #413-2).

8.    Declaration of Arnold E. Lovell (May 21, 2009; Dkt. #431-6).

9.    The *White* Plaintiffs' Objections to Class Action Settlement (Dec. 14, 2009; Dkt. #553).

10.   Declaration of Charles Juntikka in Support of *White* Plaintiffs' Objections to Class Action Settlement and Supporting Exhibits (Dec. 14, 2009; Dkt. #555).

11. Notice of Motion and Motion for Final Approval of Class Action
Settlement and Memorandum of Points and Authorities in Support Thereto
(Jan. 4, 2010; Dkt. #604).

12. Declaration of Michael W. Sobol in Support of Plaintiffs' Motion for Final
Approval of Class Action Settlement (Jan. 4, 2010; Dkt. #604-2).

13. Settling Plaintiffs' Responses to Objections to Final Approval of 23(b)(3).
Settlement (Jan. 4, 2010; Dkt. #605).

14. Declaration of Geoffrey P. Miller (Dec. 17, 2009; Dkt. #605-5).

15. Declaration of Geoffrey C. Hazard, Jr. (Dec. 17, 2009; Dkt. # 605-6).

16. Order (1) Granting Preliminary Approval to Proposed Class Action
Settlement; (2) Condionally Certifiying Settlement Class; (3) Approving
Class Notice; (4) Appointing Class Counsel; and (5) Scheduling Final
Approval Hearing date and Related Dates (May 7, 2009; Dkt. #423).

17. Declaration of William B. Rubenstein (Jan. 8, 2009; Dkt. #621).

18. Order Granting Final Approval of Class Action Settlement for Monetary
Relief (July 15, 2011; Dkt. # 776).

19. Brief of Appellant Charles Juntikka (Feb 22, 2012; 9th Cir. Dkt. #39)

20. Reply Brief of Appellant Charles Juntikka (August 6, 2012; 9th Cir. Dkt.
#84).

21. Order and Amended Opinion of the 9th Circuit (May 2, 2013; 9th Cir. Dkt.
#117).

22. Notice of Motion and Motion of the *White* Plaintiffs for an Order
Disqualifying Counsel From This Action (June 19, 2013; Dkt. #875).

23. Memorandum of Points and Authorities in Support of *White* Plaintiffs'
Motion to Disqualify Counsel (June 19, 2013; Dkt 876).

24. Declaration of Charles Juntikka and Supporting Exhibits (June 19, 2013;
Dkt. #877).

25. Notice of Motion and Application to Serve as Interim Class Counsel (June

19, 2013; Dkt. #878).

26.     Memorandum of Points and Authorities in Support of the Motion to Serve as Interim Class Counsel (June 19, 2013; Dkt. #879).

27.     Opposition to Motion to Disqualify Counsel (July 15, 2013; Dkt. #884)

28.     Notice of Motion and Cross-Motion to Appoint Interim Class Counsel and attached Proposed Order (July 15, 2013; Dkt. #885).

29.     Response to Motion to Appoint Interim Counsel and Memorandum in Support of Cross-Motion to Appoint Interim Counsel and Supporting Exhibits (July 15, 2013; Dkt. #886).

30.     Declaration of Michael W. Sobol in Support of Response to Motion to Appoint Interim Counsel and Cross-Motion to Appoint Interim Counsel and in Support of Opposition to Motion to Disqualify Counsel and Supporting Exhibits (July 15, 2013; Dkt. #887).

31.     Declaration of Michael A. Caddell in Support of Response to motion to Appoint Interim Counsel and Cross-Motion to Appoint Interim Counsel and in Support of Opposition to Motion to Disqualify Counsel and Supporting Exhibit (July 15, 2013; Dkt. #888).

32.     Declaration of Arthur H. Bryant in Support of Response to Motion to Appoint Interim Counsel and Cross-Motion to Appoint Interim Counsel (July 15, 2013; Dkt. #889).

33.     Declaration of James A. Francis in Support of Response to Motion to Appoint Interim Counsel and Cross- Motion to Appoint Interim Counsel and in Support of Opposition to Motion to Disqualify Counsel and Supporting Exhibit (July 15, 2013; Dkt. #890).

34.     Declaration of Charles Silver in Support of (1) Opposition to Motion to Disqualify Counsel, and (2) Response to Motion to Appoint Interim Counsel and Memorandum in Support of Cross-Motion to Appoint Interim Counsel and Supporting Exhibit (July 15, 2013; Dkt. #891).

35.  Declaration of Stuart T. Rossman in Support of Response to Motion to Appoint Interim Counsel and Cross-Motion to Appoint Interim Counsel and in Support of Opposition to Motion to Disqualify Counsel (July 15, 2013; Dkt. #892).

36.  Declaration of Charles Delbaum in Support of Response to Motion to Appoint Interim Counsel and Cross-Motion to Appoint Interim Counsel and in Support of Opposition to Motion to Disqualify Counsel (July 15, 2013; Dkt. #893).

37.  Declaration of Leonard Bennett in Support of Response to Motion to Appoint Interim Counsel and Cross-Motion to Appoint Interim Counsel and in Support of Opposition to Motion to Disqualify Counsel and Supporting Exhibits (July 15, 2013; Dkt. #894).

38.  Declaration of Lee A. Sherman in Support  of Response to Motion to Appoint Interim Counsel and Cross-Motion to Appoint Interim Counsel and in Support of Opposition to Motion to Disqualify Counsel (July 15, 2013; Dkt. #895).

39.  Stipulation Continuing Hearing and Setting Briefing Schedule for Motions (July 15, 2013; Dkt. #896).

40.  Transcript of Proceedings before Honorable David O. Carter (July 26, 2013).

41.  Court Discussion Topics & Questions to Raise at July 26, 2013 Hearing (July 26, 2013).

42.  Settling Plaintiffs' Letter Regarding Fee Agreement (June 21, 2013).

DATED:     August 6, 2013