O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| TERRI N. WHITE, ET AL.,<br><br>    Plaintiffs,<br><br>  vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, ET AL.,<br><br>    Defendants. | Case No.: SACV 05-01070 DOC(MLGx)<br><br>**AMENDED**<br><br>**ORDER DENYING MOTION TO DISQUALIFY [875], DENYING MOTION TO APPOINT INTERIM CLASS COUNSEL [878], AND GRANTING CROSS-MOTION TO APPOINT INTERIM CLASS COUNSEL [885]** |

Before the Court is the Motion to Disqualify Hernandez Counsel (Dkt. 875) and Application to Serve as Interim Class Counsel (Dkt. 878) filed by Plaintiffs Terri N. White, et al., and a Cross-Motion to Appoint Interim Class Counsel (Dkt. 885) filed by Jose Hernandez, et al. The Court heard oral argument on these matters on August 14, 2013. After considering the moving and opposing papers and the arguments of counsel, the Court hereby DENIES the Motion to Disqualify (Dkt. 875), DENIES White Plaintiffs' Motion to Appoint Interim Counsel

(Dkt. 878), and GRANTS Hernandez's Cross-Motion to Appoint Interim Class Counsel (Dkt. 885).

## I.     Factual and Procedural Background

### a.   Initiation of the Lawsuit

The instant lawsuit is an amalgamation of several separate suits filed in 2005 and 2006. The *White* lawsuit began with Charles Juntikka and Daniel Wolf, who noticed and recorded problems with Mr. Juntikka's bankruptcy clients' credit reports.  Five of these clients eventually became lead plaintiffs: Maria Falcon, Chester Carter, Arnold Lovell, Jr., Clifton C. Seale, III, and Robert Radcliffe (collectively, "White Plaintiffs").  In October 2005, Mr. Juntikka and Mr. Wolf recruited Lieff, Cabraser, Heimann, & Bernstein, LLP ("Lieff Cabraser") to prosecute the White Plaintiffs' claims as a class action.  The *White* case was then consolidated with a parallel class action in the Northern District of California in which Jose Hernandez was the named plaintiff.  The law firm Caddell & Chapman, P.C. ("Caddell") represented Hernandez, as did attorney Leonard Bennett.  The cases were consolidated and jointly prosecuted in the Central District of California, along with three other related cases.  Caddell and Lieff Cabraser also authorized the National Consumer Law Center to appear on behalf of both plaintiffs.  *See* First Decl. of William B. Rubenstein ("First Rubenstein Decl.") (Dkt. 621) ¶ 13.  The Lieff-Caddell team ("Settling Counsel") became lead counsel in the consolidated law suit.

In the consolidated lawsuit, Plaintiffs Jose Hernandez, Kathryn Pike, Robert Randall and Bertram Robison (collectively, "Settling Plaintiffs") brought suit against Defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax") and Trans Union, LLC ("Trans Union") (collectively, "Defendants").  The suit alleged that Defendants had recklessly and/or negligently violated—and were continuing to recklessly and/or negligently violate—the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq*. Plaintiffs claimed that the credit-reporting agencies issued credit reports that inaccurately listed outstanding debts that were discharged in bankruptcy.  A subset of the plaintiffs also claimed that Defendants did not adequately investigate the errors even after consumer disputes over the status of the discharged debts.  Plaintiffs brought causes of action for (i) willful and/or negligent

violation of Section 1681e(b) of the FCRA and its California counterpart, California Civil Code Section 1785.14(b), (ii) willful and/or negligent violation of Section 1681i of the FCRA and its California counterpart, California Civil Code Section 1785.16, and (iii) violation of California Business & Professions Code Section 17200 *et seq.*

b. Litigation and Settlement

The parties briefed motions for class certification and summary judgment.  At the hearing on class certification, the Court issued a tentative order denying certification.  *See* Minutes of Motion Hearing Re: Motions to Certify Class, January 26, 2009 (Dkt. 369); Tentative Order (Dkt. 369-2).  The parties entered mediation on August 15, 2007.  The mediation process was exhaustive, including seven in-person sessions with mediator Hon. Lourdes Baird (Ret.), five in-person sessions with mediator Randall Wulff, and various other in-person and telephonic meetings involving counsel for the parties.

In August 2008, the parties reached an injunctive relief settlement.  The Court approved that settlement on August 19, 2008.  *See* Approval Order Regarding Settlement Agreement and Release, Aug. 19, 2008 (Dkt. 338).  The injunctive relief settlement contained far-reaching relief for the class, including retrospective changes to class members' credit reports as well as new procedures going forward.  No one objected to the injunctive relief settlement.

On February 5, 2009, the parties reached a monetary settlement.  The settlement created a $45 million award fund inclusive of fees and costs, with $15 million to be contributed by each defendant.  After administrative costs, class members able to demonstrate actual harm would receive "actual-damage awards."  When this Court approved the settlement, there were roughly 15,000 Actual Damages Awards claimants: 2,141 claimants who were denied employment and were therefore eligible for a minimum award of $750; 5,593 claimants who were denied a mortgage or housing rental and were therefore eligible for a $500 minimum award; and 7,600 claimants who were denied credit or auto loans and were therefore eligible for a $150 minimum award.  Decl. of J. Keough Re Final Report of Supp. Claims, May 2, 2011 ("May 2, 2011 Keough Decl.") (Dkt. 751) ¶ 8.

Class members unable to show actual damages could apply for a Convenience Award, requiring only that they file an attestation that they believe they are members of the class.  At the time the Court approved the settlement, roughly 754,783 class members had submitted a claim for a Convenience Award.  *Id*.  This would have yielded a recovery of roughly $26.78 per Convenience Award claimant.  *Id*.  Following these distributions, the Settling Fund was to pay the class representatives and class counsel.

Settling Counsel informed the White Plaintiffs of the settlement on February 6, 2009.  First Decl. of Charles Juntikka, Esq. Ex. A ("First Juntikka Decl.") (Dkt. 555) ¶ 4.  White Plaintiffs objected to the monetary relief settlement.  *See* First Juntikka Decl. Ex. J.  Among the objections asserted was "that the Settlement would release the meritorious claims of each member of three separate 10 to 15 million-member classes for an award averaging less than 1% of the $100 statutory minimum to which they were entitled."  Motion to Disqualify Counsel at 3.

On April 16, 2009, Settling Counsel added a provision to the draft settlement that required Settling Counsel to "file an application or applications to the Court for an incentive award, to each of the Named Plaintiffs serving as class representatives in support of the Settlement, and each such award not to exceed $5,000."  Second Decl. of Charles Juntikka, Esq. ("Second Juntikka Decl.") (Dkt. 877) Ex. A at 5.  White Plaintiffs objected to the incentive award provision, arguing that it created a conflict of interest for Settling Counsel and any settling representatives by setting the interests of the named plaintiffs and the absent class members at odds.  This Court approved the monetary settlement with the incentive provision on July 15, 2011.  *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1090-91 (C.D. Cal. 2011) *rev'd and remanded sub nom. Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157 (9th Cir. 2013).

c.  Appeal and Ninth Circuit Opinion

On appeal, the Ninth Circuit reversed and vacated the settlement.  *Radcliffe v. Experian*, 715 F.3d 1157 (9th Cir. 2013).  The Ninth Circuit held that the incentive awards rendered the class representatives who signed onto the settlement inadequate under Rule 23(a)(4).  *Id*. at 1165.  The Circuit further held that "the class representatives' lack of adequacy—based on the

conditional incentive awards—also made class counsel inadequate to represent the class." *Id.* at 1167.  Applying California law, the Court held that "[a]s soon as the conditional-incentive-awards provision divorced the interests of the class representatives from those of the absent class members, class counsel was simultaneously representing clients with conflicting interests," without a waiver.  *Id.*  In light of this conflict, the Court determined that Settling Counsel was "not adequate and could not settle the case on behalf of the absent class members."  *Id.*

The Circuit vacated the class settlement, including costs and fees, and remanded for further proceedings.  The Circuit directed this Court on remand to determine: "when the conflict arose, if the conflict continues under any future settlement agreement, and how the conflicted representation should affect any attorneys' fees awards."  *Id.* at 1168.  The Circuit further noted that this Court must address whether "the subset of class counsel who brought the *Acosta* and *Pike* suits, which were consolidated with this case, faced an independent conflict of interest because of the fee-sharing agreement they executed with the rest of class counsel."  *Id.* at 1168 n.6.  Most of these issues are not ripe for resolution on the current motions.

On June 19, 2013, White Counsel filed the instant Motion to Disqualify Hernandez Counsel (Dkt. 875) and Application to Serve as Interim Class Counsel (Dkt. 878).  Settling Counsel filed an Opposition to the Motion to Disqualify (Dkt. 884) and filed a Response to Motion to Appoint Interim Counsel with a Cross-Motion to appoint the Settling Counsel as interim class counsel (Dkt. 885).  The Court heard oral argument on these matters on August 14, 2013.

## II.    Motion to Disqualify Settling Counsel

White Counsel move to disqualify Settling Counsel under California law.  White Counsel argue this disqualification is mandatory.  Settling Counsel respond that disqualification is not mandatory and is not warranted.  The Court agrees with Settling Counsel on both issues.

As an initial matter, however, the Court disagrees with Settling Counsel that the Ninth Circuit already decided this issue.  Settling Counsel do not identify whether their argument is based on a form of preclusion, the law of the case, or the rule of mandate, and so it is difficult to evaluate this claim fully.  It appears to the Court that the disqualification issue was referenced in

the briefs before the Ninth Circuit, but the question was not actually raised to the panel.  *See* Opp'n (Dkt. 886) Ex. 1 at 26-35.  Even if the disqualification issue had been raised, the Circuit made no holding on the question in its opinion.  *See* 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure Jurisdiction* § 4478 (2d ed.) (footnotes omitted) ("[D]ecision of one issue does not ordinarily imply decision of another, and failure to respond to a position taken in dissent does not imply a decision contrary to the dissent.").  Settling Counsel makes no convincing argument that this issue was somehow implicitly decided.  *See Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  Therefore, the Court proceeds to resolve the disqualification question in the first instance.

> a. Identifying the Correct Legal Standard: Automatic Disqualification or Balancing the Interests?

The Court first must address Counsels' disagreement over whether California's automatic disqualification rule applies.

> i. California Law Governs

In cases considering conflicts of interest in attorney representation, the Ninth Circuit refers to the local rules of the district to determine what standards govern an ethical violation. *See Rodriguez v. W. Publ'g Corp. (Rodriguez I)*, 563 F.3d 948, 967 (9th Cir. 2009) ("By virtue of the district court's local rules, California law controls whether an ethical violation occurred."); *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1357 (9th Cir. 1998) (citing N.D. Cal. Local Rule 110-3) ("[S]tandards of professional conduct in the Northern District are those of California Rules of Professional Conduct."); *Paul E. Iacono Structural Eng'r, Inc. v. Humphrey*, 722 F.2d 435, 439 (9th Cir. 1983) ("In the absence of rules promulgated by higher authorities in the judicial system, the district courts are free to regulate the conduct of lawyers appearing before them.").

The Central District of California's Local Rule 83-3.1.2 identifies "the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto" as the "standards of professional conduct" in the

district.  C.D. Cal. R. 83-3.1.2.  Thus, California law governs our analysis in this case.

"[B]ecause we apply state law in determining matters of disqualification, we must follow the

reasoned view of the state supreme court when it has spoken on the issue."  *In re Cnty. of Los*

*Angeles*, 223 F.3d 990, 995 (9th Cir. 2000).  *But see Rodriguez v. Disner (Rodriguez II)*, 688

F.3d 645, 656 n.7 (9th Cir. 2012) (citing C.D. Cal. R. 83-3.1.3) ("However, the decision whether

to sanction or impose other discipline is a question of federal law.").

ii.   Automatic Disqualification is the Default Rule

Next, the Court must determine the proper analysis for a concurrent conflict in the class

action context.  White Counsel argue that the proper rule is automatic disqualification, while

Settling Counsel argue that the rule is a balancing test.

The Ninth Circuit held that Settling Counsel violated California Rule of Professional

Conduct 3-310(C) because the incentive agreements made the class representatives' interests

diverge from those of the absent class plaintiffs, putting counsel in the position of representing

two clients with opposing interests without a waiver.  *Radcliffe*, 715 F.3d at 1167.  Rule 3-

310(C) addresses two forms of conflict involving representation of multiple clients with adverse

interests: representing two clients with adverse interests simultaneously, and representing a

client when a lawyer has obtained confidential information from a former client that is relevant

to the current action.  Cal. Rules of Prof. Conduct 3-310(C), (E).  The incentive provisions

created a question of actual concurrent conflict under 3-310(C)(2).

The default rule for a concurrent conflict in California is automatic disqualification in all

but a small number of cases.  *See Blue Water Sunset, LLC v. Markowitz*, 192 Cal. App. 4th 477,

486-87 (2011) ("If an attorney simultaneously represents two clients with adverse interests,

automatic disqualification is the rule in all but a few instances.").  The disqualification rule in

the case of a concurrent conflict is strict and requires disqualification in nearly every case.  *See*

*People ex rel. Dep't of Corporations v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1147

(1999) (noting that when a lawyer represents "clients whose interests are directly adverse in the

same litigation . . . the rule of automatic disqualification applies"); *Flatt v. Superior Court*, 9

Cal. 4th 275, 282-85 (1994) ("Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one.").

Settling Counsel argue that the default rule is a balancing test using general principles of California disqualification law, under which disqualification is discretionary. California law does provide a set of broad principles for courts to apply when considering motions to disqualify. California law states, for example, that the power to disqualify is discretionary, and should depend on the specific circumstances of each case. *See Oaks Mgmt. Corp. v. Superior Court*, 145 Cal. App. 4th 453, 462 (2006); *William H. Raley Co. v. Superior Court,* 149 Cal. App. 3d 1042, 1048 (1983). California law directs courts to weigh several factors to make this determination. *See Raley*, 149 Cal. App. 3d at 1048. California law also generally disfavors motions to disqualify. *Sharp v. Next Entm't, Inc.*, 163 Cal. App. 4th 410, 424 (2008). Settling Counsel argue that the balancing test described by these general principles is the rule the Court should apply to the conflict in question.

However, these broad disqualification principles give way to narrower, more specific rules in the case of attorney-client conflicts. Case law addressing concurrent conflicts under Rule 3-310(C) cite these general principles as a preface to the more specific rules governing conflicts. *See Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1104 (N.D. Cal. 2003) (describing legal standard for motions to disqualify and then stating that under Rule 3-310(C), "[w]hen evaluating whether a law firm may concurrently represent two clients . . . it is presumed that the duty of loyalty has been breached and counsel is automatically disqualified."); *SpeeDee Oil*, 20 Cal. 4th at 1145-48 (reviewing general disqualification rules before articulating the automatic disqualification rule in the case of a concurrent attorney-client conflict); *Oaks Mgmt. Corp*, 145 Cal. App. 4th at 463-64 (discussing general principles as a preface to describing the specific rules for concurrent and successive representation). General principles may govern the majority of disqualification issues, but they yield to narrower rules when an attorney-client conflict is at issue. When that conflict is a concurrent conflict, automatic disqualification is the governing rule. Whether that rule also governs class action conflicts and this case, however, is a different question.

iii.  Whether Automatic Disqualification Applies in This Case

Although the default rule for concurrent conflicts is clear in traditional litigation, it is less clear that the same standard should apply in class action cases.  The case law is mixed in the class action context, and the cases interpreting Rule 3-310(C) are not factually similar to our situation.  Settling Counsel argue that the automatic disqualification rule should not apply in class action cases, and that the Court should instead adopt a liberal application of conflict rules in the class action context.  *See Lazy Oil Co. v. Witco Corp.* 166 F.3d 581, 589 (3d Cir. 1999) (quoting Bruce A. Green, *Conflicts of Interest in Litigation: The Judicial Role,* 65 Fordham L. Rev. 71, 127 (1996)) ("Moreover, the conflict rules do not appear to be drafted with class action procedures in mind and may be at odds with the policies underlying the class action rules."); *In re "Agent Orange" Prod. Liab. Litig.* 800 F.2d 14, 19 (2d Cir. 1986) ("Thus, we conclude that the traditional rules that have been developed in the course of attorneys' representation of the interests of clients outside of the class action context should not be mechanically applied to the problems that arise in the settlement of class action litigation."); *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 165 (3d Cir. 1984) (Adams, J., concurring) ("Similarly, although the importance of maintaining client confidences cannot be minimized, a rigid 'prophylactic rule' in the area of client confidentiality in class actions would appear to be inappropriate.").  White Counsel disagree and argue that automatic disqualification applies.

### 1.  Legal Context

Because the proper application of California law is unclear in this case, the Court conducts a brief review of relevant case law to determine how to proceed.

First, California case law heavily emphasizes the importance of the policy considerations underlying the automatic disqualification rule.  The California Supreme Court wrote that the duty of loyalty is crucial to "avoid undermining public confidence in the legal profession and the judicial process."  *SpeeDee Oil,* 20 Cal. 4th at 1146.  California law protects this interest vigorously, such that even withdrawing from representation of one client is not sufficient to cure the conflict – the "hot potato rule."  *Flatt*, 9 Cal. 4th at 288.

California precedent also emphasizes that, regardless of the intention or motivation of the lawyers involved, protecting a client's expectation of undivided loyalty is the paramount concern.  *See id.* at 289 ("The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to attempt to reconcile conflicting interests.").  The *Cal Pak* decision encourages courts to be particularly vigilant in the class action context to protect the loyalty interests of absent plaintiffs.  *See Cal Pak Delivery, Inc. v. United Parcel Serv., Inc.*, 52 Cal. App. 4th 1, 11 (1997).  The Ninth Circuit echoes this concern.  *See Radcliffe*, 715 F.3d at 1168 (quoting *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)) ("We must be vigilant in guarding against conflicts of interest in class-action settlements because of the 'unique due process concerns for absent class members' who are bound by the court's judgments.").

In practice, however, California case law does not provide clear guidance on how courts should wield the automatic disqualification rule in class action cases.  Certainly courts can and do disqualify class action counsel for egregious misconduct, as in *Cal Pak*.  *See Cal Pak*, 52 Cal. App. 4th at 11 (disqualifying counsel in "sui generis" situation in which plaintiff's counsel "[s]urreptitiously contact[ed] the opposing party and offer[ed] to dismiss a client's action or forego filing a valid cause of action in return for payment of fees directly to the attorney").  The *Cal Pak* court did not reference the automatic disqualification rule, but upheld the trial court's decision to disqualify counsel because the trial court had "properly determined that the balance of interest warranted disqualification."  *Id.* at 12.  *Cal Pak* is not the only class action conflicts case that analyzes disqualification in a factually distinct scenario but does not clearly rely on the automatic disqualification rule.  In *Apple Computer*, the California Court of Appeal applied the "divided loyalties rule," and cited case law relevant to the automatic disqualification rule, but did not actually articulate automatic disqualification as the basis for its decision.  *See Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253, 1262 (2005) (upholding disqualification under California's "divided loyalties" rule where the named plaintiff was a

lawyer represented by the law firm at which he worked, and co-counsel on his case also partnered with his law firm in similar lawsuits).

Alongside the ambiguity in *Cal Pak* and *Apple Computer*, several California cases address the automatic disqualification rule but do not apply it.  These cases do not abandon the rule, but use it flexibly to accommodate the difficulties of class action cases.  In *Koo v. Rubio's Restaurants, Inc.*, the court found no conflict requiring disqualification because defense counsel had not actually formed an attorney-client relationship with the plaintiffs, even though he claimed that his law firm represented both the defendants and class members.  109 Cal. App. 4th 719, 726-29 (2003).  The court acknowledged but did not apply the automatic disqualification rule, and declined to exercise its discretion to disqualify counsel.  *Id*. at 729, 735 (quoting *In re Agent Orange*, 800 F.2d at 19) ("[T]he traditional rules that have been developed in the course of attorneys' representation of the interests of clients outside of the class action context should not be mechanically applied to the problems that arise in . . . class action litigation.").  Again, in *Sharp*, the court referenced but did not apply the automatic disqualification rule.  *See Sharp*, 163 Cal. App. 4th at 428-34.  Instead, the court interpreted the waiver requirement broadly to find no conflict and cited *Lazy Oil* for the concept that "traditional rules of professional conduct cannot be applied mechanically in the realm of class actions."  *Id*. (citing *Lazy Oil,* 166 F.3d at 589-590) (declining to disqualify counsel representing class members and union that paid for the lawsuit by construing waiver requirement broadly, noting that "[i]n the realm of class actions, the rules of disqualification cannot be applied so as to defeat the purpose of the class proceedings").

The *Kullar* court acted similarly.  The court declined to apply the automatic disqualification rule even though plaintiffs' counsel represented three objectors to a primary class settlement while also seeking to represent two parallel classes that included individuals who favored the settlement in the primary class action.  *Kullar v. Foot Locker Retail, Inc.*, 191 Cal. App. 4th 1201, 1207 (2011).  Even though some of the potential class members disagreed with the objectors about the original settlement, the court found that "their common interests in the outcome of the litigation [were] unaffected by that disagreement."  *Id*. at 1207 (citing *Lazy*

*Oil*, 166 F.3d at 589).  The court wrote that "[d]isqualification under the circumstances here would be no more justified than the automatic disqualification of class counsel whenever a dispute arises among class members or class representatives as to the advisability of settlement." *Id*. at 1207 (citing *Lazy Oil*, 166 F.3d at 589; *Agent Orange*, 800 F.2d at 18-19; *In re Corn Derivatives*, 748 F.2d at 162 (Adams, J., concurring)).

In contrast to the California class action jurisprudence, at least two district courts have applied the automatic disqualification rule in the class action context.   The facts of those cases are very different from this one; both address class counsel representing individuals with conflicting interests in two separate but parallel class actions.   *See Del Campo v. Mealing*, No. 01-21151, at 9-10 (N.D. Cal. Sept. 29, 2011) (applying the automatic disqualification rule to counsel representing two separate groups of plaintiffs in parallel class action cases); *Moreno v. Autozone, Inc.*, No. 05-04432, 2007 WL 4287517, at *5-7 (N.D. Cal. Dec. 6, 2007) (applying the automatic disqualification rule because attorneys representing objecting class members in an initial class action also represented a putative class in a parallel class action that included several individuals in the initial class who supported the settlement and had requested payment under the settlement).  These cases do not address the same type of temporary, intra-class conflict that developed in this case, and so are of limited utility to the Court.

The Ninth Circuit has not opined on this particular issue, but its opinions in this case and the *Rodriguez* cases give us a crucial piece of information about the nature of this conflict.  First, Ninth Circuit precedent in this case and *Rodriguez I* tell us that this type of conflict emerges as soon as the incentive awards provision is in place.  *See Radcliffe*, 715 F.3d at 1167 (holding that Settling Counsel operated under a conflict "[a]s soon as the conditional-incentive-awards provision divorced the interests of the class representatives from those of the absent class members"); *Rodriguez I*, 563 F.3d at 959 (holding that conflict caused by improper incentive award agreement between representatives and counsel was present "from day one" because the incentive structure was written into the initial retainer agreement).  In this case, the corresponding date is the point at which the incentive provision appeared in the Settlement, on April 16, 2009.  Second, *Rodriguez II* tells us that conflicts of this nature end when the

offending incentive provision loses effect.  *See Rodriguez II*, 688 F.3d at 652 (affirming both the
district court's denial of fees to conflicted counsel for any work prior to rejection of the
settlement and grant of a quantum meruit award to conflicted counsel "for services provided
after the courts' rejection of the incentive awards, at which point the conflict of interest had
come to an end").  The court enumerated this idea in a footnote, writing that "[t]he district court
properly determined that its rejection of the incentive awards cured any conflict of interest."  *Id*.
at 660 n.12.  An important part of our consideration, then, is that these conflicts are unique
because they have expiration dates.

    With this case law as a backdrop, the next step is to determine whether to apply the
automatic disqualification rule.

## 2.  Discussion

    With this legal context in mind, the Court concludes that the automatic disqualification
rule is not appropriate in this case.  There are compelling reasons to interpret California's
disqualification rule flexibly in light of California case law and these facts.  First and foremost,
this conflict was brief and caused by a specific provision in a now-defunct settlement.  Like the
conflict in *Rodriguez I* and *II*, this conflict was extinguished when the Ninth Circuit rejected the
settlement.  The *Rodriguez* cases address a different legal issue—attorneys' fees—but the logic
applies equally here.  This conflict is almost identical to that in *Rodriguez*, but is less severe
because it emerged on the eve of settlement, instead of being written into the retainer agreement
from the beginning.  In both cases, the class representatives did not have inherently opposing
interests from absent class plaintiffs; rather, the conflict was manufactured by the faulty
settlement terms.

    Second, even if California case law on conflicts in class actions does not wholly abandon
the automatic disqualification rule, the analysis shows a willingness to use the disqualification
rules flexibly.  For example, courts avoided mechanical application of waiver rules in *Sharp* and
rigid interpretation of a concurrent conflict in *Kullar*.  Multiple cases rely on the *Agent Orange*,
*Lazy Oil*, and *Corn Derivatives* analysis for these ideas, and for the general concept that rigid
application of disqualification rules may not be ideal in the class action context.  *See Kullar*, 191

Cal. App. 4th at 1207; *Sharp*, 163 Cal. App. 4th at 417; *Koo*, 109 Cal. App. 4th at 726.  The fact that this conflict was cabined and brief encourages applying a flexible test.  This case is also factually distinct from the district court cases applying the automatic disqualification rule.  In each of those cases, counsel represented overlapping groups of plaintiffs in *separate class actions* whose interests would, by definition, conflict indefinitely.  *See Del Campo*, No. 01-21151, at 9-10; *Moreno*, 2007 WL 4287517, at *5-6.  This conflict shares none of those traits.

Furthermore, the strong policy interests underlying the automatic disqualification rule simply do not carry the same force when counsel inadvertently creates a temporary conflict between absent class members and representative plaintiffs.  The duty of loyalty is crucial in the case of an attorney actively suing her client because "[a] client who learns that his or her lawyer is also representing a litigation adversary . . . cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship." *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal. App. 4th 1832, 1840 (1995).  But where counsel is not suing his or her client, and the court faces a terminated conflict within a plaintiff class, the duty of loyalty is not equivalently threatened.  Similarly, there is no concern that the conflict will continue to place well-meaning counsel in a position of choosing between clients.  The interests within the plaintiff class are no longer misaligned because the settlement is expunged.  *See Flatt*, 9 Cal. 4th at 289.  The fact that the conflict is not ongoing and does not call counsel's loyalty into question also mitigates concerns about "public confidence in the legal profession and the judicial process." *SpeeDee Oil,* 20 Cal. 4th at 1146.

With these considerations in mind, and in light of the California precedent on this point, the Court finds that it is inappropriate to rigidly apply the automatic disqualification rule to this conflict.  To do so would be to take a step forward in class action litigation that the California courts have yet to embrace.  The Court instead reverts to the balancing-of-interests analysis that California courts apply outside the automatic disqualification rule.  *See Sharp*, 163 Cal. App. 4th at 434-36.

b.  Legal Standard: Balancing the Interests

The power to disqualify an attorney is rooted in a court's inherent powers and is within a court's discretion. *Oaks Mgmt. Corp.*, 145 Cal. App. 4th at 462 ("A judge's authority to disqualify an attorney has its origins in the inherent power of every court in the furtherance of justice to control the conduct of ministerial officers and other persons in pending judicial proceedings."). California law also provides that "the propriety of disqualification depends on the circumstances of the particular case in light of competing interests." *Id.* at 464-65 (citing *Raley*, 149 Cal. App. 3d at 1048). Courts use a balancing process to decide whether disqualification is proper:

> The court must weigh the combined effects of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest.

*Raley*, 149 Cal. App. 3d at 1048. However, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *SpeeDee Oil,* 20 Cal. 4th at 1145. But, because motions to disqualify are often tactically motivated, such motions are strongly disfavored and subject to "particularly strict judicial scrutiny." *Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985) (citation omitted); *see Sharp*, 163 Cal. App. 4th at 424 ("Motions to disqualify counsel are especially prone to tactical abuse because disqualification imposes heavy burdens on both the clients and courts . . .").

c.   Discussion

The Court begins with California law's emphasis on the duty of loyalty. The prohibition on concurrent representation is designed to ensure the attorney's duty of undivided loyalty, and the client's legitimate expectation thereof. *Flatt*, 9 Cal. 4th at 284. "Attorneys who concurrently represent more than one client should not have to choose which client's interests are paramount or make a choice between conflicting duties." *Sharp*, 163 Cal. App. 4th at 428.

The instant conflict and the associated conduct of Settling Counsel do not seriously threaten the policy concerns underlying the duty of loyalty.  The ultimate impact of the conflict was cabined.  Unlike the incentive agreement in *Rodriguez*, this incentive award provision was displayed to the Court in the Settlement Agreement soon after its drafting and after the settlement terms were fully argued and agreed upon.  The incentive term had no impact on the settlement amount, which was well-received by a large portion of the responding class members.  *See White*, 803 F. Supp. 2d at 1100 ("Proportionally, the number of objectors and opt-outs amounts to 0.000371% of the people who received direct notice of the Settlement and 0.2% of the people who responded to the notice.").

We also have the unique situation in which the loyalty in question is not split between a plaintiff on one side and a defendant on the other.  Instead, the conflict existed between two plaintiff groups, and calls into question counsel's loyalty to the absent class.  The attorneys in question have committed no other ethical violations, have vigorously litigated the claims up to this point, did not enter into the improper award agreements until the eve of settlement, and successfully arranged far-reaching and groundbreaking injunctive relief.  The Court does not find that there is a violation of loyalty to the class serious enough to warrant the same type of treatment as the most "egregious" concurrent violations.  Where the conflict is short-lived, did not pit current clients against one another, and did not substantially affect the terms of the settlement, it seems unduly harsh to punish counsel with the full weight of disqualification.

The Court turns to weighing a "party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding" against "the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest."  *Raley,* 149 Cal. App. 3d at 1048.  This is another area in which it is difficult to apply the traditional framework of conflicts analysis to the facts of a complex class action matter.  Where a conflict divides plaintiffs, it is difficult to determine which group is rightfully "counsel of choice," and whose

interest in representing a client should supersede.  In light of the ambiguity, the Court finds those two considerations to be of reduced significance.

The burden on the class of replacing Settling Counsel is discounted by the fact that White Counsel, at least two of whom have been a part of the litigation team from the beginning, would remain involved.  However, replacing the expertise and experience of Settling Counsel would be challenging and costly, particularly given the long history of this litigation and its complex nature.  Although both counsel are skilled and experienced, Settling Counsel unquestionably have more class action and consumer class action experience, including FCRA experience.  To disqualify them would be a serious blow to the class's legal team, weighing against disqualification.

Measuring tactical abuse is also challenging.  The two legal teams have long disagreed on the best way to litigate this case.  It is hard not to imagine that any motion to disqualify in such cases is designed partly to serve the class and partly to gain control over a lawsuit that each group feels entitled to direct. But nothing in the record or the Court's experience with counsel on either side suggests bad faith or maliciousness.  The Court finds tactical abuse to be a neutral factor.

Concerns about vigorous advocacy by independent counsel do not weigh heavily in this debate.  As discussed previously, Settling Counsel's performance before and after the conflict has left the Court with no concern about their commitment to the class as a whole.  This conflict was narrow, short-lived, and did not pit two clients against one another in the same litigation, neutralizing concerns about divided loyalties in the future.  The class is also represented by an array of lawyers, further minimizing these concerns.  Settling Counsel has also added new attorneys, both from a public interest law firm and a new FCRA firm.  This will help protect the class from any residual advocacy concerns the Court can imagine.  Taking these facts together, the Court finds that this factor weighs against disqualification.

Finally, the Court considers the general policy interest of not undermining the purpose of class actions with disqualification rules designed for more traditional lawsuits.  "If, by applying the usual rules on attorney-client relations, class counsel could easily be disqualified in these

cases, not only would the objectors enjoy great 'leverage,' but many fair and reasonable settlements would be undermined by the need to find substitute counsel after months or even years of fruitful settlement negotiations." *Lazy Oil*, 166 F.3d at 589; *see Sharp*, 163 Cal. App. 4th at 428-34 ("[T]raditional rules of professional conduct cannot be applied mechanically in the realm of class actions.").  The problem this case presents is not new to class action litigation: the conflict rules written for single-client, traditional litigation simply have limited utility under these circumstances.  *See Bash v. Firstmark Standard Life Ins. Co.*, 861 F.2d 159, 161 (7th Cir. 1988) ("[C]onflicts of interest are built into the device of the class action[.]").  The conflict that emerged in this case is a direct result of the unique and evolving nature of complex class action lawsuits.  Because of these circumstances, the conflict does not implicate the same degree of concern over loyalty and fairness as would a traditional concurrent conflict, and the end of the settlement ends the conflict.  Disqualifying Settling Counsel would deprive the class of valuable experience and skill.  Disqualification would also be unduly harsh to Settling Counsel and disproportionate to their actions.  Because disqualification would be unfair and bad for the class, this factor weighs against disqualification.

After reviewing the record and considering the above factors, the Court declines to exercise its discretion to disqualify Settling Counsel.   In light of these considerations, the Motion to Disqualify is DENIED.

## III.    Motion and Cross-Motion to Appoint Interim Class Counsel

Because the Court declines to disqualify Settling Counsel, it is necessary to evaluate both counsels' respective motions for appointment as interim class counsel.

White Counsel argue that Settling Counsel are inadequate to represent the class because they violated Rule 3-310.  The argument proceeds that the violation damaged Settling Counsel's loyalty and credibility because they willfully drafted a conflicted settlement term, defended that term in litigation, and then "defiantly refused to acknowledge their error."  Motion to Disqualify at 15.  White Counsel claim that a "series of irreversible effects" permanently divorce Settling Counsel's interests from those of the class, including: (1) potential civil liability for breach of the duty of loyalty; (2) potential liability for lost interest to the class during the appeal; (3)

forfeiting the right to fees for further work; (4) adverse incentives to enter into a new settlement to avoid the cost of re-noticing the class.

Settling Counsel respond that no present conflict exists, and so there is no further ethical concern. Second, they point out that the monetary relief settlement was fully negotiated before the conflicted incentive award provision, and the Ninth Circuit took no issue with that settlement. Settling Counsel further claim full commitment to the lawsuit regardless of the prior settlement, and state outright that they will not apply for fees incurred during the conflicted representation period. *See* HT 48.[1] Settling Counsel have also agreed to cover any cost of re-noticing the class, should such a step become necessary. *See id.* at 180-81. Settling Counsel dismiss the potential for civil liability as a red herring, and point out that their own fee interests are directly tied to the amount of the settlement. Finally, Settling Counsel have since partnered with additional counsel to ensure that there are no doubts about their commitment to obtaining the best results for the class. The new members of the Settling Counsel team are two attorneys from the public interest law firm Public Justice, P.C., and FCRA specialists from Francis & Mailman, P.C.

Upon considering the voluminous filings and extensive oral argument on this issue, the Court finds that the conflicted incentive award term does not justify finding class counsel inadequate. While the ethical violation is a serious consideration in determining whether to allow Settling Counsel to remain as class counsel, the Court finds on balance that Settling Counsel is the better team to represent the class under Rule 23(g).

a. Legal Standards

i. Appointing Interim Counsel

Rule 23(g)(3) grants the Court authority to appoint pre-certification "interim" class counsel. *See* Fed R. Civ. P. 23(g)(3). The 2003 Advisory Committee Notes explain that interim counsel should be appointed "if necessary to protect the interests of the putative class," and may be appropriate in cases of "rivalry or uncertainty." *Id.*, 2003 Advisory Committee Notes. Any

---

[1] "HT" refers to the Hearing Transcript for the hearing held on August 41, 2013 (Dkt. 936).

attorney acting on behalf of the class "must act in the best interests of the class as a whole." *Id*. Interim counsel can only be appointed if that counsel is adequate under the Rule 23(g)(1) factors and will "fairly and adequately represent the interests of the class" under Rule 23(g)(4).  Fed R. Civ. P. 23(g)(2).

In deciding whether to appoint class counsel in the case of only one applicant, the Court must determine whether the applicant is "able to provide the representation called for by paragraph (1)(B) in light of the factors identified in paragraph (1)(C)." *Id*.  When there are multiple lead counsel applicants that are adequate under Rule 23(g)(1)(A), "the court must appoint the applicant best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2). The Advisory Committee Notes elaborate on this process:

> This decision should also be made using the factors outlined in paragraph (1)(C), but in the multiple applicant situation the court is to go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants.  As with the decision whether to appoint the sole applicant for the position, no single factor should be dispositive in selecting class counsel in cases in which there are multiple applicants.

*Id*., 2003 Advisory Committee Notes.

### ii.  Adequacy of Class Counsel

In evaluating adequacy under Rule 23(g)(1)(B), the Court looks to the factors identified in paragraph (1)(A): (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  Beyond the four considerations set forth in Rule 23(g)(1)(A), the Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

There is no specific direction in Rule 23 regarding how a court should consider prior ethical conduct in the adequacy analysis.  Because the issue does not fit smoothly into any of the

four enumerated factors, the Court considers it under the final residual factor, 23(g)(1)(A), as "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  This is consistent with other district courts considering this issue.  *See* Second Decl. of William B. Rubenstein ("Second Rubenstein Decl.") (Dkt. 903) ¶ 13; *Deangelis v. Corzine*, 286 F.R.D. 220, 224 (S.D.N.Y. 2012) (deciding first that all applicant counsel were adequate under Rule 23 before considering and rejecting concerns that one lead counsel firm "may be tainted by conflicts of interest arising out of their prior participation in the Securities Action, because the putative class in that action seeks damages from the same limited pool of resources as the putative class in the Commodities Action"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006) (deciding first that all applicant counsel were "adequate" under the four Rule 23 factors before weighing how one group's "baggage" of having already entered into settlements with the defendants should affect the selection of interim counsel).

This leaves the question of how to decide whether such a violation renders counsel inadequate.  Counsel have not identified a specific standard, and so the Court gathers legal guidance from the existing case law.  First, it is clear that a lawyer's unethical conduct, both before and during the litigation in question, is relevant to determining whether counsel is adequate under Rule 23.  *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011); *Yumul v. Smart Balance, Inc.*, No. 10-00927, 2010 WL 4352723, at *4 (C.D. Cal. Oct. 8, 2010) ("In determining whether to certify a class in this case, however, unethical conduct by plaintiff's counsel would be a relevant consideration."); *Walter v. Palisades Collection, LLC,* No. 06-378, 2010 WL 308978, at *10 (E.D. Pa. Jan. 26, 2010) ("Prior unethical conduct is a relevant consideration pursuant to certification under Rule 23(a)(4)."); *Bogner v. Masari Investments, LLC,* 257 F.R.D. 529, 533 (D. Ariz. 2009) (examining prior ethical complaints against proposed class counsel in a FDCPA class action).  Not every ethical violation, however, produces inadequacy under Rule 23.  *See Creative Montessori*, 662 F.3d at 917 (finding counsel adequate despite their obtaining materials from a third party "on the basis of a promise of confidentiality that concealed the purpose of obtaining

the material, a purpose inconsistent with maintaining confidentiality and likely to destroy [the broadcaster's] business," and sending a misleading letter to class representative).

At one extreme, when counsel has an ongoing conflict with a group of plaintiffs after a court rejects a settlement, counsel can no longer continue representing the whole class.  In *Piambino*, some members of the plaintiff class were claimants in a separate state-court class action against the same defendant.  *Piambino v. Bailey (Piambino I),* 610 F.2d 1306 (5th Cir. 1980).  Because the defendant lacked sufficient funds to pay the state court judgment and relief to the rest of the federal class, class counsel took steps to prevent the state plaintiffs from receiving payments.  *Id*. at 1314.  The *Piambino I* court reversed the injunction preventing payments to state claimants and allowed a Compliance Officer to intervene on behalf of those claimants.  *Id* at 1333.  When the case returned to the Eleventh Circuit in *Piambino II*, the court discussed the inherent conflict in class counsel's representing both groups of plaintiffs, and class counsel's misleading and questionable conduct surrounding its representation of the class.  *Piambino v. Bailey (Piambino II)*, 757 F.2d 1112, 1143 (11th Cir. 1985).  Finding that "any settlement [counsel] might arrange would, indeed, be suspect, even if, in truth, it was 'fair, adequate, and reasonable,'" the court invoked its supervisory power to remove class counsel from the case.  *Id*. at 1146.

Under less severe circumstances, unethical conduct that does not directly harm the class or create an immediate conflict can also render counsel inadequate.  In the Seventh Circuit, "[m]isconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification."  *Creative Montessori*, 662 F.3d at 917-18 (noting that counsel's "lack of integrity . . . casts serious doubt on their trustworthiness" and that there was "no basis for confidence that they would prosecute the case in the interest of the class . . . rather than just in their interest as lawyers") (internal citations omitted).  Such a "serious doubt" about the adequacy of counsel exists "when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case."  *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 499 (7th Cir. 2013).  Case law preceding this standard suggests that the degree of unethical conduct justifying a finding of inadequacy is high, and often turns on

counsel's integrity and candor.  *See Viveros v. VPP Grp., LLC*, No. 12- 129, 2013 WL 3733388, at *11 (W.D. Wis. July 15, 2013) (denying class certification in part because class counsel was previously publicly reprimanded by the Wisconsin Supreme Court for making misrepresentations to the Office of Lawyer Regulation, had improperly solicited a client, and had made improper comments during closing arguments in another case); *Walter,* 2010 WL 308978, at *10 (finding class counsel inadequate due to multiple prior disbarments for issues associated with the application of client funds, multiple sanctions, a "private reprimand" from the state Supreme Court disciplinary board, and a "history of dilatoriness" in the litigation at hand); *Bodner v. Oreck Direct, LLC*, No. 06-4756, 2007 WL 1223777, at *2-3 (N.D. Cal. Apr. 25, 2007) (denying certification where class counsel had a pattern of ethical violations showing that counsel repeatedly developed lawsuits before finding plaintiffs, a "cart before the horse" approach, "never mind the lack of a fitting plaintiff or the lack of ethical scruples"); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510-11 (N.D. Ill. 1990) (granting motion for decertification in part because "plaintiff's counsel was at least a silent accomplice in, and at most encouraged," plaintiff's false deposition testimony); *Wagner v. Lehman Brothers Kuhn Loeb Inc.*, 646 F. Supp. 643, 659, 661-62 (N.D. Ill.1986) (denying class certification in part because class counsel offered to pay a witness for his testimony).

      b.  Discussion

        i.  Adequacy

          1.  Work Counsel Has Done in Identifying or Investigating Potential Claims in the Action

The Court finds that both counsel have worked extensively on this matter.  Settling Counsel have been on the scene since the beginning, and have assumed the lead counsel role. The White Counsel team includes attorneys Wolf and Juntikka, both of whom were involved in the litigation from its earliest stages.  Boies Schiller joined the action in March 2009 and has been an active presence since.  *See* Motion to Appoint Interim Counsel at 8.  Consideration of the whole record shows that both groups have participated significantly in the legal work of this case.  Although both counsel do much hand-wringing and pearl-clutching over the various tasks

undertaken, or not, by each respective team, the Court finds these protestations trivial.  Each team has performed sufficient work for this factor to weigh in favor of adequacy for both.

### 2.  Counsel's Experience in Handling Class Actions, other Complex Litigation, and the Types of Claims Asserted in the Action

The Court similarly finds that both teams present sufficient experience to satisfy the adequacy inquiry.  Settling Counsel's record on this front is more impressive, as the legal team boasts extensive experience in class action lawsuits generally and FCRA particularly, with FCRA-dedicated lawyers from Francis & Mailman and class-action focused attorneys from Lieff Cabraser and Caddell & Chapman.  White Counsel have notably less class action and specialized FCRA experience, and none of the attorneys have served as lead class counsel.  *See* HT 138.  However, attorneys from Boies Schiller bring strong experience in general complex litigation.  *See* Motion to Appoint Interim Counsel at 4-5; Decl. of George F. Carpinello (Dkt. 902) ¶ 6.  Boies Schiller also represents that further resources and personnel at the firm are available, should they be needed.  HT 139-40; Motion to Appoint Interim Counsel at 11.  Given the experience of White Counsel in complex litigation matters generally, and in this lawsuit up to this point, the Court does not find that its less compelling credentials tip the scales against adequacy on this basis.  The Court thus finds that this factor weighs in favor of adequacy for both counsel.

### 3.  Counsel's Knowledge of the Applicable Law

In this arena, again, Settling Counsel's credentials are superior.  The FCRA, particularly in the class action context, is a complex and challenging area of law.  Settling Counsel's team includes a deeper bench on FCRA litigation, while the White Counsel team does not include a specific, experienced FCRA attorney.  However, White Counsel can count bankruptcy expertise on their side, and long-running involvement with the current litigation.  Requiring that every FCRA litigation team include a preordained expert would be absurd.  Nevertheless, the FCRA issues presented here are compounded by the size of the class and the complexity of the questions, making FCRA expertise even more valuable.  Still, White Counsel are experienced in complex litigation and have participated in this case up to this point.  The Court has no reason to

doubt these lawyers' abilities to handle the doctrinal complexities they face, and to associate additional counsel if necessary.  The Court thus finds that this factor weighs in favor of adequacy for both counsel.

### 4.   The Resources that Counsel Will Commit to Representing the Class

Both counsel have committed significant resources to this litigation.  Again, the Court acknowledges that each set of lawyers has a different opinion of the opposing counsel's commitment, work product, and approach.  Despite these near-fanatic beliefs, however, the Court finds that both sides have proved themselves ready and willing to commit the appropriate degree of attention and resources to this litigation.  The Court finds that this factor also weighs in favor of adequacy for both parties.

On these factors, the Court concludes that both counsel are adequate to represent the class.  *See also* Second Rubenstein Decl. ¶ 3.

### 5.   Residual Considerations Under Rule 23(g)(1)(B)

Where all the other factors weigh in favor of finding both parties adequate, the Court now turns to whether there are any considerations that might call into question either side's ability to fairly and adequately represent the class.  The only such factor of which the Court is aware is Settling Counsel's prior ethical violation caused by the improper incentive award structure.  With the standards described above in mind, the Court concludes that the conflict does not render Settling Counsel inadequate under Rule 23(g).

First, the Court notes that the question is not whether a present conflict exists between Settling Counsel and the absent class.  As discussed previously, the Court finds that no conflict existed after the Ninth Circuit rejected the settlement.  *See  Rodriguez II*, 688 F.3d at 652.  This is not a case like *Piambino*, in which the conflicts that destroyed the first settlement could not be rectified.  *See Piambino II*, 757 F.2d at 1143.  Instead, the Court must now determine the after-effects of an ethical violation whose immediate taint has been cured.  This is more similar to the unethical conduct that does not directly harm the class or create an immediate conflict that the Seventh Circuit contemplated in *Creative Montessori*, 662 F.3d at 917.

The Court finds that this is not a situation in which greedy counsel have sold out their plaintiffs for their own benefit.  Concerns about such unscrupulous and distasteful tactics are well-founded, and the Court has carefully reviewed this record for any evidence of malfeasance.  Ultimately, the Court finds that Settling Counsel has generally been attentive, diligent, and vigorous in their representation.  The conflict did not become an issue until the eve of settlement, before which counsel had helped negotiate far-reaching and badly needed injunctive relief that will benefit all consumers going forward.  Counsel also negotiated a very high settlement in the face of a tentative order denying certification.  Ultimately, the Court can find no bad faith in Settling Counsel's actions.

The Court also finds nothing insidious in Settling Counsel's failure to call the conflict to the attention of the Court, or their insistence on defending the provision in further litigation.  First, the incentive provision was part of the preliminary settlement papers presented to the Court, not a hidden agreement entered into privately or later exposed at certification, as in *Rodriguez.  See Rodriguez I*, 563 F.3d at 959.  Second, the Court can see nothing insidious in Settling Counsel's defense of the provision.  The Court finds Settling Counsel credible in their representations that they believed the incentive award was appropriate and non-conflicted.  *See* HT 49-50.  The fact that they were wrong on the law does not make them liars.  Indeed, the Court agreed with Settling Counsel and approved the settlement.  The Court thus shares the burden of fault for not recognizing the implications of the incentive provision.

The Court is more concerned about the apparent breakdown of communication between Settling Counsel and the White Plaintiffs.  *See* First Rubenstein Decl. ¶¶ 32-33.  Communicating in a timely way with class representatives is a crucial part of lead counsel's responsibilities, and it seems that Settling Counsel faltered on this front.  The Court does not find that this raises "serious doubts" about Counsel's integrity or loyalty, but it does suggest Settling Counsel's efforts to manage the litigation fell short.

Concerns about adverse incentives, including possible civil liability or costs of re-noticing the class, are better taken.  Indeed, the *Piambino II* court considered the financial liability of counsel too strong an incentive to settle.  In that case, however, counsel had already

spent the $800,000 in attorneys' fees that the court demanded returned after removing counsel from the lawsuit. *Piambino II*, 757 F.2d at 1146 ("Whatever course Lead Counsel choose to follow in an effort to extricate themselves from their present dilemma, one thing is clear: if allowed to remain in this case, they would have a compelling interest in negotiating a settlement that covers their losses."). The immediacy of that threat is far different than the amorphous potential for civil liability in this case. The possibility of civil liability by a class cannot be sufficient on its own to render counsel inadequate if there is to be any leeway granted for misconduct in the adequacy realm. As previously discussed, misconduct within the course of a class action case is not a per se bar to adequacy, although nearly all misconduct likely could give rise to some form of civil liability.

The Court also finds the association of further counsel, particularly a public interest law firm associated with a nonprofit, relevant to this question. Settling Counsel added their new partners with a specific eye to neutralizing any improper incentives for renewing the old settlement, or any attachment thereto. Counsel in fact hired an expert specifically to help draft the association agreements to speak to this issue. *See* First Decl. of Charles Silver ("First Silver Decl.") (Dkt. 891) ¶¶ 6, 8-11; Second Decl. of Charles Silver ("Second Silver Decl.") (Dkt. 911) ¶¶ 26-31. The Court also agrees that the addition of new counsel shores up any risk of adverse incentives on the Settling Counsel team. The Court disagrees with White Counsel's argument that previous donations by Settling Counsel to Public Justice's foundation or to the NCLC render the partnership suspect. The record does not suggest to the Court that an improper relationship has ever existed, nor that Public Justice and NCLC offer their services as a way to garner donations in the future. *See* HT 122-27. The overall budgets of these organizations suggest that donations from the law firms in this case are valuable but not indispensable. *See id.* at 132.

The Court finds no basis on which to seriously doubt Settling Counsel's integrity or loyalty to the class. Because courts considering these issues consistently focus on counsel's motivations, integrity, and credibility, and keep vigilant watch for any bad faith desire to cash in at the expense of the class, the Court primarily bases its finding on this ground. The record

simply does not demonstrate any nefarious, manipulative, or self-serving calculation behind Settling Counsel's actions.  The factual record herein and the Court's own experience with this legal team shows a professional, capable, and committed set of attorneys.

The Court does not intend to minimize the importance of conflicts in the class conflict generally, nor to reduce the importance of searching inquiry.  Where the conflict was brief and pointed, however, and not inherent to the nature of the suit, there is room to look back to counsel's motivations, behavior, and integrity to determine their role going forward.  Where the record bears out an unfortunate and significant legal miscalculation rather than a sneaky power play, the Court sees no reason to question counsel's loyalty.

The Court thus finds Settling Counsel adequate to represent the class under Rule 23(g).

## ii.  Choosing Between Adequate Applicants

Because both applicants are adequate, the Court turns to the issue of which counsel is "best able to represent the interests of the class."  Fed R. Civ. P. 23(g)(2).  As directed in the Advisory Committee Notes, the Court revisits the Rule 23 adequacy factors to determine which counsel group should represent the class going forward.  Regarding the amount of work and resources committed thus far, the Court finds no difference between the two groups that justifies preferring one over the other.  Similarly, the Court finds that the willingness of both teams to commit resources in the future is equally matched.

Regarding the experience of the respective teams and their expertise in the relevant area, however, Settling Counsel have a distinct advantage.  As discussed, Settling Counsel's credentials and experience are significantly stronger in class action and FCRA litigation.  Indeed, it is these credentials that likely drew Mr. Juntikka and Mr. Wolf to request Lieff Cabraser's help in the first place.  The team is also more varied and appears to work well together.  Settling Counsel's work on this case up to this point has been excellent.  First, Settling Counsel negotiated far-reaching and incredibly valuable injunctive relief on behalf of this class.  That settlement was two-fold, requiring both retrospective and prospective relief.  The agreement required fixing errors on existing credit reports and changing credit reporting agencies' methods of tracking and reporting consumer credit information.  This was a significant

benefit not only to the class, but to the public at large.  Settling Counsel played an important role in orchestrating this relief.

Second, the incentive provision does not destroy the value of the underlying settlement. Settling Counsel helped negotiate a very valuable and comprehensive monetary settlement, the terms of which were arranged before Settling Counsel added the incentive provision.  Although White Counsel strenuously emphasize that the settlement abandoned class members for pennies on the dollar, the Court views this as a short-sighted position.  The settlement provided $45 million for the class, one of the highest FCRA settlements in history.  The agreement rewarded plaintiffs with proof of harm with monetary awards commensurate to their losses.  Plaintiffs with proof would receive anywhere from $150 to $750, depending on the type of loan they lost. This is well within the range of these parties' statutory damages, which would range between $100 and $1,000, and appropriately scaled awards to the harm experienced.  The settlement further provided a "convenience award" of about $25 to members of the class *who could show no proof of any injury*.  Settling Counsel was able to obtain such an agreement while the Court's tentative order denying certification stared the parties in the face, which is further evidence of their skill and commitment to the class.

In tandem with the Court's review of Settling Counsel's work in the case up to this point, the Court considers the problems created by the incentive provision.  The Court agrees with White Counsel that the ethical violation must be relevant to this discussion.  *See* Second Rubenstein Decl. ¶¶ 23-25.  Finding counsel adequate does not render the violation irrelevant; determining which counsel is *better* for a job is not the same as deciding whether each is *capable*.  *See Deangelis*, 286 F.R.D. at 224; *In re Air Cargo*, 240 F.R.D. at 58.  The Court therefore considers the ethical violation an important part of this analysis.  Settling Counsel made a significant legal miscalculation and a costly mistake when they included the incentive provision.

But, the Court does not believe that the taint of the incentive provisions should hover, Pigpen-like, around Settling Counsel forevermore.  The Court finds no bad faith or improper motives behind the incentive provision, and does not find any basis to question Settling

Counsel's integrity.  The conflict itself did not affect the terms of the settlement, which were very favorable and carefully calibrated to account for varying degrees of harm within the plaintiff class.  Settling Counsel has also taken extraordinary steps to neutralize the effect of the ethical violation, including associating new counsel, disclaiming any fees for the conflicted representation, and agreeing to accept the costs of re-notice.  Thus, while the Court carefully considers the impact of the ethical violation, the Court does not find this to be indicative of any underlying incompetence or dishonesty on Settling Counsel's part.

With these considerations in mind, the Court turns to evaluating White Counsel. Regarding skill and experience, White Counsel lack the same depth of class action and FCRA experience.  Generally, the Court would not be reticent to give skilled litigation generalists control of a class action despite a relative lack of specialized experience.  The Court hesitates in this case because of its complexity and extensive history.  Although Boies Schiller carries an impressive reputation, none of the attorneys on record here has ever served as lead counsel for a class action; their class action experience overall is very limited.  Generalized promises of additional resources and personnel are valuable, but the promised expertise is not yet evident. The White Counsel team also does not appear to have made significant efforts to add on additional counsel who might help fill gaps in the team's current experience.

White Counsel also have less accumulated experience with this particular case.  Although Mr. Juntikka and Mr. Wolf have participated in this case from the beginning and participated in the injunctive relief negotiations, they represent a small part of the overall legal team up to this point.  Boies Schiller is a relatively recent addition, with most of its work focused on the post-settlement phase.  *See* Orders Admitting George Carpinello and Adam Shaw *pro hac vice*, May 8, 2009 (Dkt. 425, 426).  These aspects of White Counsel's experience put them at a disadvantage compared to Settling Counsel.

The Court also carefully considers White Counsel's valuation of this case as a statutory damages case.  The Court articulated numerous concerns with this theory and with the overall theory of class certification in its 2009 tentative order denying certification.  *See* Tentative Order.  Specifically, the Court found that the typicality and commonality requirements could not

be met when some class plaintiffs had benefited from Defendants' past reporting practices, while others were harmed. *See id*. at 7-8. These same concerns, along with the constitutional concerns of awarding statutory damages to individuals who suffered no harm, informed the Court's finding that the class did not satisfy Rule 23(b). *See id*. at 10. White Counsel seek to risk the substantial awards allotted to class members with actual proof in favor of those with no proof whatsoever, also while risking the commonality and typicality issues the Court raised in its tentative.

Despite these concerns, and the Court's tentative decision denying certification, White Counsel seem unwilling to entertain any alternative. Arguments on this matter do not encourage the Court that White Counsel have considered the Court's concerns or are willing to investigate all avenues to serve the class's best interests. *See* HT 31. White Counsel expressed disagreement about the value of the prior settlement and Settling Counsel's concerns regarding individual harm because "[t]his is a statutory damages case. And no plaintiff -- no plaintiff has to show that they suffered harm, quote/unquote, as a result of a violation of a credit report that was issued in error." *Id*. The Court is perfectly willing to acknowledge its own legal error if the tentative order's analysis proves inaccurate. The Court further takes no position on the proper outcome of this case. Rather, the Court's experience with White Counsel worries the Court that the legal team has a fixed idea of its legal theory, is unwilling to reconsider that idea, and unwilling to even address the Court's concerns. This calls into question counsel's ability to reasonably evaluate all of the class's options.

The Court has considered the facts and the entirety of the record in this case, and this Court's history with both counsel in this matter. The Court has also considered appointing independent and entirely unrelated counsel going forward. This would arguably be the best outcome for the class, because there are serious questions about both counsel groups working effectively and professionally together after the rancor seen on this matter. Appointing entirely new counsel would erase any concern about bias on either side, lifting the weight of past relationships or attachments. Appointing new counsel is simply not feasible, however. The time required to locate new counsel and fully educate them on the issues and legal matters of

this case would be significant.  The Court also considers it especially unfair and burdensome to appoint new counsel to a complex and unwieldy case when the Court has already issued a tentative order denying certification.

Taking all of these considerations into account, the Court finds that Settling Counsel is the better team to represent the class going forward.  The Court finds that Settling Counsel's experience, diligence, and good faith effort up to this point show they will continue to vigorously represent the class.  Were an equivalently experienced, capable, and reasonable team available on the other side of the ledger, the Court would choose that team.  White Counsel cannot provide that option at this time.  Although White Counsel has a team of able and committed lawyers who are no doubt skillful in their practice areas, they lack the same specialized experience and depth of ability.  The Court is also deeply concerned that White Counsel are unable to see past their attachment to statutory damages and explore other options, given their unwillingness to acknowledge the Court's concerns about the divergent injury and damages within the plaintiff class.

White Counsel point out that re-appointing former lead counsel after an ethical violation may be unprecedented.  *See* Second Rubenstein Decl. ¶ 26.  The Court does not disagree.  The particular factual circumstances of this case, however, do not appear to have any true parallel in the case law.  Counsel did not lie to the Court or their clients, did not work under a conflict with clients in a different litigation, and did not work against existing clients.  The particular circumstances of this conflict are unique, and simply do not carry the same disparaging connotation as the situations faced by other courts.  The Court thus returns to its obligation to "appoint the applicant best able to represent the interests of the class," Fed. R. Civ. P. 23(g)(2), and finds that this applicant is Settling Counsel's legal team.

The Court thus DENIES White Counsel's motion for appointment of interim counsel and GRANTS Settling Counsel's cross-motion for appointment of interim counsel.

## IV.    Disposition

For the reasons stated herein, the Court rules as follows:

- White Counsel's Motion to Disqualify is DENIED;

- White Counsel's Motion to Appoint Interim Class Counsel is DENIED; and

- Settling Counsel's Cross-Motion to Appoint Interim Class Counsel is GRANTED and the Settling Counsel team is APPOINTED interim class counsel under Rule 23(g)(3);

- The Court is of the opinion that this Order involves controlling questions of law about which there is substantial ground for difference of opinion and an immediate appeal may materially advance the ultimate termination of this litigation. 28 U.S.C. § 1292(b).

DATED:       May 1, 2014

_David O. Carter_

_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE