JS-6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

TERRI N. WHITE, *et al.,*

     *Plaintiffs,*

     *v.*

EXPERIAN INFORMATION SOLUTIONS, INC.,

     *Defendant.*

and related cases:

05-cv-0173-DOC (MLGx)
05-cv-7821-DOC (MLGx)
05-cv-0392-DOC (MLGx)
05-cv-1172-DOC (MLGx)
05-cv-5060-DOC (MLGx)

Case No. 8:05-cv-01070

**ORDER GRANTING MOTION FOR FINAL APPROVAL [1108] AND MOTION FOR ATTORNEYS' FEES AND SERVICE AWARDS [1096]**

Plaintiffs José Hernandez, Kathryn Pike, Robert Randall, Bertram Robinson, and Lewis Mann ("Plaintiffs") move this Court for an order granting final approval of the class action settlement ("Settlement") reached in the above-captioned case ("Motion for Final Approval") and for Attorneys' Fees, Expenses, and Service Awards ("Motion for Attorneys' Fees"). After considering all relevant written submissions and oral argument, and for the reasons set forth below, the Court GRANTS the Motion for Final Approval and Motion for Attorneys' Fees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual History

Plaintiffs' claims center on Defendants' failure to maintain reasonable procedures to assure the accurate reporting of debts that have been discharged in bankruptcy because they relied primarily on creditors and public record vendors to

report the discharged status of debts and judgments. Plaintiffs assert claims for (i) willful and/or negligent violation of Section 1681e(b) of the Fair Credit Reporting Act, 15 U.S.C. § 1681 ("FCRA"), and its California counterpart, Cal. Civ. Code § 1784.14(b), for failure to maintain reasonable procedures to assure maximum possible accuracy; (ii) willful and/or negligent violation of Section 1681i of the FCRA and its California counterpart, Cal. Civ. Code § 1785.16, for failure to reasonably investigate consumer disputes regarding the status of the discharged accounts; and (iii) violation of California's Unfair Competition law, Cal. Bus. & Prof. Code § 17200.

This litigation dates back to 2005, when José Hernandez filed his original Class Action Complaint in *Hernandez v. Equifax Info. Services, LLC, et al.*, No. 05-cv-03996 (N.D. Cal.), which was later transferred to this District and consolidated with *White v. Equifax Info. Servs.*, LLC, 05-cv-7821 DOC (MLGx) and *Pike v. Equifax Info. Servs. LLC*, 06-cv-5600 DOC (MLGx). (*Hernandez* Dkt. No. 33; *Acosta* Dkt. No. 152.) During the course of this litigation, Plaintiffs undertook substantial discovery, including taking or defending forty depositions, producing over 50,000 pages of documents, and reviewing over 40,000 pages of documents produced by the Defendants. Plaintiffs also consulted with and retained numerous credit reporting and consumer bankruptcy experts, interviewed numerous consumers, and reviewed thousands of consumer credit reports.

From August 15, 2007, to February 2009, the parties engaged in arm's-length, contentious, lengthy, and complicated negotiations (with the participation of Defendants' insurance carriers), including seven in-person sessions with a JAMS mediator, the Hon. Lourdes Baird (Ret.), and five in-person mediation sessions with mediator Randall Wulff, as well as several additional in-person or telephonic sessions involving counsel for the parties. These efforts resulted in the April 2008

Injunctive Relief Settlement Agreement, which this Court approved. (Dkt. 290.) The parties then resumed with several mediation sessions to continue working toward a settlement of the Class's monetary relief claims, but without success. On January 26, 2009, the parties appeared for a hearing on Plaintiffs' Motion for Class Certification of a 23(b)(3) damages class. Prior to the hearing, the Court issued a tentative ruling denying Plaintiffs' Motion for Class Certification pursuant to Fed. R. Civ. P. 23(b)(3), decided not to hear the Motion at that time, and directed the parties to make a final attempt to settle the litigation.

The parties and Defendants' insurance carriers participated in an additional mediation session before mediator Wulff three days later but did not reach an agreement. The parties and Defendants' insurance carriers then participated in a settlement conference at the Court on February 5, 2009. At that conference, Plaintiffs, Equifax, and Experian reached agreement on the principal terms of a settlement (the "2009 Proposed Settlement"), which would have resolved of all Plaintiffs' claims in the Litigation for monetary damages, including statutory and punitive damages. (Dkt. 383.) TransUnion agreed to join that settlement on February 18, 2009.

After the Court granted preliminary approval, (Dkt. 423), notice was given to the Class. Plaintiffs then moved for final approval, (Dkt. 604), which this Court granted after concluding the settlement was fair and reasonable and after giving due consideration to all objections received. (Dkt. 837.) Plaintiffs/Objectors Robert Radcliffe, Chester Carter, Maria Falcon, Clifton C. Seale, III, and Arnold E. Lovell (the "White Objectors") appealed to the Ninth Circuit, which found that the Settlement's service award provision created an impermissible conflict. *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013). ("*Radcliffe I*"). In response to this ruling, Class Counsel have agreed not to seek any fees or expenses

ORDER GRANTING MOTION FOR FINAL APPROVAL [1108] AND MOTION FOR ATTORNEYS' FEES AND SERVICE AWARDS [1096]

for the period of conflict identified by the Ninth Circuit, April 1, 2009, through May 1, 2013.

On remand in 2013, Class Counsel put in place multiple additional safeguards to ensure that the Class's best interests were protected, including the presence of newly associated counsel, Public Justice, P.C. and Francis & Mailman, who, in addition to being unconnected to the prior conflict, bring considerable additional class action experience and FCRA expertise to the table. Class Counsel entered into a cooperating counsel agreement, vetted by Professor Charles Silver, to ensure that newly associated counsel are incentivized to achieve the best result for the Class. On May 1, 2014, this Court appointed Class Counsel to represent the Class under Fed. R. Civ. P. 23(g). (Dkt. 956.) Class Counsel were required to defend their appointment through a lengthy appeal to the Ninth Circuit, including a petition for certiorari to the United States Supreme Court.

After the Ninth Circuit's March 2016 ruling in *Radcliffe v. Hernandez*, 818 F.3d 537 (9th Cir. 2016) ("*Radcliffe II*") and remand to this Court, the Parties resumed settlement negotiations and attended a mediation with the Hon. Daniel Weinstein (Ret.) on August 25, 2016, but did not reach agreement. On September 19, 2016, Plaintiffs moved for leave to file a Third Amended Complaint to add two additional Class Representatives and two subclasses. (Dkt. 1005.) On October 11, 2016, this Court tentatively denied Plaintiffs' motion and ordered the parties to appear for a settlement conference before the Hon. Dickran M. Tevrizian. (Dkt. 1021.) The parties reached an agreement and signed a term sheet on November 7, 2016. Over the next few months, the parties worked to document the detailed settlement language. The final Settlement Agreement was executed on April 14, 2017.

**B.  Key Terms of the Settlement**

   **1.  The Settlement Class**

The "23(b)(3) Settlement Class"[1] that will benefit from this Settlement is co-extensive with the Settlement Class under the 2009 Proposed Settlement. It includes all consumers who have received an order of discharge pursuant to Chapter 7 of the United States Bankruptcy Code and who, at any time between and including March 15, 2002 and May 11, 2009 (or, for California residents in the case of Trans Union, any time between and including May 12, 2001 and May 11, 2009), have been the subject of a Post-bankruptcy Credit Report issued by a Defendant in which one or more of the following appeared:

   a.  A Pre-bankruptcy Civil Judgment that was reported as outstanding (i.e. it was not reported as vacated, satisfied, paid, settled or discharged in bankruptcy) and without information sufficient to establish that it was, in fact, excluded from the bankruptcy discharge;

   b.  A Pre-bankruptcy Installment or Mortgage loan that was reported as delinquent or with a derogatory notation (other than "discharged in bankruptcy," "included in bankruptcy," or similar description) and without information sufficient to establish that it was, in fact, excluded from the bankruptcy discharge; and/or

   c.  A Pre-bankruptcy Revolving Account that was reported as delinquent or with a derogatory notation (other than "discharged in bankruptcy," "included in bankruptcy" or similar description) and without information sufficient to establish that it was, in fact, excluded from the bankruptcy discharge; and/or

_____
[1] Capitalized terms herein have the meanings defined in the Settlement Agreement.

d. A Pre-bankruptcy Collection Account that remained in collection after the bankruptcy date.

Under the 2009 Proposed Settlement, Defendants identified Class members using commercially reasonable procedures to search a selection of their archived files. Defendants have now updated that list and provided the Settlement Administrator with the last known mailing address associated with Class members. The Settlement Administrator has de-duplicated and updated the Class list to identify 15,335,681 Settlement Class members.

## 2. Settlement Benefits

The Settlement provides both significant monetary and important, new nonmonetary benefits. In terms of monetary benefits, the Settlement creates a non-reversionary fund consisting of approximately $37.7 million[2] remaining in the registry of the Court after payment of notice and administration expenses was made in connection with the 2009 Proposed Settlement and an additional $1 million contributed by the Defendants, for a total of approximately $38.7 million in non-reversionary cash benefits. (Settlement Agreement § 1.66.) Class members may claim either an Actual Damage Award, a Convenience Award, or a package on Non-Monetary Benefits. (*Id.* § 7.2.) Importantly, all approved claims submitted in connection with the 2009 Proposed Settlement will be automatically honored in this Settlement without further submissions. (*Id.* § 7.1(a).) Actual Damage Awards are reserved for Class members who can demonstrate that a credit inquiry was performed between March 15, 2002 and May 11, 2009 (or, for California residents in the case of TransUnion, any time between and including May 12, 2001 and May 11, 2009), related to the denial of employment, a mortgage or housing rental, or a credit card, auto loan, or other credit applied for, or requiring payment of a

###################################################

[2] This total includes $37,350,666.18 in principal remaining in the fund as of December 31, 2016, plus more than $300,000 in accrued interest.

discharged debt to obtain credit. (Settlement Agreement, Schedule 6.2.) Actual Damage Awards Claimants will receive $750 for denial of employment, $500 for denial of a mortgage or housing rental, or $150 for denial of other credit. (*Id.* )

If Class members cannot meet the proof requirements for an Actual Damage Award, they may claim a Convenience Award, with no requirement of attestation. (Settlement Agreement § 1.14; Dkt. 1066-7 at 3.) Convenience Award Claimants will receive a pro rata share of Convenience Award Funds remaining after payment of notice and administration costs, service awards, if any, any award of attorneys' fees and costs, and estimated amounts to be paid for Actual Damage Awards. (*Id.* §§ 1.4, 7.2.) The amounts of any checks, including both Actual Damage and Convenience Award checks, that remain uncashed more than 120 days after the date on the check will be redistributed on a *pro rata* basis to Convenience Award Claimants who cashed their first check, so long as the redistribution would not result in too low an amount to be economically feasible. (*Id.* § 7.2(c).)

The Settlement gives Class members the option of claiming, as an alternative to a monetary damage award, an extra free copy of their credit reports (beyond the free annual FACTA disclosure) and two free VantageScore Credit Scores. This benefit is tailored to be of particular assistance to persons who, like the Class members here, have been through bankruptcy and may be seeking to improve their credit scores.

In addition, all Class members, regardless of which benefit they choose to claim, can access the Settlement Website to receive information about Defendants' consumer relations and investigation processes to dispute any erroneous information on their credit reports. (Settlement Agreement § 3.2, Schedule 3.2(A).) This includes an offer of free legal assistance from Class Counsel with extensive expertise handling consumer credit issues. A link to the "Consumer Credit Reporting

Assistance" webpage was featured in the Settlement Notice, and as of November 24, 2017, this section of the website had already received 93,639 unique visits, and 71 Class members have requested assistance from Class Counsel. Class members who visited this section received information about (a) how to obtain free file disclosures; (b) how to read and understand credit reports; (c) the difference between a credit report and a credit score; (d) how to use settlement benefits to track credit ratings and monitor improvements; and (g) how to dispute inaccuracies in credit reports and make the most of Defendants' reinvestigation processes, as well as links to publications and advice from the Consumer Financial Protection Bureau and the National Consumer Law Center. (Settlement Agreement § 3.2, Schedule 3.2(A).)

### 3.  Notice and Claims Administration

Distributions from the Settlement Fund will be made to Class members who submitted valid claims by the November 13, 2017 deadline. The Settlement Administrator will first distribute the guaranteed amounts—$750 for denial of employment, $500 for denial of a mortgage or housing rental, or $150 for denial of other credit or payment of a discharged debt to obtain credit—to approved Actual Damage Claimants, paying each claimant the highest award for which he or she is eligible. (Settlement Agreement § 7.2(b).) After deduction of administrative and notice costs and amounts paid pursuant to any award of attorneys' fees and costs, the remaining amount will be available for pro rata distribution to the Convenience Award claimants. (*Id.* § 7.2(a).)

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 23(e) requires court approval of class action settlements, as well as notice of settlement to all class members. In deciding whether to grant approval, district courts must evaluate "whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Staton v. Boeing Co.*, 327 F.3d 938,

952 (9th Cir. 2003). To determine if a settlement is fair, some or all of the following factors should be considered: (1) the strength of Plaintiffs' case; (2) the risk, expense, complexity, and duration of further litigation; (3) the risk of maintaining class certification; (4) the amount of settlement; (5) the amount of investigation and discovery that preceded the settlement; (6) the experience and views of counsel; and (7) the reaction of class members to the proposed settlement. *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *Staton*, 327 F.3d at 959. The relative degree of importance attached to any particular factor depends on the nature of the claims advanced, the types of relief sought, and the unique facts and circumstances of each case. *Officers for Justice v. Civil Service Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). The ultimate decision to approve a class action settlement rests in the district court's sound discretion. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

## III.  DISCUSSION

### A.  Class Certification for the Purposes of Settlement

Where, as here, "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton*, 327 F.3d at 952. The first step in such cases is to assess whether a class exists. *Id.* (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). In its Preliminary Approval Order, (Dkt. 1067), the Court discussed the propriety of conditional class certification for the purposes of settlement. The Court sees no reason to depart from its previous conclusions regarding the existence of a proper settlement class. In lieu of rehashing this analysis, the Court incorporates its class certification findings from the Preliminary Approval Order into the instant Order.

**B. Settlement Approval**

The Court turns next turns to the propriety of the Settlement. The relevant factors weigh in favor of granting the Motion for Final Approval and indicate that, on the whole, the Settlement is fair, reasonable, and adequate to the class.

**1. Strength of Plaintiffs' Case and the Risk, Expense, and Complexity and Duration of Further Litigation.**

Unlike protracted litigation with an uncertain outcome, the Settlement provides Class members with prompt and efficient relief, enabling them to avoid the risks of going to trial. The factual and legal issues in this action are complex, and the trial of Plaintiffs' claims under the FCRA and related state laws would require substantial preparation and ultimately the presentation of dozens of witnesses and numerous experts. The Defendants deny that they willfully or negligently violated the FCRA or related state laws and contend that they did not report "inaccurate information" within the meaning of 15 U.S.C. § 1681e(b). *See Biggs v. Experian Info. Sols., Inc.*, 209 F. Supp. 3d 1142, 1145 (N.D. Cal. 2016 ("The FCRA does not prohibit the accurate reporting of debts that were delinquent during the pendency of a bankruptcy action, even after those debts have been discharged, so long as the bankruptcy discharge is also reported if and when it occurs."); *In re Flint*, 557 B.R. 461, 466 (N.D. W. Va. 2016) (holding that "although a debtor's debt may be personally discharged in bankruptcy, the underlying debt is not extinguished") (citing *U.S. v. Alfano*, 34 F. Supp. 2d 827, 841 (E.D.N.Y. 1999)).  The Court does not here decide the validity of this defense, but notes that Defendants' arguments merit serious consideration and that, in light of them, the outcome of a trial is uncertain.

If this case were to proceed, Plaintiffs would also be required to prove that Defendants acted willfully in violating the FCRA. 15 U.S.C. § 1681n(a). Defendants

have argued that, even if their interpretation of the law was incorrect, it was not "objectively unreasonable" in light of the statutory text and relevant court and regulatory guidance. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47, 59–60 (2007); *see also Banga v. First USA, NA*, 29 F. Supp. 3d 1270, 1278 (N.D. Cal. 2014) (plaintiff must prove that the defendant's interpretation of the FCRA is "objectively unreasonable"). Because this is a complex legal and factual issue raising matters of first impression, including whether the FCRA requires a CRA to cross-check information they receive from creditors with public records of bankruptcy discharges, proving willfulness would present a significant challenge.[3] Furthermore, even if the Class were successful in winning at trial, proceeding to trial would add years to the resolution of this case and could be further delayed by appeals.

### 2. Risk of Maintaining Class Certification

Were this case to proceed, the Class also faces a significant risk that the Class might not be certified, or that class certification might not be maintained through trial. At the hearing on class certification on January 26, 2009, the Court issued a tentative opinion denying Plaintiffs' Motion for Class Certification. (Dkt. 369.) The Court notes that in the intervening 8 years since that ruling, the climate for class actions has generally become less favorable. Trial of this case as a class action would pose significant manageability issues which, while they do not prevent certification for settlement purposes, could be a real threat to the Class receiving any recovery if these claims had to be tried to a jury. The very real risk that a class might not be

#########################################################

[3] Defendants have also argued that Class members did not suffer "concrete" injuries sufficient for standing within the meaning of Article III under the U.S. Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). The Court finds that the Named Plaintiffs have standing, because, *inter alia*, they have alleged and offered evidence that their credit ratings were adversely affected and that they were denied credit opportunities, or received less advantageous rates for the credit opportunities they did receive, as a result of Defendants' inaccurate reporting. (*See* Dkt. 49 ¶¶ 25–36, Dkt. 941 ¶ 6.) There is nevertheless a risk that issues regarding standing could raise additional manageability concerns, which further supports the reasonableness of settlement.

certified or that class certification might not be maintained through trial therefore strongly supports Settlement approval.

### 3.  Amount of Settlement

This Settlement provides relief for all Class members who have had a credit report issued by a Defendant that contained alleged errors regarding debts discharged in bankruptcy. The Settlement benefits have been revised since the 2009 Proposed Settlement in important ways, tailoring the relief to the Class and making this Settlement a significant improvement for the Class. The Class will benefit from approximately $38.7 million in non-reversionary monetary benefits as well as significant non-monetary benefits. Just in strictly monetary terms, this remains the second-largest settlement in FCRA history, which in itself weighs strongly in favor of approval of this Settlement, particularly in light of the FCRA's goal of awarding statutory damages to deter offenders from improperly reporting consumers' credit history. *See Holloway v. Full Spectrum Lending*, 2007 U.S. Dist. LEXIS 59934, at *15 (C.D. Cal. June 26, 2007) ("the determination of statutory damages, which range from $100 to $1,000 per violation, need not be determined on an individual basis, but rather can be determined based upon Defendant's conduct in the aggregate"). Given the FCRA's goal of deterring offenders from improperly reporting credit, the detriment that the Settlement imposes on Defendants ought to be considered alongside the benefit that the Settlement confers on the class members.

The addition of the non-monetary relief and adjustments made to improve the claims process, tailor the relief to the Class, and deliver benefits to over 200,000 more Class members make this Settlement better than the 2009 Proposed Settlement, which was itself fair, reasonable, and adequate. The benefits to be delivered include 3,340 new verified Actual Damage Award claims—22% more than under the 2009 Proposed Settlement—for a total of 18,669 Actual Damage Awards. (Dkt. 1105 ¶¶

28–29.) Despite the increase in the number of claims, these claims will all be paid at the full amount claimants would have received under the 2009 Proposed Settlement: $750 for denial of employment claims; $500 for denial of housing claims; and $150 for denial of other credit claims. The benefits to be delivered also include 163,397 new, approved Convenience Award claims—22% more than under the 2009 Proposed Settlement—for a total of 917,404 approved Convenience Award Claims, which will also be paid at levels comparable to what was estimated under the 2009 Proposed Settlement. (*Id.*) In addition, 53,064 Class members have claimed the free file disclosure and credit scores, a new benefit not available under the 2009 Proposed Settlement, which can be utilized for two years after the Settlement's Effective Date. (*Id.*) Overall, this Settlement will deliver claimed benefits to 989,137 approved claimants (excluding the estimated 200,000 visits to the CCRA website), which is 28.6% more claims than were approved under the 2009 Proposed Settlement.

Regarding the non-monetary relief, the almost 100,000 Class members who have already visited the CCRA section of the Settlement Website derived a meaningful benefit, which the Court conservatively values at $10.00 per Class member visit. Certainly some Class members will derive a benefit from the CCRA website far greater than this amount—which comes at no cost to Class members and which will remain available to Class members through the Settlement's Effective Date, but in any event at least through December 13, 2019. 15,335,681 notices were sent to Class members advising that all of them are entitled to access the CCRA website at no charge. Leading industry expert John Ulzheimer characterized the CCRA website as containing "a wealth of important and accurate information," (Dkt. 1111 ¶ 14), and observed that it is "unique in its breadth and provenance. (*Id.* ¶ 17.) He also noted that the fact that "the CCRA content has been vetted for accuracy by the three [CRAs] ensures that consumers are getting accurate

information" and that the website enables Class members "to obtain legal assistance to challenge the accuracy of [their] credit reports by leveraging the experience of Class counsel." (*Id.* ¶¶ 15, 17.) The CCRA website contains useful information for Class members concerning credit reporting, credit scoring, and consumer rights and, significantly, also allows Class members to seek credit reporting assistance directly from Class Counsel. Based on Class Counsel's commitment at the Final Approval Hearing that this website will remain active at least through the end of 2019, the Court estimates approximately another 100,000 or more Class members will benefit from it.

Class members were also given the opportunity to choose, as an alternative to claiming a monetary award, additional non-monetary relief consisting of a free credit file disclosure and two free VantageScore credit scores. As shown in Mr. Ulzheimer's Declaration, "giving class members access to free scores is valuable in that it allows them to see the same or similar 'grades' that their respective lenders will see when performing the underwriting and risk assessment process." (Dkt. 1111 ¶ 21.) The free file disclosure and credit scores are provided to Class members without strings, which Mr. Ulzheimer notes is "unique" in today's environment. (*Id.* ¶ 22.) The Court finds that the value of the package of a free credit disclosure and two free credit scores, made available to all Class members who did not claim monetary awards, with no cap on the number of awards that may be claimed, is $19.95. (*Id.* ¶ 25.) This value also aligns with the roughly $20 Convenience Award that Class members turned down to instead accept the non-monetary relief, which suggests those Class members valued the credit file disclosure and credit scores at an amount greater than $20. All together, Class Counsel argue that the conservative value of the Non-Monetary Relief, including both the CCRA website and Non-

1   Monetary the package of a free file disclosure and two free credit scores,  is $1 dollar

2   per Class member on average, or $15 million total. (Dkt. 1096 at 9.)

3         These substantial non-monetary benefits are closely tied to the nature of the

4   claims and alleged harm in this litigation, as the Class members, having all

5   experienced a bankruptcy, are likely to benefit from information regarding how to

6   improve their credit scores and the tools offered to help them achieve and monitor

7   such improvement. For some Class members who chose to make use of the website

8   information and/or the free file disclosure and credit scores, these non-monetary

9   benefits will be far more valuable than a Convenience Award. It is especially notable

10  that Class Counsel have achieved this improved Settlement despite some intervening

11  caselaw decisions favorable to Defendants' positions and a generally less favorable

12  climate for class actions, showing their skill and persistence.

13        In addition, it is notable that this Settlement eliminates any requirement that

14  Class members attest to knowledge of an error in their credit reports in order to claim

15  a Convenience Award or Non-Monetary benefit, eliminating any possible chilling

16  effect such a requirement might have had. The new notice and claims process

17  provided a significant benefit to the class, allowing over 200,000 more Class

18  members to claim relief. The notice and claims review was conducted efficiently at

19  a cost of approximately $6 million (including future estimated costs for completing

20  the administration and delivering claimed benefits), approximately $2.5 million less

21  than the projected total notice and administration cost of the 2009 Proposed

22  Settlement,[4] despite intervening increases in postage rates and general inflation. In

23  addition, the notice and claims costs incurred in connection with the 2009 Proposed

24  ####################################################

25  [4] About $7.65 million in notice and settlement administration costs were expended
    in connection with the 2009 Proposed Settlement. Had that settlement become final,

26  it was estimated that up to an additional $1 million would have been spent
    distributing the more than 15,000 actual damage awards and the more than 750,000

27  convenience awards.

28

Settlement were extremely valuable. They generated 754,007 Convenience Award claims, 15,329 Actual Damage Award claims, and 1,663 opt outs. These claims and opt outs are being honored, and the costs associated with processing and validating them need not be repeated. Overall, this Settlement is an excellent result for the Class, strongly supporting Settlement approval.

### 4. Investigation and Discovery

In order to achieve this Settlement, Class Counsel took substantial discovery, allowing a full development of the factual issues in dispute. Prior to the 2009 Proposed Settlement, Class Counsel undertook substantial investigation, fact-gathering, and formal discovery (including review of tens of thousands of pages of documents, retention and consultation of numerous experts in the fields of credit reporting and consumer bankruptcies, interviews with numerous consumers, review of thousands of consumer credit reports, and numerous depositions), as well as significant motion practice and other litigation. Plaintiffs took or defended forty depositions, produced over 50,000 pages of documents, and reviewed over 40,000 pages of documents produced by the Defendants. Class Counsel also retained several experts who have filed numerous declarations with the Court and engaged in extensive motion practice, including briefing and arguing a motion for summary judgment.

Further demonstrating that this Settlement is the product of vigorous, well-informed advocacy, it was achieved only after multiple intensive, arm's-length negotiations before experienced mediators. *See* 4 Newberg § 11.43 (explaining that in approving settlements, courts should consider the presence of good faith and the absence of collusion on the part of settling parties). Leading up to the 2009 Proposed Settlement, the parties conducted extensive arms-length and contentious negotiations during the course of a lengthy and complicated mediation with the Hon.

Lourdes Baird (Ret.) and with Randall Wulff. The parties participated in seven full days of mediation with the participation of Judge Baird, as well as numerous telephonic conferences with Judge Baird. The parties also participated in five in-person mediation sessions with mediator Randall Wulff, including a mandatory settlement conference at the Court on February 5, 2009.

And negotiations continued to be contentious after this case was remanded from the Ninth Circuit. The parties resumed settlement negotiations and attended a mediation with the Hon. Daniel Weinstein (Ret.) on August 25, 2016, but did not reach agreement. On September 19, 2016, Plaintiffs moved for leave to file a Third Amended Complaint to add two additional Class Representatives and two narrower, more focused subclasses. (Dkt. 1005.) On October 11, 2016, this Court tentatively denied Plaintiffs' motion and ordered the parties to appear for a settlement conference before the Hon. Dickran M. Tevrizian. (Dkt. 1021.) The parties reached an agreement and signed a term sheet on November 7, 2016. Over the next few months, the parties worked to document the detailed settlement language, finally executing the Settlement Agreement on April 14, 2017. The thorough investigation and discovery and numerous arm's-length mediations that informed this settlement support that it represents a fair and reasonable result for the Class. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999) (holding that "[o]ne may take a settlement amount as good evidence of the maximum available if one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arm's-length bargaining …").

**5.  Experience and Views of Counsel**

Class Counsel, which include highly experienced consumer class action practitioners and the most well-known and successful FCRA lawyers in the country, strongly endorse this settlement as an excellent result for the Class. "The

recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979); *see also M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987). Here, the fact that qualified and well-informed counsel endorse the Settlement as fair, reasonable, and adequate weighs heavily in favor of final approval. *See Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

### 6. Reaction of the Class Members to the Proposed Settlement

The small number of objections and requests to opt out of the Settlement, and the large number of claims filed, indicates a decisively positive response to the Settlement and supports its approval. Only three objections were filed, and two of these are from "serial objectors" with an extensive history of filing unsuccessful objections to class-action settlements. (Dkts. 1106, 1112.)[5] Notice of the settlement was given to all appropriate federal and state officials pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, on June 23, 2017. (Dkt. 1070.) Neither the Department of Justice nor any state Attorney General has objected to the Settlement. *See Browning v. Yahoo!, Inc.*, No. 04-cv-1463, 2007 WL 4105971, at *12 (N.D. Cal. Nov. 16, 2007) (holding that where governmental agencies were given notice of the settlement and did not object, factor weighed in favor of settlement).

---

[5] These "serial" objectors, Christine Swartz and Marcia and Jimmy Green, have failed to comply with the Notice requirement to list all class action settlements to which they and their counsel have objected during the past five years. (Dkt. 1109-6 at 7; Dkt. 1106 at 2; Dkt. 1112 at 2.) Because of their failure to follow the Court-approved procedure for filing objections, the Court strikes these Objections and finds that these objectors lack standing to challenge the Settlement on appeal or otherwise. To ensure that all potentially relevant arguments have been considered, however, the Court goes on to consider the points raised in these objections, (*see* Section III.C, *infra*), and overrules them on their merits.

As of November 24, 2017, the Settlement Administrator has received a total of 224,744 timely claim forms and approved a total of 18,669 Actual Damage Claims, 53,064 Non-Monetary Award Claims, and 917,404 Convenience Award Claims, including 15,329 Actual Damage Claims and 754,007 Convenience Award Claims that were submitted in connection with the 2009 Proposed Settlement, and which will be honored in this Settlement. (*See* Dkt. 1114-1 ¶¶ 15–16.) There have also already been 93,639 visits by Class members to the Consumer Credit Reporting Assistance website, which will continue to remain available through December 31, 2019, or, if later, the Effective Date. Even ignoring the number of Class members who have and are benefiting from the CCRA website, the number of new claims alone—collectively 28.6% more than approved under the 2009 Proposed Settlement—shows that the Settlement meets with approval from Class members and the claim forms were easy to understand and complete, and the notice program was effective and valuable to Class members. *See Marshall*, 550 F.2d at 1178; *Class Plaintiffs*, 955 F.2d at 1291–96 (upholding trial court's grant of final approval over Class member objections); *see also Boyd*, 485 F. Supp. at 622 (finding that objections from only 16% of the class was persuasive that the settlement was adequate).

## C. Objections

Further confirming the fairness, reasonableness, and adequacy of the Settlement, only three objections have been filed. (Dkts. 1106, 1007 & 1112.) *See Class Plaintiffs*, 955 F.2d at 1291–96; *see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.") Because one of the three objections is from the

White Objectors, and even though the White Objectors apparently had no involvement in negotiating this new settlement, it is still relevant to note that a settlement should not be rejected merely because certain named plaintiffs object. *Boyd*, 485 F. Supp. at 624; *Flinn*, 528 F.2d at 1174. Rather, in order to block a fairly negotiated settlement, the merits of the objections must be substantial. *Boyd*, 485 F. Supp. at 624. The Court evaluates each objection in turn.

### 1.  The amount of the Settlement is fair, reasonable, and adequate.

Objectors Marcia and Jimmy Green (the "Green Objectors"), Christine Swartz, and the White Objectors argue that the amount of the Settlement should be higher. The Green Objectors and the White Objectors argue that the recovery is only a small fraction of the total statutory damage recovery the Class could receive if it were to prevail on all of its claims at trial, which they estimate in the billions of dollars. (Dkt. 1107 at 10; Dkt. 1112 at 6–7.) The Court finds, however, that these Objections fail to adequately consider the risks that Plaintiffs face, including the risk that a class might not be certified or that class certification might not be maintained through trial, the risk that Plaintiffs might not prevail on their claims that Defendants' reports were inaccurate or that Defendants' conduct might not be found willful, and the risk that any aggregate statutory damage award could be reduced through remittitur. *See Murray v. GMAC Morg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("An award [under the FCRA] that would be unconstitutionally excessive may be reduced … after a class has been certified. Then a judge may evaluate the defendant's overall conduct and control its total exposure.") Plaintiffs were entitled to consider these risks in determining that settlement was appropriate. *See Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from collusion.") Courts must tread cautiously

when comparing the amount of a settlement to speculative figures regarding "what damages 'might have been won' had [plaintiffs] prevailed at trial." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Officers for Justice*, 688 F.2d at 625). Indeed, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." *Id.* (quoting *Officers for Justice*, 688 F.2d at 624). The Court therefore overrules these objections.

The White Objectors, the Green Objectors, and Objector Swartz also object that the amount of this Settlement is, they argue, lower than the 2009 Proposed Settlement. (Dkt. 1106 at 4; Dkt. 1107 at 3–4; Dkt. 1112 at 2–5.) As explained above, however, (*see supra* Section III. B. 3. the total value of this Settlement is in fact higher than the 2009 Proposed Settlement, taking into account both the cash fund and the uncapped Non-Monetary Relief made available to the Class. Furthermore, the awards each cash claimant will receive are comparable to what they were estimated to receive under the 2009 Proposed Settlement, and steps taken to tailor the relief to the Class, simplify the claims process, and deliver relief to more claimants make this Settlement more beneficial to the Class.

This Settlement protects the expectations of Claimants to the 2009 Proposed Settlement while expanding claimed benefits to over 200,000 more approved Claimants. Actual Damage Claimants will receive awards in the same dollar amount that they would have received under the 2009 Proposed Settlement, despite the fact that over 3,000 new Actual Damage Claimants have been approved. Convenience Award Claimants, including over 160,000 new Claimants who were not approved to receive awards under the 2009 Proposed Settlement, will also receive a distribution comparable to what they would have received under the 2009 Proposed Settlement. This is especially remarkable given that there were only 754,783 approved claimants in that settlement, and over 160,000 additional Convenience Award Claimants will

receive awards in this Settlement. In addition, over 50,000 Class members will receive Non-Monetary Awards valued at $19.95, and almost 100,000 have already visited the CCRA website, which will continue to be available at least through the end of 2019, benefiting another estimated 100,000 Class members. Overruling the White Objectors' and Objector Swartz's objections that the Non-Monetary Relief has little value, (*see* Dkt. 1106 at 5; Dkt. 1107 at 14), the Court finds that, as shown in John Ulzheimer's declaration, the Non-Monetary Relief has substantial value to the Class and offers information and assistance that Class members could not obtain elsewhere without paying fees, entering into agreements for services they might not want, or sharing their personal information with intrusive marketers. Overall, this Settlement is an improvement over the 2009 Proposed Settlement and is clearly fair.

### 2.  The Notice and administration expenses are reasonable.

The White Objectors and the Green Objectors argue that the notice and administration expenses are too high, contending that these expenses are duplicative of the costs incurred in connection with the 2009 Proposed Settlement and should have been paid by Class Counsel. (*See* Dkt. 1107 at 7; Dkt. 1112 at 10.) The Court finds, however, that the notice had significant value for the Class, resulting in over 200,000 newly approved claims—a 28% increase in the number of Class members who will receive claimed benefits—not including the almost 100,000 Class members who have visited the CCRA section of the Settlement Website thus far and the further 100,000 estimated visits expected through the end of 2019. (Dkt. 1114-1 at 3, 6). Furthermore, the notice and claims process is being conducted efficiently at a total cost of approximately $6 million, or $2.5 million less than the projected 2009 Proposed Settlement notice and claims process, despite intervening increases in postage rates and general inflation. In addition, the Court finds that the notice conducted in connection with the 2009 Proposed Settlement has significant ongoing

value to this Class, first in notifying in 2009 over 15 million Class members of their rights under the Fair Credit Reporting Act (the ignorance of which for most Class members was one area on which Class Counsel and White Objectors' counsel were in agreement), and because of the hundreds of thousands of claims submitted in response to that notice, and processed and validated by the claims administrator, which will be honored in this Settlement. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015) (holding that notice and administration costs benefit the Class members by providing them notice, due process, and "mak[ing] it possible to distribute a settlement award in a meaningful and significant way"). While crediting the full costs of both notice as benefits to the Class would be duplicative, the Court finds that $2.5 million of the 2009 Proposed Settlement notice costs may be credited as a benefit secured to the Class, bringing the total benefit to the Class from notice and administration expenses to $8.5 million, which was the estimated amount of notice and administrative costs under the 2009 Proposed Settlement .

### 3.  The Settlement treats Class members equitably.

The White Objectors raise a number of objections to the allocation of Settlement relief, including arguing that the Settlement unfairly favors Class members who can verify actual damages, (Dkt. 1107 at 15), that it unfairly favors those who can attest to inaccurate reporting, (Dkt. 1107 at 16), and that it unfairly disfavors those who have claims against multiple Defendants. (Dkt. 1107 at 18.) Regarding the larger awards to Claimants who provide documentation of actual damages, the Court finds that these awards are appropriate to compensate these Class members for the greater injuries they suffered. *See Andrade v. Chase Home Fin., L.L.C.*, No. 04-cv-8229, U.S. Dist. LEXIS 32799, at *20 (N.D. Ill. Dec. 12, 2005) (holding that evidence of actual damages is "quite meaningful" in determining

amount to award in statutory damages). Furthermore, these awards are appropriately calibrated to allow those with proof of a denial of employment the largest statutory damage award of $750, toward the top end of the $100–1,000 range, those denied a mortgage or housing rental a mid-range $500 award, and those denied other credit a $150 award, toward the low end of the statutory range. *See In re Broadcom Corp. Secs. Litig.*, No. SACV 01-275 DT, 2005 U.S. Dist. LEXIS 41976, *7 (C.D. Cal. 2005) ("[C]ourts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel."); *see also Glass v. UBS Fin. Servs.*, No. 06-cv-4068, 2007 U.S. Dist. LEXIS 8476, at *24–25 (N.D. Cal. Jan. 26, 2007) (rejecting objection to differential allocation among class members). Because these awards are appropriately calibrated to the harm suffered, the Court overrules these objections.

The Court also overrules White Objectors' argument that the Settlement "impermissibly favors individuals who can attest that they believe that they had a credit report issued by a Defendant that contained [debts] discharged in bankruptcy but were not reported as discharged in bankruptcy." (Dkt. 1107 at 15.) Neither Convenience Award Claimants nor those submitting claims for Non-Monetary Awards are required to make any attestation to submit a claim in this Settlement. (Dkt. 1107-9 at 6; Dkt. 1046 at 8–9.) This objection simply does not apply to the claim process provided by this Settlement. Moreover, while an attestation requirement existed for Convenience Award claims made pursuant to the 2009 Proposed Settlement, those claimants were not "favored," as the White Objectors suggest, particularly given that the entire Class had the option to submit such claims without any attestation requirement in response to the notice of this Settlement.

Third, the Court has already correctly rejected the White Objectors' argument, which they advanced against the 2009 Proposed Settlement, that Class members

whose reports were issued by multiple CRAs should receive more compensation than those whose reports were issued by a single CRA. (Dkt. 1107 at 18; *see* Dkt. 837 at 28.) Because having had reports ordered from multiple CRAs is not tied to any increased actual harm, the Settlement properly does not grant Class members any increased compensation on this basis. Because the Settlement's allocation of claims is appropriately tied to the actual harm suffered by Class members, the Court overrules these objections.

### 4.  The Settlement does not certify an actual damages class.

The White Objectors argue that certification of actual damage claims is improper because individual causation issues predominate over common questions regarding such claims. (Dkt. 1107 at 16–17.) As the Court has previously explained, however, allocating statutory damage awards fairly in accordance with the harm suffered does not transform the class from a statutory damages class into an actual damages class. (*See* Dkt. 837 at 31.) Plaintiffs were entitled to forego their actual damages claims in order to achieve class certification more readily on their statutory damages claims, so long as class members with substantial actual injuries were provided an opportunity to opt out of the class and pursue individual claims. *Murray*, 434 F.3d at 953. In addition, that the Settlement provides Defendants with a release for all claims arising from the facts in this case (including actual damages claims) is standard in class actions where, as here, Rule 23(b)(3) notice and opt-out rights are provided. *See, e.g.*, *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 142–43 (W.D. Ky. 1992) (approving settlement release of "any and all claims for any and all types of damages" and concluding that "[i]t is common for a class action settlement agreement to contain a release of "any and all related civil claims the plaintiffs had against the settling defendant[] based on the same facts"). Neither the standard scope of the release here, nor the fact that the allocation of monetary

benefits under the Settlement is designed to provide larger statutory damage payments to Class members who can show actual damages transforms the nature of the class certification order sought by Plaintiffs and granted by the Court. The Court therefore overrules this objection.

### 5.  The Settlement Notice was proper.

The Green Objectors and the White Objectors object to the form of the Court-Approved Notice. Regarding the Green Objectors' argument that the notice fails to advise the Class members of the magnitude of the claims being compromised, (Dkt. 1112 at 7), the Court finds that speculation regarding maximum theoretical potential recoveries is not necessary and in general is not included in class notices. The Notice properly advised Class members that they would give up the right to bring any suit for the claims raised in this case if they did not opt out and referred Class members to the Settlement Website for additional information about the claims in the case. The FAQs and detailed notice available on the Settlement Website explain the release in further detail and also refer Class members to the Settlement Agreement (a copy of which can also be viewed on the Settlement Website), which contains the full release terms. The White Objectors argument that the claim form does not adequately explain the criteria used for evaluating claims, (Dkt. 1107 at 13 n.9), is also incorrect. The claim form and the additional information available on the Settlement Website both describe the available claim types and the respective information requirements for submitting claims. The Court therefore overrules these objections.

**6. The Settlement and requested attorneys' fees appropriately protect the Class from being penalized for the 2009 Proposed Settlement having been overturned.**

White Objectors object that Class Counsel's fee request breaks a purported commitment that they argue Class Counsel made to pay any notice costs associated with this Settlement out of their attorneys' fees. (Dkt. 1123 at 1–3.) The Court has reviewed the hearing transcripts and finds that this is not an accurate characterization of the commitments made by Class Counsel. Rather, Class Counsel's commitments were (1) Class Counsel would deduct the costs of a supplemental notice conducted in connection with the 2009 Proposed Settlement, which totaled $567,284.91, from their fees, (*see* July 26, 2013 Hr'g Tr. at 28–29); (2) if a new Settlement were not reached, Class Counsel would cover any costs of re-notice to inform the Class that, in the absence of settlement, Plaintiffs planned to go forward with litigation, (August 14, 2013 Hr'g Tr. at 180–81; *see* Dkt. 956 at 19), and (3) Class Counsel would protect the Class from being penalized for the 2009 Proposed Settlement having been overturned. (*See* July 26, 2013 Hr'g Tr. at 28–29; August 14, 2013 Hr'g Tr. at 136–37.)

Regarding the first commitment, Class Counsel proposed at the Final Approval hearing to deduct the supplemental notice costs from their fees, reducing their fee request by $567,284.91. The second commitment is not relevant, because a new settlement was reached. Regarding the third commitment, the structure of this Settlement ensures that, far from being penalized, the Class will benefit from an improved Settlement. (*See supra* Section III. B. 3. However, the Court notes that this third commitment may have created some ambiguity and difference of opinion in terms of whether Class Counsel was required to pay the costs of re-noticing the Class. In the eyes of the White Objectors, the current Settlement is worse than the 2009 Proposed Settlement, and thus they believe the Class will be penalized if Class

Counsel does not pay the notice costs out of their attorneys' fees. If the White Objectors were right that this settlement is worse, then Class Counsel might be required to cover the notice costs in order to keep their promise not to penalize the Class for the previous mistakes of Class Counsel. In Class Counsel's view, however, the Class is not being penalized, because the instant settlement has additional nonmonetary value and has been improved in various other ways. Moreover, Class Counsel claims that both the Actual Damage Awards and Convenience Awards under the current Settlement will be in the same range as they would have been in the 2009 Proposed Settlement, and Class Counsel committed to ensuring that would be the case so as not to penalize the Class for the 2009 Proposed Settlement having been overturned. (May 30, 2017 Hr'g Tr. at 29:13–18 ("I'll represent to the Court the convenience awards, if they're not in the represented range, if for some reason it's not going to be achievable at 15 to $20, then we would expect—and by "we," again, I mean plaintiffs' counsel—we would expect the Court to address that with our attorneys' fees.").) Thus, upon a review of the record, the Court does not believe that Class Counsel has failed to follow through on one of its prior promises. For the foregoing reasons, Class Counsel have fulfilled their commitments to the Class.

White Objectors mischaracterize Class Counsel's statements at the July 26, 2013 status conference, where Class Counsel stated that, if the Settlement otherwise remained unchanged, approximately $6.5–7 million in new money would be needed to replace the value that had been spent on notice and other costs in connection with the 2009 Proposed Settlement. (*Id.* at 29.) Class Counsel went on to observe that there were "several sources" for restoring that value to the Class as part of a new, improved settlement.[6] First, the Defendants could contribute additional value;

###############################################

[6] The Court further notes that the July 23, 2016 status conference was framed as a non-dispositive day to discuss various topics, including how much settlement value had been lost. (*See* December 11, 2017 Hr'g Tr. at 44:6–45:16, 46:22–48:15.)

second, notice costs could be reduced; and third, attorneys' fees could be reduced. Regarding a reduction in attorneys' fees, Class Counsel stated "that's certainly a possibility." (*Id.*) Then, at the later hearing on appointment of Rule 23(g) Counsel, Class Counsel stated:

> We'd always like to have a better settlement. We would always like to have a bigger settlement. That's what we do. That's how we achieve success. If we can get a bigger settlement or a better settlement, we will. If we decide, however, that settlement is in the best interest of the class, and because of the current state of the law, or whatever, and we can't get additional money, then what I'm telling you is, Your Honor, we will not penalize the court – class. And if that means we will reduce our attorneys' fees, then we will do so.

(August 14, 2013 Hr'g Tr. at 137:5–14.) Class Counsel have honored this commitment not to penalize the Class by ensuring that Actual Damage Claimants will receive awards in the same dollar amounts as would have been paid under the 2009 Proposed Settlement and by making clear from their initial fee application that they did not request any fee that would result in insufficient amounts remaining in the Convenience Award Fund to issue Convenience Awards comparable to what Class members were estimated to receive under the 2009 Proposed Settlement. (Dkt. 1096 at 21 ("Class Counsel's requested fee here is based on claims data to date, with two weeks remaining in the claims period. Should additional claims submitted by the final claims deadline result in more funds than expected being required to satisfy approved claims, Class Counsel will revise their fee request downward in advance of the final approval hearing in order to ensure that sufficient funds remain available to pay claims.")

Continuing to protect the Class's interests and ensure that Class members are not penalized for the 2009 Proposed Settlement having been reversed, when final claims numbers proved higher than anticipated, Class Counsel offered to delay any

payment of attorneys' fees until it could be assured that Convenience Award Claimants would receive at least $20 each, at the top of the range estimated in the Court-approved Notice and similar to the awards originally estimated in the 2009 Proposed Settlement. (Dkt. 1118 at 9.) Thus, Class Counsel has consistently calibrated their fee request to ensure that the Class members would receive benefits comparable to what they were estimated to receive under the 2009 Proposed Settlement, fulfilling their commitment that the Class would not be penalized.

In addition, the new value secured on behalf of the Class in the form of Defendants' new $1 million cash contribution, the new Non-Monetary Relief, and the effective, efficient notice and claims process (conducted for an estimated $6 million, as opposed to $8.5 million in the 2009 Proposed Settlement), ensured that the Class's interests were protected. Because the value of the non-cash components of this Settlement together with the cash benefits exceed the value of the 2009 Proposed Settlement, the Class members have not been penalized, but have benefited further from this new Settlement. As Class Counsel explained at the August 14, 2013 Hearing, Class Counsel's commitment not to "penalize" the Class meant that the amount provided to the Class would never be less than under the 2009 Proposed Settlement.[7] Setting aside the qualitative improvements in the settlement (e.g., the ways that the nonmonetary relief is better tailored to the needs of the class and

_____

[7] Class Counsel envisioned "three possibilities" for a potential future settlement at that hearing. (August 14, 2013 Hr'g Tr. at 181–82.) These possibilities included (1) "the defendants will increase the amount of funds available to pay for the new notice so that the net to the class will be no less than it would have been under the original proposed settlement"; (2) Class Counsel would reduce their fee request to accommodate that notice"; and (3) "the parties would agree to share that." (*Id*. at 181:18–182:1.) Among these possibilities, which Class Counsel admitted were "somewhat speculative," (*id*. at 182 3–4), Class Counsel did not consider a fourth possibility, which eventually occurred, which was that Defendants agreed to provide additional value to the Class through non-monetary benefits. As explained above, these non-monetary benefits and other improvements to the Settlement terms ensure that this Settlement is more valuable to the Class, fulfilling Class Counsel's commitment.

Case No. 8:05-cv-01070                                    – 30 –

improvements to the claims process), the net value to the class under this Settlement, including the Court's conservative assessment of the value of the non-monetary relief, together with the contributions made by a reduction in Class Counsel's attorneys fees, will result in a monetary benefit to the class greater than that under the 2009 Proposed Settlement. (*See infra* Section III.D.)

Plaintiffs' expert, John Ulzheimer, estimates the value of the package of a free credit report and two free credit scores, made available to all Class members who did not choose to claim another benefit, at $19.95. (Dkt. 1111 ¶ 25.) Based on this evidence, Class Counsel argued that it could have defended a settlement valuation in excess of $200 million under Ninth Circuit law that settlements must be valued based on the total value made available to the Class. *See Williams v. MGM-Pathe Communs. Co.*, 129 F.3d 1026, 1026–27 (9th Cir. 1997) (holding that it was an abuse of discretion for a district court to award fees based on the value of claims made under a settlement, rather than the amount made available) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-81 (1980)); *see also Rainbow Bus. Sols. v. MBF Leasing LLC*, No. 10-CV-01993-CW, 2017 WL 6017844, at *2 (N.D. Cal. Dec. 5, 2017) ("Fairness of the fee should be determined by the amount made available to the class, not the amount actually paid in claims."); *Ellsworth v. U.S. Bank, N.A.*, 2015 WL 12952698, at *4 (N.D. Cal. Sept. 24, 2015) ("precedent requires courts to award class counsel fees based on the total benefits being made available to class members rather than the actual amount that is ultimately claimed"); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, *11 (N.D. Cal. Apr. 3, 2009) ("The appropriate measure of the fee amount is against the potential amount available to the class, not a lesser amount reflecting the amount actually claimed by the members."); *Miller v. Ghirardelli Chocolate Co.*, 2015 WL 758094, at *5 (N.D. Cal. Feb. 20, 2015) (same); *Miller v. Sw. Airlines Co.*, 2014 WL 11369764, at *2 (N.D. Cal. Mar. 21,

2014) (same). However, *Williams* only dealt with fees based on the total *cash* amount available in the common fund—none of Class Counsel's cited cases directly suggests that a nonmonetary benefit like the one at issue here, particularly one that is available only as an *alternative* to a monetary benefit, should be valued based on its purported availability to all 15 million plus class members.

Thus, Class Counsel instead conservatively valued the new Non-Monetary Relief at an average of $1 per Class member, or $15 million in total, including both the Non-Monetary Award package and the information provided on the CCRA website. (Dkt. 1096 at 9.) Even based on this more conservative valuation, Class Counsel requested only 21% of the value secured for the Class in attorneys' fees, less than the Ninth Circuit's 25% benchmark. (*Id.*) Furthermore, Class Counsel excluded over $5.4 million in time and expenses incurred from April 1, 2009 to May 1, 2013, from their fee request, the period of conflict identified by the Ninth Circuit, despite the fact that Ninth Circuit precedent allows district courts discretion to award fees for work performed during a period of conflict. (Dkt. 1097-3); *Rodriguez v. Disner*, 688 F.3d 645, 657–58 (9th Cir. 2012) (holding that district court "could have reasonably concluded" that conflicted counsel was entitled to fees). At each step, Class Counsel could have justified a far higher fee request if this had been a new settlement written on a blank slate, but chose instead to calibrate their fee request consistent with their commitment that the Class would receive the same or better relief under this Settlement. The Court therefore overrules this objection.

### 7.  Class Counsel's interests are aligned with those of the Class.

The Court also rejects White Objectors' argument that Class Counsel's interests conflict with those of the Class. First, White Objectors argue that a conflict exists because Class Counsel has an interest in obtaining a higher fee award, and avoiding payment of notice and administrative costs, which conflicts with the

Class's interests in receiving the largest possible claims awards. (Dkt. 1107 at 2.) As an initial matter, the Court notes that there is an inherent tension between attorneys' interests and their clients' in any matter regarding fees. *See In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994) ("Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs.") Because court review of fee awards in class actions pursuant to the Rule 23 approval process appropriately protects the Class, this inherent tension does not create an ethical conflict, much less a disqualifying one.

The Court also rejects White Objectors' argument that Class Counsel is conflicted because Class Counsel supposedly had an interest in reaching a settlement similar to the 2009 Proposed Settlement and did not have an incentive to litigate the case to trial. Not only did Class Counsel have the incentive to do so, they actually did litigate aggressively, moving for leave to file an amended Complaint and proposing a schedule for class certification and trial. (Dkts. 1005, 1027.) Far from simply "keeping the settlement the same," as the White Objectors argue Class Counsel had an incentive to do, Class Counsel fought hard to secure additional relief for the Class. With the addition of new counsel having no connection to the prior conflict, Class Counsel even walked away from one unsuccessful mediation and continued to litigate until a second mediation ultimately secured a better Settlement for the Class. (Dkt. 1097 ¶ 22.) Because Class Counsel's interests are aligned with those of the Class, the Court overrules these objections.

### 8.  Class Counsel's lodestar calculation is proper and well supported.

Objector Swartz and the Green Objectors argue that Class Counsel's lodestar is not adequately supported and should be reduced. (Dkt. 1106 at 4–6, 8; Dkt. 1112 at 8.) First, they argue that the time Class Counsel have spent to secure this Settlement after the Ninth Circuit's *Radcliffe I* decision should not be included in the lodestar calculation. (Dkt. 1106 at 4–5; Dkt. 1112 at 8.) The Court finds, however, that the time Counsel have invested in this case since the Ninth Circuit's decision was reasonable, necessary, and beneficial to the Class. Because the conflict identified by the Ninth Circuit was not the result of bad faith or improper motives, (Dkt. 956 at 29), and terminated when the 2009 Proposed Settlement was vacated, no taint from the prior conflict carries over into the post-conflict period. Indeed, the Ninth Circuit held in *Rodriguez* that a district court was not required to deny class counsel all compensation for work performed even during the period when a conflict of interest existed. *Rodriguez v. Disner*, 688 F.3d 645, 657–58 (9th Cir. 2012) (holding that district court "could have reasonably concluded" that conflicted counsel was entitled to fees). Class Counsel here nevertheless have excluded all time and expenses from the period of conflict from their lodestar. (Dkt. 1096 at 12.) The Court overrules this objection.

The Court also overrules Objector Swartz's objection that Class Counsel should be required to submit their detailed time records. (Dkt. 1106 at 6, 8.) In moving for fees to be paid from a common fund, counsel is not required to submit detailed time records. Here, each of the Class Counsel firms submitted declarations including summaries breaking down the time expended by each individual timekeeper for whom compensation is sought. (Dkts. 1097–1103), and Class Counsel also submitted a lengthy discussion summarizing the extensive work they have performed in this case over the past several years. (Dkt. 1096 at 2–6, 13–14.)

The Court finds based on these submissions and its intimate knowledge of the history of this litigation and the work performed by Class Counsel, that the tasks performed and hours expended were reasonable. Further confirming the reasonableness of Class Counsel's lodestar submission, Professor Geoffrey Miller, a well-respected expert on attorneys' fees, reviewed Class Counsel's declarations and opined that "the reported hours are appropriate in light of the size and complexity of this case." (Dkt. 1110 ¶ 4.)

Third, the Court overrules the Green Objectors' objection that, in performing a lodestar cross-check, historical billing rates, rather than current rates, should be used. (Dkt. 1112 at 8.) Courts in this Circuit regularly apply current billing rates in evaluating fee requests in multi-year litigation to account for the delay in payment. *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994). Accounting for the delay in payment is particularly appropriate in this case, which has been pending for 12 years, because Class Counsel performed years of work in this case before the conflict arose and have further performed several years of additional work since the conflict was cured. Moreover, the Court notes that the fee awarded here represents an "inverse" or "fractional" multiplier on the time and expenses Class Counsel have expended, making the question of which billing rates are used immaterial to the results of the lodestar cross-check. A much higher multiplier (e.g., that which would apply if historical rates were used) could easily be justified by the work that Class Counsel have performed in achieving the Settlement.

**9. Approval of this Settlement has no bearing on the Court's long-decided and proper award of fees for achieving the Injunctive Relief Settlement.**

The Injunctive Relief Settlement was entered into in April 2008 and approved in August 2008, before the conflict later identified by the Ninth Circuit

arose. The Injunctive Relief Settlement was not challenged on appeal. *Radcliffe I*, 715 F.3d at 1162. Objector Swartz nevertheless objects to the Court's award, already issued years ago, of attorneys' fees for achieving the Injunctive Relief Settlement. (Dkts. 775, 839.) Objector Swartz disparages the Injunctive Relief Settlement as meriting no fee because it merely "requires Defendants to follow the law." (Dkt. 1106 at 7.) To the contrary, the Injunctive Relief Settlement included specific requirements that Defendants implement highly detailed practice changes, which changed the CRAs' default treatment of debts discharged in bankruptcy to ensure accurate reporting and prevent consumer harm. (Dkt. 228.) This Court found that the Injunctive Relief Settlement effected "groundbreaking changes to the credit reporting industry." (Dkt. 775 at 9.) And Plaintiffs' expert, John Ulzheimer, notes in his declaration in support of this Settlement that the Injunctive Relief continues to benefit consumers today. (Dkt. 1111 at 9 ("The retroactive and prospective reporting changes implemented by each of the major consumer credit reporting agencies (Equifax, Experian, and TransUnion) appears, from my vantage point, to have all but eliminated the inaccurate credit reporting of pre-bankruptcy, statutorily dischargeable debts as being 'due and owing' after the filing date of Chapter 7 bankruptcies.").) Because all of this valuable relief was secured and implemented before the conflict regarding the incentive award provision arose, the conflict later identified by the Ninth Circuit has no bearing on the value of any of the work performed by Class Counsel to secure injunctive relief. (*See* Dkt. 575 at 10 (allocating one-half of the time spent from the inception of the litigation to April 3, 2008 to obtaining injunctive relief).)

Contrary to Objector Swartz's argument, (*see* Dkt. 1106 at 7), the fact that Class Counsel's motion for Injunctive Relief Fees was brought later than the motion for approval of the Injunctive Relief Settlement itself, around the same time as the

Motions for Approval and Fees in connection with the Monetary Relief Settlement, in no way retroactively invalidates all of Class Counsel's work securing the Injunctive Relief Settlement. The time that Class Counsel allocated to the Injunctive Relief Settlement, and which this Court compensated Counsel for in awarding Injunctive Relief Fees, was incurred long before the conflict arose, prior to April 2009. (Dkt. 575 at 10; Dkt. 575-3 at 12; 575-4 at 22; 575-5 at 3–4; 575-6 at 10–11; 575-7 at 8–9; 575-9 at 4.) For all the reasons set forth in Plaintiffs' prior briefing and Declarations and in this Court's orders,[8] this time was reasonable, necessary, and greatly benefitted the Class, and the Court therefore overrules this objection.

### 10. The Class Representatives are adequate and entitled to service awards.

The Green Objectors argue that the Class Representatives who were part of the 2009 Proposed Settlement should be denied service awards. (Dkt. 1112 at 10.) Courts in the Ninth Circuit have repeatedly found service awards appropriate "to compensate class representatives for work done on behalf of the class [and] to make up for financial or reputational risk undertaken in bringing the action." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Here, service awards are justified to compensate all of the Class Representatives for the significant contributions they have made to achieve the excellent result secured for the Class.) This case in not like *Rodriguez*, where the conflict existed "from day one," because the class representatives signed original retainer agreements which included "incentive agreements." *Rodriguez*, 563 F.3d at 959. Here, by contrast, the conflict identified by the Ninth Circuit did not arise until years into the litigation, well after the Class Representatives had committed significant time and effort on behalf of the Class. (Dkt. 952 ("[T]his conflict was brief and caused by a specific provision in a

###############################################

[8] Dkts. 573, 575; 575-3; 575-4; 575-4; 575-6; 575-7; 575-9; 775 & 839, incorporated here by reference.

now-defunct settlement" and was "less severe [than the conflict in *Rodriguez*] because it emerged on the eve of settlement").) Second, unlike in *Rodriguez*, the Class Representatives here committed additional time and effort to the litigation after the conflict was cured, which efforts helped achieve the Settlement. The Court declines the Green Objectors' invitation to punish some of the Class Representatives for a conflict that was limited in time and inadvertent.

The Green Objectors also argue that the common fund doctrine supposedly prohibits service awards entirely. (Dkt. 1112 at 10.) This is clearly at odds with decades of Ninth Circuit common fund case law. *See, e.g.*, *Rodriguez*, 563 F.3d at 958 (noting that service awards "are fairly typical in class action cases"). The lone authorities Green Objectors cite—two 19th Century cases that predate Rule 23 by nearly a century—considered which expenses individual creditor/litigants could recover from trust proceeds when their litigation generated benefits for the trust, and have no application to the class action context.   Court therefore overrules these objections and finds that the Class Representatives are adequate and entitled to service awards.

## D.  Attorneys' Fees and Expenses

The Court approves reasonable attorneys' fees to Class Counsel in the amount of $8,830,133.24, a $2,331,029.82 reduction below the fees originally requested, (*see* Dkt. 1096 at 23), and which the Court further reduces by $567,284.91 (representing Class Counsel's commitment to pay for the costs of the 2009 Supplemental Notice) for a total award of $8,262,848.33 million. Conservatively considering only relief actually delivered, not just made available, to the Class, this fee award (before refunding the $567,284.91 in Supplemental Notice costs to the Class) represents approximately 20.0% of the common fund, well below the Ninth

Circuit's 25% benchmark.[9] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–49 (9th Cir. 2002); *Hanson v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). The Court finds that this 5% fee reduction below the 25% benchmark, and adding $2,898,314.23 to the cash available for distribution to the Class, is appropriate given the full history and context of this Settlement.

In valuing the common fund for attorneys' fee purposes, the Court conservatively values the Non-Monetary relief at $3 million, including approximately 50,000 approved Non-Monetary Award claims, valued at $19.95 each, and approximately 200,000 visits to the CCRA Website (including estimated future visits through the end of 2019), valued at $10 each on average.[10] That $10 average valuation includes the access to free legal counsel provided by the website, which seems particularly valuable. The Court also includes $2.5 million in notice and administration costs incurred in connection with the 2009 Proposed Settlement in the common fund, finding that these expenditures had a substantial and non-duplicative benefit to the Class. Together with the approximately $37.7 million on

---

[9] As explained further below, for the purposes of attorneys' fees the Court values the common fund at $44,150,666.18 (which includes $38,650,666.18 in cash, $3 million in non-monetary value, and $2.5 million in benefit from the first round of notice and administration). Thus, 20% of $44,150,666.18 is $8,830,133.24. From this fee award, Class Counsel has agreed to return $567,284.91 in Supplemental Notice costs.

[10] The Court has chosen not to adopt Class Counsel's proposed valuation of the Non-Monetary Relief based on the total value made available to the Class. (See Dkt. 1096 at 9–10.) Although Class Counsel argues that Ninth Circuit precedent supports its valuation, see *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d at 1027, the cited case does not cover a settlement with a non-monetary benefit component. The Court believes that, particularly in the context of this Settlement, it is more appropriate to value the Settlement based on relief actually delivered to class members. *See* Fed. R. Civ. P. 23(h) committee note on 2003 amendment (" One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members."). It should be noted, however, that in declining to adopt Class Counsel's proposed valuation, the Court does not find that Class Counsel's valuation lacks a good-faith basis or that, in making the request, Class Counsel violated any duty to the Class.

Case No. 8:05-cv-01070                           – 39 –

deposit in the registry of the Court and the Defendants' new $1 million cash contribution, this creates a total common fund of approximately $44.2 million.

The Court further finds that, even conservatively valuing the Non-Monetary Benefits at $3 million, this Settlement will provide a net amount delivered to the to the Class that is higher than would have been provided under the 2009 Proposed Settlement. Under that Settlement, Actual Damage Claimants would have received approximately $5.5 million, and the Convenience Award Fund would have been approximately $20 million, for a total estimated amount of $25.5 million in claimed benefits delivered to the Class. Here, the Actual Damage Awards will total $7.1 million, the Non-Monetary Benefits are conservatively valued at $3 million, and the initial proposed Convenience Award fund is $13.5 million. When the funds from the Court's decision to reduce attorneys' fees by a total of $2,898,314.23 are added to increase the Convenience Award Fund to approximately $16.4 million, these components total approximately $26.5 million in net direct benefits delivered to Class members, which is greater than the net monetary benefit projected under the 2009 Proposed Settlement.[11]

A lodestar cross-check further confirms that the awarded fee is reasonable. The Court has reviewed Class Counsel's lodestar and rates and finds that Class Counsel's collective lodestar attributable to this Settlement is $11,830,950.71 for work performed over more than 12 years of litigation. This lodestar figure does not include any hours expended during the period of conflict identified by the Ninth Circuit in *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013)

---

[11] In addition, the Court believes that those Class members taking advantage of the Non-Monetary Benefits offered by this Settlement (including the opportunity to seek legal assistance directly from Class Counsel,  an opportunity which 71 class members have already exercised) will potentially receive a value greater than that offered by the convenience award opportunity, which would have been their only option under the 2009 Proposed Settlement.

("*Radcliffe I*"), from April 1, 2009 to May 1, 2013. Nor does it include any time that has been allocated to the Injunctive Relief Settlement in this action.

Class Counsel shall be separately compensated for time spent obtaining Injunctive Relief according to the Court's Injunctive Relief Fee Order, which the Court hereby reaffirms. (Dkts. 775, 839.) The Court incorporates by reference its previous Orders and finds, for the reasons set forth in the Orders and in the briefing and declarations submitted in support of Class Counsel's Motion for Injunctive Relief Fees, (*see* Dkts. 573, 575, 575-3, 575-4, 575-5, 575-6, 575-7, 575-9), that the awards of fees and expenses granted therein are reasonable.

Class Counsel's hourly rates are consistent with current market rates for complex class action legal services in this district and are accordingly reasonable in this matter, particularly in light of the fact that Class Counsel have extensive experience in consumer class actions, other complex cases, and Fair Credit Reporting Act ("FCRA") litigation. The Court also finds that the work performed was reasonable and necessary.

The fee awarded here represents an inverse multiplier of 0.75, reflecting that the fees awarded are less than the total time Class Counsel have expended in obtaining this Settlement. This lodestar cross-check confirms that the requested fee is reasonable, because the inverse multiplier is well below the multipliers typically approved in the Ninth Circuit. *See Steiner v. Am. Broad. Co.*, 248 Fed. Appx. 780, 783 (9th Cir. 2007) (common fund settlement with fee based on percentage of 24% held reasonable, and lodestar cross-check indicated a multiplier of approximately 6.85, which was well within the range of multipliers allowed in other cases); *see also Vizcaino*, 290 F.3d at 1051 n.6 (noting that a multiplier is frequently awarded in common fund cases when the lodestar method is applied and citing cases with multipliers ranging from 0.6 to 19.6, with most of the cases ranging from 1.0 to 4.0

and a bare majority of cases in the 1.5 to 3.0 range); *In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, No. 06-2069, 2011 WL 31266, at *7 (N.D. Cal. Jan. 5, 2011) (approving 1.4 multiplier as "warranted in view of the results counsel achieved for the class"); *Hopson v. Hanesbrands Inc.*, No. 08-cv-0844, 2009 WL 928133, at *12 (N.D. Cal. April 3, 2010) ("'[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'") (quoting *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 341 (3d Cir. 1998)). The fee awarded is more than reasonable given the fact that Class Counsel have expended their considerable time and resources in this litigation on a completely contingent basis, and given the complex nature of the issues involved. *See Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).

The Court further approves expenses to Class Counsel in the amount of $838,836.94. These expenses exclude any expenses incurred during the period of conflict identified by the Ninth Circuit in *Radcliffe I*, from April 1, 2009 to May 1, 2013 (roughly $200,00), and also exclude any expenses previously allocated to obtaining injunctive relief. (*See* Dkts. 775, 839.) The expenses are reasonable, and Class Counsel bore these out-of-pocket expenses over 12 years of litigation with no promise of reimbursement. Because these expenses were necessary in conjunction with this litigation and its resolution for the benefit of the Class, they are reimbursable. *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) (citing *Mills v. Electric Auto-Lite*, 396 U.S. 375, 391–92 (1970).

The Court approves a service award of $2,500 each to Class Representatives José Hernandez, Kathryn Pike, Robert Randall, Bertram Robison, and Lewis Mann. The Court finds that these amounts are reasonable in light of the Class Representatives' actions taken to protect the interests of the Class, the degree to

which the Class has benefited from the Class Representatives' actions, and the amount of time and effort the Class Representatives have expended in pursuing the litigation. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).

## IV. DISPOSITION

For the reasons set forth above, the Motion for Final Approval and Motion for Attorneys' Fees are GRANTED and the Settlement is hereby APPROVED.  It is therefore ORDERED that:

1.   The Court certifies, solely for purposes of effectuating the Settlement, the following Settlement Class:

All consumers who have received an order of discharge pursuant to Chapter 7 of the United States Bankruptcy Code and who, at any time between and including March 15, 2002 and May 11, 2009 (or, for California residents in the case of Trans Union, any time between and including May 12, 2001 and May 11, 2009), have been the subject of a Post-bankruptcy Credit Report issued by a Defendant in which one or more of the following appeared:

a. A Pre-bankruptcy Civil Judgment that was reported as outstanding (i.e. it was not reported as vacated, satisfied, paid, settled or discharged in bankruptcy) and without information sufficient to establish that it was, in fact, excluded from the bankruptcy discharge;

b. A Pre-bankruptcy Installment or Mortgage loan that was reported as delinquent or with a derogatory notation (other than "discharged in bankruptcy," "included in bankruptcy," or similar

description) and without information sufficient to establish that it was, in fact, excluded from the bankruptcy discharge; and/or

c. A Pre-bankruptcy Revolving Account that was reported as delinquent or with a derogatory notation (other than "discharged in bankruptcy," "included in bankruptcy" or similar description) and without information sufficient to establish that it was, in fact, excluded from the bankruptcy discharge; and/or

d. A Pre-bankruptcy Collection Account that remained in collection after the bankruptcy date.

2.   The Court dismisses with prejudice all Released Claims belonging to the Class Representatives and Class members who did not timely and validly request exclusion from the Settlement Class.

3.   Upon the Effective Date, Plaintiffs and Class members who did not timely and validly request exclusion from the Settlement Class, their respective spouses, heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors, and assigns and all those acting or purporting to act on their behalf acknowledge full satisfaction of, and shall be conclusively deemed to have fully, finally and forever settled, released, and discharged (i) Equifax and its present, former and future officers, directors, partners, employees, agents, attorneys, servants, heirs, administrators, executors, members, member entities, shareholders, predecessors, successors, affiliates (including, without limitation, CSC Credit Services, Inc.), subsidiaries, parents, representatives, trustees, principals, insurers, investors, vendors and assigns, individually, jointly and severally; (ii) Experian and its present, former and future officers, directors, partners, employees, agents, attorneys, servants, heirs, administrators, executors, members, member entities,

shareholders, predecessors, successors, affiliates, subsidiaries, parents, representatives, trustees, principals, insurers, investors, vendors and assigns, individually, jointly and severally; and (iii) TransUnion and its present, former and future officers, directors, partners, employees, agents, attorneys, servants, heirs, administrators, executors, members, member entities, shareholders, predecessors, successors, affiliates, subsidiaries, parents, representatives, trustees, principals, insurers, investors, vendors and assigns, individually, jointly and severally of and from any and all duties, obligations, demands, claims, actions, causes of action, suits, damages, rights or liabilities of any nature and description whatsoever, whether arising under local, state or federal law, whether by Constitution, statute (including, but not limited to, the FCRA and FCRA State Equivalents), tort, contract, common law or equity or otherwise, whether known or unknown, concealed or hidden, suspected or unsuspected, anticipated or unanticipated, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, fixed or contingent, that have been or could have been asserted in the Litigation based upon the Defendants' furnishing of consumer reports during the Class period based upon the fact or allegation that they contained false or misleading reporting of debts, accounts, judgments, or public records, or other obligations, that had been discharged in bankruptcy or their alleged failure to have properly reinvestigated such inaccuracies, by Plaintiffs or the 23(b)(3) Settlement Class Members or any of their respective heirs, spouses, executors, administrators, partners, attorneys, predecessors, successors, assigns, agents and/or representatives, and/or anyone acting or purporting to act on their behalf, except for any such claims that were the subject of pending litigation on November 7, 2016, against an unaffiliated vendor of any of the Defendants. Released Claims include, but are not limited to, all claimed or unclaimed compensatory damages, damages for emotional distress, actual

damages, statutory damages, consequential damages, incidental damages, treble damages, punitive and exemplary damages, as well as all claims for equitable, declaratory or injunctive relief under any federal or state statute or common law or other theory that was alleged or could have been alleged based on the facts forming the basis for the Litigation, including but not limited to any and all claims under deceptive or unfair practices statutes, or any other statute, regulation or judicial interpretation. Released Claims further include interest, costs and fees arising out of any of the claims asserted or that could have been asserted in the Litigation. Notwithstanding the foregoing, the Parties shall retail their respective rights and obligations under the Settlement Agreement.

4.   Class members were afforded a reasonable opportunity to request exclusion from the Settlement Class. Only 183 timely and valid requests for exclusion were received by the Settlement Administrator, and they are added to the 1,663 opt-out requests submitted in conjunction with the 2009 Proposed Settlement. The persons who timely requested exclusion from the Settlement Class are listed in Exhibit A hereto. The Court hereby excludes the persons listed in Exhibit A, as well as the 1,663 prior opt-outs, from the Settlement Class, and they are not bound by the final judgment in this consolidated case.

5.   If the Effective Date does not occur, this Judgment shall be void as provided in the Settlement Agreement.

6.   The Rule 23(b)(3) Settlement Class members were given an opportunity to object to the Settlement. Only three objections were received by the Court, from Christine Swartz, Marcia and Jimmy Green, and Robert Radcliffe, Chester Carter, Maria Falcon, Clifton Seale III, and Arnold E. Lovell. The Court finds that Christine Swartz and Marcia and Jimmy Green have not complied with the requirements in the Court-approved Notice for filing objections, and their objections are therefore

stricken. Furthermore, the Court overrules all of the objections. All Settlement Class members who failed to file a timely and valid objection to the Settlement are deemed to have waived any objections and are bound by the terms of the Settlement Agreement.

7.   This Order constitutes a judgment for purposes of Federal Rule of Civil Procedure 58. Without affecting the finality of this Final Order and Judgment in any way, the Court reserves continuing and exclusive jurisdiction over the parties, including all members of the Settlement Class, and the execution, consummation, administration, and enforcement of the terms of the Settlement Agreement.

8.   Within five (5) days of the Effective Date, each of the three Defendants, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union LLC, shall cause to be deposited into the Registry Account an amount equal to three hundred thirty-three thousand and three hundred thirty-three dollars and thirty-three cents ($333,333.33).

9.   Within ten (10) days of the Effective Date, the Parties shall jointly petition the Court to release funds from the Settlement Fund in the Registry of the Court to the Settlement Administrator in trust for distribution to the Claimants.

10. Within ten (10) days of the Effective Date, the Parties shall jointly petition the Court to release funds from the Settlement Fund in the Registry of the Court to the Settlement Administrator for payment of the service awards granted herein.

11. Within ten (10) days of the Effective Date, the Parties shall jointly petition the Court to release funds from the Settlement Fund in the Registry of the Court to the Settlement Administrator for payment of the Attorneys' Fees and Expenses granted in this Order. The Settlement Administrator shall then deposit the awarded attorneys' fees and expenses into the trust account of Caddell & Chapman, as Trustee

for Rule 23(b)(3) Settlement Class Counsel, to be distributed in accordance with this Court's Orders and any applicable agreements among counsel.

12. Within fifteen (15) days of the Effective Date, each of the three Defendants, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union LLC, shall deposit $2 million for payment of Injunctive Relief Fees and expenses into the trust account of Caddell & Chapman, as Trustee for Rule 23(b)(2) Settlement Class Counsel, to be distributed in accordance with this Court's Orders and any applicable agreements among counsel.

13. The parties to the Settlement Agreement are directed to consummate the Settlement in accordance with the Settlement Agreement according to its terms. Without further Court Order, the parties may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

IT IS SO ORDERED.

DATED:_____April 6, 2018_____        BY:_____*David O. Carter*_____

HON. DAVID O. CARTER
U.S. DISTRICT JUDGE